UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
PATRICIA CUMMINGS,

                                   Plaintiff,           Docket No. 19-cv-01664 (SJF) (SIL)

      -against-                            **VERIFIED COMPLAINT**

THE CITY OF NEW YORK;
NEW YORK CITY DEPARTMENT OF EDUCATION;     **Plaintiff Demands a**
CITY OF NEW YORK OFFICE OF SPECIAL            **Trial by Jury**
INVESTIGATIONS; NYC MAYOR BILL de BLASIO;
GIULIA COX; COURTNEY WARE; BEN CHAPMAN;
NEW YORK DAILY NEWS; DR. ANDRE PERRY;
THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA;
LENARD LARRY McKELVEY a/k/a
*CHARLAMAGNE THA GOD*;
WWPR-FM (105.1 MHZ); iHEARTMEDIA;
CLEAR CHANNEL COMMUNICATIONS, INC.;
NEW YORK STATE SENATOR, KEVIN S. PARKER;
COUNCILMAN, JUMAANE D. WILLIAMS;
COUNCILMAN, DANIEL DROMM;
COALITION OF EDUCATIONAL JUSTICE; ANGEL
MARTINEZ; NATASHA CAPERS; and
"JOHN DOE AND JANE DOE # 1-100" said names
being fictitious, it being the intent of Plaintiff
to designate any and all individuals, officers, members,
agents, servants, and/or employees of the
aforementioned agencies owing a duty of care to Plaintiff,
individually and jointly and severally,

                                Defendants

------------------------------------------------------------------------X

       Plaintiff, by her attorneys, the Law Offices of Thomas F. Liotti, LLC, for her Complaint

in this matter, respectfully alleges:

1

## JURISDICTION

1.      The jurisdiction of this action is based upon the United States Constitution and the Civil Rights Law, 42 U.S.C. §§1981, 1983, 1985(1)(2) and (3), 1988, the First, Second, Fourth, Fifth, Sixth, Seventh, Eighth and Fourteenth Amendments of the United States Constitution and those parts of the New York State Constitution which similarly apply with like language and together with this Court's pendent jurisdiction over causes of action arising under New York State laws, both common and statutory. Jurisdiction is founded upon 28 U.S.C. §§1331 and 28 U.S.C. §1343(a)(1)(2)(3) and (4), and the aforementioned Constitutional provisions and 42 U.S.C. ch. 126, §12101, and the Universal Declaration of Human Rights. Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising out of state law pursuant to 28 U.S.C. §§1367(a) and 1376(a).

2.      It is alleged that these Defendants have conspired together under color of the aforementioned New York State and Federal laws to deprive this Plaintiff of her civil rights. The actions perpetrated by these Defendants as herein described have abridged the privileges and immunities of the Plaintiff and have deprived her of life, liberty, property and the pursuit of happiness without due process of law; and have denied the Plaintiff the equal protection of the laws. It is further alleged that the actions of these Defendants have discriminated against the Plaintiff due to her race.

3.      The Plaintiff further alleges the jurisdiction of this Court pursuant to the Universal Declaration of Human Rights as adopted by the United Nations General Assembly on December 10, 1948 in which the United States of America is a party and in particular all articles therein.

4.    This Court has federal question jurisdiction, pursuant to 28 U.S.C. §1331, over claims arising under 42 U.S.C. §1983.

5.    Supplemental jurisdiction over the Plaintiff's state law claims exists pursuant to 28 U.S.C. §1367(a).

6.    Plaintiff has complied with the requirements of New York General Municipal Law Section 50-I by serving notices of claim on THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF EDUCATION; and CITY OF NEW YORK OFFICE OF SPECIAL INVESTIGATIONS, on September 26, 2018, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of those notices, and no offer of settlement has been made.

7.    At the request of The City of New York, the Plaintiff submitted to hearings pursuant to New York General Municipal Law Section 50-h involving the events as referred to hereinafter. No other hearings have been conducted.

## VENUE

8.    The Plaintiff commenced a civil action for the same relief as herein on January 10, 2019, in the Supreme Court in the County of Suffolk, where she resides.

9.    On February 19, 2019, Plaintiff's counsel received the City Defendants' Demand for a Complaint, and on that same date, received the City Defendant's a Demand for a Change of Venue from Suffolk County to New York County, *inter alia*, on the ground that Suffolk County is an improper county for venue. Plaintiff did not consent to the demand, and the City Defendants purchased an index number in New York County Supreme Court and

moved for a change of venue under CPLR §§§ 504(2) (3), and 511(a) and (b). The Plaintiff opposed said motion.

10.    On or about March 22, 2019, Plaintiff's counsel received a Notice of Removal to Federal Court from the Defendant, Daily News, transferring the case to the United States Eastern District of New York. The City Defendants along with other Defendants consented and agreed to the removal to the Eastern District of New York. Thereafter, on April 2, 2019, the Plaintiff's counsel was contacted by the City Defendant's counsel requesting consent to a further transfer the matter to the United States Southern District of New York; the Plaintiff refused to consent to the transfer to the United States Southern District of New York. This issue presented and fully briefed on letter motion, is still pending with this Court.

11.    The amount in controversy greatly exceeds the amount required to sustain subject matter jurisdiction in this Court.

12.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (a).

13.    This is an action for damages brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et. seq., 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the United States Constitution, Fourteenth Amendment.

14.    Based on the foregoing, this Court has subject matter jurisdiction and may exercise supplemental and pendant jurisdiction of all related state-law based claims.

### JURY DEMAND

15.    Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

**PARTIES**

16.     That at all times relevant herein and material hereto, the Plaintiff, PATRICIA CUMMINGS, ("Plaintiff" or "Ms. Cummings"), was and is a resident of the County of Suffolk, State of New York, and was employed with the Department of Education as a New York City Public School Teacher at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York.

17.     At all times relevant herein and material hereto, the Defendant, THE CITY OF NEW YORK, was and is a domestic municipal corporation located in and established pursuant to the laws of the State of New York.

18.     At all times relevant herein and material hereto, the Defendant, NEW YORK CITY DEPARTMENT OF EDUCATION, ("DOE"), was and is a public corporation created pursuant to the laws of the State of New York.

19.      At all times relevant herein and material hereto, the Defendant, CITY OF NEW YORK OFFICE OF SPECIAL INVESTIGATIONS, ("OSI") was and is an organization within the New York City Department of Education ("DOE") that investigates reports of incidents of inappropriate and unlawful behavior such as corporal punishment and verbal abuse against students in New York City Department of Education ("DOE") schools.

20.     At all times relevant herein and material hereto, the Defendant, NYC MAYOR BILL de BLASIO, was and is New York City's 109th Mayor; the head of the executive branch of the Government of New York City. The Mayor's office administers all city services, public property, police and fire protection, most public agencies, enforces all city and state laws within New York City, and has jurisdiction over all five boroughs of New York City:

5

Manhattan, Brooklyn, the Bronx, Staten Island and Queens. Furthermore, New York State Bill A40001 gave and extended mayoral control over the NYC Department of Education to Mayor Bill de Blasio

21.    At all times relevant herein and material hereto, the Defendant, GIULIA COX, was and is an individual, employed by the City of New York Department of Education as a Principal, at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York.

22.    At all times relevant herein and material hereto, the Defendant, COURTNEY WARE, was and is an individual, employed by the City of New York Department of Education as an Assistant Principal, at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York.

23.    At all times relevant herein and material hereto, the Defendant, BEN CHAPMAN, was and is an individual, employed by the Defendant, DAILY NEWS, L.P. s/h/a NEW YORK DAILY NEWS, as a news reporter, covering education and has written more than 2,000 articles about New York City schools for the Daily News since joining the newspaper in 2009.

24.    At all times relevant herein and material hereto, the Defendant, DAILY NEWS, LP s/h/a NEW YORK DAILY NEWS, was and is a Delaware limited partnership, with its principal place of business located at 450 West 33rd Street, New York, New York 10001.

25.    Upon information and belief, Defendant, DAILY NEWS, LP, at all times relevant herein and material hereto, was and is the owner, operator and publisher of the "Daily News," a New York daily newspaper ("Daily News").

26.     The Daily News has a daily circulation of hundreds of thousands of readers.

27.     In addition to its regular daily print edition, the Daily News publishes substantially the entire newspaper online at http://www.nydailynews.com.

28.     At all times relevant herein and material hereto, the Defendant, DR. ANDRE PERRY, was and is an individual education leader, author and advisor to people working to improve education in K-12 and postsecondary institutions.. He is the David M. Rubenstein Fellow in the Metropolitan Policy Program at the Brookings Institution, and his research focuses on race and structural inequality, education, and economic inclusion. Dr. Perry's recent scholarship at Brookings has analyzed majority-black places and institutions in America, focusing on highlighting valuable assets worthy of increased investment.

29.     Prior to his work at the Brookings Institution, Dr. Perry has been a founding dean, professor, award-winning journalist, and activist in the field of education. In 2015, Perry served on Louisiana Governor-elect John Bel Edward's K-12 education transition committee, as well as New Orleans Mayor-elect Mitch Landrieu's transition team as its co-chair for education in 2010.

30.     In 2013, Dr. Perry founded the College of Urban Education at Davenport University in Grand Rapids, MI. Preceding his stint in Michigan, he was an associate professor of educational leadership at the University of New Orleans and served as CEO of the Capital One-University of New Orleans Charter Network.

31.     Since 2013, Dr. Perry's column on educational equity has appeared in the Hechinger Report, a nonprofit news organization focused on producing in-depth education journalism. Dr. Perry also contributes to TheRoot.com and the Washington Post. His views,

7

opinions and educational leadership have been featured on CNN, PBS, National Public Radio, The New Republic and NBC. Dr. Perry's academic writings have concentrated on race, structural inequality, and urban schools.

32.    At all times relevant herein and material hereto, the Defendant, THE HECHINGER REPORT a/k/a HECHINGER INSTITUTE ON EDUCATION AND THE MEDIA, was and is a nonprofit independent news organization focused on inequality and innovation in education and producing in-depth education journalism.

33.    At all times relevant herein and material hereto, the Defendant, LENARD LARRY McKELVEY a/k/a *CHARLAMAGNE THA GOD,* was and is an individual American radio presenter, television personality, and author; known professionally as *Charlamagne tha God*; co-host of the nationally syndicated radio show The Breakfast Club with DJ Envy.

34.    At all times relevant herein and material hereto, the Defendant, WWPR-FM (105.1 MHZ), better known by its branding Power 105.1, was and is an Urban contemporary radio station licensed to New York City and is owned by iHeartMedia. The station is the flagship station of the nationally syndicated morning radio show, The Breakfast Club.

35.    At all times relevant herein and material hereto, the Defendant, iHEARTMEDIA, a/k/a iHEARTMEADIA, INC. was and is formerly CC Media Holdings, Inc., an American mass media corporation headquartered in San Antonio, Texas. It is the holding company of iHeartCommunications, Inc. (formerly Clear Channel Communications, Inc.), a leading global media and entertainment company specializing in radio, digital, mobile, social, live events and on-demand entertainment, which owns WWPR-FM (105.1 MHZ).

