UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------X

PATRICIA CUMMINGS,

                            Plaintiff,

        -against-

THE CITY OF NEW YORK; NEW YORK CITY DEPARTMENT
OF EDUCATION; CITY OF NEW YORK OFFICE OF SPECIAL
INVESTIGATIONS; NYC MAYOR BILL de BLASIO; GIULIA COX;
COURTNEY WARE; BEN CHAPMAN; NEW YORK DAILY NEWS;
DR. ANDRE PERRY; THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA; LENARD LARRY
McKELVEY a/k/a CHARLAMAGNE THA GOD; WWPR-FM
(105.1 MHZ); iHEARTMEDIA; CLEAR CHANNEL
COMMUNICATIONS, INC.; NEW YORK STATE SENATOR,
KEVIN S. PARKER; COUNCILMAN, JUMAANE D. WILLIAMS;
COUNCILMAN, DANIEL DROMM; COALITION OF
EDUCATIONAL JUSTICE; ANGELMARTINEZ;
NATASHA CAPERS, et al.

                           Defendants.

-------------------------------------------------------------------------------------X

Docket No.
19-cv-07723 (CM) (OTW)

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
### TO THE DEPARTMENT OF EDUCATION AND CITY OF NEW YORK DEFENDANTS'
### MOTION TO DISMISS PURSUANT TO FED. RULE OF CIV. PROCED. 12 (b)(6)

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq. (TL 4471)
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*
600 Old Country Road, Suite 530
Garden City, New York 11530
*Tom@TLiotti.com*
Phone:  (516) 794-4700
Fax:     (516) 794-2816

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ...............................................................................................2

ARGUMENT ..................................................................................................................12

POINT I ..........................................................................................................................12

    PLAINTIFF'S CONSTITUTIONAL LAW CLAIMS
    ARE MERITORIOUS ...............................................................................................12

    Plaintiff's Due Process Claims are Meritorious..............................................................13

    The Plaintiff Has Established the Deprivation of a Property Interest.................................13

    The Plaintiff Has Established a Deprivation of Liberty Interest........................................15

    Plaintiff's Equal Protection Claim is Meritorious ...........................................................17

    The City of New York is a Proper Party for
    the Plaintiff's Constitutional Claims...............................................................................19

    The Plaintiff has sufficiently Demonstrated a Private Right of Action .............................19

    The Plaintiff has established a *Monell* Claim .................................................................20

POINT II .........................................................................................................................26

    PLAINTIFF'S STATE LAW CLAIMS ARE MERIOTORIOUS ....................................26

    The Plaintiff's Notice of Claim was Timely....................................................................26

    Plaintiff's Defamation Claims are Meritorious................................................................29

    The Claim Against Mayor de Blasio are NOT
    Protected By Absolute Privilege.....................................................................................30

    Claims Against the Council Members are Likewise Actionable .......................................31

    The Plaintiff's Fraud Claim is Meritorious and Should Not be Dismissed .......................32

    The Plaintiff's Claims for Negligence, Negligent Infliction of Emotional
    Distress, and Intentional Infliction of Emotional Distress are Meritorious.......................32

The Defendants Breach of Contract Claim is Meritorious ..................................................34

POINT III..............................................................................................................................34

OSI IS A SUABLE ENTITY..............................................................................................34

CONCLUSION.....................................................................................................................34

# TABLE OF AUTHORITIES

**Federal Cases**

*Abramson v. Pataki,*
    278 F.3d 93, 103 (2d Cir.2002) ........................................................................ 15

*Ahern v. Board of Education,*
    456 F.2d 399, 403 (8th Cir.1972) .................................................................... 13

*Armstrong v. Manzo,*
    380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) ..................... 13

*Ashcroft v. Iqbal,*
    556 U.S. 662, 678, 681 (2009) ........................................................................ 12

*Baden v. Koch,*
    799 F.2d 825, 830–31 (2d Cir.1986) .............................................................. 15

*Batista v. DeGennaro,*
    13 Civ. 1099 (DAB), 2015 U.S. Dist. LEXIS 44022, at *8
    (S.D.N.Y. Mar. 31, 2015) ................................................................................ 18

*Bell Atlantic Corp v. Twombly,*
    (550 US 544, 570, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) ............ 2, 12

*Bloom v. Fox News of LA,*
    528 F. Supp. 2d 69, (EDNY 2007) .................................................................. 32

*Board of Regents v. Roth,*
    408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972). ............... 13

*Brown v. State of New York,*
    89 N.Y.2d 172 (N.Y. 1996) ............................................................................ 14

*Cooley v. Board of Education,*
    453 F.2d 282, 286-87 (8th Cir.1972) .............................................................. 13

*Codd v. Velger,*
    429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) ................................. 15

*Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,*
    96 F.3d 623, 632 (2d Cir.1996) ...................................................................... 16

i

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC,*
F Supp 3d , 2016 WL 3773394, [SD NY 2016] ..................................................................31

*Famous Horse Inc. v. 5th Ave. Photo Inc.,*
624 F.3d 106, 108 (2d Cir. 2010) .....................................................................................12

*Fox v. NYC Dep't of Education,*
2015 US Dist. LEXIS 110857 (SDNY Aug. 20, 2015)........................................................34

*Gentile v. Wallen,*
562 F.2d 193, 198 (2d Cir.1977) .......................................................................................16

*Goetz v. Windsor Cent. Sch. Dist.,*
698 F.2d 606, 610 (2d Cir.1983) .......................................................................................15

*Koulkina v. City of New York,*
559 F. Supp. 2d 300 (S.D.N.Y. 2008) ..................................................................................2

*LaForgia v. Davis,* No. 01 Civ.
7599, 2004 WL 2884524, (S.D.N.Y. Dec. 14, 2004).........................................................16

*Martz v. Incorporated Vill. of Valley Stream,*
22 F.3d 26, 32 (2d Cir.1994) ............................................................................................16

*McGovern v. City of Philadelphia,*
554 F.3d 114, 120-21 (3d Cir. 2009) ................................................................................20

*Monell v. Department of Social Serv.,*
436 U.S. 658 (1978) ..........................................................................................................20

*O'Neill v. City of Auburn,*
23 F.3d 685, 691 (2d Cir.1994) ...................................................................................15, 16

*Oneida Indian Nation of N.Y. v. Madison County,*
665 F.3d 408, 427-28 (2d Cir. 2011).................................................................................13

*Passucci v. Home Depot, Inc.,*
67 AD3d 1470, 1471 [4th Dept. 2009]...............................................................................33

*Patterson v. McLean Credit Union,*
491 U.S. 164 (1989) ..........................................................................................................20

*Paul v. Davis,*
424 U.S. 693, 701, 96 S. Ct. 1155, 47 L.Ed.2d 405 (1976) ..............................................15

*Perry v. Sindermann,*
408 U.S. 593 (1972) ..........................................................................................................13

*Sciolino v. Newport News,*
    US-2229 (4th Cir. Mar. 12, 2007) ....................................................................... 17

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002) .......................................................................................... 17

*Twombly,*
    550 U.S. at 570 [2007] ....................................................................................... 12

*Valmonte v. Bane,*
18 F.3d 992, 999 (2d Cir.1994) ............................................................................. 15

*Walker v. Schult,*
    717 F.3d 119, 124 (2d Cir. 2013) ..................................................................... 12

*Walentas v. Lipper,*
    862 F.2d 414, 420 (2d Cir.1988) ...................................................................... 15

*Williams v. City of New York,*
    2014 US Dist. LEXIS 49837 (SDNY Mar. 26, 2014),
    aff'd, 602 Fed. Appx. 28 (2d Cir. 2015). ......................................................... 19

**State Cases**

*Barnes v. County of Onondaga,*
    103 AD2d 624, 627, 481 NYS2d 539, aff'd,
    65 NY2d 664, 491 NYS2d 613 [1984] ............................................................ 27

*Beary v. City of Rye,*
    44 N.Y.2d 398, 406N.Y.S.2d 9 (1978) ............................................................. 28

*Biss v. City of New York,*
    (Sup.Ct. Queens County) NYLJ 1/2/97, page 30, cols. 1, 2,
    GML Section 50-e(5) Op. Cit. ........................................................................... 28

*Brian v. Richardson,*
    87 NY2d 46 (1995) ............................................................................................ 29

*Calloway v. City of New York Hous. Auth.,*
    219 A.D.2d 711, 631 N.Y.S.2d 752; ................................................................. 28

*Chapadeau v. Utica Observer-Dispatch,*
    38 NY2d 196, 199 (1975) .................................................................................. 32

*Cheatum v. Wehle,*
    5 N.Y.2d 585 ...................................................................................................... 30

*Dillon v. City of New York,*
  261 AD2d 34 (1999)]. ....................................................................................................29

*Egiazaryan v. Zalmayev,*
  880 F Supp 2d 494, 503 [SD NY 2012] ....................................................................30, 31

*Gisondi v. Harrison,*
  220 N.Y.S.2d 105, 1961 N.Y. Misc. LEXIS 3680 (N.Y. Sup. Ct. 1961),
  modified, 16 A.D.2d 929, 229 N.Y.S.2d 698, 1962 N.Y. App. Div.
  LEXIS 9364 (N.Y. App. Div. 2d Dep't 1962). ..............................................................28

*Gross v. New York Times Co.,*
  82 NY2d 146 at 53-154 (1993). .................................................................................30, 31

*Heinman v. City of New York,*
  85 AD2d 25, 28, 447 NYS2d 158 [1st Dept. 1982] .........................................................27

*International Publishing Concepts, LLC v. Locatelli,*
  2015 NY Slip Op. 50049(U).............................................................................................31

*Lozada v. City of New York,*
  189 A.D.2d 726, 592 N.Y.S.2d 742 (1st Dept.1993) .......................................................29

*Leader v. Marone, Ponzini & Spencer,*
  97 N.Y.2d 95, 736 N.Y.S.2d 291, 761 N.E.2d 1018
  (C.A. 2001) at p. 105-106.................................................................................................27

*Matter of Morris,*
  88 A.D.2d 956, 451 N.Y.S.2d 448, aff'd 58 N.Y.2d 767,
  459 N.Y.S.2d 38, 445 N.E.2d 214....................................................................................28

*Matter of Newcomb v. Middle Country Cent. Sch. Dist.,*
  28 N.Y.3d 455, 68 N.E.3d 714, 45 N.Y.S.3d 895, 2016 N.Y.
  LEXIS 3854 (N.Y. 2016), reh'g denied, 29 N.Y.3d 963,
  73 N.E.3d 853, 51 N.Y.S.3d 496, 2017 N.Y. LEXIS 811 (N.Y. 2017) ......................28, 29
*Matter of Roland v. Nassau County Dept. of Social Servs.,*
  35 A.D.3d 477, 478, 828 N.Y.S.2d 94 .............................................................................29

*Matter of Belenky v. Nassau Community Coll.,*
  4 A.D.3d 422, 771 N.Y.S.2d 379. ....................................................................................29

*Mestel v. Board of Education of the City of Yonkers,*
  90 A.D.2d 809,455 N.Y.S.2d 667 (2d Dept. 1982) .........................................................29

