UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------X
PATRICIA CUMMINGS,

         Plaintiff,        Docket No.
                         19-cv-07723 (CM) (OTW)

   -against-

THE CITY OF NEW YORK; NEW YORK CITY DEPARTMENT
OF EDUCATION; CITY OF NEW YORK OFFICE OF SPECIAL
INVESTIGATIONS; NYC MAYOR BILL de BLASIO; GIULIA COX;
COURTNEY WARE; BEN CHAPMAN; NEW YORK DAILY NEWS;
DR. ANDRE PERRY; THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA; LENARD LARRY
McKELVEY a/k/a CHARLAMAGNE THA GOD; WWPR-FM
(105.1 MHZ); iHEARTMEDIA; CLEAR CHANNEL
COMMUNICATIONS, INC.; NEW YORK STATE SENATOR,
KEVIN S. PARKER; COUNCILMAN, JUMAANE D. WILLIAMS;
COUNCILMAN, DANIEL DROMM; COALITION OF
EDUCATIONAL JUSTICE; ANGELMARTINEZ;
NATASHA CAPERS, and
"JOHN DOE AND JANE DOE # 1-100" said names
being fictitious, it being the intent of Plaintiff
to designate any and all individuals, officers, members,
agents, servants, and/or employees of the
aforementioned agencies owing a duty of care to Plaintiff,
individually and jointly and severally,

         Defendants.
------------------------------------------------------------------------------------X


### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT, LENARD LARRY McKELVEY a/k/a CHARLAMAGNE THA GOD's MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12 (b)(6)

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq.
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*
600 Old Country Road, Suite 530
Garden City, New York 11530
Phone: (516) 794-4700
Fax: (516) 794-2816
E-mail: tom@tliotti.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... i

PRELIMINARY STATEMENT ................................................................ 1

ARGUMENT .........................................................................................7

    POINT 1 .......................................................................................7

        THE COMPLAINT PLEADS SPECIFIC FACTS WHICH
        ESTABLISH A PLAUSIBLE CLAIM TO RELIEF ...........................................7

    POINT II.......................................................................................... 12

        THE DEFAMATION CLAIM AGAINST THE DEFENDANT
        CHARLAMAGNE SHOULD NOT BE DISMISSED BECAUSE
        IT IS ALLEGED THAT CERTAIN STATEMENTS
        COMPLAINED OF ARE NOT DEFAMATORY ................................................. 12

    POINT III.......................................................................................17

        THE CHALLENGED COMMENTS ARE NOT EXPRESSIONS
        OF OPINION ENTITLED TO CONSITUTIONAL PROTECTION ..................17

        Characterization of Someone as a "Racist," "Bigoted,"
        a "Cracker" or a "White Devil" is NOT Protected Opinion ..................................19

        The Nature of Term "Racist" Does Not Render it Protected Opinion...................20

        Descriptions of the Plaintiff as a "Racist," "Bigoted," a "Cracker"
        or a "White Devil" are Actionable.......................................................................20

        Speculation Over State of Mind is Not Applicable
        to These Proceedings ..........................................................................................21

        Charlamagne's Commentary is NOT
        Merely Emotionally Charged Rhetoric................................................................22

        The Comments Complained of Are Actionable Fact
        Despite the Facts in the Public Domain................................................................23

    POINT IV.......................................................................................24

        PLAINTIFF HAS PLEAD PUBLICATION WITH
        GROSS IRRESPONSIBILITY ..........................................................................24

POINT V.......................................................................................................................25

      THE COMPLAINT'S INTENTIONAL INFLICTION
      OF EMOTIONAL DISTRESS CLAIM AGAINST
      CHARLAMAGNE IS MERITORIOUS...............................................................25

      The Complaint's IIED Claim Is NOT an Impermissible
      Attempt to Avoid Dispositive Constitutional Principles .......................................25

      The Outrageousness Standard................................................................................26

      The Complaint's IIED Claim is NOT Barred as Redundant .................................26

      The Disputed Statements Are "Extreme and Outrageous"....................................27

      Charlamagne's Commentary Was a Campaign of
      Harassment Directed at the Plaintiff.....................................................................28

POINT VI......................................................................................................................29

      THE COMPLAINT'S NEGLIGENT INFLICTION OF
      EMOTIONAL DISTRESS STATES A CAUSE OF ACTION
      AGAINST CHARLAMAGNE............................................................................29

POINT VII ....................................................................................................................30

      THE COMPLAINT'S CLAIM OF NEGLIGENCE
      STATES A CAUSE OF ACTION AGAINST CHARLAMAGNE......................30

CONCLUSION..............................................................................................................31

# TABLE OF AUTHORITIES

**Federal Cases**

*Advanced Cardiovascular Sys. Inc. v. SciMed Life Sys.,*
  988 F.2d 1157, 1160 (Fed. Cir. 1993). ..............................................................7

*Ashcroft v. Iqbal,*
  556 US 662, 678 (2009) ....................................................................................8

*Bell Atlantic Corporation v. Twombly,*
  550 US 544, 570 (2007) ....................................................................................8

*Bloom v. Fox News of LA,*
  528 F. Supp. 2d 69, (EDNY 2007). .................................................................. 30

*Bose Corp. v. Consumers Union,*
  466 US 485, 503-504 (1984) ...........................................................................17

*Buckley v. Littell,*
  539 F2d 882, 894 (2d Cir. 1976)............................................................... 20, 21

*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 (2d Cir. 2002). ...........................................................................11

*Chaplinsky v. New Hampshire,*
  315 U.S. 568, 572 (1942).................................................................................. 17

*Chau v. Lewis,*
  771 F.3d at 127 (2014).....................................................................................16

*Cohen v. Cowles Media Co.,*
  501 U.S. 663, 669-70, 115 L. Ed. 2d 586, 111 S. Ct. 2513 (1991).....................17

*Christopher v. American News Co.,*
  171 F.2d 275 (7th Cir. 1948). ..........................................................................13

*Conley v. Gibson,*
  355 U.S. 41 (1957)........................................................................................... 11

*DeLeon v. Little,*
  981 F. Supp. 728, 737 (D. Conn. 1997)............................................................ 26

*Doe v. Doe,*
  No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017)..............14

*Egiazaryan v. Zalmayev,*
 880 F Supp 2d 494, 503 [SD NY 2012] ........................................................ *13*

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC,*
 F Supp 3d , 2016 WL 3773394, [SD NY 2016] ...............................................13

*Gertz v. Robert Welch, Inc.,*
 418 U.S. 323, 471 F.2d 801 (1974) .........................................9, 10, 13, 17, 18

*Greenbelt Pub. Assn. v. Bresler,*
 398 U.S. 6 (1970). ............................................................................................18

*Harris v. City of New York,*
 186 F.3d 243 (2d Cir. 1999)..............................................................................10

*Herbert v. Lando,*
 441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed. 2d 115, 1979 U.S. LEXIS 88,
 27 Fed. R. Serv. 2d (Callaghan) 1, 3 Fed. R. Evid. Serv ...........................21, 22

*Hustler Magazine, Inc. v. Falwell,*
 485 U.S. 46, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988) ......................................26

*Kelly v. Schmidberger,*
 806 F.2d 44, 46 (2d Cir. 1986)..........................................................................12

*Koulkina v. City of New York,*
 559 F. Supp. 2d 300 (S.D.N.Y. 2008)..................................................................8

*Lerman v. Flynt Distributing Co., Inc.,*
 745 F.2d 123 (2d Cir. 1984) at 136-137 ....................................................... *21*

*Letter Carriers v. Austin,*
 418 U.S. 264 (1974)...........................................................................................18

*Levin v. McPhee,*
 119 F.3d 189, 196 (2d Cir. 1997).......................................................................22

*Lopez v. Univision Commc'ns, Inc.,*
 45 F. Supp 2d 348, 362 (S.D.N.Y. 1999) ....................................................... *25*

*Mott v. Anheuser-Busch, Inc.,*
 910 F. Supp. 868, 875 (N.D.N.Y. 1994), aff'd, 112 F.3d 504 (2d Cir. 1996)................... 24

*Mitre Sports Int'l Ltd. v. Home Box Office, Inc.,*
 22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) .......................................................24

*Mr. Chow of N. Y. v Ste. Jour Azur S.A.,*
    759 F.2d 219, 227-228 ................................................................................................18

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964).................................................................................................9, 21

*Ollman v. Evans,*
    750 F.2d 970 (1984)............................................................................................... *18, 19*

*Piesco v. City of New York Dep't of Personnel,*
    753 F. Supp. 468, 479 (S.D.N.Y. 1990)..........................................................................27

*Phelps v. Kapnolas*, 308
    F.3d 180, 184-185 (2d Cir. 2002). ...................................................................................11

