UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------------X

PATRICIA CUMMINGS,

                                  Plaintiff,                            Docket No.
                                                                       19-cv-07723 (CM) (OTW)

        -against-

THE CITY OF NEW YORK; NEW YORK CITY DEPARTMENT
OF EDUCATION; CITY OF NEW YORK OFFICE OF SPECIAL
INVESTIGATIONS; NYC MAYOR BILL de BLASIO; GIULIA COX;
COURTNEY WARE; BEN CHAPMAN; NEW YORK DAILY NEWS;
DR. ANDRE PERRY; THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA; LENARD LARRY
McKELVEY a/k/a CHARLAMAGNE THA GOD; WWPR-FM
(105.1 MHZ); iHEARTMEDIA; CLEAR CHANNEL
COMMUNICATIONS, INC.; NEW YORK STATE SENATOR,
KEVIN S. PARKER; COUNCILMAN, JUMAANE D. WILLIAMS;
COUNCILMAN, DANIEL DROMM; COALITION OF
EDUCATIONAL JUSTICE; ANGELMARTINEZ;
NATASHA CAPERS, and
"JOHN DOE AND JANE DOE # 1-100" said names
being fictitious, it being the intent of Plaintiff
to designate any and all individuals, officers, members,
agents, servants, and/or employees of the
aforementioned agencies owing a duty of care to Plaintiff,
individually and jointly and severally,

                                  Defendants.

---------------------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S HECHINGER INSTITUTE ON EDUCATION
## AND THE MEDIA AND DR. ANDRE PERRY'S
## MOTION TO DISMISS PURSUANT TO FED. RULE OF CIV. PROCED. 12 (b) (6)

                      THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
                      By: Thomas F. Liotti, Esq. (TL 4471)
                      Attorneys for the Plaintiff
                      *PATRICIA CUMMINGS*
                      600 Old Country Road, Suite 530
                      Garden City, New York 11530
                      *Tom@TLiotti.com*
                      Phone:  (516) 794-4700
                      Fax:     (516) 794-2816

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. i

PRELIMINARY STATEMENT ........................................................................1

The Statements Concerning Plaintiff's "Teachable Moment"
on Slavery and the Department of Education's Subsequent
Investigation Contain Numerous Errors ..................................................8

ARGUMENT .................................................................................................10

POINT 1 .......................................................................................................10

THE HECHINGER DEFENDANTS' MOTION TO DISMISS
IS PROCEDURALLY DEFECTIVE .............................................................10

POINT II .......................................................................................................11

THE PLAINTIFF HAS SUFFICIENTLY DEMONSTRATED
A BASIS FOR A DEFAMATION ACTION AGAINST
THE HECHINGER DEFENDANTS ..............................................................11

Courts Do Not Regularly Dismiss Defamation Actions ........................11

The Defendants DID NOT Fairly and Accurately
Report on These Proceedings..................................................................17

The Statements Describing the Plaintiff and
Her Lesson are NOT Opinions ...............................................................19

Characterization of Someone as a "Racist" or
an "Oppressor" is NOT Protected Opinion.............................................25

The Nature of Term "Racist" Does Not Render it Protected Opinion...................26

Descriptions of the Plaintiff as a "Racist" and "Oppressor" are Actionable .........26

POINT III......................................................................................................27

THE PLAINTIFF'S NEGLIGENCE AND EMOTIONAL
DISTRESS CLAIMS ARE ACTIONABLE ..................................................27

The Plaintiff's Claims for Negligence and
Emotional Distress are NOT Duplicative ..............................................27

The Complaint Sufficiently States a Claim for Negligence,
Negligent Infliction of Emotional Distress, and
Intentional Infliction of Emotional Distress ..........................................................29

CONCLUSION............................................................................................................................31

# TABLE OF AUTHORITIES

**Federal Cases**

*Advanced Cardiovascular Sys. Inc. v. SciMed Life Sys.*,
  988 F.2d 1157, 1160 (Fed. Cir. 1993)................................................................11

*Ashcroft v. Iqbal*,
  556 US 662, 678 (2009).................................................................................11

*Bell Atlantic Corporation v. Twombly*,
  550 US 544, 570 (2007)................................................................................11

*Bloom v. Fox News of LA*,
  528 F. Supp. 2d 69, (EDNY 2007) ............................................................... 29

*Buckley v. Littell*,
  539 F2d 882, 894 (2d Cir. 1976)..................................................................26

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002).........................................................................15

*Chau v. Lewis*, 7
  71 F.3d at 127 (2014 ...................................................................................23

*Christopher v. American News Co.*,
  171 F.2d 275 (7th Cir. 1948)........................................................................20

*Chylinski v. Wal-Mart Stores, Inc.*,
  150 F.3d 214, 218 (2d Cir. 1998)..................................................................29

*Conboy v. AT&T Corp.*,
  241 F.3d 242, 258 (2d Cir. 2001) .................................................................30

*Conley v. Gibson*,
  355 U.S. 41 (1957).................................................................................14, 15

*Doe v. Doe*,
  No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017)......................20, 21

*Egiazaryan v. Zalmayev*,
  880 F Supp 2d 494, 503 [SD NY 2012] ...........................................................19

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
  F Supp 3d, 2016 WL 3773394, [SD NY 2016] ...................................................20

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323, 471 F.2d 801 (1974) ...............................................13, 19, 23, 24

*Green v. City of Mount Vernon,*
  96 F. Supp. 3d 263, 297-98 (S.D.N.Y. 2015) .................................................29

*Greenbelt Pub. Assn. v. Bresler,*
  398 U.S. 6 (1970). ...........................................................................24

*Harris v. City of New York,*
  186 F.3d 243 (2d Cir. 1999)...............................................................14

*Jewell v. NYP Holdings, Inc.,*
  23 F. Supp.2d 348, 371 (SDNY 1998) ...............................................18

*Kelly v. Schmidberger,*
  806 F.2d 44, 46 (2d Cir. 1986)..........................................................21

*Koulkina v. City of New York,*
  559 F. Supp. 2d 300 (S.D.N.Y. 2008)................................................11

*Letter Carriers v. Austin,*
  (418 U.S. 264 (1974) .......................................................................24

*Lopez v. Univision Commc'ns, Inc.,*
  45 F. Supp. 2d 348, 362 (S.D.N.Y. 1999) ..........................................19

*Mitre Sports Int'l Ltd. v. Home Box Office, Inc.,*
  22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) ..........................................19

*Mr. Chow of N. Y. v Ste. Jour Azur S.A.,*
  759 F.2d 219, 227-228)....................................................................23

*Mott v. Anheuser-Busch, Inc.,*
  910 F. Supp. 868, 875 (N.D.N.Y. 1994), aff'd, 112 F.3d 504 (2d Cir. 1996)....................19

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964)....................................................................12, 13

*Ollman v. Evans,*
  750 F.2d 970 (1984), ..................................................................24, 25

*Piesco v. City of New York Dep't of Personnel,*
  753 F. Supp. 468, 479 (S.D.N.Y. 1990)..........................................28, 29

*Phelps v. Kapnolas,*
  308 F.3d 180, 184-185 (2d Cir. 2002). .............................................. 15

*Qureshi v. St. Barnabas Hosp. Ctr.,*
  430 F.Supp.2d 279, 287 (SDNY 2006)..............................................21

*Rosenblatt v. Baer,*
      383 U.S. 75 (1966)...................................................................................................12

*Stevens v. Tillman,*
      855 F.2d 394, 403 (7th Cir. 1988) ...................................................................25

*Swierkiewicz v. Sorema N.A.,*
      534 U.S. 506 (2002)...................................................................................................15

**State Cases**

*Anderson v. City of New York,*
      NY Slip Op 30080(U) (Sup. Ct. NY County 2014)..........................................10

*Aronson v. Wiersma,*
      65 NY2d 592, (1985) at 594 ................................................................................16

*Armstrong v. Simon & Schuster,*
      85 NY2d 373 (1995) at 380 ................................................................................16

*Ava v. NYP Holdings, Inc.,*
      64 AD3d 407 (2009) at 413 ................................................................................16

*Brian v Richardson,*
      87 NY2d 46, 51 [1995] .........................................................................................20

*Brien v. Troy Pub. Co., Inc.,*
      121 AD2d 794 (1986), at 795; ...........................................................................18

*Chapadeau v. Utica Observer-Dispatch,*
      38 NY2d 196, 199 (1975) ....................................................................................29

*Davis v. Boeheim,*
      24 NY3d 262 at 269 (2014) ...........................................................................19, 20

*Deluca v. New York News,*
      109 Misc. 2d 341 (1981)......................................................................................30

*Farber v. Jefferys,*
      33 Misc 3d 1218[A], 2011 NY Slip Op 51966, [Sup Ct, NY County 2011],
      affd 103 AD3d 514 [1st Dept. 2013], lv denied 21 NY3d 858.........................16

