UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X
PATRICIA CUMMINGS,

                                    Plaintiff,                        Docket No.
                                                                     19-cv-07723 (CM) (OTW)

            -against-

THE CITY OF NEW YORK; NEW YORK CITY DEPARTMENT
OF EDUCATION; CITY OF NEW YORK OFFICE OF SPECIAL
INVESTIGATIONS; NYC MAYOR BILL de BLASIO; GIULIA COX;
COURTNEY WARE; BEN CHAPMAN; NEW YORK DAILY NEWS;
DR. ANDRE PERRY; THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA; LENARD LARRY
McKELVEY a/k/a CHARLAMAGNE THA GOD; WWPR-FM
(105.1 MHZ); iHEARTMEDIA; CLEAR CHANNEL
COMMUNICATIONS, INC.; NEW YORK STATE SENATOR,
KEVIN S. PARKER; COUNCILMAN, JUMAANE D. WILLIAMS;
COUNCILMAN, DANIEL DROMM; COALITION OF
EDUCATIONAL JUSTICE; ANGELMARTINEZ;
NATASHA CAPERS, and "JOHN DOE AND JANE DOE # 1-100"
said names being fictitious, it being the intent of Plaintiff
to designate any and all individuals, officers, members,
agents, servants, and/or employees of the aforementioned
agencies owing a duty of care to Plaintiff, individually and
jointly and severally,

                                    Defendants.
-----------------------------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANT, NEW YORK STATE SENATOR,
### KEVIN S. PARKER'S MOTION FOR JUDGMENT ON PLEADINGS PURSUANT TO
### FED. RULE OF CIV. PROCED. 12 (c)

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq. (TL 4471)
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*
600 Old Country Road, Suite 530
Garden City, New York 11530
*Tom@TLiotti.com*
Phone: (516) 794-4700
Fax:    (516) 794-2816

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... i

PRELIMINARY STATEMENT ................................................................................1

The Statements Concerning Plaintiff's "Teachable Moment"
on Slavery and the Department of Education's Subsequent
Investigation Contain Numerous Errors .................................................................9

ARGUMENT ...........................................................................................................11

POINT 1 ..................................................................................................................11

SENATOR PARKER'S MOTION FOR JUDGMENT
ON THE PLEADINGS IS PROCEDURALLY DEFECTIVE .........................................11

POINT II .................................................................................................................12

THE PLAINTIFF HAS SUFFICIENTLY DEMONSTRATED
A BASIS FOR A DEFAMATION ACTION AGAINST
SENATOR PARKER ................................................................................................12

Courts Do Not Regularly Dismiss Defamation Actions .......................................12

The Defendant DID NOT Fairly and Accurately
Comment on the Actual Proceedings.....................................................................18

The Statements Describing the Plaintiff and
Her Lesson are NOT Opinions ...............................................................................19

Characterization of Someone as a "Racist" or
an "Oppressor" is NOT Protected Opinion............................................................25

POINT III.................................................................................................................27

THE PLAINTIFF'S NEGLIGENCE AND EMOTIONAL
DISTRESS CLAIMS ARE ACTIONABLE ...............................................................26

The Plaintiff's Claims for Negligence and
Emotional Distress are Actionable ........................................................................26

The Complaint Sufficiently States a Claim for Negligence,
Negligent Infliction of Emotional Distress, and
Intentional Infliction of Emotional Distress .........................................................28

CONCLUSION.............................................................................................................................30

# TABLE OF AUTHORITIES

## Federal Cases

*Bell Atlantic Corporation v. Twombly,*
550 US 544, 570 (2007)..................................................................................13

*Bloom v. Fox News of LA,*
528 F. Supp. 2d 69, (EDNY 2007) ................................................. 28

*Chau v. Lewis,*
771 F.3d at 127 (2014 ...................................................................................23

*Christopher v. American News Co.,*
171 F.2d 275 (7th Cir. 1948) ..........................................................20

*Chylinski v. Wal-Mart Stores, Inc.,*
150 F.3d 214, 218 (2d Cir. 1998)...................................................28

*Conboy v. AT&T Corp.,*
241 F.3d 242, 258 (2d Cir. 2001) ...........................................29, 30

*Conley v. Gibson,*
355 U.S. 41 (1957).........................................................................16

*Doe v. Doe,*
No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017)...........................21

*Egiazaryan v. Zalmayev,*
880 F Supp 2d 494, 503 [SD NY 2012] .........................................20

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC,*
F Supp 3d, 2016 WL 3773394, [SD NY 2016]................................20

*Gertz v. Robert Welch, Inc.,*
418 U.S. 323, 471 F.2d 801 (1974) .............................................14, 15, 19, 23

*Green v. City of Mount Vernon,*
96 F. Supp. 3d 263, 297-98 (S.D.N.Y. 2015) .................................29

*Greenbelt Pub. Assn. v. Bresler,*
398 U.S. 6 (1970) ..........................................................................24

*Irish Lesbian & Gay Org. v. Giuliani,*
143 F.3d 638, 644 (2d Cir. 1998)...................................................12

*Kelly v. Schmidberger,*
806 F.2d 44, 46 (2d Cir. 1986).......................................................22

*King v. American Airlines, Inc.*,
    284 F.3d 352, 356 (2d Cir. 2002)....................................................................................12

*Koulkina v. City of New York*,
    559 F. Supp. 2d 300 (S.D.N.Y. 2008)...........................................................................13

*Letter Carriers v. Austin*,
    418 U.S. 264 (1974).........................................................................................................24

*Leonard F. v. Isr. Disc. Bank of N.Y.*,
    199 F.3d 99, 107 (2d Cir. 1999) ....................................................................................16

*Lopez v. Nat'l Archives & Records Admin.*,
    301 F. Supp. 3d 78, 84 (D.D.C. 2018) ..........................................................................13

*Lopez v. Univision Commc'ns, Inc.*,
    45 F. Supp. 2d 348, 362 (S.D.N.Y. 1999) ....................................................................19

*Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*,
    22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) ....................................................................19

*Mr. Chow of N. Y. v Ste. Jour Azur S.A.*,
    759 F.2d 219, 227-228)..............................................................................................23, 24

*Mott v. Anheuser-Busch, Inc.*,
    910 F. Supp. 868, 875 (N.D.N.Y. 1994), aff'd, 112 F.3d 504 (2d Cir. 1996)...................19

*Murphy v. Dep't of Air Force*,
    326 F.R.D. 47, 49 (D.D.C. 2018) 82...............................................................................13

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)...............................................................................................13, 14, 15

*Ollman v. Evans*,
    750 F.2d 970 (1984) ..................................................................................................24, 25

*Patel v. Searles*,
    305 F.3d 130, 135 (2d Cir. 2002) ..................................................................................16

*Piesco v. City of New York Dep't of Personnel*,
    753 F. Supp. 468, 479 (S.D.N.Y. 1990)........................................................................28

*Qureshi v. St. Barnabas Hosp. Ctr.*,
    430 F.Supp.2d 279, 287 (SDNY 2006) .........................................................................22

*Rosenblatt v. Baer*,
    383 U.S. 75 (1966).........................................................................................................13

*Schuler v. PricewaterhouseCoopers, LLP,*
    514 F.3d 1365, 1370 (D.C. Cir. 2008) ........................................................12, 13

*Sellers v. M.C. Floor Crafters, Inc.,*
    842 F.2d 639, 642 (2d Cir. 1988) ..................................................................12

*Smith v. City of New York,*
    No. 13-CV-2395, 2014 U.S. Dist. LEXIS 139267, 2014
    WL 4904557, (E.D.N.Y. Sept. 30, 2014) ..................................................16, 17

*Stevens v. Tillman,*
    855 F.2d 394, 403 (7th Cir. 1988) ................................................................25

*Vega v. Hempstead Union Free Sch. Dist,*
    801 F.3d 72, 78 (2d Cir. 2015)......................................................................12

**State Cases**

*Anderson v. City of New York,*
    NY Slip Op 30080(U) (Sup. Ct. NY County 2014).........................................11

*Aronson v. Wiersma,*
    65 NY2d 592, (1985) at 594 .........................................................................17

*Armstrong v. Simon & Schuster,*
    85 NY2d 373 (1995) at 380 ..........................................................................17

*Ava v. NYP Holdings, Inc.,*
    64 AD3d 407 (2009) at 413 ..........................................................................17

*Brian v Richardson,*
    87 NY2d 46, 51 [1995] .................................................................................20

*Chapadeau v. Utica Observer-Dispatch,*
    38 NY2d 196, 199 (1975).............................................................................28

*Davis v. Boeheim,*
    24 NY3d 262 at 269 (2014) ....................................................................19, 20

