UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

PATRICIA CUMMINGS,

Plaintiff,

-against-                                                                    No. 19-cv-7723 (CM)(OTW)

THE CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF EDUCATION; CITY OF NEW YORK
OFFICE OF SPECIAL INVESTIGATIONS; NYC MAYOR
BILL de BLASIO; GIULIA COX; COURTNEY WARE; BEN
CHAPMAN; NEW YORK DAILY NEWS; DR. ANDRE
PERRY; THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA; LENARD
LARRY McKELVEY a/k/a CHARLAMAGNE THA GOD;
WWPR-FM (105.1 MHZ); iHEARTMEDIA; CLEAR
CHANNEL COMMUNICATIONS, INC.; NEW YORK STATE
SENATOR KEVIN S. PARKER; COUNCILMAN, JUMAANE
D. WILLIAMS; COUNCILMAN, DANIEL DROMM;
COALITION OF EDUCATIONAL JUSTICE; ANGEL
MARTINEZ; NATASHA CAPERS; and "JOHN DOE AND
JANE DOE #1-100" said names being fictitious, it being the intent
of Plaintiff to designate any and all individuals, officers, members,
agents, servants, and/or employees of the aforementioned agencies
owing a duty of care to Plaintiff, individually and jointly and
severally,

Defendants.

_____x

**MEMORANDUM DECISION AND ORDER DISMISSING COMPLAINT**

McMahon, C.J.:

At all relevant times, Plaintiff Patricia Cummings ("Plaintiff") was a probationary social

studies teacher employed by the New York City Department of Education ("DOE"). She taught

at the William W. Niles School – Middle School 118 ("X118") in the Bronx. In January 2018,

she taught her seventh grade social studies classes a lesson on the Middle Passage[1] that featured a clip from the movie *Freedom* and an impromptu demonstration that included a simulation of the conditions on a slave ship. Multiple students in the classroom reported that she physically moved students closer together, asking them "how it felt" to be a slave.

A student and parent, upset by Plaintiff's lesson, filed a complaint with the school's principal, Giulia Cox. The complaint included the allegation that Plaintiff pushed her knee into the student's back to demonstrate "how the slaves were on the boat." Fearing that what occurred might have qualified as "corporal punishment," Cox elevated the complaint to the DOE, which opened an investigation into Plaintiff shortly thereafter.

Months later, after interviewing various students and staff members, the Department concluded that, while Plaintiff's Middle Passage lesson did not rise to the level of "corporal punishment," it reflected "poor judgment" and "significantly diverged from best practices." Plaintiff was terminated from her probationary employment at the school in October 2018. (Dkt. No. 13, Compl. ¶ 80.)

The *New York Daily News*, in a series of articles written by Defendant Ben Chapman and others, reported on the allegations against Plaintiff and the DOE's investigation into the matter as the situation developed (the "*Daily News* Articles"). The reportage was picked up by other media outlets and sparked significant public controversy.

Now, claiming that the DOE's investigation "exonerated" her, Plaintiff brings this suit against myriad defendants, including the City of New York, the Department of Education, local lawmakers, the Mayor of New York, media organizations, and journalists. Plaintiff asserts

---

[1] The Middle Passage refers to the forced voyage of enslaved Africans between West Africa and the Americas during the transatlantic slave trade.

federal claims pursuant to, *inter alia*, 42 U.S.C. §1983 for violation of her civil rights, right to

due process, and right to equal protection, and state law claims including fraud, breach of

contract, negligence, defamation, libel, and slander.

Defendants the *Daily News*, Ben Chapman, the City of New York, the New York City

Department of Education, Mayor Bill de Blasio, Councilmember Daniel Dromm, Public

Advocate Jumaane Williams, DOE employees Giulia Cox, and Courtney Ware, Dr. Andre Perry,

the Hechinger Institute, and Lenard Larry McKelvey (a.k.a. Charlamagne the God) move to

dismiss the Complaint for failure to state a claim upon which relief can be granted. (Dkt. Nos.

27, 28, 29, 31.)

Defendant State Senator Kevin Parker moves for judgment on the pleadings. (Dkt. No.

88.)

For the reasons discussed below, all Defendants' motions are GRANTED.

## BACKGROUND

**I.     The Defendants**

*A.  The* Daily News *Defendants*

Defendant Daily News, L.P. (the "*Daily News*") publishes a New York daily newspaper

in print and online with a daily circulation of hundreds of thousands of readers. (Compl. ¶¶ 25–

27.)

Defendant Ben Chapman ("Chapman") is an award-winning reporter employed by the

*Daily News*. (*Id.* ¶ 23, Exh. B.) Chapman covers education in New York City and has written

more than 2,000 articles about New York City schools for the *Daily News* since joining the

newspaper in 2009. (*Id.*) His reportage about the DOE investigation into Plaintiff's Middle

Passage Lesson was "picked up by the media worldwide and transmitted to various news outlets

3

and appeared online and in media all over the world," including in "several prominent newspapers and televised news programs, as well as on YouTube." (*Id*. ¶¶ 60–61.)

### B. *The Media Defendants*

Defendant Dr. Andre Perry is an individual education leader and author whose work focuses on race and structural inequality, education, and economic inclusion. Since 2013, Dr. Perry's column on educational equity has appeared in the Hechinger Report. (*Id.* ¶ 28.)

Defendant the Hechinger Institute, part of Teachers College, Columbia University, provides in-depth writings that focus "on inequality and innovation in education." (*Id*. ¶ 32.)

Defendant Lenard Larry McKelvey, is an individual American radio presenter, television personality, and author; known professionally as Charlamagne tha God; co-host of the nationally syndicated radio program *The Breakfast Club* with Angela Yee and DJ Envy. (*Id.* ¶ 33.)

### C. *The Municipal Defendants*

Defendant City of New York is a domestic municipal corporation located in and established pursuant to the laws of the State of New York. (*Id.* ¶ 17.)

Defendant New York City Department of Education ("DOE") is a public corporation created pursuant to the laws of the State of New York. (*Id.* ¶ 18.)

Defendant City of New York Office of Special Investigations ("OSI") is an entity within the New York City Department of Education that investigates reports of incidents of inappropriate behavior within New York City Department of Education schools. (*Id.* ¶ 19.)

At all times relevant, Defendant Giulia Cox was an individual employed by the City of New York DOE as a Principal at the William W. Niles School – Middle School 118, Community School District 10, located in Bronx County, New York. (*Id.* ¶ 21.)

At all times relevant, Defendant Courtney Ware was an individual employed by the City of New York DOE as an Assistant Principal at the William W. Niles School – Middle School 118, Community School District 10, located in Bronx County, New York. (*Id.* ¶ 22.)

### D. The Political Defendants

Defendant Mayor Bill de Blasio is New York City's 109th Mayor. (*Id.* ¶ 20.)

Defendant Jumaane Williams, is an individual who, at all times relevant to the Complaint, served as a member of the New York City Council from the 45th District. He is the New York City Public Advocate. (*Id.* ¶ 40.)

Defendant Councilman, Daniel Dromm, is an individual councilmember for the 25th District of the New York City Council. (*Id.* ¶ 41.)

Defendant Kevin S. Parker is and was at all times relevant to the Complaint, an individual member of the New York State Senate. (*Id*. ¶ 39.)

## II.     Plaintiff's Lesson on Slavery and the Middle Passage

On January 9, 2018, Plaintiff taught two of her seventh grade social studies classes a lesson on slavery and the Middle Passage in ways that deviated from the class's pre-approved curriculum. *See* (Dkt. No. 29, Balog Decl. Exh. A, Redacted OSI Investigative Report, dated July 24, 2018 ("OSI report"), at 10.)[2] As part of the lesson, Plaintiff showed clips from the movie

---

[2] "In reviewing a motion to dismiss, a court may consider, *inter alia*, (1) documents that are incorporated by reference into the complaint, and (2) documents that, even if not incorporated by reference, the defendant has notice of and that are 'integral' to the complaint" without converting the motion to dismiss to a motion for summary judgment. *BankUnited, N.A. v. Merrit Envtl. Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018) (citing *Weiss v. Inc. Vill. Of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1992). Plaintiff annexes the *Daily News* Articles to the Complaint, the Complaint references the Notice of Claim, *see* ¶ 6, and the Complaint extensively quotes from and refers to the Office of Special Investigations Report, *see, e.g.*, ¶ 53, making it proper to consider those documents in determining the motion.

*Freedom*, which "depict[ed] the horrible conditions and atrocities slaves were subjected to on the Middle Passage." (Compl. ¶ 53.)

According to Plaintiff, students "were mocking … the deplorable conditions" of the slave ships. (*Id*. ¶ 53.) Hoping to take advantage of the "teachable moment," Plaintiff enlisted four students in a "demonstration to exhibit the cramped conditions on the ship." (*Id*.) Seeking to replicate the conditions on the boats along the Middle Passage, Plaintiff had these four students sit close to each other on the floor with their knees against their chests. (OSI Report at 10.) Plaintiff "denies making any physical contact with any student during the demonstration," (Compl. ¶ 54), but multiple students later reported that Plaintiff, using either her hands or feet, moved students closer together to mimic the conditions on the boat. (OSI Report at 2, 3, 4.)

## III.    The Department of Education's Subsequent Investigation

On January 11, 2018, Plaintiff learned that X118 Assistant Principal Andre Ware was taking students' statements about her Middle Passage lesson. (Compl. ¶ 166.) On January 16, 2018, Plaintiff received a letter from X118 Principal Giulia Cox, stating that she was the subject of a disciplinary meeting to take place on January 18, 2018. (*Id*. ¶¶ 55, 166.) The letter made no mention of an allegation of corporal punishment. (*Id*. ¶ 166.) There is no allegation in the Complaint or the OSI Report that Defendant Ware had knowledge of the corporal punishment allegations before January 16.

The day before the meeting, on January 17, 2018, a parent of one of the students in Plaintiff's class filed a written complaint about the lesson. (*Id*. ¶ 52; OSI Report at 6.) The parent stated that Plaintiff instructed her child to "get on the floor" and to "assume the position of a slave." (OSI Report at 8.) According to the parent, Plaintiff then "'put her knee into [the student's] back' and pushed down asking if [the student] felt pain." (*Id.*) She said her child felt

6

"ashamed and embarrassed." (*Id.*) The student similarly reported that Plaintiff said, "I can show you how it is to be squashed on a boat," lined the students "in front of each other with [their] knees up," and "pushed [the students'] back[s] with her knees." (*Id.* at 8–9.)

On January 18, 2018, Plaintiff met with defendant Cox and was told about the January 17 parent complaint. (Compl. ¶ 56.) According to Plaintiff, Cox did not raise the issue of the corporal punishment allegation at that meeting. (Compl. ¶ 166.)

That same day, Cox reported the parent complaint to the Department of Education's Office of Special Investigations ("OSI"), which promptly began an investigation into Plaintiff's conduct. (OSI Report at 1, 6, 12.)

Plaintiff was removed from teaching one of her social studies classes for three days – from January 23 through January 25, 2018. (Compl. ¶¶ 57, 166.)