36.    At all times relevant herein and material hereto, the Defendant, CLEAR CHANNEL COMMUNICATIONS, INC., was and is a wholly owned subsidiary of CC Media Holdings, Inc. On September 16, 2014, CC Media Holdings, Inc. was rebranded iHeartMedia, Inc.; and Clear Channel Communications, Inc., became iHeartCommunications, Inc.

37.    Upon information and belief, on March 15, 2018, iHeartMedia, Inc. and certain of its subsidiaries, including iHeartCommunications, Inc. and WWPR-FM (105.1 MHZ) ("debtors"), commenced cases under Chapter 11 of title 11 of the United States Code, which are pending in the United States Bankruptcy Court for the Southern District of Texas.

38.    As such, due to the imposition of the automatic stay that acts as an injunction against certain actions, particularly the continuation of a judicial, administrative, or other such actions, the Plaintiff is currently precluded from pursuit of this action as against them, and takes no action herein to prosecute these claims, as against the aforementioned debtors at this time.

39.    At all times relevant herein and material hereto, the Defendant, NEW YORK STATE SENATOR, KEVIN S. PARKER, was and is and individual member of the New York State Senate representing the 21st District, which comprises portions of the neighborhoods East Flatbush, Flatbush, Midwood, Ditmas Park, Kensington, Park Slope, and Windsor Terrace in Brooklyn. Senator Parker is a Democrat, and was first elected in 2002.

40.    At all times relevant herein and material hereto, the Defendant, COUNCILMAN, JUMAANE D. WILLIAMS, was and an individual who formerly served as a member of the New York City Council from the 45th District. The District includes East Flatbush, Flatbush, Flatlands, Marine Park, and Midwood in Brooklyn. A member of the Democratic Party and a

self-described democratic socialist, he served as Deputy Leader of the New York City Council and Chair of the Task Force on City Workforce Equity. He is the New York City Public Advocate.

41.     At all times relevant herein and material hereto, the Defendant, COUNCILMAN, DANIEL DROMM, was and is and individual Council member for the 25th District of the New York City Council. He is a Democrat, whose District includes East Elmhurst, Elmhurst and Jackson Heights in Queens, New York.

42.     At all times relevant herein and material hereto, the Defendant, COALITION OF EDUCATIONAL JUSTICE, a/k/a the NYC Coalition for Educational Justice (CEJ) is a parent-led movement seeking educational equity and excellence in the city's public schools; a citywide collaborative of community-based organizations and unions whose members are parents, community residents and teachers formed to ensure that every child in NYC receives a quality and well-rounded education.

43.     At all times relevant herein and material hereto, the Defendant, ANGEL MARTINEZ, was and is an individual residing in Harlem, New York and is a parent member of the COALITION OF EDUCATIONAL JUSTICE, a/k/a the NYC Coalition for Educational Justice (CEJ).

44.     At all times relevant herein and material hereto, the Defendant, NATASHA CAPERS, was and is an individual residing in Brownsville, Brooklyn, New York and is a parent member and coordinator for the COALITION OF EDUCATIONAL JUSTICE, a/k/a the NYC Coalition for Educational Justice (CEJ).

45.     At all times relevant herein and material hereto, the Defendant, PHILIP SCOTT, who is identified herein as JOHN DOE #1, was and is an individual residing in Texas and creator of The Advise Show; a weekly radio and YouTube program whose mission is to: engaging discussions on current events, thought provoking topics, and controversial issues, (which have garnered over 304 million YouTube views to date). His online platform has created a very diverse fan base that varies in age, ethnicity, socio-economic status, and loyal international supporters.

46.     At all times relevant herein and material hereto, the Defendant, ADVISE MEDIA NETWORK, who is identified herein as JOHN DOE # 2, at all times relevant herein and material hereto, is and was is an independent media company that operates three (3) YouTube channels, and TheAdviseShowTV which claims to bring news and social commentary and to present "Media With A Common Sense Approach."

47.     At all times relevant herein and material hereto, the Defendant, PATREON, who is identified herein as JOHN DOE #3, was and is corporate entity offering a crowdfunding membership platform that provides business tools for creators to run a subscription content service, with ways for artists to build relationships and provide exclusive experiences to their subscribers, or "patrons." Patreon provides a membership platform for the Defendants, Philip Scott and his YouTube program, The AdviseShowTV, and provides for the procurement of funding on their behalf.

48.     The Plaintiff is informed and believes, and based on that information and belief alleges, that each of the Defendants designated herein are legally responsible for the events

and happenings referred to in this Complaint, and unlawfully caused the injuries and damages to the Plaintiff alleged in this Complaint.

49.    Plaintiff is informed and believes, and based on that information and belief alleges, that at all times mentioned in this Complaint, in some instances the Defendants were the agents and/or employees of their co-defendants and in doing the things alleged in this Complaint were acting within the course and scope of such agency and/or employment.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

50.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "49," above, with the same force and effect as though fully set forth herein.

51.    The Plaintiff, PATRICIA CUMMINGS, was a dedicated, effective, and highly respected middle school teacher employed with the Department of Education as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York.

52.    This claim arises as a result of what was erroneously reported concerning a complaint made by a student and their parent on or about January 11, 2018, regarding a lesson taught by the Plaintiff in her social studies class 408, on the Middle Passage, which took place on January 9, 2018.

53.    It was erroneously alleged by the mother of Student A that "during [her] social studies class [her] teacher wanted to demonstrate 'how the slaves were on the boat." The mother of Student A further alleged that the Plaintiff instructed Student A to get on the floor and the Plaintiff "put her knee into her back" and "pushed down" asking if [Student A] felt

12

pain. The Plaintiff acknowledges showing a five (5) minute video clip from the movie entitled *Freedom* to reinforce her lesson and depicting the horrible conditions and atrocities slaves were subjected to on the Middle Passage. In this regard, as some students were mocking the contents of the video, specifically the deplorable conditions, a teachable moment arose, and the Plaintiff engaged four (4) student volunteers to sit very close together for a demonstration to exhibit the cramped conditions on the ship.

54.     The Plaintiff denies that any student laid on the floor at any time during the demonstration and denies making any physical contact with any student during the demonstration, which was no more than 20 seconds in length. Ralph Hudson[1], another teacher on his preparation period in the Plaintiff's classroom, observed the Plaintiff's lesson.

55.     On or about January 16, 2018, the Plaintiff received a hand-delivered correspondence by and from the Defendant, Giulia Cox, Principal of The William W. Niles School - Middle School 118, inexplicably informing her that she was the subject of a disciplinary meeting to take place on January 18, 2018.

56.     On or about January 18, 2018, the Plaintiff met with the Defendant, Giulia Cox and was informed of the student's statements regarding the alleged incident. The Plaintiff requested that the Defendant, Giulia Cox speak with Ralph Hudson regarding what he had observed in the classroom that day; the Defendant, Giulia Cox inexplicably refused. It was at

---

[1] It should be noted that Ralph Hudson is African-American and acknowledged to the Plaintiff that he found the lesson to be appropriate and was in the scope of effectively educating students about the harsh conditions endured by slaves during transport, and did not observe the events as indicated by the student. He indicated that it was his belief, that if the Plaintiff were African-American, the incident would have been a non-issue.

this time that the Defendant, Giulia Cox began to create a false narrative regarding the events of January 9, 2018.

57.     Shortly thereafter, from January 23, 2018 to January 25, 2018, the Plaintiff was removed from teaching class 408; however, she continued to teach her other classes during this time.

58.     Following the Plaintiff's return to class 408, on or about February 1, 2018, the Plaintiff was confronted on school property by the Defendant, Ben Chapman, a reporter from the New York Daily News, and as a result, she became the subject of a false and scandalous front page story falsely accusing her of being a "racist" and "making black students lie face down on the floor of her class, and asking them 'See how it feels to be a slave?' "

59.     The Defendant, Ben Chapman, wrote that the Plaintiff had "shocked and traumatized children in her social studies class" – falsely accused and reported that she "singled out black students and told them to lie on the floor for a lesson on US slavery – and then stepped on their backs to show them what slavery felt like."

60.     As a result, this fabricated and erroneous set of "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world.

61.     The Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it is erroneously reported, among other things that she "*singled out black students and made them act like slaves;*" she is falsely

reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*"

62.      She has been publically and falsely accused of "child abuse," labeled as a "racist," referred to as an "oppressor," by many, including politicians and activists, and specifically by Defendant, Ben Chapman, a reporter from the New York Daily News and Defendant, Dr. Andre Perry in the Hechinger Report, a nonprofit, independent news organization focused on inequality and innovation in education.

63.      The Plaintiff has been publically referred to as, among other things, a "racist," a "bigot" a "cracker," and a "white devil," by New York City Power 105.1 radio personality, Defendant, Lenard Larry McKelvey, known professionally as "*Charlamagne tha God;*" and, among other things, as a "cave animal" and a "white supremacist" by Defendant, Philip Scott, a YouTube personality, host of TheAdviseShowTV channel, disingenuously proclaiming a commitment to reporting "truthful" and "accurate news," where he has over a million subscribers listening to his social and political commentary, and further by other members of the general public in various and extensive online media posts discussing this issue.

64.      The Plaintiff has received direct threats of violence, sexual assault, and death causing her to fear for her life and safety. The Defendant, Giulia Cox, Principal of The William W. Niles School - Middle School 118, adamantly refused to speak with another teacher, who was present in the classroom and witnessed the Plaintiff's lesson and later testified to the Office of Special Investigations that the lesson in question was appropriate, and in the scope of effectively educating the students.

65.     On February 1, 2018, after being confronted on school property at dismissal by the Defendant, Ben Chapman and his photographer, the Plaintiff immediately went to see the Assistant Principal, Leah Dyer and advised her that she had been ambushed on school grounds by the Defendant, Ben Chapman. Ms. Dyer called over to the Defendant, Giulia Cox, who came down and advised that she [Cox] called the Chancellor Division that handles media issues and confirmed that the Daily News would indeed be running a story on the Plaintiff, and suggested that the Plaintiff take the next day off. The Plaintiff refused to take the next day off, as she had done nothing wrong.

66.     Later on February 1, 2018, at 6:02 pm, the Plaintiff was advised via e-mail that the Division of Human Resources has reassigned her work location to 100 Gold Street; which has been notoriously referred to as "teacher jail." In an effort to be certain that the Plaintiff would be advised of her abrupt reassignment, the Defendant, Giulia Cox left the Plaintiff a voicemail message at 5:59 pm. The Plaintiff was further advised that she was the subject of an investigation by the Office of Special Investigations (OSI).

67.     On February 2, 2018, at 6:15 am, the Defendant, Giulia Cox sent an e-mail to the entire school staff advising that the Superintendent has advised that the school should expect a large media presence at the school that morning. They were expected to be reporting on the "classroom incident" that occurred approximately two weeks ago. She further stated: "It is normal for Middle School children to be curious and excited about the presence of reporters, but the students are minors and should not be speaking with the media without parental permission."

68.     These statements by the Defendant, Giulia Cox are curiously disingenuous, as the Defendant, Ben Chapman and his photographer had been on school grounds speaking freely with minor students and walking around the entire campus unattended. In homeroom on February 1, 2018, two of the Plaintiff's students reported to her that on January 31, 2018, a "white man" had been walking around campus confronting students asking questions about her [Plaintiff]. Further, a student told the Plaintiff that the "white man" had asked in the Plaintiff had ever walked on their backs.