*Murphy v. Am. Home Products Corp.,*
  58 NY2d 293, 303 [1983]..................................................................................................33

*O'Mara v. Town of Cortlandt,*
    210 A.D.2d 337, 620 N.Y.S.2d 82. ...............................................................28

*Parks v. Steinbrenner,*
    131 AD2d 60, 62-63 [1st Dept. 1987]. ......................................................31

*Pelaez v. Seide,*
    778 NYS2d 111, 117 (2004)........................................................................34

*Prince v. Fox Television Stations, Inc.,*
    33 Misc 3d 1225(A) (2011) .......................................................................30

*Rinaldi v. Holt, Reinhart & Winston,*
    42 NY2d 369, 379, cert denied 434 US 969 (1977)].................................29

*Santana v. Leith,*
    117 AD3d 711, 712 [2d Dept. 2014] ..........................................................33

*Sheila C. v. Povich,*
    11 AD3d 120, 131 [1st Dept. 2004...............................................................33

*Silsdorf v. Levine,*
    59 NY2d 8, 15-16 [1983], cert denied 464 US 831.....................................31

*Steinhilber,*
    68 NY2d .......................................................................................................31

*Sverdlin v. City of New York,*
    229 A.D.2d 544, 645 N.Y.S.2d 843 ...........................................................28

*Valdez v. City of New York,*
    936 NYS2d at 592 .......................................................................................34

**Rules**

Federal Rule of Civil Procedure 12 (b)(6).........................................1, 2,12, 17, 34

Fed. R. Civ. P. 8.......................................................................................................17

New York General Municipal Law Section 50-I......................................................26

New York General Municipal Law Section 50-e................................................27, 28

New York General Municipal Law Section 50-h.......................................................27

NY Ed Law § 2950-g(2)............................................................................................19

Section 1 of the Civil Rights Act of 1866 ................................................................18

Title VII of the Civil Rights Act..........................................................................15, 17

42 U.S.C. §1981 ...................................................................................................19, 20

42 U.S.C. §1981(c) ...................................................................................................20

42 U.S.C. §1983 ...................................................................................................19, 20

42 U.S.C. §1988 ...................................................................................................25

**Constitutional Provisions**

Fourteenth Amendment of US Constitution ...................................................................20

**Secondary Sources**

Article 7B (1) .............................................................................................................9

Article 20 Contract between DOE & UFT .......................................................4, 14, 22

Article 21 A Contract between DOE & UFT ........................................................ 23, 24

Chapman, Ben, *City to Spend $23M for Anti-Bias Training for Public
    School Educators*, New York Daily News, (online), April 26, 2018 ...............................16

Chancellor Regulation A-420 .........................................................4, 14, 21, 22, 26, 32

The Nonintercourse Act, 25 U.S.C. § 177 ....................................................................13

White, Helen and Christina Evans, *Learning to Listen to Learn:
    Using Multi-Sensory Teaching for Effective Listening* (2005). ..........................................2

3 Restatement, Torts, § 591 ..........................................................................................30

Plaintiff, Patricia Cummings, (hereinafter "Plaintiff" or "Ms. Cummings"), a private individual, respectfully submits this Memorandum of Law in Opposition to the DOE Defendants and the City Defendants (hereinafter referred to collectively as the "Defendants" and separately as "DOE Defendants" and "City Defendants") Motion to Dismiss the Plaintiff's Verified Complaint pursuant to Federal Rule of Civil Procedure 12 (b)(6).

## PRELIMINARY STATEMENT

The Plaintiff was a dedicated, effective, and highly respected probationary New York City Public School Teacher employed by the Department of Education to teach at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York. She seeks damages related *inter alia* to the infliction of defamation and defamation *per se*, reverse discrimination, denial of due process, severe emotional, psychological, and physical distress, loss of reputation, loss of income, expenses upon her, the erroneous termination of her employment as a New York City school teacher, and the "*badge of infamy*" with which she has forever been branded.

The Plaintiff's claim arose as a result of what was fallaciously reported concerning an alleged complaint made by **one (1)** parent of **one (1)** student on or about January 11, 2018, regarding a lesson taught by the Plaintiff in her social studies class 408, on the Middle Passage, which took place on January 9, 2018, wherein she subsequently and unwillingly became the subject of a front page pictorial and story in the New York Daily News, falsely accusing her of being a "*racist*" and "making black students lie face down on the floor of her class," and asking them: "*[H]ow does it feel to be a slave?*" As a result of the City Defendants' actions, this fabricated and erroneous set of purported "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world.

The Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it was erroneously reported, among other things that she "*singled out black students and made them act like slaves;*" she is falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" She has been publically shamed and falsely accused of "*child abuse,*" labeled as a "*racist,*" referred to as an "*oppressor,*" by many, including politicians and activists, and

1

specifically in various and extensive media outlets discussing this issue. She has received direct threats of violence and death causing her to fear for her life. The Plaintiff was ultimately exonerated of the original erroneous allegations following an investigation by the New York City Department of Education's Office of Special Investigations, yet has nonetheless been terminated from her employment as New York City Public School Teacher at The William W. Niles School - Middle School 118.

Neither the City Defendants nor the DOE Defendants have met this Circuit's standard on Rule 12 (b)(6) motions. "The Supreme Court in *Bell Atlantic Corp v. Twombly*, (550 US 544, 570, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) held that, in order to survive a motion to dismiss pursuant to Rule 12 (b)(6), a plaintiff need not provide detailed factual allegations, but the factual allegations asserted must be "enough to raise a right to relief above the speculative level…" See, *Koulkina v. City of New York*, 559 F. Supp. 2d 300 (S.D.N.Y. 2008). Accordingly, the Defendants' motion to dismiss should be denied in all respects.

## STATEMENT OF FACTS

The Plaintiff's lesson was, in actuality, an example of a multi-sensory[1] teacher demonstrating "spatial recognition" to her students. This part of her lesson was described by the Plaintiff as a "teachable moment," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes; it was not, in any way, a reenactment. A fabricated account made by one student from Plaintiff's 408 class accused Ms. Cummings of using her feet or her knees to push the students closer together during the demonstration is contradicted by the reported findings of the of the New York City Department of Education's Office of Special Investigations (also referred to as OSI); to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student' I never observed Ms. Cummings' knee make contact with 'Student A'*" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them*." See, Redacted Copy of Office of Special Investigations Investigative Report (OSI)

---

[1] Multi-sensory teaching is a didactic system that seeks to develop awareness of self in time and space in order to raise cognition and understanding of the world as is experienced. It takes into account that different children learn in different ways; conveys information through things like touch and movement-called tactile and kinesthetic elements, as well as sight and hearing. See, White, Helen and Christina Evans, <u>Learning to Listen to Learn: Using Multi-Sensory Teaching for Effective Listening</u> (2005).

dated July 24, 2018, included as City Defendants' Exhibit A. Moreover, "Students B, D, E, F, I, J and K" noted that the participating student volunteers did not appear to be in any distress. <u>See</u>, City Defendants' Exhibit A. Most remarkably, "Student J" admitted that "'*Student A*'[2] *was lying and was attempting to get Ms. Cummings fired or in trouble because 'Student A' did not like Ms. Cummings*." <u>See</u>, Defendants' Exhibit A, at page 5. Moreover, the Plaintiff controverts this fallacious allegation in her rebuttal correspondence addressed to Community Superintendent Maribel Torres-Hulla dated October 5, 2018, annexed hereto as **Exhibit A** at page 8.

The Plaintiff acknowledges that in her lesson she showed a *five (5) minute* *video clip* from the movie entitled *Freedom* to differentiate her lesson and increase student engagement and retention of the material which depicted the horrible conditions and atrocities Africans who were slaves were subjected to on the Middle Passage. The Defendants disingenuously include in their papers descriptions of the entire movie as a "melodramatic religious drama," where the ship's captain "sees countless awful sights, from nearly naked people chained together in the tightest quarters to a woman being branded with a hot iron." (noting that it "[c]ontains violence and disturbing images"). It should be noted that nothing graphic was shown to the students. In this regard, as some students were mocking the contents of the 5 minute video clip, specifically the closeness of the conditions being discussed; as a result, a teachable moment arose, and the Plaintiff engaged four (4) student volunteers to sit very close together for a demonstration to perceive the cramped conditions on the ship. Nonetheless, the Plaintiff denies that any student laid on the floor at any time during the demonstration and denies making any physical contact with any student during the demonstration, which was no more than 20 seconds in length. Ralph Hudson[3], another teacher on his preparation period in the Plaintiff's classroom, observed the Plaintiff's lesson.

---

[2] "Student A" was one of four students who voluntarily participated in the classroom demonstration on the Middle Passage. It was erroneously alleged that Ms. Cummings pushed "Student A's" back with her knee and asked if it hurt or caused her discomfort.

[3] It should be noted that Ralph Hudson is African-American and witnessed the Plaintiff's lesson. He acknowledged to the Plaintiff after the lesson that he was impressed with how she handled the situation and subject matter with such grace and dignity. It is important to note that he told investigators from the Department of Education's Office of Special Investigations (OSI) that he found the lesson to be "*appropriate* and was within the scope of *effectively educating students* about the harsh conditions endured by slaves during transport." (Emphasis added). He did not corroborate the events that the student alleged to have happened. Furthermore, he indicated that it was his belief that if the Plaintiff were African-American, the incident would have been a non-issue.

"Student A" is alleged to have complained on or about January 11, 2018, and as noted in the OSI Report, "Student A's" mother is noted to have complained 6 days later (9 days after the lesson). Further, it is evident that a complaint was not immediately filed according to the OSI Report. See, City Defendants' Exhibit A. Furthermore, the Plaintiff was not removed for investigation by the New York City Department of Education's Office of Special Investigations until February 2, 2018; the day the Daily News exclusive front page story was published. Principal Cox did a school based investigation, but failed to adhere to Chancellor Regulation A-420 and breached Article 20 of the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT). A copy of the Plaintiff's Verified Complaint dated May 15, 2019, annexed hereto as **Exhibit B**, at pages 46-48.

On or about January 16, 2018, the Plaintiff received a hand-delivered correspondence by and from the Defendant, Giulia Cox, Principal of The William W. Niles School - Middle School 118, inexplicably informing her that she was the subject of a disciplinary meeting to take place on January 18, 2018. On or about January 18, 2018, the Plaintiff met with the Defendant, Giulia Cox and was shown the student's statements taken on January 11, 2018. The Plaintiff requested that the Defendant, Giulia Cox speak with Ralph Hudson regarding what he had observed in the classroom that day; the Defendant, Giulia Cox inexplicably refused. It was at this time that the Defendant, Giulia Cox began to create a false narrative regarding the events of January 9, 2018.

Shortly thereafter, from January 23, 2018 to January 25, 2018, the Plaintiff was removed from teaching class 408; however, notably, she continued to teach her other classes during this time. Following the Plaintiff's return to class 408, on or about February 1, 2018, due to the Defendants' negligence and/or lack of security, the Plaintiff was accosted and confronted on school property by Defendant, Ben Chapman, a reporter with the New York Daily News, and as a result, the Plaintiff became the subject of a false and scandalous front page story falsely accusing her of being a "racist" and *singling out black students and making them act like slaves;*" telling them to "*lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like.*" The Defendant herein, Ben Chapman, further wrote that the Plaintiff had "shocked and traumatized children in her social studies class."