*Qureshi v. St. Barnabas Hosp. Ctr.,*
    430 F.Supp.2d 279, 287 (SDNY 2006). ..........................................................................12

*Rosenblatt v. Baer,*
    383 U.S. 75 (1966)..............................................................................................................8

*Stevens v. Tillman,*
    855 F.2d 394, 403 (7th Cir. 1988) ............................................................................19, 20

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002)..........................................................................................................11

**State Cases**

*Brian v. Richardson,*
    87 N.Y.2d 46, 660 N.E.2d 1126, 1129, 637 N.Y.S.2d 347 (N.Y. 1995)...............13, 22, 23

*Chapadeau v. Utica Observer-Dispatch,*
    38 NY2d 196, 199 (1975) ................................................................................................30

*Davis v. Boeheim,*
    24 NY3d 262 at 269 (2014) .............................................................................................13

*DeLaurentis v. City of New Haven,*
    220 Conn. 225, 266-67, 597 A.2d 807 (1991). ............................................................... 25

*Deluca v. New York News,*
    *109 Misc. 2d 341 (1981)* ................................................................................................ 30

*Fischer* v. *Maloney,*
    43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978)............25, 26

*Gross v. New York Times Co.*,
    82 NY2d 146 at 53-154 (1993)............................................................................13, 23

*Howell v. New York Post Co.*,
    81 N.Y.2d 115, 121, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993)...............................26, 27

*Immuno AG. v. Moor-Jankowski*,
    77 N.Y.2d 235, 243, 567 N.E.2d 1270, 566 N.Y.S.2d 906 (1991)................................... 24

*Liberman v. Gelstein*,
    80 NY2d 429, 435 (1992) ...........................................................................................14

*Mann v. Abel,*
    10 NY3d 271 at 276 (2008) ......................................................................................... 13

*Murphy v. American Home Prods. Corp.*,
    58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) [**33] ...................27, 29

*Parks v. Steinbrenner*,
    131 AD2d 60, 62-63 [1st Dept. 1987]. ............................................................................13

*Passucci v. Home Depot, Inc.,*
    67 AD3d 1470, 1471 [4th Dept. 2009] .......................................................................... 30

*Penn Warranty Corp. v. DiGiovanni*,
    2005 NY Slip Op 25449 10 Misc3d 998 (2005)...............................................................14

*Pollnow v. Poughkeepsie Newspapers, Inc.*,
    107 A.D.2d 10, 18, 486 N.Y.S.2d 11 (2d Dep't 1985)

*Rinaldi v. Holt, Rinehart & Winston*,
    53 A.D.2d 839, 386 N.Y.S.2d 818 (1st Dept. 1976).........................................................18

*Santana v. Leith*,
    117 AD3d 711, 712 [2d Dept. 2014] ...............................................................................29

*Sheila C. v. Povich*,
    11 AD3d 120, 131 [1st Dept. 2004].............................................................................. 29

*Silverman v. Daily News, LP*,
    129 AD3d 1054 (2nd Dept. 2015).............................................................................14, 16

*Silverman v. Daily News, LP*,
    129 AD3d 1054 (2nd Dept. 2015), ..................................................................................20

*Silsdorf v. Levine,*
    59 NY2d 8, 15-16 [1983], cert denied 464 US 831 ...........................................13

*Shor v. Billingsley,*
    4 Misc. 2d 857 (N.Y. Misc. 1957) ...................................................................1

*Steinhilber v. Alphonse,*
    68 NY2d 283 at 289 (1986) ...........................................................................13

**Rules**

*Federal Rule of Civil Procedure 12 (b)(6).* ....................................*1, 7, 8, 10, 11, 12, 31*

**Constitutional Provisions**

*First Amendment of US Constitution* ............................................................*8, 9*

**Secondary Sources**

Article 20 .........................................................................................................4

Chancellor Regulation A-420 .........................................................................4

Henshall, Peter and David Ingram, *The News Manual:*
*A Professional Resource for Journalists and the Media* (1991).....................................6

Restatement [Second] of Torts § 566 comment c .........................................18

Thomas E. Willging, *Use of Rule 12 (B) (6) in Two Federal District Courts*
(Federal Judicial Center 1989)........................................................................7

White, Helen and Christina Evans, *Learning to Listen to Learn:*
*Using Multi-Sensory Teaching for Effective Listening* (2005). ......................................3

Plaintiff, Patricia Cummings, (hereinafter "Plaintiff" or "Ms. Cummings"), a private individual, respectfully submits this Memorandum of Law in Opposition to Defendant, Lenard Larry McKelvey a/k/a *Charlamagne tha God*'s, (hereinafter "Defendant" or "Defendant Charlamagne") Motion to Dismiss the Plaintiff's Verified Complaint pursuant to Federal Rule of Civil Procedure 12 (b)(6).

## **PRELIMINARY STATEMENT**

*"When account is taken of the vast and far-flung audience reached by radio today - often far greater in number than the readers of the largest metropolitan newspaper (cf. Seelman on* The Law of Libel and Slander, *p. 3) - it is evident that the broadcast of scandalous utterances is, in general, as potentially harmful to the defamed person's reputation as a publication by writing." See,* Shor v. Billingsley, *4 Misc. 2d 857 (N.Y. Misc. 1957).*

The Defendant, Lenard Larry McKelvey is an individual American radio presenter, television personality, social media influencer, and author; known professionally as *Charlamagne tha God*; co-host of the nationally syndicated radio show The Breakfast Club with DJ Envy and Angela Yee, broadcast on Power 105.1, an Urban contemporary radio station. The Plaintiff has alleged that she was defamed by comments made by the Defendant Charlamagne on a "Donkey of the Day" segment of his show, which aired on February 7, 2018. The Defendant Charlamagne's radio show broadcasts a segment known as "Donkey of the Day," wherein he speaks out on racial inequality and call out a person or place that embodies foolery for the given moment. On this segment the Plaintiff publically referred to as, among other things, a "*racist*," a "*bigot*" a "*cracker*," "*white devil,*" and other racial and ethnic slurs." The Defendant Charlamagne disingenuously argues that Plaintiff lacks the ability to impose any liability, as the personal viewpoints expressed by him concerning the performance of her classroom educational responsibilities (1) is speech involving an essential matter of public concern and (2) is extinguished by the First Amendment. This argument fails on all counts.

The Defendant Charlamagne's motion is a thinly-veiled attempt to reframe Plaintiff's case into something that it is not. In a confusing presentation of misguided and misstated facts, the motion and supporting papers ignore the four corners of the Verified Complaint, submit facts outside of the Verified Complaint, and disregard that the detailed factual allegations in the Verified Complaint are to be accepted as true.

The Plaintiff was a probationary New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York. She seeks damages related *inter alia* to the infliction of defamation and defamation *per se*, reverse discrimination, denial of due process, severe emotional, psychological, and physical distress, loss of reputation, loss of income, expenses upon her, the erroneous termination of her employment as a New York City school teacher, and the "*badge of infamy*" with which she has forever been branded.

The Plaintiff's claim arose as a result of what was fallaciously reported concerning an alleged complaint made by **one (1)** parent of **one (1)** student regarding a lesson taught by the Plaintiff in her social studies class on the Middle Passage, wherein she subsequently and unwillingly became the subject of a front page pictorial and story in the New York Daily News, falsely accusing her of being a "*racist*" and "making black students lie face down on the floor of her class, and asking them: *'[H]ow does it feel to be a slave?*'" Thereafter, this fabricated and erroneous set of purported "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world.

The Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it was erroneously reported, among other things that she "*singled out black students and made them act like slaves;*" she is falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" She has been publically shamed and falsely accused of "*child abuse,*" labeled as a "*racist,*" referred to as an "*oppressor,*" by many, including politicians and activists, and specifically in various and extensive media outlets discussing this issue. She has received direct threats of violence and death causing her to fear for her life. The Plaintiff was ultimately exonerated of the original erroneous allegations following an investigation by the New York City Department of Education's Office of Special Investigations, yet has nonetheless been terminated from her employment as New York City Public School Teacher at The William W. Niles School - Middle School 118.