*Fischer v. Maloney,*
      43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978).................27

*Freeze Right Refrigeration & Air Conditioning Services, Inc. v. City of New York,*
      101 AD3d 175, 182............................................................................................... 17

*Gross v. New York Times Co.*,
    82 N.Y.2d at 153, 603 N.Y.S.2d at 817, 623 N.E.2d at 1167 (1993) ....................16, 19, 20

*Hawks v. Record Printing and Pub. Co., Inc.*,
    109 AD2d 972, 975) ..........................................................................................18

*Howell v. New York Post Co.*,
    81 N.Y.2d 115, 121 (1993) ...............................................................................28

*Immuno AG v. J. Moor-Jankowski*,
    77 N.Y.2d at 248-49, 566 N.Y.S.2d at 913-14, 567 N.E.2d at 1277-78 (1991) ...............16

*James v. Gannett Co.*,
    40 NY2d 415 (1976) at 419-420 .........................................................................16

*Karaduman v. Newsday*,
    51 NY2d 531, 539 (1980) ..............................................................................17, 18

*Kelly v. Schmidberger*,
    806 F.2d 44, 46 (2d Cir. 1986)...........................................................................21

*Liberman v. Gelstein*,
    80 NY2d 429, 435 (1992) ..................................................................................21

*Mann v. Abel*,
    10 NY3d 271 at 276 (2008) ...............................................................................20

*Morsette v. Final Call*,
    278 AD2d 81 (2000), at 82 ................................................................................18

*Murphy v. Am. Home Products Corp.*,
    58 NY2d 293, 303 [1983] ............................................................................27, 28

*Parks v. Steinbrenner*,
    131 AD2d 60, 62-63 [1st Dept. 1987]. ...............................................................20

*Passucci v. Home Depot, Inc.*,
    67 AD3d 1470, 1471 [4th Dept. 2009] ...............................................................30

*Penn Warranty Corp. v. DiGiovanni*,
    2005 NY Slip Op 25449 10 Misc3d 998 (2005)....................................................20

*Pollnow v. Poughkeepsie Newspapers, Inc.*,
    107 A.D.2d 10, 18, 486 N.Y.S.2d 11 (2d Dep't 1985).......................................... 19

*Qureshi v. St. Barnabas Hosp. Ctr.*,
    430 F.Supp.2d 279, 287 (SDNY 2006) ..............................................................21

*Rinaldi v. Holt, Rinehart & Winston*
    53A.D.2d 839, 386 N.Y.S.2d 818 (1st Dept. 1976)............................................23

*Santana v. Leith,*
    117 AD3d 711, 712 [2d Dept. 2014] ................................................28

*Sheila C. v. Povich,*
    11 AD3d 120, 131 [1st Dept. 2004]................................................27

*Silsdorf v. Levine,*
    59 NY2d 8, 15-16 [1983], cert denied 464 US 831 ........................................20

*Silverman v. Daily News, LP,*
    129 AD3d 1054 (2nd Dept. 2015)................................................22, 26

*Steinhilber v. Alphonse,*
    68 NY2d 283, 291-292 [1986]................................................16, 19, 20

*600 West 115th Street Corp. v. Von Gutfeld,*
    80 N.Y.2d at 136 & 138, 589 N.Y.S.2d at 827 & 829,
    603 N.E.2d at 932 & 934 (1992)................................................ 16

**Rules**

Fed. R. Civ. P. 8 (a)(2) ................................................15

Federal Rule of Civil Procedure 12 (b)(6) ........................ 1, 10, 11, 14, 15, 31

Rule 56................................................15

**Secondary Sources**

Henshall, Peter and David Ingram, *The News Manual: A Professional Resource*
    *for Journalists and the Media* (1991) ................................................5

Restatement [Second] of Torts § 566 comment c. ................................................23

Thomas E. Willging, *Use of Rule 12 (B) (6) in Two Federal District Courts*
    (Federal Judicial Center 1989)................................................11

White, Helen and Christina Evans, *Learning to Listen to Learn:*
    *Using Multi-Sensory Teaching for Effective Listening* (2005). ........................2

Plaintiff, Patricia Cummings, (hereinafter "Plaintiff" or "Ms. Cummings"), a private individual, respectfully submits this Memorandum of Law in Opposition to Defendants' Hechinger Institute on Education and the Media, an Institute of Teachers College, Columbia University (hereinafter the "Hechinger Institute") and Dr. Andre Perry (hereinafter "Dr. Perry", collectively referred to as, the "Hechinger Defendants" or "Defendants") Motion to Dismiss the Plaintiff's Verified Complaint pursuant to Federal Rule of Civil Procedure 12 (b)(6).

## PRELIMINARY STATEMENT

The Hechinger Defendants' Motion is a thinly-veiled attempt to reframe Plaintiff's case into something that it is not. The Defendants' disingenuously argue that they merely repeated statements, which were originally published in a reputable media outlet and can escape liability because it is alleged that the Complaint does not contain any allegations upon which it could plausibly be found that Dr. Perry knew or should have known that those statements were false.

The Plaintiff was a probationary New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York. She seeks damages related *inter alia* to the infliction of defamation and defamation *per se*, reverse discrimination, denial of due process, severe emotional, psychological, and physical distress, loss of reputation, loss of income, expenses upon her, the erroneous termination of her employment as a New York City school teacher, and the "*badge of infamy*" with which she has forever been branded.

The Plaintiff's claim arose as a result of what was fallaciously reported concerning an alleged complaint made by **one (1)** parent of **one (1)** student regarding a lesson taught by the Plaintiff in her social studies class on the Middle Passage, wherein she subsequently and unwillingly became the subject of a front page pictorial and story in the *New York Daily News*, falsely accusing her of being a "*racist*" and "*making black students lie face down on the floor of her class*, and asking them: '*[H]ow does it feel to be a slave?*" As

1

a result, this fabricated and erroneous set of purported "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world.

The Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it was erroneously reported, among other things that she "*singled out black students and made them act like slaves;*" and she is falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" She has been publically shamed and falsely accused of "*child abuse,*" labeled as a "*racist,*" referred to as an "*oppressor,*" by many, including politicians and activists, and specifically in various and extensive media outlets discussing this issue. She has received direct threats of violence and death causing her to fear for her life. The Plaintiff was ultimately exonerated of the original erroneous allegations following an investigation by the New York City Department of Education's Office of Special Investigations, yet has nonetheless been terminated from her employment as New York City Public School Teacher at The William W. Niles School - Middle School 118.

What has been disingenuously described elsewhere as a "misguided history lesson" was, in actuality, an example of a multi-sensory[1] teacher demonstrating "spatial recognition" to her students. This part of her lesson was described by the Plaintiff as a "teachable moment," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes; it was not, in any way, a reenactment. It was falsely recounted that "multiple students in the classroom reported that she *physically pushed* the 'student volunteers' closer together, asking them "*how it felt*" to be a slave. This fabricated account is contradicted by the reported findings of the of the New York City Department of Education's Office of Special Investigations (also referred to as OSI); to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration;*" "'*Student' I never observed Ms. Cummings' knee make contact*

---

[1] Multi-sensory teaching is a didactic system that seeks to develop awareness of self in time and space in order to raise cognition and understanding of the world as is experienced. It takes into account that different children learn in different ways; conveys information through things like touch and movement-called tactile and kinesthetic elements, as well as sight and hearing. See, White, Helen and Christina Evans, Learning to Listen to Learn: Using Multi-Sensory Teaching for Effective Listening (2005).

with '*Student A*'" "'*Student J*' *denied that Ms. Cummings made any physical contact with the students to make contact with them.*" See, Redacted Copy of Office of Special Investigations Investigative Report (OSI) dated July 24, 2018, included as Plaintiff's **Exhibit A**. Moreover, "Students B, D, E, F, I, J and K" noted that the participating student volunteers did not appear to be in any distress. See, Plaintiff's Exhibit A. Most remarkably, "Student J" admitted that "'*Student A* '[2] *was lying and was attempting to get Ms. Cummings fired or in trouble because 'Student A' did not like Ms. Cummings.*" See, Plaintiff's Exhibit A, at page 5. Moreover, the Plaintiff controverts this fallacious allegation in her rebuttal correspondence addressed to Community Superintendent Maribel Torres-Hulla dated October 5, 2018, annexed hereto as **Exhibit B** at page 8.

"Student A" is alleged to have complained on or about January 11, 2018, and as noted in the OSI Report, "Student A's" mother is noted to have complained 6 days later (9 days after the lesson). Further, it is evident that a complaint was not immediately filed according to the OSI Report. See, Plaintiff's Exhibit A. Furthermore, the Plaintiff was not removed for investigation by the New York City Department of Education's Office of Special Investigations until February 2, 2018; the day the *New York Daily News'* exclusive front page story was published. Principal Cox did a school based investigation, but failed to adhere to Chancellor Regulation A-420 and breached Article 20 of the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT). A copy of the Plaintiff's Verified Complaint dated May 15, 2019, annexed hereto as **Exhibit C**, at pages 46-48.