*Farber v. Jefferys,*
    33 Misc 3d 1218[A], 2011 NY Slip Op 51966, [Sup Ct, NY County 2011],
    affd 103 AD3d 514 [1st Dept. 2013], lv denied 21 NY3d 858.........................17

*Fischer v. Maloney,*
    43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978)..................26

*Freeze Right Refrigeration & Air Conditioning Services, Inc. v. City of New York,*
    101 AD2d 175, 182 ................................................................................................ 18

*Gross v. New York Times Co.,*
    82 N.Y.2d at 153, 603 N.Y.S.2d at 817, 623 N.E.2d at 1167 (1993) .......................... 17, 20

*Howell v. New York Post Co.,*
    81 N.Y.2d 115, 121 (1993) ....................................................................................... 27

*Immuno AG v. J. Moor-Jankowski,*
    77 N.Y.2d at 248-49, 566 N.Y.S.2d at 913-14, 567 N.E.2d at 1277-78 (1991) ............... 17

*James v. Gannett Co.,*
    40 NY2d 415 (1976) at 419-420 ............................................................................... 17

*Liberman v. Gelstein,*
    80 NY2d 429, 435 (1992) ......................................................................................... 21

*Mann v. Abel,*
    10 NY3d 271 at 276 (2008) ...................................................................................... 20

*Murphy v. Am. Home Products Corp.,*
    58 NY2d 293, 303 [1983] ..................................................................................... 27, 28

*Parks v. Steinbrenner,*
    131 AD2d 60, 62-63 [1st Dept. 1987]. ....................................................................... 20

*Passucci v. Home Depot, Inc.,*
    67 AD3d 1470, 1471 [4th Dept. 2009] ........................................................................ 29

*Penn Warranty Corp. v. DiGiovanni,*
    2005 NY Slip Op 25449 10 Misc3d 998 (2005) ............................................................ 21

*Pollnow v. Poughkeepsie Newspapers, Inc.,*
    107 A.D.2d 10, 18, 486 N.Y.S.2d 11 (2d Dep't 1985) .................................................. 19

*Rinaldi v. Holt, Rinehart & Winston*
    53 A.D.2d 839, 386 N.Y.S.2d 818 (1st Dept. 1976) ...................................................... 23

*Santana v. Leith,*
    117 AD3d 711, 712 [2d Dept. 2014] .......................................................................... 27

*Sheila C. v. Povich,*
    11 AD3d 120, 131 [1st Dept. 2004] ........................................................................... 27

*Silsdorf v. Levine,*
    59 NY2d 8, 15-16 [1983], cert denied 464 US 831 ....................................................... 20

*Silverman v. Daily News, LP,*
    129 AD3d 1054 (2ⁿᵈ Dept. 2015)......................................................................22

*Steinhilber v. Alphonse,*
    68 NY2d 283, 291-292 [1986].............................................................17, 19, 20

*600 West 115ᵗʰ Street Corp. v. Von Gutfeld,*
    80 N.Y.2d at 136 & 138, 589 N.Y.S.2d at 827 & 829,
    603 N.E.2d at 932 & 934 (1992)........................................................... 17

## Rules

Fed. R. Civ. P. 8 (a)(2) ........................................................................16

Federal Rule of Civil Procedure 12 (b)(6) ........................................... 12, 13

Federal Rule of Civil Procedure 12 (c) ........................................... 12, 13, 16

## Secondary Sources

Restatement [Second] of Torts § 46 comment d...........................................28

Restatement [Second] of Torts § 566 comment c..................................24, 30

Willging, Thomas E., *Use of Rule 12 (B) (6) in Two Federal District Courts*
    (Federal Judicial Center 1989)...........................................................12

Williams, Akhee Jamiel, *Divided We Fall. Ignorant We Fail* (2013). ...........................................5

Plaintiff, Patricia Cummings, (hereinafter "Plaintiff" or "Ms. Cummings"), a private individual, respectfully submits this Memorandum of Law in Opposition to Defendant, New York State Senator Kevin S. Parker's (referred to as, "Senator Parker," "Defendant, Senator Parker," or "Defendant") Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12 (c).

## PRELIMINARY STATEMENT

The Senator Parker's Motion is a thinly-veiled attempt to reframe Plaintiff's case into something that it is not. The Defendant disingenuously argues that his quoted statements were mere expressions of opinion, and accompanied by the facts on which those opinions were based, are protected by both the United States and New York Constitutions.

The Plaintiff was a probationary New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York. She seeks damages related *inter alia* to the infliction of defamation and defamation *per se*, reverse discrimination, denial of due process, severe emotional, psychological, and physical distress, loss of reputation, loss of income, expenses upon her, the erroneous termination of her employment as a New York City school teacher, and the "*badge of infamy*" with which she has forever been branded.

The Plaintiff's claim arose as a result of what was fallaciously reported concerning an alleged complaint made by **one (1)** parent of **one (1)** student regarding a lesson taught by the Plaintiff in her social studies class on the Middle Passage, wherein she subsequently and unwillingly became the subject of a front page pictorial and story in the *New York Daily News*, falsely accusing her of being a "*racist*" and "*making black students lie face down on the floor of her class*, and asking them: *'[H]ow does it feel to be a slave?*" As a result, this fabricated and erroneous set of purported "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world. The Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it was erroneously reported, among other things that she

1

"*singled out black students and made them act like slaves;*" and she is falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" She has been publically shamed and falsely accused of "*child abuse,*" labeled as a "*racist,*" referred to as an "*oppressor,*" by many, including politicians and activists, and specifically in various and extensive media outlets discussing this issue. She has received direct threats of violence and death causing her to fear for her life. The Plaintiff was ultimately exonerated of the original erroneous allegations following an investigation by the New York City Department of Education's Office of Special Investigations, yet has nonetheless been terminated from her employment as New York City Public School Teacher at The William W. Niles School - Middle School 118.

What has been disingenuously described by the Defendant as "*controversial classroom conduct*" was, in actuality, an example of a multi-sensory[1] teacher demonstrating "spatial recognition" to her students. This part of her lesson was described by the Plaintiff as a "teachable moment," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes; it was not, in any way, a reenactment. It was falsely recounted that "multiple students in the classroom reported that she *physically pushed* the 'student volunteers' closer together, asking them "*how it felt*" to be a slave. This fabricated account is contradicted by the reported findings of the of the New York City Department of Education's Office of Special Investigations (also referred to as OSI); to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration;*" "'*Student' I never observed Ms. Cummings' knee make contact with 'Student A'*" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them.*" See, Redacted Copy of Office of Special Investigations Investigative Report

---

[1] Multi-sensory teaching is a didactic system that seeks to develop awareness of self in time and space in order to raise cognition and understanding of the world as is experienced. It takes into account that different children learn in different ways; conveys information through things like touch and movement-called tactile and kinesthetic elements, as well as sight and hearing. See, White, Helen and Christina Evans, Learning to Listen to Learn: Using Multi-Sensory Teaching for Effective Listening (2005).

(OSI) dated July 24, 2018, included herein as Plaintiff's **Exhibit A**. Moreover, "Students B, D, E, F, I, J and K" noted that the participating student volunteers did not appear to be in any distress. See, Plaintiff's Exhibit A. Most remarkably, "Student J" admitted that "'*Student A* '[2] *was lying and was attempting to get Ms. Cummings fired or in trouble because 'Student A' did not like Ms. Cummings.*" See, Plaintiff's Exhibit A, at page 5. Moreover, the Plaintiff controverts this fallacious allegation in her rebuttal correspondence addressed to Community Superintendent Maribel Torres-Hulla dated October 5, 2018, annexed hereto as **Exhibit B** at page 8.

"Student A" is alleged to have complained on or about January 11, 2018, and as noted in the OSI Report, "Student A's" mother is noted to have complained 6 days later (9 days after the lesson). Further, it is evident that a complaint was not immediately filed according to the OSI Report. See, Plaintiff's Exhibit A. Furthermore, the Plaintiff was not removed for investigation by the New York City Department of Education's Office of Special Investigations until February 2, 2018; the day the *New York Daily News'* exclusive front page story was published. Principal Cox did a school based investigation, but failed to adhere to Chancellor Regulation A-420 and breached Article 20 of the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT). A copy of the Plaintiff's Verified Complaint dated May 15, 2019, annexed hereto as **Exhibit C**, at pages 46-48.

The reports were grossly incorrect and completely distinct from the allegation that was actually being investigated by OSI. The original allegation involved a false report that the Plaintiff physically pushed student volunteers closer together, using her feet or her knees to push the students closer together during a lesson demonstration; it was never the complaint that she "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped*

---

[2] "Student A" was one of four students who voluntarily participated in the classroom demonstration on the Middle Passage. It was erroneously alleged that Ms. Cummings pushed "Student A's" back with her knee and asked if it hurt or caused her discomfort.