At 5:59 PM on February 1, 2018, defendant Cox left Plaintiff a voicemail advising her that she was being removed altogether from the classroom and reassigned to 100 Gold Street, and that she was the subject of an OSI investigation. (Compl. ¶¶ 66, 170.) Three minutes later, Plaintiff received an email informing her of her reassignment. (*Id.* ¶ 66.) Plaintiff alleges that others have referred to 100 Gold Street as "teacher jail." (*Id.*)

At some point, Plaintiff was reassigned to the Queens South Reassignment center, which she describes as "a small, uncomfortable room with bars on the windows and 15+ teachers crammed together …." (*Id.* ¶ 170.)

While Plaintiff was on reassignment, OSI interviewed various students and staff members who were familiar with the events of January 9. The student's parent who reported the allegation of corporal punishment refused to permit her child to be interviewed as part of the OSI investigation. (*Id.* ¶ 174.) Plaintiff asserts that the failure of the parent to permit her child to be

interviewed by the OSI investigator is "a form of blatant racism" and speculates, without

evidence, that "Defendants may have offered the Plaintiff, parents, and students a lie detector

examination …." (*Id.*)

The OSI investigation report issued on July 24, 2019. OSI concluded that Plaintiff's

actions during the January 9, 2018 lesson did not qualify as "corporal punishment," (OSI Report

at 11), but also concluded that Plaintiff had acted with "poor judgment" in administering the

lesson, and that her actions "significantly diverged from best-practices." (*Id*.) Plaintiff alleges

that the OSI Report "demonstrated that she had not engaged in acts of racism and otherwise

engaged in racist misconduct," (Compl. ¶ 97), but OSI explained that the Department of

Education "does not ever include or encourage reenactments of historical events where students

take on roles of victimized people." (OSI Report at 11.) The Report recommended that Plaintiff

be provided "with appropriate training to ensure her lesson plans are developed in a manner that

takes into account potential social and cultural sensitivities." (OSI Report at 12.) OSI referred its

report back to Principal Cox to take "appropriate disciplinary action." (*Id*.)

## IV.   DOE'S Termination of Plaintiff's Employment

On August 22, 2018, Principal Cox e-mailed Plaintiff and informed her that she was

scheduled to return to X118 in September. (Compl. ¶ 74.)

Plaintiff returned to X118 on September 4, 2018. (*Id*. ¶ 77.) Early in the day, she met

with Cox and received her program schedule and a 48-hour notice to review the OSI Report. (*Id.*)

At another meeting shortly thereafter, Cox's secretary approached Plaintiff and informed her that

Cox needed Plaintiff to sign a reassignment notice pending employee discipline. (*Id*. ¶ 78.)

Plaintiff signed the reassignment notice and left the building. (*Id*. ¶¶ 78–79.)

By letter dated September 17, 2018, Plaintiff was informed that, on October 18, 2018, the District 10 Superintendent would be reviewing and considering whether Plaintiff's employment should be terminated. (*Id.* ¶ 179.) Referral to the Superintendent is the process by which the DOE determines whether to discontinue probationary employment. (*Id.*) As a probationary employee, Plaintiff's employment could have been terminated without a hearing and without cause unless the termination was in bad faith, for a constitutionally impermissible purpose, or in violation of statutory or decisional law. *See Johnson v. County of Orange*, 29 N.Y.S.3d 502, 503 (2d Dep't 2016).

On September 28, 2018, the *Daily News* reported that a DOE spokesperson told it that the DOE had "begun the process of firing Ms. Cummings based upon an investigation of this unacceptable behavior and her performance as an educator." (Compl. ¶ 179.)

On October 18, 2018, the DOE terminated Plaintiff's probationary employment. (*Id.* ¶¶ 80, 175.) Plaintiff claims that this violated her "due process and civil rights." (*Id.* ¶ 179.)

## V.     The *Daily News* Report on the Department of Education's Investigation

On February 1, 2018, before the completion of the OSI investigation, two students reported to Plaintiff that a "white man" had been walking around the school campus asking questions about Plaintiff, including whether Plaintiff had ever walked on their backs. (*Id.* ¶¶ 68, 167.) At the end of that school day, Ben Chapman, a reporter for the *Daily News*, approached Plaintiff on school property to question her about her Middle Passage lesson. (*Id.* ¶¶ 65, 167.) Plaintiff claims that, "Defendants did nothing to prevent Mr. Chapman from being present on school property," although the Complaint does not contain any allegations that Principal Cox, Assistant Principal Ware, or any of the Municipal Defendants knew or should have known that Mr. Chapman was on school grounds. (*Id.* ¶ 167.)

After being approached, Plaintiff immediately went to speak with an Assistant Principal. (*Id*. ¶ 65.) That Assistant Principal called Cox, who then told Plaintiff that she had spoken with the DOE division that handles media issues and had been told that the *Daily News* would be running an article the following day. (*Id.*)

The next morning, Cox sent an email to the entire school staff informing them that the Superintendent had advised the school to expect a large media presence. (*Id*. ¶ 67.) She also sent a letter to parents "expressing the school's concern over the reported accusation; informing them that it is being investigated; and reassuring the parents that [Plaintiff had] … 'been assigned away from students.'" (*Id*. ¶¶ 70, 171.) Defendant Cox also advised the parents that she was "working with staff to review the Department's Non-Discrimination Policy to further diversity and sensitivity in the workplace." (*Id*. ¶ 70.)

On February 2, 2018, the *Daily News* published its first in a series of articles written by Chapman and others that reported on OSI's investigation into Plaintiff's conduct. The front page of the paper previewed the article and expressly referenced the ongoing investigation. It featured the caption: "Bronx middle school teacher Patricia Cummings (above) has been removed from classroom while officials look into shocking slave lesson." (Dkt. No. 31, Rosenfeld Decl. Exh. A.) The article explained that, according to students in Plaintiff's class and a staff member at the school, Plaintiff told her history students to "lie on the floor" and then "stepped on their backs to show them what slavery felt like." (Rosenfeld Decl. Exh. B at 2.) It cited one student, who stated that Plaintiff "picked three of the black kids," instructed them to get on the floor, and said "You see how it was to be a slave?" (*Id.* at 1, 3.) When one student made a joke, the source reported that Plaintiff "put her foot on [the student's] back and said, 'How does it feel?'" (*Id.* at 3.) The article then quoted another student who stated that Plaintiff "had students lie on the floor" and

that she "was measuring the length and width to show how little space slaves had in the ship." (*Id.* at 4.) The article explained that OSI was investigating the allegations against Plaintiff and included a quote from a Department of Education spokesperson: "While the investigation has not been completed, these are deeply disturbing allegations, and the alleged behavior has no place in our schools or in society." (*Id.*)

As the investigation progressed, so too did the *Daily News*'s coverage. For example, on July 9, 2018, the *Daily News* published another article titled, "Bronx educators accused of racism still under investigation, still on payroll." (Compl. Exh. E. at 1.) This article explained that OSI had not yet concluded its investigation into Plaintiff and cited DOE officials who stated that the investigation could take months to complete. (*Id.* at 2.) On August 11, 2018, the *Daily News* reported that the investigation had been completed but that the results had not yet been made public. (Compl. Exh. F. at 1.) And on October 4, 2018, October 28, 2018, and March 9, 2019, the *Daily News* published reports of the completed investigation, noting that OSI found that Plaintiff had used "poor judgment" but that OSI "did not substantiate the allegations that she engaged in corporal punishment." (Compl. Exhs. H, I, J.)

## VI.     Public Reaction to the *Daily News* Report and Investigation

In her Complaint, Plaintiff identifies various individuals who she alleges defamed her by commenting on the reports of Plaintiff's controversial January 9 lesson on the Middle Passage. Each will be considered in turn.

### A.   *The Statements of Mayor de Blasio*

On February 6, 2018, four days after the *Daily News* published the article about Plaintiff and the allegations made by a student and parent, Mayor de Blasio held a press conference along with the Police Commissioner regarding crime statistics. (Compl. ¶ 102; *see also* Balog Decl.

Exh. B, Transcript of February 6, 2018 Press Conference ("Feb. 6, 2018 Tr.").) At the end of the

conference, a reporter asked the Mayor about the *Daily News* article and for his "reaction to the

fact that this happened and also there's some parents who will be protesting today and seeking

some cultural sensitivity training in schools …." (Feb. 6. 2018 Tr. at 14.) Plaintiff alleges that

Mayor de Blasio made the following statement:

> "It is not acceptable. It's not even close," de Blasio said when asked about the
> allegations. "I don't know any teacher in their right mind who would do
> something like that … we're doing a full investigation of that. That makes no
> sense. It is unfair to the kids. It's insensitive."
>
> "But I will say, this has not been a widespread problem in terms of any type of
> incident like that, thank God, but we will keep deepening our implicit type
> training, and ways of helping our teachers to think about these issues better."

(Compl. ¶ 102; *see also* Balog Decl. Exh. B, Feb. 6, 2018 Tr. at 14 (setting forth the complete

statement by Mayor de Blasio).) Although on February 6, 2018, OSI had not yet completed the

investigation and Plaintiff had not yet been interviewed by OSI, Plaintiff alleges that Mayor de

Blasio "knew or should have known" when he answered the question at the conference that

"what was reported in the *Daily News* was false based on the investigation …." (Compl. ¶ 103.)

On April 26, 2018, Mayor de Blasio set aside $23 million for "anti-bias training and the

creation of the Office of Culturally Responsive Education." (*Id*. ¶ 104.) Plaintiff further alleges

that Mayor de Blasio "defamed" her when on an unspecified date he "accepted" petitions from

the Coalition of Educational Justice. (*Id*. ¶ 105.)

### B.  *Statements of Councilmembers Dromm and Williams*

On February 9, 2018, the *New York Amsterdam News* published an article about a protest

in front of New York City Hall organized by an education advocacy group in response to the

reports about Plaintiff's lesson. (*Id*. ¶¶ 114–115.) The article purportedly attributed the following

statement to Councilmember Dromm:

"Educators teaching in a city as diverse as ours should be given cultural competency training," said Daniel Dromm, NYC Council Finance Committee chair. "This is the only way to avoid similar traumatic experiences like what happened in the Bronx."

The article also attributed the following statement to former-Councilmember Williams:

"There is a clear need for the administration to be more proactive in mandating Culturally Responsive Education in our schools," said Councilmember Jumaane Williams. "We should not have to wait for grotesque events of cultural insensitivity to mar our classrooms in order to spur action, and I sincerely hope we don't have to wait for the next one."

Plaintiff alleges that both Councilmembers Dromm and Williams "exhibited flagrant disregard as to whether the accusations against the Plaintiff were actually true …." When they spoke. (*Id*. ¶¶ 114–115.)

 *C.* *Statement of State Senator Kevin Parker*

 In the article featuring comments by Councilmember Dromm and Public Advocate Williams, the *New York Amsterdam News* also quoted New York State Senator Kevin Parker. (*Id*. ¶¶ 108.) The quote reads:

"Like many others, I am completely outraged [] by the actions of Bronx Middle School 118 teacher, Patricia Cummings," said State Sen. Kevin Parker. "I call for her swift removal from the New York City Department of Education, and the revocation of all New York State licensures and credentials that would allow her to teach in our State."