69.     Other students agreed that they had also been confronted by a "white man" who was 'writing down what they [the students] were saying. During second period, a student in the Plaintiff's class confronted a second student and accused him of being a liar – screaming that he [the student] had lied to the "white man" yesterday when asked about the Plaintiff. After class, two students confided in the Plaintiff that another student (J.),[2] had erroneously told the reporter that she [Plaintiff] "had the students lie on their stomachs and then walked on their backs," and the student was laughing hysterically at what he had told the reporter. Those two students had tried to defend the Plaintiff by saying it never happened and what (J.) had told the reporter was a lie.

70.     On or about February 2, 2018, the Defendant, Giulia Cox sent a letter to the parents expressing the school's concern over the reported accusation; informing them that it is being investigated; and reassuring the parents that she [Plaintiff] has "been assigned away from students." Moreover, the Defendant, Cox appeased the parents by advising them

---

[2] The Plaintiff acknowledged that this student was angry with the Plaintiff because he was not doing well in her class, and wanted to get her fired.

that "she was working with staff to review the Department's Non-Discrimination Policy to further diversity and sensitivity awareness in the workplace.

71.    On or about March 9, 2018, the Plaintiff received a 48-hour written notice from the Defendant, DOE's confidential investigator, William Deininger, advising that OSI is conducting an investigation into an allegation of employee misconduct that had been filed against her. The meeting did not take place until March 15, 2018, due to inclement weather.

72.    On or about March 19, 2018, the Plaintiff received an e-mail from the Defendant, DOE's confidential investigator, William Deininger advising that she would be returning to her teaching position at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York. That never happened.

73.    The Plaintiff was ultimately exonerated of the erroneous allegations following an investigation by the Office of Special Investigations. The OSI report was reduced to writing on July 24, 2018, but the Plaintiff was not notified that she had been cleared of the accusations until July 26, 2018, by her UFT representative. She was advised by the UFT representative that she would be returning to work and teaching at the William W. Niles School - Middle School 118 for the 2018/2019 school year.

74.    On August 22, 2018, the Plaintiff received an e-mail from the Defendant, Giulia Cox, advising that she was released from reassignment in August and would be scheduled to be teaching at the William W. Niles School - Middle School 118 in September. Her teaching assignment was scheduled to be 6th grade social studies in Spectrum Academy. However, the Plaintiff is not licensed in NYS to teach 6th grade and would be violating NYS Education Law by accepting this assignment.

75.     Nonetheless, the Plaintiff advised the Defendant, Giulia Cox that she would be returning to the school and provided her with a completed preference sheet[3] and filled out a circular assignment utilizing the hyperlink Ms. Cox had provided.

76.     On August 29, 2018, the Plaintiff contacted the Manager of Reassigned Staffing Team – Division of Human Resources, Colin Caldwell, because it was her understanding that if she is still reassigned at the end of the (2017/2018) school year, she should report to the same reassignment location on the first day of school, unless she received a formal notice. The Plaintiff had not received any official notice from the DOE authorizing her to return to the Middle School, and she was concerned about being falsely accused of insubordination. Nonetheless, she was advised by Mr. Caldwell that she should report to the William W. Niles School - Middle School 118 in September.

77.     On September 4, 2018, the Plaintiff returned to the William W. Niles School - Middle School 118, and at 8:11 am the Plaintiff was texted by the Defendant, Cox's secretary Arlene Enriquez, summoning her to the Principal's office for a "meeting." At this meeting, following her receipt of her program schedule and 48 hour notice to review the OSI report, the Plaintiff was instructed to report downstairs for the Welcome Back meeting.

78.     The Plaintiff went downstairs and was warmly greeted by faculty and staff. As she was gathering for the Welcome Back meeting, the Defendant, Cox's secretary Arlene Enriquez, came to her and told her that the Principal needed her to sign something. The Plaintiff was abruptly and inexplicably presented with another notice to reassign her, again,

---

[3] The preference sheet was received by the Plaintiff in the August 22, 2018, e-mail, but it should have properly been provided to the Plaintiff in May in accordance with the UFT/DOE Contract for Classroom Teachers. See, Article 7B(1).

pending employee discipline. The Plaintiff was shocked and devastated that they could do this to her, after the DOE had cleared her to come back. The Plaintiff notified her UFT District representative and the Manager of Reassigned Staffing Team – Division of Human Resources, Colin Caldwell, who proceeded to advise her that her Principal had done this to her. He stated, "I'm sorry. Your Principal did this to you."

79.     The Plaintiff reluctantly signed the reassignment in the presence of her UFT Chapter leader (Lisa Baccari) and Arlene Enriquez, and clocked out of the building at 8:38 am; she had been there a mere one hour and thirty-eight minutes of arriving. NYPD School Safety Officers were already positioned to escort the Plaintiff out of the building.

80.     Nonetheless, despite being exonerated of the erroneous allegations following an investigation by the Office of Special Investigations, the Plaintiff was found in the report, to have exercised "poor judgment" and was terminated from her position as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10 on October 18, 2018.

81.     The Plaintiff's reputation as a respected educator has been irrevocably damaged. Her professional career has been substantially compromised and she has been unwillingly exposed to negative notoriety, which has publically humiliated and embarrassed her and subjected her to threats of violence, assault, and death.

AS TO THE DEFENDANTS, THE CITY OF NEW YORK;
NYC MAYOR BILL de BLASIO; BEN CHAPMAN; NEW YORK DAILY NEWS;
DR. ANDRE PERRY; THE HECHINGER REPORT a/k/a HECHINGER INSTITUTE ON
EDUCATION AND THE MEDIA; LENARD LARRY McKELVEY a/k/a CHARLAMAGNE
*THA GOD*; WWPR-FM (105.1 MHZ); iHEARTMEDIA; CLEAR CHANNEL
COMMUNICATIONS, INC.; NEW YORK STATE SENATOR, KEVIN S. PARKER;
COUNCILMAN, JUMAANE D. WILLIAMS; COUNCILMAN, DANIEL DROMM; COALITION
OF EDUCATIONAL JUSTICE; ANGEL MARTINEZ; NATASHA CAPERS; PHILIP SCOTT;
ADVISE MEDIA NETWORK; and PATREON

## CAUSES OF ACTION FOR DEFAMATION, *DEFAMATION PER SE*, LIBEL, AND SLANDER

82. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "81," above, with the same force and effect as though fully set forth herein.

83. In a span of thirteen (13) months from February, 2018, through March, 2019, and continuing to date, the Defendants have engaged a mainstream media and social media mob of bullies, which attacked, vilified, and threatened, the Plaintiff, Patricia Cummings, an innocent, New York City Public School teacher.

84. The Defendants wrongfully targeted and vilified, the Plaintiff because she was a white, New York City Public School Teacher, teaching at The William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York; comprised of minority students and faculty.

85. In targeting and bullying the Plaintiff, by falsely accusing her of "*singling out black students and made them act like slaves*" and making black students "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like,*" the Defendants falsely conveyed that the Plaintiff engaged in acts of racism and otherwise engaging in racist misconduct, child abuse, and child endangerment.

21

86.     The Defendants ignored basic journalistic standards because they wanted to advance their own biased agenda.

87.     The Plaintiff is not a racist and did not exhibit any such conduct, even when confronted with unbridled racist attacks.

88.     The Defendants campaign to target the Plaintiff in furtherance of their own agenda was carried out by using vast financial resources to enter the bully pulpit by publishing a series of false and defamatory print and online articles, which effectively provided a world-wide megaphone and echo-chamber for the Defendants and other individuals and entities to smear the reputation of a young Caucasian, teacher, who was, in their view, an acceptable casualty.

89.      This lawsuit is being brought to seek redress for the negligent, reckless, and malicious attacks on the Plaintiff, which has caused permanent damage to her life and reputation.

90.     The Defendants bullied an innocent young teacher, with an absolute disregard for the pain and destruction this would cause her life.

91.     The Defendants proved themselves to be loud, aggressive bullies wielding "pitch-forks and torches" while utilizing a considerable bully pulpit, causing her to be branded forever as the "racist slave teacher."

92.     In this country, our society is dedicated to the equal protection of the law regardless of the color of a person's skin. However, the Defendants did not care about protecting the Plaintiff. To the contrary, the Defendants raced with a reckless disregard of

22

the facts and truth, because in this day and time, there is a premium for being the first and loudest media bully.

93.     Then Chancellor, Carmen Farina stated on ABC News, "*I don't want to make any suppositions. It's under investigation. It's a very serious allegation and she was removed, and I think, at this time, we have to wait for the investigation to be complete.*" Nonetheless, no one waited, as then Chancellor Farina had suggested; instead, this matter was thrust upon the media and the politicians and activists began their quest for funding – with NYC Mayor de Blasio earmarking $23 million dollars to quell the rioting parent groups seeking diversity and sensitivity training. It was, in fact, the DOE who wanted that money, and jumped at the chance to get it at the expense of the Plaintiff.

94.     The Defendants all wanted to lead the charge against the Plaintiff because she became a pawn in their political and professional agenda.

95.     The Defendants must be held accountable for their wrong-doing in a manner, which effectively deters them from again bullying other persons in a similar fashion. In a civil lawsuit, punishment and deterrence is found in awarding money damages to a victim and target of reckless and defamatory behavior.

96.     The Defendants failed to conduct a proper investigation before publishing and disseminating its false and defamatory statements and writings concerning the Plaintiff.

97.     False and defamatory statements concerning the Plaintiff were published and disseminated before a proper investigation had been done. Subsequently, the Office of Special Investigation of the Department of Education conducted an investigation, and issued a final report dated July 24, 2018, which exonerated the Plaintiff and demonstrated that she

had not engaged in acts of racism and otherwise engaged in racist misconduct; nor was she found to have committed any acts, which constituted corporal punishment.

98.     The Office of Special Investigations report is consistent with the statements of a teacher witness present in the classroom during her social studies class 408, on the Middle Passage, which took place on January 9, 2018.

<u>False Claims Made By the Defendants</u>

99.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "98," above, with the same force and effect as though fully set forth herein.