As a result of the Defendants' negligence and/or willful failure to secure the campus, this fabricated and erroneous set of "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world. The Plaintiff has received direct threats of violence, sexual assault, and death causing her to fear for her life and safety. Not only did the Defendant, Ben Chapman and Defendant, New York Daily News defame the Plaintiff's character in their exclusive February 2, 2018 article, and subsequent articles thereafter, but they also took her picture against her will on school property and published it on the cover page to entice the public to read the article as well as other pictures of the Plaintiff in the article itself, which caused Plaintiff to suffer enormous and outrageous attacks. Due to the Defendants' negligence and/or lack of security, the Defendant, Ben Chapman and his photographer trespassed on school grounds speaking freely with minor students, without parental knowledge or consent and walked around the entire campus unattended. In homeroom on February 1, 2018, two of the Plaintiff's students reported to her that on January 31, 2018, a "white man" had been walking around campus confronting students asking questions about her [Plaintiff]. The Plaintiff immediately went to the main office after speaking to said two students, to inform Defendant, Giulia Cox. She learned that Defendant Cox was not in the building at the start of the school day, and saw the UFT Chapter Leader, (Ms. Murphy-Higgs) and informed her. Ms. Higgs in turn informed Defendant, Assistant Principal Courtney Ware, of the situation. Defendant, Courtney Ware confronted and questioned the students. She also spoke to School Safety Agent Rodriguez and stated to him how "she couldn't understand how he let this happen," and directed that "there better be more agents outside because this cannot happen again." Further, numerous students informed the Plaintiff throughout the school day on February 1, 2018, that a "white man" with a notepad had asked if the Plaintiff ever walked on their backs. This fabricated and erroneous set of "facts" would be what the public at large would believe had been perpetrated by the Plaintiff. Other students agreed that they had also been confronted by a "white man" who was 'writing down what they [the students] were saying. During second period, two students in the Plaintiff's class 408 confronted a third student and accused him of being a liar – screaming that he [the student] had lied to the "white man" yesterday when asked about the Plaintiff. After class, those same two students confided in the Plaintiff

and stated that the third student (J.S.),[4] had erroneously told the reporter that she [Plaintiff] "*had us [the students] lie on our stomachs and walk on our backs*," and the student was described as laughing hysterically at what he had told the reporter. Those two students had tried to defend the Plaintiff by saying it never happened and what (J.S.) had told the reporter was a lie. One of the two students even explained the lesson and what he learned while defending her. It is important to note that <u>Student J.S. was not even in attendance the day the lesson was taught</u>; a fact that would have easily been verifiable.

Following the Daily News exclusive, the Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it is erroneously reported, among other things that she "*singled out black students and made them act like slaves*;" she is falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*." She has been publically and falsely accused of "child abuse," labeled as a "racist," referred to as an "oppressor," by many, including politicians and activists, and specifically by Defendant, Ben Chapman, a reporter from the New York Daily News and Defendant, Dr. Andre Perry in the Hechinger Report, a nonprofit, independent news organization focused on inequality and innovation in education. The Plaintiff has been publically referred to as, among other things, a "racist," a "bigot" a "cracker," and a "white devil," by New York City Power 105.1 radio personality and social media influencer, Defendant, Lenard Larry McKelvey, known professionally as "*Charlamagne tha God*;" and, among other things, as a "cave animal" and a "white supremacist" by Defendant, Philip Scott, a YouTube personality, host of TheAdviseShowTV channel, disingenuously proclaiming a commitment to reporting "truthful" and "accurate news," where he has over a million subscribers listening to his social and political commentary, and further by other members of the general public in various and extensive online media posts discussing this issue. The Plaintiff has received direct threats of violence, sexual assault, and death causing her to fear for her life and safety. Notably, the Defendant, Giulia Cox, Principal of The William W. Niles School - Middle School 118, adamantly refused to speak with Ralph Hudson, a teacher who was present in the classroom, witnessed the plaintiff's

---

[4] The minor student's name has been replaced with in initials in order to protect his privacy. The Plaintiff acknowledged that this student was angry with the Plaintiff because he was not doing well in her class and wanted to get her [Plaintiff] fired.

lesson, and later testified to the Office of Special Investigations (O.S.I.) that the lesson in question was "appropriate and in the scope of effectively educating students." See, Defendants' Exhibit A at pages 7 and 8.

On February 1, 2018, after being confronted on school property at dismissal by the Defendant, Ben Chapman and his photographer, the Plaintiff immediately went to see her immediate supervisor, the Assistant Principal, Leah Dyer and advised her that she had been ambushed on school grounds by the Defendant, Ben Chapman. Assistant Principal, Leah Dyer consoled the Plaintiff and advised her to fill out a DOE OORS Report so as to document the incident. She then called the Main Office to speak with Defendant, Giulia Cox regarding the incident. After some time passed, Defendant, Giulia Cox came to Ms. Dyer's Office and stated she [Defendant, Giulia Cox] called the Chancellor Division that handles media issues and confirmed that the *Daily News* would indeed be running a story on the Plaintiff. Defendant, Giulia Cox then suggested to the Plaintiff that she should take the next day off. The Plaintiff adamantly refused, as she had done nothing wrong. Later on February 1, 2018, at 6:02 pm, the Plaintiff was advised via e-mail that the Division of Human Resources has reassigned her work location to 100 Gold Street; which has been notoriously referred to as "teacher jail." In an effort to be certain that the Plaintiff would be advised of her abrupt reassignment, the Defendant, Giulia Cox left the Plaintiff a voicemail message at 5:59 pm. The Plaintiff was further advised that she was the subject of an investigation by the Office of Special Investigations (OSI). As a result, the Plaintiff was prohibited from returning to the Department of Education Middle School 118 without prior written permission. The Plaintiff was subsequently further reassigned to the Queens South Reassignment Center, at 82-01 Rockaway Boulevard, Queens County, a small, uncomfortable room with bars on the windows and 15+ teachers crammed together. On February 2, 2018, at 6:15 am, the Defendant, Giulia Cox sent an e-mail to the entire school staff advising that the Superintendent has advised that the school should expect a large media presence at the school that morning. They were expected to be reporting on the "classroom incident" that occurred approximately two weeks ago. She further stated: "It is normal for Middle School children to be curious and excited about the presence of reporters, but the students are minors and should not be speaking with the media without parental permission." These statements by the Defendant, Giulia Cox are curiously disingenuous, as the Defendant, Ben Chapman and his photographer had been on school grounds speaking freely with minor students without parental knowledge or consent and walking around the entire campus unattended. As previously stated, two

of the Plaintiff's homeroom students, two students in her class 408 second period, and numerous students throughout the school day, reported to her that the previous day, January 31, 2018, that on January 31, 2018, a "white man" had been walking around campus confronting students asking questions about her [Plaintiff]. Moreover, the students told the Plaintiff that the "white man" had asked if the Plaintiff had ever walked on their backs and was writing things down in a notepad. On or about February 2, 2018, the Defendant, Giulia Cox sent a letter to the parents expressing the school's concern over the reported accusation; informing them that it is being investigated; and reassuring the parents that she [Plaintiff] has "been assigned away from students." Moreover, the Defendant, Giulia Cox appeased the parents by advising them that "she was working with staff to review the Department's Non-Discrimination Policy to further diversity and sensitivity awareness in the workplace."

On or about March 9, 2018, the Plaintiff received a 48-hour written notice from the Defendant, DOE's confidential investigator, William Deininger, advising that OSI is conducting an investigation into an allegation of employee misconduct that had been filed against her. The meeting did not take place until March 15, 2018, due to inclement weather. On or about March 19, 2018, the Plaintiff received an e-mail from the Defendant, DOE's confidential investigator, William Deininger advising that she would be returning to her teaching position at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York. That never happened. The Plaintiff was ultimately exonerated of the erroneous allegations following an investigation by the Office of Special Investigations. The OSI report was reduced to writing on July 24, 2018, (see, Defendant's Exhibit A), but the Plaintiff was not notified that she had been cleared of the accusations until July 26, 2018, by her UFT District 10 Representative. She was advised by the UFT District 10 Representative that she would be returning to work and teaching at the William W. Niles School - Middle School 118 for the 2018/2019 school year. The DOE curiously did not mail the letter stating she was able to return to her position as "TEACHER" to her mailing address, but instead mailed the letter to the William W. Niles School, Middle School 118.

On August 22, 2018, the Plaintiff received an e-mail from the Defendant, Giulia Cox, advising that she was released from reassignment in August, (which is factually wrong), and would be scheduled to be teaching at the William W. Niles School - Middle School 118 in September. Defendant, Giulia Cox stated that Plaintiff would be tentatively teaching 6th grade Social Studies in Spectrum Academy; the position that Mr. Cavallo vacated when he

took an Open Market Transfer in June. This is extremely notable, as the Plaintiff believes that was how Defendant Giulia Cox knew the Plaintiff was going to be terminated, and she would be able to justify her hiring someone with that schedule. It would be just an easy name switch on her part. However, the fact that Plaintiff had filled out a preference sheet complicated matters; therefore, the Defendant, Giulia Cox had to create the fake schedule. The Plaintiff advises that as Middle School teacher you teach 25 classes per week; 21 out of the 25 were Mr. Baker's, 2 were Mr. Thomas' and 2 were Ms. Gambordelli's - all matching the same class number, day, period, and room number. The Plaintiff was NEVER the teacher of record for the classes she was scheduled for, which evidences the fact that her firing was pre-meditated and that there was no due process in her termination. Defendant, Giulia Cox will likely argue that she had to restructure the building; however, to make her story plausible, if the Plaintiff was the true and actual teacher of record for those classes, there would've had to have been a substitute teacher covering those classes the Plaintiff was scheduled for during her second reassignment, from September 5th, (the first day students report) up until her termination on October 18, 2018. Moreover, the Plaintiff is not licensed in NYS to teach 6th grade and would be violating NYS Education Law by accepting this assignment. Nonetheless, the Plaintiff advised the Defendant, Giulia Cox that she would be returning to the school and provided her with a completed preference sheet[5] and filled out a circular assignment utilizing the hyperlink Defendant, Giulia Cox had provided. On August 29, 2018, the Plaintiff contacted the Manager of Reassigned Staffing Team – Division of Human Resources, Colin Caldwell, because it was her understanding that if she is still reassigned at the end of the (2017/2018) school year, she should report to the same reassignment location on the first day of school, unless she received a formal notice. The Plaintiff had not received any official notice from the DOE authorizing her to return to the Middle School, and she was concerned about being falsely accused of insubordination. Nonetheless, she was advised by Mr. Caldwell that she should report to the William W. Niles School - Middle School 118 on September 4, 2018, the date all teachers in the NYC Department of Education return from summer break and return to their

---

[5] The preference sheet was received by the Plaintiff in the August 22, 2018, e-mail, but it should have properly been provided to the Plaintiff in May in accordance with the UFT/DOE Contract for Classroom Teachers. See, Article 7B (1). Nothing in the collective Bargaining Agreement between the DOE & UFT indicates that a teacher who has been reassigned would not be afforded this right.