The Defendant Charlamagne's arguments are comprised of offensive, imprudent and factually incorrect statements. What was falsely, disparagingly, and slanderously described by the Defendant

Charlamagne as a "*history lesson with extra mayonnaise[1] on it*" (see, Transcript of the Donkey of the Day

Broadcast Segment airing February 7, 2018, Defendant's Exhibit A, at page 5 and 6) was, in actuality, an

example of a multi-sensory[2] teacher demonstrating "spatial recognition" to her students. This part of her lesson

was described by the Plaintiff as a "teachable moment," meant for the students to perceive the closeness of the

conditions being discussed for clarification purposes; it was not, in any way, a reenactment. The Defendant

Charlamagne was describing as fact, a false scenario, wherein it was stated that the Plaintiff had *singled out*

*black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then*

*stepped on their backs to show them what slavery felt like*." This fabricated account is contradicted by the

reported findings of the of the New York City Department of Education's Office of Special Investigations

(also referred to as OSI); wherein the Defendant was being investigated for an false accusation of "*using her*

*feet or her knees to push the students closer together during a classroom demonstration*," which was ultimately

unsubstantiated, to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students*

*closer together during the demonstration*;" "'*Student' I never observed Ms. Cummings' knee make contact*

*with 'Student A'*" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make*

*contact with them*." See, Redacted Copy of Office of Special Investigations Investigative Report (OSI) dated

July 24, 2018, included Plaintiff's **Exhibit A**. Moreover, "Students B, D, E, F, I, J and K" noted that the

participating student volunteers did not appear to be in any distress. See, Plaintiff's Exhibit A. Most

remarkably, "Student J" admitted that "'*Student A'[3] was lying and was attempting to get Ms. Cummings fired*

---

[1] The reference to "mayonnaise" is a racial slur word used to describe Caucasian individuals.

[2] Multi-sensory teaching is a didactic system that seeks to develop awareness of self in time and space in order to raise cognition and understanding of the world as is experienced. It takes into account that different children learn in different ways; conveys information through things like touch and movement-called tactile and kinesthetic elements, as well as sight and hearing. See, White, Helen and Christina Evans, Learning to Listen to Learn: Using Multi-Sensory Teaching for Effective Listening (2005).

[3] "Student A" was one of four students who voluntarily participated in the classroom demonstration on the Middle Passage. It was erroneously alleged that Ms. Cummings pushed "Student A's" back with her knee and asked if it hurt or caused her discomfort.

or in trouble because 'Student A' did not like Ms. Cummings." See, Plaintiff's Exhibit A, at page 5. Moreover, the Plaintiff controverts this fallacious allegation in her rebuttal correspondence addressed to Community Superintendent Maribel Torres-Hulla dated October 5, 2018, annexed hereto as **Exhibit B** at page 8.

"Student A" is alleged to have complained on or about January 11, 2018, and as noted in the OSI Report, "Student A's" mother is noted to have complained 6 days later (9 days after the lesson). Further, it is evident that a complaint was not immediately filed according to the OSI Report. See, Plaintiff's Exhibit A. Furthermore, the Plaintiff was not removed for investigation by the New York City Department of Education's Office of Special Investigations until February 2, 2018. Principal Cox did a school based investigation, but failed to adhere to Chancellor Regulation A-420 and breached Article 20 of the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT). A copy of the Plaintiff's Verified Complaint dated May 15, 2019, annexed hereto as **Exhibit C**, at pages 46-48.

The segment broadcast by the Defendant Charlamagne asserted as fact, grossly incorrect information, which was completely distinct from the allegation that was actually being investigated by OSI. The original allegation involved a false report that the Plaintiff physically pushed student volunteers closer together, using her feet or her knees to push the students closer together during a lesson demonstration; it was never the complaint that she "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like,*" as falsely and repeatedly reported. See, Plaintiff's Exhibit A at pages 24-25. Notably, the Office of Special Investigations Investigative Report (OSI Report) dated July 24, 2018, indicates that "*[T]he written statements made by 'Students B, C, D, E, H, I, J, Q, R, S, T, U, and V' fail to corroborate that Ms. Cummings pressed her knee into 'Student A's' back or any students' back.*" See, Plaintiff's Exhibit A. "Therefore, the allegation that Ms. Cummings used corporal punishment against "Student A" by pushing her knee into her ["Student A's"] back during a classroom demonstration was never corroborated and is **unsubstantiated**." See, Plaintiff's Exhibit A.

The Charlamagne Defendant erroneously argues that the Plaintiff's claims against him fail for five (5) reasons; yet each of the reasons cited are without merit. First, the Defendant argues that the given the ordinary

4

meaning as understood by the average listener of the challenged broadcast comments, given in their full context, are not defamatory. This is untrue. There were no substantiated, accurate facts reported the Defendant Charlamagne. Plaintiff has not distorted the meaning of any statements. We must remain mindful of the rule that the defamatory effect of the segment is to be ascertained not from the viewpoint of a critic or language expert, but rather from that of a reader of reasonable intelligence who takes ordinary interest in the articles of a periodical, but does not commonly subject them to careful scrutiny and analysis. Clearly a reasonable viewer in this instance would believe that the statements were conveying facts about the Plaintiff [this is evidenced by the vicious attacks and public outcry for social justice that followed], and would believe that the statements constituted reports of a proceeding, which they did not. The Defendant Charlemagne used no language to presuppose the Plaintiff's innocence, such as "accused" or "alleged." He presented the narrative as being proven and true, thus facilitating and inciting the protest and unrest directed toward the Plaintiff. Notably, the Defendant Charlemagne spoke volumes in his segment regarding the curriculum when he has no degree in education or any experience in the education system of knowledge of the appropriate curriculum.

Second, the Defendant Charlamagne argues that the comments complained of are classic examples of "rhetorical hyperbole" and "expressions of pure opinion" on facts extensively reported by the media, and not assertions of fact, and thus protected. This is problematic and misguided. There were no substantiated, accurate facts reported by the News Defendants. Moreover, the disingenuous attempt to characterize the reference to the Plaintiff's actions as opinion by the Charlamagne Defendant is derisory. Credible reporters of facts must be able to distinguish between facts and opinions. A journalist needs to know how reliable statements are before reporting them as facts. See, Henshall, Peter and David Ingram, The News Manual: A Professional Resource for Journalists and the Media (1991). While, Defendant Charlamagne may argue that he is not a "journalist" or "reporter," per se; he is a media influencer, with a following of listeners who are guided by what he has to say, and blindly accept his statements as truth. No other investigation of the purported "facts" occurred, as evidenced by the fact that the reported accounts differed dramatically from the actual allegation that was made by just one student and ultimately unsubstantiated by OSI. What was being erroneously reported

amounted to child abuse and/or endangerment, yet there was no indication of a substantiated investigation. Therefore, the Defendant Charlamagne cannot disingenuously cloak his otherwise actionable behavior as "opinion" while publically and repeatedly describing and referring to the Plaintiff as a "racist" and utilizing a myriad of other offensive racial and ethnic slurs, while promoting a false fact pattern and expect to escape any liability. Plaintiff's quarrel is not with "what she believes to be unfair assessments and remonstrations concerning her lesson." She has no doubts regarding her lesson, and her colleague, (an African-American teacher), who was present in the classroom, testified as to its appropriateness[4]. Contrary to the Defendant's argument, there was no "dubious" decision, nor was there even a "reenactment." As the Plaintiff has argued herein, <u>there was never any reenactment</u>, this part of her lesson, which was a teachable moment[5] was for "spatial recognition," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes.

Third, the Complaint contains numerous factual allegations to demonstrate that the broadcast comments were published in a grossly irresponsible manner. The Defendant Charlamagne disingenuously argues a failure to demonstrate that the Defendant knew or should have known that the reporting was inaccurate. In this regard, plausibility was completely ignored, to wit: if the Plaintiff had in fact walked on student's backs, would they not have sustained physical injuries? Would she not have been arrested or charged with child abuse? It should have been obvious that this allegation was preposterous; however this gross

---

[4] Ralph Hudson is African-American teacher who witnessed the Plaintiff's lesson. He acknowledged to the Plaintiff after the lesson that he was impressed with how she handled the situation and subject matter with such grace and dignity. It is important to note that he told investigators from the Department of Education's Office of Special Investigations (OSI) that he found the lesson to be "*appropriate* and was within the scope of *effectively educating students* about the harsh conditions endured by slaves during transport." (Emphasis added). He did not corroborate the events that the student alleged to have happened. Furthermore, he indicated that it was his belief that if the Plaintiff were African-American, the incident would have been a non-issue. See, Plaintiff's Exhibit A at pages 7 and 8.

[5] A teachable moment is not something that you can plan for; rather, it is a fleeting opportunity that must be sensed and seized by the teacher. Often it will require a brief digression that temporary sidetracks the original lesson plan so that the teacher can explain a concept. See, Footnote number 41 of Plaintiff's Exhibit B, at page 7.

distortion helped the Defendant incite his listeners to protest and ultimately assisted the Department of Education in securing the funding that it so desperately desired.