The reports were grossly incorrect and completely distinct from the allegation that was actually being investigated by OSI. The original allegation involved a false report that the Plaintiff physically pushed student volunteers closer together, using her feet or her knees to push the students closer together during a lesson demonstration; it was never the complaint that she "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery*

---

[2] "Student A" was one of four students who voluntarily participated in the classroom demonstration on the Middle Passage. It was erroneously alleged that Ms. Cummings pushed "Student A's" back with her knee and asked if it hurt or caused her discomfort.

*felt like,*" as falsely and repeatedly reported. See, Plaintiff's Exhibit C, at pages 24-25. Notably, the Office of Special Investigations Investigative Report (OSI Report) dated July 24, 2018, indicates that *"[T]he written statements made by 'Students B, C, D, E, H, I, J, Q, R, S, T, U, and V' fail to corroborate that Ms. Cummings pressed her knee into 'Student A's' back or any students' back.*" See, Plaintiff's Exhibit A. "Therefore, the allegation that Ms. Cummings used corporal punishment against "Student A" by pushing her knee into her ["Student A's"] back during a classroom demonstration was never corroborated and is **unsubstantiated**." See, Plaintiff's Exhibit A. Parenthetically, the finding that Ms. Cummings acted with poor judgment in conducting a lesson that inadequately incorporated the New York City DOE social studies curriculum and guidance for this topic is a violation of her due process, as this is an improper finding, as it is not the function of the Office of Special Investigations to examine and evaluate teacher pedagogy (method or practice of teaching).

The Hechinger Defendants erroneously argue that cannot be liable to the Plaintiff, as the references to the Plaintiff were "explicitly and exclusively based on the reporting by the *New York Daily News*. This is a fallacy. Nonetheless, any claim that the *New York Daily News'* articles are <u>fair</u> and <u>true</u> reports of judicial proceedings, is <u>completely false</u>. There were <u>no</u> proceedings taking place at that time which alleged that the Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like,*" as was reported as "fact." The Plaintiff was being investigated for a completely different allegation.

Likewise, the Hechinger Defendants disingenuously claim that Dr. Perry did not offer any reporting on the Plaintiff in particular, but **only made passing reference** to the "facts" as outlined in the New York *Daily News'* article. This is also **false**. It is also **misleadingly** asserted that Dr. Perry's column was not largely about the Plaintiff. It is further disingenuously asserted that Dr. Perry "simply used the widely reported and discussed story to provide context for his larger academic discussion of addressing race in the classroom." How could the challenged column not have been largely about the Plaintiff, when the widely reported and discussed story, (though false), **was clearly all about the Plaintiff**. Further, it is clear that the Hechinger Defendants knew or should have known that the original reporting was not accurate. Plausibility was

completely ignored, to wit: if the Plaintiff had in fact walked on student's backs, would they not have sustained physical injuries? Would she not have been arrested or charged with child abuse? It should have been obvious that this allegation was preposterous; however this gross distortion helped Dr. Perry to substantiate his column. As a result, the Plaintiff's negligence claims must stand.

Defendant, Dr. Perry further argues that he simply used the previous reporting about the Plaintiff in a "broader" academic column about addressing race in education. In this regard, the Hechinger Defendants argue that his intended audience would understand his column to be "his opinion and an academic rumination on race in the classroom." It is important to note that there were no substantiated, accurate facts reported. Moreover, the disingenuous attempt to characterize the reference to the Plaintiff's actions as opinion by the Hechinger Defendants is derisory. Defendant, Dr. Perry is self-described as a thought-leader in the field of education and a publisher of a weekly column on an academic blogging platform for the Hechinger Institute at Columbia University. Credible journalists must be able to distinguish between facts and opinions. A journalist needs to know how reliable statements are before reporting them as facts. See, Henshall, Peter and David Ingram, The News Manual: A Professional Resource for Journalists and the Media (1991). In order to formulate his purported "opinion," that the Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*" the Defendant performed no independent investigation of the "facts" despite the fact that the reported account by Defendant, Dr. Perry differed dramatically from the actual allegation that was made by just **one student and ultimately unsubstantiated by OSI**. What was erroneously the subject of his column amounted to child abuse and/or endangerment, yet there was no indication of a substantiated investigation by Dr. Perry before making the Plaintiff a subject of his column. He is a self-designated thought-leader; referencing recent events in the media, and it is further admitted that the Defendant Hechinger Report is a news organization focused on producing in-depth journalism. Thus, the Defendants are held to a higher standard. Those events as reported by Defendants Dr. Perry in the Hechinger Report were **not** opinion.

There were no substantiated, accurate facts reported by the Hechinger Defendants. This Court must remain mindful of the rule that <u>the defamatory effect of the segment is to be ascertained</u> not from the viewpoint of a critic or language expert, but rather <u>from that of a reader</u> of reasonable intelligence who takes ordinary interest in the articles of a periodical, but does not commonly subject them to careful scrutiny and analysis. <u>Clearly a reasonable reader, in this instance would believe that the statements were conveying facts about the Plaintiff</u> [this is evidenced by the vicious attacks and public outcry for social justice that followed], and would believe that the statements constituted reports of a proceeding, which they did not. The Defendants used no language to presuppose the Plaintiff's innocence, such as "accused" or "alleged." They presented the narrative as being proven and true, thus facilitating and inciting the protest and unrest directed toward the Plaintiff. Notably, in the challenged publication, the Defendant Dr. Perry disingenuously offered that "*This was not the first time that Patricia Cummings, who is white, 'taught' this module* [instructing three black children in her seventh-grade class to lie on the floor during a lesson on slavery] *on the Middle Passage.*" He further stated that "*[T]he New York City Education Department should throw her out of the District.*"

Nonetheless, the Defendants Hechinger maintain the specious argument that the comments complained of are expressions of pure opinion on facts extensively reported by the media, and not assertions of fact, and thus are protected. This is problematic and misguided. There were no substantiated, accurate facts reported. While, Defendant Perry may argue that he is not a "journalist" or "reporter," *per se*; he is a self-proclaimed <u>thought leader</u>, and <u>advisor working to improve education</u> and an <u>activist</u>, with a following of readers who are guided by what he has to say, and blindly accept his statements as truth. Further, the Defendant Hechinger Report is admittedly **a <u>news organization</u> focused on <u>producing in-depth education journalism</u>**. No other investigation of the purported "facts" occurred, as evidenced by the fact that the reported accounts differed dramatically from the actual allegation that was made by just one student and ultimately unsubstantiated by OSI. What was being erroneously reported amounted to child abuse and/or endangerment, yet there was no indication of a substantiated investigation. Therefore, the Defendants cannot disingenuously cloak his otherwise actionable behavior as "opinion" while publically describing the Plaintiff as a "racist" and an

"oppressor," while promoting a false fact pattern and expect to escape any liability. Plaintiff's quarrel is not with what she believes to be unfair assessments and remonstrations concerning her lesson. She has no doubts regarding her lesson, and her colleague, (an African-American teacher), who was present in the classroom, testified as to its appropriateness[3]. Contrary to the Defendants' contention, there was no "dubious" decision, nor was there even a "reenactment." As the Plaintiff has argued herein, there was never any reenactment, this part of her lesson, which was a teachable moment[4] was for "spatial recognition," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes. As a professor and a thought-leader in the field of education, the Defendant Perry should be familiar with this teaching method and should have known better. The Complaint contains numerous factual allegations to demonstrate that Defendant, Dr. Perry's comments were published in a grossly irresponsible manner. The Defendant Dr. Perry disingenuously argues a failure to demonstrate that he knew or should have known that the reporting was inaccurate.

Lastly, the Defendants erroneously argue that the Plaintiff's cause of action for intentional infliction of emotional distress should fail as they are merely duplicative of her defamation claim and rely on the same set of facts, and failed to plead the elements of these additional tort claims. The conduct described by the Plaintiff more than meets the rigorous standard formulated by the New York courts for emotional distress claims. The Defendant, Dr. Perry failed to exhibit any iota of integrity when he made entirely false statements

---

[3] Ralph Hudson is African-American teacher who witnessed the Plaintiff's lesson. He acknowledged to the Plaintiff after the lesson that he was impressed with how she handled the situation and subject matter with such grace and dignity. It is important to note that he told investigators from the Department of Education's Office of Special Investigations (OSI) that he found the lesson to be "*appropriate* and was within the scope of *effectively educating students* about the harsh conditions endured by slaves during transport." (Emphasis added). He did not corroborate the events that the student alleged to have happened. Furthermore, he indicated that it was his belief that if the Plaintiff were African-American, the incident would have been a non-issue. See, Plaintiff's Exhibit A at pages 7 and 8.