*on their backs to show them what slavery felt like,"* as falsely and repeatedly reported. See, Plaintiff's

Exhibit C, at pages 24-25. Notably, the Office of Special Investigations Investigative Report (OSI

Report) dated July 24, 2018, indicates that *"[T]he written statements made by 'Students B, C, D, E, H,*

*I, J, Q, R, S, T, U, and V' fail to corroborate that Ms. Cummings pressed her knee into 'Student A's'*

*back or any students' back."* See, Plaintiff's Exhibit A. "Therefore, the allegation that Ms. Cummings

used corporal punishment against "Student A" by pushing her knee into her ["Student A's"] back

during a classroom demonstration was never corroborated and is **unsubstantiated**." See, Plaintiff's

Exhibit A. Parenthetically, the finding that Ms. Cummings acted with poor judgment in conducting a

lesson that inadequately incorporated the New York City DOE social studies curriculum and guidance

for this topic is a violation of her due process, as this is an improper finding, as it is not the function of

the Office of Special Investigations to examine and evaluate teacher pedagogy (method or practice of

teaching).

  The Defendant, Senator Parker erroneously argues that he cannot be liable to the Plaintiff, as

the references to the Plaintiff were "explicitly and exclusively based on the reporting in the press,

which had already generated substantial public discussion and protests. This is a fallacy. Nonetheless,

any claim that the press articles, particularly the *New York Daily News'* articles, were fair and true

reports of judicial proceedings, is completely false. There were no proceedings taking place at that time

which alleged that the Plaintiff *"singled out black students and made them act like slaves;"* told them

to *"lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery*

*felt like,"* as was reported as "fact." The Plaintiff was being investigated for a completely different

allegation.

  Likewise, Senator Parker disingenuously claims that by the time he had been quoted in the

press, the Plaintiff had become a public figure, and the subject of her classroom conduct had become

a matter of substantial political, social or other concern to the community and the City. Nonetheless, it

is clear that Senator Parker knew or should have known that the original reporting was not accurate.

4

Plausibility was completely ignored, to wit: if the Plaintiff had in fact walked on student's backs, would they not have sustained physical injuries? Would she not have been arrested or charged with child abuse? It should have been obvious that this allegation was preposterous; however this gross distortion helped Senator Parker to substantiate his call for the Plaintiff's "*swift removal from the New York City Department of Education*" and "*the revocation of all New York State licensures and credentials that would allow her to teach in our State*." As a result, the Plaintiff's negligence claims must also stand.

Senator Parker further argues that he simply used the reporting about the Plaintiff in addressing race in education. In this regard, he argues that his quoted statements were mere expressions of opinion and an academic rumination on the best practices for sensitivity in the classroom. It is important to note that there were no substantiated, accurate facts reported anywhere. Moreover, the disingenuous attempt to characterize the reference to the Plaintiff's actions as opinion by Senator Parker is derisory. Senator Parker is self-described as committed to restoring the overall quality of life for his constituents. His asserted commitment to his community is reflected in his leadership in civic organizations. He has expressed his commitment to education, as a professor of both African-American Studies and Political Science at several colleges, including: CUNYs: Baruch College, John Jay College, Medgar Evers College, City College; SUNY, Old Westbury; and Long Island University. Brooklyn College is where Senator Parker teaches a majority of his classes and is a faculty advisor to student organizations and activities. The Senator is currently an adjunct professor at Brooklyn College's Center for Worker Education. At Penn State (where he received his Bachelor of Science Degree in Public Service), Senator Parker organized students for racial justice and encouraged diversity at the University. As such he is inarguably considered a thought-leader in the field of racial justice and diversity in education. As such elected officials have a responsibility and must be able to distinguish between "facts and fiction, opinion from proven data, and statistical analysis from baseless hypothesis." They need to know how reliable statements are before reporting them as facts. See, Williams, Akhee Jamiel, Divided We Fall. Ignorant We Fail (2013). In order to formulate his purported "opinion," that the Plaintiff "*singled out*

*black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*" the Defendant performed no independent investigation of the "facts" despite the fact that the reported account referred to by Senator Parker differed dramatically from the actual allegation that was made by just **one student and ultimately unsubstantiated by OSI**. What was erroneously the subject of his quoted statement amounted to child abuse and/or endangerment, yet there was no indication of a substantiated investigation by him before he called for the Plaintiff's removal as a New York City teacher and revocation of her New York State teaching license and credentials. He is a self-designated thought-leader for his constituents and an elected official, referencing unsubstantiated events in the media. He presents himself in his statement as an authority, affirming that his expertise as an African Studies professor for over 20 years, makes him qualified to determine the Plaintiff's character.[3] Thus, Senator

---

[3] Senator Parker's statements on the Plaintiff's character and on her alleged "deplorable acts" are quite ironic given his own personal controversies, to wit: In January 2005, he was arrested after punching a traffic agent in the face during a dispute over a traffic citation that he had been issued. He was subsequently charged with third degree assault, a misdemeanor. The charges were dropped after he agreed to take anger management classes. See, "NY Senator: 'You Racist People In Here.'" wcbstv.com; archived from the original on April 30, 2010. Retrieved April 29, 2010. In 2008, an aide filed charges against him, claiming he pushed her during an argument and smashed her glasses. Id. On May 8, 2009, he was charged with felony criminal mischief for attacking a New York Post photographer and damaging the photographer's camera and car door. According to prosecutors, the photographer's finger was broken in the alleged attack. See, "Convicted NY State Senator Loses 1 Leader Post." CBSLocal.com. January 11, 2011. Retrieved January 25, 2018. He was charged with a felony due to the value of damage to the camera and car door. See, Gendar, Alison; Lovett, Ken; Standora, Leo (May 8, 2009). "State Senator Kevin Parker busted over tussle with photographer." New York: Nydailynews.com. Retrieved April 29, 2010. As a result, he was stripped of his leadership position as majority whip and chair of the Energy Committee. See, Baker, Al (May 10, 2009). "After Arrest, a State Senator Loses His Leadership Posts." The New York Times. He was convicted of a misdemeanor charge, criminal mischief, and on March 21, 2011 was sentenced to three years probation and a $1,000 fine. See, Gorta, William J. (March 21, 2011). "State Sen. Parker sentenced to probation for attacking Post photographer." New York Post. Had he been convicted of the felonies, he would have automatically lost his seat in the Senate, and the Senate had already expelled Hiram Monserrate for misdemeanor charges earlier in the year. The Senate Democrats expressed an unwillingness to expel Parker as they had Monserrate. See, "Sampson sees no Monserrate-Parker parallels." TimesUnion.com. December 7, 2010. Retrieved January 25, 2018. In February 2010, Parker was restrained by his colleagues during a profane tirade against Senator Diane Savino in which Parker referred to Savino as a "bitch." See, Lovett, Kenneth (February 11, 2010). "Another Senate brawl in Albany: Sen. Kevin Parker charges towards then curses out female colleague." Daily News. New York. In April 2010, he launched into an outburst while colleague John DeFrancisco (R) of Syracuse was questioning a black nominee for the New York State Power Authority. Senator Parker objected to DeFrancisco's questions and asserted that he had never seen a white nominee treated in similar fashion. See, Katz, Celeste; Lovett, Kenneth (April 28, 2010). "State Sen. Kevin Parker erupts again with raced-based rant, and even allies are concerned" Daily News. New York. "Amid the nearly two-minute tirade, committee chairman Carl Kruger told Senator Parker he would be removed from the hearing room if he didn't settle down." Id. He has accused his colleagues of racism, and followed up in a radio

Parker must be held to a higher standard. Those events as quoted by Senator Parker in his statement were **not** opinion.