Parker continued, "Although I hear some calling for a second chance for Ms. Cummings via culturally competent training and the like, as an African studies professor at the City University of New York for over 20 years now, I know there is no level of training that can make a person more sensitive to the struggles of another. Those feelings cannot be prepared in one's mind, but rather must be intrinsic to one's character. This is not the case for Ms. Cummings and it is my hope we can learn for this deplorable act to inform future decisions and best practices when deciding who will be afforded the honor of teaching our children."

 Plaintiff alleges that Senator Parker "exhibited flagrant disregard as to whether the accusations against the Plaintiff were actually true …" when he spoke. (*Id*.)

13

D.  *Dr. Andre Perry's Column on Race in Education*

On February 6, 2018, four days after the *Daily News* ran their first story on the incident, Dr. Andre Perry published a column in the Hechinger Report titled "Teachers, how does it feel to be oppressors?" (*Id.* ¶ 117.) In his column, Dr. Perry explicitly references the contemporaneous *Daily News* story and provides a link to it. Perry uses the incident as a launch point for offering his views on race in education more generally. (Dkt. No. 27, Rochford Decl., Exh. A.)

In the Complaint, Plaintiff identifies a series of sentences and passages in Dr. Perry's column that, to Plaintiff, constitute defamation:

- A subheadline that reads: "A teacher literally stepped on children to 'teach' them about slavery."

- "Cummings' slavery lesson wasn't only cruel; it was redundant."

- "Black students know too well what it's like to be humiliated, held in captivity and to suffer from inhumane conditions created by educators. Many compliant students who sit quietly accepting demeaning lessons like the ones administered by Cummings and others like her are viewed as obedient and law-abiding. Their counterparts who resist are deemed disorderly and subjected to harsh disciplinary policies, often ending up in jail by way of the school-to-prison pipeline. Whether you are obedient or 'woke' – conscious of your oppression – you are being oppressed in schools. Yep, black students already know what it's like to be stepped on."

- "There are white teachers like Cummings who have not reckoned with what it means to oppress."

- "While most teachers probably won't see themselves in either Black or Cummings, most should recognize that they associate with white norms, which makes it possible to act in racist ways, …."

Only one of the fifteen paragraphs in the article – the very first – refers specifically to the facts alleged to have occurred in Cummings's classroom. In this paragraph, Dr. Perry conspicuously identified the *Daily News* as the source for the allegations and provided a link to the article: "The New York Daily News reported on February 1 – the start of Black History Month – that a teacher in a majority-minority school in the Bronx, NY, instructed three black

14

children in her seventh-grade class to lie on the floor during a lesson slavery." (Compl. ¶ 117 n. 9.)

  E.   *Lenard Larry McKelvey's, a/k/a Charlamagne tha God's, Challenged Broadcast*

On February 7, 2018, during a "Donkey of the Day" segment of *The Breakfast Club* that incorporated a CBS news report on Plaintiff's Middle Passage lesson (Dkt. No. 28, Exh. 1, p. 7, 11. 10-23; p. 8 11. 2-4), Charlamagne described Plaintiff as a "racist," a "bigot," a "cracker," and a "white devil." (Compl. ¶¶ 63, 106-107 and Exh. 1.)

**VII.   The Instant Litigation**

On September 25, 2018, Plaintiff's counsel served a Notice of Claim on Defendants the City of New York, New York City Department of Education, and the City of New York Office of Special Investigations. (Dkt. No. 31, Rosenfeld Decl. Exh. D.) In the Notice, Plaintiff alleged that the City and its Departments engaged in "'reverse discrimination' at its worst" because – according to Plaintiff's unidentified colleague – "a black teacher could have taught the very same lesson, and there would not have been a single complaint from any student's parent." (*Id.* at 7, 11.) The Notice also threatened that the "irresponsible media" would be held accountable for "promulgating and promoting 'fake news' stories" about Plaintiff. (*Id.* at 7.) Plaintiff claimed that, as a result of this "reverse discrimination," she was damaged "in the amount of $120 Million …." (*Id.* at 13.)

The *Daily News* Defendants reported on this Notice of Claim in a September 28, 2018 article titled "White social studies teacher ousted over slavery lesson plans to sue over reverse racism." (Compl. Exh. G at 1.)

On January 10, 2019, Plaintiff served the *Daily News* Defendants and other parties, including New York City, the Department of Education, the Mayor of New York,

Councilmember Daniel Dromm, former Councilmember Jumaane Williams, State Senator Kevin Parker, various media organizations, and journalists, with a Summons with Notice seeking damages for "defamation, reverse discrimination, denial of due process, severe emotional, psychological, and physical distress, loss of reputation, loss of income, and expenses" totaling $120 million. (Dkt. No. 1, Exh. 1 at 5.) The action was commenced in the Supreme Court of New York, County of Suffolk, by the filing of a Summons with Notice. (Compl. ¶ 8.)

On March 4, 2019, the Municipal Defendants moved in state court to change venue to the Supreme Court of New York, New York County.

Before any judicial action was taken on that motion, defendants *New York Daily News* and Ben Chapman on March 22, 2019, removed the case to the Eastern District of New York based on the allegations of federal civil rights claims under 42 U.S.C. §§1983 and 1988.

The Municipal Defendants timely moved pursuant to 28 U.S.C. §1404 to transfer venue to the Southern District.

On May 17, 2019, Plaintiff filed her Complaint. (Dkt. No. 13.)

On June 27, 2019, Senator Parker filed his Answer to the Complaint. (Dkt. No. 18.)

On July 22, 2019, all other Defendants that have appeared filed motions to dismiss the Complaint. (Dkt. Nos. 27, 28, 29, 31.)

On November 6, 2019, Defendant Senator Kevin Parker moved for judgment on the pleadings. (Dkt. No. 81.)

**VIII.  Disciplinary Letter Arbitration**

On February 7, 2019 and May 21, 2019, Plaintiff, represented by her union, participated in arbitration with the DOE on the issue of whether "the Department of Education violate[d]

Article 21(C)(3) of the Collective Bargaining Agreement ("CBA") by issuing a letter to file to [Plaintiff] dated September 12, 2018." (Dkt. No. 54, Exh. C at 2.)

Article 21(C)(3) of the CBA lays out the procedure for placing disciplinary letters in a DOE employee's personnel file. (*Id.*) Through arbitration, Plaintiff challenged whether those procedures were properly followed when Principal Giulia Cox placed a September 2018 disciplinary letter related to the Middle Passage lesson in Plaintiff's personnel file.

While noting that the "decision has no bearing on the propriety of any disciplinary action taken against [Plaintiff]," the arbitrator found that those procedures were not followed and ordered that the September 12, 2018 letter be removed from Plaintiff's file. (*Id.* at 15–16.)

## DISCUSSION

### I.    Standard of Review

To survive a motion to dismiss made pursuant to either Federal Rule 12(b)(6) or 12(c),[3] "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating whether the Complaint meets this standard, the Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiff's favor. *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court is not, however, obligated to accept as true legal conclusions couched as factual allegations. *Rolon v. Hennenman*, 517 F.3d 140, 148–49 (2d Cir. 2008); *see also Iqbal*, 556 U.S. at 678. Unless a plaintiff's well-

---

[3] The Second Circuit has stated that "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (internal quotations and citations omitted).

pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

## II.     Plaintiff's Constitutional Law Claims Are Dismissed

Plaintiff claims that the Municipal Defendants violated her rights under the Fourteenth, First, Second, Fourth, Fifth, Sixth, Seventh, and Eighth Amendments to the Constitution in the course of investigating her Middle Passage lesson and terminating her probationary employment. (Compl. ¶¶ 1, 165–187.)

These claims are without merit.

### A.   *Plaintiff's Due Process Claims Fail*

To state a claim for deprivation of procedural due process, "a plaintiff must show that a government entity deprived her of a right secured by law." *Finley v. Giacobbe*, 79 F.3d 1285, 1296 (2d Cir. 1996). To do so, plaintiffs must demonstrate that they "have a legitimate claim of entitlement to [a benefit] under state or federal law." *Id*. (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (internal quotations omitted). Therefore, when analyzing procedural due process claims, the threshold issue is whether the plaintiff possessed a valid property or liberty interest. *Oneida Indian Nation of N.Y. v. Madison Cnty*, 665 F.3d 408, 427–28 (2d Cir. 2011).

To the extent that Plaintiff claims that she was deprived of a property interest by the Municipal Defendants when they ended her probationary employment, that claim fails because as a probationary teacher, she did not possess a property interest in her position and Plaintiff has not pled that she had a legitimate claim of entitlement to her job.

To the extent that Plaintiff claims that she was deprived of a liberty interest, that claim fails because she has not pleaded facts that would suggest a stigma-plus claim.

### 1. Plaintiff had no property interest in her job.

Plaintiff had no property interest in her continued employment as she was a probationary teacher. It is well-settled that under New York law, a probationary employee has no property interest in her job. *Finley*, 79 F.3d at 1297–98 (collecting cases).

Plaintiff also had no property interest in remaining at X118 – the Middle School where she taught – rather than being transferred, with full salary, to a reassignment center. Courts have held that "being placed in a reassignment center with full salary does not implicate a property interest." *Norgrove v. N.Y.C. Dep't of Educ.*, No. 08 Civ. 2202 (FB)(MDG), 2011 WL 441678, at *4 (E.D.N.Y. Feb. 4, 2011); *see O'Connor v. Pierson*, 426 F.3d 187, 199 (2d Cir. 2005) (observing that "no court has held that an employee on fully paid leave has been deprived of a property right merely by virtue of being relieved of his job duties.").

Finally, Plaintiff argues that she has been deprived of a property interest because the DOE did not comply with certain Chancellors Regulations and the contract between the United Federation of Teachers and the DOE in investigating the allegations. But again, Plaintiff had no property interest in having the allegations against her investigated in any particular way or the DOE using any specific procedures. In *Perez v. Metro Transp. Auth.*, No. 11 Civ. 8655 (RWS), 2012 WL 1943943 (S.D.N.Y. May 29, 2012), the plaintiff claimed that "she was deprived" of "the expectation that she would be treated in accordance with the applicable agency policy and procedures." *Id.* at *8. The court dismissed the plaintiff's due process claim because "Plaintiff cannot claim a property interest in the MTA's policy and procedures." *Id.* For the same reason, Plaintiff's claim fails because DOE investigatory procedures do not create an independent cognizable property interest. *See also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541

(1985) ("'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty.").

### 2.  Plaintiff has not established a deprivation of a liberty interest.

Where Plaintiff claims deprivation of a liberty interest in her reputation, she must establish the elements of a "stigma-plus" claim. To prevail, Plaintiff must show that (1) defendants made false and stigmatizing statements about her—statements that call into question her good name, reputation, honor or integrity; (2) a tangible and material state-imposed burden in addition to the stigmatizing statement, and (3) the false and stigmatizing statements were made public, concurrently with, or in close proximity to the tangible and material state-imposed burden. *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006). Crucially, "a stigma-plus claim enforces a limited but important right: the right to be heard 'at a meaningful time and in a meaningful manner.'" *Segal*, 459 F.3d at 213. Indeed, "the hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate [her] employment is solely to provide the person an opportunity to clear [her] name." *Codd v. Velger*, 429 U.S. 624, 627 (1977) (per curiam).

Statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession" satisfy the stigma requirement. *Segal*, 459 F.3d at 212 (citation omitted). However, "Statement[s] that an employee poorly performed her duties or acted in an improper manner, or that describe behavior or actions that are within the employee's power to correct, do not generally qualify as stigma for constitutional purposes." *Adams v. New York State Educ. Dep't*, 732 F. Supp. 2d 420, 449 (S.D.N.Y. 2010) (quotations and citations omitted).

In the instant case, Plaintiff fails to plead any facts alleging the publication by the Municipal Defendants of an arguably false statement injurious to her reputation made in close temporal proximity of her termination. The only statement that Plaintiff alleges was made by the DOE to the public and in close temporal proximity to her termination is that on September 28, 2018, when a DOE spokesperson stated to the *Daily News* that the DOE had "begun the process of firing Ms. Cummings based upon an investigation of this unacceptable behavior and her performance as an educator." (Compl. ¶ 179.) That statement is not alleged to be false and it is not false. As alleged in the Complaint, the DOE began the process of ending Plaintiff's probationary employment on September 17 by sending Plaintiff her 30-day notice. (*Id*. ¶ 180.)

Plaintiff does not dispute that the stated reasons by the DOE for its determination to begin the termination process – the allegedly "unacceptable behavior" uncovered by the OSI investigation and its assessment of her "performance as an educator" – was not the basis for the proceedings. Accordingly, Plaintiff can establish neither the first nor third elements of a stigma-plus claim.

Even if Plaintiff were to establish those elements, dismissal of Plaintiff's stigma-plus due process claim is also warranted because an adequate state remedy was available to her in the form of an Article 78 proceeding. *See Segal*, 549 F.3d at 213 (dismissing a stigma-plus claim and noting that "the availability of adequate process defeats a stigma-plus claim."). In a case "involving an at-will government employee, the availability of an adequate, reasonably prompt post termination name-clearing hearing is sufficient to defeat a stigma-plus claim …." *Id.* at 214. Courts in the Second Circuit have held repeatedly that a proceeding under Article 78 of the CPLR affords such a remedy. *Id.*; *Anemone v. Metro. Trans. Auth.*, 629 F.3d 97, 121 (2d Cir.

2011). That Plaintiff chose not to pursue an Article 78 proceeding does not render that remedy inadequate.

Accordingly, Plaintiff's claim that she was deprived of a liberty interest without due process is dismissed.

B.   *Plaintiff's Equal Protection Claim Is Dismissed*

The Equal Protection Clause of the Fourteenth Amendment provides that, "No State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state a claim under the clause, "a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).

Plaintiff asserts a claim under the Equal Protection Clause against the Municipal Defendants. Though neither the Complaint nor Plaintiff's briefing is the model of clarity, taken in its best light, Plaintiff asserts that her firing "was the result of '*having a white teacher, teach events of black history to black students*.'" (Compl. ¶ 182 (emphasis in original).) Plaintiff also points to various statements by a "colleague" and an unidentified individual to the effect that "A black teacher could have taught the very same lesson, and there would not have been a single complaint from any student's parent." (*Id.*) Nowhere does Plaintiff allege that a black teacher did in fact teach "the very same lesson" without consequence but, to Plaintiff, these statements, "evidence the reverse discrimination employed by the Defendants in the way that the Plaintiff was treated, as a Caucasian teacher, teaching in a school that has a significant minority population." (*Id.*)

Plaintiff's equal protection claim fails because she pleads nothing more than conclusory allegations that do not give rise to a plausible inference that she was treated differently than a

22

black teacher who did the same thing. To be sure, the Complaint is replete with the words
"discrimination" and "racism." (Compl. ¶¶ 85, 97, 169, 174, 181, 182.) And Plaintiff summarily
alleges that "there was an intention to harm Plaintiff because she is Caucasian ...." (Compl. ¶
150.) But the fact that an unidentified colleague of Plaintiff opined that Plaintiff's whiteness was
the reason why a student's parent complained about her Middle Passage lesson does "not nudge
[Plaintiff's] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570 and
certainly does not give rise to a plausible inference that Defendants intentionally or purposefully
discriminated against her because of her race.

Equally fatal to her claim is that nowhere in the Complaint has Plaintiff set forth any
allegations, as she must, from which one could adduce that there were non-Caucasian employees
who were treated better than her, let alone that they were "similarly situated." *Id.*

C. *Plaintiff Has Not Adequately Alleged* Monell *Liability*

In ¶181, Plaintiff cites to *Monell v. Department of Social Services*, 436 U.S. 658 (1978)
and states that the Municipal Defendants have a "pattern of discrimination against Caucasian
teachers." When the defendant in a § 1983 discrimination claim is a municipality – or an
individual sued in her official capacity, *see Hafer v. Melo,* 502 U.S. 21, 25 (1991) (claim against
a municipal employee in his official capacity deemed brought against the municipality itself) –
the plaintiff must establish that the challenged acts were performed pursuant to a municipal
policy or custom. *Monell,* 436 U.S at 692–94.

In service of her *Monell* claim, Plaintiff cites to three comments of an unidentified
colleague that, to Plaintiff, "evidence the reverse discrimination employed by the Defendants."
(Compl. ¶182.) To wit:

> [1] that what occurred was the result of 'having a white teacher, teach events of
> black history to black students.'… [2] that 'only black teachers should be allowed

> to teach about events of black history to black students.' [3] 'A black teacher could
> have taught the very same lesson, and there would not have been a single
> complaint from any student's parents.'"

(*Id.*) None of these musings, however, identifies any municipal policy, much less raises an

inference that the Municipal defendants maintain a policy responsible for a constitutional

violation. The second statement – that "only black teachers should be allowed to teach about

events of black history to black students" – might amount to this unidentified individual's

pedagogical preference. However, Plaintiff does not allege that the Municipal Defendants have a

policy of prohibiting teachers other than black teachers from teaching black history. The third

statement – an observation couched as a hypothetical – is directed at the reaction of parents to

Plaintiff's lesson, and in no way refers to a municipal policy. The entirely unsubstantiated

musings of Plaintiff's unidentified colleague are not enough to raise a plausible inference that the

Municipal Defendants maintain a policy that led to a constitutional violation.

Because Plaintiff has neither adequately alleged an underlying constitutional violation

nor a pattern or practice of discrimination attributable to the Municipal Defendants, Plaintiff has

failed to plead a *Monell* claim against the City.

### D.  *Plaintiff's Miscellaneous Constitutional Claims Fail*

In the very first paragraph of the Complaint, Plaintiff mentions the First, Second, Fourth,

Fifth, Sixth, Seventh and Eighth Amendments to the Constitution. The Fifth Amendment is, of

course made applicable to the Municipal Defendants by the Fourteenth Amendment. The First

and Fifth Amendment claims asserted by Plaintiff are comprehended in her Fourteenth

Amendment claims discussed above.

As for the rest of these amendments, neither they nor any facts relevant to them, are mentioned anywhere else in the Complaint. To the extent that Plaintiff intended to assert claims pursuant to these Amendments, the Complaint fails to provide sufficient facts to proceed on any of these theories.

The Second Amendment concerns the right to bear arms. There are no allegations in the Complaint that Defendants infringed upon Plaintiff's right to bear arms.

The Fourth Amendment protects the privacy and security of individuals against unreasonable searches and seizures by government officials. There are no allegations in the Complaint that the government carried out an illegal search on Plaintiff's effects or illegally seized her person.

The Sixth Amendment right to counsel in inapplicable in this civil action, or in any proceeding conducted by the DOE.

Any claims that the Municipal Defendants denied Plaintiff a Seventh Amendment-guaranteed jury trial or punished her in violation of the Eighth Amendment's prohibition against cruel and unusual punishments, are absurd on their face.

## III.    Plaintiff's Fraud Claim Is Dismissed

To the extent that Plaintiff intended to assert a fraud claim against the Municipal Defendants, (*see* Compl. p. 46), that claim is dismissed for failure to plead a fraud claim.

To state a claim for common law fraud in New York, a plaintiff must plead that "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant[] intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of

such reliance plaintiff sustained pecuniary loss[.]" *Stephenson v. PricewaterhouseCoopers, Ltd. Liab. P'ship*, 482 F. App'x 618, 622 (2d Cir. 2012) (citation omitted).

Additionally, a claim for common law fraud must meet the particularity pleading requirements of Federal Rule of Civil Procedure 9(b), "which requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Financial Guar. Ins. Co. Putnam Advisory Co., LLC*, 783 F.3d 395 (2d Cir. 2015) (citation omitted).

Plaintiff has done none of the above. The Complaint does not plead the elements of a fraud claim and comes nowhere close to the level of particularity demanded by Rule 9(b). Plaintiff has not identified a single false statement that was made to her on which she relied. Instead, she complains that defendant Cox made a false statement to OSI investigators. (Dkt. No. 58, Pl. Mem. at 32.) That allegation does not give rise to a fraud against Plaintiff.

## IV.    Plaintiff's Breach of Contract Claim Is Dismissed

Plaintiff, a probationary teacher, asserts a breach of contract claim against the Municipal Defendants. As noted above, Plaintiff had no contractual right to continued employment, so her dismissal did not break her contract of employment. It appears that Plaintiff is alleging that the City breached the contract between the DOE and the United Federation of Teachers ("UFT") and the Chancellor's Regulations when they investigated her Middle Passage Lesson and subsequently ended her probationary employment. (*See, e.g.*, Compl. ¶¶ 166, 176.) Plaintiff further argues that, because an arbitrator sustained the grievance brought by Plaintiff's union concerning the September 12, 2018 disciplinary letter that was placed in Plaintiff's employment file, she has a meritorious claim for breach of contract. (Dkt. No. 55, Opp. p. 34.)

Plaintiff lacks standing to assert a breach of the contract between DOE and the Union. By becoming a union member, an individual employee "has no individual rights under a collective bargaining agreement which he can enforce against his employer except through the union." *Berlyn v. Board of Ed. of E. Meadow Union Free Sch. Dist.*, 435 N.Y.S.2d 793, 794 (2d Dep't 1981), *aff'd* 433 N.E.2d 1278 (N.Y. 1982).[4]

Moreover, the outcome of the arbitration is irrelevant. The proceedings had nothing to do whatever with the propriety of either the investigation into the Middle Passage lesson or the subsequent decision to terminate Plaintiff's probationary employment. It concerned only whether proper procedures were followed before a disciplinary letter was placed in Plaintiff's personnel file. (Dkt. No. 54, Exh. C at 2.) Indeed, the arbitrator took care to note that the arbitration decision "has no bearing on the propriety of any disciplinary action taken against [Plaintiff]." (*Id.* at 15.)

Plaintiff's breach of contract claim is dismissed.

## V.   Claims Against Other Defendants

All claims against all other Defendants arise under state law. However, the Court will elect to exercise supplemental jurisdiction over them, as they are dismissible on their face.