100.    Specifically, as to the Defendants, BEN CHAPMAN and NEW YORK DAILY NEWS, exhibited flagrant disregard as to whether the accusations made against the Plaintiff were actually true, published the following articles:

- Employee and Education Reporter for the New York Daily News along with Stephen Rex Brown, covering NYC courts, and Andrew Savulich, staff photographer, who took the Plaintiff's picture against her will on February 1, 2018, which placed her image on the cover of the Daily News on February 2, 2018. **<u>See</u>, Exhibit A.**

- Ben Chapman

    "All Things Considered" on WNYC with Jamie Floyd (interview)

    "*The seventh grade history teacher at the school by the name of Patricia Cummings, had asked black students to lie face down on the floor in the classroom and then stepped on at least one of those students in a lesson on the Middle Passage, which is the infamous slave route used in U.S. Slave Trade.*"

24

- Ben Chapman, Kerry Burke, and Esha Ray, February 2, 2018 **See, Exhibit B.**

  "Bronx Teacher Sparks Outrage for Using Black Students in Cruel Slavery Lesson"

- Ben Chapman, April 10, 2018 **See, Exhibit C.**

  "Thousands Sign Parents' Petition Demanding Action from de Blasio on Racist School Incidents"

- Ben Chapman, April 26, 2018 **See, Exhibit D.**

  "City to Spend $23M for Anti-Bias training for Public School Educators"

- Ben Chapman, July 10, 2018 **See, Exhibit E.**

  "Bronx Educators Accused of Racism Still Under Investigation, Still on Payroll"

- Ben Chapman, August 12, 2018 **See, Exhibit F.**

  "City Completes Probe of Teacher in 'Slavery' Controversy"

- Ben Chapman and Stephen Rex Brown, September 28, 2018 **See, Exhibit G.**

  "White Social Studies Teacher Ousted Over Slavery Lesson Plans to Sue over Reverse Racism"

- (No One took a By-Line) October 4, 2018 **See, Exhibit H.**

  "Slave Teach Hit For Judgment"

- Ben Chapman and Stephen Rex Brown, October 20, 2018 **See, Exhibit I.**

  EXCLUSIVE: "City Fires Bronx 'Slave' Teacher"

- Ellen Moynihan and Ben Chapman, March 9, 2019 **See, Exhibit J.**

  "Race Rage Lesson – Parent's Irate Over Slave Sale at School"

101.    With regard to Defendant, NYC MAYOR BILL de BLASIO, as reported on June 29, 2017, the NYS "Legislature and Gov. Andrew M. Cuomo granted a two-year extension of

mayoral control over New York City's schools on Thursday, ending months of uncertainty over Mayor Bill de Blasio's leadership of the nation's largest school system and its 1.1 million students a day before it was to expire.[4]" "Mr. Cuomo said of mayoral-control issue, before noting, "[B]ut at the end of the day this is the best way to provide education to our children in New York City."[5]

102.    Specifically, as to Defendant, NYC MAYOR BILL de BLASIO, who exhibited blatant disregard as to whether the accusations made against the Plaintiff were actually true, made the following statement regarding the Plaintiff:

- February 6, 2018, When Mayor de Blasio and Commissioner O'Neill host press conference to discuss crime statistics

    o    *"It's not acceptable. It's not even close," de Blasio said when asked about the allegations. "I don't know any teacher in their right mind who would do something like that....we're doing a full investigation of that. That makes no sense. It is unfair to the kids. It's insensitive." "But I will say, this has not been a widespread problem in terms of any type of incident like that, thank God, but we will keep deepening our implicit type training, and ways of helping our teachers to think about these issues better."*

103.    Mayor de Blasio, having mayoral control over New York City's schools, knew or should have known that what was reported in the Daily News was false based on the investigation; however, he kowtowed to the Coalition for Educational Justice and allowed the New York City Department of Education and the Coalition for Educational Justice, needlessly extort $23 Million dollars from the City of New York.

---

[4] https://www.nytimes.com/2017/06/29/nyregion/new-york-senate-assembly-schools.html
[5] ibid

104.    The Plaintiff became the scapegoat to justify the $23 Million dollars Mayor de Blasio set aside for anti-bias training and the creation of the Office of Culturally Responsive Education, which was announced on April 26, 2018.

105.    Mayor de Blasio accepted the 20,000 defamatory petitions from the Coalition of Educational Justice, yet there was NO truth or merit to those petitions, and by doing so, further defamed the Plaintiff and demonstrated reckless disregard for whether the accusations were true or not.

106.    Specifically, as to the Defendants, LENARD LARRY McKELVEY a/k/a *CHARLAMAGNE THA GOD*; WWPR-FM (105.1 MHZ); iHEARTMEDIA; CLEAR CHANNEL COMMUNICATIONS, INC., who exhibited blatant disregard as to whether the accusations made against the Plaintiff were actually true, broadcast on the Defendant's nationally syndicated radio show, The Breakfast Club:

<u>Donkey of the Day</u>, February 7, 2018, as said by Defendant, McKelvey/Charlamagne[6]:

- *"Now Patricia Cummings teaches at a middle school, middle school 118, and she teaches social studies. She decided that she wanted to give the students a history lesson on the good old American pastime called slavery. Now, it's Black History Month ladies and gentlemen, and one of the main problems I have with America's version of black history is that when white people teach us about us they usually start at slavery. But we know that's not the case, right? In the words of the late, great, Malcom X, our history did not begin in chains, but that's what white people in America like to begin our story."* (approx 00:29-00:58)

- *"See, Patricia Cummings decided to give these kids a lesson on slavery and she put extra mayonnaise on it. Oh the Helmans is heavy on this one. You see, Patricia Cummings was teaching kids about the Middle Passage—You do know what the Middle Passage is, right? It's when Africans were kidnapped, stolen, boosted from Africa and brought to America as part of the slave trade."* (approx. 01:42-02:02)

---

[6] https://youtu.be/A10CBumee6o

- *"Now let's keep in mind that the kids in this school are 81% black and Hispanic and 3% white. Quick side-note, I'd love to know how many black and Spanish teachers this school has because you can avoid problems like the one Patricia caused for herself if you simply have us teaching us."* (approx. 02:02-02:17)

- *"What's up man? What's up man? Why y' all just be tryin' to give me to you, cracker-ass cracker? Man. I just told you that the school was 81% black and Hispanic so I have one question, why is Patricia in the kitchen on Soul Food Sundays? When it's time to make a nice quiche, call Patricia. You know good and damn well when you let Patricia make the potato salad she heavy handed with the mayonnaise. So why, oh why, is she in the kitchen on Soul-Food Sundays?"* (approx. 03:06-03:31)

- *"If you a white teacher teaching majority black and Hispanic class you should have to run those lesson plans by some type of diversity board at the school to make sure you talkin' the right language to the kids, especially when it comes to sensitive subject like slavery."* (03:39-03:52)

- *"Okay Patricia. Why would you want kids to know what slavery feels like? You could have shown them the horrors of slavery by simply showing them 12 Years a Slave. Okay, you could have puts Roots on in the classroom, the old one or the remake. You could've put Birth of a Nation and showed them the horror of slavery but also how the great Nat Turner fought back, but NO. You would rather lay kids on their stomach and step on their backs because, truth be told, you wanted to break their spirits; You wanted to give them an inferiority complex. It has to be that because I can't think of any other reason you would want kids to know what slavery feels like."* (03:52-04:25)

- *"There was all kind of lesson plans you could've gave these kids other than laying them on the floor, on their stomachs, and steppin' on their back. See I refuse to believe that Patricia Cummings, a middle school teacher making over 68,000 a year, doesn't know any better and that she couldn't do any better. I could've created a better lesson plan for these kids and my lesson plan would've actually had some redeeming qualities to it. I need Patricia Cummings to explain what was the redeeming value in this lesson."* (05:19-05:44)

- *"Okay, she wanted kids to feel how it felt to be a slave? You gonna lay someone's child on their stomach, put your foot in their back and say how does it feel? I'll tell you how it feels! It feels like a white devil got her hoof in my back, alright! It feels like I wanna slap fire out of a racist, bigot cracker-ass cracker."* (05:44-06:05)

107.   Defendant, McKelvey/Charlamagne's racist and defamatory rant is also published on Apple iTunes with a copyright to Power 105.1 FM (WWPR-FM). It also has a

"clean lyrics" label, yet, the content within the transmission consists of inappropriate, racist, derogatory and defamatory references and hate speech made to and of the Plaintiff.

108.   Specifically, as to Defendant, KEVIN PARKER, New York State Senator, District 21, who exhibited flagrant disregard as to whether the accusations made against the Plaintiff were actually true, made the following statements:

- New York Amsterdam News—February 9, 2018

  - *"Like many others, I am completely outraged to by the actions of Bronx Middle School 118 teacher, Patricia Cummings," said State Sen. Kevin Parker. "I call for her swift removal from the New York City Department of Education, and the revocation of all New York State licensures and credentials that would allow her to teach in our State."*

  - *Parker continued, "Although I hear some calling for a second chance for Ms. Cummings via culturally competent training and the like, as an African studies professor at the City University of New York for over 20 years now, I know there is no level of training that can make a person more sensitive to the struggles of another. Those feelings cannot be prepared in one's mind, but rather must be intrinsic to one's character. This is not the case for Ms. Cummings and it is my hope we can learn for this deplorable act to inform future decisions and best practices when deciding who will be afforded the honor of teaching our children."*

109.   Specifically, as to Defendants, COALITION FOR EDUCATION JUSTICE, NATASHA CAPERS and ANGEL MARTINEZ, who exhibited flagrant disregard as to whether the accusations made against the Plaintiff were actually true, made the following statements:

**Natasha Capers[7]:**

- New York Amsterdam News—February 9, 2018

  o *"For over a year public school parents have rallied, organized and advocated for Culturally Responsive Education and anti-bias trainings to protect students from exactly this type of trauma" said Capers. "Now that it's in the news, will you listen to parents and work with them? The leaders of this city must take responsibility. UFT, this is your member. Chancellor Fariña, this happened under your supervision.  Mayor de Blasio, this occurred in a system you* wanted control over. ... *What will you do now to end the systemic racism in NYC public schools that children suffer from? What will you do to ensure nothing like this happens again?..."*

- New York Amsterdam News—February 15, 2018

  o *Natasha Capers, coordinator NYC Coalition for Educational Justice, told the AmNews, that aside from the initial assault on the students, parents were upset that the Bronx teachers was initially only suspended for a couple of days and was allowed to work at the school before she was reassigned. "Just thinking about how these kids have to continue to interact with her after she disrespected them like that is beyond words," said Capers. "Some of the kids really adored Cummings but were just disappointed of how much of a racist she was. It's even worse when you realize what trauma the kids are now in. Some may have never experienced racism or even realize how problematic what Cummings did. What she did to the children was horrible and we need to have talks our children when they are facing racism and how to deal with it."*

  o *Capers organized a rally last week in front of City Hall. She said, "The fact that Cummings had the notion to disrespect these children and is actually getting away with this should not be OK. We shall continue to fight for our children and for the next generations to come."*

- "All Things Considered" on WNYC with Jamie Floyd (interview)

  o *"I've heard a lot of folks say, well this teacher was just trying to impart on those students how hard it must have been, how they needed to feel it, but*

---

*actually if you want someone to identify with someone else that takes empathy."*

- New York Amsterdam News—February 16, 2018
  Article written by Natasha Capers, Coalition for Educational Justice Coordinator

  - *"It's been nearly two weeks since the Daily News broke the story about the white teacher in the Bronx who, in a lesson on slavery and the Middle Passage, made Black students in several classes lie face down on the floor and stepped on a female student while asking, "See how it feels to be a slave?"*
    *It's been nearly two weeks, and the city has still not taken any steps to ensure that this type of degrading and traumatic incident will not occur again."*

**Angel Martinez:**

- New York Amsterdam News—February 9, 2018

  - *"This outrageous, racist incident demonstrates the city's failure to address racial bias and cultural competence, and to teach students of color their history," said Angel Martinez, Harlem mother of three and CEJ parent leader.*

  - *"...We demand that Mayor de Blasio apologize to these Bronx students and their families, provide counseling support to the students who were affected and immediately commit to implement Culturally Responsive Education throughout New York City public schools."*