schools. On September 4, 2018, the Plaintiff returned to the William W. Niles School - Middle School 118, and at 8:11 am the Plaintiff was texted by the Defendant, Cox's secretary Arlene Enriquez, summoning her to the Principal's office for a "meeting." At this meeting, following her receipt of her program schedule and 48-hour notice to review the OSI report, the Plaintiff was instructed to report downstairs for the Welcome Back meeting. The Plaintiff went downstairs and was warmly greeted by faculty and staff. As she was about to take her seat with her colleagues for the Welcome Back Meeting, in the inner courtyard of the building, Defendant, Cox's secretary Arlene Enriquez, came to her and told her that the Principal needed her to sign something. The Plaintiff was abruptly and inexplicably presented with another notice to reassign her, again, pending employee discipline. The Plaintiff was shocked and devastated that they could do this to her, after the DOE had cleared her to come back. The Plaintiff notified her UFT District representative and the Manager of Reassigned Staffing Team – Division of Human Resources, Colin Caldwell, who proceeded to advise her that her Principal had done this to her. He stated blatantly and with remorse, "*I'm sorry. Your Principal did this to you.*"

The Plaintiff reluctantly signed the reassignment paper acknowledging she received it in accordance with the Contract between the UFT and DOE, in the presence of her UFT Chapter Leader (Lisa Baccari) and Arlene Enriquez, and clocked out of the building at 8:38 am; she [Plaintiff] had been there a mere one hour and thirty-eight minutes of arriving. Defendant, Giulia Cox further exacerbated the Plaintiff's humiliation and embarrassment, by publically notifying the Plaintiff of her reassignment back to 100 Gold Street, in front of the entire faculty and staff and having the Plaintiff escorted out of the building by NYPD School Safety agents. The Plaintiff was subsequently and inexplicably placed back in the Queens South Reassignment Center, where she remained until she was terminated on October 18, 2018. Nonetheless, despite being exonerated of the erroneous allegations following an investigation by the Office of Special Investigations, the Plaintiff was found in the report, to have exercised "poor judgment" and was terminated from her position as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10 on October 18, 2018.

In an attempt to diminish the Plaintiff's claims, the Defendants erroneously argue that by showing the clip from the movie *Freedom*, the Plaintiff deviated from the class's preapproved curriculum and failed to seek permission. Nonetheless, the Plaintiff maintains that she did not deviate from the curriculum. See, Plaintiff's Exhibit

A, at page 3-4. The Plaintiff was not looking to replicate the <u>conditions</u> on the boats along the Middle Passage; she sought to replicate the space, or lack thereof, as a demonstration of spatial recognition. Moreover, the Plaintiff did <u>not</u> specifically select black students as volunteers for the demonstration. It was acknowledged that she sought random volunteers from the class to participate in the demonstration; no student was forced to participate. Notably, the class was comprised entirely of minority students. Again, the claim that multiple students reported that Plaintiff used her feet or hands to push these students even closer together is <u>false</u>. As stated previously herein, "Student B" specifically denied that Ms. Cummings used her feet or her knees to push students closer together. The fabricated account is clearly contradicted by the reported findings of the Office of Special Investigations; to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student I' never observed Ms. Cummings' knee make contact with Student 'A'*;'" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them.*" <u>See</u>, Defendants' Exhibit A; <u>see</u> <u>also</u>, Plaintiff's Exhibit A at page 8.

The Defendants herein present an inaccurate account of the complaint filed with the principal, (Defendant Giulia Cox), by the student and her parent. Believing that these actions may constitute corporal punishment, for any of that account to be plausible, Principal Cox would have had to report the alleged incident on January 17, 2018, prior to the Plaintiff's initial meeting with her on January 18, 2018; she (Principal Cox) had not. The Plaintiff was <u>never</u> removed to a different school; she was reassigned to an administration building. The OSI report did <u>not</u> contain "various eyewitness accounts confirming that Plaintiff had placed her feet or knees on the students." <u>See</u>, Defendant's Exhibit A; <u>see</u> <u>also</u>, Plaintiff's Exhibit A at page 8. The <u>one</u> student's complaint was <u>not corroborated</u>. While it was reported that the Department of Education "does not ever include or encourage reenactments of historical events where students take on roles of victimized people," no such policy is known to exist. <u>See</u>, Plaintiff's Exhibit A at pages 7-8. Nonsensically, OSI, in its report, referred the matter back to the Defendant, Principal Cox to "take appropriate disciplinary action." <u>See</u>, Defendants' Exhibit A. Yet, the Plaintiff had already been disciplined by the Defendant, Principal Giulia Cox when she was removed from her classroom in January, 2018. Furthermore, the report recommended training, <u>not</u> termination; however, the events that followed made it very clear that there was no intention for the Plaintiff to return to the school. Though she was assured that she would be returning

following the requisite filing of the disciplinary letter, the school apparently created a false schedule for the Plaintiff in order to conceal their true and premeditated intention to terminate her from her position. She was not terminated at the beginning of the 2018-2019 school year; she was actually terminated on October 18, 2018. Additionally, the finding that the Plaintiff acted with poor judgment in conducting a lesson that inadequately incorporated the New York City DOE social studies curriculum and guidance for this topic is a violation of her due process, as this is an improper finding, as it is not the function of the Office of Special Investigations to examine and evaluate teacher pedagogy (method or practice of teaching). As a result, the Plaintiff's reputation as a respected educator has been irrevocably damaged. Her professional career has been substantially compromised and she has been unwillingly exposed to negative notoriety, which has publicly humiliated and embarrassed her and subjected her to threats of violence, assault, and death.

## ARGUMENT

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), District Courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. See, *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); see also, *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). In order to satisfy the pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. See, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) at 678 (citing, *Twombly*, 550 U.S. at 570 [2007]). Accordingly, a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." Id.

### POINT 1
### PLAINTIFF'S CONSTITUTIONAL LAW CLAIMS ARE MERITORIOUS

The Plaintiff has sufficiently demonstrated that the actions of the City Defendants violated her rights under the Fourteenth, First, Second, Fourth, Fifth, Sixth, Seventh, and Eighth Amendments to the United States Constitution.

**Plaintiff's Due Process Claims are Meritorious**

Despite its malleable characteristics, a fundamental requirement of due process is the opportunity to be heard, at a meaningful time and in a meaningful manner. See, *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); *Ahern v. Board of Education*, 456 F.2d 399, 403 (8th Cir.1972); *Cooley v. Board of Education*, 453 F.2d 282, 286-87 (8th Cir.1972). In the absence of a state tenure statute, a teacher may still attain *de facto* tenure rights if the customs or circumstances of employment demonstrate that a teacher has a "legitimate claim of entitlement for job tenure." The United States Supreme Court recognized this right in the case of *Perry v. Sindermann*, 408 U.S. 593 (1972), which also held that where a teacher has attained *de facto* tenure, the teacher is entitled to due process prior to dismissal by the School District.

**The Plaintiff Has Established the Deprivation of a Property Interest**

To have a property interest in a benefit an individual must show he is entitled to the benefit. See, *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972). Since the Plaintiff is non-tenured, her claim of a property interest created by the probationary teachers' statutes must be evaluated in light of *Board of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). The United States Supreme Court stated in *Roth*, supra that the requirements of procedural due process apply only to the interests encompassed by the Fourteenth Amendment's protection of liberty and property. See, *Roth*, supra at 556.

In an attempt to rebut the Plaintiff's due process claims, particularly disputing the existence of a valid property or liberty interest, the Defendants have cited various cases in their Memorandum of Law, which are easily distinguishable from the facts of the case at hand. For example, one case that was cited by Defendants, *Oneida Indian Nation of N.Y.* (OIN) *v. Madison County,* 665 F.3d 408, 427-28 (2d Cir. 2011), addresses Congress' ability to qualify the plaintiffs' as tribal sovereign immunity from suit; federal restrictions on the alienation of tribal lands under the Nonintercourse Act, 25 U.S.C. § 177; inadequate notice to the OIN of the expiration of the Counties' respective redemption periods, in violation of due process; and the exemption of "Indian reservation[s]" from property tax under New York state law. There is little difficulty in distinguishing *Oneida* from the case at hand where the Plaintiff was an employee of the Department of Education with property interests and rights in her respective position as a teacher.

Further, the remedies recognized in *Brown v. State of New York*, 89 N.Y.2d 172 (N.Y. 1996) were the private interests that citizens harmed by constitutional violations have an avenue of redress and the public interest that future violations be deterred. Additionally, plaintiffs must establish grounds that entitled them to damages and in addition to proving their Constitutional rights have been violated. Notably, the money damages must be appropriate to ensure full realization of her asserted constitutional rights. Similar to case at hand, the Plaintiff has suffered a multitude of damages, including but not limited to, bearing a "*badge of infamy*" forever. The Plaintiff was also entitled to the proper procedures as afforded to her in the Collective Bargaining Agreement between the DOE and UFT. As stated in Article 1 of the Contract, "The Board recognizes the Union as the exclusive bargaining representative of all those assigned as teachers in the regular day school instructional program…" The Plaintiff's position in the DOE was "Teacher" and she taught in the regular day school instructional program. Therefore she was afforded the due process that was outlined in the contract for all teacher regardless if their status was probationary or tenured.

Although a probationary teacher is not afforded a 3020-A procedure, they are still afforded other procedures directed by the Department of Education's regulations. For example, Article 20 in the contract between the DOE and UFT states:

> "All existing determinations, authorizations, by-laws, regulations, rules, rulings, resolutions, certifications, orders, directives and other actions, made issued or entered into by the Board of Education governing or affecting salary and working conditions of the employees in the bargaining unit shall continue in force during the term of the Agreement, except in so far as change is commanded by law."

Therefore, all Chancellor Regulations and their procedures are contractual and as such the Plaintiff is afforded due process. As such, the New York City Chancellor Regulations and the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT), applied to the Plaintiff's interest in her position regardless of permanency. The Plaintiff was in contract with Defendants and they breached said contract. See, a copy of the Opinion and Award of the American Arbitration Association dated June 19, 2019 annexed hereto as Plaintiff's **Exhibit C**. Based on the Defendants' actions and arguments regarding this point, it would seem that the Defendants believe they are above the law and may partake in any procedure or lack

thereof at their own whim regardless of such conduct constituting the violation of Plaintiff's rights. Given the comportment of the Defendants, it is clear that they fired the Plaintiff for the unlawful reason that she was a white teacher teaching African American students about slavery. Plaintiff's termination of her respective position as a reputable, Middle School teacher is in violation of Title VII of the Civil Rights Act.

**The Plaintiff Has Established a Deprivation of Liberty Interest**

The Due Process Clause protects an individual from a government employer who disseminates false and defamatory information about the individual in connection with his termination. See, *Goetz v. Windsor Cent. Sch. Dist.*, 698 F.2d 606, 610 (2d Cir.1983). While the liberty interest at stake is the employee's reputation, injury to one's reputation by itself is insufficient to invoke due process protections. See, *Paul v. Davis*, 424 U.S. 693, 701, 96 S. Ct. 1155, 47 L.Ed.2d 405 (1976); *Walentas v. Lipper*, 862 F.2d 414, 420 (2d Cir.1988). The employee's liberty interest is only implicated when the employer imposes such a **stigma** as to restrict the employee's ability to obtain future employment, in which case due process requires the government to provide the employee a name-clearing hearing. See, *Baden v. Koch*, 799 F.2d 825, 830–31 (2d Cir.1986). This is commonly referred to as the "*stigma plus*" test. See, *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir.1994).