Lastly, the Defendant erroneously argues that the Plaintiff's cause of action for intentional infliction of emotional distress should fail as a "transparent attempt to circumvent First Amendment privileges," and that the Plaintiff's cause of actions for intentional infliction of emotional distress and negligence should be dismissed because it relies upon a constitutionally insufficient basis for the imposition based on the publication of a newsworthy information and that the Defendant owed no duty to the Plaintiff in connection with the disputed broadcast. There are **no** First Amendment privileges to protect false statements. Further, the conduct described by the Plaintiff more than meets the rigorous standard formulated by the New York courts for emotional distress claims. The Defendant Charlamagne failed to exhibit any iota of integrity when he made entirely false statements about the Plaintiff; this makes him unquestionably negligent. Notably, even when he undoubtedly learned that the Office of Special Investigations Investigative Report, (see, Plaintiff's Exhibit A), had confirmed every item previously reported to be blatantly <u>false</u>, the Defendant never issued a retraction or made any attempt to correct the record.

## ARGUMENT

### POINT 1
### <u>THE COMPLAINT PLEADS SPECIFIC FACTS WHICH ESTABLISH</u>
### <u>A PLAUSIBLE CLAIM TO RELIEF</u>

Rule 12 (b)(6) provides that a motion to dismiss a complaint may be filed for "failure to state a claim upon which relief can be granted." <u>Id</u>. "The purpose of the rule is to allow the court to eliminate actions that are fatally flawed in their legal premise and destined to fail, and thus spare the litigants the burdens of unnecessary pretrial and trial activity." <u>See</u>, *Advanced Cardiovascular Sys. Inc. v. SciMed Life Sys.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993). Nonetheless, in these matters, it has been said that a Rule 12 (b)(6) motion is **rarely** granted. <u>See</u>, Thomas E. Willging, <u>Use of Rule 12 (B) (6) in Two Federal District Courts</u> (Federal Judicial Center 1989).

The Supreme Court's landmark decisions in *Bell Atlantic Corporation v. Twombly*, 550 US 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 US 662, 678 (2009), shifted pleading standards from "simple notice pleading" to a "more heightened form of pleading." To survive a motion to dismiss under *Twombly*, supra and *Iqbal*, supra, a plaintiff's allegations must meet a standard of "plausibility." A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." While plausibility "is not akin to a probability requirement," plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." Pleading facts that are "merely consistent with a defendant's liability" is insufficient to "nudge [a plaintiff's] claims across the line from the conceivable to plausible." In deciding a motion to dismiss, the court must "accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in the plaintiff's favor." Id.

Clearly, the Defendant Charlamagne has not met this Circuit's standard on a Rule 12 (b)(6) motion. The Supreme Court in *Bell Atlantic Corp v. Twombly*, (550 US 544, 570, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), held that, "in order to survive a motion to dismiss pursuant to Rule 12 (b)(6), a plaintiff need not provide detailed factual allegations, but the factual allegations asserted must be "enough to raise a right to relief above the speculative level…." See, *Koulkina v. City of New York*, 559 F. Supp. 2d 300 (S.D.N.Y. 2008). The Defendant misleadingly asserts that claims such as this implicate the First Amendment and must be considered "*against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks*." Yet, it is well held that the First Amendment cannot be used as protection against blatantly false statements. This Court cannot ignore that the Defendant's broadcast was not merely "*unpleasantly sharp attacks*," it was factually incorrect.

The hallmark of a defamation claim is reputational harm. Former United States Supreme Court Justice Potter Stewart wrote in *Rosenblatt v. Baer*, 383 U.S. 75 (1966), that the essence of a defamation claim is the right to protect one's good name. According to Justice Stewart, this tort "reflects no more than our basic

concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty." Id.

The Defendant Charlamagne mistakenly relies upon *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), where the landscape of libel law dramatically changed involving a case where two paragraphs in an advertisement contained factual errors. For the first time, the Supreme Court ruled that "libel can claim no talismanic immunity from constitutional limitations," but must "be measured by standards that satisfy the First Amendment." The high court established a rule for defamation cases that dominates modern-day American libel law. The Court wrote:

> "The constitutional guarantees require, we think, a federal rule that prohibits a *public* official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (Emphasis added).

The Court required a public official defamation plaintiff to show evidence of actual malice or reckless disregard for the truth by "convincing clarity" or clear and convincing evidence. Notably, as an individual, probationary middle school teacher, with no involvement in administration or policy, the Plaintiff is not a public official. Nonetheless, even if, assuming *arguendo*, the Plaintiff was considered a public official, she has no problem demonstrating that the blatantly false statement was made with actual malice - knowledge that it was false or with reckless disregard of whether it was false or not. The Defendant Charlamagne viciously promoted the Plaintiff as a "racist," never once retracting the false account that she "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*"

Nonetheless, the Supreme Court clarified the limits of the "actual malice" standard and the difference between public and private figures in defamation cases in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 471 F.2d 801 (1974). The court had to determine what standard to apply for private persons and so-called limited purpose public figures. Then, the Court had to determine whether Gertz was a private person or some sort of public figure. The news-media defendant argued that the *Times v. Sullivan* standard should apply to any defamation

plaintiff as long as the published statements related to a matter of public importance. The high court disagreed, finding a distinction between public figures and private persons. The Court noted two differences: (1) public officials and public figures have greater access to the media in order to counter defamatory statements; and (2) public officials and public figures, to a certain extent, seek out public acclaim and assume the risk of greater public scrutiny.

For these reasons, the *Gertz* Court set up a different standard for private persons:

> "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

This standard means that <u>a private person does not have to show that a defendant acted with actual malice in order to prevail in a defamation suit</u>. The private plaintiff usually must show simply that the defendant was negligent, or at fault. However, the Supreme Court also ruled that private defamation plaintiffs could not recover punitive damages unless they showed evidence of actual malice.

A defamation plaintiff must usually establish the following elements to recover: (1) Identification: The plaintiff must show that the publication was "of and concerning" himself or herself; (2) Publication: The plaintiff must show that the defamatory statements were disseminated to a third party; (3) Defamatory meaning: The plaintiff must establish that the statements in question were defamatory. For example, the language must do more than simply annoy a person or hurt a person's feelings; (4) Falsity: The statements must be false; truth is a defense to a defamation claim. Generally, the plaintiff bears the burden of proof of establishing falsity; (5) Statements of fact: The statements in question must be objectively verifiable as <u>false</u> statements of fact. In other words, the statements must be provable as false; and (7) Damages: The false and defamatory statements must cause actual injury or special damages. Clearly, the Plaintiff has successfully demonstrated each of the elements. Further, in *Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999), the Court discussed the high burden of proof necessary on a motion to dismiss under Fed. R. Civ. P. 12 (b)(6) and held:

> "Any Rule 12 (b)(6) motion for a dismissal faces a difficult (though not insurmountable) hurdle. (citations and internal quotation marks omitted): On a motion to dismiss under 12 (b)(6), the Court must accept as true the factual allegations in the complaint, and draw all favorable inferences in favor of the plaintiff. The District Court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

It is well settled that courts in this Circuit follow the Supreme Court determination in *Conley v. Gibson*, 355 U.S. 41 (1957). In *Conley*, Court laid down the criteria to be applied when evaluating motions to dismiss prior to the defendants serving an answer and discovery being conducted. The Court held that a dismissal should only be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id.

The Court then referenced Fed. R. Civ. P. 8 (a)(2) to illustrate the liberal system of pleading in a federal action and cited the oft advanced rule that the appropriate inquiry on a motion to dismiss is not whether the plaintiff will ultimately prevail on the merits, but whether the plaintiff is entitled to offer evidence in support of his claims at the time of trial. "A claimant need only give a statement that gives the defendant 'fair notice of what the…claim is and the grounds upon which it rests." See, *Conley,* 355 U.S. 41 (1957), supra. The issue at the motion to dismiss stage of an action is not whether a plaintiff will ultimately prevail on the merits, but whether or not the plaintiff is entitled to offer evidence to support the complaint. "Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." See, *Phelps v. Kapnolas*, 308 F.3d 180, 184-185 (2d Cir. 2002).

The test, as relied upon by this Circuit and the standard on a Rule 12 (b)(6) motion, is for the Court to merely determine the legal feasibility of the complaint and not to weigh the evidence which might ultimately be offered in support of the complaint. Moreover, it is well settled that on a motion to dismiss pursuant to Rule 12 (b)(6), the Court must accept all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. See, *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002). In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), the Supreme Court set forth:

> Given the federal rule of simplified standard for pleading, [a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations ... Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56.

In the instant case, the Defendant Charlamagne's motion to dismiss under Rule 12 (b)(6) is based upon the alleged lack of merit in the Plaintiff's case; however, that is not the test in this Circuit when determining the validity of a 12 (b)(6) motion. The Defendant has not met this Circuit's test on motions of this type, and should; therefore, be denied in all respects.