[4] A teachable moment is not something that you can plan for; rather, it is a fleeting opportunity that must be sensed and seized by the teacher. Often it will require a brief digression that temporary sidetracks the original lesson plan so that the teacher can explain a concept. See, Footnote number 41 of Plaintiff's Exhibit B, at page 7.

about the Plaintiff; this makes him unquestionably negligent. Notably, even when he undoubtedly learned that the Office of Special Investigations Investigative Report, (see, Plaintiff's Exhibit A), had confirmed every item previously reported to be blatantly <u>false</u>, the Defendants never issued a retraction or made any attempt to correct the record.

**The Statements Concerning Plaintiff's "Teachable Moment" on Slavery and the Department of Education's Subsequent Investigation Contain Numerous Errors**

In an attempt to diminish the Plaintiff's claims, it was erroneously reported that by showing the clip from the movie *Freedom*, the Plaintiff deviated from the class's preapproved curriculum. Nonetheless, the Plaintiff maintains that she did not deviate from the curriculum. <u>See</u>, Plaintiff's Exhibit B, at page 3-4. The Plaintiff was not looking to replicate the <u>conditions</u> on the boats along the Middle Passage; she sought to replicate the space, or lack thereof, as a demonstration of spatial recognition. Moreover, the Plaintiff did <u>not</u> specifically select black students as volunteers for the demonstration. It was acknowledged that she sought random volunteers from the class to participate in the demonstration; no student was forced to participate. Notably, the class was comprised entirely of minority students. Again, the claim that multiple students reported that Plaintiff used her feet or hands to push these students even closer together is false. As stated previously herein, "Student B" specifically denied that Ms. Cummings used her feet or her knees to push students closer together. The fabricated account is clearly contradicted by the reported findings of the Office of Special Investigations; to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student I' never observed Ms. Cummings' knee make contact with Student 'A*;'" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them*." <u>See</u>, Plaintiff's Exhibit A; <u>see also</u>, Plaintiff's Exhibit B at page 8.

An inaccurate account of the complaint filed with the principal, (Defendant Giulia Cox), by the student and her parent were reported. Believing that these actions actually constituted corporal punishment, for any of that account to be plausible, Principal Cox would have had to report the alleged incident on January 17, 2018, prior to the Plaintiff's initial meeting with her on January 18, 2018; she (Principal Cox) had not. The Plaintiff

was <u>never</u> removed to a different school; she was reassigned to an administration building. The OSI report did <u>not</u> contain "various eyewitness accounts confirming that Plaintiff had placed her feet or knees on the students." <u>See</u>, Plaintiff's Exhibit A; <u>see also</u>, Plaintiff's Exhibit B at page 8. The <u>one</u> student's complaint was <u>not corroborated</u>. While it was reported that the Department of Education "does not ever include or encourage reenactments of historical events where students take on roles of victimized people," no such policy is known to exist. <u>See</u>, Plaintiff's Exhibit B at pages 7-8. Nonsensically, OSI, in its report, referred the matter back to Principal Cox to "take appropriate disciplinary action." <u>See</u>, Plaintiff's Exhibit A. Yet, the Plaintiff had already been disciplined by Principal Giulia Cox when she was removed from her classroom in January, 2018. Furthermore, the report recommended training, <u>not</u> termination; however, the events that followed made it very clear that there was no intention for the Plaintiff to return to the school. Though she was assured that she would be returning following the requisite filing of the disciplinary letter, the school apparently created a false schedule for the Plaintiff in order to conceal their true and premeditated intention to terminate her from her position. She was not terminated at the beginning of the 2018-2019 school year; she was actually terminated on October 18, 2018.

The Defendants included the Plaintiff in an article entitled, "*Teachers, how does it feel to be oppressors?*" (which was published a mere four (4) days after the *New York Daily News* published its first article on this matter); clearly, referring to the Plaintiff as an oppressor and attempting to hide behind what they purport herein, to be a "<u>suggestion</u>" that "*teachers use narratives written by slaves in order to teach about slavery from the perspectives of the slaves and properly educate their students on the horrors of slavery.*" This self-serving and conclusory argument ignores the fact that the 5 minute clip of the movie shown by the Plaintiff

depicted John Newton[5]. Notably, the Southern Poverty Law Center[6] encourages teaching students through the lens of Newton, and the New York City Department of Education Supports this stance, as well. Further, he refers to "*not making 'white norms' the standard*." See, Defendants' Exhibit A.

## ARGUMENT

### POINT 1
### THE HECHINGER DEFENDANTS' MOTION TO DISMISS IS PROCEDURALLY DEFECTIVE

Primarily, this Court must consider the glaring procedural defect of the Hechinger Defendants' Rule 12 (b)(6) Motion to Dismiss, which fails to include a copy of the Plaintiff's Verified Complaint as an Exhibit. The Hechinger Defendants have not seen fit to include a copy of the key document - the Verified Complaint. Arguably, the Court would have great difficulty determining either the legal sufficiency or the timeliness of a complaint that it has not been provided. A decision from the Supreme Court, New York County provides that when making a motion to dismiss based on an alleged pleading, a copy of the challenged pleading needs to be included. In *Anderson v. City of New York*, NY Slip Op 30080(U) (Sup. Ct. NY County 2014), the plaintiff alleged race and gender discrimination under the New York State and City Human Rights Laws, and the Court denied defendants' motion to dismiss with leave to renew on proper papers, for failure to attach a copy of the complaint." Id. Thus, the Hechinger Defendants' motion is likewise procedurally defective and should be denied. Nonetheless, should this Court elect to overlook the Defendants' procedurally defective motion, the Defendants' motion should otherwise be denied as it is lacking in any legal basis and is devoid of any merit sufficient to withstand this Court's review.

---

[5] John Newton was an Anglican clergyman and former slave ship master who eventually spoke out against the Slave Trade. In 1787, Newton wrote a tract supporting the campaign, 'Thoughts upon the African Slave Trade', which was very influential. It graphically described the horrors of the Slave Trade and his role in it. He later joined William Wilberforce in the campaign for abolition of the Slave Trade.

[6] The Southern Poverty Law Center is a nonprofit legal advocacy organization specializing in civil rights and public interest litigation, dedicated to fighting hate and bigotry and seeking equal justice and equal opportunity.

**THE PLAINTIFF HAS SUFFICIENTLY DEMONSTRATED A BASIS FOR A DEFAMATION ACTION AGAINST THE HECHINGER DEFENDANTS**

**Courts Do Not Regularly Dismiss Defamation Actions**

It has been said that a Rule 12 (b)(6) motion is **rarely** granted. See, Thomas E. Willging, Use of Rule 12 (B) (6) in Two Federal District Courts (Federal Judicial Center 1989). Rule 12 (b)(6) provides that a motion to dismiss a complaint may be filed for "failure to state a claim upon which relief can be granted." Id. "The purpose of the rule is to allow the court to eliminate actions that are fatally flawed in their legal premise and destined to fail, and thus spare the litigants the burdens of unnecessary pretrial and trial activity." See, *Advanced Cardiovascular Sys. Inc. v. SciMed Life Sys.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993).

The Supreme Court's landmark decisions in *Bell Atlantic Corporation v. Twombly*, 550 US 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 US 662, 678 (2009), shifted pleading standards from "simple notice pleading" to a "more heightened form of pleading." To survive a motion to dismiss under *Twombly*, supra and *Iqbal*, supra, a plaintiff's allegations must meet a standard of "plausibility." A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." While plausibility "is not akin to a probability requirement," plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." Pleading facts that are "merely consistent with a defendant's liability" is insufficient to "nudge [a plaintiff's] claims across the line from the conceivable to plausible." In deciding a motion to dismiss, the court must "accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in the plaintiff's favor." Id.

Clearly, the Defendants have not met this Circuit's standard on a Rule 12 (b)(6) motion. The Supreme Court in *Bell Atlantic Corp v. Twombly*, (550 US 544, 570, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), held that, "in order to survive a motion to dismiss pursuant to Rule 12 (b)(6), a plaintiff need not provide detailed factual allegations, but the factual allegations asserted must be "enough to raise a right to relief above the speculative level...." See, *Koulkina v. City of New York*, 559 F. Supp. 2d 300 (S.D.N.Y. 2008).

The Hechinger Defendants claim that the Plaintiff's action should be dismissed on two (2) independently sufficient grounds (1) Plaintiff failed to plead facts to plausibly show that the Hechinger Defendants acted in a grossly irresponsible manner; and (2) the statements at issue are unactionable statements of opinion. The Defendants misleadingly assert that claims such as this must be considered "*against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks.*" Yet, it is well held that protection cannot be afforded against blatantly false statements. This Court cannot ignore that the Hechinger Defendants' reporting was not merely "*unpleasantly sharp attacks,*" it was factually incorrect.