There were no substantiated, accurate facts reported by Senator Parker. This Court must remain mindful of the rule that <u>the defamatory effect of the segment is to be ascertained</u> not from the viewpoint of a critic or language expert, but rather <u>from that of a reader</u> of reasonable intelligence who takes ordinary interest in the articles of a periodical or statements made by an elected official, but does not commonly subject them to careful scrutiny and analysis. <u>Clearly a reasonable reader, in this instance would believe that Senator Parker's statements were conveying facts about the Plaintiff</u> [this is evidenced by the vicious attacks and public outcry for social justice that continued], and would believe that the statements constituted reports of a proceeding, which they did not. He presented the narrative as being proven and true, thus facilitating and further inciting the protest and unrest directed toward the Plaintiff. Notably, in the challenged statement, the Defendant Senator Parker disingenuously offered that "*Although some are calling for a second chance for Ms. Cummings via culturally competent training and the like, as an African American Studies professor at the City University of New York for over 20 years now, I know there is no level of training that can make a person more*

---

interview by accusing his Republican "enemies" of being white supremacists. <u>See</u>, "<u>NY Senator: 'You Racist People In Here.</u>'" wcbstv.com; archived from the original on April 30, 2010. Retrieved April 29, 2010. Following the tirade, Sen. Rubén Díaz Sr. (D-Bronx) was quoted as saying that Parker "needed help." <u>See</u>, Katz, Celeste; Lovett, Kenneth (April 28, 2010). "<u>State Sen. Kevin Parker erupts again with raced-based rant, and even allies are concerned</u>" Daily News. New York. In December 2018, Senator Parker allegedly blocked a bike lane with a car using his official parking placard, but a different license plate. When questioned about the incident on Twitter, he replied, "Kill yourself!" <u>See</u>, Mills Rodrigo, Chris (January 18, 2018). "<u>NY state senator tweets 'Kill yourself' at user who called him out over parking placard.</u>" The Hill. Retrieved January 18, 2018; <u>see also</u>, Fearnow, Benjamin, (18 December 2018). "'<u>Kill Yourself!': New York State Senator Kevin Parker Apologized for Tweet Over Parking Spot.</u>" Newsweek. Retrieved 19 December 2018. "Parker responded with an irrational demand that she kill herself before he offered a weak Twitter apology using his verified account. But less than an hour after the apology, Parker continued his criticism of Giove." Incoming Senate President Andrea Stewart-Cousins expressed her "disappointment" at Parker's action. <u>See</u>, "<u>Dem. State Senator Slammed For 'Kill Yourself!' Tweet To GOP Aide.</u>" WLNY-TV CBS. 18 December 2018. Retrieved 19 December 2018. In an April, 2019 closed-door meeting of Senate Democrats, an argument between Parker and Sen. Alessandra Biaggi (D) occurred, and Senator Parker reportedly "ripped off his tie and threw it down in a rage." <u>See</u>, Fink, Zack, "<u>Nasty Fight Erupts Between State Senate Democrats During Closed Door Meeting.</u>" www.ny1.com (April 12, 2019).

*sensitive to the struggles of another.*" He further stated that *"[T]hose feelings cannot be prepared in one's mind, but rather must be intrinsic to one's character. This is not the case for Ms. Cummings.....*"

Nonetheless, Senator Parker maintains the specious argument that the comments complained of are expressions of pure opinion on facts extensively reported by the media, and not assertions of fact, and thus are protected. This is problematic and misguided. There were no substantiated, accurate facts reported. While, Senator Parker may argue that he is not a "journalist" or "reporter," *per se*; he is a self-proclaimed <u>thought leader</u>, and <u>public leader, working to improve education</u> and an <u>activist</u>, with a following of constituents, who are guided by what he has to say, and blindly accept his statements as truth. No other investigation of the purported "facts" occurred, as evidenced by the fact that the reported accounts differed dramatically from the actual allegation that was made by just one student and ultimately unsubstantiated by OSI. What was being erroneously reported amounted to child abuse and/or endangerment, yet there was no indication of a substantiated investigation. Therefore, the Defendant cannot disingenuously cloak his otherwise actionable behavior as "opinion" while publically describing the Plaintiff as having the character of a "racist" and an "oppressor," while promoting a false fact pattern and expect to escape any liability. Plaintiff's quarrel is not with what she believes to be unfair assessments and remonstrations concerning her lesson. She has no doubts regarding her lesson, and her colleague, (an African-American teacher), who was present in the classroom, testified as to its appropriateness[4]. Contrary to the contentions, there was no "dubious" decision, nor was there even a "reenactment." As the Plaintiff has argued herein, <u>there was never any</u>

---

[4] Ralph Hudson is African-American teacher who witnessed the Plaintiff's lesson. He acknowledged to the Plaintiff after the lesson that he was impressed with how she handled the situation and subject matter with such grace and dignity. It is important to note that he told investigators from the Department of Education's Office of Special Investigations (OSI) that he found the lesson to be "*appropriate* and was within the scope of *effectively educating students* about the harsh conditions endured by slaves during transport." (Emphasis added). He did not corroborate the events that the student alleged to have happened. Furthermore, he indicated that it was his belief that if the Plaintiff were African-American, the incident would have been a non-issue. See, Plaintiff's Exhibit A at pages 7 and 8.

reenactment, this part of her lesson, which was a teachable moment[5] was for "spatial recognition," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes. In addition to be an elected official, as a professor and a thought-leader in the field of education, Senator Parker should be familiar with this teaching method and should have known better. The Complaint contains numerous factual allegations to demonstrate that Senator Parker's comments were made in a grossly irresponsible manner. In this regard, Senator Parker disingenuously argues a failure to demonstrate that he knew or should have known that the reporting was inaccurate.

Lastly, with respect to the Plaintiff's cause of action for intentional infliction of emotional distress, the conduct described by the Plaintiff more than meets the rigorous standard formulated by the New York courts for emotional distress claims. The Defendant, Senator Parker failed to exhibit any iota of integrity when he made entirely false statements about the Plaintiff; this makes him unquestionably negligent. Notably, even when he undoubtedly learned that the Office of Special Investigations Investigative Report, (see, Plaintiff's Exhibit A), had confirmed every item previously reported to be blatantly false, the Defendant never issued a retraction or made any attempt to correct the record.

**The Statements Concerning Plaintiff's "Teachable Moment" on Slavery and the Department of Education's Subsequent Investigation Contain Numerous Errors**

In an attempt to diminish the Plaintiff's claims, it was erroneously reported that by showing the clip from the movie *Freedom*, the Plaintiff deviated from the class's preapproved curriculum. Nonetheless, the Plaintiff maintains that she did not deviate from the curriculum. See, Plaintiff's Exhibit B, at page 3-4. The Plaintiff was not looking to replicate the conditions on the boats along the Middle Passage; she sought to replicate the space, or lack thereof, as a demonstration of spatial recognition. Moreover, the Plaintiff did not specifically select black students as volunteers for the

---

[5] A teachable moment is not something that you can plan for; rather, it is a fleeting opportunity that must be sensed and seized by the teacher. Often it will require a brief digression that temporary sidetracks the original lesson plan so that the teacher can explain a concept. See, Footnote number 41 of Plaintiff's Exhibit B, at page 7.

demonstration. It was acknowledged that she sought random volunteers from the class to participate in the demonstration; no student was forced to participate. Notably, the class was comprised entirely of minority students. Again, the claim that multiple students reported that Plaintiff used her feet or hands to push these students even closer together is false. As stated previously herein, "Student B" specifically denied that Ms. Cummings used her feet or her knees to push students closer together. The fabricated account is clearly contradicted by the reported findings of the Office of Special Investigations; to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student I' never observed Ms. Cummings' knee make contact with Student 'A*;'" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them.*" See, Plaintiff's Exhibit A; see also, Plaintiff's Exhibit B at page 8.

An inaccurate account of the complaint filed with the principal, (Defendant Giulia Cox), by the student and her parent were reported. Believing that these actions actually constituted corporal punishment, for any of that account to be plausible, Principal Cox would have had to report the alleged incident on January 17, 2018, prior to the Plaintiff's initial meeting with her on January 18, 2018; she (Principal Cox) had not. The Plaintiff was never removed to a different school; she was reassigned to an administration building. The OSI report did not contain "various eyewitness accounts confirming that Plaintiff had placed her feet or knees on the students." See, Plaintiff's Exhibit A; see also, Plaintiff's Exhibit B at page 8. The one student's complaint was not corroborated. While it was reported that the Department of Education "does not ever include or encourage reenactments of historical events where students take on roles of victimized people," no such policy is known to exist. See, Plaintiff's Exhibit B at pages 7-8. Nonsensically, OSI, in its report, referred the matter back to Principal Cox to "take appropriate disciplinary action." See, Plaintiff's Exhibit A. Yet, the Plaintiff had already been disciplined by Principal Giulia Cox when she was removed from her classroom in January, 2018. Furthermore, the report recommended training, not termination; however, the events that followed

made it very clear that there was no intention for the Plaintiff to return to the school. Though she was assured that she would be returning following the requisite filing of the disciplinary letter, the school apparently created a false schedule for the Plaintiff in order to conceal their true and premeditated intention to terminate her from her position, undoubtedly based on the public outcry fueled by the likes of Senator Parker and others who defamed the Plaintiff based entirely on false information.