### A. *Defendants' Motion to Dismiss Plaintiff's Cause of Action for Defamation Is Granted as to the Daily News Defendants*

Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander. *See Morrison v. Nat'l Broad. Co.*, 227 N.E.2d 572, 574 (N.Y. 1967). The law of defamation serves to protect an individual's right to one's reputation. *See Gertz v. Welch*, 418 U.S. 323, 343–45 (1974). However, courts have held that, "Because a

---

[4] And indeed, Plaintiff's union filed a grievance on her behalf, which resulted in the disciplinary letter's being removed from Plaintiff's personnel file. (Dkt. No. 54, Ex. C at 17.)

defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Adelson v. Harris*, 973 F. Supp.2d 467, 481 (S.D.N.Y. 2013), (internal quotations and citations omitted), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

Under New York law, to establish a claim for defamation, a plaintiff must plead "(1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) 'of and concerning' the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) either causing special harm or constituting slander per se; and (7) not protected by privilege." *Frascatore v. Blake*, 344 F. Supp.3d 481, 493 (S.D.N.Y. 2018) (quoting *FTA Mkt. Inc. v. Vevi, Inc.*, No. 11 Civ. 4789 (VB), 2012 WL 383945, at *6 (S.D.N.Y. Feb. 1, 2012)).

Falsity is a necessary element of a defamation cause of action and because "only 'facts' are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action." *Rosner v. Amazon.com*, 18 N.Y.S.3d 155, 157 (2d Dep't 2015) (internal quotations and citations omitted).

Plaintiff avers that Defendants Ben Chapman and the *New York Daily News* "exhibited flagrant disregard as to whether the accusations made against the Plaintiff were actually true" in publishing a series of articles related to Plaintiff's Middle Passage lesson and the ensuing DOE investigation. (Compl. ¶ 100.)

However, because the *Daily News* Articles are substantially accurate reports of official proceedings, they are absolutely privileged under New York Civil Rights Law § 74.

The Complaint is therefore dismissed as to the *Daily News* Defendants.

1.  **The Daily News Articles Are Absolutely Privileged Under New York Civil Rights Law Section 74**

A plaintiff cannot prevail on a defamation claim where the statements complained of are privileged under state law. *Zappin v. NYP Holdings, Inc.*, No. 16 Civ. 8838 (KPF), 2018 WL 1474414, at *5 (S.D.N.Y. Mar. 26, 2018), *aff'd*, 769 F. App'x 5 (2d Cir. 2019). One such privilege is codified at § 74 of the New York Civil Rights Law. It provides:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

N.Y. Civ. Rights Law § 74. The New York legislature enacted this statute in order to avoid stifling "an active, thriving, and untrammeled press" and to ensure that the press receive "broad protection." *Idema v. Wagner*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (citation omitted), *aff'd*, 29 F. App'x 676 (2d Cir. 2002).

Under § 74, a report of an official proceeding that is "fair and true" is protected by an "absolute privilege," and this privilege is "not defeated by the presence of malice or bad faith." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 477 (S.D.N.Y. 2012) (internal quotation marks and citations omitted). Courts look to the context of the statements in order to determine whether a reasonable observer would find that they constitute reports of a proceeding. *See Gonzalez v. Gray*, 69 F. Supp. 2d 561, 570 (S.D.N.Y. 1999).

The privilege requires that the "substance of the article be substantially accurate." *Holy Spirit Ass'n*, 399 N.E.2d 1185, 1187 (N.Y. 1979). The language used in an article "should not be dissected and analyzed with a lexicographer's precision." *Id.* Rather, the "test is whether the published account of the proceeding would have a different effect on the reader's mind than the

actual truth, if published." *Procter & Gamble*, 974 F. Supp. 190, 196 (E.D.N.Y. 1997) (quoting

*Daniel Goldreyer, Ltd. v. Van de Wetering*, 630 N.Y.S.2d 18, 22 (1st Dep't 1995)).

Crucially, § 74 protects reporting on charges and allegations made in proceedings

regardless of whether the underlying allegations are in fact true. *See Mulder v. Donaldson,*

*Lufkin & Jenrette*, 611 N.Y.S.2d 1019, 1024–25 (Sup. Ct. N.Y. Cty. 1994) ("The question is not

whether or not the statement is 'true.' The question is whether it is a substantially accurate

description of the claims made in the … proceeding."), *aff'd*, 623 N.Y.S.2d 560 (1st Dep't 1995).

Applying the above principles here, it is abundantly clear both that (1) the *Daily News*

articles reported on "official proceeding[s]," and (2) the Articles were "fair and true report[s]" of

those proceedings. § 74 therefore bars Plaintiff's claims against the *Daily News* and Chapman.

> i.   The Department of Education's investigation and Plaintiff's filings in this litigation are "Proceedings" covered by Section 74.

The fair report statute applies to reports of "any judicial proceeding, legislative

proceeding or other official proceeding," which courts have construed to include official

investigations. *See Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 214 (N.D.N.Y. 2014); *Test Masters*

*Educ. Servs., Inc. v. NYP Holdings, Inc.,* 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009)).

Here, both (1) the Department of Education's investigation into Plaintiff; and (2)

Plaintiff's own Notice of Claim and Summons, which initiated this judicial action, qualify as

"proceedings" for purposes of Section 74.

> a.   *The Department of Education investigation into Plaintiff, including the allegations leading thereto, comprised a "proceeding."*

New York courts have consistently held that "even the announcement of an investigation

by a public agency, made before the formal investigation has begun, is protected as a report of an

official proceeding within the contemplation of the statute, as the report is of an ongoing

investigation." *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of N.Y.*, 475

N.Y.S.2d 383, 388 (1st Dep't 1984) (internal citations omitted). Similarly, "reports on allegations

that lead to a government investigation are fully protected." *SentosaCare LLC v. Lehman*, No.

2016-504407, 2018 WL 692568, at *7 (Sup. Ct. Kings Cty. Jan 25, 2018), *appeal docketed*, No.

2018-03473 (N.Y. App. Div. 2d Dep't Nov. 20, 2018); *cf. El Greco Leather Prods. Co. v. Shoe

World, Inc.*, 623 F. Supp. 1038, 1043 (E.D.N.Y. 1985) (holding that allegations included in an

article but not contained in court papers "constitute[] background information … and thus do not

remove the article from the protection of Section 74"), *aff'd*, 806 F.2d 392 (2d Cir. 1986).

Here, each of the *Daily News* Articles identified in the Complaint reports on OSI's

investigation into Plaintiff, including the allegations from parents and students that triggered the

investigation.

On February 2, 2018, the day the first article appeared in the *Daily News*, the front page

of the paper states: "Bronx middle school teacher Patricia Cummings (above) has been removed

from the classroom while officials look into shocking slave lesson." (Dkt. No. 31, Rosenfeld

Decl. Exh. A.) The article proceeds to report on the allegations that led to the investigation,

contains quotations from students and staff members from the school, and includes a quotation

from a Department of Education employee, that, "While the investigation has not been

completed, these are deeply disturbing allegations, and the alleged behavior has no place in our

schools or in society." (Dkt. No. 31, Rosenfeld Decl. Exh. B at 4.)

In a July 9, 2018 article, the *Daily News* reports that "City Department of Education

officials have failed to conclude investigations of two Bronx educators accused of racist acts

roughly five months after launching their probes." (Dkt. No 13, Compl. Exh. E at 1) It then

recounts the allegations against Plaintiff being investigated by OSI. (*Id.*)

In an August 11, 2018 article titled "City completes probe of teacher in 'slavery' controversy," the *Daily News* states, "City Education Department officials have finished their probe of a teacher who grabbed headlines and sparked protests after she was accused of stepping on a student during a lesson on slavery in January." (Dkt. No. 13, Compl. Exh. F at 1.) The article explains that the report had not yet been released and cites to a DOE spokesperson who stated that the Department would provide an update when the matter was resolved. (*Id.*)

In articles written on October 4, 2018, October 20, 2018, and March 9, 2019, the *Daily News* reports on – and quotes – the results of the OSI's investigation. For example, the October 4 article quotes portions of the investigatory report stating that Plaintiff's actions "significantly diverged from best practices" and "the DOE does not ever include or encourage re-enactments of historical events where students take on roles of victimized people." (Dkt. No. 13, Compl. Exh. H.) The October 20 article states that the investigation found that Plaintiff used "poor judgment" but that the allegation that she engaged in corporal punishment was unsubstantiated. (Dkt. No. 13, Compl. Exh. I at 2.) And the March 9 article similarly reports on the allegations that underlay the investigation, and then explains that the Department of Education, "did not substantiate allegations by one student that [Plaintiff] pushed her knee into students' backs." (Dkt. No. 13, Compl. Exh. J.)

Any reasonable reader would know that the *Daily News* Articles were reports on the DOE's investigation into allegations made against Plaintiff.

> b.  *The notice of claim, summons, and other papers served or filed in this litigation constitute "judicial proceedings."*

Reports of judicial proceedings – including the documents that initiate them – lay at the heart of the § 74 privilege. *Gristede's Foods, Inc. v Poospatuck (Unkechauge) Nation*, No. 06 Civ. 1260 (KAM), 2009 WL 4547792, at \*16 (E.D.N.Y. Dec. 1, 2009) ("Allegedly libelous

statements fall within the privilege conferred by § 74 where it appears that all of the statements published by the defendants are of and concerning the complaint in the underlying federal litigation and constitute substantially accurate descriptions or characterizations of such complaint.") (citations and internal quotation marks omitted); *Riel v. Morgan Stanley*, No. 06 Civ. 524 (TPG), 2007 WL 541955, at *10 (S.D.N.Y. Feb. 16, 2007) ("The protections of section 74 extend to pleadings, transcripts, live proceedings and the release by the parties of background material regarding their positions in the case."), *aff'd*, 299 F. App'x 91 (2d Cir. 2008).

The same is true of reports on notices of claims.[5] For example, in *Rickerson v. Porsch*, No. 20180015, 2019 WL 1289734, at *4 (Sup. Ct. Seneca Cty. Feb 5, 2019), the court explained that a notice of claim constitutes both a "judicial proceeding" under § 74 because it is a "jurisdictional pre-requisite to the filing of a plenary action against a municipal corporation" and an "official proceeding" because it is "prescribed by law with its own procedures." *Id.* The court held that as a result, "any reporting about the notice of claims … is not actionable under Civil Rights Law § 74." *Id.*

Here, in addition to reporting on the OSI investigation, certain of the *Daily News* Articles quote from or cite to Plaintiff's Notice of Claim and summons. For example, the September 27, 2018 article begins by noting that Plaintiff "says she is the victim of reverse-racism" and explains that Plaintiff filed a "Notice of Claim filed in anticipation of a lawsuit against 'the city, parents, students, and the media.'" (Dkt. No. 13, Compl. Exh. G at 2.) The article recounts the allegations that the *Daily News* reports – which Plaintiff claimed were false and which formed the basis of her proposed lawsuit – and explains that Plaintiff "denied that any child laid on the

---

[5] Pursuant to New York statute, notices of claims must be filed 90 days prior to suing a municipal entity. N.Y. Gen. Mun. Law § 50-e.

floor at any time during the demonstration and denied making any physical contact with any student." (*Id.*; *see also* Compl. Exh. H (reporting that Plaintiff "filed a $120 million discrimination suit")); (Compl. Exh. I at 2 (reporting that Plaintiff "announced she planned to sue the city" because "accounts of the [slavery] lesson were all wrong")); (Compl. Exh. J (reporting that Plaintiff "is suing the Education Department and various individuals and entities including The News in a suit that her attorney said could become a class action worth as much as $1 billion").)