**The Coalition for Educational Justice:**

- New York Amsterdam News—February 9, 2018

  - *The Coalition for Educational Justice stated, "Because of the mayor's inaction, dozens of students have been victimized and traumatized. ... Racist and psychically damaging incidents like this are treated as isolated incidents by the de Blasio administration..."*

- The Coalition for Educational Justice Website

- o *"CEJ made their demands for NYC schools to adopt **Culturally Responsive Education** loud and clear at a rally at City Hall on February 6th. In the wake of a **racist slavery lesson** at a Bronx middle school, parents, students, elected officials, and education equity advocates alike came together to let the Mayor's office and the Department of Education know that our communities will not let this disgraceful incident get swept under the rug. Over 50 people entered City Hall, singing and chanting, until their voices were heard and Natasha Capers, CEJ coordinator, met with the Mayor's chief of staff to discuss **CEJ's demands**."*

- The Coalition for Educational Justice's Petition to Mayor Bill de Blasio

  - o *"It's been more than a month since the Daily News broke a story about a white teacher in the Bronx who, in a lesson on slavery and the Middle Passage, made Black students in several classes lay face down on the floor and even stepped on a female student while asking "see how it feels to be a slave?"*

  - o *It's been more than a month, and the city has still not taken any steps to ensure that this type of degrading and traumatic incident will not occur again."*

  - o *"Parents need him to step up and take action, to get justice for those students in the Bronx, and to make sure no child has to experience that again."*

110.   The Coalition of Educational Justice used *Color of Change*, a progressive, nonprofit civil rights advocacy organization in the United States, to publish their discriminatory and defamatory agenda/petition. Thus, Color of Change published a digital petition at the bequest of the Defendant, Coalition of Educational Justice, utilizing the following characteristics:

- o A digital petition is an online organizing tool that you can use to bring other people together to pressure decision-makers to implement a specific change needed in your community.

o A digital petition campaign is a structured, creative effort to share the petition on a variety of online channels to engage other people in supporting the petitioner's demand given a specific time and goals. A digital petition campaign focuses on expanding the reach of an individual's efforts through the power of online social networks. It may also include offline actions that increase pressure on the decision-maker."

o For a digital petition campaign to be effective on OrganizeFor.org, it needs to include the following elements:

- A CLEAR DEMAND: What is the specific change that you want to see in the world? [e.g. Drop charges on the students who have been wrongfully suspended and rescind the discriminatory part of the dress code that is disproportionately affecting Black students.]

- AN APPROPRIATE TARGET(S): the target has to actually have the power to make the change you want to see happen. [e.g. the local school board]

- A STRONG THEORY OF CHANGE AND STRATEGY: This is an 'if then' statement that describes cause and effect between your goal and plan to make it happen. A strong theory of change is typically accompanied by a strategy that outlines how you will reach your goal. [e.g. If hundreds of parents, family and community members support this petition, we can deliver the signatures at next month's school board meeting and show our united support for equal treatment for all students regardless of race or culture - including hairstyles. We will attract local press to the board meeting which will pressure the board members to change the discriminatory policy]

- IDENTIFY A CAMPAIGN LEADER: A good petition leader will be someone that has a strong connection to the issues addressed in the petition. Ideally, that person is you! [e.g. As a resident of this town whose nieces and nephews attend our schools I am representing my family and others who are concerned that our children are not being treated fairly.]

- A COMPELLING NARRATIVE/CONTENT: Stories are what draw people in and allow them connect with others. A strong story for an OrganizeFor petition should focus on an issue that negatively impacts Black people and communities as the basis for the petition demand, and starts with a powerful introduction sentence and a good hook. [e.g. Read this petition for a good example of a powerful narrative that centers the impact on Black communities]"

111.  The Defendant, Coalition of Educational Justice was further advised:

o  "Your first goal is to hit 100 signatures. Share right away with your friends, followers and networks to get started! Once you get 100 signatures, Color of Change staff will review your petition and send a test email to Color of Change members to see how they respond." "If Color of Change members in the test group sign your petition, we'll keep sending it out to larger and larger groups of members. Very relevant or timely petitions will be shared on the Color of Change Facebook and Twitter accounts. You may receive a call or email from a Color of Change staff member to talk about your petition."

o  In the meantime, read the next section on "ENGAGING OTHERS TO WIN ON YOUR CAMPAIGN." Think about what else you can do to **make the TARGET feel that pressure** and bring those ideas to life!"

112.  James Rucker and Van Jones are co-founders of Color of Change. James Rucker was quoted in a 2010 Washington Post Article stating, how his "work involves telling a compelling story and finding what he calls a 'theory of change' or a cause that the group's members can directly impact". He further states that, "[T]he internet has the power to democratize, and it has the power to amplify voices.

113.  The Defendant, Coalition for Educational Justice is not interested in the truth, but a "compelling story" to further their agenda. Furthermore, when the internet is used irresponsibly it also has the power to amplify hatred, which is what is group did in regards to assisting the Defendant, the Coalition for Educational Justice in their petition campaign.

114.    Specifically, as to Defendant, DANIEL DROMM, NYC Council Member, 25th

District, who exhibited flagrant disregard as to whether the accusations made against the

Plaintiff were actually true, made the following statements:

- New York Amsterdam News—February 9, 2018

    o *"Educators teaching in a city as diverse as ours should be given cultural competency training,"* said Daniel Dromm, NYC Council Finance Committee chair. *"This is the only way to avoid similar **traumatic experiences** like what happened in the Bronx.*

115.    Specifically, as to Defendant, JUMAANE WILLIAMS, NYC Council Member, 45th

District, who exhibited flagrant disregard as to whether the accusations made against the

Plaintiff were actually true, made the following statements:

- New York Amsterdam News—February 9, 2018

    o *"There is a clear need for the administration to be more proactive in mandating Culturally Responsive Education in our schools,"* said Councilmember Jumaane Williams. *"We should not have to wait for **grotesque events of cultural insensitivity** to mar our classrooms in order to spur action, and I sincerely hope we don't have to wait for the next one."*

116.    Specifically, as to Defendants, PHILIP SCOTT, ADVISE MEDIA NETWORK, and

PATREON, who exhibited flagrant disregard as to whether the accusations made against the

Plaintiff were actually true, the Defendant, PHILIP SCOTT, in his official capacity as host of

the TheAdviseShowTV on his YouTube channel[8], made the following statements:

    o *"There was a teacher by the name of Patricia Cummings out of Bronx middle school number 118. Now she decided to make a lesson about black history and what she done to the children, how she singled them out. I want you to hear the details of what this teacher done to the children and then we really*

---

[8] https://www.youtube.com/watch?v=Qw6dOcsS3b0

gonna get into the rest of details and how we can make a difference to help the children out who suffered at the hands of this white supremacist teacher." (0:00-00:33)

o "Now, let's get into what _really_ happened to that classroom. Now the teacher was doing a lesson on U.S. slavery, Black History Month and then she called three students to the front of the class and she instructed them to get on the ground, okay. So she told them, _You see how it was to be a slave? How does it feel?_ This Caucasian female is directing this at three black children. One of the black children, a black girl, stated she feel fine. So then this teacher proceeded to step on her back and say _how does it feel now._ Now this teacher was reported, as you heard, she was removed from teaching students, but _SHE WAS NOT FIRED._" (01:58-02:54)

o "Now this is the kind of teachers that's in public schools teaching black children. So when you hear me say over and over and over again that we need schools that are safe spaces for black children to get an education, that they don't have to lay on floors, and have Caucasians steppin' on their back and saying, um, how does it feel, this is why I state these things." (02:54-03:16)

o "Over and over and over and over, we see white supremacist teachers are harming our children daily. She's not calling out the _white_ children and having a lesson with them about the caves of Europe. She not putting them in no kinda dark place, and ask them, "[H]ow does it feel to simulate a cave. She's not doing that, but she simulates, um, the Trans-Atlantic Slave Trade and what our brothers and sisters went through in the bottom of those boats, and she enjoyed that because that racialized terrorism and racialized fetishing of black people, they enjoy that so much. A lot of them wish they could live in the slavery times; they would love slavery because they lazy, they good for nothin', and I don't know why we allow them to teach any child to be hon with you. (03:16-04:08)

o "Now if parents were to do that same thing to their child and that child reported it, the police would be at the parents' house, CPS would take the children away, but she can get away with this? And she's not goin to jail but a parent would go to jail if they did the exact same thing to their child?? Pay attention to that." (04:08-04:30)

o "We have to, in the Black Community, get ourselves right, unify, put aside all your silly differences, and unify under the guise of 'we are black people, African people—whatever term you want to use, cause some of you wanna call yourselves different things—we have this hue, we have this history here, and we need to unify and take care of ourselves'". (04:30-04:58)

o *"We aren't taking care of our children and we are subjecting our children to these white supremacists in the classroom. These white supremacists are telling our children that they can't wear braided hair, they can't wear afros, they can't do this, they can't do that. You know about the school to prison pipeline. It's proven black children are suspended more, the cops in schools arrest black kids more, not because they doin more things, but because of racial bias and racialized terrorism at the hands of white supremacist administrators, white supremacist cops. We know that. The data is out there proving that over and over and over and over again." (04:58-05:41)*

o *"I'm not one to keep beggin people that I know it's just in them to do this. It's in them to treat us that way and I have over, well almost 400 years of history to back that up. It's not like I'm just singling one event and that's it. And if you aren't a white supremacist or believe in white supremacy than I'm not talkin to you. The way I speak is if the shoe fits wear it, and if you are <u>defending</u> a white supremacist then to <u>me</u> you are a white supremacist. Don't come to me sayin you not racist but you defending white supremacists, just that simple. And to that other crowd that's gonna come, um, and say 'oh well you guys say this about white people', No, we talkin about white supremacists. And if you feel white people/ white supremacists that says a lot about you, right? (05:41-06:24)*

o *"But what could we do about this situation? She wasn't fired. This woman needs to be gone. Black people need to mobilize on Twitter, YouTube, whatever. So in the penned comment I'm going to post, um, the chancellor's phone number where you can call the New York City Department of Education, I'm gonna post the Principal's number, um, and you can call the Bronx Middle School 118 and call them and let them know that you do not want to see a white supremacist teacher who were child abusing three children, humiliating them, racially terrorizing them, let them know on the phone that you don't want them, that woman teaching the children any more. Patricia Cummings need to go. Last week Terri Butcher, she had to go. She resigned. This one need to go." (06:24-07:15)*

o *"And from now on any time someone mess with <u>our</u> children in school, or any kind a government official say something, we gonna start putting out phone numbers, emails, and then I'm gonna ask you to every time to call and email; do your part, because if you're not gonna defend the children, then we all a piece of crap. How is it that we gonna have the next generation, but we not gonna defend them from racialized terrorism? <u>NO!</u> We need to do this. (07:15-07:41)*

o   *And when I had this discussion this morning about this <u>particular</u> story with the people on Patreon, they gave me the green light. They say yeah, this one is important enough to be public because you know I'm on a hiatus right now, you know why, but this is more important about the kids and not about the situation with I had on the last video that I posted. Now I'm not sayin I'm back to makin regular videos, but they gave me the green light, so we went ahead and made sure to make that decision for the sake of our children." (07:41-08:11)*

o   *"So if you're watchin this video, make sure you call, uh, the chancellor. Make sure you call the school. Flood their lines. Don't let them get a call in because <u>this teacher needs to go</u>." (08:11-08:23)*

o   *"But leave me a comment. Let me know what you think about this, make sure you call, share the video with everyone you that you know, like the commentaries, subscribe ..."(08:23-08:30)*