To satisfy the "*stigma-plus*" test, the Plaintiff must prove (1) that she was defamed; (2) that the defamation took place in the course of her termination; and (3) and that stigma foreclosed her from any future employment. See, *Abramson v. Pataki*, 278 F.3d 93, 103 (2d Cir.2002); *O'Neill v. City of Auburn*, 23 F.3d 685, 691 (2d Cir.1994); *Baden v. Koch*, 799 F.2d 825 (2d Cir. 1986) at 830–31. After showing each of the three elements of the "*stigma-plus*" test, the Plaintiff must also show that the District failed to provide her a hearing consistent with her due process rights. That is, she must show harm caused by denial of a hearing. See, *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). The Defendants claim that the Plaintiff has failed to establish a *stigma-plus* claim, which is an inaccurate statement. Public employees who are not afforded the due process of the law are deprived of liberty interests. The reason being because damaging information tarnishes their reputations which in turn, makes it that much more difficult to secure employment.

Defamation is established if the statements made were false and publicly stigmatized the Plaintiff. See, *Abramson*, supra, 278 F.3d at 101–02. "[S]tigmatizing allegations ... include charges going to professional

competence when the charges are sufficiently serious." *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 632 (2d Cir.1996). Yet, "[a] statement that an employee poorly performed her duties or acted in an improper manner is insufficient to establish defamation." See, *LaForgia v. Davis*, No. 01 Civ. 7599, 2004 WL 2884524, (S.D.N.Y. Dec. 14, 2004) (quoting, *O'Neill*, supra, 23 F.3d at 692). A temporal link between the defamation and the dismissal is necessary if the employee is to succeed upon a claim of liberty deprivation. See, *Martz v. Incorporated Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir.1994) (holding that in the absence of the necessary nexus between the defamation and the time of termination, defamatory statements in newspaper did not deprive attorney of liberty interest for due process purposes); *Gentile v. Wallen*, 562 F.2d 193, 198 (2d Cir.1977) (stating that alleged defamatory statements made after plaintiff had been terminated from employment as public school teacher amounted to "simple defamation" which does not trigger due process rights). In the present case, the temporal nexus between the defamation and the termination is present.

Similar to the case at hand, the alleged charges against the Plaintiff have placed a negative stigma on her reputation. The reason being because the Defendants never updated nor corrected the record to reflect the Plaintiffs' full exoneration of the charges placed against her, nor did they correct the record to reflect that the stories being published regarding her and the investigation were actually false. The Defendants' failure to rectify the record resulted in additional defamatory statements made by the Defendant, New York City Mayor, Bill de Blasio. There is a presumption that the defendants failed to correct the record because they wanted the $23 million "*for anti-bias training of city educators after the Daily News exposed shocking instances of racism in public schools. In February, The News uncovered allegations of a white Bronx teacher who stepped on a black student during a lesson on slavery….*" "*The stories fueled demonstrations across the city from activists who had pushed for anti-bias training for months without response from the city. Now the 2019 city budget unveiled by Mayor de Blasio includes millions in funding for the training and a plan to offer anti-bias training to all city educators by 2021.*" See, Chapman, Ben, City to Spend $23M for Anti-Bias Training for Public School Educators, New York Daily News, (online article), April 26, 2018; see also, Plaintiff's Exhibit B at page 25. Therefore, the Defendant New York City Mayor Bill de Blasio allowed the extortion of $23 Million dollars out of New York City's budget. Had the DOE publicly admitted that the Plaintiff was exonerated of the charges and that the stories published were inaccurate and heinously false,

16

the extortion of these funds would have never occurred. Furthermore, it is important to note that when Richard Carranza took over as the DOE's Chancellor there was an e-mail exchange from April 3 to April 23 between the assigned investigator, OSI Deputy Director, Christina Nowak, Sara Shumway, Director of Academic Policy, and Chris Sandor, Chief of Staff Curriculum, Instruction and Professional Learning. This e-mail exchange not only gave the City the justification it needed for said funding, it also violated the Plaintiff's due process as an educator. See, Plaintiff's Exhibit A, at page 5.

Further, in *Sciolino v. Newport News,* US-2229 (4th Cir. Mar. 12, 2007), the court concluded that an employee sufficiently meets the second element when they allege that prospective employers are likely to see the stigmatizing allegations. The Plaintiff has actively attempted to mitigate her circumstances and seek employment in her respective field. Connetquot School District was going to hire the Plaintiff for a long term assignment teaching position at the school until they undoubtedly learned of her wrongful termination and false accusations in the Daily News on Saturday, October 20, 2018. This is evidenced by the e-mail she received from Connetquot School District at 9:00 am on Monday, October 22, 2018, stating that they would not be able to recommend her to the School Board. For this reason, the Plaintiff has suffered a deprivation of her liberty. Therefore, Defendant's argument that Plaintiff lacked a property interest and therefore was not entitled procedures in place to protect her liberty interest, in her teaching position because she was a "*probationary employee*" fails despondently.

**Plaintiff's Equal Protection Claim is Meritorious**

The Equal Protection Clause of the Fourteenth Amendment applies to actions by public schools towards their employees. The Equal Protection Clause prohibits discrimination on the basis of national origin, race, color, gender, religion, age or disability. In addition to this Constitutional protection, teachers are protected against similar discrimination by the New York State Human Rights Law, New York City Human Rights Law (if you live in New York City), and Title VII of the Civil Rights Act of 1964. The Supreme Court has held that, when confronted with a Rule 12 (b)(6) motion to dismiss, courts must evaluate complaints of discrimination under the standard set forth in Fed.R.Civ.P. 8, which requires that pleadings present "a short and plain statement of the claim showing that the pleader is entitled to relief." See, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (holding that plaintiffs met Fed.R.Civ.P. 8(a)'s simplified notice pleading standard).

As Defendants have indicated, "The Equal Protection Clause prohibits, *inter alia,* purposeful employment discrimination on the basis of race." See, *Batista v. DeGennaro,* 13 Civ. 1099 (DAB), 2015 U.S. Dist. LEXIS 44022, (S.D.N.Y. Mar. 31, 2015). The Defendants' further state the Plaintiff's claim of discrimination by the Defendants because she is Caucasian should be dismissed. Such a statement alone, bolsters the notion that because Plaintiff is Caucasian, her claim of discrimination on that basis should be dismissed, this statement alone is discriminatory. Section 1 of the Civil Rights Act of 1866 states:

> "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, **of every race and color**, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

The fact that Defendant, Giulia Cox opted not to interview the only other adult who was in the room at the time of the Middle Passage lesson, who, he himself is African American seems outrageously careless unless Defendant, Giulia Cox knew that such an interview would exonerate the Plaintiff. It should be noted that Defendant, Giulia Cox was under investigation herself and has been forced to resign as principal since this action. There is enough reason to believe that her forced resignation is a result of *her* [Defendant, Giulia Cox] "poor judgment" and the DOE attempting to collude and conceal all of the DOE Defendants' improper execution of procedures against the Plaintiff. Given that the Defendants make **NO** mention of their violations of the Plaintiffs' 4th and 14th Amendment rights, it should be acknowledged and ratified that they concede to violating her Constitutional rights. While the city wants to claim that they are not liable for the actions of the DOE or its' employees, they are certainly liable for the actions of the city's Mayor Bill de Blasio, whom has openly defamed the Plaintiff as mentioned herein, as well as in the notice of claim and the verified complaint. Additionally, the Plaintiff's action against the defendants is not only for wrongful termination but a majority of the basis of her claim is due to her being discriminated against which resulted in her wrongful termination.

18

**The City of New York is a Proper Party for the Plaintiff's Constitutional Claims**

The City Defendants argue that all of her Constitutional claims concern her employment by the DOE, and thus these claims asserted against the City of New York should be dismissed because the City and DOE are separate legal entities and the City is not liable for the actions of the DOE or its employees absent some action by the City itself. See, NY Ed Law § 2950-g(2); see also, *Williams v. City of New York*, 2014 US Dist. LEXIS 49837 (SDNY Mar. 26, 2014), aff'd, 602 Fed. Appx. 28 (2d Cir. 2015). It bears mentioning that the Legislature amended the Education Law in 2002 to grant the Mayor greater control over public schools and limit the power of the DOE. See, L 2002, ch 91. Moreover, the Defendant, Mayor Bill de Blasio was appointed to operate New York City's $34 billion public education system, a.k.a. the Department of Education. Unlike much of the rest of New York state, since 2002 the city's schools have not had elected school boards. They are instead consolidated under the auspices of the mayor, who appoints the schools chancellor and sets policy through the Department of Education. Thus, there is arguably a sufficient nexus in this instance to connect the City and the DOE and its employees.

With respect to the Plaintiff, since Defendant, Mayor Bill de Blasio just "assumed" the allegations were true, he didn't contact any other officials to see any prove of the allegations. Further, plausibility was completely ignored, to wit: if the Plaintiff had in fact walked on student's backs, would they not have sustained physical injuries? Would she not have been arrested or charged with child abuse? It should have been obvious that this allegation was preposterous; however this gross distortion helped them sell papers and assisted the Department of Education in securing the funding that it so desperately desired. As a result, the Plaintiff's negligence claims must stand.

**The Plaintiff has sufficiently Demonstrated a Private Right of Action**

The distinction between § 1983 and § 1981 is clear. § 1983 is the mechanism for enforcing constitutional and statutory rights against state actors–i.e., the government. Section 1981, though conceivably able to be violated by the government, provides a remedy against private actors–individuals and businesses–for, among other things, discriminating against someone in contracts on the basis of race. This case stems from the overlap of the two statutes because the Defendants are arguably state actors. Plaintiff has alleged that her former employer violated her rights under 42 U.S.C. § 1981. Before 1989, employees or former employees could rely on Section 1981 to challenge

various forms of employment discrimination. Then in 1989, the Supreme Court decided *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). The Court ruled that the phrase "make and enforce contracts" applied only to the formation of contracts and subsequent legal enforcement. Id. at 177-78. Section 1981 provides a broad right to employees. The Third Circuit explained in *McGovern v. City of Philadelphia*, 554 F.3d 114, 120-21 (3d Cir. 2009) that "[I]n sum, because Congress neither explicitly created a remedy against state actors under § 1981(c), or expressed its intent to overrule Jett, we hold that 'the express cause of action for damages by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in Section 1981." Id.