**POINT II**
**THE DEFAMATION CLAIM AGAINST THE DEFENDANT CHARLAMAGNE SHOULD NOT BE DISMISSED BECAUSE IT IS ALLEGED THAT CERTAIN STATEMENTS COMPLAINED OF ARE NOT DEFAMATORY**

The Defendant Charlamagne disingenuously argues that multiple statements alleged to be actionable in the Complaint are non-defamatory on their face. The Defendant has nonetheless correctly argued that the challenged statements are to be read in the context of the publication as a whole. See, *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986). A statement is defamatory "if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of [him] in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." See, *Qureshi v. St. Barnabas Hosp. Ctr.,* 430 F.Supp.2d 279, 287 (SDNY 2006). Clearly, the Plaintiff's has demonstrated the defamatory nature of the Defendant's statements. He publically referred to her a "racist," a "bigot" a "cracker-ass cracker," and a "white devil." He further noted that [he] wanted to slap the fire" out of her, and "described her when making the potato salad, (see, Defendant's Exhibit 1, at page 8), as "being heavy-handed with the mayonnaise," questioning, "[w]hy is she in the kitchen on Soul Food Sundays." See, Defendant's Exhibit 1, at pages 8, 9, and 13. These statements undoubtedly exposed the Plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of her in the minds of right-thinking persons, and to deprive her of her friendly intercourse in society. This is evident in the online commentary following this broadcast and the demonstrations of hate, ridicule, harassment, and threats of violence which followed.

The privilege protecting the expression of an opinion is rooted in the preference that ideas be fully aired. See, *Davis v. Boeheim*, 24 NY3d 262 at 269 (2014), citing, *Steinhilber v. Alphonse*, 68 NY2d 283 at 289 (1986), and *Gertz v. Robert Welch, Inc.*, supra, 418 US 323, 339-340 (1974). Nonetheless, privileged statements of opinion are either accompanied by the facts on which they are based, or do not imply that they are based on undisclosed facts. See, *Gross v. New York Times Co.*, 82 NY2d 146 at 53-154 (1993). "When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" See, *Egiazaryan v. Zalmayev*, 880 F Supp 2d 494, 503 [SD NY 2012], quoting, *Steinhilber*, supra, 68 NY2d at 289, "because a reasonable listener or reader would infer that 'the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]'" See, *Gross*, supra, 82 NY2d at 153-154, quoting, *Steinhilber*, 68 NY2d at 290, and "if the predicate facts are disclosed, but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity," the statement may be actionable as a "defamatory opinion" See, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, F Supp 3d , 2016 WL 3773394, [SD NY 2016], citing *Silsdorf v. Levine*, 59 NY2d 8, 15-16 [1983], cert denied 464 US 831; see also, *Parks v. Steinbrenner*, 131 AD2d 60, 62-63 [1st Dept. 1987].

An asserted fact may be distinguished from a nonactionable opinion if the statement: (1) has a precise, readily understood meaning, that is (2) capable of being proven true or false, and (3) where the full context in which it is asserted or its broader social context and surrounding circumstances indicate to readers or listeners that it is likely fact, not opinion. See, *Davis*, supra, 24 NY3d at 271, citing, Mann v. Abel, 10 NY3d 271 at 276 (2008), and *Brian v Richardson*, 87 NY2d 46, 51 [1995]; *Gross*, supra, 82 NY2d at 153; *Steinhilber*, supra, 68 NY2d at 292.

"Where readers would understand a defamatory meaning, liability cannot be avoided merely because the publication is alleged to be cast in the form of an opinion, belief, insinuation or even question. A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community." See, *Christopher v. American News Co.*, 171 F.2d 275 (7th Cir. 1948).

"[T]he following factors should be considered in distinguishing fact from opinion: (1) whether the language used has a precise meaning or whether it is indefinite or ambiguous, (2) whether the statement is capable of objectively being true or false, and (3) the full context of the entire communication or the broader social context surrounding the communication. Moreover, the Court of Appeals makes a distinction between a statement of opinion that implies a factual basis that is not disclosed to the reader and an opinion that is accompanied by a recitation of facts on which it is based. The former is actionable, the latter is not." See, *Penn Warranty Corp. v. DiGiovanni*, 2005 NY Slip Op 25449 10 Misc3d 998 (2005). The Defendant Charlamagne never used words such as "alleged" or "accused of" in his broadcast; he lead his listeners to believe the recitation of the facts presented to be accurate.

It bears mentioning that Under New York law, some statements are considered defamation (slander) *per se* if they "(1) charge plaintiff with a serious crime; (2) tend to injure plaintiff in its business, trade or profession; (3) [communicate that] plaintiff has some loathsome disease; or (4) impute unchastity. See, *Doe v. Doe*, No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017) (a statement is *per se* defamatory when it tends to injure another in his or her trade, business, or profession) (citing *Liberman v. Gelstein*, 80 NY2d 429, 435 (1992)). Such statements are presumed to cause injury, so a separate showing of harm is not necessary. Here, the facts as presented by the Defendant Charlamagne accuse the Plaintiff of having committed a serious crime; walking on the backs of students is akin to child abuse and endangerment and the false labeling of the Plaintiff as a racist who committed such an atrocity has irreparably injured the Plaintiff in her profession as a school teacher and otherwise. The Plaintiff was never accused or investigated on an allegation of a racist act by the City Department of Education. She was being investigated on allegations of corporal punishment.

Contrary to *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), Defendant Charlamagne disclosed erroneous facts. There were no allegations from parents, students, or staff that the Plaintiff "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Likewise, the Plaintiff contests that she ever admitted "having misbehaving students sit in the front of the room to demonstrate the conditions on slave

14

ships, or that a parent reported that she 'pushed her knee' into *students'* (plural) backs and asked if students (plural) felt pain." See, Plaintiff's Exhibit B at paragraph 53. How can the Defendant argue that there was nothing in the statements, which disparage the Plaintiff's professional skills or competence or attributes wrongdoing to her? The entirety of the transcript was a criticism of her skills and competence and falsely accused her of the equivalent of child abuse and/or child endangerment, to wit:

- "…..it's levels to this thing called stupid sometimes." Defendant's Exhibit 1, at page 3

- "But nope, that's not what Patricia Cummings did. See, Patricia Cummings decided to give these kids a lesson on slavery and she put extra mayonnaise on it. Oh that Hellman's is heavy on this one." Defendant's Exhibit 1, at pages 5 and 6.

- "I would love to know how many black and Spanish teachers this school has, because you can avoid problems like the one Patricia cause for herself, if you simply have us teaching us." Defendant's Exhibit 1, at page 6.

- "She picked three black kids to participate." Defendant's Exhibit 1, at page 7

- "Patricia Cummings, told several black children to lie on the floor during a lesson about the slave trade…. stepped on their back saying, '[S]ee how it feels to be a slave.'" Defendant's Exhibit 1, at pages 7 and 8.

- "Why is Patricia Cummings in the kitchen on Soul Food Sundays…..When it's time to make a nice quiche, call Patricia. You know good damn well when you let Patricia make the potato salad, she heavy-handed with the mayonnaise." Defendant's Exhibit 1, at page 8.

- "…..if you a white teacher teaching a majority black and Hispanic class, you should have to run those lesson plans by some type of diversity board at the school to make sure you talking the right language to the kids…" Defendant's Exhibit 1, at page 9.

- "You could have showed them the horror of slavery by simply letting them watch '12 Years a Slave….but no you would rather lay kids on their stomach and step on their backs, because truth be

told, you wanted to break their spirits. You wanted to give them an inferiority complex.'" Defendant's Exhibit 1, at pages 9 and 10.

- "Why not give the kids some required reading about slavery and let them come to their own conclusions?....." Defendant's Exhibit 1, at pages 10 and 11.

- "It was all kind of lesson plans you could have gave these kids other than laying them on the floor on their stomachs, and stepping on their backs. Defendant's Exhibit 1, at page 12.

- "See, I refuse to believe that Patricia Cummings, a middle school teacher making over $68,000 a year, doesn't know any better and that she couldn't do any better." Defendant's Exhibit 1, at page 12.

- "I could have created a better lesson plan for these kids, and my lesson plan would have actually had some redeeming qualities to it…..There is no redeeming value in this lesson" Defendant's Exhibit 1, at pages 12 and 13.

- "….and now they have reassigned her away from children after the New York Daily News contacted the City Education Department about her slavery lesson." Defendant's Exhibit 1, at page 13.