The hallmark of a defamation claim is reputational harm. Former United States Supreme Court Justice Potter Stewart wrote in *Rosenblatt v. Baer*, 383 U.S. 75 (1966), that the essence of a defamation claim is the right to protect one's good name. According to Justice Stewart, this tort "reflects no more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty." Id.

The Hechinger Defendants mistakenly rely upon *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), where the landscape of libel law dramatically changed involving a case where two paragraphs in an advertisement contained factual errors. For the first time, the Supreme Court ruled that "libel can claim no talismanic immunity from constitutional limitations," but must "be measured by standards that satisfy the First Amendment." The high court established a rule for defamation cases that dominates modern-day American libel law. The Court wrote:

> "The constitutional guarantees require, we think, a federal rule that prohibits a *public* official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (Emphasis added).

The Court required a <u>public</u> official defamation plaintiff to show evidence of actual malice or reckless disregard for the truth by "convincing clarity" or clear and convincing evidence. Notably, as an individual, probationary middle school teacher, with no involvement in administration or policy, the Plaintiff is <u>not</u> a public official. Nonetheless, even if, assuming *arguendo*, the Plaintiff was considered a public official, she has no problem demonstrating that the blatantly false statement was made with actual malice - knowledge that it was false or with reckless disregard of whether it was false or not. Even after seeing the OSI conclusion, the Hechinger Defendants promoted the Plaintiff as a "racist" and an oppressor," never once retracting the false account that she "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*"

Nonetheless, the Supreme Court clarified the limits of the "actual malice" standard and the difference between public and private figures in defamation cases in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 471 F.2d 801 (1974). The court had to determine what standard to apply for private persons and so-called limited purpose public figures. Then, the Court had to determine whether Gertz was a private person or some sort of public figure. The news-media defendant argued that the *Times v. Sullivan* standard should apply to any defamation plaintiff as long as the published statements related to a matter of public importance. The high court disagreed, finding a distinction between public figures and private persons. The Court noted two differences: (1) public officials and public figures have greater access to the media in order to counter defamatory statements; and (2) public officials and public figures, to a certain extent, seek out public acclaim and assume the risk of greater public scrutiny.

For these reasons, the *Gertz* Court set up a different standard for private persons:

> "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

This standard means that <u>a private person does not have to show that a defendant acted with actual malice in order to prevail in a defamation suit</u>. The private plaintiff usually must show simply that the defendant

was negligent, or at fault. However, the Supreme Court also ruled that private defamation plaintiffs could not recover punitive damages unless they showed evidence of actual malice.

A defamation plaintiff must usually establish the following elements to recover: (1) Identification: The plaintiff must show that the publication was "of and concerning" himself or herself; (2) Publication: The plaintiff must show that the defamatory statements were disseminated to a third party; (3) Defamatory meaning: The plaintiff must establish that the statements in question were defamatory. For example, the language must do more than simply annoy a person or hurt a person's feelings; (4) Falsity: The statements must be false; truth is a defense to a defamation claim. Generally, the plaintiff bears the burden of proof of establishing falsity; (5) Statements of fact: The statements in question must be objectively verifiable as <u>false</u> statements of fact. In other words, the statements must be provable as false; and (7) Damages: The false and defamatory statements must cause actual injury or special damages. Clearly, the Plaintiff has successfully demonstrated each of the elements. Further, in *Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999), the Court discussed the high burden of proof necessary on a motion to dismiss under Fed. R. Civ. P. 12 (b)(6) and held:

> "Any Rule 12 (b)(6) motion for a dismissal faces a difficult (though not insurmountable) hurdle. (citations and internal quotation marks omitted): On a motion to dismiss under 12 (b)(6), the Court must accept as true the factual allegations in the complaint, and draw all favorable inferences in favor of the plaintiff. The District Court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

It is well settled that courts in this Circuit follow the Supreme Court determination in *Conley v. Gibson*, 355 U.S. 41 (1957). In *Conley*, Court laid down the criteria to be applied when evaluating motions to dismiss prior to the defendants serving an answer and discovery being conducted. The Court held that a dismissal should only be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id.

The Court then referenced Fed. R. Civ. P. 8 (a)(2) to illustrate the liberal system of pleading in a federal action and cited the oft advanced rule that the appropriate inquiry on a motion to dismiss is not whether the plaintiff will ultimately prevail on the merits, but whether the plaintiff is entitled to offer evidence in support of his claims at the time of trial. "A claimant need only give a statement that gives the defendant 'fair notice of what the…claim is and the grounds upon which it rests." See, *Conley,* 355 U.S. 41 (1957), supra. The issue at the motion to dismiss stage of an action is not whether a plaintiff will ultimately prevail on the merits, but whether or not the plaintiff is entitled to offer evidence to support the complaint. "Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." See, *Phelps v. Kapnolas*, 308 F.3d 180, 184-185 (2d Cir. 2002).

The test, as relied upon by this Circuit and the standard on a Rule 12 (b)(6) motion, is for the Court to merely determine the legal feasibility of the complaint and not to weigh the evidence which might ultimately be offered in support of the complaint. Moreover, it is well settled that on a motion to dismiss pursuant to Rule 12 (b)(6), the Court must accept all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. See, *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002). In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), the Supreme Court set forth:

> Given the federal rule of simplified standard for pleading, [a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations … Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56.

In the instant case, the Hechinger Defendants' motion to dismiss under Rule 12 (b)(6) is based upon the alleged lack of merit in the Plaintiff's case; however, that is not the test in this Circuit when determining the validity of a 12 (b)(6) motion. The Hechinger Defendants have not met this Circuit's test on motions of this type, and should; therefore, be denied in all respects.

Third, the Hechinger Defendants argue that if a reasonable observer would find that the statements **constitute reports of a proceeding**, then the Plaintiff would be barred from claims against them. We must

remain mindful of the rule that the defamatory effect of the article is to be ascertained not from the viewpoint of a critic or language expert, but rather from that of a reader of reasonable intelligence who takes ordinary interest in the articles of a periodical, but does not commonly subject them to careful scrutiny and analysis. In applying New York law, words that are challenged as defamatory "must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader . . . ." See, *Aronson v. Wiersma*, 65 NY2d 592, (1985) at 594; see also, *Armstrong v. Simon & Schuster*, 85 NY2d 373 (1995) at 380; *James v. Gannett Co.*, 40 NY2d 415 (1976) at 419-420; *Ava v. NYP Holdings, Inc.*, 64 AD3d 407 (2009) at 413. All relevant factors may be considered in determining whether a word or statement is defamatory. See, *Farber v. Jefferys*, 33 Misc 3d 1218[A], 2011 NY Slip Op 51966, [Sup Ct, NY County 2011], affd 103 AD3d 514 [1st Dept. 2013], lv denied 21 NY3d 858, citing, *Steinhilber v. Alphonse*, 68 NY2d 283, 291-292 [1986], and courts have considerable discretion in deciding whether a statement is defamatory, guided only by "the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used . . . ." See, *Steinhilber*, supra, 68 NY2d at 291-292.

While notably, the New York Court of Appeals has repeatedly held that the New York Constitution provides greater protection than the United States Constitution and, accordingly that the inquiry under the two constitutional regimes is different, (see, *600 West 115th Street Corp. v. Von Gutfeld*, 80 N.Y.2d at 136 & 138, 589 N.Y.S.2d at 827 & 829, 603 N.E.2d at 932 & 934 (1992); *Immuno AG v. J. Moor-Jankowski*, 77 N.Y.2d at 248-49, 566 N.Y.S.2d at 913-14, 567 N.E.2d at 1277-78 (1991)), the thrust of the dispositive inquiry under both New York and constitutional law is "whether a reasonable [reader] could have concluded that [the publications were] conveying facts about the plaintiff." See, *Gross v. New York Times Co.*, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817, 623 N.E.2d at 1167 (1993); *600 West 115th Street*, supra, at 829, 603 N.E.2d at 934 ("Under either Federal or State law, the dispositive question is whether a reasonable listener….could have concluded that [defendant] was conveying facts about the plaintiff"). Clearly a reasonable viewer in this instance would believe that the statements were conveying facts about the Plaintiff [this is evidenced by the vicious attacks and public outcry for social justice that followed], and would believe that the statements

constituted reports of a proceeding, which they did not. There never was a reporting of any truth, to wit: there was NEVER any proceedings investigating the Plaintiff for "*singling out black students and making them act like slaves;*" or telling them to "*lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like.*" THIS ERRONEOUS ACCUSATION WAS NEVER THE SUBJECT OF ANY INQUIRY BY THE DEPARTMENT OF EDUCATION OR OTHERWISE. It was entirely INACCURATE. See, *Freeze Right Refrigeration & Air Conditioning Services, Inc. v. City of New York*, 101 AD2d 175, 182. This was not ever something being investigated by OSI. It was completely ignored that the Plaintiff was never being accused or investigated of "racist acts." She was being investigated by the DOE for allegations of corporal punishment. Defendants evidently preferred readers believe the false narrative of a "slavery controversy" that they themselves promoted.