## ARGUMENT

### POINT 1
### SENATOR PARKER'S MOTION FOR JUDGMENT
### ON THE PLEADINGS IS PROCEDURALLY DEFECTIVE

Primarily, this Court must consider the glaring procedural defect of the Defendant's Rule 12(c) Motion for Judgment on the Pleadings, which fails to include a copy of the Plaintiff's Verified Complaint as an Exhibit. The Defendant has not seen fit to include a copy of the key document - the Verified Complaint. Arguably, the Court would have great difficulty determining either the legal sufficiency of a complaint that it has not been provided. A decision from the Supreme Court, New York County provides that when making a motion to dismiss based on an alleged pleading, a copy of the challenged pleading needs to be included. In *Anderson v. City of New York*, NY Slip Op 30080(U) (Sup. Ct. NY County 2014), the plaintiff alleged race and gender discrimination under the New York State and City Human Rights Laws, and the Court denied defendants' motion to dismiss with leave to renew on proper papers, for failure to attach a copy of the complaint." Id. Thus, Senator Parker's motion is likewise procedurally defective and should be denied. Nonetheless, should this Court elect to overlook the Defendant's procedurally defective motion, the Defendant's motion should otherwise be denied as it is lacking in any legal basis and is devoid of any merit sufficient to withstand this Court's review.

## THE PLAINTIFF HAS SUFFICIENTLY DEMONSTRATED A BASIS FOR A DEFAMATION ACTION AGAINST SENATOR PARKER

**Courts Do Not Regularly Dismiss Defamation Actions**

The Second Circuit has stated that "[t]he standard for addressing a Rule 12 (c) motion for judgment on the pleadings is the same as that for a Rule 12(6)(b) motion to dismiss for failure to state a claim, and in this regard, it has been said that a Rule 12 (b)(6) motion is **rarely** granted. See, Willging, Thomas E., Use of Rule 12 (B)(6) in Two Federal District Courts (Federal Judicial Center 1989). Seeking judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) "is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." See, *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d. Cir. 1988) (citation and internal quotations omitted). In evaluating a motion to dismiss based on the pleadings under Federal Rule of Civil Procedure 12(c), the court uses "the same standard applicable to Rule 12(b)(6) motions to dismiss or failure to state a claim for which relief can be granted, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in [the nonmoving party's] favor." See, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78(2d Cir. 2015) (internal quotations omitted). See also, *King v. American Airlines, Inc.*, 284 F.3d 352, 356 (2d Cir. 2002); *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998) ("The test for evaluating a [Fed. R. Civ. P.] 12(c) motion is the same as that applicable to a motion to dismiss under Fed. R. Civ. P. 12(b)(6)").

Clearly, the Defendant has not met this Circuit's standard on a Rule 12 (c) motion. To prevail on a Rule 12(c) motion, "the moving party [must] demonstrate that no material fact is in dispute and that it is entitled to judgment as a matter of law." See, *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1370 (D.C. Cir. 2008) (internal quotation marks omitted). "[T]he factual allegations of the complaint must be taken as true, and any ambiguities or doubts concerning the sufficiency of the claim must be resolved in favor of the pleader." Id. (internal quotation marks omitted). "[U]nlike a Rule

12(b)(6) motion," which focuses merely on the *sufficiency* of the complaint, "a Rule 12(c) motion asks the court to render a judgment on the merits . . . by looking at the *substance* of the pleadings and any judicially noted facts." See, *Murphy v. Dep't of Air Force*, 326 F.R.D. 47, 49 (D.D.C. 2018) (internal quotation marks omitted); accord *Lopez v. Nat'l Archives & Records Admin.*, 301 F. Supp. 3d 78, 84 (D.D.C. 2018) (Berman Jackson, J.) ("[T]he [12(c)] standard . . . comes closer to a summary judgment type of determination."). "[T]he Rule 12(c) burden is substantial." See, *Murphy*, supra, 326 F.R.D. at 49. As argued by the Defendant, the Supreme Court in *Bell Atlantic Corp v. Twombly*, (550 US 544, 570, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), held that, "in order to survive a motion to dismiss pursuant to Rule 12 (b)(6) or Rule 12 (c), a plaintiff need not provide detailed factual allegations, but the factual allegations asserted must be "enough to raise a right to relief above the speculative level...." See, *Koulkina v. City of New York*, 559 F. Supp. 2d 300 (S.D.N.Y. 2008). The Defendant claims that the Plaintiff's action should be dismissed primarily on two (2) independently sufficient grounds (1) Plaintiff failed to plead facts to plausibly show that Senator Parker acted in a grossly irresponsible manner; and (2) the statements at issue are unactionable statements of opinion. Yet, it is well held that protection cannot be afforded against blatantly false statements. This Court cannot ignore that the Defendant's statements were not merely "*his ideas,*" they were actually based upon incorrect information and made to denigrate the Plaintiff's character and reputation and demand her removal as a New York City teacher and revocation of her New York State teaching license and credentials, her only means of financial support. The hallmark of a defamation claim is reputational harm. Former United States Supreme Court Justice Potter Stewart wrote in *Rosenblatt v. Baer*, 383 U.S. 75 (1966), that the essence of a defamation claim is the right to protect one's good name. According to Justice Stewart, this tort "reflects no more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty." Id.

Senator Parker mistakenly relies upon *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), where the landscape of libel law dramatically changed involving a case where two paragraphs in an

advertisement contained factual errors. For the first time, the Supreme Court ruled that "libel can claim no talismanic immunity from constitutional limitations," but must "be measured by standards that satisfy the First Amendment." The high court established a rule for defamation cases that dominates modern-day American libel law. The Court wrote:

> "The constitutional guarantees require, we think, a federal rule that prohibits a *public* official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (Emphasis added).

The Court required a public official defamation plaintiff to show evidence of actual malice or reckless disregard for the truth by "convincing clarity" or clear and convincing evidence. Notably, as an individual, probationary middle school teacher, with no involvement in administration or policy, the Plaintiff is not a public official. Her having been unwillingly drawn into fabricated public controversy in 2018, is not sufficient to characterize her as a "public figure." In this regard, the Defendant's reliance on *Gertz v. Robert Welch, Inc.*, 418 US 323, 339-40 (1974), for this premise is misguided. "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." Id. "For the most part those who attain this status have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." See, *Gertz*, supra. This is not the case herein. In this context it is plain that the Plaintiff was not a public figure. She plainly did not thrust herself into the vortex of this public issue, nor did she engage the public's attention in an attempt to influence its outcome. Id. Nonetheless, even if, assuming *arguendo*, the Plaintiff was considered a public figure, she has no problem demonstrating that the blatantly false statement was made with actual

malice - knowledge that it was false or with reckless disregard of whether it was false or not. Even after seeing the OSI conclusion, the Defendant never once retracting the false account that she "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*" or his demand that she be removed as a teacher from the New York City Department of Education and the revocation of her New York State teaching license and credentials.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 471 F.2d 801 (1974) does present the Court's clarification of the limits of the "actual malice" standard and the difference between public and private figures in defamation cases. The court had to determine what standard to apply for private persons and so-called limited purpose public figures. Then, the Court had to determine whether *Gertz* was a private person or some sort of public figure. In *Gertz*, <u>supra</u>, the news-media defendant argued that the *Times v. Sullivan* standard should apply to any defamation plaintiff as long as the published statements related to a matter of public importance. The high court disagreed, finding a distinction between public figures and private persons. The Court noted two differences: (1) public officials and public figures have greater access to the media in order to counter defamatory statements; and (2) public officials and public figures, to a certain extent, seek out public acclaim and assume the risk of greater public scrutiny. For these reasons, the *Gertz* Court set up a different standard for private persons:

> "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

This standard means that <u>a private person does not have to show that a defendant acted with actual malice in order to prevail in a defamation suit</u>. The private plaintiff usually must show simply that the defendant was negligent, or at fault. However, the Supreme Court also ruled that private defamation plaintiffs could not recover punitive damages unless they showed evidence of actual malice.

A defamation plaintiff must usually establish the following elements to recover: (1) Identification: The plaintiff must show that the publication was "of and concerning" himself or herself; (2) Publication: The plaintiff must show that the defamatory statements were disseminated to a third party; (3) Defamatory meaning: The plaintiff must establish that the statements in question were defamatory. For example, the language must do more than simply annoy a person or hurt a person's feelings; (4) Falsity: The statements must be false; truth is a defense to a defamation claim. Generally, the plaintiff bears the burden of proof of establishing falsity; (5) Statements of fact: The statements in question must be objectively verifiable as _false_ statements of fact. In other words, the statements must be provable as false; and (7) Damages: The false and defamatory statements must cause actual injury or special damages. Clearly, the Plaintiff has successfully demonstrated each of the elements. Further, in *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002), the Court discussed the high burden of proof necessary on a motion to dismiss under Fed. R. Civ. P. 12 (c) and held:

> "A complaint will only be dismissed under Rule 12(c) if it appears beyond doubt that the [nonmoving party] can prove no set of facts in support of his claim which would entitle him to relief." See, *Patel*, supra. (internal quotations omitted).