In sum, the *Daily News* Articles are clearly reports of official proceedings within the contemplation of § 74.

ii. The Daily News Defendants fairly and accurately reported on these proceedings.

Plaintiff vehemently asserts that she "NEVER" engaged in the conduct reported in the *Daily News* Articles and that the "claims made [of corporal punishment] were **completely inaccurate**." (Dkt. No. 58, Plaintiff's Opposition at 19) (all emphasis in original). However, nowhere does Plaintiff allege that the articles present inaccurate accounts of the *allegations* that were made against her.

And indeed, she cannot. Plaintiff argues that because the allegation that Plaintiff "singled out black students and made them act like slaves" and then "stepped on their backs to show them what slavery felt like" is false, that the *Daily News* Articles are not substantially accurate reports. She complains that the allegations were "reported as 'fact' by the News Defendants each and every time they reported on this matter." (*Id.* at 4.)

Plaintiff is incorrect.

One example emblematic of the reporting from the *Daily News* Articles is instructive. It reads:

> Middle School 118 teacher Patricia Cummings shocked and traumatized children in her social studies classes when she singled out black students and told them to lie on the floor for a lesson on U.S. slavery – and then stepped on their backs to show them what slavery felt like, *students and a staffer said*.

(Dkt. No. 13, Compl., Exh. B) (emphasis added). The articles do not posit the allegations as fact. To the contrary, the Articles repeatedly uses phrases like "students said" to report on allegations that were at the heart of a public agency investigation.

Plaintiff further argues that the *Daily News* reportage presented "erroneous facts to the public," because one of the students Chapman interviewed for the first story in the series "was absent on the day of the lesson in question and could not have possibly witnessed the lesson." (Dkt. No. 58, Opp'n at 19.) To Plaintiff, because, "Absolutely no fact checking was done," (*id.*), into whether the underlying allegations were true, the Articles lose the § 74 privilege.

But this conclusory statement is unsupported by the law. As the court explained in *Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 596 (2d Dep't 2009):

> [H]ow a reporter gathers [] information concerning a judicial proceeding is immaterial provided his [or her] story is a fair and substantially accurate portrayal of the events in questions. … Accordingly, the fact that the defendants derived information about the [] proceedings from secondary sources did not mean that Civil Rights Law § 74 was inapplicable.

(internal citations omitted). Thus, it is immaterial whether the *Daily News* Defendants gathered their information directly from proceedings, from witnesses in Plaintiff's class, or from third parties who heard about Plaintiff's actions because their reportage was a substantially accurate portrayal of the allegations against Plaintiff.

Even if the allegations are "erroneous[]," *id.* ¶¶ 53–54, § 74's privilege is purposely designed to immunize reporting on the allegations made in proceedings regardless of the veracity of those underlying allegations. *Mulder*, 611 N.Y.S.2d at 1023–24 (noting that in applying § 74 privilege, "The question is not whether or not the statement is 'true.' The question is whether it is

a substantially accurate description of the … proceeding"); *Freeze Right*, 475 N.Y.S.2d at 389

("Section 74 … was designed precisely to protect the publisher of a fair and true report from

liability for just such an error and to relieve it of any duty to expose the error through its own

investigation."); *Zappin*, 2018 WL 1474414, at *7 ("To invoke the § 74 privilege properly,

Defendants need not prove that the statements made at the … proceeding were, themselves,

accurate; rather, all that matters for the application of § 74 is that the article is a substantially

accurate rendering of what was said, even if the testimony given was not true."), *aff'd*, 769 F.

App'x 5 (2d Cir. 2019).

For example, in *Rodriguez v. Daily News, L.P.*, 37 N.Y.S.3d 613 (2d Dep't 2016), the

plaintiff sued the *Daily News* and WPIX for defamation after the paper reported that he was

wanted in connection with an attempted crime. *Id.* at 614. The final news report on the attempted

crime reported that another individual had been arrested for the crime, but also included a

photograph of plaintiff. *Id.* Even though the underlying allegations were untrue, the New York

Supreme Court dismissed plaintiff's defamation claim and the Appellate Division affirmed,

finding that the report was a "substantially accurate report[ ] of the information provided by the

NYPD in its press releases." *Id.* at 615. In other words, the veracity of the underlying allegations

against Plaintiff is simply not relevant to a § 74 analysis; the question is whether the articles truly

and fairly report those allegations.

They do. Indeed, Plaintiff does not allege that the *descriptions* of the allegations are

erroneous. Plaintiff concedes that one parent complained that, "Plaintiff instructed [the student]

to get on the floor" and that Plaintiff "put her knee into her back and pushed down." (Compl. ¶

53.) That parent and their child said that Plaintiff "put her knee into [the student's] back and

pushed down asking if [the student] felt pain," and the OSI report shows that numerous other

students stated that Plaintiff used her feet or hands to push students together. (Dkt. No. 31, Rosenfeld Decl. Exh. C at 8–9.) The Articles contain variations of these allegations, including that Plaintiff "stepped" on, "pressed," and "put her foot on" students' backs. While Plaintiff may rightfully take issue with the substance of the allegations, it is beyond cavil that these statements were made to the DOE.

Finally, Plaintiff takes issue with the following statement made by Chapman on a WNYC radio program: "The seventh grade history teacher at the school by the name of Patricia Cummings had asked black students to lie face down on the floor in the classroom and then stepped on at least one of those students in a lesson on the Middle Passage, which is the infamous slave route used in the U.S. slave trade." (Compl. ¶ 100.) This statement – like the others at issue – is a privileged fair report of the allegations at the heart of the OSI investigation. The radio program both mentions the *Daily News*'s reporting and, in a written excerpt on the same web page as the program, hyperlinks to the February 2, 2018 article. As my colleague Judge Oetken explained in *Adelson v. Harris*, 973 F. Supp. 2d 467, 482–86 (S.D.N.Y. 2013), hyperlinking to another article that itself is a fair report of a proceeding signals to the reader that the allegations stem from a proceeding, *aff'd*, 876 F.3d 413 (2d Cir. 2017). As explained, the statement that Plaintiff "stepped on at least one student" is a substantially accurate formulation of one of the allegations that was the subject of the OSI investigation.

### 2.   Statements Describing Plaintiff or Plaintiff's Lesson as "Racist" Are Nonactionable Opinions

Statements describing Plaintiff or Plaintiff's Lesson as "racist" are dismissed because they are nonactionable statements of opinion.

"Since falsity is a *sine qua non* of a libel claim and since only assertions of fact are capable of being proven false … a libel action cannot be maintained unless it is premised on

published assertions of *fact*." *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995). Thus, defendants cannot be liable "for simply expressing their opinion … no matter how unreasonable, extreme or erroneous these opinions might be." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1306 (N.Y. 1977); *see also Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) ("[T]he New York Constitution provides for absolute protection of opinions.").

The question of whether a statement constitutes fact or opinion is a question of law for the court. *Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014) ("Determining whether a statement is an allegation of fact or mere opinion is a legal question for the court."). To make this determination, New York courts consider three factors:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion.

*Brian*, 660 N.E.2d at 1129 (internal alterations omitted).

In applying these factors, courts have adopted a "holistic approach." *Davis v. Boheim*, 22 N.E.3d 999, 1005 (N.Y. 2014). "Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff." *Brian*, 660 N.E.2d at 1129 (internal citations and quotation marks omitted); *see also Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993) ("The dispositive inquiry … is whether a reasonable [reader] could have concluded that [the articles were] conveying facts about the plaintiff.") (citation and internal quotation marks omitted). Further, where the facts supporting

the opinion are fully set forth, the characterization accompanying those facts is a nonactionable opinion. *Gross*, 613 N.E.2d at 1167–1168.

Courts in New York have consistently held that terms like "racist" constitute nonactionable opinion. In *Silverman v. Daily News, L.P.*, 11 N.Y.S.3d 674 (2d Dep't 2015), the plaintiff was fired from his position as the principal of a school after defendant published articles referring to materials authored by the plaintiff as "racist writing." The court held that "the context of the complained-of statements was such that a reasonable reader would have concluded that he or she was reading opinions, not facts, about the plaintiff." *Id.* at 676. Further, "defendants made the statements with express references to the written materials authored by the plaintiff." *Id.* The court therefore concluded that the statements were nonactionable because "there was full disclosure of the facts supporting the opinions." *Id.*; *see also Russell v. Davis*, 948 N.Y.S.2d 394, 395–396 (2d Dep't 2012) (statements by reports and local politicians interpreting an essay by an electoral candidate as racist and anti-Semitic were opinions based on disclosed facts); *Goetz v. Kuntsler*, 625 N.Y.S.2d 447, 452 (Sup. Ct. N.Y. Cty. 1995) (statement that plaintiff had "venomous feelings against black people" and "developed hatred toward all blacks" was protected opinion); *Covino v. Hagemann*, 627 N.Y.S.2d 894 (Sup. Ct. Rich. Cty. 1995) (statement that plaintiff's actions were "racially insensitive" were nonactionable opinions because "racially insensitive and disrespectful racial insensitivity have no meaning which is readily understood," *id.* at 897 (internal quotation marks omitted)).

Here too, the terms "racist" and "racism" that appear in the *Daily News* Defendants' articles are pure statements of opinion based on disclosed facts. For example, in the *Daily News* Defendants' February 2, 2018 article, the opening line states, "Kids and parents say this Bronx teacher needs a lesson – in racism." (Dkt. No. 13, Exh. B at 2.) In this context, references to

Plaintiff as racist do not have the precise meaning capable of sustaining a defamation action. The line merely expresses the views of Plaintiff's students and their parents, quotation from whose interviews feature prominently in the Articles. Similarly, in the *Daily News* Defendants' July 9, 2018 article, the *Daily News* Defendants note that City Department of Education officials had not yet concluded investigations of "educators accused of racist acts." (Compl. Exh. E. at 1.) This, too, indicates that Plaintiff's accusers viewed her actions as racist – an opinion about her conduct, rather than a factual assertion.

In addition, as in *Silverman*, the *Daily News* Defendants disclosed the facts on which the opinions are based—i.e., that they were allegations from parents, students, and staff about the Plaintiff's Middle Passage lesson. While Plaintiff denies that she ever had students lie on the floor and denies any physical contact with students, (Compl. ¶ 54), she admits (1) that she had students sit in the front of the room to demonstrate the conditions on slave ships, and (2) that a parent reported that she "pushed her knee" into students' backs and asked if the students felt pain. (*Id.* ¶ 53.)