117.   Specifically, as to Defendants, DR. ANDRE PERRY; THE HECHINGER REPORT a/k/a HECHINGER INSTITTE ON EDUCATION AND THE MEDIA, who exhibited flagrant disregard as to whether the accusations ~~made against the Plaintiff were actually true,~~ the Defendant, DR. ANDRE PERRY, in his official capacity as a columnist on educational equity appearing in the Hechinger Report, a nonprofit news organization focused on producing in-depth education journalism, TheRoot.com, and the Washington Post and has made the following statements:

- Published on February 6, 2018: "Teachers, How Does it Feel to Be Oppressors? A Teacher Literally Stepped On Children to 'Teach' Them About Slavery"[9]

    o   *A teacher literally stepped on children to 'teach' them about slavery."*

    o   *"Cummings' slavery lesson wasn't only cruel; it was redundant."*

---

[9] https://hechingerreport.org/teachers-feel-oppressor/

https://www.theroot.com/dear-teacher-how-does-it-feel-to-be-an-oppressor-1822701650

- ○ *"Black students know too well what it's like to be humiliated, held in captivity and to suffer from inhumane conditions created by educators. Many compliant students who sit quietly accepting demeaning lessons like the ones administered by Cummings and others like her are viewed as obedient and law-abiding. Their counterparts who resist are deemed disorderly and subjected to harsh disciplinary policies, often ending up in jail by way of the school-to-prison pipeline. Whether you are obedient or "woke" — conscious of your oppression — you are being oppressed in schools. Yep, black students already know what it's like to be stepped on."*

- ○ *"There are white teachers like Cummings who have not reckoned with what it means to oppress."*

- ○ *"While most teachers probably won't see themselves in either Black or Cummings, most should recognize that they associate with white norms, which makes it possible to act in racist ways,…"*

118.   The accusations made against the Plaintiff, as published, spoken, generated and disseminated by these Defendants and others as identified above are remarkably false.

119.   The Plaintiff has already been presumed to be guilty in these areas. This rush to judgment is a denial of due process and the equal protection of the laws and defamation. Politicians, parents, students, investigators, the Department of Education, irresponsible media, and school officials responsible for this injustice have promulgated and promoted "fake news" stories concerning the Plaintiff. Since February 1, 2018, the Plaintiff has found herself having to publically defend her reputation and integrity, as a direct result of the defamatory and negligent actions of the Defendants.

<u>The Plaintiff is a Private Figure</u>

120.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "119," above, with the same force and effect as though fully set forth herein.

39

121.    The Plaintiff is a private figure for the purposes of this action, having lived her entire life outside of the public eye.

122.    Prior to February 1, 2018, the Plaintiff had no notoriety of any kind in the community at large.

123.    The Plaintiff did not engage the public's attention to resolve any public issue that could impact the community at large.

124.    The Plaintiff made no public appearances prior to the false allegations being made against her.

125.    The Plaintiff has not inserted herself into the forefront of any public issue.

126.    The Plaintiff's limited public statements after the accusations against her were reasonable, proportionate, and in direct response to the false accusations against her and do not render the Plaintiff a limited purpose public figure.

<u>The Defendants Acted Negligently and With Actual Malice</u>

127.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "126," above, with the same force and effect as though fully set forth herein.

128.    The Defendants published, spoke, and disseminated false and defamatory statements negligently and with actual knowledge of falsity or a reckless disregard for the truth.

129.    As one of the world's leading news outlets, the Defendant, Daily News and its reporter, Ben Chapman knew, but ignored the importance of verifying the damaging and incendiary accusations against the Plaintiff prior to publication.

130.    The Defendants knew, but ignored the importance of verifying the damaging and incendiary accusations against the Plaintiff prior to publication or distribution.

131.    The negligence and actual malice of the Defendants is demonstrated by their utter knowing disregard for the truth available; however, the Defendants chose to substantiate its own biased narrative.

132.    Instead of investigation and publishing the true stories and statements, the Defendants, recklessly rushed to publish and distribute their false and defamatory accusations in order to advance their own respective agendas.

133.    In doing so, the Defendants widely distributed the false allegations in print, online, and on social media and furthered it in mainstream media, giving these false and defamatory accusations the appearance of credibility and permanence.

134.    The Defendants negligently published and distributed these false and defamatory accusations by departing from the reasonable standard of care employed by journalists, including those standards articulated by the Society of Professional Journalists' Code of Ethics.

135.    The Defendants' collective conduct demonstrates a purposeful avoidance of the truth and the publication of false and defamatory accusations with actual knowledge of falsity.

136.    The Defendants negligently and recklessly published its false and defamatory accusations by failing to conduct a reasonable investigation prior to publication.

137.   The Defendants negligently and recklessly published and distributed its false and defamatory accusations by failing to conduct a reasonable investigation by not having a credible or reliable source for its publications.

138.   The Defendants negligently and recklessly published its false and defamatory accusations by relying on unreliable and biased sources with questionable credibility.

139.   Indeed, the Defendants negligently and recklessly relied upon a biased pre-disposition of guilt on the part of the Plaintiff.

140.   The Defendants consciously elected to ignore any contrary information in favor of its pre-conceived, false narrative against the Plaintiff.

141.   The Defendants continued to publish its false and defamatory accusations with actual knowledge of falsity.

142.   The Defendants negligently and recklessly failed to seek information from other obvious sources, who would have demonstrated their false and defamatory accusations to be false, including the students in the Plaintiff's class 408, and a teacher witness present in the classroom during her social studies lesson on the Middle Passage, which took place on January 9, 2018.

143.   The Defendants negligently and recklessly published and distributed false and defamatory accusations in derogation of acceptable principals of journalistic ethics, including by failing to verify before publication.

144.   The Defendants negligently and recklessly published and distributed false and defamatory accusations in derogation of acceptable principals of journalistic ethics,

including by failing to take special care not to misrepresent coverage, and by failing to provide any appropriate context to their false and defamatory accusations.

145.    The Defendants negligently and recklessly published and distributed false and defamatory accusations in derogation of acceptable principals of journalistic ethics, including by failing to avoid stereotyping.

146.    The Defendants negligently and recklessly published and distributed false and defamatory accusations in derogation of acceptable principals of journalistic ethics, including by failing to examine the way in which its own biases and agenda shaped its false reporting.

147.    The Defendants negligently and recklessly published and distributed false and defamatory accusations in derogation of acceptable principals of journalistic ethics, including by failing to treat the Plaintiff as a human being deserving of respect.

148.    The Defendants negligently and recklessly published and distributed false and defamatory accusations in derogation of acceptable principals of journalistic ethics, including by wrongfully placing its own biased agenda over the harm the false and defamatory accusations caused to the Plaintiff.

149.    The Defendants actual malice is further evidenced by any failure to retract the false and defamatory accusations made against the Plaintiff.

150.    The Defendants published and distributed the false and defamatory accusations with common law malice, including because there was an intention to harm the Plaintiff because she is Caucasian, and consciously ignored the threats of harm that it knew would inevitably ensue.

151.   The Defendants published and distributed the false and defamatory accusations with common law malice, demonstrated by their failure to retract the false and defamatory accusations despite the harm and danger they know would be inflicted on the Plaintiff.

<u>Damages</u>

152.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "151," above, with the same force and effect as though fully set forth herein.

153.   The publication and distribution of the false and defamatory accusations directly and proximately caused substantial and permanent damage to the Plaintiff.

154.   The false and defamatory accusations were republished and spoken by third-parties and members of mainstream and social media all over the world, which was reasonably foreseeable.

155.   The false and defamatory accusations against the Plaintiff are defamatory *per se*, as they are libelous on their face without resort to additional facts, and as clearly demonstrated here, the Plaintiff was subjected to public hatred, contempt, scorn, obloquy, and shame.

156.   These statements were made without privilege or authorization.

157.   The statements attacked the Plaintiff's professional abilities and the conduct of Plaintiff's employment as a New York City School teacher and were therefore defamatory *per se*. She has been terminated from her job and is unable to seek employment.

158.    The Plaintiff has suffered, and will continue to suffer, damages as a result of the Defendant's defamation of the Plaintiff's employment as a teacher and her professional reputation.

159.    As a direct and proximate result of the false and defamatory accusations the Plaintiff suffered and continues to suffer permanent harm to her reputation.

160.    As a direct and proximate result of the false and defamatory accusations the Plaintiff suffered and continues to suffer severe emotional distress.

161.    As a direct and proximate result of the false and defamatory accusations the Plaintiff is forced to live her life in a constant state of concern over her safety and is unable to procure employment.

162.    The Defendants published and distributed the false and defamatory accusations with actual malice and common law malice, thereby entitling the Plaintiff to an award of punitive damages.

163.    The Defendants' conduct was outrageous and willful, demonstrating that entire want of care that raises a conscious indifference to consequences.

164.    The Plaintiff is entitled to an award of punitive damages to punish the Defendants to deter them from repeating such egregiously unlawful misconduct in the future.

**AS TO THE DEFENDANTS, THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF EDUCATION, CITY OF NEW YORK OFFICE OF SPECIAL INVESTIGATIONS, GIULIA COX, AND COURTNEY WARE**

**CAUSES OF ACTION FOR FRAUD, BREACH OF CONTRACT, VIOLATION OF DUE PROCESS AND VIOLATION CIVIL RIGHTS, and DISCRIMINATION**

165.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "164," above, with the same force and effect as though fully set forth herein.