**The Plaintiff has established a *Monell* Claim**

Under *Monell v. Department of Social Serv.*, 436 U.S. 658 (1978), a municipal government can be held liable under Section 1983 if a plaintiff can demonstrate that a deprivation of a federal right occurred as a result of a "policy" of the local government's legislative body or of those local officials whose acts may fairly be said to be those of the municipality. An employee must be acting pursuant to a municipal "policy." To establish a municipal "policy," a plaintiff must prove that the municipal action was (I) taken with the requisite degree of culpability and (ii) causally linked to the deprivation of a federal right. See, also, Amendment 14 of the United States Constitution. The actions and statements of these Defendants are indicative of a pattern of discrimination against Caucasian teachers.[6] The Plaintiff was actually told by a colleague in the school that what occurred was the result of "*having a white teacher, teach events of black history to black students*." It was further stated to her that "*only black teachers should be allowed to teach about events of black history to black students*." "*A black teacher could have taught the very same lesson, and there would not have been a single complaint from any student's parent.*" Statements such as these, evidence the reverse discrimination employed by the Defendants in the way that the Plaintiff was treated, as a Caucasian teacher, teaching in a school that has a significant minority population.

To reiterate, on January 11, 2018, the Plaintiff learned from various students in her class that with regard to concerning the Plaintiff's January 9, 2018 lesson, students' statements were being taken by Assistant Principal,

---

[6] "Schools Chancellor Richard Carranza Accused of Demoting Admins Because They Were White" https://nypost.com/2019/05/18/nyc-schools-chancellor-richard-carranza-has-made-whiteness-toxic-doe-insiders-claim/

Courtney Ware, collectively and in a classroom setting. This method for taking students' statements was a direct violation of the New York City Chancellor Regulations and the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT), such that, in accordance with New York City Chancellor Regulations, alleged victims and student/staff witnesses are to be interviewed separately and their written statements are to be obtained as quickly as possible, (see, Regulations of the Chancellor A-420 (VI)[B](1); the first set of statements were taken by the Assistant Principal, Courtney Ware, in a classroom setting. This is not the only instance of direct violation of the New York City Chancellor Regulations. There were other violations including, but not limited to the following:

☐    The accused employee must be provided with 48 hour written notice of the right to appear with union representation at an investigative interview to discuss the allegation of corporal punishment. See, Regulations of the Chancellor A-420 (VI)[B](2). The Plaintiff was given a letter directing a disciplinary meeting from the principal, of The William W. Niles School - Middle School 118, Giulia Cox, on January 16, 2018. No mention was made of any allegation of corporal punishment; no Chancellor Regulation was cited in the correspondence;

☐    Upon receipt of any complaint of corporal punishment, OSI will recommend whether the employee should be removed from his/her assignment pending completion of the investigation. See, Regulations of the Chancellor A-420 (V)[A]. According to the investigators, the principal, of The William W. Niles School - Middle School 118, Giulia Cox did **not** inform OSI until February 18, 2018, after the "disciplinary meeting;"

☐    When determining whether to remove the employee, the following should be considered: the severity of the alleged behavior; the prior record of the accused employee; the likely disciplinary action if the allegations are substantiated; the nature and frequency of the contact between the subject students; and any other relevant factors. See, Regulations of the Chancellor A-420 (V)[B]. Giulia Cox, Principal of The William W. Niles School - Middle School 118, only removed the Plaintiff from teaching class 408, from January 23, 2018 to January 25, 2018, the Plaintiff nonetheless continued to teach her other classes at Middle School 118 during this time;

☐    If an employee has been removed from his/her assignment pending the outcome of a corporal punishment investigation, the principal shall inform the employee, in writing, of the nature of the investigation, no later than five (5) school days from the date of his/her removal. See, Regulations of the Chancellor A-420 (V)[C]. The Plaintiff was never informed in writing of the nature of the investigation;

☐    At the time of the meeting with the accused employee, the employee must be provided with an explanation of the allegation of corporal punishment and the opportunity to make a statement. See, Regulations of the Chancellor A-420 (VI)[B](4). There was no allegation of corporal punishment asserted at the January 18, 2018 meeting with Giulia Cox, Principal of The William W. Niles School - Middle School 118, nor was the Plaintiff told she would be removed from teaching class 408, until January 22, 2018;

☐    If the accused employee requests an opportunity to review student witness statements, or adult witness statements that contain student-specific information, the employee must be provided with an opportunity to review and sign a privacy acknowledgment in the presence of union representation (where such representation is present) that he/she will not disclose the contents of the statements or retaliate against the author(s) of the statements. The UFT union representative also must also be provided the opportunity to review and sign the privacy acknowledgment. See, Regulations of the Chancellor A-420 (VI)[B](4)(a). The Plaintiff asked that the statements be redacted, because it had already been reported to her by other students that certain students, who were failing, were trying to get her fired;

☐     The principal/designee must evaluate the evidence and credibility of all witnesses, including the alleged victim and the accused employee. <u>See</u>, Regulations of the Chancellor A-420 (VI)[B][4](a). Instead, Giulia Cox, Principal of The William W. Niles School - Middle School 118, created her own narrative of the alleged incident and despite the Plaintiff' pleas, refused to speak with several witnesses, including Ralph Hudson, another teacher, who is African American, and was present in the classroom on his preparation period, and observed the Plaintiff's lesson on the day in question.

The Plaintiff was presumed to be guilty without following the guidelines set forth within the Chancellor's Regulations for investigating allegations, which fall under Article 20 of the Contract between the DOE and UFT. This rush to judgment is a clear denial of due process and the equal protection of the laws. It is unfortunately, a classic example of "reverse racial discrimination" at its worst. Since February 1, 2018, the Plaintiff has found herself having to publicly defend her reputation and integrity, as a direct result of the actions of the Defendants, particularly, the principal, of The William W. Niles School - Middle School 118, Defendant, Giulia Cox, whose negligent actions commenced a course of misconduct designed to conceal her failure and inability to adhere to the New York City Chancellor Regulations and the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT). The principal, Defendant, Giulia Cox, recklessly disclosed false and unsubstantiated information to the NYCDOE Investigators, prior to and during the investigation and tampered with witnesses, to wit: in the disciplinary meeting on January 18, 2018, the Plaintiff advised Defendant, Principal Giulia Cox that Ralph Hudson, another teacher, was present in the classroom on his preparation period and observed the Plaintiff's lesson, yet Defendant Principal Giulia Cox refused to speak with Mr. Hudson, flatly stating to the Plaintiff, "*I don't have to*." Further, Defendant, Principal Giulia Cox told the OSI investigators that the Plaintiff's lesson was taught on a different date than it actually was, so that it would corroborate her [Defendant, Giulia Cox] false narrative that Mr. Hudson was not in the room when the lesson was taught. These actions by the Defendant, Giulia Cox and the other City and DOE Defendants, directly resulted in an erroneous Daily News article and numerous subsequent articles and reports thereafter being written and subjecting the Plaintiff to defamation by numerous individuals. As a result of the Defendants' actions, the Plaintiff has been erroneously and permanently labeled and identified as a "racist," constituting a "*badge of infamy*" with which she has been forever branded. Moreover, she has been publicly humiliated and subjected to public scrutiny, causing a degradation of her professional status and reputation, death threats, and numerous threats of physical harm.

In order to mask the Defendants' own inadequacies and to cover up the fact that the Defendants erroneously accused the Plaintiff of an act which never occurred and that they grossly overreacted and exaggerated their diversity and sensitivity awareness in order to appease their constituents, the Plaintiff learned (on September 6, 2018, when she reviewed the Report) that the Defendants erroneously found in the OSI Investigative Report, that the Plaintiff generally "acted with poor judgment in allegedly conducting a lesson that inadequately incorporated the New York City Department of Education social studies curriculum and guidance for the topic, and that the lesson significantly diverged from best-practices." In actuality, the Plaintiff's lesson on the Middle Passage was in accordance with the New York State approved standards. See, Plaintiff's Exhibit A, at page 3. It should be noted that "Student A's" parent (who made the initial complaint to the school), curiously refused to permit Student A to be interviewed during the course of the OSI Investigation, likely because they knew that the complaint contained fabricated accusations in the first instance. This is a form of blatant discrimination and racism condoned by these Defendants. The Defendants may have offered the Plaintiff, parents, and students a lie detector examination; which they failed to do. Further, as a result of these erroneous acts of the Defendants, the Plaintiff was subjected to a further review to consider whether her services as a probationer would be discontinued and for possible termination of her employment. She was subsequently terminated as a New York City Public School Teacher at The William W. Niles School - Middle School 118 on October 18, 2018.

The Defendant Giulia Cox has repeatedly and egregiously violated the rights of the Plaintiff. Notably, in or around September, 2018, the Plaintiff made a request to view and copy her personnel file; however, the Defendant Giulia Cox inexplicably refused to provide the Plaintiff with such an opportunity, a blatant violation of Article 21 A, of the Contract between the Board of Education of the City School District of the City of New York and the United Federation of Teachers. Accordingly, the Plaintiff filed a grievance with the UFT and the Step One was ignored by the Defendant, Giulia Cox. As such, The UFT agreed that the grievance should go to the next level (Step 2 Grievance a/k/a, a grievance at the Chancellor Level). A decision was subsequently made prior to leaving the hearing on November 13, 2018, wherein the Defendant, Giulia Cox stated, that she "can make arrangements to have the original files, and a full paper copy of the file, available for [Plaintiff's] review in the presence of a UFT Secretary at 1 Fordham Plaza." It was then that Chancellor Representative, Alan Lichtenstein confirmed that "*You*

*[Giulia Cox] agreed to have a complete copy of the file plus the original at 1 Fordham Plaza pending a request for a mutually convenient time*." Mr. Lichtenstein then confirmed that the Plaintiff grievant will provide three dates and Defendant, Giulia Cox will select one." The Plaintiff provided the dates as requested in an e-mail to Defendant, Giulia Cox on November 21, 2018, and received the following response: "+ *Alan L. for his input. Have a nice holiday, all!*" Instead, the Chancellor Representative, Alan Lichtenstein, wrote his decision in December, 2018; however, the decision that was written was <u>not</u> what had been agreed to at the prior grievance hearing. The decision instead stated that the Defendant, Giulia Cox would e-mail the Plaintiff her file, which is also a clear violation of Article 21 A. Furthermore, his decision was signed off on by Karen Solimando, Director of the Office of Collective Bargaining and Labor Relations for the New York City Department of Education. Further, the Defendant Giulia Cox sent the e-mail with the Plaintiff's personnel file, which blatantly and egregiously violated the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and the Plaintiff's rights thereunder, by transmitting via e-mail and carbon copying other individuals in said e-mail, Plaintiff's medical records and other personal health information without the Plaintiff's consent. Moreover, New York City Department of Education, spokesman Doug Cohen stated on the record in the media, in particular to the Daily News on September 28, 2018, that "[*W]e've begun the process of firing Ms. Cummings based on an investigation of this unacceptable behavior and her performance as an educator*." Curiously, the 30-day, possible termination notice provided to Plaintiff by District 10 Superintendent Maribel Torres-Hulla, dated September 17, 2018, stated that on October 18, 2018, Ms. Torres-Hulla would be *<u>reviewing and considering rendering whether the probationer services of the Plaintiff would continue</u>*. How could Mr. Cohen have already determined that the process to fire the Plaintiff had begun on September 28, 2018, when Superintendent Torres-Hulla had not yet completed her review and consideration? This demonstrates the Defendant's clear violation of the Plaintiff's due process and civil rights.