There is no question that these comments would be interpreted by the average [listener] as defamatory. They are not merely observations; in distinguishing *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), it is clear that the Court in this matter could not find that the context of the complained-of statements was such that a reasonable [listener] would have concluded that he or she was [hearing] opinions, not facts about the Plaintiff. To describe these rants as merely setting forth pedagogical preferences and teaching protocols is entirely disingenuous; as is claiming that they are "merely offensive or unpleasant." They clearly do negatively reflect on Plaintiff's reputation as a school teacher and her ability to appropriately determine the way to present the curriculum to the students. Unquestionably, this speech attributes odious and despicable characterizations to the Plaintiff. See, *Chau v. Lewis*, 771 F.3d at 127 (2014). There is no need to render any interpretation of the challenged comments. Thus, the statements describing the Plaintiff's lesson are actionable.

**THE CHALLENGED COMMENTS ARE NOT EXPRESSIONS OF OPINION ENTITLED TO CONSTITUTIONAL PROTECTION**

"The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty - and thus a good unto itself - but also is essential to the common quest for truth and the vitality of society as a whole." See, *Bose Corp. v. Consumers Union*, 466 US 485, 503-504 (1984). Nevertheless, there are categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend because they "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." See, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

The counsel for the Defendant, Charlamagne erroneously classifies this case as "free speech litigation;" (*Neidl Memorandum of Law at page 1*), however, it is well established that the media "has no special privilege to invade the rights and liberties of others," and that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on [the press's] ability to gather and report news." See, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669-70, 115 L. Ed. 2d 586, 111 S. Ct. 2513 (1991) (quotations and citation omitted). The Defendant Charlamagne conflictingly argues that falsity is a necessary element in a defamation claim and only statements alleging facts can properly be the subject of a defamation action. Here, the challenged statements alleging "facts" about the incident were absolutely false. The allegations that were the subject of the OSI investigation were proven to be false and unsubstantiated, (see, Plaintiff's Exhibit A), and the factual narrative spoken about by the Defendant Charlamagne in his "Donkey of the Day" segment was never true, nor was it ever the subject of an investigation. The Defendant's reliance on *Gertz*, (418 U.S. 323, 471 F.2d 801 (1974)), in this instance is misplaced. The challenged statements were clearly not opinion, entitling the Defendant Charlamagne to Constitutional protection. While it is argued that expressions of opinion receive absolute constitutional protection under Gertz, determining whether a given statement expresses fact or opinion may be difficult. The question must be answered on the basis of what the

17

average person hearing or reading the communication would take it to mean. See, *Rinaldi v. Holt, Rinehart & Winston*, supra, at p 381; *Mr. Chow of N. Y. v Ste. Jour Azur S.A.*, 759 F.2d 219, 227-228). There is no definitive test or set of criteria. See, *Mr. Chow of N. Y. v. Ste. Jour Azur S.A.*, supra, at pp 225-226. The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion. See, Restatement [Second] of Torts § 566 comment c.

While the Supreme Court in *Gertz*, supra, did not focus on the distinction between fact and opinion, the court, in *Letter Carriers v. Austin*, (418 U.S. 264 (1974)), decided on the same day as *Gertz*, supra, provides some precedent. The court considered both the context of the entire communication and the type of "intemperate, abusive, or insulting language." (Id., at p 283). In *Letter Carriers*, supra, it concluded that no reader of the newsletter would have understood the union "to be charging the appellees with committing the criminal offense of treason." Id., at pp 285, 286; see also, *Greenbelt Pub. Assn. v. Bresler*, 398 U.S. 6 (1970). The Courts have taken great pains to avoid any attempt to reduce the problem of distinguishing fact from opinion to a rigid set of criteria which can be universally applied. The infinite variety of meanings conveyed by words; depending on the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used, rules out a formulistic approach. A court must have the flexibility to consider the relevant factors and to accord each the degree of importance which the specific circumstances warrant.

Nonetheless, Judge Starr's plurality opinion in *Ollman v. Evans*, 750 F.2d 970 (1984), sets out four factors which should generally be considered in differentiating between fact and opinion. The four factors are: (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might "signal to

readers or listeners that what is being read or heard is likely to be opinion, not fact." See, *Ollman v. Evans*, 750 F.2d 970 (1984) at p 983.

Consideration of the circumstances and of the broader social context (i.e., the factual background leading to segment) confirms the conclusion that the broadcast would be taken literally by the ordinary person. An analysis of the statements made about the Plaintiff in the light of the third and fourth *Ollman* factors (the full verbal context of the statement and its broader social context), compels the conclusion that the statement would not be taken as pure opinion. Further, to be sure, in another context, the statements made by the Defendant will be viewed as a factual assertion, if considered under the first and second *Ollman* factors: whether the statements are sufficiently specific to convey "a precise core of meaning for which a consensus of understanding exists," (see, *Ollman v. Evans*, supra, at p 979), and whether it is "capable of being objectively characterized as true or false." See, *Ollman v. Evans*, supra, at p 979. Here, the inescapable conclusion from the verbal context of the entire message and all of the circumstances under which it was delivered is that the statement would be understood by the ordinary listener for what it is: a defamatory factual assertion, wherein the Defendant Charlamagne was falsely asserting as "fact" that the Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Thus, there is no constitutional protection afforded.

**Characterization of Someone as a "Racist," "Bigoted," a "Cracker" or a "White Devil" is NOT Protected Opinion**

Many courts in other jurisdictions that have faced the issue of defamation claims based on accusations of bigotry or racism have held the statements to be nonactionable statements of opinion. See, e.g., *Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) (holding that neither general statements charging a person with being racist, unfair, unjust, nor references to general discriminatory treatment, without more, constitute provably false assertions of fact); however, claiming that a person made a particular statement would be a factual assertion, and might well be libelous if false and defamatory (i.e., if the statement, if made, would reflect badly on the person). In this instance, there were not mere references to general discriminatory

treatment. Thus, in this instance, there was a "factual" assertion that that the Plaintiff "singled out black students in her class and made them act like slaves;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" This false and defamatory statement reflected badly on the Plaintiff and in conjunction with the implication of those accusations of bigotry and racism, would remove any purported protection and render those statements actionable.

**The Nature of Term "Racist" Does Not Render it Protected Opinion**

The Defendant Charlamagne attempts to support his position by siting various cases where the term "racist" or the like was used; however, these are clearly distinguishable from this case, as it should be noted that some of these cases involved public figures. For example, in *Stevens v. Tillman*, 855 F.2d 394, 402, the Court opines that "[I]n daily life 'racist' is hurled about so indiscriminately that it is no more than a verbal slap in the face; the target can slap back (as Stevens did). It is not actionable <u>unless it implies the existence of undisclosed, defamatory facts</u>." Here, the Plaintiff was not a public figure, who easily could "slap back" and the implication of the existence undisclosed defamatory facts was clear.

The Defendant Charlamagne disingenuously argues that speech is not actionable so long as it is a protected opinion. Remarkably, the statements falsely permitted his listeners to believe that the Plaintiff was being accused of "singling out black students and making them act like slaves;" telling them to "lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like." Moreover, in distinguishing *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), it is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable listener would have concluded that he or she was hearing opinions, not facts about the Plaintiff. Thus, the statements describing the Plaintiff's lesson and the Plaintiff herself as "racist" are actionable.

**Descriptions of the Plaintiff as a "Racist," "Bigoted," a "Cracker" or a "White Devil" are Actionable**

The Defendant Charlamagne disingenuously duplicates his prior argument alleging that such statements could not be understood as assertions of objective fact. Further, as the Defendant argues, in order to constitute actionable defamation, a challenged statement must be provably false. <u>See</u>, *Buckley v. Littell*, 539

F2d 882, 894 (2d Cir. 1976). Arguing that the descriptions of the Plaintiff as a "racist," "bigot," "cracker," or a "white devil" cannot be proven false is misguided. In this instance, the very alleged incident that prompted these offensive descriptions was false. **It never happened**. The Plaintiff **NEVER** *singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Therefore, these descriptions of the Plaintiff are similarly false. The cases cited by the Defendant Charlamagne are distinguishable from the instant matter; none of the cases demonstrate a scenario, where those terms were unequivocally proven to be related to a false event. Thus, again, in this instance, the assertion that that the Plaintiff "singled out black students in her class and made them act like slaves;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*" was false and not the subject of the OSI investigation, for which she was otherwise exonerated. See, Plaintiff's Exhibit B.