**The Defendants DID NOT Fairly and Accurately Report on These Proceedings**

The Plaintiff does allege that the articles present inaccurate summaries of the allegations against her. The Defendants attempt to distract this Court with an analysis of truth or falsity of the underlying allegations; however, they concede that the ultimate question is whether the articles truly and fairly report the allegations, and it this case, they clearly did not. The glaring distinctions in the allegations are clear and disqualify this report from any protections.

It is important to also note that the student that was interviewed by the Defendant, Ben Chapman, and who allegedly reported that the Plaintiff "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" was **absent** on the day of the lesson in question and could not have possibly witnessed the lesson. Absolutely no fact checking was done in presenting these erroneous facts to the public.

The Hechinger Defendants argue that they merely republished what had been previously published by the Defendant *New York Daily News* and Ben Chapman. As such, the Defendants improvidently reply upon *Karaduman v. Newsday*, (51 NY2d 531, 539 (1980), holding that the republication of statements is only actionable if the Defendant republisher acted in a "**grossly irresponsible**" manner in relation to the

republication. Id. The Defendants disingenuously argue that the Plaintiff's complaint does not point to any fact known by Dr. Perry or Hechinger Report that would have caused them to doubt the accuracy of the story; however, they knew at the very least that some allegation remained under investigation with the New York City Department of Education. The Plaintiff has sufficiently plead facts to plausibly demonstrate that the Hechinger Defendants knew or should have known that the *New York Daily News'* cover story was inaccurate.

Notably, "(a) wide variety of factors may enter into a determination of whether the **grossly irresponsible** standard has been met, such as whether sound journalistic practices were followed in preparing the defamatory article, whether normal procedures were followed, and whether an editor reviewed the copy, whether there was any reason to doubt the accuracy of the source relied upon <u>so as to produce a duty to make further inquiry to verify the information,</u> for example, by checking secondary sources, and whether the truth was easily accessible." <u>See,</u> *Hawks v. Record Printing and Pub. Co., Inc.*, 109 AD2d 972, 975) (citations omitted). The facts of this matter clearly demonstrate that the Hechinger Defendants acted had or should have had substantial reasons to question the accuracy of the articles or the *bona fides* of [the] reporter, and thus the Defendants acted in a grossly irresponsible manner. <u>See,</u> *Karaduman,* <u>supra</u> and *Jewell v. NYP Holdings, Inc.*, 23 F. Supp.2d 348, 371 (SDNY 1998). There were substantial reasons to question the accuracy of the material. Accordingly, and "(s)ince a wide variety of factors enter into a determination of whether the grossly irresponsible standard has been met, the issue of Defendants' conduct in this case should be resolved by a jury." <u>See,</u> *Brien v. Troy Pub. Co., Inc.*, 121 AD2d 794 (1986), at 795; *Morsette v. Final Call*, 278 AD2d 81 (2000), at 82. Thus, dismissal of the Plaintiff's complaint would be improper. Similarly, triable issues of fact exist as to the claimed substantial truthfulness of the article.

The Plaintiff has plead and proven that the Hechinger Defendants' comments addressing the Plaintiff were made with "gross irresponsibility." The parties dispute whether the statements at issue are "arguably within the sphere of legitimate public concern," and thus whether the "gross irresponsibility" standard applies. However, the Court need not reach the issue because even if gross irresponsibility is the requisite level of fault, the Plaintiff satisfies that standard. The complaint sufficiently alleges that the Hechinger Defendants

"knowingly" and intentionally made false statements. On a motion to dismiss, the Court accepts this assertion as true, considering the additional facts pleaded by the Plaintiff and the glaring fact that the accusation was not even plausible. See, *Pollnow v. Poughkeepsie Newspapers, Inc.*, 107 A.D.2d 10, 18, 486 N.Y.S.2d 11 (2d Dep't 1985) (plaintiff satisfied the "minimum requirements for stating a cause of action" by alleging that "defendant acted negligently, maliciously and with a reckless disregard for the truth"), aff'd, 67 N.Y.2d 778, 492 N.E.2d 125, 501 N.Y.S.2d 17 (1986).

Intentional lies not only satisfy, but surpass, the culpability of "gross irresponsibility," which signifies "something more than . . . negligence." See, *Mott v. Anheuser-Busch, Inc.*, 910 F. Supp. 868, 875 (N.D.N.Y. 1994), aff'd, 112 F.3d 504 (2d Cir. 1996); see also, *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) (regarding knowing falsities as a level of fault "[b]eyond gross irresponsibility"); *Lopez v. Univision Commc'ns, Inc.*, 45 F. Supp. 2d 348, 362 (S.D.N.Y. 1999) (observing that at least one court has equated gross irresponsibility with "gross negligence"). Accordingly, the complaint sufficiently alleges that the Hechinger Defendants acted with the requisite level of fault and it cannot be dismissed on this basis.

**The Statements Describing the Plaintiff and Her Lesson are NOT Opinions**

The privilege protecting the expression of an opinion is rooted in the preference that ideas be fully aired. See, *Davis v. Boeheim*, 24 NY3d 262 at 269 (2014), citing, *Steinhilber v. Alphonse*, 68 NY2d 283 at 289 (1986), and *Gertz v. Robert Welch, Inc.*, supra, 418 US 323, 339-340 (1974). Nonetheless, privileged statements of opinion are either accompanied by the facts on which they are based, or do not imply that they are based on undisclosed facts. See, *Gross v. New York Times Co.*, 82 NY2d 146 at 53-154 (1993). "When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" See, *Egiazaryan v. Zalmayev*, 880 F Supp 2d 494, 503 [SD NY 2012], quoting, *Steinhilber*, supra, 68 NY2d at 289, "because a reasonable listener or reader would infer that 'the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]'" See, *Gross*, supra, 82 NY2d at 153-154, quoting, *Steinhilber*, 68 NY2d at 290, and "if the predicate facts are disclosed, but are false, such that the disparity

19

between the stated facts and the truth would cause a reader to question the opinion's validity," the statement may be actionable as a "defamatory opinion" See, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, F Supp 3d , 2016 WL 3773394, [SD NY 2016], citing *Silsdorf v. Levine*, 59 NY2d 8, 15-16 [1983], cert denied 464 US 831; see also, *Parks v. Steinbrenner*, 131 AD2d 60, 62-63 [1st Dept. 1987].

An asserted fact may be distinguished from a nonactionable opinion if the statement: (1) has a precise, readily understood meaning, that is (2) capable of being proven true or false, and (3) where the full context in which it is asserted or its broader social context and surrounding circumstances indicate to readers or listeners that it is likely fact, not opinion. See, *Davis*, supra, 24 NY3d at 271, citing, Mann v. Abel, 10 NY3d 271 at 276 (2008), and *Brian v Richardson*, 87 NY2d 46, 51 [1995]; *Gross*, supra, 82 NY2d at 153; *Steinhilber*, supra, 68 NY2d at 292. "Where readers would understand a defamatory meaning, liability cannot be avoided merely because the publication is alleged to be cast in the form of an opinion, belief, insinuation or even question. A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community." See, *Christopher v. American News Co.*, 171 F.2d 275 (7th Cir. 1948).

"[T]he following factors should be considered in distinguishing fact from opinion: (1) whether the language used has a precise meaning or whether it is indefinite or ambiguous, (2) whether the statement is capable of objectively being true or false, and (3) the full context of the entire communication or the broader social context surrounding the communication. Moreover, the Court of Appeals makes a distinction between a statement of opinion that implies a factual basis that is not disclosed to the reader and an opinion that is accompanied by a recitation of facts on which it is based. The former is actionable, the latter is not." See, *Penn Warranty Corp. v. DiGiovanni*, 2005 NY Slip Op 25449 10 Misc3d 998 (2005). The Hechinger Defendants never used words such as "alleged" or "accused of" when reporting; they lead the readers to believe the recitation of the facts presented to be accurate.

It bears mentioning that Under New York law, some statements are considered defamation (slander) *per se* if they "(1) charge plaintiff with a serious crime; (2) tend to injure plaintiff in its business, trade or profession; (3) [communicate that] plaintiff has some loathsome disease; or (4) impute unchastity. See, *Doe v.*

*Doe*, No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017) (a statement is *per se* defamatory when it tends to injure another in his or her trade, business, or profession) (<u>citing</u> *Liberman v. Gelstein*, 80 NY2d 429, 435 (1992)). Such statements are presumed to cause injury, so a separate showing of harm is not necessary. Here, the facts as presented by the Defendants accuse the Plaintiff of having committed a serious crime; walking on the backs of students is akin to child abuse and endangerment and the false labeling of the Plaintiff as a racist oppressor, who committed such an atrocity has irreparably injured the Plaintiff in her profession as a school teacher and otherwise. The Plaintiff was <u>never</u> accused or investigated on an allegation of a racist act by the City Department of Education. She was being investigated on allegations of corporal punishment.