Further, the Court has referenced Fed. R. Civ. P. 8 (a)(2) to illustrate the liberal system of pleading in a federal action. See, *Conley v. Gibson*, 355 U.S. 41 (1957). "A District Court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." See, *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); see also, *Smith v. City of New York*, No. 13-CV-2395, 2014 U.S. Dist. LEXIS 139267, 2014 WL 4904557, (E.D.N.Y. Sept. 30, 2014) ("When deciding a motion on the pleadings, the court must confine its consideration to the pleadings and their attachments, to documents . . . incorporated in the complaint by reference, and to matters of which judicial notice may be taken") (internal quotation

marks omitted).Thus, Senator Parker's motion has not met this Circuit's test on motions of this type, and should; therefore, be denied in all respects.

Further, Senator Parker argues that his alleged statements were expressions of opinion and not actionable as defamation. We must remain mindful of the rule that the defamatory effect of the statements are to be ascertained from that of a person of reasonable intelligence who takes ordinary interest in the statements made by an elected official, and does not commonly subject them to careful scrutiny and analysis. In applying New York law, words that are challenged as defamatory "must be construed in the context of the entire statement or publication as a whole," tested against the understanding of the average person. See, *Aronson v. Wiersma*, 65 NY2d 592, (1985) at 594; see also, *Armstrong v. Simon & Schuster*, 85 NY2d 373 (1995) at 380; *James v. Gannett Co.*, 40 NY2d 415 (1976) at 419-420; *Ava v. NYP Holdings, Inc.*, 64 AD3d 407 (2009) at 413. All relevant factors may be considered in determining whether a word or statement is defamatory. See, *Farber v. Jefferys*, 33 Misc 3d 1218[A], 2011 NY Slip Op 51966, [Sup Ct, NY County 2011], affd 103 AD3d 514 [1st Dept. 2013], lv denied 21 NY3d 858, citing, *Steinhilber v. Alphonse*, 68 NY2d 283, 291-292 [1986], and courts have considerable discretion in deciding whether a statement is defamatory, guided only by "the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used . . . ." See, *Steinhilber*, supra, 68 NY2d at 291-292. While notably, the New York Court of Appeals has repeatedly held that the New York Constitution provides greater protection than the United States Constitution and, accordingly that the inquiry under the two constitutional regimes is different, (see, *600 West 115th Street Corp. v. Von Gutfeld*, 80 N.Y.2d at 136 & 138, 589 N.Y.S.2d at 827 & 829, 603 N.E.2d at 932 & 934 (1992); *Immuno AG v. J. Moor-Jankowski*, 77 N.Y.2d at 248-49, 566 N.Y.S.2d at 913-14, 567 N.E.2d at 1277-78 (1991)), the thrust of the dispositive inquiry under both New York and constitutional law is "whether a reasonable [person]" could have concluded that there was a conveyance of facts about the plaintiff." See, *Gross v. New York Times Co.*, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817, 623 N.E.2d at 1167 (1993); *600 West*

*115th Street*, supra, at 829, 603 N.E.2d at 934 (Under either Federal or State law, the dispositive question is whether a reasonable person....could have concluded that [defendant] was conveying facts about the plaintiff). Clearly a reasonable viewer in this instance would believe that the statements were conveying facts about the Plaintiff [this is evidenced by the vicious attacks and public outcry for social justice that continued followed by the Plaintiff's removal from her position as a New York City teacher], and would believe that the statements constituted reports of a proceeding, which they did not. There never was a reporting of any truth, to wit: there was NEVER any proceedings investigating the Plaintiff for *"singling out black students and making them act like slaves;"* or telling them to *"lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like."* THIS ERRONEOUS ACCUSATION WAS NEVER THE SUBJECT OF ANY INQUIRY BY THE DEPARTMENT OF EDUCATION OR OTHERWISE. It was entirely INACCURATE. See, *Freeze Right Refrigeration & Air Conditioning Services, Inc. v. City of New York*, 101 AD2d 175, 182. This was not ever something being investigated by OSI. It was completely ignored that the Plaintiff was never being accused or investigated of "racist acts." She was being investigated by the DOE for allegations of corporal punishment. The Defendant evidently preferred his constituents to believe the false narrative of a "slavery controversy" that they themselves promoted.

**The Defendant DID NOT Fairly and Accurately Comment on the Actual Proceedings**

The Plaintiff does allege that the Defendant's statements present inaccurate summaries of the allegations against her. The Defendant attempts to distract this Court with an analysis of truth or falsity of the underlying allegations; however, he concedes that the ultimate question is whether his statements truly and fairly report the allegations, and it this case, they clearly did not. The glaring distinctions in the allegations are clear and disqualify this report from any protections. It is important to also note that the student that was interviewed by the Defendant, Ben Chapman, and who allegedly reported that the Plaintiff *"singled out black students and made them act like slaves;"* told them to *"lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like."* was **absent**

on the day of the lesson in question and could not have possibly witnessed the lesson. Absolutely no fact checking was done in presenting these erroneous facts to the public. The Defendant disingenuously argues that he merely commented what had been previously published by the Defendant *New York Daily News* and Ben Chapman and others.

The Plaintiff has plead and proven that Senator Parker's comments addressing the Plaintiff were made with "gross irresponsibility." The complaint sufficiently alleges that Senator Parker "knowingly" and intentionally made false statements. On a motion to dismiss, the Court accepts this assertion as true, considering the additional facts pleaded by the Plaintiff and the glaring fact that the accusation was not even plausible. See, *Pollnow v. Poughkeepsie Newspapers, Inc.*, 107 A.D.2d 10, 18, 486 N.Y.S.2d 11 (2d Dep't 1985) (plaintiff satisfied the "minimum requirements for stating a cause of action" by alleging that "defendant acted negligently, maliciously and with a reckless disregard for the truth"), aff'd, 67 N.Y.2d 778, 492 N.E.2d 125, 501 N.Y.S.2d 17 (1986). Intentional lies not only satisfy, but surpass, the culpability of "gross irresponsibility," which signifies "something more than . . . negligence." See, *Mott v. Anheuser-Busch, Inc.*, 910 F. Supp. 868, 875 (N.D.N.Y. 1994), aff'd, 112 F.3d 504 (2d Cir. 1996); see also, *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) (regarding knowing falsities as a level of fault "[b]eyond gross irresponsibility"); *Lopez v. Univision Commc'ns, Inc.*, 45 F. Supp. 2d 348, 362 (S.D.N.Y. 1999) (observing that at least one court has equated gross irresponsibility with "gross negligence"). Accordingly, the complaint sufficiently alleges that Senator Parker acted with the requisite level of fault and it cannot be dismissed on this basis.

**The Statements Describing the Plaintiff and Her Lesson are NOT Opinions**

The privilege protecting the expression of an opinion is rooted in the preference that ideas be fully aired. See, *Davis v. Boeheim*, 24 NY3d 262 at 269 (2014), citing, *Steinhilber v. Alphonse*, 68 NY2d 283 at 289 (1986), and *Gertz v. Robert Welch, Inc.*, supra, 418 US 323, 339-340 (1974). Nonetheless, privileged statements of opinion are either accompanied by the facts on which they are

based, or do not imply that they are based on undisclosed facts. See, *Gross v. New York Times Co.*, 82 NY2d 146 at 53-154 (1993). "When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" See, *Egiazaryan v. Zalmayev*, 880 F Supp 2d 494, 503 [SD NY 2012], quoting, *Steinhilber*, supra, 68 NY2d at 289, "because a reasonable listener or reader would infer that 'the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]'" See, *Gross*, supra, 82 NY2d at 153-154, quoting, *Steinhilber*, 68 NY2d at 290, and "if the predicate facts are disclosed, but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity," the statement may be actionable as a "defamatory opinion" See, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, F Supp 3d , 2016 WL 3773394, [SD NY 2016], citing *Silsdorf v. Levine*, 59 NY2d 8, 15-16 [1983], cert denied 464 US 831; see also, *Parks v. Steinbrenner*, 131 AD2d 60, 62-63 [1st Dept. 1987]. An asserted fact may be distinguished from a nonactionable opinion if the statement: (1) has a precise, readily understood meaning, that is (2) capable of being proven true or false, and (3) where the full context in which it is asserted or its broader social context and surrounding circumstances indicate to readers or listeners that it is likely fact, not opinion. See, *Davis*, supra, 24 NY3d at 271, citing, Mann v. Abel, 10 NY3d 271 at 276 (2008), and *Brian v. Richardson*, 87 NY2d 46, 51 [1995]; *Gross*, supra, 82 NY2d at 153; *Steinhilber*, supra, 68 NY2d at 292. "Where readers would understand a defamatory meaning, liability cannot be avoided merely because the publication is alleged to be cast in the form of an opinion, belief, insinuation or even question. A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community." See, *Christopher v. American News Co.*, 171 F.2d 275 (7th Cir. 1948).