Thus, because the facts reported by the *Daily News* Defendants underlying the opinions were based on substantially true disclosed facts, the opinions are not actionable under a defamation theory. *See Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 281 (S.D.N.Y. 2016) (holding that opinion based on disclosed facts is only actionable when the "disparity between the stated facts and the truth would cause a reader to question the opinion's validity"). The fact that Plaintiff may disagree with the sources' characterizations of her or wish that the articles painted her in a different light, does not alter this conclusion.

To the extent Plaintiff's claims arise from the inclusion of "racism" and "racist" in the headlines over the articles, they are also dismissed. *See* (Compl. Exh. C ("Thousands sign parents' petition demanding action from de Blasio on racist school incidents")); (Exh. E ("Bronx educator accused of racism still under investigation, still on payroll")). Plaintiff takes issue with reference to her as "Slave Teach" or "Slave Teacher" in the headlines of certain articles. (Dkt. No. 58, Opp'n at 18.) A headline is not actionable so long as it is a "fair index of the article with which it appears." *Mondello v. Newsday, Inc.*, 774 N.Y.S.2d 794 (2d Dep't 2004). "A newspaper need not choose the most delicate word available in constructing its headline; it is permitted some drama in grabbing its reader's attention." *Test Masters Educ. Servs. V. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009). Here, the headlines fairly depict the contents of the articles—that students and parents alleged that Plaintiff's lesson on slavery was racist and that OSI was investigating these allegations. As a result, these headlines cannot form the basis of Plaintiff's Complaint.

B. *Defendants' Motion to Dismiss Plaintiff's Cause of Action for Defamation Is Granted as to the Media Defendants*

As to the Media Defendants, the Complaint disputes comments made by Defendant Charlamagne tha God on a radio program, and Defendant Perry and the Hechinger Report on an internet blog post.

Defendants argue that their statements are also nonactionable opinions.

When understood in their respective contexts, statements made by Defendants Charlamagne and Perry could only be understood by listeners and readers as impassioned criticism of the conduct reported in media coverage, and as their personal ruminations concerning the educational impropriety and racial insensitivity of that conduct. The statements therefore do not give rise to a cause of action for defamation.

41

Each Defendant's statement will be considered in turn.

### 1. Charlamagne's Challenged Comments Are Expressions of Opinion and Are Therefore Nonactionable

In her Complaint, Plaintiff's objects to what she characterizes as Charlamagne's "racist and defamatory rant" (Compl. ¶ 107) on a February 7, 2018 episode of *The Breakfast Club* morning show. As will be shown below, Plaintiff cannot as a matter of law base a defamation claim on these remarks, because they offer expressions of opinion so subjective as to be insufficient to state a claim for defamation.

Descriptions of Plaintiff as a "bigot," "white devil" and "cracker-ass-cracker" are not actionable. To constitute actionable defamation, a challenged statement must be provably false. *Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir. 1976). Based on this principle, the Complaint's allegations arising from the broadcast descriptions of Plaintiff as a "white devil" and a "bigot cracker-ass cracker" fail to state a viable cause of action. *See Rubinstein v. Transp. Workers' Union, Local 100*, No. 02 Civ. 994 (GBD)(KNF), 2005 U.S. Dist. LEXIS 19969, at *17 (S.D.N.Y. Sept 6, 2005) (statement that defamation counter-claimant "endorsed and rewarded a confessed bigot" not actionable as a matter of law). The on-air characterizations of Plaintiff as a "white devil [with] her hoof in my back" are "the sort of loose, figurative, [and] hyperbolic language" that courts routinely hold to be nonactionable. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990).

Similarly, the observations that, with respect to the students involved in the Middle Passage demonstration, Plaintiff "wanted to break their spirits" and "give them an inferiority complex" reflect inherently subjective evaluations of intent and state of mind, which are matters not readily verifiable and intrinsically unsuitable as a foundation for defamation. Imputing a motive or state of mind to a person based on that person's publicly reported conduct is not

actionable in defamation. *See, e.g.*, *Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) (statement that plaintiff aimed to "set up" brokerage houses "is nothing more than speculation about … motivations" and, as such, is a "clear statement of opinion" which "does not support a claim for libel"); *Rappaport v. VV Publ'g Corp.*, 618 N.Y.S.2d 746, 751 (Sup. Ct. N.Y. Cty. 1984), *aff'd*, 637 N.Y.S.2d 109 (1st Dep't 1986) ("Because statements concerning state of mind, such as hypotheses as to motivation, are not readily verifiable as true or false, courts of this State have consistently found them to be protected."). A person's internal thoughts are hardly capable of being proven false, and anyone is entitled to speculate about a person's motives from known facts of his behavior.

Neither can Plaintiff argue that these statements implied facts unknown to the listener. Charlamagne's rant was classic "pure" opinion under the law. As a matter of law, "pure" opinions are absolutely privileged and will not support an action for defamation. *Torain v. Liu*, 279 Fed. App'x 46, 47 (2d Cir. 2008) ("Under New York and federal law, expression of pure opinion, … are not actionable, receiving full constitutional protection."). A pure expression of opinion occurs when the parties to the communication know the facts or assume their existence and the statement is obviously based on those facts as justification for the opinion. *Chau*, 771 F.3d at 129. Such statements are "not actionable because … a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture." *Gross*, 623 N.E.2d at 1168.

The factual predicate for Charlamagne's commentary was contained in a CBS news broadcast that was expressly incorporated as part of the "Donkey of the Day" segment. (Dkt. No. 29, Exh. 1, p. 7, 11. 10-23; p. 8, 11. 2-4.) The essential facts animating Charlamagne's opinion were "transmitted to various news outlets and appeared online and in media all over the world."

(Compl. ¶ 60) According to the Complaint's allegations, they were known to the public. "Thus, the statements of opinion are nonactionable on the additional basis that there was full disclosure of the facts supporting the opinions." *Silverman*, 11 N.Y.S.3d at 676. Charlamagne's words can only plausibly be construed as presenting his personal point of view, "an exercise in fleshing out the implications of the facts previously disclosed" on the broadcast. *Ratajack v. Brewster Fire Dep't*, 178 F.Supp.3d 118, 166 (S.D.N.Y. 2016).

Indeed, given the immediate context of the contentious debate over the "lesson taught by the Plaintiff in her social studies class 408, on the Middle Passage" (Compl. ¶ 52) as reported by the global media (*id.* ¶¶ 60–61) – as well as the fact that Charlamagne's comments were made in the setting of a freewheeling morning radio show dedicated to animated discussion of public controversies – "the conclusion easily follows that defendant['s] statements in this case were hyperbolic." *600 West 115th Street Corp. v. Von Gutfeld*, 603 N.E.2d 930, 935 (N.Y. 1992). Indeed, Charlamagne's memorable description of the Middle Passage lesson as "heavy" on the Hellman's and covered with "extra mayonnaise" – i.e., drenched in whiteness – can only be understood as figurative criticism. Accordingly, "it would be plain to the reasonable [listener] of [Power 105.1] that [Charlamagne] was voicing no more than a highly partisan point of view" immunized from a defamation claim. *Immuno AG. V. Moor-Jankowski*, 567 N.E.2d 1270, 1281 (N.Y. 1991).

### 2. Dr. Andre Perry's Challenged Comments Are Expressions of Opinion and Are Therefore Nonactionable

The Complaint asserts that five statements in Dr. Perry's column are defamatory:

(1) A subheadline that reads: "A teacher literally stepped on children to 'teach' them about slavery."

(2) "Cummings' slavery lesson wasn't only cruel; it was redundant."

(3) "Black students know too well what it's like to be humiliated, held in captivity and to suffer from inhumane conditions created by educators. Many compliant students who sit quietly accepting demeaning lessons like the ones administered by Cummings and others like her are viewed as obedient and law-abiding. Their counterparts who resist are deemed disorderly and subjected to harsh disciplinary policies, often ending up in jail by way of the school-to-prison pipeline. Whether you are obedient or 'woke' – conscious of your oppression – you are being oppressed in schools. Yep, black students already know what it's like to be stepped on."

(4) "There are white teachers like Cummings who have not reckoned with what it means to oppress."

(5) "While most teachers probably won't see themselves in … Cummings, most should recognize that they associate with white norms, which makes it possible to act in racist ways …."

When considering the full context of the communication – an opinion column about race and academia – the thrust of the challenged statements are Perry's ruminations on education and race, rather than a factual statement about Cummings. Except for the piece's subheadline, the specific statements addressed in the Complaint are not provably true or false, but instead are Dr. Perry's views on education and race, based on his personal experience and expertise.

Nor is the subheadline actionable when read in context of the blog post. *Cf. Sandals Resorts Intern. Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 414 (1st Dep't 2011) ("even apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate … or other circumstances in which an audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole."). For one thing, the headline – standing alone – is not independently actionable because it does not mention Plaintiff by name. *See Chaiken v. VV Publishing Corp.*, 907 F. Supp. 689, 698 (S.D.N.Y. 1995), *aff'd* 119 F.3d 1018 (2d Cir. 1997), *cert. denied* 522 U.S. 1149 (1998). Any defamatory implication would occur "if at all, after reading the entire article," *id.*, and the subheadline can only be construed in conjunction with the

article. *See Mann,* 885 N.E.2d at 886 ("courts must consider the content of the communication as a whole, as well as its tone and apparent purpose") (citations omitted).

Dr. Perry's column begins "The *New York Daily News* reported on February 1"—with a hyperlink to the article containing the allegations. (Compl. ¶ 119, n. 9.) With that hyperlink, Perry disclosed that the facts he relied on are the allegations – subject to a government investigation – contained in *The Daily News* article. Further, Perry uses the word "allegedly" in his description of the allegations contained in the article. *See Nicosia v. De Rooy*, 72 F.Supp.2d 1093, 1103 (N.D. Cal. 1999) (holding that an online post accusing the plaintiff of embezzlement was nondefamatory opinion where the facts upon which the post relied were in articles to which the posting hyperlinked). Perry's column does not purport to offer any facts outside of what was reported therein.

When considered in their full context – an academic blog post offering personal observations on race, pedagogy, and education – and where the author has disclosed that his reference to Cummings is based on the allegations contained in the *Daily News* article hyperlinked and referred to explicitly in a piece reporting on a government investigation, these statements are nonactionable. "Fairly read … these statements constitute [Dr. Perry's] commentary on the allegations" at the heart of the OSI investigation. *See Catalanello v. Kramer*, 18 F. Supp. 3d 504, 518 (S.D.N.Y. 2014) ("Read in context, these statements are properly viewed as statements of opinion – an academic's ruminations – and therefore are not actionable as defamation.").

In Plaintiff's own words, the essential facts animating Dr. Perry's blog post were "transmitted to various news outlets and appeared online and in media all over the world"

(Compl. ¶ 60.) Given that those facts were explicitly integrated into the post, Plaintiff fails to plausibly allege that the post was based on undisclosed facts.

C. *Defendants' Motion to Dismiss Plaintiff's Cause of Action for Defamation Is Granted as to the Political Defendants*

Finally, Plaintiff asserts defamation claims against the City, Mayor de Blasio, New York State Senator Kevin Parker, and Councilmembers Williams and Dromm—who allegedly "exhibited flagrant disregard as to whether the accusations made against the Plaintiff were actually true …." (Compl. ¶¶ 102, 114, 115.)