166.    On January 11, 2018, the Plaintiff learned from various students in her class that students' statements were being taken collectively by the Assistant Principal, Courtney Ware, in a classroom setting concerning the Plaintiff's January 9, 2018 lesson. This method for taking students' statements was a direct violation of the New York City Chancellor Regulations and the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT), such that, in accordance with New York City Chancellor Regulations, alleged victims and student/staff witnesses are to be interviewed _separately_ and their written statements are to be obtained as quickly as possible, (_see_, Regulations of the Chancellor A-420 (VI)[B](1); the first set of statements were taken by the Assistant Principal, Courtney Ware, in a classroom setting. This is not the only instance of direct violation of the New York City Chancellor Regulations. There were other violations including, but not limited to the following:

    □    The accused employee must be provided with 48 hour written notice of the right to appear with union representation at an investigative interview to discuss the allegation of corporal punishment. _See_, Regulations of the Chancellor A-420 (VI)[B](2). The Plaintiff was given a letter directing a disciplinary meeting from the principal, of The William W. Niles School - Middle School 118, Giulia Cox, on January 16, 2018. No mention was made of any allegation of corporal punishment; no Chancellor Regulation was cited in the correspondence;

46

▢ Upon receipt of any complaint of corporal punishment, OSI will recommend whether the employee should be removed from his/her assignment pending completion of the investigation. <u>See</u>, Regulations of the Chancellor A-420 (V)[A]. According to the investigators, the principal, of The William W. Niles School - Middle School 118, Giulia Cox did **not** inform OSI until February 18, 2018, after the "disciplinary meeting;"

▢ When determining whether to remove the employee, the following should be considered: the severity of the alleged behavior; the prior record of the accused employee; the likely disciplinary action if the allegations are substantiated; the nature and frequency of the contact between the subject students; and any other relevant factors. <u>See</u>, Regulations of the Chancellor A-420 (V)[B]. Giulia Cox, Principal of The William W. Niles School - Middle School 118, only removed the Plaintiff from teaching class 408, from January 23, 2018 to January 25, 2018, the Plaintiff nonetheless continued to teach her other classes at Middle School 118 during this time;

▢ If an employee has been removed from his/her assignment pending the outcome of a corporal punishment investigation, the principal shall inform the employee, in writing, of the nature of the investigation, no later than five (5) school days from the date of his/her removal. <u>See</u>, Regulations of the Chancellor A-420 (V)[C]. The Plaintiff was never informed in writing of the nature of the investigation;

▢ At the time of the meeting with the accused employee, the employee must be provided with an explanation of the allegation of corporal punishment and the opportunity to make a statement. <u>See</u>, Regulations of the Chancellor A-420 (VI)[B](4). There was no allegation of corporal punishment asserted at the first meeting with Giulia Cox, Principal of The William W. Niles School - Middle School 118, nor was the Plaintiff told she would be removed from teaching class 408, until January 22, 2018;

▢ If the accused employee requests an opportunity to review student witness statements, or adult witness statements that contain student-specific information, the employee must be provided with an opportunity to review and sign a privacy acknowledgment in the presence of union representation (where such representation is present) that he/she will not disclose the contents of the statements or retaliate against the author(s) of the statements. The UFT union representative also must also be provided the opportunity to review and sign the privacy acknowledgment. <u>See</u>, Regulations of the Chancellor A-420 (VI)[B](4)(a). The Plaintiff asked that the statements be redacted, because it had already been reported to her by other students that certain students, who were failing, were trying to get her fired;

▢ The principal/designee must evaluate the evidence and credibility of all witnesses, including the alleged victim and the accused employee. <u>See</u>, Regulations of the Chancellor A-420 (VI)[B](4)(a). Instead, Giulia Cox, Principal of The William W. Niles School - Middle School 118, created her own narrative of the alleged incident and despite

47

the Plaintiff' pleas, refused to speak with several witnesses, including Ralph Hudson, another teacher, who is African American, and was present in the classroom on his preparation period, and observed the Plaintiff's lesson on the day in question.

167.    Following her return to class 408, on or about February 1, 2018, the Plaintiff was advised by students that there was an individual, (an unidentified male), on campus asking the students questions about the Plaintiff. Later that day, at dismissal, the Plaintiff was confronted on school property by this same individual, who was later identified as Ben Chapman, a reporter from the New York Daily News. The Defendants did nothing to prevent Mr. Chapman from being present on school property, questioning students, or from directly approaching the Plaintiff and taking her photograph (against her will), which would later become the subject of a front page story in the New York Daily News, falsely accusing her of being a "racist" and "*making black students lie face down on the floor of her class, and asking them '[H]ow does it feel to be a slave?'*" As a result, this fabricated and erroneous set of "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world. The Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube.

168.    The Plaintiff was presumed to be guilty without a hearing or a trial. This rush to judgment is a denial of due process and the equal protection of the laws. It is unfortunately, a classic example of "reverse racial discrimination" at its worst.

169.    Since February 1, 2018, the Plaintiff has found herself having to publically defend her reputation and integrity, as a direct result of the actions of The Defendants, particularly, the principal, of The William W. Niles School - Middle School 118, Giulia Cox,

whose negligent actions commenced a course of conduct designed to conceal Principal Cox's failure to adhere to the New York City Chancellor Regulations and the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT). The principal, Giulia Cox, recklessly disclosed false and unsubstantiated information to the NYCDOE Investigators, prior to and during the investigation and tampered with witnesses, to wit: in the disciplinary meeting on January 18, 2018, the Plaintiff advised Principal Cox that Ralph Hudson, another teacher, was present in the classroom on his preparation period and observed the Plaintiff lesson, yet Principal Cox refused to speak with Mr. Hudson, flatly stating to the Plaintiff, "*I don't have to.*" Further, Principal Cox told the OSI investigators that the Plaintiff's lesson was taught on a different date than it actually was, so that it would corroborate Principal Cox's false narrative that Mr. Hudson was not in the room when the lesson was taught. These actions by the Defendants directly resulted in an erroneous news article being written and subjecting the Plaintiff to defamation by numerous individuals. As a result of the Defendants' actions, the Plaintiff has been erroneously and permanently labeled and identified as a "racist," publically humiliated and subjected to public scrutiny, causing a degradation of her professional status and reputation, death threats, and numerous threats of physical harm.

170.    On February 1, 2018, at approximately 6:00 pm, the Plaintiff received a letter from the New York City Department of Education and correspondence from the principal, of The William W. Niles School - Middle School 118, Giulia Cox, advising of the Plaintiff's reassignment from her position as a New York City Public School Teacher at The William

W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York, to Reassigned Staffing Team at 100 Gold Street, New York, New York 10038. As a result, the Plaintiff was prohibited from returning to the Department of Education Middle School 118 without prior written permission. The Plaintiff was subsequently further reassigned to the Queens South Reassignment Center, at 82-01 Rockaway Boulevard, Queens County, a small, uncomfortable room with bars on the windows and 15+ teachers crammed together, where she continues to remain.

171.    On or about February 2, 2018, the principal, of The William W. Niles School - Middle School 118, Giulia Cox sent a letter to the families of the Middle School 118 students advising of the Plaintiff's reassignment. This was purportedly to "calm the masses," who had allegedly threatened an uproar if the Plaintiff was not adequately "punished."

172.    The Plaintiff eventually learned that the front page story in the New York Daily News, falsely accusing her of "*making black students lie face down on the floor of her class, and asking them '[H]ow does it feel to be a slave?'* " [and subsequently disseminated in other media outlets all over the world,] was based on one (1) unsubstantiated allegation from a problem student, who apparently made a false claims to the reporter that the Plaintiff "stood on the back of a black student" and then the Plaintiff allegedly exclaimed, "*This is what slavery feels like.*" This claim was notably different than the complaint made by Student A and Student A's mother, yet was also blatantly false and erroneous. Notably, it was later learned that the student who made the false statement to the New York Daily News reporter was absent from school on the day the lesson on the Middle Passage was taught. This was never revealed by the Defendants.

173.   The Plaintiff was advised that on or about April 19, 2018, that the OSI investigation had exonerated her from the false allegations, and that she would be reassigned back to a classroom; that did not occur[2].

174.   In order to mask the Defendants' own inadequacies and to cover up the fact that the Defendants erroneously accused the Plaintiff of an act which never occurred and that they grossly overreacted and exaggerated their diversity and sensitivity awareness in order to appease their constituents, the Plaintiff learned on September 6, 2018, when she reviewed the Report that the Defendants erroneously found in the OSI Investigative Report that the Plaintiff generally "acted with poor judgment in allegedly conducting a lesson that inadequately incorporated the New York City Department of Education social studies curriculum and guidance for the topic, and that the lesson significantly diverged from best-practices." In actuality, the Plaintiff's lesson on the Middle Passage was in accordance with the New York State approved standards. It should be noted that Student A's parent (who made the initial complaint to the school), curiously refused to permit Student A to be interviewed during the course of the OSI Investigation, likely because they knew that the complaint contained fabricated accusations in the first instance. This is a form of blatant

---

[2] In fact, the Plaintiff was advised that she was being removed from the reassignment at Queens South Reassignment Center, and was able to return to her position at The William W. Niles School - Middle School 118 for the start of the 2018/2019 school year; however, after reporting to The William W. Niles School - Middle School 118 on September 4, 2018, she was notified at 8:38 am that she was again been inexplicably reassigned to 100 Gold Street, New York, New York by the principal, of The William W. Niles School - Middle School 118, Giulia Cox. Principal Cox further exacerbated the Plaintiff humiliation and embarrassment, by publically notifying the Plaintiff of her reassignment back to 100 Gold Street, in front of the entire faculty and staff and having the Plaintiff escorted out of the building by NYPD School Safety Agents. The Plaintiff was subsequently and inexplicably placed back in the Queens South Reassignment Center, where she remained until she was terminated on October 18, 2018.

discrimination and racism condoned by these Defendants. The Defendants may have offered the Plaintiff, parents, and students a lie detector examination; which they failed to do.

175.    Further, as a result of these erroneous acts of the Defendants, the Plaintiff was subjected to a further review to consider whether her services as a probationer would be discontinued and for possible termination of her employment. She was subsequently terminated as a New York City Public School Teacher at The William W. Niles School - Middle School 118 on October 18, 2018.

176.    The Defendant Giulia Cox has repeatedly and egregiously violated the rights of the Plaintiff. Notably, in or around September, 2018, the Plaintiff made a request to view and copy her personnel file; however, the Defendant Giulia Cox inexplicably refused to provide the Plaintiff with such an opportunity, in blatant violation of Article 21 A, of the Contract between the Board of Education of the City School District of the City of New York and the United Federation of Teachers. Accordingly, the Plaintiff filed a grievance with the UFT and the Step One was ignored by the Defendant Giulia Cox.

177.    As such, The UFT agreed that the grievance should go to the next level (Step 2 Grievance a/k/a a grievance at the Chancellor Level). A decision was subsequently made prior to leaving the hearing on November 13, 2018, wherein The Defendant, Giulia Cox stated, that she "can make arrangements to have the original files, and a full paper copy of the file, available for [Plaintiff's] review in the presence of a UFT Secretary at 1 Fordham Plaza." It was then that Chancellor Representative, Alan Lichtenstein confirmed that "You [Giulia Cox] agreed to have a complete copy of the file plus the original at 1 Fordham Plaza

pending a request for a mutually convenient time." Mr. Lichtenstein then confirmed that

the Plaintiff grievant will provide three dates and Giulia Cox will select one." The Plaintiff

provided the dates as requested in an e-mail to Defendant, Giulia Cox on November 21,

2018, and did not receive a response. Instead, the Chancellor Representative, Alan

Lichtenstein, wrote his decision in December, 2018; however, the decision that was written

was not what had been agreed to at the prior grievance hearing. The decision instead stated

that Defendant, Giulia Cox would e-mail her file to the Plaintiff, which is also a clear

violation of Article 21 A.

178.    Further, the Defendant Giulia Cox sent the e-mail with the Plaintiff's personnel

file, which blatantly and egregiously violated the Health Insurance Portability and

Accountability Act of 1996 (HIPAA), and the Plaintiff's rights thereunder, by transmitting

via e-mail and carbon copying other individuals in said e-mail, Plaintiff's medical records

and other personal health information without the Plaintiff's consent.