Based on the events leading up to and following the Plaintiff's removal as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York, the Defendants knew or should have known that the accusations made against the Plaintiff were erroneous, and the Plaintiff should have never been initially removed from her position in class 408, and subsequently reassigned to Queens South Reassignment Center, at 82-01 Rockaway Boulevard, Queens County,

which is informally referred to as "teacher jail." The reassignment to "teacher jail" is a policy improperly utilized by the Defendants as a form of "punishment" for teachers, where the teacher's civil rights are continuously and repeatedly violated. Due to the regulations of the Defendants, the Plaintiff and others likewise situated are deprived of their constitutional right to due process. The Plaintiff and other teachers are subject to the unsubstantiated narrative as reported by the principals of their respective schools and referred to "teacher jail" reassignment at the whim of their superiors. 42 U.S.C. §§ 1983 and 1988, provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. Notably, on or about April 9, 2018, it was reported to the UFT that the OSI investigation was completed, and the report was finalized and sent to the Defendant, Department of Education on April 2, 2018. However, the final report, curiously dated July 24, 2018, was not released and provided to the Plaintiff until September 6, 2018 [almost five (5) months] following when it was reported to have been completed and three (3) months after it is dated. The Plaintiff was advised that she should have been returned to Middle School 118 on April 23, 2018, but that never occurred, yet there was never any substantiation of the claims made against the Plaintiff. Further, the Defendants' only finding in the OSI Investigative Report is that the Plaintiff generally "acted with poor judgment in allegedly conducting a lesson that inadequately incorporated the New York City Department of Education social studies curriculum and guidance for the topic, and that the lesson significantly diverged from best-practices"; this is not even a charge that would be investigated by OSI in the first instance. Claims relating to pedagogy are handled internally with observations and assessments. This was the Defendants' way of substantiating something, because the investigation of the Plaintiff was a public relations nightmare for the Defendants and it was considered a media case. The Plaintiff was involuntarily removed from her school and compelled to report to an undesirable location under undesirable conditions without any rational or reasonable basis for her removal and reassignment. around the world. She is humiliated and embarrassed by the actions taken against her by the Defendants in removing her from her position without sufficient justification when the Defendants knew or should have known that the claim against her was fabricated and uncorroborated.

The Defendants, their agents, servants and/or employees were careless and negligent in departing from good and accepted practice in the investigation and monitoring of the unsubstantiated claims made against the Plaintiff, in screening them before taking action against a teacher, for their credibility, veracity, and reliability; and for the removal of the Plaintiff from her position as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York; among other things: in failing to possess the requisite learning, skill, knowledge and judgment ordinarily exercised in investigating and monitoring claims against faculty members; in permitting the media on school property and to question students; in failing to perform certain procedures, which the reasonably skillful and competent personnel would have so done under the circumstances; and in violating each and every rule, regulation, code statute or ordinance governing the exercise of reasonable care and due diligence concerning the management, and control of the aforementioned situation, including but not limited to, violating the New York City Chancellor Regulations and the contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT).

Due to the negligence of the Defendants, the Plaintiff has been significantly damaged. The Plaintiff's reputation as a respected educator has been irreparably and permanently damaged, the extent of which cannot be measured at this time. Her professional career has been substantially compromised and she has been unwillingly exposed to negative notoriety, which has publicly humiliated and embarrassed her and subjected her to threats of violence, assault, and death.

**POINT II**
**PLAINTIFF'S STATE LAW CLAIMS ARE MERITORIOUS**

**The Plaintiff's Notice of Claim was Timely**

The Defendants disingenuously assert that all of the Plaintiff's state law claims asserted against the DOE Defendants and all of the tort claims asserted against the City, Mayor, and Councilmembers Dromm and Williams that accrued before July 3, 2018, are barred. The Defendants make no mention of what they have established as the purported claim date. Nonetheless, the Plaintiff has complied with the requirements of New York General Municipal Law Section 50-I by serving notices of claim upon City and DOE Defendants within the time required by New

York General Municipal Law Section 50-e. Further, at the request of The City of New York, the Plaintiff submitted to hearings pursuant to New York General Municipal Law Section 50-h involving the events as referred to hereinafter. No other hearings have been conducted.

In any event, clearly it would be in the interest of justice to deny a dismissal of the Plaintiffs' action as to these Defendants. An interest of justice standard requires a careful judicial analysis of the factual setting of the case and a balancing of the competing interests presented by the parties. Factors that might be considered include whether Plaintiff has a meritorious cause of action, prejudice, if any, to the Defendants, and the length of any delay. See, *Leader v. Marone, Ponzini & Spencer*, 97 N.Y.2d 95, 736 N.Y.S.2d 291, 761 N.E.2d 1018 (C.A. 2001) at p. 105-106. No one fact is determinative and the calculus of the court's decision is dependent on the competing interests of the litigants. Prior to 1976, many courts construed General Municipal Law § 50 (e) rigidly, thereby depriving claimants of the right to commence a tort action against public entities despite the merit of the claim and the severity of the claimant's injury. In 1976 a remedial amendment to General Municipal Law §50 (e) was proposed and adopted by the legislature. The official committee that proposed said amendment stated that "it is intended that older judicial decisions construing the provisions of General Municipal Law section 50 (e) rigidly and narrowly will be inapplicable as a result of these remedial amendments, which will enable the court to apply the provisions in a more flexible manner to do substantial justice." Significantly, in the published memorandum submitted in support of the said legislation, it was emphasized that:

> "These amendments introduce a degree of flexibility long needed in this area of law, without subverting the basic purposes of a notice of claim provisions. It is intended that these remedial amendments will overrule older decisional law which construed rigidly and narrowly the provisions related to late filing and will enable the court to construe these provisions liberally to do substantial justice." (1976 Legislative Annual; emphasis added.)

Subsequent to enactment of this remedial legislation, courts have (almost) uniformly recognized that the judiciary is now provided with a mandate to liberally construe its provisions; and that they now have been provided with sufficient discretion to afford greater flexibility in granting leave to serve a notice of claim after the ninety (90) day period has expired. See, e.g., *Heinman v. City of New York*, 85 AD2d 25, 28, 447 NYS2d 158 [1st Dept. 1982]; *Barnes v. County of Onondaga*, 103 AD2d 624, 627, 481 NYS2d 539, aff'd, 65 NY2d 664, 491 NYS2d 613 [1984].

The purpose behind the Notice of Claim requirement is ostensibly to allow the municipality to investigate the claim while the information is still available and before witnesses depart or conditions change. See, *Beary v. City of Rye*, 44 N.Y.2d 398, 406N.Y.S.2d 9 (1978). This section was designed to act as a shield and not as a sword to defeat rights of people having legitimate claims against a municipal body. See, *Gisondi v. Harrison*, 220 N.Y.S.2d 105, 1961 N.Y. Misc. LEXIS 3680 (N.Y. Sup. Ct. 1961), modified, 16 A.D.2d 929, 229 N.Y.S.2d 698, 1962 N.Y. App. Div. LEXIS 9364 (N.Y. App. Div. 2d Dep't 1962). A late notice of claim may be filed with leave of the Court, upon consideration of "whether the plaintiff has demonstrated a reasonable excuse for the delay, whether the entity to be served acquired actual knowledge of the essential facts within ninety (90) days, or within a reasonable time thereafter, and whether the delay would substantially prejudice the entity in maintaining its defense on the merits." See, *Biss v. City of New York*, (Sup.Ct. Queens County) NYLJ 1/2/97, page 30, cols. 1, 2, GML Section 50-e(5) Op. Cit.; *Sverdlin v. City of New York*, 229 A.D.2d 544, 645 N.Y.S.2d 843; *Calloway v. City of New York Hous. Auth.*, 219 A.D.2d 711, 631 N.Y.S.2d 752; and *O'Mara v. Town of Cortlandt*, 210 A.D.2d 337, 620 N.Y.S.2d 82. Here, even if, assuming *arguendo*, the Court were to consider the date of the suture removal on December 15, 2016, as the accrual date, only thirteen (13) days would have elapsed prior to the date the Notice of Claim was filed on March 28, 2017. It should be noted that the Defendants in this case has failed to claim or suffer any prejudice. See, e.g., Matter of Morris, 88 A.D.2d 956, 451 N.Y.S.2d 448, aff'd 58 N.Y.2d 767, 459 N.Y.S.2d 38, 445 N.E.2d 214. In fact, the Defendants had an opportunity to acquire knowledge of the essential facts of the Plaintiff's claim within a reasonable time, and further by examining the Plaintiff in a 50-h hearing on January 16, 2019. Moreover, the Defendants have essentially waived any argument regarding prejudice and untimeliness, by examining the Plaintiff in a 50-h hearing.

Where a petitioner sued a school district for negligence, the trial court was found to have abused its discretion in denying his motion for leave to serve a late notice of claim because "it erred (1) in placing the burden solely on him to establish lack of substantial prejudice and by failing to consider whether his initial showing shifted the burden to the district; and (2) by relying on speculation and inference rather than record evidence to find that the district would by substantially prejudiced by the late notice. See, Matter of Newcomb v. Middle Country Cent. Sch. Dist., 28 N.Y.3d 455, 68 N.E.3d 714, 45 N.Y.S.3d 895, 2016 N.Y. LEXIS 3854 (N.Y. 2016), reh'g denied, 29

N.Y.3d 963, 73 N.E.3d 853, 51 N.Y.S.3d 496, 2017 N.Y. LEXIS 811 (N.Y. 2017). The Courts have exercised flexibility and discretion when the Defendants have had an opportunity to acquire knowledge of the essential facts of the Plaintiffs' claim. See, *Lozada v. City of New York*, 189 A.D.2d 726, 592 N.Y.S.2d 742 (1st Dept.1993) (late filing allowed 8½ months after the 90 day limitations against the Housing Authority where a housing police officer had filed an accident report giving the authority notice of the accident); *Mestel v. Board of Education of the City of Yonkers*, 90 A.D.2d 809,455 N.Y.S.2d 667 (2d Dept. 1982) (late notice of claim was excused where employees of the City were at the scene and assisted the plaintiff at the time of the accident). Here, while it is argued by the Defendants that the Plaintiff's notice of claim is untimely, under the particular circumstances of this case, assuming *arguendo* that the notice of claim is determined to be untimely, the Court may exercise its discretion in granting the Plaintiff's motion for leave to serve a late notice of claim. See, *Matter of Roland v. Nassau County Dept. of Social Servs.*, 35 A.D.3d 477, 478, 828 N.Y.S.2d 94; *Matter of Belenky v. Nassau Community Coll.*, 4 A.D.3d 422, 771 N.Y.S.2d 379.