**Speculation Over State of Mind is Not Applicable to These Proceedings**

The Defendant Charlamagne's argument that his statements relating to the Plaintiff's demonstration, to wit: that she "*wanted to break their spiri*ts" and "*give them an inferiority complex*" are not mere subjective evaluations of intent and state of mind. With respect to these statements, it has been correctly noted the evidence produced by the Plaintiff demonstrates that the Defendant Charlamagne should have known the statements were false at the time of the broadcast. *New York Times*, supra, and its progeny made it essential to proving liability that the public plaintiff focus on the conduct and state of mind of the defendant. "To be liable, the alleged defamer of public officials or of public figures must know or have reason to suspect that his publication is false. In other cases, proof of some kind of fault, negligence perhaps, is essential to recovery." See, *Herbert v. Lando*, 441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed. 2d 115, 1979 U.S. LEXIS 88, 27 Fed. R. Serv. 2d (Callaghan) 1, 3 Fed. R. Evid. Serv. (Callaghan) 822, 4 Media L. Rep. 2575. Citing *Herbert*, supra, the Second Circuit held in *Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123 (2d Cir. 1984) at 136-137, that "actual malice" as is implied in that expression, is a subjective test focused on the Defendant's state of mind." At 140. The state of mind requisite for liability is knowledge of actual or probable falsity. See, *Herbert v.*

*Lando*, supra, at 172. "If such proof results in liability for damages which in turn discourages the publication of erroneous information known to be false or probably false, this does not abridge either freedom of speech or of the press." Id.

**Charlamagne's Commentary is NOT Merely Emotionally Charged Rhetoric**

The key question here is whether, drawing all reasonable inferences in favor of Plaintiff, the comments contain assertions of fact or opinion. The New York Court of Appeals distilled the following three factors which courts are instructed to consider in determining whether a statement is one of fact or opinion: (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] readers or listeners that what is being read or heard is likely to be opinion, not fact. See, *Brian v. Richardson*, 87 N.Y.2d 46, 660 N.E.2d 1126, 1129, 637 N.Y.S.2d 347 (N.Y. 1995) (internal quotation marks and citations omitted), cited in *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997). The third factor "lends both depth and difficulty to the analysis" and is critical to determining whether the alleged defamatory statements consist of "assertions of facts [or] nonactionable expressions of opinion." Id. It is important for a court to "consider the content of the communications as a whole, as well as its tone and apparent purpose." Id. At 1129-30 (citation omitted). "Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff." Id. At 1130 (internal quotation marks omitted). Beyond the "immediate context in which the disputed words appear," the New York Court of Appeals requires courts "to take into consideration the larger context in which the statements were published, including the nature of the particular forum." Id.

The Defendant argues that the comments are hyperbolic statements of opinion. Yet in this instance, the broadcast statements are clearly capable of being proven false—the comments, even if viewed in isolation, are not considered opinion. Notably, the purported "fractious debate" described by the Defendant was actually

based on a fact pattern that was entirely fabricated. Yet, when viewed within the larger context of the broadcast on which they were made, there can be no doubt that a reasonable reader would understand the comments to be factual. The average listener would <u>not</u> know that the comments were merely "emotionally charged rhetoric." <u>Id</u>. Of course the Internet and social media makes it more likely that a greater number of people heard the Defendant Charlamagne's statements, and thereby amplifying the impact they may have on a person.

**The Comments Complained of Are Actionable Fact Despite the Facts in the Public Domain**

The comments complained of are <u>not</u> protected under the First Amendment or the New York State Constitution. They cannot be considered statements of "pure opinion" despite the fact that the media worldwide picked up on this false incident.

Under New York and federal law, expressions of "pure opinion," <u>as opposed to statements of fact</u>, are not actionable, receiving full constitutional protection. <u>See</u>, *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152, 623 N.E.2d 1163, 603 N.Y.S.2d 813 (1993). Yet, at bottom, the inquiry is whether a reasonable listener is likely to have understood the statements as conveying provable facts about the plaintiff. <u>See</u>, *Gross*, <u>supra</u>, 82 N.Y.2d at 155; <u>see also</u>, *Brian v. Richardson*, 87 N.Y.2d 46, 51, 660 N.E.2d 1126, 637 N.Y.S.2d 347 (1995) (explaining that the factors to be considered in addressing this question are: (1) whether the specific language at issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances signals to listeners that what is being heard is likely to be opinion, not fact).

Having reviewed the statements in the overall context that they were made, (<u>see</u>, *Brian*, <u>supra</u>, 87 N.Y.2d at 51), it can be concluded that a reasonable listener would have believed that the statements were intended to convey objective facts. The terms used by the Defendant may be used in a way that has a precise meaning and that is capable of being proven true or false; (<u>see</u>, <u>Id</u>.), a reasonable listener would have perceived the Defendant Charlamagne's statements, in the context that they were made, to convey that the Plaintiff had

actually committed racist acts. Further, his remarks, received extensive media coverage and commentary. It is within this surrounding circumstance that the Defendant's statements must be examined and how a reasonable listener would have perceived them. Thus, for example, when the Defendant Charlamagne described the Plaintiff as a "racist" and a "bigot," a reasonable listener would have easily perceived that the Defendant was expressing that the Plaintiff was described as having committed the actual acts stated. In short, when examined in the context in which they were made, it must be concluded that all of the Defendant Charlamagne's statements would "reasonably appear to state or imply assertions of objective fact." See, *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 243, 567 N.E.2d 1270, 566 N.Y.S.2d 906 (1991).

### POINT IV
### PLAINTIFF HAS PLEAD PUBLICATION WITH GROSS IRRESPONSIBILITY

The Plaintiff has plead and proven that the Defendant Charlamagne's comments addressing the Plaintiff were made with "gross irresponsibility." The parties dispute whether the statements at issue are "arguably within the sphere of legitimate public concern," and thus whether the "gross irresponsibility" standard applies. However, the Court need not reach the issue because even if gross irresponsibility is the requisite level of fault, the Plaintiff satisfies that standard. The complaint repeatedly alleges that the Defendant Charlamagne "knowingly" and intentionally made false statements. On a motion to dismiss, the Court accepts this assertion as true, considering the additional facts pleaded by the Plaintiff and the glaring fact that the accusation was not even plausible. See, *Pollnow v. Poughkeepsie Newspapers, Inc.*, 107 A.D.2d 10, 18, 486 N.Y.S.2d 11 (2d Dep't 1985) (plaintiff satisfied the "minimum requirements for stating a cause of action" by alleging that "defendant acted negligently, maliciously and with a reckless disregard for the truth"), aff'd, 67 N.Y.2d 778, 492 N.E.2d 125, 501 N.Y.S.2d 17 (1986).

Intentional lies not only satisfy, but surpass, the culpability of "gross irresponsibility," which signifies "something more than . . . negligence." See, *Mott v. Anheuser-Busch, Inc.*, 910 F. Supp. 868, 875 (N.D.N.Y. 1994), aff'd, 112 F.3d 504 (2d Cir. 1996); see also, *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) (regarding knowing falsities as a level of fault "[b]eyond gross irresponsibility");

*Lopez v. Univision Commc'ns, Inc.*, 45 F. Supp. 2d 348, 362 (S.D.N.Y. 1999) (observing that at least one court has equated gross irresponsibility with "gross negligence"). Accordingly, the complaint sufficiently alleges that the Defendant Charlamagne acted with the requisite level of fault and it cannot be dismissed on this basis.

**POINT V**
**THE COMPLAINT'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM**
**AGAINST CHARLAMAGNE IS MERITORIOUS**

It has been noted in certain dicta from the New York Court of Appeals that "questioning whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability." See, *Fischer* v. *Maloney*, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978). It has been concluded that, even if New York law does not permit entirely overlapping torts, the negligence and intentional infliction of emotional distress claims in this case contain elements that did not entirely overlap the claims of defamation. In particular it is noted that, if a jury believes that the Defendant Charlamagne acted with reckless intent a jury could believe that there were additional elements of negligence and intentional infliction of emotional distress which do not necessarily inhere in a charge of defamation.

**The Complaint's IIED Claim Is NOT an Impermissible Attempt to Avoid Dispositive Constitutional Principles**

The complaint's cause of action for intentional infliction of emotional distress circumvents the constitutional privileges and defenses to maintain a cause of action for defamation. To establish a claim for intentional infliction of emotional distress, a plaintiff must prove that (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was a likely result of his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the emotional distress; and (4) the emotional distress was severe. See, *DeLaurentis v. City of New Haven*, 220 Conn. 225, 266-67, 597 A.2d 807 (1991).

This tort should not be used to circumvent the established and carefully balanced framework of constitutional and state libel law. In the context of public figures and defamation claims, the Supreme Court

has held that a <u>public figure</u> cannot recover for intentional infliction of emotional distress by reason of an offending publication without first proving the elements of a defamation claim. <u>See</u>, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988) (<u>public figure</u> must demonstrate that the offending publication contains a false statement of fact which was made with "actual malice" before recovering for intentional infliction of emotional distress based on the publication); <u>see also</u>, *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993) (intentional infliction of emotional distress claim stemming from publication of photograph dismissed after invasion of privacy claim based on same publication dismissed). Nonetheless, <u>a private figure plaintiff</u> will recover for intentional infliction of emotional distress if they can first demonstrate that publication was made with gross irresponsibility. <u>See</u>, *Hustler*, <u>supra</u>, 485 U.S. at 52 (citation omitted). Accordingly, Plaintiffs' intentional infliction of emotional distress claims are actionable together with their libel claims.