In this regard, any quotes from the OSI Report would have related to the corporal punishment allegation, **not** what had been falsely reported - that she "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" This is an indication that the Hechinger Defendants inappropriately grouped the Plaintiff with other educators who had been accused of racist acts. The Plaintiff was <u>never</u> accused or investigated on an allegation of a racist act by the City Department of Education. She was being investigated on allegations of corporal punishment. Moreover, it is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable reader would have concluded that he or she was reading opinions, not facts about the Plaintiff. Thus, the statements describing the Plaintiff's lesson as "racist" are actionable.

The challenged statements are to be read in the context of the publication as a whole. <u>See</u>, *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986). A statement is defamatory "if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of [him] in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." <u>See</u>, *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F.Supp.2d 279, 287 (SDNY 2006). Clearly, the Plaintiff's has demonstrated the defamatory nature of the Defendant's statements. These statements undoubtedly exposed the Plaintiff to public contempt,

ridicule, aversion, or disgrace, or induce an evil opinion of her in the minds of right-thinking persons, and to deprive her of her friendly intercourse in society. This is evident in the demonstrations of hate, ridicule, harassment, and threats of violence which followed.

Contrary to *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), Defendants disclosed erroneous facts. There were no allegations from parents, students, or staff that the Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Likewise, the Plaintiff contests that she ever admitted "having misbehaving students sit in the front of the room to demonstrate the conditions on slave ships, or that a parent reported that she 'pushed her knee' into *students'* (plural) backs and asked if students (plural) felt pain." See, Plaintiff's Exhibit B at paragraph 53. How can the Defendant argue that there was <u>nothing</u> in the statements, which disparage the Plaintiff's professional skills or competence or attributes wrongdoing to her? The entirety of the column was a <u>criticism of her skills</u> and <u>competence</u> and falsely accused her of the equivalent of child abuse and/or child endangerment, to wit:

- "*A teacher [Patricia Cummings] in a majority-minority school in the Bronx, NY instructed three black children in her seventh grade class to lie on the floor during a lesson on slavery.*" <u>See</u>, Defendant's Exhibit A, at page 1.

- "*This was not the first time that Patricia Cummings, who is white, 'taught' this module on the Middle Passage…*" <u>See</u>, Defendant's Exhibit A, at page 1.

- "*Cummings' slavery lesson wasn't only cruel…"* <u>See</u>, Defendant's Exhibit A, at page 2.

- "*Many compliant students who sit quietly accepting demeaning lessons like the ones administered by Cummings…*" <u>See</u>, Defendant's Exhibit A, at page 2.

- "*There are white teachers like Cummings who have not reckoned with what it means to oppress….*" <u>See</u>, Defendant's Exhibit A, at page 3.

- *"Cummings has since been reassigned away from children. The New York City education department should throw her out of the district, with assistance from the union."* <u>See</u>, Defendant's Exhibit A, at page 3.

- *"While most teachers probably won't see themselves in either Black or Cummings..."* <u>See</u>, Defendant's Exhibit A, at page 6.

They are not merely observations; it is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable reader would have concluded that he or she was reading opinions, not facts about the Plaintiff. To describe these comments as merely setting forth pedagogical preferences and teaching protocols is entirely disingenuous; as is claiming that they are "merely offensive or unpleasant." They clearly do negatively reflect on Plaintiff's reputation as a school teacher and her ability to appropriately determine the way to present the curriculum to the students. Unquestionably, these statements attribute odious and despicable characterizations to the Plaintiff. <u>See</u>, *Chau v. Lewis*, 771 F.3d at 127 (2014). There is no need to render any interpretation of the challenged comments.

The Defendant's reliance on *Gertz*, (418 U.S. 323, 471 F.2d 801 (1974)), in this instance is misplaced. The challenged statements were clearly <u>not</u> opinion, entitling the Hechinger Defendants to Constitutional protection. While it is argued that expressions of opinion receive absolute constitutional protection under Gertz, determining whether a given statement expresses fact or opinion may be difficult. The question must be answered on the basis of <u>what the average person hearing or reading the communication would take it to mean</u>. <u>See</u>, *Rinaldi v. Holt, Rinehart & Winston*, <u>supra</u>, at p 381; *Mr. Chow of N. Y. v Ste. Jour Azur S.A.*, 759 F.2d 219, 227-228). There is no definitive test or set of criteria. <u>See</u>, *Mr. Chow of N. Y. v. Ste. Jour Azur S.A.*, <u>supra</u>, at pp 225-226. The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion. <u>See</u>, Restatement [Second] of Torts § 566 comment c.

While the Supreme Court in *Gertz*, supra, did not focus on the distinction between fact and opinion, the court, in *Letter Carriers v. Austin*, (418 U.S. 264 (1974)), decided on the same day as *Gertz*, supra, provides some precedent. The court considered both the context of the entire communication and the type of "intemperate, abusive, or insulting language." (Id., at p 283). In *Letter Carriers*, supra, it concluded that no reader of the newsletter would have understood the union "to be charging the appellees with committing the criminal offense of treason." Id., at pp 285, 286; see also, *Greenbelt Pub. Assn. v. Bresler*, 398 U.S. 6 (1970). The Courts have taken great pains to avoid any attempt to reduce the problem of distinguishing fact from opinion to a rigid set of criteria which can be universally applied. The infinite variety of meanings conveyed by words; depending on the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used, rules out a formulistic approach. A court must have the flexibility to consider the relevant factors and to accord each the degree of importance which the specific circumstances warrant.

Nonetheless, Judge Starr's plurality opinion in *Ollman v. Evans*, 750 F.2d 970 (1984), sets out four factors which should generally be considered in differentiating between fact and opinion. The four factors are: (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might "signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." See, *Ollman v. Evans*, 750 F.2d 970 (1984) at p 983.

Consideration of the circumstances and of the broader social context (i.e., the factual background leading to segment) confirms the conclusion that the broadcast would be taken literally by the ordinary person. An analysis of the statements made about the Plaintiff in the light of the third and fourth *Ollman* factors (the full verbal context of the statement and its broader social context), compels the conclusion that the statement

would not be taken as pure opinion. Further, to be sure, in another context, the statements made by the Defendant will be viewed as a factual assertion, if considered under the first and second *Ollman* factors: whether the statements are sufficiently specific to convey "a precise core of meaning for which a consensus of understanding exists," (see, *Ollman v. Evans*, supra, at p 979), and whether it is "capable of being objectively characterized as true or false." See, *Ollman v. Evans*, supra, at p 979. Here, the inescapable conclusion from the verbal context of the entire message and all of the circumstances under which it was delivered is that the statement would be understood by the ordinary listener for what it is: a defamatory factual assertion, wherein the Hechinger Defendants were falsely asserting as "fact" that the Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Thus, there is no protection afforded.

**Characterization of Someone as a "Racist" or an "Oppressor" is NOT Protected Opinion**

Many courts in other jurisdictions that have faced the issue of defamation claims based on accusations of bigotry or racism have held the statements to be nonactionable statements of opinion. See, e.g., *Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) (holding that neither general statements charging a person with being racist, unfair, unjust, nor references to general discriminatory treatment, without more, constitute provably false assertions of fact); however, claiming that a person made a particular statement would be a factual assertion, and might well be libelous if false and defamatory (i.e., if the statement, if made, would reflect badly on the person). In this instance, there were not mere references to general discriminatory treatment. Thus, in this instance, there was a "factual" assertion that that the Plaintiff "*singled out black students in her class and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" This false and defamatory statement reflected badly on the Plaintiff and in conjunction with the implication of those accusations of bigotry and racism, would remove any purported protection and render those statements actionable.

**The Nature of Term "Racist" Does Not Render it Protected Opinion**

The Hechinger Defendants attempt to support their position by siting various cases where the term "racist" or the like was used; however, these are clearly distinguishable from this case, as it should be noted that some of these cases involved public figures. The Hechinger Defendants disingenuously argue that speech is not actionable so long as it is a protected opinion. Remarkably, the statements falsely permitted Dr. Perry's readers to believe that the Plaintiff was being accused of "*singling out black students and making them act like slaves;*" *telling them to "lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like*." Moreover, in distinguishing *Silverman v. Daily News, LP*, 129 AD3d 1054 (2ⁿᵈ Dept. 2015), it is clear that the Court in this matter could not find that the context of the complained-of statements was such that a reasonable listener would have concluded that he or she was hearing opinions, not facts about the Plaintiff. Thus, the statements describing the Plaintiff's lesson and the Plaintiff herself as "racist" are actionable.