"[T]he following factors should be considered in distinguishing fact from opinion: (1) whether the language used has a precise meaning or whether it is indefinite or ambiguous, (2) whether the statement is capable of objectively being true or false, and (3) the full context of the entire

communication or the broader social context surrounding the communication. Moreover, the Court of Appeals makes a distinction between a statement of opinion that implies a factual basis that is not disclosed to the reader and an opinion that is accompanied by a recitation of facts on which it is based. The former is actionable, the latter is not." See, *Penn Warranty Corp. v. DiGiovanni*, 2005 NY Slip Op 25449 10 Misc3d 998 (2005). Senator Parker never used words such as "alleged" or "accused of" when making his statements; he lead the readers to believe the recitation of the facts presented to be accurate.

It bears mentioning that Under New York law, some statements are considered defamation (slander) *per se* if they "(1) charge plaintiff with a serious crime; (2) tend to injure plaintiff in its business, trade or profession; (3) [communicate that] plaintiff has some loathsome disease; or (4) impute unchastity. See, *Doe v. Doe*, No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017) (a statement is *per se* defamatory when it tends to injure another in his or her trade, business, or profession) (citing *Liberman v. Gelstein*, 80 NY2d 429, 435 (1992)). Such statements are presumed to cause injury, so a separate showing of harm is not necessary. Here, the facts as presented by the Defendant and his request for punishment accuse the Plaintiff of having committed a serious crime; walking on the backs of students is akin to child abuse and endangerment and the false labeling of the Plaintiff as a racist oppressor, who committed such an atrocity has irreparably injured the Plaintiff in her profession as a school teacher and otherwise. The Plaintiff was never accused or investigated on an allegation of a racist act by the City Department of Education. She was being investigated on allegations of corporal punishment.

In this regard, any quotes from the OSI Report would have related to the corporal punishment allegation, **not** what had been falsely reported - that she "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" This is an indication that Senator Parker inappropriately grouped the Plaintiff with other educators of bad character and insensitive to the struggles of others. The Plaintiff

was <u>never</u> accused or investigated on an allegation of a racist act by the City Department of Education. She was being investigated on allegations of corporal punishment. Moreover, it is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable reader would have concluded that he or she was reading opinions, not facts about the Plaintiff. Thus, the statements describing the Plaintiff's lesson as "deplorable," attacking her character, and describing her to be "insensitive to the struggles of others" are actionable.

The challenged statements are to be read in the context of the statements as a whole. <u>See</u>, *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986). A statement is defamatory "if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of [him] in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." <u>See</u>, *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F.Supp.2d 279, 287 (SDNY 2006). Clearly, the Plaintiff's has demonstrated the defamatory nature of the Defendant's statements. These statements undoubtedly exposed the Plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of her in the minds of right-thinking persons, and to deprive her of her friendly intercourse in society. This is evident in the demonstrations of hate, ridicule, harassment, and threats of violence which followed and continued.

Contrary to *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), the Defendant commented on erroneous facts. There were no allegations from anyone that the Plaintiff *"singled out black students and made them act like slaves;"* told them to *"lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like."* Likewise, the Plaintiff contests that she ever admitted "having misbehaving students sit in the front of the room to demonstrate the conditions on slave ships, or that a parent reported that she 'pushed her knee' into *students'* (plural) backs and asked if students (plural) felt pain." <u>See</u>, Plaintiff's Exhibit B at paragraph 53. How can the Defendant argue that there was <u>nothing</u> in his statements, which disparage the Plaintiff's professional skills or competence or attributes wrongdoing to her? The entirety of the quote was a <u>criticism of her</u>

skills and competence and falsely accused her of the equivalent of child abuse and/or child endangerment, to wit:

- *"Like many others, I am completely outraged by the actions of Bronx Middle School 118 teacher, Patricia Cummings."* See, Defendant's Exhibit A, at page 2.

- *"I call for her swift removal from the New York City Department of Education, and the revocation of all New York State licenses and credentials that would allow her to teach in our State."* See, Defendant's Exhibit A, at page 2.

- *"Although I hear some calling for a second chance for Ms. Cummings via culturally competent training and the like, as an African studies professor at the City University of New York for over twenty years now, I know there is no level of training that can make a person more sensitive to the struggles of another. Those feelings cannot be prepared in one's mind, but rather must be intrinsic to one's character."* See, Defendant's Exhibit A, at page 2.

- *"This is not the case for Ms. Cummings and it is my hope that we can learn from this deplorable act to inform future decisions and the best practices when deciding who will be afforded the honor of teaching our children."* See, Defendant's Exhibit A, at page 2.

They are not merely observations or ideas; it is clear that the Court in this matter could **not** find that the context of the complained-of statements was such that a reasonable reader would have concluded that he or she were reading opinions, not facts about the Plaintiff. To describe these comments as merely setting forth "ideas" and "opinions" is entirely disingenuous. They clearly do negatively reflect on Plaintiff's reputation as a school teacher and her ability to appropriately determine the way to present the curriculum to the students. Unquestionably, these statements attribute odious and despicable characterizations to the Plaintiff. See, *Chau v. Lewis*, 771 F.3d at 127 (2014). There is no need to render any interpretation of the challenged comments.

As stated previously, the Defendant's reliance on *Gertz*, supra, (418 U.S. 323, 471 F.2d 801 (1974)), in this instance is misplaced. The challenged statements were clearly not opinion, entitling the Senator Parker to Constitutional protection. While it is argued that expressions of opinion receive absolute constitutional protection under *Gertz*, supra, determining whether a given statement expresses fact or opinion may be difficult. The question must be answered on the basis of what the average person hearing or reading the communication would take it to mean. See, *Rinaldi v. Holt, Rinehart & Winston*, supra, at p 381; *Mr. Chow of N. Y. v Ste. Jour Azur S.A.*, 759 F.2d 219, 227-228). There is no definitive

test or set of criteria. See, *Mr. Chow of N. Y. v. Ste. Jour Azur S.A.*, supra, at pp 225-226. The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion. See, Restatement [Second] of Torts § 566 comment c.

While the Supreme Court in *Gertz*, supra, did not focus on the distinction between fact and opinion, the court, in *Letter Carriers v. Austin*, (418 U.S. 264 (1974)), decided on the same day as *Gertz*, supra, provides some precedent. The court considered both the context of the entire communication and the type of "intemperate, abusive, or insulting language." (Id., at p 283). In *Letter Carriers*, supra, it concluded that no reader of the newsletter would have understood the union "to be charging the appellees with committing the criminal offense of treason." Id., at pp 285, 286; see also, *Greenbelt Pub. Assn. v. Bresler*, 398 U.S. 6 (1970). The Courts have taken great pains to avoid any attempt to reduce the problem of distinguishing fact from opinion to a rigid set of criteria which can be universally applied. The infinite variety of meanings conveyed by words; depending on the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used, rules out a formulistic approach. A court must have the flexibility to consider the relevant factors and to accord each the degree of importance which the specific circumstances warrant.

Nonetheless, Judge Starr's plurality opinion in *Ollman v. Evans*, 750 F.2d 970 (1984), sets out four factors which should generally be considered in differentiating between fact and opinion. The four factors are: (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable

customs or conventions which might "signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." See, *Ollman v. Evans*, 750 F.2d 970 (1984) at p 983.

Consideration of the circumstances and of the broader social context (i.e., the factual background leading to segment) confirms the conclusion that the broadcast would be taken literally by the ordinary person. An analysis of the statements made about the Plaintiff in the light of the third and fourth *Ollman* factors (the full verbal context of the statement and its broader social context), compels the conclusion that the statement would not be taken as pure opinion. Further, to be sure, in another context, the statements made by the Defendant will be viewed as a factual assertion, if considered under the first and second *Ollman* factors: whether the statements are sufficiently specific to convey "a precise core of meaning for which a consensus of understanding exists," (see, *Ollman v. Evans*, supra, at p 979), and whether it is "capable of being objectively characterized as true or false." See, *Ollman v. Evans*, supra, at p 979. Here, the inescapable conclusion from the verbal context of the entire message and all of the circumstances under which it was delivered is that the statement would be understood by the ordinary reader for what it is: a defamatory factual assertion, wherein Senator Parker was falsely asserting as "fact" that the Plaintiff "*singled out students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Thus, there is no protection afforded.