The claim against Mayor de Blasio fails because, as the Mayor was speaking in his official capacity about an ongoing governmental investigation, his comments are protected by an absolute privilege.

The claims against the Councilmembers and State Senator Parker fail because, *inter alia*, their statements were nonactionable opinions.

Each will be considered in turn.

### 1. The Statements Made by Mayor de Blasio Are Protected by an Absolute Privilege

Plaintiff alleges that Mayor de Blasio's response to a question at a February 6 press conference about the OSI investigation was defamatory. (Compl. ¶ 102.) The statement reads:

> "It's not acceptable. It's not even close," de Blasio said when asked about the allegations. "I don't know any teacher in their right mind who would do something like that … we're doing a full investigation of that. That makes no sense. It is unfair to the kids. It's insensitive." "But I will say, this has not been a widespread problem in terms of any type of incident like that, thank God, but we will keep deepening our implicit type training, and ways of helping our teachers to think about these issues better."

(*Id.*; *see also* Dkt. No. 29, Balog Decl. Exh. B, Feb. 6, 2018 Tr. at 14 (setting forth the complete statement by Mayor de Blasio).) Although OSI had not yet completed its investigation on

February 6, 2018, Plaintiff alleges that Mayor de Blasio "knew or should have known" when he answered the question that what was reported in the *Daily News* was false "based on the investigation …." (Compl. ¶ 103.) Plaintiff further alleges that Mayor de Blasio "defamed" her when on some unspecified date he "accepted" petitions from the Coalition of Educational Justice. (*Id*. ¶ 105.)

The statements made by Mayor de Blasio – and Mayor de Blasio's "accepting" petitions (the precise meaning of which remains unclear) – are protected by an absolute privilege. "The absolute privilege defense affords complete immunity from liability for defamation to 'an official who is a principal executive of State or local government' … with respect to statements made during the discharge of those responsibilities about matters which come within the ambit of those duties." *Spring v. Cnty of Monroe*, 92 N.Y.S.3d 509, 511 (4th Dep't 2019) (citation omitted). "[A]n absolute privilege, a veritable immunity, is impervious to proof, and therefore to a charge, of malice." *Stukuls v. State of N.Y.*, 366 N.E.2d 829, 831 (N.Y. 1977).

Over 40 years ago, the New York Court of Appeals addressed an analogous situation to the one before this Court. In *Lombardo v. Stoke*, 222 N.E.2d 721 (N.Y. 1966), the President of Queens College, in conjunction with the Board of Higher Education, made a public statement about charges by some former faculty members that the appointment and promotional process at Queens College was tainted with religious bias—a matter that had been widely reported on by the press. *Id.* at 722. In the statement, he expressed the belief that these former faculty members had advanced the charges of religious discrimination to explain their lack of academic success and to obtain promotion. *Id*. The Court ruled that this statement, alleged to be defamatory, was protected by absolute privilege. It reasoned that "the members of the defendant Board of Higher

Education … should be free to report to the public on appropriate occasions 'without fear or reprisal by civil suit for damages.'" *Id.* at 724.

Here, Mayor de Blasio responded to a question about the DOE investigation into Plaintiff's Middle Passage lesson at a Mayoral press availability. Such statements are absolutely privileged. *See Spring v. County of Monroe*, 92 N.Y.S.3d 509, 511 (4th Dep't 2019) (holding that statements made to the press by county executive about plaintiff's termination were absolutely privileged "because the investigation and the underlying actions of plaintiff became a matter of public attention and controversy …."); *Cosme v. Town of Islip*, 476 N.Y.S.2d 857, 858 (1st Dep't 1984) (executive officer of the Town of Islip's responses to questions at a town meeting were protected by absolute privilege). The Mayor must be allowed to inform the public about the administration of the school system.

For the same reason, the Mayor's "accepting" petitions relating to the incident is absolutely privileged. New York City school parents, as members of the public, have a First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I. Nothing about the Mayor's accepting petitions from constituents implies anything about Plaintiff, or about the truth of the allegations made against her.

Plaintiff's defamation claim against Mayor de Blasio is dismissed.

### 2.  The Statements Made by the Council Members Are Nonactionable Opinions

On February 9, 2018, the *New York Amsterdam News* published an article about a protest in front of New York City Hall organized by an education advocacy group in response to the reports about Plaintiff's lesson. The article purportedly attributed the following statement to Councilmember Dromm:

> "Educators teaching in a city as diverse as ours should be given cultural
> competency training," said Daniel Dromm, NYC Council Finance Committee

chair. "This is the only way to avoid similar traumatic experiences like what happened in the Bronx."

The article also purportedly attributed the following statement to then-Councilmember Williams:

> "There is clear need for the administration to be more proactive in mandating Culturally Responsive Education in our schools," said Councilmember Jumaane Williams. "We should not have to wait for grotesque events of cultural insensitivity to mar our classrooms in order to spur action, and I sincerely hope we don't have to wait for the next one."

Plaintiff alleges that both Dromm and Williams "exhibited flagrant disregard as to whether the accusations made against Plaintiff were actually true…" when they made the statements. (Compl. ¶¶ 114–115.)

Neither statement is defamatory, in part because neither refers directly to Plaintiff. Councilmember Dromm's statement is directed at "educators" teaching in a diverse city. Under New York law, "a plaintiff cannot sustain a libel claim if the allegedly defamatory statement is not 'of and concerning plaintiff' but rather only speaks about a group of which the plaintiff is a member." *Chau*, 771 F.3d at 129 (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006)). And then-Councilmember Williams's statement is not directed at Plaintiff at all, but rather at the Mayor.

Even if the statements did identify Plaintiff with specificity, the officials' characterization of "what happened in the Bronx" as "traumatic" and "grotesque" are clearly expressions of opinion incapable of being provably true or false. The Councilmembers use of these words indicate that the statements are the kind of "fiery rhetoric" typical of debates on public issues. In this context, "a reasonable listener would have believed that they were opinion." *Melius v. Glacken*, 94 N.Y.S.2d 134, 136 (2d Dep't 2012).

### 3. The Statements Made by New York State Senator Kevin Parker Are Nonactionable Opinions

The same February 9, 2018 *New York Amsterdam News* article that quoted the

Councilmembers also provides a quote from State Senator Kevin Parker, which Plaintiff alleges

"exhibited flagrant disregard as to whether the accusations made against the Plaintiff were

actually true." (Compl. ¶ 108.) The quote reads:

> "Like many others, I am completely outraged [] by the actions of Bronx Middle
> School 118 teacher, Patricia Cummings," said State Sen. Kevin Parker. "I call for
> her swift removal from the New York City Department of Education, and the
> revocation of all New York State licensures and credentials that would allow her
> to teach in our State."
>
> Parker continued, "Although I hear some calling for a second chance for Ms.
> Cummings via culturally competent training and the like, as an African studies
> professor at the City University of New York for over 20 years now, I know there
> is no level of training that can make a person more sensitive to the struggles of
> another. Those feelings cannot be prepared in one's mind, but rather must be
> intrinsic to one's character. This is not the case for Ms. Cummings and it is my
> hope we can learn for this deplorable act to inform future decisions and best
> practices when deciding who will be afforded the honor of teaching our children."

(*Id.*)

Senator Parker moves for judgment on the pleadings, (Dkt. No. 81), on the basis that

these statements are protected opinion. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d

Cir. 2006) ("The standard for addressing a Rule 12(c) motion for judgment on the pleadings is

the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim.") This

statement was clearly an expression of opinion. It was quoted in the same article as, and was a

reaction to, the "reported" and "alleged" facts concerning Plaintiff's lesson about the Middle

Passage. (*See* Dkt. No. 82, Schwartz Decl. Exh. A.) It consisted of three core ideas: (1) that

Senator Parker was "outraged" by Plaintiff's actions (quite clearly referring to the "allegations" at

the heart of the investigation), (2) that Plaintiff should be removed from the DOE, and (3) that

"culturally competent training and the like" would not be effective, based on his personal

experience as an African Studies Professor at the City University of New York and his understanding that sensitivity to the struggles of another must be intrinsic to a person's character, which appeared not to be the case for Plaintiff. *Id.*

The only statement arguably capable of defamatory construction is the statement that culturally sensitive training would not be effective for Ms. Cummings. However, that is plainly not something provable and so qualifies as opinion. Moreover, the facts about Plaintiff on which Senator Parker based this statement are set out in the article, and there is no suggestion therein, or anywhere else in the Complaint, that Defendant Parker was referring to any undisclosed facts about Plaintiff. To the contrary, Parker explained in the preceding sentence that the basis of this statement was his personal experience as an African studies professor. Those receiving the statement would be free to credit or discount the bearing that experience had on the debate at hand. Indeed, the full context in which the statement appears would signal to a reader that they were reading or hearing impassioned rhetoric typical of debates on public issues. Senator Parker's quoted comment is "protected as a statement of opinion and thus not a false statement of fact." *Frascatore v. Blake*, 344 F. Supp.3d 481, 494 (S.D.N.Y. 2018).

D. *Plaintiff's Claims for Negligence, Negligent Infliction of Emotional Distress, and Intentional Infliction of Emotional Distress Are Dismissed as to all Defendants as Duplicative*

Plaintiff asserts claims for negligence (Compl. ¶¶ 188–194), negligent infliction of emotional distress ("NIED"), and intentional infliction of emotional distress ("IIED") (Compl. ¶¶ 195–209) against all defendants.

Plaintiff supports these claims with the same facts that underlie her defamation claims. But her attempt to recast a defamation claim as various other torts is impermissible under New York law. Each of Plaintiff's claims for negligence and emotional distress must be dismissed.

It is well-settled that tort claims "aimed at controlling the same speech that is the basis of a libel claim" should not be entertained "under less stringent standards." *Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988). Under New York law, a tort claim "based on the same conduct underlying [a] defamation claim fails as a matter of law, because "New York cases have held that a separate cause of action for what are essentially defamation claims should not be entertained." *Anyanwu v. Columbia Broadcasting System, Inc.*, 887 F. Supp. 690, 693 (S.D.N.Y. 1995) (collecting cases). On this basis, courts applying New York law have dismissed negligence claims paired with defamation claims, *see, e.g.*, *Butler v. Delaware Otsego Corp.*, 610 N.Y.S.2d 664 (3d Dep't. 1994), intentional infliction of emotional distress claims paired with defamation claims, *see, e.g.*, *Matthaus v. Hadjedj*, 49 N.Y.S.3d 393 (1st Dep't 2017), and negligent infliction of emotional distress claims paired with defamation claims, *see, e.g.*, *Napoli v. New York Post*, 107 N.Y.S.3d 279 (1st Dep't 2019).

This Court does the same.

## CONCLUSION

Defendants' motion to dismiss Plaintiff's Complaint is granted. Plaintiff's claim is dismissed with leave to replead. The amended complaint is due within 21 days. The Clerk of the Court is directed to remove the motions at Dkt. Nos. 27, 28, 29, 31, and 81 from the Court's list of pending motions.

Dated: February 24, 2020

_____
Chief Judge

BY ECF TO ALL COUNSEL