179.    Moreover, New York City Department of Education, spokesman Doug Cohen

stated on the record in the media, in particular to the Daily News on September 28, 2018,

that "[W]e've begun the process of firing Ms. Cummings based on an investigation of this

unacceptable behavior and her performance as an educator." Curiously, the 30 day, possible

termination notice provided to Plaintiff by District 10 Superintendent Maribel Torres-

Hulla, dated September 17, 2018, stated that on October 18, 2018, Ms. Torres-Hulla would

be reviewing and considering rendering whether the probationer services of the Plaintiff

would continue. How could Mr. Cohen have already determined that the process to fire the

Plaintiff had begun on September 28, 2018, when Superintendent Torres-Hulla had not yet

completed her review and consideration? This demonstrates the Defendant's clear violation of the Plaintiff's due process and civil rights.

180.    Based on the events leading up to and following the Plaintiff's removal as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York, the Defendants knew or should have known that the accusations made against the Plaintiff were erroneous, and the Plaintiff should have never been initially removed from her position in class 408, and subsequently reassigned to Queens South Reassignment Center, at 82-01 Rockaway Boulevard, Queens County, which is informally referred to as "teacher jail." The reassignment to "teacher jail" is a policy improperly utilized by the Defendants as a form of "punishment" for teachers, where the teacher's civil rights are continuously and repeatedly violated.  Due to the regulations of the Defendants, the Plaintiff and others likewise situated are deprived of their constitutional right to due process. The Plaintiff and other teachers are subject to the unsubstantiated narrative as reported by the principals of their respective schools and referred to "teacher jail" reassignment at the whim of their superiors. 42 U.S.C. §§ 1983 and 1988, provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party.

181.    Under *Monell v. Department of Social Serv.*, 436 U.S. 658 (1978), a municipal government can be held liable under Section 1983 if a plaintiff can demonstrate that a deprivation of a federal right occurred as a result of a "policy" of the local government's

54

legislative body or of those local officials whose acts may fairly be said to be those of the municipality. An employee must be acting pursuant to a municipal "policy." To establish a municipal "policy," a plaintiff must prove that the municipal action was (I) taken with the requisite degree of culpability and (ii) causally linked to the deprivation of a federal right. See, also, Amendment 14 of the United States Constitution. The actions and statements of these Defendants are indicative of a pattern of discrimination against Caucasian teachers.

182.     The Plaintiff was actually told by a colleague in the school that what occurred was the result of "*having a white teacher, teach events of black history to black students.*" It was further stated to her that "*only black teachers should be allowed to teach about events of black history to black students.*" "*A black teacher could have taught the very same lesson, and there would not have been a single complaint from any student's parent.*" Statements such as these evidence the reverse discrimination employed by the Defendants in the way that the Plaintiff was treated, as a Caucasian teacher, teaching in a school that has a significant minority population.

183.     Notably, on or about April 9, 2018, it was reported to the UFT that the OSI investigation was completed, and the report was finalized and sent to the Defendant, Department of Education on April 2, 2018. However, the final report, curiously dated July 24, 2018, was not released and provided to the Plaintiff until September 6, 2018 [almost five (5) months] following when it was reported to have been completed and three (3) months after it is dated. The Plaintiff was advised that she should have been returned to Middle School 118 on April 23, 2018, but that never occurred, yet there was never any substantiation of the claims made against the Plaintiff.

184.    Further, the Defendants' only finding in the OSI Investigative Report is that the Plaintiff generally "acted with poor judgment in allegedly conducting a lesson that inadequately incorporated the New York City Department of Education social studies curriculum and guidance for the topic, and that the lesson significantly diverged from best-practices"; this is not even a charge that would be investigated by OSI in the first instance. Claims relating to pedagogy are handled internally with observations and assessments.

185.    The Plaintiff was involuntarily removed from her school and compelled to report to an undesirable location under undesirable conditions without any rational or reasonable basis for her removal and reassignment. She has lost and will continue to lose time from students and has been defamed substantially in the media around the world. She is humiliated and embarrassed by the actions taken against her by the Defendants in removing her from her position without sufficient justification, when the Defendants knew or should have known that the claim against her was fabricated and uncorroborated.

186.    The Defendants, their agents, servants and/or employees were careless and negligent in departing from good and accepted practice in the investigation and monitoring of the unsubstantiated claims made against the Plaintiff, in screening them before taking action against a teacher, for their credibility, veracity, and reliability; and for the removal of the Plaintiff from her position as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York; among other things: in failing to possess the requisite learning, skill,

56

knowledge and judgment ordinarily exercised in investigating and monitoring claims against faculty members; in permitting the media on school property and to question students; in failing to perform certain procedures, which the reasonably skillful and competent personnel would have so done under the circumstances; and in violating each and every rule, regulation, code statute or ordinance governing the exercise of reasonable care and due diligence concerning the management, and control of the aforementioned situation, including but not limited to, violating the New York City Chancellor Regulations and the contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT).

187.    Due to the negligence of the Defendants, the Plaintiff has been significantly damaged. The Plaintiff's reputation as a respected educator has been irreparably and permanently damaged, the extent of which cannot be measured at this time. Her professional career has been substantially compromised and she has been unwillingly exposed to negative notoriety, which has publically humiliated and embarrassed her and subjected her to threats of violence, assault, and death.

### AS TO ALL DEFENDANTS

### <u>CAUSE OF ACTION FOR NEGLIGENCE</u>

188.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "187," above, with the same force and effect as though fully set forth herein.

189.    All Defendants each individually, by and through its agents, servants and employees, actual and ostensible, were negligent and departed from standards of good

and accepted practice, of which they had a non-delegable duty to utilize reasonable care and judgment in the performance of their respective responsibilities and obligations with respect to the Plaintiff; such negligence was continuing and cumulative over the period of time referenced herein.

190.    Defendants' negligence and negligent acts, whether taken singularly or in combination, were a direct and proximate cause of Plaintiff's suffering, mental anguish, and loss of personal dignity, both in the past and continuing in the future.

191.    The Defendants, their agents, servants and/or employees were careless and negligent in departing from good and accepted practice in the investigation and monitoring of the unsubstantiated claims made against the Plaintiff, Patricia Cummings; in screening them before taking action against a teacher, for their credibility, veracity, and reliability; and for the removal of the Plaintiff, from her position as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York; among other things: in failing to possess the requisite learning, skill, knowledge and judgment ordinarily exercised in investigating and monitoring claims against faculty members; in permitting the media on school property and to question students; in failing to perform certain procedures, which the reasonably skillful and competent personnel would have so done under the circumstances; and in violating each and every rule, regulation, code statute or ordinance governing the exercise of reasonable care and due diligence concerning the management, and control of the aforementioned situation, including but not limited to, violating the

New York City Chancellor Regulations and the contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT).

192.    The Plaintiff has suffered significant economic damages, actually and proximately caused by the departures and negligence of the Defendants herein. She is now without employment and without income, and it is unlikely that she will be able to secure other employment due to the public nature of these matters.

193.    The injuries and damages sustained by Plaintiff were caused solely by the torts of the Defendants, without any negligence on the part of any other person contributing thereto.

194.    Plaintiff sustained damages in excess of the jurisdictional limits of all lower courts, which might otherwise have jurisdiction.

## CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

195.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "194," above, with the same force and effect as though fully set forth herein.

196.    By virtue of all of the aforesaid, the Defendants' conduct was and is so atrocious and malicious that a reasonable person should know or would have known that its effect was such as to cause the Plaintiff extreme emotional distress.

197.    The effect of such negligent behavior toward the Plaintiff, inflicted through the Defendants' intentional and deliberate campaign of harassment, rose and continues to rise to a level that goes beyond all bounds of decency in a civilized society.

198.   As a result of the utterly vicious and incomprehensible nature of the actions taken against the Plaintiff by the Defendants, the Plaintiff has suffered and continues to suffer such distress that the conduct and actions rose and continues to rise to a level such that no reasonable person could be expected to endure.

199.   The Plaintiff has sustained, among other things, severe mental and physical distress, severe emotional and psychological distress, physical discomfort, loss of sleep, anxiety, and has sustained damages of a permanent, lasting nature.

200.   The Defendants have proximately caused the Plaintiff to sustain very substantial damages to be determined at a jury trial of this matter.

## CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

201.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "200," above, with the same force and effect as though fully set forth herein.

202.   The aforementioned conduct of the Defendants is extreme, outrageous, and unwarranted and constitutes a deliberate and persistent campaign of harassment and intimidation resulting in an intentional infliction of emotional distress on the Plaintiff.

203.   The Defendants intentionally, willfully, and recklessly permitted a deliberate and persistent campaign to threaten, intimidate, harass, and demean the Plaintiff for the intentional purpose of attaining her/their own gains and causing the Plaintiff grief and distress.

204.   The Defendants have intentionally inflicted severe emotional distress upon the Plaintiff by a course of outrageous and horrifying conduct, which has caused her to

suffer humiliation; embarrassment; the loss of business, friendships and associations; the loss of reputation; ridicule; depletion of financial resources, as well as other inchoate and unspecified damages, as yet to be fully determined.

205.    The Defendants have specifically and intentionally uttered, stated and published the foregoing knowing or having reason to know that such statements would cause the Plaintiff to be ridiculed, embarrassed, humiliated and emotionally hurt or distressed by the aforesaid comments.

206.    The Defendants' conduct as related to the Plaintiff in these and the aforementioned incidents in the allegations common to all causes of action, were such that they knew that severe emotional distress would be certain or substantially certain to result, and in fact, engaged in the acts purposefully and specifically with the intent to cause distress in an effort to achieve their own ulterior motives. Such conduct was so malicious that it rises to a level that goes beyond all bounds of decency in a civilized society.

207.    The Defendants have specifically and intentionally caused the Plaintiff to suffer extreme emotional distress by outlandish and egregious statements that are untrue.

208.    That as a result of the aforesaid intentional infliction of emotional distress, the Plaintiff has suffered and continues to suffer a level of distress that rises to a level such that no reasonable person could be expected to endure.

209.    The Defendants have proximately caused the Plaintiff to sustain very substantial damages to be determined at a jury trial of this matter.

**WHEREFORE**, the Plaintiff demands (a) judgment against the Defendants on all causes of action for compensatory damages and punitive damages, together with interest, costs and disbursements of this action, in an amount to be determined at a jury trial of this matter, no less than $1,500,000,000.00; (b) that all costs of this action be taxed to the Defendants; and (c) that the Court grant to the Plaintiff such other and further relief that the Court deems just and proper, including equitable relief.

Dated:  Garden City, New York
       May 15, 2019

Yours, etc.,

LAW OFFICES OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq.
Attorneys for Plaintiff
600 Old Country Road. Suite 530
Garden City, New York 11530
(516) 794-4700

<u>VERIFICATION</u>

STATE OF NEW YORK )

                          ss.:

COUNTY OF NASSAU )

      **Patricia Cummings,** being duly sworn, deposes and says: that the deponent is the Plaintiff in

the within action; that she has read the foregoing Complaint and knows the contents thereof; that the

same is true to her own knowledge, except as to the matters therein stated to be alleged on

information and belief, and that as to those matters deponent believes it to be true.

*Patricia Cummings*

PATRICIA CUMMINGS

Sworn to before me this

_17th_ day of May, 2019.

*Lucia M. Ciaravino*

Notary Public

LUCIA M. CIARAVINO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01CI6061004  Nassau
QUALIFIED IN ~~QUEENS~~ COUNTY
COMMISSION EXPIRES JULY 8, 20_19_