**Plaintiff's Defamation Claims are Meritorious**

Contrary to the Defendants' argument, the defamation claims against the City, Mayor de Blasio, and Councilmembers Dromm and Williams are meritorious. In New York defamation is defined as the making of a false statement of fact which "tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace." See, *Rinaldi v. Holt, Reinhart & Winston*, 42 NY2d 369, 379, cert denied 434 US 969 (1977)]. A libel action cannot be maintained unless it is based on the published assertion of fact rather than on assertions of opinion. See, *Brian v. Richardson*, 87 NY2d 46 (1995). For defamation purposes "publication" means communicated to a third person. The elements of defamation are (1) the publishing of a false statement to a third party; (2) without authorization or privilege; (3) fault, judged at a minimum by a negligence standard; and (4) special harm or defamation *per se*. See, *Dillon v. City of New York*, 261 AD2d 34 (1999)]. Under New York law, among the categories where words are per se defamatory are statements that imply criminal activity, or tend to injure a party's trade, occupation or business. "A statement which concerns a person in his trade or business and tends to injure him therein is actionable *per se*" (citations omitted). Likewise, with regard to business entities, "statements which impugn the basic integrity,

creditworthiness, or competence of the business, are defamatory *per se*, and thus, special damages need not be pleaded (citations omitted). See, *Prince v. Fox Television Stations, Inc.*, 33 Misc 3d 1225(A) (2011).

**The Claim Against Mayor de Blasio are NOT Protected By Absolute Privilege**

Contrary to the Defendants' arguments, the Plaintiff argues that the absolute privilege is inapplicable, since Defendant, Mayor de Balsio's statements were so obviously malicious, defamatory and vindictive that he loses the privilege. The question here is whether, under the circumstances here, Defendant is to be accorded an absolute privilege. The solution in that regard is suggested in *Cheatum v. Wehle*, 5 N.Y.2d 585, wherein the court stated (pp. 592-593): "Under Federal decisions, it has long been held that an executive official is absolutely privileged to publish false and defamatory matter of another in the exercise of his executive function if the matter has some relation to the executive proceeding in which the official is acting." (3 Restatement, Torts, § 591). (Emphasis added). Such was not the case in this instance. The Mayor's statements were not made in relation to any executive proceeding in which he was acting. They were wholly gratuitous and made in response to an angry protest mob of individuals who had been incited by the false reporting, without any concern for the truth of the statements made. The cases cited by the Defendants are distinguishable from the instant matter. Primarily, the statements made by the Defendant Mayor were false, as was the expression that the DOE would be doing a full investigation of the allegations in the *Daily News* Article. The DOE was not doing an investigation of the allegations in the Daily News article; they were doing an investigation on allegations of corporal punishment. What had been alleged in the Daily News article was never the subject of any investigation. The statement made clearly was about the Plaintiff is alleged to be false, and was plead with specificity in the pleadings. See, Plaintiff's Exhibit B. Moreover, the disingenuous attempt to characterize the reference to the Plaintiff's actions as opinion by Defendant Mayor is derisory. Therefore, the City Defendants cannot disingenuously cloak his otherwise actionable behavior as "opinion" while publically describing the Plaintiff as a "racist" while promoting a false fact pattern as truth and expect to escape any liability.

Privileged statements of opinion are either accompanied by the facts on which they are based, or do not imply that they are based on undisclosed facts. See, *Gross v. New York Times Co.*, 82 NY2d 146 at 53-154 (1993). "When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" See, *Egiazaryan v. Zalmayev*, 880 F Supp 2d 494, 503 [SD NY 2012], quoting,

*Steinhilber*, supra, 68 NY2d at 289, "because a reasonable listener or reader would infer that 'the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]'" See, *Gross*, supra, 82 NY2d at 153-154, quoting, *Steinhilber*, 68 NY2d at 290, and "if the predicate facts are disclosed, but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity," the statement may be actionable as a "defamatory opinion" See, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, F Supp 3d , 2016 WL 3773394, [SD NY 2016], citing *Silsdorf v. Levine*, 59 NY2d 8, 15-16 [1983], cert denied 464 US 831; see also, *Parks v. Steinbrenner*, 131 AD2d 60, 62-63 [1st Dept. 1987].

**Claims Against the Council Members are Likewise Actionable**

Similarly, the claims made as to Councilmembers Dromm and Williams should not be dismissed. The statements made by each clearly refer to the Plaintiff, are alleged to be false, and were plead with specificity in the pleadings. See, Plaintiff's Exhibit B. The context of these statements and the fact that they were clearly referring to the fabricated events as reported in the Daily News discredit their arguments. As to claims of privilege, neither an absolute or qualified privilege will associate to these statements. Similarly to the arguments made regarding Defendant, Mayor de Blasio, there was no demonstration that the statements were made in an exercise of their executive function nor did the matter have any relation to the executive proceeding in which the official is acting." (3 Restatement, Torts, § 591. (Emphasis added). The Councilmembers' statements were not made in relation to any executive proceeding in which they was acting. They were wholly gratuitous, without any concern for the truth of the statements made. Further, the Court in *International Publishing Concepts, LLC v. Locatelli*, 2015 NY Slip Op. 50049(U), analyzed the contours of the litigation privilege and claims for defamation. For a qualified privilege to exist, the statement must have been made with a proper purpose, and publication must be in a proper manner and to proper parties only. Further, the shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that Defendant made the statement with malice, which may mean either spite or ill will, or knowledge that the statement was false or made in reckless disregard of its truth or falsity. Here, there was clearly a reckless disregard, as the plausibility of the claims were questionable and unverified. The outcome of the OSI investigation was irrelevant, as the investigation was unrelated to what had been reported. Likewise, the disingenuous attempt to

characterize the reference to the Plaintiff's actions as <u>opinion</u> is also derisory. The Defendant Councilmembers cannot disingenuously cloak their otherwise actionable behavior as "opinion" while publically promoting a false fact pattern as truth and expect to escape any liability.

**The Plaintiff's Fraud Claim is Meritorious and Should Not Be Dismissed**

The Plaintiff has substantially demonstrated the elements of a fraud claim against the City and DOE Defendants. The Plaintiff's Verified Complaint details the false material representations that were perpetrated against the Plaintiff to which she relied and ultimately sustained a pecuniary loss. <u>See,</u> Plaintiff's Exhibit B. Based on the events already stated herein, leading up to and following the Plaintiff's removal as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York, the Defendants knew or should have known that the accusations made against the Plaintiff were erroneous, and the Plaintiff should have never been initially removed from her position in class 408, and subsequently reassigned. The principal, Defendant, Giulia Cox, recklessly disclosed false and unsubstantiated information to the NYCDOE Investigators, prior to and during the investigation and tampered with witnesses. These fraudulent actions commenced a course of misconduct designed to conceal a failure and inability to adhere to the New York City Chancellor Regulations and the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT), resulting in the Plaintiffs termination.

**The Plaintiff's Claims for Negligence, Negligent Infliction of Emotional Distress, and Intentional Infliction of Emotional Distress are Meritorious**

Based on what has been demonstrated in this matter, the City and DOE Defendants' argument that "defamation claims (that involve matters of public concern) cannot be sustained upon a showing of negligence" must fail. The Plaintiff has more than established not only that the statements were false statements of fact, but that the City and DOE Defendants acted in a "grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." <u>See,</u> *Chapadeau v. Utica Observer-Dispatch*, 38 NY2d 196, 199 (1975); <u>see</u> also, *Bloom v. Fox News of LA*, 528 F. Supp. 2d 69, (EDNY 2007). In addition, as the Fourth Department has held that a cause of action for negligent infliction of emotional distress must be "premised on conduct that unreasonably endangers the plaintiff's physical safety or causes the

plaintiff to fear for his or her physical safety." See, *Passucci v. Home Depot, Inc.*, 67 AD3d 1470, 1471 [4th Dept. 2009]. The Plaintiff's complaint contains allegations that the City and DOE Defendants engaged in conduct that unreasonably endangered the Plaintiff's physical safety or caused her to fear for her safety. See, Plaintiff's Exhibit B, at pages 15 and 45.

The Defendants erroneously plead that Plaintiff cannot, as a matter of law, plead negligent infliction of emotional distress (NIED) or intentional infliction of emotional distress. In order to support a claim for negligent infliction of emotional distress, Plaintiff is also required to allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Murphy v. Am. Home Products Corp.*, 58 NY2d 293, 303 [1983]. The extreme and outrageous conduct "must be clearly alleged in order for the complaint to survive a motion to dismiss." See, *Sheila C. v. Povich*, 11 AD3d 120, 131 [1st Dept. 2004]. As a claim for negligent infliction of emotional distress arises out of negligence, Plaintiff must allege that the Defendants owed Plaintiff a duty and the breach of that duty owed to the Plaintiff "either unreasonably endangers the plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety." See, *Santana v. Leith*, 117 AD3d 711, 712 [2d Dept. 2014]. Plaintiff has clearly identified the duty owed to her by the Defendants. In order to qualify as "extreme and outrageous," the conduct at issue must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Sheila C. v. Povich*, 11 AD3d 120, 130-31 (1st Dept. 20014). To falsely accuse the Plaintiff of "singling out black students and making them act like slaves;" telling them to "lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like," without checking the facts and continuing to characterize her under that narrative, even after confronted with the falsity, subjecting her to public admonishment, ridicule, and harassment is extreme and outrageous. The Defendants furthered a false narrative, purporting it to be undisputed fact. As a result, the Plaintiff's claims must stand. Further, as to the arguments concerning a demonstration of the existence of a special duty, the Plaintiff has sufficiently alleged a special relationship; she claims that Defendants were required to monitor, supervise and control, thereby creating a special relationship. A special relationship giving rise to a duty of care can be created in three ways: "(1) when the municipality violates a statutory duty enacted for the benefit of a particular

class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; and, (3) when the municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation." See, *Valdez v. City of New York*, 936 NYS2d at 592; *Pelaez v. Seide*, 778 NYS2d 111, 117 (2004). Plaintiff has adequately alleged facts sufficient to demonstrate that she had a special relationship with municipal Defendants, such that they owed her a special duty.

**The Defendants' Breach of Contract Claim is Meritorious**

The Defendants' arguments concerning Plaintiff's breach of contract claim are without merit. The Plaintiff won her arbitration matter against the Department of Education, which evidences the fact that the Defendants did in fact breach their contract with her, and as such, owe her damages for said breach. See, Plaintiff's Exhibit C.

**POINT III**
**OSI IS A PROPER PARTY TO THE LITIGATION**

The Defendants erroneously argue that OSI is not a suable entity, and cite to *Fox v. NYC Dep't of Education*, 2015 US Dist. LEXIS 110857 (SDNY Aug. 20, 2015); however, there is not part of this case, which supports this position. Further, notably, among other things as argued herein, the OSI finding that the Plaintiff acted with poor judgment in conducting a lesson that inadequately incorporated the New York City DOE social studies curriculum and guidance for this topic is a violation of her due process, as this is an improper finding, as it is not the function of the Office of Special Investigations to examine and evaluate teacher pedagogy (method or practice of teaching). Thus, they inappropriately exceeded their duties and can be held liable to the Plaintiff for her damages.

**CONCLUSION**

Based on the foregoing, it has been demonstrated that the City and DOE Defendants have failed to meet the standard in this Circuit that is necessary on a motion to dismiss under Rule 12 (b)(6). Accordingly, the Defendants' motion to dismiss should be denied in all respects and Plaintiff should have such other and further relief that this Court may deem just and proper.

Dated:  Garden City, New York
       September 27, 2019

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq. (TL4471)