**The Outrageousness Standard**

Determination of whether the alleged conduct is sufficiently extreme and outrageous to sustain the cause of action is an issue for the court in the first instance. <u>See</u>, *DeLeon v. Little*, 981 F. Supp. 728, 737 (D. Conn. 1997). If a defendant's conduct is merely insulting, displays bad taste, or results in hurt feelings or embarrassment, the claim is generally dismissed as a matter of law. However, "liability has been found where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Id</u>. at 738.

**The Complaint's IIED Claim is NOT Barred as Redundant**

With respect to the argument that a separate tort for intentional infliction of emotional distress could not be sustained where the underlying conduct overlapped with other torts, it has been noted in certain dicta from the New York Court of Appeals that "questioning whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability." <u>See</u>, *Fischer* v. *Maloney*, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978). It has been concluded that, even if New York law does not permit entirely

overlapping torts, the negligence and intentional infliction of emotional distress claims in this case contained elements that did not entirely overlap the claims of defamation. Id. In particular it is noted that, if a jury believes that the Defendant Charlamagne acted with reckless intent a jury could believe that there were additional elements of negligence and intentional infliction of emotional distress which do not necessarily inhere in a charge of defamation.

**The Disputed Statements Are "Extreme and Outrageous"**

The defendant argues that it is nearly impossible in New York for a Plaintiff to state a viable claim for intentional infliction of emotional distress, predicating liability on the basis of extreme and outrageous conduct. Nonetheless, under New York law, the four elements required to state a claim for intentional infliction of emotional distress are: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress. See, *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). In this case the Plaintiff has established the elements necessary to sustain a claim of intentional infliction of emotional distress, specifically the outrageous conduct and the Defendant's intent to cause emotion distress. Outrageous conduct is defined to be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) [**33] (quoting Restatement (Second) of Torts § 46, comment d (1979)); see also, *Piesco v. City of New York Dep't of Personnel*, 753 F. Supp. 468, 479 (S.D.N.Y. 1990), aff'd in part, rev'd in part and remanded on other grounds, 933 F.2d 1149 (2d Cir.), cert. denied, U.S., 112 S. Ct. 331 (1991).

Here, the actions of the Defendant Charlamagne in promoting a false account of facts and destroying the Plaintiff's reputation, and inciting others to believe that should would commit such a heinous act, which ultimately affected her reputation and employment, does constitute, as a matter of New York law, conduct which may be deemed outrageous or beyond the possible bounds decency. Accordingly, the Plaintiff has adequately alleged outrageous conduct necessary to sustain this claim.

27

Second, the Plaintiff has plead sufficient facts to allege that the Defendant intended to cause her severe emotional distress or such disregard which has the probability of causing severe emotional distress. The Defendant Charlamagne was selfishly pursuing his own interests in gathering ratings and inciting his audience at the Plaintiff's expense without considering the plausibility of the statements being made or verifying the facts. Therefore, the Plaintiff's claim of intentional infliction of emotional distress must prevail.

**Charlamagne's Commentary Was a Campaign of Harassment Directed at the Plaintiff**

The Defendant Charlamagne speciously argues that the broadcast at issue "was not a targeted effort to hurt the Plaintiff." This could not be further from the truth. The Defendant purposefully commandeered a vicious tirade of offensive racial and ethnic slurs and accusations, which he presented to his audience to be truthful. His conduct was not merely incidental, as argued by the Defendant. The "Donkey of the Day" segment did depart from its ordinary practices, as it would be expected that the segments are based on truthful information. Undoubtedly, his listeners would have believed the statements to be truthful. The Defendant further disingenuously argues the broadcast was directed to Power 105.1's general listening audience, and not directly at Plaintiff. This analysis is without merit, as the offensive commentary was directed particularly at Plaintiff and her qualifications as a teacher. Moreover, a Youtube search will reveal video of the Defendant's challenged segment, wherein the Defendant is seen flashing the Plaintiff's name and photograph over 30 times in total during the broadcast, and this racist and ethnic defamatory rant is still available for download on I-Tunes. This evidences no intention to retract or remove what has been broadcast, despite now knowing its falsity.

Lastly, the argument that the radio broadcast related to a current news event is misleading. The news events being reported were entirely erroneous and based on false information. The Defendant Charlamagne cannot hide behind reliance upon what was being reported. He has his own responsibility to verify the truth of what is being stated, or otherwise qualify his commentary with words like "accused" or "alleged," so that his audience will not interpret his statements as substantiated and factual. There was never any choice by the Plaintiff to instruct her students in the manner described. There was clearly a "deliberate and malicious

campaign of harassment or intimidation" perpetrated by the Defendant Charlamagne against the Plaintiff, which would substantiate the Plaintiff's claim.

**POINT VI**
**THE COMPLAINT'S NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS STATES**
**A CAUSE OF ACTION AGAINST CHARLAMAGNE**

In order to support a claim for negligent infliction of emotional distress, Plaintiff is also required to allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Murphy v. Am. Home Products Corp.*, 58 NY2d 293, 303 [1983]. The extreme and outrageous conduct "must be clearly alleged in order for the complaint to survive a motion to dismiss." See, *Sheila C. v. Povich*, 11 AD3d 120, 131 [1st Dept. 2004].

As a claim for negligent infliction of emotional distress arises out of negligence, Plaintiff must allege that the News Defendants owed Plaintiff a duty and the breach of that duty owed to the Plaintiff "either unreasonably endangers the plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety." See, *Santana v. Leith*, 117 AD3d 711, 712 [2d Dept. 2014]. Plaintiff has clearly identified the duty owed to her by the Defendant Charlamagne. In order to qualify as "extreme and outrageous," the conduct at issue must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Sheila C. v. Povich*, 11 AD3d 120, 130-31 (1st Dept. 20014). To falsely accuse the Plaintiff of "*singling out black students and making them act like slaves*;" telling them to "*lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like*," without checking the facts and continuing to characterize her under that narrative, even after confronted with the falsity, subjecting her to public admonishment, ridicule, and harassment is extreme and outrageous. The Defendant Charlamagne did not merely "publish statements about Plaintiff's conduct based on firsthand account of students, reports from the Department of Education, and Plaintiff's own judicial findings." He furthered a false narrative, purporting it to be undisputed fact.

The Defendant failed to ever demonstrate that his statements were true, and it is a well-known fact that truth and only truth is an absolute defense in any defamation claim. Further, in *Deluca v. New York News*, 109 Misc. 2d 341 (1981), it is stated that reporters, have the right to be wrong, so long as they are not guilty of not checking their facts at all, making gross distortions of the record, or jumping to totally unwarranted conclusions. Further, plausibility was completely ignored, to wit: if the Plaintiff had in fact walked on student's backs, would they not have sustained physical injuries? Would she not have been arrested or charged with child abuse? It should have been obvious that this allegation was preposterous; however this gross distortion helped him incite his listeners. As a result, the Plaintiff's negligent infliction of emotional distress claim must stand.

**POINT VII**
**THE COMPLAINT'S CLAIM OF NEGLIGENCE STATES A CAUSE OF ACTION**
**AGAINST CHARLAMAGNE**

Based on what has been demonstrated in this matter, the Defendant Charlamagne's argument that "defamation claims (that involve matters of public concern) cannot be sustained upon a showing of negligence" must fail. The Plaintiff has more than established not only that the statements were false statements of fact, but that the Charlamagne Defendant acted in a "grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." See, *Chapadeau v. Utica Observer-Dispatch*, 38 NY2d 196, 199 (1975); see also, *Bloom v. Fox News of LA*, 528 F. Supp. 2d 69, (EDNY 2007).

In addition, as the Fourth Department has held that a cause of action for negligent infliction of emotional distress must be "premised on conduct that unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for his or her physical safety." See, *Passucci v. Home Depot, Inc.*, 67 AD3d 1470, 1471 [4th Dept. 2009]. The Plaintiff's complaint contains allegations that the Charlamagne Defendant engaged in conduct that unreasonably endangered the Plaintiff's physical safety or caused her to fear for her safety. See, Plaintiff's Exhibit B, at pages 15 and 45. As a result, the Plaintiff's negligence claim must stand.

## CONCLUSION

Based on the foregoing, it has been demonstrated that the Defendant Charlamagne has failed to meet the standard in this Circuit that is necessary on a motion to dismiss under Rule 12 (b)(6). Accordingly, the Defendant's motion to dismiss should be denied in all respects and Plaintiff should have such other and further relief that this Court may deem just and proper.

Dated: Garden City, New York
      September 27, 2019

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq. (TL 4471)
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*