**Descriptions of the Plaintiff as a "Racist" and "Oppressor" are Actionable**

The Hechinger Defendants disingenuously allege that such statements could not be understood as assertions of objective fact. Further, as the Defendants argue, in order to constitute actionable defamation, a challenged statement must be provably false. See, *Buckley v. Littell*, 539 F2d 882, 894 (2d Cir. 1976). Arguing that the descriptions of the Plaintiff as a "racist" and an "oppressor" cannot be proven false is misguided. In this instance, the very alleged incident that prompted these offensive descriptions was false. **It never happened**. The Plaintiff **NEVER** *singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Therefore, these descriptions of the Plaintiff are similarly false. The cases cited by the Hechinger Defendants are distinguishable from the instant matter; none of the cases demonstrate a scenario, where those terms were unequivocally proven to be related to a false event. Thus, again, in this instance, the assertion that that the Plaintiff "*singled out black students in her class and made them act like slaves;*" told them to "*lie on the floor*

*for a lesson on slavery and then stepped on their backs to show them what slavery felt like*" was false and not

the subject of the OSI investigation, for which she was otherwise exonerated. See, Plaintiff's Exhibit A.

## POINT III
## THE PLAINTIFF'S NEGLIGENCE AND EMOTIONAL DISTRESS CLAIMS ARE ACTIONABLE

### The Plaintiff's Claims for Negligence and Emotional Distress are NOT Duplicative

With respect to the argument that a separate tort for infliction of emotional distress could not be

sustained where the underlying conduct overlapped with other torts, it has been noted in certain dicta from the

New York Court of Appeals that "questioning whether the doctrine of liability for intentional infliction of

extreme emotional distress should be applicable where the conduct complained of falls well within the ambit

of other traditional tort liability." See, *Fischer* v. *Maloney*, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 993, 373

N.E.2d 1215, 1217 (1978). It has been concluded that, even if New York law does not permit entirely

overlapping torts, the negligence and intentional infliction of emotional distress claims in this case contained

elements that did not entirely overlap the claims of defamation. In particular it is noted that, if a jury believes

that the Hechinger Defendants acted with reckless intent a jury could believe that there were additional

elements of negligence and intentional infliction of emotional distress which do not necessarily inhere in a

charge of defamation.

The Defendants further erroneously plead that Plaintiff cannot, as a matter of law, plead negligent

infliction of emotional distress (NIED) or intentional infliction of emotional distress. In order to support a

claim for negligent infliction of emotional distress, Plaintiff is also required to allege conduct that is "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized community." See, *Murphy v. Am. Home Products*

*Corp.*, 58 NY2d 293, 303 [1983]. The extreme and outrageous conduct "must be clearly alleged in order for

the complaint to survive a motion to dismiss." See, *Sheila C. v. Povich*, 11 AD3d 120, 131 [1st Dept. 2004].

As a claim for negligent infliction of emotional distress arises out of negligence, Plaintiff must allege

that the Hechinger Defendants owed Plaintiff a duty and the breach of that duty owed to the Plaintiff "either

unreasonably endangers the plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety." See, *Santana v. Leith*, 117 AD3d 711, 712 [2d Dept. 2014]. Plaintiff has clearly identified the duty owed to her by the Hechinger Defendants. In order to qualify as "extreme and outrageous," the conduct at issue must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Sheila C. v. Povich*, 11 AD3d 120, 130-31 (1st Dept. 20014). To falsely accuse the Plaintiff of "*singling out black students and making them act like slaves;*" telling them to "*lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like,*" without checking the facts and continuing to characterize her under that narrative, even after confronted with the falsity, subjecting her to public admonishment, ridicule, and harassment is extreme and outrageous. The Hechinger Defendants did not merely "publish articles about Plaintiff's conduct based on firsthand account of students, reports from the Department of Education, and Plaintiff's own judicial findings." They furthered a false narrative, purporting it to be undisputed fact.

The Defendant argues that it is nearly impossible in New York for a Plaintiff to state a viable claim for intentional infliction of emotional distress, predicating liability on the basis of extreme and outrageous conduct. Nonetheless, under New York law, the four elements required to state a claim for intentional infliction of emotional distress are: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress. See, *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). In this case the Plaintiff has established the elements necessary to sustain a claim of intentional infliction of emotional distress, specifically the outrageous conduct and the Defendant's intent to cause emotion distress. Outrageous conduct is defined to be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) [**33] (quoting Restatement (Second) of Torts § 46, comment d (1979)); see also, *Piesco v. City of New York Dep't of Personnel*, 753 F. Supp. 468,

479 (S.D.N.Y. 1990), aff'd in part, rev'd in part and remanded on other grounds, 933 F.2d 1149 (2d Cir.), cert. denied, U.S., 112 S. Ct. 331 (1991).

Here, the actions of the Defendants in promoting a false account of facts and destroying the Plaintiff's reputation, and inciting others to believe that she would commit such a heinous act, which ultimately affected her reputation and employment, does constitute, as a matter of New York law, conduct which may be deemed outrageous or beyond the possible bounds decency. Accordingly, the Plaintiff has adequately alleged outrageous conduct necessary to sustain this claim.

**The Complaint Sufficiently States a Claim for Negligence, Negligent Infliction of Emotional Distress, and Intentional Infliction of Emotional Distress**

To establish a cause of action in negligence, a plaintiff must demonstrate the existence of a duty, a breach of that duty, causation, and damages. See, *Chylinski v. Wal-Mart Stores, Inc.*, 150 F.3d 214, 218 (2d Cir. 1998). Based on what has been demonstrated in this matter, the Hechinger Defendants' argument that "defamation claims (that involve matters of public concern) cannot be sustained upon a showing of negligence" must fail. The Plaintiff has more than established not only that the statements were false statements of fact, but that the Defendants acted in a "grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." See, *Chapadeau v. Utica Observer-Dispatch*, 38 NY2d 196, 199 (1975); see also, *Bloom v. Fox News of LA*, 528 F. Supp. 2d 69, (EDNY 2007). As a result, the Plaintiff's negligence claim must stand.

Further, the Plaintiff alleges that Defendants inflicted emotional distress both intentionally and negligently. See, Plaintiff's Exhibit C. To state a claim for negligent infliction of emotional distress ("NIED") in New York, a plaintiff must allege: "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress." See, *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 297-98 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). Intentional infliction of emotional distress ("IIED") claims require a plaintiff to allege the same elements as an NIED claim together with the additional requirement that the defendant must have an

29

"intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress." See, *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (citation and internal quotation marks omitted). The basis for Plaintiff's NIED claim is clear from the face of the Complaint. To the extent her NIED claim is based on the same conduct as her IIED claim, both claims can be sustained. Id.

The Fourth Department has held that a cause of action for negligent infliction of emotional distress must be "premised on conduct that unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for his or her physical safety." See, *Passucci v. Home Depot, Inc.*, 67 AD3d 1470, 1471 [4th Dept. 2009]. In this regard, the Plaintiff's complaint contains allegations that the Hechinger Defendants engaged in conduct that unreasonably endangered the Plaintiff's physical safety or caused her to fear for her safety. See, Plaintiff's Exhibit C, at pages 15 and 45. Second, the Plaintiff has plead sufficient facts to allege that the Defendant intended to cause her severe emotional distress or such disregard which has the probability of causing severe emotional distress. The Defendant Dr. Perry was selfishly pursuing his own interests in gathering ratings and inciting his audience at the Plaintiff's expense without considering the plausibility of the statements being made or verifying the facts.

To support an emotional distress claim, the alleged conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." See, *Conboy*, supra, 241 F.3d at 258 (citation and internal quotation marks omitted). Defendants failed to ever demonstrate that their articles were true, and it is a well-known fact that truth and only truth is an absolute defense in any defamation claim. Further, in *Deluca v. New York News*, 109 Misc. 2d 341 (1981), it is stated that journalists, have the right to be wrong, so long as they are not guilty of not checking their facts at all, making gross distortions of the record, or jumping to totally unwarranted conclusions. The Hechinger Defendants never interviewed or contacted any school officials, nor did they verify what Defendants Ben Chapman and the *New York Daily News* were allegedly told by the student, or even realize that the student he allegedly spoke to was absent the day the lesson was taught. Had he done this, they

would have known the actual allegation made against the Plaintiff. Further, plausibility was completely ignored, to wit: if the Plaintiff had in fact walked on student's backs, would they not have sustained physical injuries? Would she not have been arrested or charged with child abuse? It should have been obvious that this allegation was preposterous; however this gross distortion helped them sell papers and assisted the Department of Education in securing the funding that it so desperately desired. As a result, the Plaintiff's claims for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress must stand.

## CONCLUSION

Based on the foregoing, it has been demonstrated that the Hechinger Defendants have failed to meet the standard in this Circuit that is necessary on a motion to dismiss under Rule 12 (b)(6). Accordingly, the Defendants' motion to dismiss should be denied in all respects and Plaintiff should have such other and further relief that this Court may deem just and proper.

Dated: Garden City, New York
      September 27, 2019

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq. (TL 4471)
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*