**Characterization of Someone as a "Racist" or an "Oppressor" is NOT Protected Opinion**

Many courts in other jurisdictions that have faced the issue of defamation claims based on accusations of bigotry or racism have held the statements to be nonactionable statements of opinion. See, e.g., *Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) (holding that neither general statements charging a person with being racist, unfair, unjust, nor references to general discriminatory treatment, without more, constitute provably false assertions of fact); however, claiming that a person made a particular statement would be a factual assertion, and might well be libelous if false and defamatory (i.e., if the statement, if made, would reflect badly on the person). In this instance, there were not mere

25

references to general discriminatory treatment. Thus, in this instance, there was a "factual" assertion that that the Plaintiff "*singled out black students in her class and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" This false and defamatory statement reflected badly on the Plaintiff and in conjunction with the implication of those accusations of bigotry and racism, would remove any purported protection and render those statements actionable.

## POINT III
## THE PLAINTIFF'S NEGLIGENCE AND EMOTIONAL DISTRESS CLAIMS ARE ACTIONABLE

**The Plaintiff's Claims for Negligence and Emotional Distress are Actionable**

With respect to the argument that a separate tort for infliction of emotional distress could not be sustained where the underlying conduct overlapped with other torts, it has been noted in certain dicta from the New York Court of Appeals that "questioning whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability." See, *Fischer* v. *Maloney*, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978). It has been concluded that, even if New York law does not permit entirely overlapping torts, the negligence and intentional infliction of emotional distress claims in this case contained elements that did not entirely overlap the claims of defamation. In particular it is noted that, if a jury believes that Senator Parker acted with reckless intent a jury could believe that there were additional elements of negligence and intentional infliction of emotional distress which do not necessarily inhere in a charge of defamation.

The Defendant further erroneously plead that Plaintiff cannot, as a matter of law, plead negligent infliction of emotional distress (NIED) or intentional infliction of emotional distress. In order to support a claim for negligent infliction of emotional distress, Plaintiff is also required to allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

See, *Murphy v. Am. Home Products Corp.*, 58 NY2d 293, 303 [1983]. The extreme and outrageous conduct "must be clearly alleged in order for the complaint to survive a motion to dismiss." See, *Sheila C. v. Povich*, 11 AD3d 120, 131 [1st Dept. 2004]. As a claim for negligent infliction of emotional distress arises out of negligence, Plaintiff must allege that Senator Parker owed Plaintiff a duty and the breach of that duty owed to the Plaintiff "either unreasonably endangers the plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety." See, *Santana v. Leith*, 117 AD3d 711, 712 [2d Dept. 2014]. Plaintiff has clearly identified the duty owed to her by Senator Parker. In order to qualify as "extreme and outrageous," the conduct at issue must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Sheila C. v. Povich*, 11 AD3d 120, 130-31 (1st Dept. 20014). To falsely accuse the Plaintiff of "*singling out black students and making them act like slaves*;" telling them to "*lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like*," without checking the facts and continuing to characterize her under that narrative, even after confronted with the falsity, subjecting her to public admonishment, ridicule, and harassment and demanding her termination as a New York City teacher and revocation of her State teaching license and credentials is extreme and outrageous. Senator Parker did not merely "make statements about Plaintiff's conduct based on the existing media coverage" He furthered a false narrative, purporting it to be undisputed fact.

The Defendant argues that it is nearly impossible in New York for a Plaintiff to state a viable claim for intentional infliction of emotional distress, predicating liability on the basis of extreme and outrageous conduct. Nonetheless, under New York law, the four elements required to state a claim for intentional infliction of emotional distress are: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress. See, *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). In this case the Plaintiff has established the elements necessary to

sustain a claim of intentional infliction of emotional distress, specifically the outrageous conduct and the Defendant's intent to cause emotion distress. Outrageous conduct is defined to be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) [**33] (quoting Restatement (Second] of Torts § 46, comment d (1979)); see also, *Piesco v. City of New York Dep't of Personnel*, 753 F. Supp. 468, 479 (S.D.N.Y. 1990), aff'd in part, rev'd in part and remanded on other grounds, 933 F.2d 1149 (2d Cir.), cert. denied, U.S., 112 S. Ct. 331 (1991). Here, the actions of the Defendant in promoting a false account of facts and destroying the Plaintiff's reputation, and inciting others to believe that she would commit such a heinous act, which ultimately affected her reputation and employment, does constitute, as a matter of New York law, conduct which may be deemed outrageous or beyond the possible bounds decency. Accordingly, the Plaintiff has adequately alleged outrageous conduct necessary to sustain this claim.

**The Complaint Sufficiently States a Claim for Negligence, Negligent Infliction of Emotional Distress, and Intentional Infliction of Emotional Distress**

To establish a cause of action in negligence, a plaintiff must demonstrate the existence of a duty, a breach of that duty, causation, and damages. See, *Chylinski v. Wal-Mart Stores, Inc.*, 150 F.3d 214, 218 (2d Cir. 1998). Based on what has been demonstrated in this matter, the Defendant's argument that "defamation claims (that involve matters of public concern) cannot be sustained upon a showing of negligence" must fail. The Plaintiff has more than established not only that the statements were false statements of fact, but that the Defendant acted in a "grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." See, *Chapadeau v. Utica Observer-Dispatch*, 38 NY2d 196, 199 (1975); see also, *Bloom v. Fox News of LA*, 528 F. Supp. 2d 69, (EDNY 2007). As a result, the Plaintiff's negligence claim must stand.

Further, the Plaintiff alleges that Defendant inflicted emotional distress both intentionally and negligently. See, Plaintiff's Exhibit C. To state a claim for negligent infliction of emotional distress ("NIED") in New York, a plaintiff must allege: "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress." See, *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 297-98 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). Intentional infliction of emotional distress ("IIED") claims require a plaintiff to allege the same elements as an NIED claim together with the additional requirement that the defendant must have an "intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress." See, *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (citation and internal quotation marks omitted). The basis for Plaintiff's NIED claim is clear from the face of the Complaint. To the extent her NIED claim is based on the same conduct as her IIED claim, both claims can be sustained. Id.

The Fourth Department has held that a cause of action for negligent infliction of emotional distress must be "premised on conduct that unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for his or her physical safety." See, *Passucci v. Home Depot, Inc.*, 67 AD3d 1470, 1471 [4th Dept. 2009]. In this regard, the Plaintiff's complaint contains allegations that the Defendant engaged in conduct that unreasonably endangered the Plaintiff's physical safety or caused her to fear for her safety. See, Plaintiff's Exhibit C, at pages 15 and 45. Second, the Plaintiff has plead sufficient facts to allege that the Defendant intended to cause her severe emotional distress or such disregard which has the probability of causing severe emotional distress. The Defendant was selfishly pursuing his own interests and inciting his audience at the Plaintiff's expense without considering the plausibility of the statements being made or verifying the facts.

To support an emotional distress claim, the alleged conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." See, *Conboy*, supra, 241 F.3d at 258 (citation

and internal quotation marks omitted). The Defendant failed to <u>ever</u> demonstrate that his statements were true, and it is a well-known fact that truth and only truth is an absolute defense in any defamation claim. Senator Parker evidently never contacted any school officials, nor did he verify what Defendants Ben Chapman and the *New York Daily News* were allegedly told by the student, or even realize <u>that the student he allegedly spoke to was absent the day the lesson was taught</u>. Had he done this, he would have known the actual allegation made against the Plaintiff. Further, plausibility was completely ignored, to wit: if the Plaintiff had in fact walked on student's backs, would they not have sustained physical injuries? Would she not have been arrested or charged with child abuse? It should have been obvious that this allegation was preposterous; however this gross distortion helped him fuel the need for cultural competence in the schools and appease the mass of protesters and assisted the Department of Education in securing the funding that it so desperately desired. As a result, the Plaintiff's claims for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress must stand.

## CONCLUSION

Based on the foregoing, it has been demonstrated that Senator Parker have failed to meet the standard in this Circuit that is necessary on a Motion for Judgment on the Pleadings under Rule 12 (c). Accordingly, the Defendant's motion should be denied in all respects and Plaintiff should have such other and further relief that this Court may deem just and proper.

Dated: Garden City, New York
      December 19, 2019

                                    _____
                              THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
                              By: Thomas F. Liotti, Esq. (TL 4471)
                              Attorneys for the Plaintiff
                              *PATRICIA CUMMINGS*