UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
PATRICIA CUMMINGS,

|  |  |
|---|---|
| Plaintiff, | Docket No. 19-cv-07723 (CM) (OTW) |
| -against- | **AMENDED VERIFIED COMPLAINT** |
| THE CITY OF NEW YORK; | **Plaintiff Demands a Trial by Jury** |

THE CITY OF NEW YORK;
NEW YORK CITY DEPARTMENT OF EDUCATION;
GIULIA COX; COURTNEY WARE; BEN CHAPMAN;
NEW YORK DAILY NEWS; DR. ANDRE PERRY;
THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA;
LENARD LARRY McKELVEY a/k/a
*CHARLAMAGNE THA GOD*;
WWPR-FM (105.1 MHZ); iHEARTMEDIA;
CLEAR CHANNEL COMMUNICATIONS, INC.;
NEW YORK STATE SENATOR, KEVIN S. PARKER;
COALITION OF EDUCATIONAL JUSTICE[1];
ANGEL MARTINEZ[2]; NATASHA CAPERS[3];
PHILIP SCOTT; ADVISE MEDIA NETWORK
n/k/a AFRICAN DIASPORA NEWS CHANNEL, and
"JOHN DOE AND JANE DOE # 1-100" said names
being fictitious, it being the intent of Plaintiff
to designate any and all individuals, officers, members,
agents, servants, and/or employees of the
aforementioned agencies owing a duty of care to Plaintiff,
individually and jointly and severally,

Defendants.
-----------------------------------------------------------------------X

---

[1] Defendant, Coalition of Educational Justice was served with a copy of the Verified Complaint on January 30, 2019, and failed to timely answer.

[2] Defendant, Angel Martinez was served with a copy of the Verified Complaint on January 30, 2019, and failed to timely answer.

[3] Defendant, Natasha Capers was served with a copy of the Verified Complaint on January 30, 2019, and failed to timely answer.

1

Plaintiff, by her attorneys, the Law Offices of Thomas F. Liotti, LLC, for her Amended Verified Complaint in this matter, respectfully alleges:

## **JURISDICTION**

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a) (1), (2), (3), and (4), related to those causes of action for damages brought pursuant to Civil Rights Law §§§ 1981, 1983, §1985 (1), (2), and (3), §1988, Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Fifth and Fourteenth Amendment of the United States Constitution; together with this Court's pendent jurisdiction over causes of action arising under New York State laws, both common and statutory.

2.    Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising out of state law pursuant to 28 U.S.C. §1367(a).

3.    Based on the foregoing, this Court has subject matter jurisdiction and may exercise supplemental and pendent jurisdiction of all related state-law based claims.

4.    It is alleged that these Defendants have conspired together under color of the aforementioned New York State and Federal laws to deprive this Plaintiff of her civil rights. The actions perpetrated by these Defendants as herein described have abridged the privileges and immunities of the Plaintiff and have deprived her of life, liberty, and the pursuit of happiness without due process of law, and have denied the Plaintiff the equal protection of the laws. It is further alleged that the actions of these Defendants have discriminated against the Plaintiff due to her race.

5.    She further seeks damages related *inter alia* to the infliction of defamation and defamation *per se*, libel, libel *per se*, slander, slander, *per se*, discrimination,

2

fraud/misconduct, negligence, denial of due process, denial of civil rights, severe emotional, psychological, loss of reputation, loss of income, expenses upon her, the erroneous termination of her employment as a New York City school teacher, and the "*badge of infamy*" with which she has forever been branded.

6.     The Plaintiff further alleges the jurisdiction of this Court pursuant to the Universal Declaration of Human Rights as adopted by the United Nations General Assembly on December 10, 1948, in which the United States of America is a party and in particular all articles therein.

## VENUE

7.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).

8.     Plaintiff brings this action to redress harms caused to her by the Defendants.

9.     The Plaintiff commenced a civil action for the same relief as herein on January 10, 2019, in the Supreme Court in the County of Suffolk, where she resides.

10.     On February 19, 2019, Plaintiff's counsel received the City Defendants' Demand for a Complaint, and on that same date, received the City Defendant's a Demand for a Change of Venue from Suffolk County to New York County, *inter alia*, on the ground that Suffolk County is an improper county for venue. Plaintiff did not consent to the demand, and the City Defendants purchased an index number in New York County Supreme Court and moved for a change of venue under CPLR §§504(2) (3) and 511(a) and (b). The Plaintiff opposed said motion.

11.     On or about March 22, 2019, Plaintiff's counsel received a Notice of Removal to Federal Court on behalf of the City of New York Defendants seeking a transfer of the case

3

to the United States Eastern District of New York. Thereafter, on April 2, 2019, Plaintiff's counsel was contacted by the City Defendants' counsel requesting consent to a further transfer of the matter to the United States Southern District of New York; Plaintiff refused to consent to the transfer. Nonetheless, this application was presented and fully briefed on letter motion and granted by the Court.

## JURY DEMAND

12.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

13.     That at all times relevant herein and material hereto, the Plaintiff, PATRICIA CUMMINGS, ("Plaintiff" or "Ms. Cummings"), was and is a resident of the County of Suffolk, State of New York, and was employed with the Department of Education as a New York City Public School Teacher at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York.

14.     At all times relevant herein and material hereto, the Defendant, THE CITY OF NEW YORK, was and is a domestic municipal corporation located in and established pursuant to the laws of the State of New York.

15.     At all times relevant herein and material hereto, the Defendant, NEW YORK CITY DEPARTMENT OF EDUCATION, ("NYCDOE"), was and is a public corporation created pursuant to the laws of the State of New York.

16.     At all times relevant herein and material hereto, the Defendant, GIULIA COX, is an individual, who was employed by the City of New York Department of Education as the

4

Principal, at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York.

17.     At all times relevant herein and material hereto, the Defendant, COURTNEY WARE, was and is an individual, employed by the City of New York Department of Education as an Assistant Principal, at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York.

18.     At all times relevant herein and material hereto, the Defendant, BEN CHAPMAN, is an individual, who was employed by the Defendant, DAILY NEWS, L.P. s/h/a NEW YORK DAILY NEWS, as in investigative news reporter, covering education and has written more than 2,000 articles about New York City schools for the Daily News since joining the newspaper in 2009.

19.     At all times relevant herein and material hereto, the Defendant, DAILY NEWS, LP s/h/a NEW YORK DAILY NEWS, was and is a Delaware limited partnership, with its principal place of business located at 450 West 33rd Street, New York, New York 10001.

20.     Upon information and belief, Defendant, DAILY NEWS, LP, at all times relevant herein and material hereto, was and is the owner, operator and publisher of the "Daily News," a New York daily newspaper ("Daily News").

21.     The Daily News publishes substantially the entire newspaper online at http://www.nydailynews.com.

22.     In addition to its regular daily print edition, the Daily News has a daily circulation of hundreds of thousands of readers and is the ninth most circulated paper in the United States.

23.     At all times relevant herein and material hereto, the Defendant, DR. ANDRE PERRY, was and is an individual education leader, author and advisor to people working to improve education in K-12 and postsecondary institutions.. He is the David M. Rubenstein Fellow in the Metropolitan Policy Program at the Brookings Institution, and his research focuses on race and structural inequality, education, and economic inclusion. Dr. Perry's recent scholarship at Brookings has analyzed majority-black places and institutions in America, focusing on highlighting valuable assets worthy of increased investment.

24.     Prior to his work at the Brookings Institution, Dr. Perry has been a founding dean, professor, award-winning journalist, and activist in the field of education. In 2015, Perry served on Louisiana Governor-elect John Bel Edward's K-12 education transition committee, as well as New Orleans Mayor-elect Mitch Landrieu's transition team as its co-chair for education in 2010.

25.     In 2013, Dr. Perry founded the College of Urban Education at Davenport University in Grand Rapids, MI. Preceding his stint in Michigan, he was an associate professor of educational leadership at the University of New Orleans and served as CEO of the Capital One-University of New Orleans Charter Network.

26.     Since 2013, Dr. Perry's column on educational equity has appeared in the Hechinger Report, a nonprofit news organization focused on producing in-depth education journalism. Dr. Perry also contributes to TheRoot.com and the Washington Post. His views, opinions and educational leadership have been featured on CNN, PBS, National Public Radio, The New Republic and NBC. Dr. Perry's academic writings have concentrated on race, structural inequality, and urban schools.

27.     At all times relevant herein and material hereto, the Defendant, THE HECHINGER REPORT a/k/a HECHINGER INSTITUTE ON EDUCATION AND THE MEDIA, was and is a nonprofit independent news organization focused on inequality and innovation in education and producing in-depth education journalism.

28.     At all times relevant herein and material hereto, the Defendant, LENARD LARRY McKELVEY a/k/a *CHARLAMAGNE THA GOD,* was and is an individual American radio presenter, television personality, and author; known professionally as *Charlamagne tha God*; co-host of the nationally syndicated radio show The Breakfast Club with DJ Envy.

29.     At all times relevant herein and material hereto, the Defendant, WWPR-FM (105.1 MHZ), better known by its branding Power 105.1, was and is an Urban contemporary radio station licensed to New York City and is owned by iHeartMedia. The station is the flagship station of the nationally syndicated morning radio show, The Breakfast Club.

30.     At all times relevant herein and material hereto, the Defendant, iHEARTMEDIA, a/k/a iHEARTMEADIA, INC. was and is formerly CC Media Holdings, Inc., an American mass media corporation headquartered in San Antonio, Texas. It is the holding company of iHeartCommunications, Inc. (formerly Clear Channel Communications, Inc.), a leading global media and entertainment company specializing in radio, digital, mobile, social, live events and on-demand entertainment, which owns WWPR-FM (105.1 MHZ).

31.     At all times relevant herein and material hereto, the Defendant, CLEAR CHANNEL COMMUNICATIONS, INC., was and is a wholly owned subsidiary of CC Media Holdings, Inc. On September 16, 2014, CC Media Holdings, Inc. was rebranded iHeartMedia, Inc.; and Clear Channel Communications, Inc., became iHeartCommunications, Inc.

32.     Upon information and belief, on March 15, 2018, iHeartMedia, Inc. and certain of its subsidiaries, including iHeartCommunications, Inc. and WWPR-FM (105.1 MHZ) ("debtors"), commenced cases under Chapter 11 of title 11 of the United States Code, which are pending in the United States Bankruptcy Court for the Southern District of Texas.

33.     As such, due to the imposition of the automatic stay that acts as an injunction against certain actions, particularly the continuation of a judicial, administrative, or other such actions, the Plaintiff is currently precluded from pursuit of this action as against them, and takes no action herein to prosecute these claims, as against the aforementioned debtors at this time.

34.     At all times relevant herein and material hereto, the Defendant, NEW YORK STATE SENATOR, KEVIN S. PARKER, was and is and individual member of the New York State Senate representing the 21st District, which comprises portions of the neighborhoods East Flatbush, Flatbush, Midwood, Ditmas Park, Kensington, Park Slope, and Windsor Terrace in Brooklyn. Senator Parker is a Democrat, and was first elected in 2002.

35.     In January 2005, he was arrested after punching a traffic agent in the face during a dispute over a traffic citation that he had been issued. He was subsequently charged with third degree assault, a misdemeanor. The charges were dropped after he agreed to take anger management classes. See, "NY Senator: 'You Racist People In Here.'" wcbstv.com; archived from the original on April 30, 2010. Retrieved April 29, 2010. In 2008, an aide filed charges against him, claiming he pushed her during an argument and smashed her glasses. Id. On May 8, 2009, he was charged with felony criminal mischief for attacking a New York Post photographer and damaging the photographer's camera and car door. According to

8

prosecutors, the photographer's finger was broken in the alleged attack. See, "Convicted NY State Senator Loses 1 Leader Post." CBSLocal.com. January 11, 2011. Retrieved January 25, 2018. He was charged with a felony due to the value of damage to the camera and car door. See, Gendar, Alison; Lovett, Ken; Standora, Leo (May 8, 2009). "State Senator Kevin Parker busted over tussle with photographer." New York: Nydailynews.com. Retrieved April 29, 2010. As a result, he was stripped of his leadership position as majority whip and chair of the Energy Committee. See, Baker, Al (May 10, 2009). "After Arrest, a State Senator Loses His Leadership Posts." The New York Times. He was convicted of a misdemeanor charge, criminal mischief, and on March 21, 2011 was sentenced to three years probation and a $1,000 fine. See, Gorta, William J. (March 21, 2011). "State Sen. Parker sentenced to probation for attacking Post photographer." New York Post. Had he been convicted of the felonies, he would have automatically lost his seat in the Senate, and the Senate had already expelled Hiram Monserrate for misdemeanor charges earlier in the year. The Senate Democrats expressed an unwillingness to expel Parker as they had Monserrate. See, "Sampson sees no Monserrate-Parker parallels." TimesUnion.com. December 7, 2010. Retrieved January 25, 2018. In February 2010, Parker was restrained by his colleagues during a profane tirade against Senator Diane Savino in which Parker referred to Savino as a "bitch." See, Lovett, Kenneth (February 11, 2010). "Another Senate brawl in Albany: Sen. Kevin Parker charges towards then curses out female colleague." Daily News. New York. In April 2010, he launched into an outburst while colleague John DeFrancisco (R) of Syracuse was questioning a black nominee for the New York State Power Authority. Senator Parker objected to DeFrancisco's questions and asserted that he had never seen a white nominee

treated in similar fashion. <u>See</u>, Katz, Celeste; Lovett, Kenneth (April 28, 2010). "<u>State Sen.</u>
<u>Kevin Parker erupts again with raced-based rant, and even allies are concerned</u>" Daily News.
New York. "Amid the nearly two-minute tirade, committee chairman Carl Kruger told
Senator Parker he would be removed from the hearing room if he didn't settle down." <u>Id</u>. He
has accused his colleagues of racism, and followed up in a radio interview by accusing his
Republican "enemies" of being white supremacists. <u>See</u>, "<u>NY Senator: 'You Racist People In</u>
<u>Here.'</u>" wcbstv.com; archived from the original on April 30, 2010. Retrieved April 29, 2010.
Following the tirade, Sen. Rubén Díaz Sr. (D-Bronx) was quoted as saying that Parker
"needed help." <u>See</u>, Katz, Celeste; Lovett, Kenneth (April 28, 2010). "<u>State Sen. Kevin Parker</u>
<u>erupts again with raced-based rant, and even allies are concerned</u>" Daily News. New York. In
December 2018, Senator Parker allegedly blocked a bike lane with a car using his official
parking placard, but a different license plate. When questioned about the incident on Twitter,
he replied, "Kill yourself!" <u>See</u>, Mills Rodrigo, Chris (January 18, 2018). "<u>NY state senator</u>
<u>tweets 'Kill yourself' at user who called him out over parking placard</u>." The Hill. Retrieved
January 18, 2018; <u>see also</u>, Fearnow, Benjamin, (18 December 2018). "'<u>Kill Yourself!': New</u>
<u>York State Senator Kevin Parker Apologized for Tweet Over Parking Spot</u>." Newsweek.
Retrieved 19 December 2018. "Parker responded with an irrational demand that she kill
herself before he offered a weak Twitter apology using his verified account. But less than an
hour after the apology, Parker continued his criticism of Giove." Incoming Senate President
Andrea Stewart-Cousins expressed her "disappointment" at Parker's action. <u>See</u>, "<u>Dem. State</u>
<u>Senator Slammed For 'Kill Yourself!' Tweet To GOP Aide</u>." WLNY-TV CBS. 18 December 2018.
Retrieved 19 December 2018. In an April, 2019 closed-door meeting of Senate Democrats,

10

an argument between Parker and Sen. Alessandra Biaggi (D) occurred, and Senator Parker reportedly "ripped off his tie and threw it down in a rage." <u>See</u>, Fink, Zack, "<u>Nasty Fight Erupts Between State Senate Democrats During Closed Door Meeting</u>." <u>www.ny1.com</u> (April 12, 2019).

36.     At all times relevant herein and material hereto, the Defendant, COALITION OF EDUCATIONAL JUSTICE, a/k/a the NYC Coalition for Educational Justice (CEJ) is a parent-led movement seeking educational equity and excellence in the city's public schools; a citywide collaborative of community-based organizations and unions whose members are parents, community residents and teachers formed to ensure that every child in NYC receives a quality and well-rounded education.

37.     At all times relevant herein and material hereto, the Defendant, ANGEL MARTINEZ, was and is an individual residing in Harlem, New York and is a parent member of the COALITION OF EDUCATIONAL JUSTICE, a/k/a the NYC Coalition for Educational Justice (CEJ).

38.     At all times relevant herein and material hereto, the Defendant, NATASHA CAPERS, was and is an individual residing in Brownsville, Brooklyn, New York and is a parent member and coordinator for the COALITION OF EDUCATIONAL JUSTICE, a/k/a the NYC Coalition for Educational Justice (CEJ).

39.     At all times relevant herein and material hereto, the Defendant, PHILIP SCOTT, upon information and belief, was and is an individual and self-proclaimed multi-media journalist residing in Texas, the creator of The Advise Show, and the journalist anchor a weekly radio and YouTube program whose mission is to: engage in discussions on current

11

events, thought provoking topics, and controversial issues, (which have garnered over 304 million YouTube views to date). His online platform has created a very diverse fan base that varies in age, ethnicity, socio-economic status, and loyal international supporters.

40.     At all times relevant herein and material hereto, the Defendant, ADVISE MEDIA NETWORK, (now known as African Diaspora News Channel), at all times relevant herein and material hereto, is and was an independent media company that operates three (3) YouTube channels, and TheAdviseShowTV, which claims to bring news and social commentary and to present "Media With A Common Sense Approach."

41.     Plaintiff has complied with the requirements of New York General Municipal Law Section 50-I by serving notices of claim on THE CITY OF NEW YORK and NEW YORK CITY DEPARTMENT OF EDUCATION, on September 26, 2018, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of those notices, and no offer of settlement has been made.

42.     At the request of The City of New York, the Plaintiff submitted to hearings pursuant to New York General Municipal Law Section 50-h involving the events as referred to hereinafter. No other hearings have been conducted.

43.     The Plaintiff is informed and believes, and based on that information and belief alleges, that each of the Defendants designated herein are legally responsible for the events and happenings referred to in this Complaint, and unlawfully caused the injuries and damages to the Plaintiff alleged in this Complaint.

44.     Plaintiff is informed and believes, and based on that information and belief alleges, that at all times mentioned in this Complaint, in some instances the Defendants were

12

the agents and/or employees of their co-defendants and in doing the things alleged in this Complaint were acting within the course and scope of such agency and/or employment.

## The Plaintiff is a Private Figure

45.      Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "44," above, with the same force and effect as though fully set forth herein.

46.      Plaintiff is a private figure for the purposes of this action, having lived her entire life outside of the public eye.

47.      Prior to February 1, 2018, the Plaintiff had no notoriety of any kind in the community at large.

48.      Plaintiff did not engage the public's attention to resolve any public issue that could impact the community at large.

49.      Plaintiff made no public appearances prior to the false allegations brought against her.

50.      Plaintiff has not inserted herself into the forefront of any public issue.

51.      Plaintiff's limited public statements after the accusations against her were reasonable, proportionate, and in direct response to the false accusations against her and do not render the Plaintiff a limited purpose public figure.

## I.  ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

52.      Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "51," above, with the same force and effect as though fully set forth herein.

13

53.     Plaintiff, PATRICIA CUMMINGS, was a dedicated, effective, and highly respected New York City Department of Education Public School teacher at The William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York. Plaintiff has a Bachelor of Science Degree from Adelphi University and has completed the coursework at SUNY College at Old Westbury for a Bachelor's Degree in American Studies. Plaintiff has a Master's Degree in teaching (MAT) from SUNY College at Old Westbury.  Plaintiff also holds a license to teach grades 7-12 in New York State. In addition, Plaintiff has taken the required coursework in Special Education and has passed the New York State required exam for a Special Education certification. Plaintiff has taught Social Studies on the secondary level in three (3) prominent Long Island School Districts, as well as a program for an extended school year for students with disabilities that require year round education.

54.     This claim arises as a result of what was erroneously reported concerning a complaint made by a student and their parent on or about January 11, 2018, regarding a lesson on the Middle Passage taught by Plaintiff on January 9, 2018 in her social studies class 408, which was an Integrated Co-Teaching (ICT) Class. An ICT class has both a General Education teacher and a Special Education Teacher. Plaintiff was the General Education Teacher. The number of students with disabilities in an Integrated Co-Teaching class may not exceed 40 percent of the total class register. Integrated Co-Teaching classes must adhere to general education class size limits. Yet, Class 408 was comprised of approximately 23 students, where 11 students were Special Education students with Individualized Education

14

Programs (IEPs). Notably, the ratio in the class of General Education Students and those with Special Needs was in violation of New York State Education Law.

55.     It was erroneously alleged by the mother of a student, (Student A), that "during [her] social studies class [her] teacher wanted to demonstrate 'how the slaves were on the boat." The mother of Student A further alleged that Plaintiff instructed said student to get on the floor and Plaintiff "put her knee into her back" and "pushed down" asking if [Student A] felt pain. Plaintiff acknowledges showing a five (5) minute video clip from the movie entitled *Freedom* to differentiate her instruction which depicted the horrible conditions and atrocities slaves were subjected to on the Middle Passage, and aided in the delivery of the historical information.

56.     By using the video, Plaintiff was able to incorporate the theory of multiple intelligences into the classroom, which is beneficial to all students, both with and without disabilities. Some students began mocking the contents of the video, specifically the deplorable conditions, and a teachable moment arose. Plaintiff asked for four (4) student volunteers to sit very close together for an exercise to exhibit spatial recognition.

57.     Plaintiff denies that any student laid on the floor at any time during the exercise and denies making any physical contact with any student during the exercise, which was no more than 20 seconds in length. Ralph Hudson[4], another teacher on his preparation period in Plaintiff's classroom at the time of the lesson, <u>observed</u> Plaintiff's lesson.

---

[4] Ralph Hudson is an African-American teacher and acknowledged to the Plaintiff that he found the lesson to be appropriate and in the scope of effectively educating students about the harsh conditions endured by slaves during transport. He did not witness the events as indicated by the student. He indicated that it was his belief, that if the Plaintiff were African-American, the incident would have been a non-issue. Mr. Hudson provided an Affidavit to

58.     On or about January 16, 2018, Plaintiff received a hand-delivered correspondence by and from the Defendant, Giulia Cox, then Principal of The William W. Niles School - Middle School 118, inexplicably informing her that she was the subject of a disciplinary meeting to take place on January 18, 2018.

59.     On or about January 18, 2018, Plaintiff met with Defendant Giulia Cox as directed, and was informed of students' written statements dated January 11, 2018, regarding an alleged incident that occurred in class 408, and that they were taken by Defendant, Courtney Ware, one of the Assistant Principals of the school. The Plaintiff requested that the Defendant, Giulia Cox speak with Ralph Hudson regarding what he had witnessed in the classroom on January 9, 2018; yet the Defendant, Giulia Cox inexplicably refused to speak with Mr. Hudson. It is Plaintiff's conjecture that Defendant Cox did not speak with the witness, Ralph Hudson, so she could state that he was not a witness, which would make her false narrative that she later told investigators, that the lesson was taught on January 10, 2018, plausible.

60.     Shortly thereafter, the Defendant Giulia Cox disciplined the Plaintiff and only removed her from teaching class 408 from January 23, 2018 - January 25, 2018; however she [Plaintiff] continued to teach her other classes during that time. This infers that Defendant Cox, did a rogue investigation, which did not constitute any type of State investigation or official "proceeding" by the NYCDOE. If this was a true proceeding, an OSI number would have been generated and the Plaintiff would have known that she was the subject of one in

_____

that effect and also stated, from a personal standpoint, that he would not have had an issue with his own children participating in the lesson.

16

accordance with the NYCDOE's own rules and regulations. This also leads one to conclude that the student statements taken on January 11, 2018 by Defendant, Courtney Ware, did not rise to the level of "corporal punishment," which would require an immediate investigation by OSI; thus, a proceeding would have begun. Had this been done, in accordance with Article 20 of the UFT Contract and the Chancellor's Regulations, there would have been an investigation opened within 24 hours of January 11, 2018, and an OSI Index number would have been immediately produced and provided to Plaintiff within five (5) school days; not two weeks after statements were taken. Furthermore, in accordance with Article 20 of the UFT Contract and the Chancellor's Regulations, Plaintiff would have been notified within 5 school days that she was the subject of an OSI Investigation, and she was not. It is important to indicate that Plaintiff was the subject on an investigation by OSI, but only after the Daily News article was published online on February 1, 2018.

61.     It was the outrage caused by the publicity set forth by the Daily News, which ignited the investigation, not the written students' statements taken on January 11, 2018, which (1) did not have the allegation as described by the Daily News and (2) was **not** corporal punishment. No corporal punishment was originally concluded by Defendant Cox before the Daily News article existed, and later by OSI, six months after the article appeared. Therefore, the only reason why Plaintiff was investigated was because of this substantially false, erroneous article with egregious descriptions of false allegations and statements asserted as facts.

62.     Therefore, the Defendant, Daily News and its investigative journalist Defendant, Ben Chapman, manufactured a story line that contained descriptions of

allegations that were verifiably false and inaccurate, in advance of the thought of any investigation by NYCDOE. Moreover, the NYCDOE only removed Plaintiff from her position on February 2, 2018, after Defendant, Daily News' misleading and substantially inaccurate account.

63.     Moreover, had students' written statements taken on January 11, 2018, included the allegations as the Daily News described and reported as fact, then an investigation would have been opened at that time, not two weeks later when the NYCDOE learned of the story to be published about the Plaintiff. None of the original (or second set) of students' written statements included the allegation set forth by the Daily News, to wit that Plaintiff "*singled out black students and told them to lie on the floor for a lesson on US slavery – and then stepped on their backs to show them what slavery felt like.*" One might inquire how the Daily News and its reporter even knew to come to the school.

64.     In homeroom on February 1, 2018, two of Plaintiff's students reported to her that on the day prior, (January 31, 2018), a "white man" had been walking around campus confronting students and questioning them about Plaintiff. Further, a student told the Plaintiff that the "white man" had asked if Plaintiff had ever walked on their backs.

65.     Other students agreed that they had also been confronted by a "white man," who was "writing down what they [the students] were saying." During second period, a student in the Plaintiff's class, (Student 1), confronted another student, (Student 2), and accused him of being a liar – screaming that he (Student 2) had lied to the "white man" on (January 31, 2018), when asked about Plaintiff. After class, Student 1 and Student 3 confided in Plaintiff, that Student 2 had erroneously and falsely told the reporter that Plaintiff "*had*

18

*the students lie on their stomachs and then walked on their backs*," and that Student 2 was "laughing hysterically while and after he told that to the 'white man'". Those two students, (identified herein as Student 1 and Student 3 intentionally, in order to protect their identities, as they are minors), had tried to defend Plaintiff by saying that it never happened, and what Student 2, (whose name has been intentionally omitted herein to protect his/her identity, as he/she is minor), had told the reporter was a lie.

66.     Defendant Chapman questioned minors, (without parental consent), and an "unidentified staffer," (who had, no first-hand knowledge of anything in the plaintiff's classroom), and as a result, Plaintiff became the subject of a substantially false and scandalous "exclusive" story that falsely accused her of "*making black students lie face down on the floor of her class, and asking them: 'See how it feels to be a slave?'*", and characterized her as a "racist," because she was a white teacher teaching minority students. Again, if the written students' statements taken on January 11, 2018, did indicate "corporal punishment," it is curious that Defendant Cox did not want to speak to the only adult witness present in the room on that date.

67.     As a result, Plaintiff fell victim to the Defendant, Daily News' publishing of a demonstrably false, manufactured, and defamatory story. The Defendant Daily News and the Defendant Ben Chapman published false statements as fact with a reckless disregard for the truth without any verification, contrary to every standard of journalistic ethics and integrity. As a result of the false statements asserted as fact, Plaintiff was exposed to public contempt and ridicule concerning her character and professional integrity as a teacher and injured her. However, since there were student statements that were taken on January 11, 2018,

19

Defendant Ben Chapman could have easily verified what was told to him by minor students, (without their parents present and without parental consent), and the "unidentified staffer," but he chose not to. Instead, Defendant Ben Chapman and Defendant Daily News abandoned all journalistic standards and integrity in writing, editing, and publishing the "exclusive" article.

68.    The Defendant Daily News and Defendant, Ben Chapman, engaged in modern day yellow journalism and sensationalized reporting on a private figure. Defendant Daily News and Defendant, Ben Chapman published, among other things, that the Plaintiff had "shocked and traumatized children in her social studies class" – falsely accused and published that she *singled out black students and told them to lie on the floor for a lesson on US slavery – and then stepped on their backs to show them what slavery felt like.*" There is no basis in fact to conclude that Plaintiff traumatized students, because that can only be determined by a medical professional. Using inflammatory words such as that is reckless and irresponsible, because Defendant Ben Chapman does not have the qualifications to make this assessment. This is a "buzz word" used to sell newspapers, because the Plaintiff was a "white" teacher teaching in a minority school and community. Parenthetically, this story was published on February 1, 2018, the start of Black History Month.

69.    These reported and published statements and descriptions were false and based upon an erroneous set of egregious false statements asserted as "facts." Defendant Daily News' award-winning investigative reporter, Defendant Ben Chapman, failed to fully investigate and reasonably assess the veracity of the minor children and "unidentified staffer" before manufacturing the salacious story that was published by Defendant Daily

20

News, and republished over and over by third-parties to Plaintiff's detriment. This was not an opinion or the subject of an editorial or Op-Ed piece.

70.     Plaintiff, a private figure, was featured in several newspapers and televised news programs, as well as online on venues such as YouTube, where it was further reported specifically that Plaintiff "*singled out black students and made them act like slaves*." Plaintiff was falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*." These reports were substantially inaccurate.

71.     Plaintiff, a private figure, has been publicly referred to as, among other things, a "racist," a "bigot" a "cracker," and a "white devil," by New York City Power 105.1 radio personality, Defendant, Lenard Larry McKelvey, known professionally as "*Charlamagne tha God*;" and, among other things, as a "cave animal" and a "white supremacist" by Defendant, Philip Scott,[5] a YouTube personality, host of TheAdviseShowTV channel now known as African Diaspora News Chanel, disingenuously proclaiming a commitment to reporting "truthful" and "accurate news," where he has over a million subscribers listening to his social and political commentary, and further by other members of the general public in various and extensive online media posts discussing this issue. These statements, among others, were based upon false, erroneous and alleged description of facts and therefore, were not opinions. The publishing and reporting about the Plaintiff by the Defendants were not accurate and therefore, not privileged.

---

[5] Philip Scott stated that black people need to mobilize on Twitter, YouTube, etc.

72.     At dismissal from school, at approximately 2:40 pm on February 1, 2018, Plaintiff was ambushed on school property by Defendant, Ben Chapman, an award winning investigative journalist with Defendant Daily News, who asked her if she had ever walked on kids during one of her lessons.

73.     On February 1, 2018, after being confronted on school property at dismissal by the Defendant, Ben Chapman and his photographer, the Plaintiff immediately went to see the Assistant Principal, Leah Dyer and told her that she had been ambushed on school grounds by the Defendant, Ben Chapman. Assistant Principal, Leah Dyer instructed the Plaintiff to complete a report to be filed with the Department Of Education's Online Occurance Reporting System (OORS) to document the event. Ms. Dyer called the Defendant, Giulia Cox, in her office to notify her of what had just occurred. Defendant Cox came to A.P. Dyer's Office and advised that she [Cox] called the Chancellor Division that handles media issues and confirmed that the Daily News would indeed be running a story on Plaintiff, and suggested that Plaintiff take the next day off. Plaintiff refused to take the next day off, as she had done nothing wrong.

74.     Later on February 1, 2018, in an effort to be certain that the Plaintiff would be told of the abrupt reassignment and not show up to teach the following day, the Defendant, Giulia Cox called Plaintiff after working hours and instructed her to check her email. Upon checking her email, Plaintiff was instructed by the Division of Human Resources that they had reassigned her work location to 100 Gold Street in Manhattan for February 2, 2018, and further told Plaintiff that she was the subject of an Office of Special Investigations (OSI) investigation. This is the first time the Plaintiff was ever notified that she was the subject of

22

ANY investigation. Therefore, the Defendant, Daily News' publication and Defendant, Ben Chapman's investigative reporting (that was published on line on February 1, 2018 at approximately 9:00 pm and also printed as a front page exclusive story), was not reporting on an actual proceeding.

75.    The "investigative reporting" and subsequent news story broke before any investigation by OSI began; therefore, it is NOT privileged under defamation law, New York Civil Rights §74, or otherwise.

76.    On February 2, 2018, at 6:15 am, the Defendant, Giulia Cox sent an e-mail to the entire school staff advising that the Superintendent has advised that the school should expect a large media presence at the school that morning. They were expected to be reporting on the "classroom incident" that occurred approximately two weeks ago. This is also false and negligent because it infers that the allegations being falsely published and exclusively reported on by the Defendant, Daily News were true. Furthermore, there was no allegation being investigated of a proceeding until the afternoon of February 1, 2018. The email further disingenuously stated: "It is normal for Middle School children to be curious and excited about the presence of reporters, but the students are minors and should not be speaking with the media without parental permission."

77.    The statements in the email to the Middle School staff by the Defendant, Giulia Cox are curiously disingenuous, as the Defendant, Ben Chapman and his photographer had been walking around the entire school grounds unattended and spoke freely with minor students without their parent/guardian present and without parental consent.

78.    On or about February 2, 2018, the Defendant, Giulia Cox sent a letter to the parents/guardians of the students, expressing the school's concern over the "reported accusation"; informing them that it is being investigated; and reassuring the parents that she [Plaintiff] has "been assigned away from students." This is likewise false, misleading, and negligent because it infers that the allegations being falsely published and exclusively reported by the Defendant, Daily News are true, when they were not. Defendant Cox had first-hand knowledge that they were untrue, as well; yet she never corrected the record. Moreover, Defendant, Cox appeased the parents by advising them that "she was working with staff to review the Department's Non-Discrimination Policy to further diversity and sensitivity awareness in the workplace. Had this actually been a violation of the Department's Non-Discrimination Policy, Plaintiff would have been investigated (within 24 hours of the students' original written statements being taken by AP Courtney Ware on January 11, 2018), by the NYCDOE Office of Equal Opportunity (OEO), which investigates complaints of discrimination and sexual harassment and ensures that the NYCDOE complies with related locate, State, and Federal laws.

79.    On or about March 9, 2018, the Plaintiff received a 48-hour written notice from the Defendant, NYCDOE's confidential investigator, William Deininger, advising that OSI is conducting an investigation into an allegation of employee misconduct that had been filed against her. The meeting did not take place until March 15, 2018, due to inclement weather.

80.    During the investigation by New York City Office of Special Investigations (OSI), Investigator William Deininger showed the Plaintiff written students' statements that were provided by Defendant, Giulia Cox for her [Plaintiff] review. Upon inspection, by the

24

Plaintiff, they were found NOT to be the statements taken by Defendant, Courtney Ware and previously shown to Plaintiff by Defendant, Cox at the January 18, 2018 meeting. Nonetheless, the statements were dated "1/11/18", the date of the original written statements. Plaintiff and her Union Representative informed the Investigator of the blatant discrepancy and asked which A.P. took the written statements. Investigator Deininger informed Plaintiff that the statements she was shown by him were taken by A.P. Leah Dyer. It is Plaintiff's conjecture that Defendant Giulia Cox instructed A.P. Leah Dyer to take a second set of written student statements and further tampered with physical evidence by falsifying the date. It was not until Investigator Deininger returned to the school to FINALLY question Ralph Hudson, (who witnessed the lesson), that he [Deininger] confronted A.P. Cortney Ware about the original set of statements, which she turned over to him.

81.     On or about March 19, 2018, Plaintiff received an e-mail from the Defendant, NYCDOE's confidential investigator, William Deininger, advising that she would be returning to her teaching position at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York. That never happened.

82.     Plaintiff was ultimately exonerated of the erroneous and egregious accusation of "corporal punishment" alleged by Defendant, Giulia Cox following the investigation conducted by the Office of Special Investigations; the report was reduced to writing on July 24, 2018. Nonetheless, the OSI Report found that Plaintiff used "poor judgement." An important public policy issue is at stake with the rendering of that conclusion. It is important to know that the sole job of OSI is to investigate allegations of verbal abuse and corporal punishment. "Everything about our [a teacher's] evaluation and development system is

based upon the understanding that a constructive, professional process is the best way for colleagues to collaborate to help children learn."[6]

83.     The email exchange between OSI and the Office of Academic Policy that contributed to this finding, violates the Department of Education's own policy on how to evaluate a teacher's pedagogy (lesson and performance). Describing a lesson, to which the investigator was not present to observe first-hand, to anyone else who did not observe the lesson first-hand, is hearsay to hearsay, negligent, and an infringement upon the due process and procedures afforded to all public school teachers regardless of their employment status as a tenured or untenured teacher.

84.     The teacher's lesson MUST be observed. It cannot occur in one's mind as an imaginary event. The information was hearsay to hearsay. Therefore, the conclusion of "poor judgement" as noted in the OSI report has no basis in fact whatsoever, and therefore, cannot be appropriately used to pass judgement against Plaintiff.

85.     On July 26, 2018, Plaintiff was advised by her UFT representative that she would be returning to work and teaching at the William W. Niles School - Middle School 118 for the 2018/2019 school year.

86.     On August 22, 2018, the Plaintiff received an e-mail from the Defendant, Giulia Cox, advising that she was "released from reassignment in August," which was factually incorrect, and that she would be scheduled to be teaching at the William W. Niles School - Middle School 118 in September. Her teaching assignment was scheduled to be 6th grade

---

[6] Joint Letter from the DOE and UFT Dated September 19, 2014.

social studies. However, the Plaintiff is not licensed in NYS to teach 6th grade and would be violating NYS Education Law by accepting this assignment.

87.    Nonetheless, the Plaintiff advised the Defendant, Giulia Cox that she would be returning to the school to teach in the 2018-2019 school year and provided her with a completed preference sheet[7] and filled out a circular six assignment utilizing the hyperlink provided by Defendant Cox in her email.

88.    On August 29, 2018, Plaintiff contacted the Manager of Reassigned Staffing Team – Division of Human Resources, Colin Caldwell, because it was her understanding that if she is still reassigned at the end of the (2017/2018) school year, she should report to the same reassignment location on the first day of school, unless she received a formal notice. Plaintiff had not received any official notice from the DOE authorizing her to return to the Middle School, and she was concerned about being falsely accused of insubordination. Nonetheless, she was advised by Mr. Caldwell that she should report to the William W. Niles School - Middle School 118 in September. Plaintiff also asked if there was any correspondence from the Division of Human Resources to prove that she was cleared and out of reassignment. Mr. Caldwell stated that the letter was mailed to Middle School 118 and not the Plaintiff's home. This is a vital point, due to the fact that if Plaintiff had timely received that letter, she would have been eligible for a transfer to a different school and/or Borough using NYC's Open Market System. Had she been able to apply within the Market System with

---

[7] The preference sheet was received by the Plaintiff in the August 22, 2018, e-mail, but it should have properly been provided to the Plaintiff in May in accordance with the UFT/DOE Contract for Classroom Teachers. See, Article 7B(1).

that letter, Plaintiff could have been hired in a different school located in a different District and the NYCDOE would have been unable to terminate her.

89.     On September 4, 2018, the Plaintiff happily returned to the William W. Niles School – Middle School 118, and at 8:11 am the Plaintiff was texted by the Defendant, Cox's secretary Arlene Enriquez, summoning her to the Principal's office for a "meeting." At this meeting, following her receipt of her teaching schedule and 48 hour notice to review the OSI report, the Plaintiff was instructed to report downstairs for the "Welcome Back" meeting.

90.     The Plaintiff went downstairs and was warmly greeted by faculty and staff. As she was gathering for the "Welcome Back" meeting, the Defendant, Cox's secretary Arlene Enriquez, came to her and told her that the Principal needed her to sign something. The Plaintiff was abruptly and inexplicably presented with another notice to reassign her, again, pending employee discipline. The Plaintiff was shocked and devastated that they could do this to her, after the DOE had cleared her to come back. The Plaintiff notified her UFT District Representative and called the Manager of Reassigned Staffing Team – Division of Human Resources, Colin Caldwell, who proceeded to tell Plaintiff that her Principal had done this to her. He stated, "*I'm sorry. Your Principal did this to you.*"

91.     The Plaintiff reluctantly signed to acknowledge receipt of the reassignment in the presence of her UFT Chapter leader, (Lisa Baccari) and Arlene Enriquez, and clocked out of the building at 8:38 am; she had been there a mere one hour and thirty-eight minutes of arriving. NYPD School Safety Officers were already positioned to escort the Plaintiff out of the building.

28

92.     Nonetheless, despite being exonerated of the erroneous allegations following an investigation by the Office of Special Investigations, the Plaintiff was found in the report, to have exercised "poor judgment." It is pertinent to again, clarify that OSI's function in the NYCDOE is to investigate allegations of corporal punishment and verbal abuse, not critique and pass judgement on a teacher's pedagogy (lesson and performance). A teacher can only be evaluated through observation of their lessons, as stated in policies put forth by the NYCDOE and UFT, and as a standard of practice for all public school teachers, regardless of employment status as a probationary or tenured teacher in the State of New York. Thus, "poor judgement" in an inappropriate finding of the report and violates the very essence of the education profession.

93.     Plaintiff was discontinued from her position as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10 on October 18, 2018.

94.     The Plaintiff interviewed in Connetquot School District on Long Island and was offered a position on October 18, 2018, to which she accepted and filled out the necessary paperwork for employment the following day.

95.     On October 20, 2018, the Defendant, Daily News published an exclusive story, stating the Plaintiff was "*Axed*" because she "*walked on kids*. This is entirely and knowingly false because Doug Cohen, a spokesperson for the DOE had stated publicly that "Ms. Cummings was terminated based on the results of this investigation and a review of her overall performance as an educator;" NOT because she ever walked on any student.

96.    Notably, the Plaintiff was informed in writing on October 22, 2018, by the Connetquot School District that she would not be confirmed as the new hire for that position. Since then, Plaintiff has had to change careers so she could obtain employment, outside of the field of education, since she was unable to find employment in the career that she trained for due to the negative notoriety, public contempt, ridicule, and the "badge of infamy" she now wears, denying Plaintiff her liberty and livelihood.

97.    Plaintiff's reputation as a respected educator has been irrevocably damaged. The statements made about her by the Defendants impute to Plaintiff an unfitness to perform the duties of a teacher, an employment for profit, including lack of ethics and morality. The false statements prejudice Plaintiff in her profession and employment as a school teacher. Plaintiff's professional career has been substantially compromised and she has been unwillingly exposed to negative notoriety, public humiliation, embarrassment, injury to her reputation and good name. Her professional and personal future has been irrevocably harmed. As a result of the allegations set forth in this claim, Plaintiff has been subjected to threats of violence, assault, and death.

## AS TO THE DEFENDANTS:

**BEN CHAPMAN; NEW YORK DAILY NEWS; PHILIP SCOTT; ADVISE MEDIA NETWORK; LENARD LARRY McKELVEY a/k/a CHARLAMAGNE *THA GOD*; WWPR-FM (105.1 MHZ); iHEARTMEDIA; CLEAR CHANNEL COMMUNICATIONS, INC.; DR. ANDRE PERRY; THE HECHINGER REPORT a/k/a HECHINGER INSTITUTE ON EDUCATION AND THE MEDIA; NEW YORK STATE SENATOR, KEVIN S. PARKER; NYC COALITION FOR EDUCATIONAL JUSTICE; ANGEL MARTINEZ; and NATASHA CAPERS;**

### II.   CAUSES OF ACTION FOR DEFAMATION, DEFAMATION *PER SE*, LIBEL, LIBEL *PER SE*, SLANDER, SLANDER, *PER SE* and FALSE LIGHT

98.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "97," above, with the same force and effect as though fully set forth herein.

99.     In a span of thirteen (13) months from February, 2018, through March, 2019, and continuing to date, the Defendants have engaged in defamation, defamation *per se*, libel, libel *per se*, slander, slander *per se*, and false light through such mediums as mainstream media and social media against the Plaintiff, Patricia Cummings, an innocent, New York City Public School teacher, by publishing and/or republishing numerous and verifiably false statements. These false statements that were asserted as fact and were first published on February 1, 2018, when read or listened to by a reasonable observer, and not dissected and analyzed with a lexicographer's precision, would believe the published allegations and stories to be true and accurate, which would thus have a different effect in their mind's than the actual truth.

100.     This public "branding" of the Plaintiff has been etched upon the minds of the public, at large. Their defamatory attacks upon her reputation and name constitute a deprivation of her liberty. Plaintiff's "branding," thus constituting a "badge of infamy," should

31

be considered modern day "McCarthyism." A person has a Constitutional right to defend their reputation, which is considered a liberty. Thus, a person has the right to a reputation that is free of false or derogatory characterizations by others.

101.    The Defendants wrongfully targeted and vilified Plaintiff because she was a white, New York City Public School Teacher, teaching at The William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York; comprised of minority students and faculty.

102.    The Society of Professional Journalists, since its inception in 1909, its creation of a Code of Ethics in 1926, and its present version adopted in 1996, declares four principles as the foundation of ethical journalism and encourages their use in its practice by all people in all media, to wit: (1) Seek Truth and Report It by taking responsibility for the accuracy of their work, verifying information before releasing it, remembering that neither speed nor format excuses inaccuracy, and take special care not to misrepresent or oversimplify in promoting, previewing or summarizing a story, (2) Minimize Harm by realizing that private people have a greater right to control information about themselves than public figures and others who seek power, influence or attention, weighing the consequences of publishing or broadcasting personal information. balancing the public's need for information against potential harm or discomfort; the pursuit of the news is not a license for arrogance or undue intrusiveness, and by considering the long-term implications of the extended reach and permanence of publication, (3) Be Accountable and Transparent by taking responsibility for one's work and explaining one's decisions to the public and acknowledging mistakes and

32

correct them promptly and prominently, and (4) <u>Act Independently</u> by avoiding conflicts of interest, real or perceived.

103.    The American Society of Newspaper Editors states "Good faith with the reader is the foundation of good journalism. Every effort must be made to assure that the news content is accurate, free from bias and in context, and that all sides are presented fairly. Editorials, analytical articles, and commentary should be held to the same standards of accuracy with respect to facts as news reports. Significant errors of fact, as well as errors of omission, should be corrected promptly and prominently."[8]

**As to Defendants DAILY NEWS and BEN CHAPMAN**

104.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "103," above, with the same force and effect as though fully set forth herein.

105.    Plaintiff has a Constitutional right to her good name and reputation. Herein will explain and describe the statements alleging facts about Plaintiff as well as how they are actionable under New York law and not protected by privilege.

106.    The Daily News, in using its vast network and resources made, published, and republished numerous false statements of and concerning Plaintiff. These statements are detailed below:

---

[8] http://www.columbia.edu/itc/journalism/j6075/edit/codes.html

| The Daily News and Ben Chapman (Fake News)<br><br>February 1, 2018 online<br><u>See</u>, Exhibit A | THE TRUTH and ACCURACY |
|---|---|
| "Patricia Cummings shocked and traumatized children in her social studies classes when she singled out black students and told them to lie on the floor for a lesson on U.S. slavery — and then stepped on their backs to show them what slavery felt like" | <ul><li>Plaintiff did **not** shock and traumatize children in her class</li><li>Plaintiff did **not** singled out black students, tell them to lie on the floor for a lesson on U.S. slavery or step on their backs to show them what slavery felt like.</li><li>A determination on "traumatizing" cannot be made. There is no basis in fact to conclude that Plaintiff traumatized students, because that can only be determined by a medical professional. Using inflammatory words such as that is reckless and irresponsible, because Defendant Ben Chapman does not have the qualifications to make this assessment. This is a "buzz word" used to sell newspapers, because the Plaintiff was a "white" teacher teaching in a minority school and community.</li><li>Being falsely accused of allegedly putting a knee into a child's back versus it being reported that a child was made to lie on their stomach, while being walked on their back are two totally different scenarios and create two totally different images in one's mind. Those two actions, as they are described, are **not** one and the same. Thus making this assertion of fact false and substantially inaccurate.</li></ul> |

| | |
|---|---|
| "Students said Cummings, who is white, pulled the insensitive stunt in multiple seventh-grade classes as part of a unit on the infamous Middle Passage, in which Africans were kidnapped and brought to America as part of the slave trade." | ▪ Plaintiff did not pull any sort of insensitive stunt in any seventh grade class, let alone multiple classes regarding her lesson on the Middle Passage.<br><br>▪ Plaintiff used the Theory of Spatial Intelligence during the teachable moment that arose and asked four (4) student volunteers to sit very close together in class 408, **ONLY**. |
| Kids and adults in Cummings' school, "were horrified by the offensive lessons they said occurred roughly two weeks ago." | ▪ No students or adults were horrified by any lesson taught by Plaintiff, as proven in the OSI Report.<br><br>▪ The lesson taught by Plaintiff, and observed by witness, Ralph Hudson (an African-American teacher), who was inexplicably not interviewed by Defendant Cox. |
| "It was a lesson about slavery and the Triangle Trade," said one of Cummings' students, who asked to remain anonymous.<br><br>"She picked three of the black kids," the boy said, and instructed them to get on the floor in front of the class. "She said, 'You see how it was to be a slave?' She said, 'How does it feel?'" | ▪ This is completely taken out of context. The Plaintiff taught about the Triangle Trade as part of the NYS curriculum she must teach as a seventh grade social studies teacher.<br><br>▪ The Plaintiff asked for student volunteers in her class to which the students that comprise her class are minority students; she did not "pick three of the black kids," there was no white student enrolled in her class.<br><br>▪ This misleads the public and puts Plaintiff in a false light. It infers to the reader that Plaintiff avoided picking white students, though no white students were enrolled in that class. |

35

| | |
|---|---|
| | ▪ Plaintiff did ask the question to spark discussion in her class regarding the five (5) minute video clip that was shown to differentiate her instruction. However, this quote was taken completely out of context. |
| "When a girl on the floor made an uncomfortable joke, and said she felt fine, Cummings stepped on her back, the student said."<br><br>"She put her foot on her back and said 'How does it feel?'" the student said. "'See how it feels to be a slave?'" | ▪ The events as reported by the Defendants NEVER happened. The Plaintiff NEVER stepped on a student's back, nor was she ever accused of doing so.<br><br>▪ This is blatantly false, as well as misleading to the public.<br><br>▪ OSI drew the same conclusion that Defendant Cox did – that the Plaintiff did nothing wrong, but was disciplined by Defendant Cox just to appease the parent. OSI concluded that the allegation that the Plaintiff put her knee into a student's back was false. |
| "Cummings was removed from her post for a couple of days following the incident but then returned to class and was in school Thursday." | ▪ This is blatantly false as well as misleading to the public.<br><br>▪ Plaintiff was in attendance at the William W. Niles School, Middle School 118 the entire start of 2018 until her removal/reassignment on February 2, 2018, the day after the Defendants' "exclusive" was published. |

107.    The events in Plaintiff's classroom as reported by the Defendants Daily News and Ben Chapman and asserted as fact NEVER happened and was NEVER the subject of any investigation.

108.   The day the lesson was taught, January 9, 2018, Ralph Hudson, an African-American teacher on his prep period witnessed and observed the lesson. Also, between January 11, 2018, students' written statements were taken, by an administrator, Defendant Courtney Ware, to which Defendant Chapman and Defendant Daily News could have verified the statements made to their investigative journalist by minor students and an "unidentified staffer".

109.   The Defendants' reported and published statements were false and based upon an erroneous set of egregious "facts," in an "exclusive" article not an opinion or the subject of an editorial or Op-Ed piece. The fact that the article states that it is an "exclusive" indicates that is an item of news reported by one journalist or news organization before others.

110.   The Defendant Daily News' award-winning investigative journalist, Defendant, Ben Chapman, failed to fully investigate and reasonably assess the veracity of his sources, to wit: minor children and an "unidentified staffer," before creating the scandalous "exclusive" that was published by Defendant Daily News, to Plaintiff's detriment.

111.   The New York City Department of Education officials only began an investigation regarding Plaintiff because of the Defendants' publication of false statements asserted as fact and erroneous description of facts that could have been verified to which the Defendants would have learned that they had no story to publish.

112.   Due to the fact that Defendant Daily New and Defendant Ben Chapman published statements alleging facts which were one hundred percent false, to wit: such facts

37

would have been a crime under NYS law, making the statements, assertions of fact, and publication actionable.

113.    Furthermore these statements are actionable because the articles to which they are published are in no way accurate by any means, let alone substantially accurate. Being falsely accused of allegedly putting a knee into a child's back versus it being reported that a child was made to lay on their stomach, while being walked on their back are two totally different scenarios and create two totally different images in one's mind. Those two actions, as they are described, are not one and the same. Thus, these statements are not privileged under New York Civil Rights Law § 74, because the articles cannot be deemed substantially accurate.

114.    Therefore, what the Daily News published, reported and asserted as fact, was false and later published by third-parties, was explicitly about Plaintiff, was not verified, and caused harm to Plaintiff, thus constituting the causes of action.

115.    Not only is what was reported, blatantly false, defamation, defamation *per se*, libel, libel *per se*, but was also, misleading to the public and placed Plaintiff in a false light.

116.    Between January 23, 2018 – January 25, 2018, Plaintiff was not removed from her "post" as reported and published by the Defendants. Plaintiff was disciplined by Defendant Giulia Cox, then Principal of the school, and removed from only teaching class 408. To be removed from one's post is to be removed from one's employment or job description. Plaintiff was not removed from teaching all her classes or removed from the school. In fact, Plaintiff actually taught a different class in lieu of class 408 within those three (3) days.

117.   Defendant Chapman and Defendant Daily News could have easily verified this information by looking at school records which show the Plaintiff was in attendance at the school as well as the "Daily Coverage Sheets" which indicate any changes to a teacher's schedule for the day due to their absence or any other reason the teacher is not in class, since the teacher of record is responsible for the children they are scheduled to be with. The Defendants reported and published statements were false and based upon a set of falsity which they peddled as "facts", in an "exclusive" article; not an opinion or the subject of an editorial or Op-Ed piece.

118.   Defendant Chapman did an interview on WNYC with Jamie Floyd, entitled, "<u>All Things Considered</u>," wherein he stated:

> *"The seventh grade history teacher at the school by the name of Patricia Cummings had asked black students to lie face down on the floor in the classroom and then stepped on at least one of those students in a lesson on the Middle Passage, which is the infamous slave route used in US Slave Trade."*

119.   Defendant Chapman states as an assertion of fact that *"Patricia Cummings had asked black students to lie face down on the floor in the classroom and then stepped on at least one of those students in a lesson on the Middle Passage,"* which is false. He is asserting facts about Plaintiff that NEVER happened, and she was never accused of doing. Thus, this statement about the Plaintiff is actionable as defamation, defamation *per se*, slander *per se*, and false light, because it impugned the Plaintiff's character and professional integrity, exposed her to public contempt and ridicule, and damaged her reputation.

120.   Defendants, Daily News and Ben Chapman continued to publish false assertions of fact, which were comprised of verifiably false information, which mislead the

public in the following articles after their February 1, 2018 "Exclusive," which further exposed the Plaintiff to public contempt and ridicule, thus damaging her character and reputation as a teacher. The articles are listed below:

- Ben Chapman, Kerry Burke, and Esha Ray, February 2, 2018. <u>See</u>, Exhibit B.

*"Bronx Teacher Sparks Outrage for Using Black Students in Cruel Slavery Lesson"*

- Ben Chapman, April 10, 2018. <u>See</u>, Exhibit C.

*"Thousands Sign Parents' Petition Demanding Action from de Blasio on Racist School Incidents"*

- Ben Chapman, April 26, 2018. <u>See</u>, Exhibit D.

"City to Spend $23M for Anti-Bias training for Public School Educators"

- Ben Chapman, July 10, 2018. <u>See</u>, Exhibit E.

"Bronx Educators Accused of Racism Still Under Investigation, Still on Payroll"

- Ben Chapman, August 12, 2018. <u>See</u>, Exhibit F.

"City Completes Probe of Teacher in 'Slavery' Controversy"

- Ben Chapman and Stephen Rex Brown, September 28, 2018. <u>See</u>, Exhibit G.

*"White Social Studies Teacher Ousted Over Slavery Lesson Plans to Sue over Reverse Racism"*

- (No One took a By-Line) October 4, 2018. <u>See</u>, Exhibit H.

*"'Slave' Teach Hit For 'Judgment'"*

121.    The Defendants failed to abide by their own Code of Ethics, which states, "[I]n this climate, it is more important than ever that we act fairly and responsibly in reporting the news."

122.    The Defendants significantly diverged from ethical practice and caused substantial harm to Plaintiff.

123.    These statements constitute defamation, defamation *per se*, libel, libel *per se*, slander, slander *per se*, and false light. The statements accuse and impute to Plaintiff crimes involving moral turpitude for which Plaintiff may be punished and imprisoned in a state criminal institution. The statements impute to Plaintiff an unfitness to perform the duties of a teacher, an employment for profit, including lack of ethics and morality. The false statements prejudice Plaintiff in her profession and employment as a teacher. Plaintiff has a "badge of infamy" as a result of the false statements and assertions of fact reported, published, and said by the Defendants.

124.    The overall context of the Daily News article which broke on February 1, 2018 with assertions presented and described as "facts," to which a reasonable reader would have and did, believe that these statements were being described and conveyed were indeed facts when, in actuality, they were far from it. Defendants used no language to presuppose Plaintiff's innocence, such as "accused" or "alleged." Furthermore, the articles were not opinion pieces and are, therefore actionable. The context to which the Defendants were writing were not opinions and thus, cannot be protected, because there is no actual facts being reported about Plaintiff. Lies disguised as facts cannot be considered disclosed facts and thus opinions based on these false facts cannot be protected.

125.    The Defendants failed to conduct a proper investigation before publishing and disseminating its false, defamatory, and libelous statements and presented them as "facts" and assertions of facts in their publications concerning Plaintiff.

41

126.    False and defamatory statements concerning Plaintiff were published, asserted, and disseminated as "facts" <u>before</u> any official proceeding ever begun. In fact, Plaintiff only became the subject of an OSI investigation, which began in the evening of February 1, 2019 AFTER Defendant Ben Chapman questioned minor students on January 31, 2018, and approached the Plaintiff on school grounds on February 1, 2018 at dismissal at approximately 2:40 pm, for a soundbite/comment to add to his exclusive, false, salacious, manifested story about Plaintiff. Due to the fact that the false exclusive publication was published before any proceeding began, they would in no way constitute background information. Thus, the article is <u>not</u> protected speech.

127.    The articles written, edited and published by Defendants Daily News and Ben Chapman are NOT privileged under N.Y. Civils Rights Law § 74, and thus, are actionable. What was reported and asserted as fact is fabricated and false, and is proven to be false. Thus, the Defendants' statements are actionable because (1) their published statements and descriptions were assertions of fact, and (2) they can be proven false.

128.    The articles written, edited and published by Defendants Daily News and Ben Chapman are NOT opinion, and as such are not protected and are actionable. If they were opinion, it would be labeled as an "Op-Ed" story or "opinion" piece. Furthermore Defendant Daily News would have labeled the published stories about Plaintiff as an opinion story, as they do with others. The labeling of Daily News' stories by the Defendant, Daily News is detailed below:

42







DAILY NEWS
1¢ A DAY FOR 6 MONTHS
City pols call for cultural sensitivity training in schools
White social studies teacher ousted over slavery lesson plans to sue over reverse racism
Protesters demand removal of Bronx principal over black history lessons scandal
Parents urge de Blasio to give teachers anti-bias training after cruel slavery lesson at Bronx school
Bronx teacher sparks outrage for using black students in cruel slavery lesson
Bronx principal probed after creating hostile environment for black teachers, students: 'She's a racist'

DAILY NEWS
LOG IN
Bronx teacher behind controversial slavery lesson used 'poor judgment' – investigators
Carranza vows to fast-track anti-bias lessons for city educators – as desegregation plan falters
City completes probe of teacher in 'slavery' controversy
Bronx educators accused of racism still under investigation, still on payroll
Protesters to demand anti-bias training for city teachers after racist lesson on slavery in Bronx school
Thousands sign parents' petition demanding action from de Blasio on racist school incidents

129.    In targeting and bullying the Plaintiff, by falsely accusing her of "*singling out*

*black students and made them act like slaves*" and making black students "*lie on the floor for*

*a lesson on slavery and then stepped on their backs to show them what slavery felt like,*" the

Defendants falsely conveyed that the Plaintiff engaged in acts of racism and otherwise

engaging in racist misconduct, child abuse, and child endangerment. If these actions had

been committed by Plaintiff or any other teacher/person, they would have been charged

with a crime and subject to criminal prosecution. Plaintiff was NOT charged with any crime,

which is easily verifiable had Defendants Daily News and Ben Chapman chose to write, edit,

and publish a story with any journalistic ethics, integrity or truth; thus abandoning the

journalistic standards that have existed for almost one hundred (100) years.

130.    The Defendants ignored basic journalistic standards, because they wanted to advance their own biased agenda, as outlined below:

| Daily News' Agenda<br>February 3, 2018 | TRUTH |
|---|---|
|  | • Curiously came out two (2) days after the online publication of this story on February 1, 2018<br><br>• Needed something salacious to advance their circulation in order to sell newspapers. Badly researched news and eye-catching headlines in order to sell more online subscriptions and newspapers as possible<br><br>• Capitalized on the fabrication of scandalous and untrue information<br><br>• Used emotional words, misleading headlines, and false information that treated the news in an unprofessional and unethical manner |

131.    The Plaintiff is not a racist and did not exhibit any such conduct, even when confronted with unbridled racist attacks, threats of violence and threats of death.

132.    The Defendants bullied an innocent, young, Caucasian teacher, with an absolute disregard for the pain and destruction this would cause her life and liberty. It must be concluded that the statements made by the Defendants about Plaintiff are defamation, defamation *per se*, libel, libel *per se*, slander, slander *per se*, and false light.

133.    The Defendants campaign to target the Plaintiff in furtherance of their own agenda was carried out by using vast financial resources to enter the bully pulpit by publishing a series of false and defamatory print and online articles, which effectively provided a world-wide megaphone and echo-chamber for the Defendants and other

individuals and entities to smear the reputation and good name of a young Caucasian, teacher, who was, in their view, an acceptable casualty.

134.    The Defendants proved themselves to be loud, aggressive bullies wielding "pitch-forks and torches" while utilizing a considerable bully pulpit, causing her to be branded forever as the "racist slave teacher", thus creating a "badge of infamy" and infringing upon her liberty and livelihood.

135.    In this country, our society is dedicated to the equal protection of the law regardless of the color of a person's skin. However, the Defendants did not care about protecting the Plaintiff. To the contrary, the Defendants raced with a reckless disregard of the facts and a reckless disregard for the truth, because in this day and time, there is a premium for being the first and loudest media bully. This is evidenced by the fact that the Defendants wrote an "exclusive" published February 1, 2018.

136.    Then, Chancellor, Carmen Farina stated on ABC News, the evening of February 2, 2018, "*I don't want to make any suppositions. It's under investigation. It's a very serious allegation and she was removed, and I think, at this time, we have to wait for the investigation to be complete.*" Nonetheless, Defendants did not wait as then Chancellor Farina had suggested. Instead, they continued with their false and defamatory narrative. and thrusted it into the media prior to an official investigation ever began

137.    The Defendants Daily News and Ben Chapman made false statements with actual or constructive knowledge that they were false or with a reckless disregard for whether they were false. The Defendants Daily New and Ben Chapman acted with actual malice and reckless disregard for the truth for the following reasons:

46

| Daily News<br>October 4, 2018 | THE TRUTH and ACCURACY |
|---|---|
|  | ▪ The title of the publication is a prime example as to how Plaintiff has been characterized by and since the Daily News first published their "exclusive" story which was completely conceived by the Daily News.<br><br>▪ On October 3, 2018, reporter, Esha Ray of the Daily News was given the conclusion page of the OSI Report by Plaintiff's attorney, Thomas Liotti. Until that moment, no documents of the investigation had been released to the public or the media. To date, the Department of Education has not released the OSI Report to the public or media, or any of the supporting documentation to Plaintiff as she has repeatedly requested through the Freedom of Information Act.<br><br>▪ The TRUE and FACTUAL original allegation that was "Student A reported that during a lesson related to the Middle Passage in Ms. Cummings' social studies class, Ms. Cummings had her and other students SIT on the floor to "demonstrate the conditions on a slave ship." Student A alleged that during this demonstration, Ms. Cummings PUSHED HER KNEE into her back and to Student D's back."[9] |

---

[9] OSI Report page 11

| | |
|---|---|
| | ▪ This is dramatically and significantly different than what was reported and published as "facts" and assertions of fact.<br><br>▪ It is at this time that the Daily News learned that the story they originated as an "exclusive" and published on February 1, 2018 not only had a false narrative but the overall context of their published work would have caused any reasonable reader to believe that the statements they reported were conveying fact about Plaintiff were fact and they were not. It is Plaintiff's contention that that is the reason why no one took a byline and why the coverage of Plaintiff is significantly shorter than any other publication about her. |

| Daily News<br><br>October 19, 2018 (Online)<br><br>October 20, 2018 (Print) | Truth |
|---|---|
|  | ▪ The statements set forth are allegations of fact and are actionable. (1) The specific language used in the title of the publication has precise meaning which is easily understood.<br><br>▪ Any reasonable reader would read this and believe Plaintiff was fired because she walked on students for a slave lesson<br><br>▪ (2) These statements/assertions of fact are capable of being proven true or false, and have been proven false, and (3) it indicates to the reader that the context signals will not be opinion.<br><br>▪ Furthermore it is not a fair index of the article. A reasonable reader would believe the article to be about a teacher fired because they walked on students, which in itself would be a crime and punishable under NYS Laws.<br><br>▪ Though a newspaper needs not to choose the most delicate word in their headline and they have some leeway in grabbing the reader's attention - they do need to choose words that accurately report the truth.<br><br>▪ Instead, the Daily New and Ben Chapman doubled down, and |

| | |
|---|---|
| *"Former Middle School 118 teacher, Patricia Cummings caused a furor in February when several students and one staffer claimed that she singled out black students and told them to lie on the floor for a lesson on US slavery – and then stepped on their backs to show them what it felt like"*<br><br>*"An education official said the investigation found that Cummings used poor judgment – but did not substantiate the allegations that she engaged in corporal punishment by walking on students' backs."*<br><br>*"Cummings has denied assertions from students – made to both to the Daily News and school investigators – that she pressed on a student's back during the demonstration or made any of the kids physically uncomfortable."* | continued to attribute this action to the Plaintiff.<br><br>▪ This NEVER happened nor was it even the allegation investigated by OSI. Defendant Cox concluded Plaintiff did nothing wrong and was not a danger to kids by keeping her in the classroom. OSI concluded what Defendant Cox originally concluded prior to the Daily News Article publication on February 1, 2018.<br><br>▪ The allegation was that Plaintiff put knee into a student's back, which is distinctively different than "walking on students' backs." Also, the allegation as reported and described constituted a criminal act to which Plaintiff was never accused/arrested because it never happened.<br><br>▪ Daily News never made assertion that Plaintiff "pressed on students backs", it was always that she walked on students.<br><br>▪ Overall context of the article as interpreted by the average reader still believes that the allegations being investigated against Plaintiff was that she *singled out black students and told them to lie on the floor for a lesson on US slavery – and then stepped on their backs to show them what it felt like"* |

138.    The Defendants must be held accountable for their wrong-doing in a manner, which effectively deters them from again falsely accusing other persons in a similar fashion.

**As to Defendants PHILIP SCOTT and ADVISE MEDIA NETWORK**

139.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "138," above, with the same force and effect as though fully set forth herein.

140.    Plaintiff has a Constitutional right to protect her good name and reputation. Herein will explain and describe the statements alleging facts about Plaintiff, as well as how they are actionable under New York law and not protected by privilege.

141.    Specifically, as to Defendants, PHILIP SCOTT and ADVISE MEDIA NETWORK, exhibited flagrant disregard as to whether the accusations made against the Plaintiff were actually true, the Defendant, PHILIP SCOTT, in his official capacity as host of the <u>Advise Show TV</u> on his YouTube channel, made defamatory statements about Plaintiff: These statements are detailed below:

| Philip Scott's Oral Defamatory Statements | TRUTH AND ACCURACY |
|---|---|
| *"Now, let's get into what <u>really</u> happened to that classroom. Now the teacher was doing a lesson on U.S. slavery, Black History Month and then she called three students to the front of the class and she instructed them to get on the ground, okay. So she told them, <u>You see how it was to be a slave? How does it feel?</u> This Caucasian female is directing this at three black children. One of the black children, a black girl, stated she feel fine. So then this teacher proceeded to step on her back and* | ▪ The Defendant's version and description of the events is not what really happened in the classroom<br><br>▪ The Plaintiff NEVER stepped on a student's back, saying, "How does it feel?" |

| | |
|---|---|
| say _how does it feel now._ Now this teacher was reported, as you heard, she was removed from teaching students, but _SHE WAS NOT FIRED._" (01:58-02:54) | |
| "Now this is the kind of teachers that's in public schools teaching black children. So when you hear me say over and over and over again that we need schools that are safe spaces for black children to get an education, that they don't have to lay on floors, and have Caucasians steppin' on their back and saying, um, how does it feel, this is why I state these things." (02:54-03:16) | ▪ Plaintiff did provide a safe space for all children regardless of race, religion, creed, or sexual orientation to get an education<br><br>▪ Plaintiff NEVER stepped on a student's back, nor was she accused or reported to NYCDOE of having done so |
| "Over and over and over and over, we see white supremacist teachers are harming our children daily. She's not calling out the _white_ children and having a lesson with them about the caves of Europe. She not putting them in no kinda dark place, and ask them, "[H]ow does it feel to simulate a cave. She's not doing that, but she simulates, um, the Trans-Atlantic Slave Trade and what our brothers and sisters went through in the bottom of those boats, and she enjoyed that because that racialized terrorism and racialized fetishing of black people, they enjoy that so much. A lot of them wish they could live in the slavery times; they would love slavery because they lazy, they good for nothin', and I don't know why we allow them to teach any child to be hon with you. (03:16-04:08) | ▪ There were no white children in Plaintiff's class 408<br><br>▪ Plaintiff's lesson was on the Middle Passage<br><br>▪ Plaintiff was not simulating the Trans-Atlantic Slave Trade<br><br>▪ There was no racialized terrorism (Plaintiff was not teaching about the era of Jim Crowe and/or lynching in the South – there would never be a lynching in society, let alone a classroom), or fetishing of black people in Plaintiff's lesson |
| "Now if parents were to do that same thing to their child and that child reported it, the police would be at the parents' house, CPS would take the children away, but she can | ▪ Plaintiff did not commit any crime |

| | |
|---|---|
| *get away with this? And she's not goin to jail but a parent would go to jail if they did the exact same thing to their child?? Pay attention to that." (04:08-04:30)*<br><br>*"We have to, in the Black Community, get ourselves right, unify, put aside all your silly differences, and unify under the guise of 'we are black people, African people— whatever term you want to use, cause some of you wanna call yourselves different things—we have this hue, we have this history here, and we need to unify and take care of ourselves'". (04:30-04:58)* | |
| *"We aren't taking care of our children and we are subjecting our children to these white supremacists in the classroom. These white supremacists are telling our children that they can't wear braided hair, they can't wear afros, they can't do this, they can't do that. You know about the school to prison pipeline. It's proven black children are suspended more, the cops in schools arrest black kids more, not because they doin more things, but because of racial bias and racialized terrorism at the hands of white supremacist administrators, white supremacist cops. We know that. The data is out there proving that over and over and over and over again." (04:58-05:41)* | ▪ Plaintiff is not a white supremacist. Plaintiff does not support this ideology; she not a member or supporter of any groups, which condone this belief. In fact, Plaintiff's maternal grandfather and his lineage were born in the Cayman Islands, and he became a naturalized citizen of the US in 1925. Historically, in the age of exploration, the Spanish enslaved the indigenous people of the Islands in the Encomienda System. Therefore, it is believed that the Plaintiff's ancestors were confined into a system of servitude, which eventually was replaced by a system of open slavery until its abolishment in the 18[th] century. Accordingly, how could the Plaintiff support a white supremacist rational? |

53

| | |
|---|---|
| *"I'm not one to keep beggin people that I know it's just in them to do this. It's in them to treat us that way and I have over, well almost 400 years of history to back that up. It's not like I'm just singling one event and that's it. And if you aren't a white supremacist or believe in white supremacy than I'm not talkin to you. The way I speak is if the shoe fits wear it, and if you are <u>defending</u> a white supremacist then to <u>me</u> you are a white supremacist. Don't come to me sayin you not racist but you defending white supremacists, just that simple. And to that other crowd that's gonna come, um, and say 'oh well you guys say this about white people', No, we talkin about white supremacists. And if you feel white people/ white supremacists that says a lot about you, right? (05:41-06:24)* | ▪ Defendant is classifying the Plaintiff as a white supremacist and anyone who supports or defends her to also be a white supremacist |
| *"But what could we do about this situation? She wasn't fired. This woman needs to be gone. Black people need to mobilize on Twitter, YouTube, whatever. So in the penned comment I'm going to post, um, the chancellor's phone number where you can call the New York City Department of Education, I'm gonna post the Principal's number, um, and you can call the Bronx Middle School 118 and call them and let them know that you do not want to see a white supremacist teacher who were child abusing three children, humiliating them, racially terrorizing them, let them know on the phone that you don't want them, that woman teaching the children any more. Patricia Cummings need to go. Last week Terri Butcher, she had to go. She resigned. This one need to go." (06:24-07:15)* | ▪ Defendant incited his audience to mobilize to have the Plaintiff fired; thus subjecting her to public contempt and ridicule<br><br>▪ Plaintiff did nothing to warrant being described as a white supremacist<br><br>▪ Plaintiff was not accused of having committed any acts of child abuse, (which is a crime and punishable by law), humiliation, or racial terrorism |

| | |
|---|---|
| *"And from now on any time someone mess with <u>our</u> children in school, or any kind a government official say something, we gonna start putting out phone numbers, emails, and then I'm gonna ask you to every time to call and email; do your part, because if you're not gonna defend the children, then we all a piece of crap. How is it that we gonna have the next generation, but we not gonna defend them from racialized terrorism? <u>NO</u>! We need to do this. (07:15-07:41)*<br><br>*And when I had this discussion this morning about this <u>particular</u> story with the people on Patreon, they gave me the green light. They say yeah, this one is important enough to be public because you know I'm on a hiatus right now, you know why, but this is more important about the kids and not about the situation with I had on the last video that I posted. Now I'm not sayin I'm back to makin regular videos, but they gave me the green light, so we went ahead and made sure to make that decision for the sake of our children." (07:41-08:11)* | |
| *"So if you're watchin this video, make sure you call, uh, the chancellor. Make sure you call the school. Flood their lines. Don't let them get a call in because <u>this teacher needs to go</u>." (08:11-08:23)*<br><br>*"But leave me a comment. Let me know what you think about this, make sure you call, share the video with everyone you that you know, like the commentaries, subscribe ..."(08:23-08:30)* | ▪ Inciting the Plaintiff's termination, as a white NYCDOE , teaching in a minority school |

142.    The ordinary meaning as understood by the average listener with reasonable intelligence, would clearly ascertain that this broadcast, and given in its full context, constitutes defamation, defamation *per se*, slander, slander *per se*, and false light, and thus is actionable. The statements by the Defendant about Plaintiff were personal in their invective and were designed to impugn her character and professional integrity with the intent to damage her reputation.

**As to Defendants LENARD LARRY McKELVEY a/k/a CHARLAMAGNE *THA GOD*, WWPR-FM (105.1 MHZ), iHEARTMEDIA, and CLEAR CHANNEL COMMUNICATIONS, INC.**

143.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "142," above, with the same force and effect as though fully set forth herein.

144.    Plaintiff has a Constitutional right to protect her good name and reputation. Herein will explain and describe the statements alleging facts about Plaintiff as well as how they are actionable under New York law and not protected by privilege.

145.    Specifically, as to the Defendants, LENARD LARRY McKELVEY a/k/a *CHARLAMAGNE THA GOD*; WWPR-FM (105.1 MHZ); iHEARTMEDIA; CLEAR CHANNEL COMMUNICATIONS, INC., each exhibited a blatant disregard as to whether the accusations made against Plaintiff were actually true, and broadcasted them on the Defendant's nationally syndicated radio show, The Breakfast Club. The defamatory statements made during the segment <u>Donkey of the Day</u> on February 7, 2018, as said by Defendant, MccKelvey/Charlamagne[10] about Plaintiff are detailed below:

---

[10] https://youtu.be/A10CBumee6o

56

| Donkey of the Day<br>Aired February 7, 2018<br>Defamatory Speech Spoken by:<br>Charlamagne *Tha* God | TRUTH AND ACCURACY REGARDING DEFENDANT'S COMMENTS THAT CONTAIN DEFAMATORY MEANING, AND/OR ARE NOT PROTECTED BY OPINION PRIVILEGE |
|---|---|
| *"Now Patricia Cummings teaches at a middle school, middle school 118, and she teaches social studies. She decided that she wanted to give the students a history lesson on the good old American pastime called slavery. Now, it's Black History Month ladies and gentlemen, and one of the main problems I have with America's version of black history is that when white people teach us about us they usually start at slavery. But we know that's not the case, right? In the words of the late, great, Malcom X, our history did not begin in chains, but that's what white people in America like to begin our story."* (approx 00:29-00:58) | Plaintiff is a Caucasian teacher who taught in a minority populated school and neighborhood. Defendant Charlemagne/s statement is not only defamatory, but false. NYS curriculum dictates how teachers, whether they are "white people" or not, teach about African Americans. In NYS 7th grade curriculum, African-Americans are introduced into American history through slavery. The curriculum in 9th grade Social Studies (World History) delves more into African-American history, as it is world history. |
| *"See, Patricia Cummings decided to give these kids a lesson on slavery and she put extra mayonnaise on it. Oh the Helmans is heavy on this one. You see, Patricia Cummings was teaching kids about the Middle Passage—You do know what the Middle Passage is, right? It's when Africans were kidnapped, stolen, boosted from Africa and brought to America as part of the slave trade."* (approx. 01:42-02:02) | The reference to "mayonnaise" is a racial slur word used to describe Caucasian individuals, most commonly used in African-American slang. |

| | |
|---|---|
| *"Now let's keep in mind that the kids in this school are 81% black and Hispanic and 3% white. Quick side-note, I'd love to know how many black and Spanish teachers this school has because you can avoid problems like the one Patricia caused for herself if you simply have us teaching us."* (approx. 02:02-02:17) | By stating that Plaintiff could avoid problems like the one she caused for herself, any reasonable listener would be able to conclude that her teaching minority students was the problem, when 81% of the students are black and Hispanic. |
| *"What's up man? What's up man? Why y'all just be tryin' to give me to you, cracker-ass cracker? Man. I just told you that the school was 81% black and Hispanic so I have one question, why is Patricia in the kitchen on Soul Food Sundays? When it's time to make a nice quiche, call Patricia. You know good and damn well when you let Patricia make the potato salad she heavy handed with the mayonnaise. So why, oh why, is she in the kitchen on Soul-Food Sundays?"* (approx. 03:06-03:31) | "Cracker-ass cracker" is a racial slur which is disparaging and offensive. It is a contemptuous term used to refer to a white person in the South, especially a poor white living in some rural parts of the Southeastern U.S. The word in this sense often implies that the person is regarded as ignorant or uneducated. When used by black people, "cracker" can refer to a Southern white racist, not necessarily poor or rural. Therefore, the Defendant referred to Plaintiff as a white racist. This is not figurative language or exaggerated figurative language.<br><br>The term soul food originated from the meals developed by African-American slaves. By asking, "why is the Plaintiff in the kitchen on Soul-Food Sunday," the Defendant is actually asking, why is the Plaintiff, (a white woman), teaching in a minority school. Furthermore, by saying, "when you let the Plaintiff make the potato salad, she's heavy with the mayonnaise;" it is an ethnic slur against her Irish heritage, and an insinuation that she will destroy or |

58

| | break anything and everything with her whiteness. |
|---|---|
| *"If you a white teacher teaching majority black and Hispanic class you should have to run those lesson plans by some type of diversity board at the school to make sure you talkin' the right language to the kids, especially when it comes to sensitive subject like slavery."* (03:39-03:52) | All NYS teachers go through rigorous programs and education classes to obtain licensures in NYS. By stating that one specific race of teachers has to have their lessons evaluated is discrimination at its core. It also puts Plaintiff and all other Caucasian teachers in a false light.<br><br>By his own logic, African Americans would have to put their lessons on a board to be evaluated by other ethnicities, as well, with regard to sensitive topics and subjects. This is a prime example of the racial double standard that exists. |
| *"Okay Patricia. Why would you want kids to know what slavery feels like? You could have shown them the horrors of slavery by simply showing them 12 Years a Slave. Okay, you could have puts Roots on in the classroom, the old one or the remake. You could've put Birth of a Nation and showed them the horror of slavery but also how the great Nat Turner fought back, but NO. You would rather lay kids on their stomach and step on their backs because, truth be told, you wanted to break their spirits; You wanted to give them an inferiority complex. It has to be that because I can't think of any other reason you would want kids to know what slavery feels like."* (03:52-04:25) | Empathy is the intrapersonal realization of another's struggle that illuminates the potential consequences of one's own actions on the lives of others. As educators incorporating empathy into instruction yields positive results in and outside of the classroom.<br><br>Defendant has no educational background or degree for which he could properly assert what materials should be used to teach a lesson during the historiography period that the Plaintiff was teaching. He sites "Twelve Years of Slaves" and "Nat Turner," which would not be taught at the time of Triangular Trade period. Triangular Trade originated pre-Revolutionary War, and the examples that Defendant gives are during the Antebellum Period, which was between 1820-1860 (pre-Civil War). |

59

|  | Furthermore, "Birth of a Nation" deals with historical events from 1860 forward, and the only scene applicable in "Roots" would be during the voyage of human cargo to become slaves. Plaintiff actually showed a five minute movie clip, which aligned with NYS curriculum and the sample lesson provided by the NYCDOE. |
|---|---|
| *"There was all kind of lesson plans you could've gave these kids other than laying them on the floor, on their stomachs, and steppin' on their back. See I refuse to believe that Patricia Cummings, a middle school teacher making over 68,000 a year, doesn't know any better and that she couldn't do any better. I could've created a better lesson plan for these kids and my lesson plan would've actually had some redeeming qualities to it. I need Patricia Cummings to explain what the redeeming value was in this lesson." (05:19-05:44)* | Defendant has no educational background or degree for which he could properly assert what materials should be used to teach a lesson during the historiography period that the Plaintiff was teaching.<br><br>Defendant Charlemagne is stating as a fact that Plaintiff laid students on the floor and stepped on their backs, thus constituting a criminal act, which never happened and could have been verified. If this had happened, this would have been a crime under NYS law and thus would have been arrested. Plaintiff was never arrested because it never happened.<br><br>He does not know how to write a proper lesson plan, let alone to teach children with special needs to accommodate differentiated instruction, because he does not possess a degree in education. |
| *"Okay, she wanted kids to feel how it felt to be a slave? You gonna lay someone's child on their stomach, put your foot in their back and say how does it feel? I'll tell you how it feels! It feels like a white devil got her* | Defendant Charlemagne is stating and asserting as a fact that Plaintiff laid students on the floor and stepped on their backs, thus constituting a criminal act, which never happened and could have been verified. If |

60

| | |
|---|---|
| *hoof in my back, alright! It feels like I wanna slap fire out of a racist, bigot cracker-ass cracker." (05:44-06:05)* | this had happened, this would have been a crime under NYS law and thus would have been arrested. Plaintiff was never arrested because it never happened.<br><br>Moreover, Defendant continues his racial and ethnic attacks with his slurs, by which he refers to Plaintiff as a "white devil," which defines a person who takes advantage of a minority; describes Plaintiff as a "bigot," one who is intolerantly devoted to their own prejudices and once again calls the Plaintiff a "cracker," an ignorant white person. |

146.    Defendant, McKelvey/Charlamagne's racist and defamatory rant is also published on Apple iTunes with a copyright to Power 105.1 FM (WWPR-FM). It also has a "clean lyrics" label, yet, the content within the transmission consists of inappropriate, racist, derogatory and defamatory references made to and of Plaintiff.

147.    Defendant, Charlamagne's statements are actionable due to the fact that there are no First Amendment privileges to protect false statements.

148.    The ordinary meaning as understood by the average listener with reasonable intelligence would clearly ascertain that this broadcast and given in its full context constitutes defamation, defamation *per se*, slander, slander *per se*, libel, libel *per se*, and false light, and thus are actionable.

149.    Defendant Charlemagne used no language to presuppose Plaintiff's innocence, such as "accused" or "alleged." The statements made by Defendant Charlemagne about

Plaintiff were personal in their invective, designed to expose her to public contempt and ridicule and impugn Plaintiff's character and professional integrity. Moreover, he led his listeners to believe that the recitation of the facts presented were accurate. Thus, Defendant Charlemagne's statements are actionable.

150.   The Defendant Charlemagne indicated that Plaintiff committed acts constituting child abuse and/or endangerment, thus broadcasting that Plaintiff committed crimes punishable by NYS law. Therefore, Defendant Charlemagne cannot cloak his actionable behavior as "opinion" while publicly stating that she committed such acts, all the while utilizing a myriad of other offensive racial slurs against a Caucasian woman. It has been held in the courts that when readers [or listeners] understand a defamatory meaning, liability cannot be avoided simply because the publication is alleged to be cast in the form of an opinion, belief, insinuation, or even question. Thus, Defendant Charlemagne's statements are actionable.

151.   Notably, the Defendant Charlemagne spoke in his broadcast regarding curriculum when he possess no degree in education or has any experience in the educational system of knowledge of the appropriate curriculum. For example, when teaching about the Triangular Trade, you are educating students about the trade pattern which evolved prior to the Revolutionary War. Defendant Charlemagne kept discussing how he would teach the lesson with such examples as Nat Turner, the movie *12 Years a Slave*, which was adapted from the 1853 slave memoir Twelve Years a Slave by Solomon Northup. However, his examples were not from the correct historiography the lesson was from, but from the

Antebellum Period of the United States (1820-1860), one hundred year later in the curriculum Plaintiff is deemed to teach by New York State.

152.    Defendant Charlemagne's comments cannot be considered rhetorical hyperbole or an expression of his opinion. The statements made by the Defendant Charlemagne about Plaintiff constitute defamation, defamation *per se*, slander, slander *per se*, and false light. They are personal in their invective and were designed to expose her to public contempt and ridicule and impugn Plaintiff's character and professional integrity. With a following of listeners, who are informed by what he says, his words are blindly accepted as the truth. What he reported in his broadcast amounted to child abuse and/or endangerment, thus broadcasting that Plaintiff committed crimes punishable by NYS law. Therefore, Defendant Charlemagne cannot cloak his actionable behavior as "opinion" while publicly stating that she committed such acts, all the while utilizing a myriad of other offensive racial slurs against a Caucasian woman. It has been held in the courts that when readers [or listeners] understand a defamatory meaning, liability cannot be avoided simply because the publication is alleged to be cast in the form of an opinion, belief, insinuation or even question. Thus, Defendant Charlemagne's statements are actionable.

153.    Moreover, due to the Defendant not verifying any information, plausibility was ignored, to wit: if Plaintiff had in fact walked on students' backs, would they not have sustained physical injuries? Wouldn't have Plaintiff been arrested and charged with a crime? It should have been obvious that this was preposterous. Thus, Defendant Charlemagne's statements are actionable.

**As to SENATOR KEVIN PARKER**

154.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "153," above, with the same force and effect as though fully set forth herein.

155.    Plaintiff has a Constitutional right to protect her good name and reputation. Herein will explain and describe the statements alleging facts about Plaintiff as well as how they are actionable under New York law and not protected by privilege.

156.    The ordinary meaning as understood by the average reader with reasonable intelligence, would clearly ascertain, that the statements made by Senator Parker and given in its full context constitutes, defamation, defamation *per se,* libel, libel *per se*, and false light, and thus are actionable.

157.    Specifically, as to Defendant, KEVIN PARKER, New York State Senator, District 21, made the following statements in the February 9, 2018 publication of New York Amsterdam News:

- *"Like many others, I am completely outraged to by the actions of Bronx Middle School 118 teacher, Patricia Cummings," said State Sen. Kevin Parker. "I call for her swift removal from the New York City Department of Education, and the revocation of all New York State licensures and credentials that would allow her to teach in our State."*

- *Parker continued, "Although I hear some calling for a second chance for Ms. Cummings via culturally competent training and the like, as an African studies professor at the City University of New York for over 20 years now, I know there is no level of training that can make a person more sensitive to the struggles of another. Those feelings cannot be prepared in one's mind, but rather must be intrinsic to one's character. This is not the case for Ms. Cummings and it is my hope we can learn for this deplorable act to inform future decisions and best practices when deciding who will be afforded the honor of teaching our children."*

64

158.    Defendant Parker cannot hide behind the Speech and Debate Clause of the Constitution. The protections of the Clause are limited to "legislative activities." It has been established by the Court that "[w]hatever imprecision there may be in the term 'legislative activities,' it is clear that nothing in history or in the explicit language of the Clause suggests any intention to create an absolute privilege from liability or suit for defamatory statements made outside the Chamber."[11] Therefore, the Defendant Parker cannot cloak his actionable behavior as "privilege" or "non-actionable," while publically calling for Plaintiff's *swift removal from the New York City Department of Education, and the revocation of all New York State licensures and credentials.*

159.    Senator Parker's statements on Plaintiff's character and on her alleged "deplorable acts" are quite ironic given his own personal controversies.

160.    Defendant Parker's comments cannot be an expression of his opinion. As a New York State Senator, his words are accepted as the truth. The statements made about Plaintiff by Defendant Parker were personal in their invective, exposed her to public contempt and ridicule and were designed to impugn the Plaintiff's character, professional integrity, and reputation.

**As to Defendants NATASHA CAPERS; ANGEL MARTINEZ; and NYC COALITION FOR EDUCATIONAL JUSTICE**

161.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "160," above, with the same force and effect as though fully set forth herein.

---

[11] *Hutchinson v. Proxmire*, 442 US 111 (1979).

162.   Specifically, as to Defendants, COALITION FOR EDUCATION JUSTICE, NATASHA CAPERS and ANGEL MARTINEZ, who exhibited flagrant disregard as to whether the accusations made against the Plaintiff were actually true, made the following statements:

**Natasha Capers** [12]:

- New York Amsterdam News—February 9, 2018

  o   *"For over a year public school parents have rallied, organized and advocated for Culturally Responsive Education and anti-bias trainings to protect students from exactly this type of trauma" said Capers. "Now that it's in the news, will you listen to parents and work with them? The leaders of this city must take responsibility. UFT, this is your member. Chancellor Fariña, this happened under your supervision.   Mayor de Blasio, this occurred in a system you wanted control over. ... What will you do now to end the systemic racism in NYC public schools that children suffer from? What will you do to ensure nothing like this happens again?..."*

- New York Amsterdam News—February 15, 2018

  o   *Natasha Capers, coordinator NYC Coalition for Educational Justice, told the AmNews, that aside from the initial assault on the students, parents were upset that the Bronx teachers was initially only suspended for a couple of days and was allowed to work at the school before she was reassigned. "Just thinking about how these kids have to continue to interact with her after she disrespected them like that is beyond words," said Capers. "Some of the kids really adored Cummings but were just disappointed of how much of a racist she was. It's even worse when you realize what trauma the kids are now in. Some may have never experienced racism or even realize how problematic what Cummings did. What she did to the children was horrible and we need to have talks our children when they are facing racism and how to deal with it."*

  o   *Capers organized a rally last week in front of City Hall. She said, "The fact that Cummings had the notion to disrespect these children and is actually getting away with this should not be OK. We shall continue to fight for our children and for the next generations to come."*

---

[12] https://youtu.be/UBweg0BrMls

- "All Things Considered" on WNYC with Jamie Floyd (interview)

  - *"I've heard a lot of folks say, well this teacher was just trying to impart on those students how hard it must have been, how they needed to feel it, but actually if you want someone to identify with someone else that takes empathy."*

- New York Amsterdam News—February 16, 2018
  Article written by Natasha Capers, Coalition for Educational Justice
  Coordinator

  - *"It's been nearly two weeks since the Daily News broke the story about the white teacher in the Bronx who, in a lesson on slavery and the Middle Passage, made Black students in several classes lie face down on the floor and stepped on a female student while asking, "See how it feels to be a slave?"*
    *It's been nearly two weeks, and the city has still not taken any steps to ensure that this type of degrading and traumatic incident will not occur again."*

**Angel Martinez:**

- New York Amsterdam News—February 9, 2018

  - *"This outrageous, racist incident demonstrates the city's failure to address racial bias and cultural competence, and to teach students of color their history," said Angel Martinez, Harlem mother of three and CEJ parent leader.*

  - *"...We demand that Mayor de Blasio apologize to these Bronx students and their families, provide counseling support to the students who were affected and immediately commit to implement Culturally Responsive Education throughout New York City public schools."*

**The Coalition for Educational Justice:**

- New York Amsterdam News—February 9, 2018

  - *The Coalition for Educational Justice stated, "Because of the mayor's inaction, dozens of students have been victimized and traumatized. ...*

> *Racist and psychically damaging incidents like this are treated as isolated incidents by the de Blasio administration...*"

- The Coalition for Educational Justice Website

  - "*CEJ made their demands for NYC schools to adopt **Culturally Responsive Education** loud and clear at a rally at City Hall on February 6th. In the wake of a **racist slavery lesson** at a Bronx middle school, parents, students, elected officials, and education equity advocates alike came together to let the Mayor's office and the Department of Education know that our communities will not let this disgraceful incident get swept under the rug. Over 50 people entered City Hall, singing and chanting, until their voices were heard and Natasha Capers, CEJ coordinator, met with the Mayor's chief of staff to discuss **CEJ's demands**.*"

- The Coalition for Educational Justice's Petition to Mayor Bill de Blasio

  - "*It's been more than a month since the Daily News broke a story about a white teacher in the Bronx who, in a lesson on slavery and the Middle Passage, made Black students in several classes lay face down on the floor and even stepped on a female student while asking "see how it feels to be a slave?"*

  - *It's been more than a month, and the city has still not taken any steps to ensure that this type of degrading and traumatic incident will not occur again.*"

  - "*Parents need him to step up and take action, to get justice for those students in the Bronx, and to make sure no child has to experience that again.*"

163.    The Coalition of Educational Justice used *Color of Change*, a progressive, nonprofit civil rights advocacy organization in the United States, to publish their discriminatory and defamatory agenda/petition. Thus, Color of Change published a digital petition at the bequest of the Defendant, Coalition of Educational Justice, utilizing the following characteristics:

68

- A digital petition is an online organizing tool that you can use to bring other people together to pressure decision-makers to implement a specific change needed in your community.

- A digital petition campaign is a structured, creative effort to share the petition on a variety of online channels to engage other people in supporting the petitioner's demand given a specific time and goals. A digital petition campaign focuses on expanding the reach of an individual's efforts through the power of online social networks. It may also include offline actions that increase pressure on the decision-maker."

- For a digital petition campaign to be effective on OrganizeFor.org, it needs to include the following elements:

  - A CLEAR DEMAND: What is the specific change that you want to see in the world? [e.g. Drop charges on the students who have been wrongfully suspended and rescind the discriminatory part of the dress code that is disproportionately affecting Black students.]

  - AN APPROPRIATE TARGET(S): the target has to actually have the power to make the change you want to see happen. [e.g. the local school board]

  - A STRONG THEORY OF CHANGE AND STRATEGY: This is an 'if then' statement that describes cause and effect between your goal and plan to make it happen. A strong theory of change is typically accompanied by a strategy that outlines how you will reach your goal. [e.g. If hundreds of parents, family and community members support this petition, we can deliver the signatures at next month's school board meeting and show our united support for equal treatment for all students regardless of race or culture - including hairstyles. We will attract local press to the board meeting which will pressure the board members to change the discriminatory policy]

- IDENTIFY A CAMPAIGN LEADER: A good petition leader will be someone that has a strong connection to the issues addressed in the petition. Ideally, that person is you! [e.g. As a resident of this town whose nieces and nephews attend our schools I am representing my family and others who are concerned that our children are not being treated fairly.]

- A COMPELLING NARRATIVE/CONTENT: Stories are what draw people in and allow them connect with others. A strong story for an OrganizeFor petition should focus on an issue that negatively impacts Black people and communities as the basis for the petition demand, and starts with a powerful introduction sentence and a good hook. [e.g. Read this petition for a good example of a powerful narrative that centers the impact on Black communities]"

164. The Defendant, Coalition of Educational Justice was further advised:

   o "Your first goal is to hit 100 signatures. Share right away with your friends, followers and networks to get started! Once you get 100 signatures, Color of Change staff will review your petition and send a test email to Color of Change members to see how they respond." "If Color of Change members in the test group sign your petition, we'll keep sending it out to larger and larger groups of members. Very relevant or timely petitions will be shared on the Color of Change Facebook and Twitter accounts. You may receive a call or email from a Color of Change staff member to talk about your petition."

   o In the meantime, read the next section on "ENGAGING OTHERS TO WIN ON YOUR CAMPAIGN." Think about what else you can do to **make the TARGET feel that pressure** and bring those ideas to life!"

165.     James Rucker and Van Jones are co-founders of Color of Change. James Rucker was quoted in a 2010 Washington Post Article stating, how his "work involves telling a compelling story and finding what he calls a 'theory of change' or a cause that the group's members can directly impact". He further states that, "[T]he internet has the power to democratize, and it has the power to amplify voices.

166.     The Defendant, Coalition for Educational Justice is not interested in the truth, but a "compelling story" to further their agenda. Furthermore, when the internet is used

irresponsibly it also has the power to amplify hatred, which is what is group did in regards

to assisting the Defendant, the Coalition for Educational Justice in their petition campaign.

**As to Defendants DR. ANDRE PERRY; THE HECHINGER REPORT a/k/a HECHINGER INSTITUTE ON EDUCATION AND THE MEDIA**

167.    Plaintiff repeats, reiterates and realleges each and every allegation contained

in paragraphs "1" through "166," above, with the same force and effect as though fully set

forth herein.

168.    Specifically, as to Defendants, DR. ANDRE PERRY; THE HECHINGER REPORT

a/k/a HECHINGER INSTITTE ON EDUCATION AND THE MEDIA, who exhibited flagrant

disregard as to whether the accusations made against the Plaintiff were actually true, the

Defendant, DR. ANDRE PERRY, in his official capacity as a columnist on educational equity

appearing in the Hechinger Report, a nonprofit news organization focused on producing in-

depth education journalism, TheRoot.com, and the Washington Post and has made the

following statements:

- Published on February 6, 2018: "Teachers, How Does it Feel to Be Oppressors? A Teacher Literally Stepped On Children to 'Teach' Them About Slavery"[13]

    o    *A teacher literally stepped on children to 'teach' them about slavery."*

    o    *"Cummings' slavery lesson wasn't only cruel; it was redundant."*

    o    *"Black students know too well what it's like to be humiliated, held in captivity and to suffer from inhumane conditions created by educators.*

---

[13] https://hechingerreport.org/teachers-feel-oppressor/

https://www.theroot.com/dear-teacher-how-does-it-feel-to-be-an-oppressor-1822701650

> *Many compliant students who sit quietly accepting demeaning lessons like the ones administered by Cummings and others like her are viewed as obedient and law-abiding. Their counterparts who resist are deemed disorderly and subjected to harsh disciplinary policies, often ending up in jail by way of the school-to-prison pipeline. Whether you are obedient or "woke" — conscious of your oppression — you are being oppressed in schools. Yep, black students already know what it's like to be stepped on."*

- o *"There are white teachers like Cummings who have not reckoned with what it means to oppress."*

- o *"While most teachers probably won't see themselves in either Black or Cummings, most should recognize that they associate with white norms, which makes it possible to act in racist ways,..."*

169.    The accusations made against the Plaintiff, as published, spoken, generated and disseminated by these Defendants and others as identified above are remarkably false.

170.    Therefore, Defendant Perry, likewise, cannot cloak his actionable behavior as "opinion," while publicly stating that Plaintiff committed such acts, all the while utilizing a myriad of other offensive racial slurs and hate speech against a Caucasian woman. The statements made about Plaintiff by Defendant Perry were personal in their invective, exposed her to public contempt and ridicule and were designed to impugn the Plaintiff's character, professional integrity, and reputation. It has been held in the courts that when readers understand a defamatory meaning, liability cannot be avoided simply because the publication is alleged to be cast in the form of an opinion, belief, insinuation or even question. Thus, Defendant Perry's statements are actionable as defamation, defamation *per se*, libel, libel *per se*, and false light.

171.    Plaintiff sustained damages in excess of the jurisdictional limits of all lower courts, which might otherwise have jurisdiction.

**AS TO THE DEFENDANTS,**
**THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF EDUCATION,**
**GIULIA COX, AND COURTNEY WARE**

### III.   CAUSES OF ACTION FOR FRAUD/MISCONDUCT, NEGLIGENCE, VIOLATION OF DUE PROCESS, VIOLATION CIVIL RIGHTS, and DISCRIMINATION

172.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "171," above, with the same force and effect as though fully set forth herein.

173.   Defendants' actions give rise to a cause of action for fraud due to the knowing, intentional, and material misrepresentations made in connection with the allegations asserted against the Plaintiff in this matter.

174.   The Plaintiff established that Defendants' purposeful misconduct, tampering, concealing material existing facts, and false material representations constituted material false representations, which the Defendants knowingly made to and with regard to the Plaintiff with the intent to deceive. In addition, Plaintiff and others justifiably relied on the veracity and accuracy of the Defendants' representations and was damaged as a result.

175.   Further, the Defendants' collective actions constitute acts of deception and manipulation, by omission, concealment, and commission, in undertaking to serve as the administrators, investigators, liaisons, and monitors of such subject complaints and procured, generated, or assisted in generating repeated false and misleading statements and information in violation of the Chancellor Regulations and State and Federal laws and the Plaintiff's due process and civil rights.

176.   As a result of these fraudulent acts of collusion among the Defendants, the

Plaintiff is and will continue to be damaged.

177.   The Defendants made representations to Plaintiff which were false, and known to be false by the Defendants, and that the representations were made for the purpose of inducing Plaintiff to rely upon what she was being told, and ultimately resulted in her damages. Further, the Defendants purposefully violated the New York City Chancellor Regulations and the contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT), and attempted to conceal their wrongdoing by falsifying and filing erroneous documents.

178.   On January 11, 2018, Plaintiff learned from various students in her class that students' statements were being taken collectively by the Assistant Principal, Courtney Ware, in a classroom setting concerning the Plaintiff's January 9, 2018 lesson. This method for taking students' statements was a direct violation of the New York City Chancellor Regulations and the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT), such that, in accordance with New York City Chancellor Regulations, alleged victims and student/staff witnesses are to be interviewed separately and their written statements are to be obtained as quickly as possible, (see, Regulations of the Chancellor A-420 (VI)[B](1); the first set of statements were taken by the Assistant Principal, Courtney Ware, in a classroom setting. This is not the only instance of direct violation of the New York City Chancellor Regulations. There were other violations including, but not limited to the following in the chart provided below:

74

| NYCDOE REGULATION | WHAT THE DEFENDANTS ACTUALLY DID |
|---|---|
| The accused employee must be provided with 48 hour written notice of the right to appear with union representation at an investigative interview to discuss the allegation of corporal punishment. <u>See</u>, Regulations of the Chancellor A-420 (VI)[B](2). | Plaintiff was given a letter directing a disciplinary meeting from then principal of The William W. Niles School - Middle School 118, Defendant Giulia Cox, on January 16, 2018.<br><br>No mention was made of any allegation of corporal punishment; no Chancellor Regulation was cited in the correspondence. <u>See</u>, Letter Below: |



| NYCDOE REGULATION | WHAT THE DEFENDANTS ACTUALLY DID |
|---|---|
| Upon receipt of any complaint of corporal punishment, OSI will recommend whether the employee should be removed from his/her | There was no complaint or alleging of corporal punishment at the February 18, 2018 meeting According to the investigators, Defendant Giulia Cox, who was principal at that time, did **not** |

| | |
|---|---|
| assignment pending completion of the investigation. <u>See</u>, Regulations of the Chancellor A-420 (V)[A]. | allege Corporal punishment to OSI until after the February 18, 2018, "disciplinary meeting;" That in itself is a clear violation. |
| When determining whether to remove the employee, the following should be considered: the severity of the alleged behavior; the prior record of the accused employee; the likely disciplinary action if the allegations are substantiated; the nature and frequency of the contact between the subject students; and any other relevant factors. <u>See</u>, Regulations of the Chancellor A-420 (V)[B]. | Defendant Cox, then Principal of The William W. Niles School - Middle School 118, removed the Plaintiff from teaching only class 408, from January 23, 2018 to January 25, 2018, the Plaintiff continued to teach her other classes at Middle School 118 during this time. Plaintiff also covered classes in Lieu of teaching her class 408 during those three days as well. There is only one logical conclusion: that the statements taken by Defendant Courtney Ware on January 11, 2018 and shown to Plaintiff by Defendant Giulia Cox at the January 18, 2018 meeting, did not compel her to conclude that (1) anything arose to the level of corporal punishment, and (2) that Plaintiff was a danger to students, to wit: she would be removed from the school. |
| If an employee has been removed from his/her assignment pending the outcome of a corporal punishment investigation, the principal shall inform the employee, in writing, of the nature of the investigation, no later than five (5) school days from the date of his/her removal. <u>See</u>, Regulations of the Chancellor A-420 (V)[C]. | The Plaintiff was never informed in writing of an investigation conducted by OSI or Defendant Cox on or by January 25, 2020, as the Regulation outlines.<br><br>Plaintiff was notified in writing on February 1, 2018 that she was being removed as of February 2, 2018, the same day Defendant Cox and Defendant NYCDOE learned that there was going to be a story published about her. |
| At the time of the meeting with the accused employee, the employee must be provided with an explanation of the allegation of corporal punishment and the opportunity to make a statement. <u>See</u>, Regulations of the Chancellor A-420 (VI)[B](4). | There was no allegation of corporal punishment alleged at the January 18, 2018 with then Principal Defendant Giulia Cox, nor on January 22, 2018 when Plaintiff met with Defendant Cox and was informed she was removing Plaintiff from teaching only and specifically class 408, "for a couple of days" and will be covering/teaching classes in lieu of her scheduled class 408. |

| | |
|---|---|
| If the accused employee requests an opportunity to review student witness statements, or adult witness statements that contain student-specific information, the employee must be provided with an opportunity to review and sign a privacy acknowledgment in the presence of union representation (where such representation is present) that he/she will not disclose the contents of the statements or retaliate against the author(s) of the statements. The UFT union representative also must also be provided the opportunity to review and sign the privacy acknowledgment. See, Regulations of the Chancellor A-420 (VI)[B](4)(a). | On January 18, 2018, Plaintiff asked that the written statements, which were shown to her by Defendant Cox, which were written on OORS Reporting paper, to be redacted because it had already been reported to her by her students in class 408 that certain students, who were failing, were trying to get her fired.<br><br>Furthermore, the written student statements taken on January 11, 2018 by Defendant Ware and shown to Plaintiff at the January 18, 2018 meeting, were recorded on OORS reporting paper, to wit they should have been recorded into the OORS system. IF they were, which we contend they weren't, then OSI would have generated a case number, and either the agency itself or the Principal would investigate any allegation or corporal punishment. There was no generated OSI number until February 1, 2018; the same day Defendant Cox, Defendant Ware, and Defendant NYCDOE learned that there was going to be a story about Plaintiff written and published by Defendant Daily News. |
| The principal/designee must evaluate the evidence and credibility of all witnesses, including the alleged victim and the accused employee. See, Regulations of the Chancellor A-420 (VI)[B](4)(a). | Instead of following the outlined procedure, then Principal of The William W. Niles School - Middle School 118, Defendant Giulia Cox, created her own narrative of the alleged incident and despite the Plaintiff' pleas, refused to speak with several witnesses, including Ralph Hudson, another teacher, who is African American, who was present in the classroom on his preparation period, and witnessed and observed Plaintiff's lesson on the day in question. |

179.    New York City Department of Education, spokesman Doug Cohen stated on the record in the media, on February 2, 2018, "[W]hile the investigation has not been completed,

these are deeply disturbing allegations, and the alleged behavior has no place in our schools or in our society." His statement to the public is highly misleading, with misrepresentation of what Plaintiff was actually being investigated for, following the Daily News online article on February 1, 2018. His statement as interpreted by a reasonable minded person of average intelligence, would believe that the allegation published and described by the Daily News Defendants was a true, accurate fact, but it was actually, one hundred percent false. This is not the first time the NYCDOE, issued statements to the public, when they knew nothing of this nature had actually happened. This is a prime example of the fraudulent activity of the Defendants and their negligent misconduct.

180.    Moreover, New York City Department of Education, spokesman Doug Cohen also stated on the record in the media, in particular to the Daily News on September 28, 2018, that "[W]e've begun the process of firing Ms. Cummings based on an investigation of this unacceptable behavior and her performance as an educator." Curiously, the 30-day, possible termination notice provided to Plaintiff by District 10 Superintendent Maribel Torres-Hulla, dated September 17, 2018, stated that on October 18, 2018, Ms. Torres-Hulla would be reviewing and considering rendering whether the probationer services of the Plaintiff would continue. How could Mr. Cohen have already determined that the process to fire the Plaintiff had begun on September 28, 2018, when Superintendent Torres-Hulla had not yet completed her review and consideration? This demonstrates the Defendant's clear violation of the Plaintiff's due process and civil rights.

181.    The Plaintiff was found solely to have exercised "poor judgment," a previously discussed inappropriate conclusion for an OSI investigation, as Administrators are the only

ones who can evaluate a teacher's performance. However, as it was a media case, something was needed to be substantiated. Further, it should be noted that the OSI Report recommended training, not termination.

182.   Since February 1, 2018, the Plaintiff has found herself having to publically defend her reputation, integrity, and good name, as a direct result of the actions of The Defendants, particularly, the then principal of The William W. Niles School - Middle School 118, Defendant Giulia Cox, whose negligent actions commenced a course of conduct designed to conceal her failure to perform her duties as a NYCDOE Principal and failure to adhere to the New York City Chancellor Regulations and the Contract existing between NYCDOE and the United Federation of Teachers (UFT). The former principal, Defendant Giulia Cox, fraudulently and recklessly disclosed false and unsubstantiated information to the NYCDOE Investigators, prior to and during the investigation, tampered with witnesses, and tampered with physical evidence, to wit: in the disciplinary meeting on January 18, 2018, the Plaintiff advised Principal Cox that Ralph Hudson, another teacher, was present in the classroom on his preparation period and observed the Plaintiff's lesson, yet Defendant Cox refused to speak with Mr. Hudson, flatly stating to the Plaintiff, "I don't have to." Defendant Giulia Cox had a legal and supervisory duty to speak with Ralph Hudson, the eyewitness. Her failure to act as a reasonable person would and failure to meet the reasonable standard of care and NYCDOE's standards constitutes negligence and misconduct. This is a clear and substantial factor that led to Plaintiff's damages. Further, Defendant Cox told the OSI investigators that Plaintiff's lesson was taught on a different date than it actually was, so that

it would corroborate Defendant Cox's false narrative that Mr. Hudson was not in the classroom when the lesson was taught; thus, there would be no witness.

183.    On August 22, 2018, the Plaintiff received an e-mail from the Defendant, Giulia Cox, advising that she was released from reassignment in August, (which is factually wrong), and would be scheduled to be teaching at the William W. Niles School - Middle School 118 in September. Defendant, Giulia Cox stated that Plaintiff would be tentatively teaching 6th grade Social Studies; the position that another teacher (Mr. Cavallo) vacated when he took an Open Market Transfer in June. This is extremely notable, as the Plaintiff believes that was how Defendant Giulia Cox knew the Plaintiff was going to be terminated, and she would be able to justify her hiring someone with that schedule. It would be just an easy name switch on her part. However, the fact that Plaintiff had filled out a preference sheet complicated matters, because now Defendant Cox had to make it look like she followed the Contract with regard to "preference sheets." It was then that the Defendant, Giulia Cox created a <u>fake schedule</u>, to wit: as Middle School teacher you teach 25 classes per week; 21 out of the 25 classes on the Plaintiff's schedule had the same exact class number, room number, day and period as Mr. Baker, two of Plaintiff's classes had the same exact class number, room number, day and period to be taught as Mr. Thomas, and two of Plaintiff's classes had the same exact class number, room number, day and period to be taught as Ms. Gambordelli. Notably, Mr. Baker, Mr. Thomas, and Ms. Gambordelli are all General Education teachers, like the Plaintiff, and as such, would never share the exact same class number, day, period, and room number.

184.    When Defendant Cox removed the Plaintiff from the school and put her back into reassignment on September 4, 2018, there should have been a substitute teacher

covering her schedule, staring September 5, 2018, (the first day students report), if she was the actual and true teacher of record for those classes listed on the schedule Defendant Cox provided to the Plaintiff.  The fact that there was never a substitute from September 5, 2018 to the day Plaintiff was terminated on October 18, 2018, indicates and proves that Plaintiff was never the teacher of record. Thus, the schedule provided by Defendant Cox was fake, and Defendant Cox knew the premeditated decision to terminate Plaintiff's employment. The NYCDOE fraudulently made it appear that they were following the regulations, when in fact they were not; therefore the Defendants violated the Plaintiff's due process and it is demonstrated that Plaintiff's termination was not in good faith.

185.    Furthermore, when Plaintiff was questioned by investigators, she learned that there were two (2) sets of written student statements. However, BOTH sets of statements are dated "1/11/18"; the first and original set of statements taken by Defendant, Courtney Ware and the Second set taken by Assistant Principal, Leah Dyer.

186.    These actions by the Defendants directly resulted in an erroneous and egregious article and subsequent news articles and broadcasts, subjecting Plaintiff to defamation, defamation *per se* and false light, public contempt, and ridicule by numerous individuals.

187.    As a result of the Defendants' actions, Plaintiff has been erroneously and permanently labeled and identified as a "racist," publically humiliated and subjected to public scrutiny, causing a degradation of her professional status, reputation and name, along with numerous threats of physical harm and threats of death.

188.    The Defendants, their employees and agents, owed the Plaintiff a duty under

81

the due process clauses of 42 U.S.C. §1983, the Fourteenth Amendments to the U.S. Constitution and Article I, §11 of the New York State Constitution to ensure the Plaintiff's due process of law.

189.   Despite this well-defined duty, Defendants failed to act in accordance with the preservation of the Plaintiff's due process rights. The Plaintiff's subjected to an erroneous, unsubstantiated process and subjected to the placement of fabricated and unfounded charges not only in her teaching record with the New York City Department of Education, but also with New York State with respect to her licenses and certifications as a teacher.

190.   Plaintiff is informed and believes that the acts of the Defendants, their employees and agents, were intentional in failing to protect and preserve Plaintiff's civil rights and that, at minimum, Defendants were deliberately indifferent to the likelihood that the Plaintiff's rights would be violated without due process based on their purposeful and fraudulent acts.

191.   As a direct and proximate consequence of the acts of Defendants' agents and employees, the Plaintiff has suffered and continues to suffer loss of his civil rights and is entitled to compensatory damages for said loss.

192.   Moreover as to the claims arising under 42 U.S.C. § 1985, the Defendants herein have acted under color of State law.

193.   Further, while acting under color of state law, the Defendants deprived the Plaintiff of a federal statutory right. The Plaintiff has demonstrated a deprivation of liberty/"stigma-plus" claim that the Defendants made false a stigmatizing statements about her, wherein there was a state imposed burden, and Plaintiff has experienced an adverse

act, to wit: she has been publically "marked" and falsely branded as a "racist" and a "white supremacist;" stated as having performed physical act akin to child abuse and/or endangerment that will prevent her from working with the children or the New York City Department of Education or any District in any capacity. Further, there is no post-deprivation remedy that would exonerate her, as that false inappropriate, public characterization is a permanent part of her teaching record. The Plaintiff has no other adequate remedy at law or in equity.

194.    Freedom from a "badge of infamy" is a legal right, which when found together with the privilege of government employment, dictates the application of due process to both.

195.    Civil rights protects all people from racial discrimination in the exercise of certain civil rights and eradication of race discrimination of any kind is a National priority. Civil liability for private conspiracies motivated by "racial, or perhaps otherwise class-based, invidiously discriminatory animus" that seek to deprive the plaintiff "of equal enjoyment of rights secured by the law at all."

196.    Race discrimination in the workplace *prima facie* case has four parts:

| 1. | You're a protected class | Plaintiff is a white woman |
|---|---|---|
| 2. | Qualified for job/performing adequately | Plaintiff is an NYS certified teacher and was rated as an effective teacher by the NYCDOE |
| 3. | Subject to negatively job action | Defendant Cox lied to investigators; tampered with physical evidence, because that would eliminate her narrative |
| 4. | Person who got the benefit was of a different race | Benefit is to Student A's parent (who was African American) and NYCDOE, who received $23 Million Dollars from |

| | | NYC for "anti-bias training of City educators after the Daily News exposed "shocking instances" of racism in public schools.[14] With minority Chancellor Richard Carranza lauding the cultural sensitivity training for City educators. |
| --- | --- | --- |

197.    Furthermore, under *Monell v. Department of Social Serv.*, 436 U.S. 658 (1978), a municipal government can be held liable under Section 1983 if a plaintiff can demonstrate that a deprivation of a federal right occurred as a result of a "policy" of the local government's legislative body or of those local officials whose acts may fairly be said to be those of the municipality. An employee must be acting pursuant to a municipal "policy." To establish a municipal "policy," a plaintiff must prove that the municipal action was (I) taken with the requisite degree of culpability and (ii) causally linked to the deprivation of a federal right. See, also, Amendment 14 of the United States Constitution. The actions and statements of these Defendants are indicative of a pattern of such behavior against non-tenured teachers.

198.    The Defendants, their agents, servants and/or employees were careless and negligent in departing from good and accepted practice in the investigation and monitoring of the unsubstantiated claims made against the Plaintiff, for their credibility, veracity, and reliability, in failing to possess the requisite learning, skill, knowledge and judgment ordinarily exercised in investigating and monitoring claims against faculty members; in failing to perform certain procedures, which the reasonably skillful and competent

---

[14] New York Daily News.com April 26, 2018, Ben Chapman, City to Spend $23MFor Anti-Bias Training for Public School Educators.

84

personnel would have so done under the circumstances; and in violating each and every rule, regulation, code statute or ordinance governing the exercise of reasonable care and due diligence concerning the management, and control of the aforementioned situation, including but not limited to, violating the New York City Chancellor Regulations and the contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT).

199. Due to the negligence of the Defendants, Plaintiff has been significantly damaged. The Plaintiff's reputation as a respected educator has been irreparably and permanently damaged, the extent of which cannot be measured at this time. Her professional career has been substantially compromised and she has been unwillingly exposed to negative notoriety, which has publically humiliated and embarrassed her and subjected her to threats of violence, assault, and death.

200. Defendants' negligence and negligent acts, whether taken singularly or in combination, were a direct and proximate cause of Plaintiff's suffering, mental anguish, and loss of personal dignity, both in the past and continuing in the future.

201. Plaintiff has suffered significant economic damages, actually and proximately caused by the departures and negligence of the Defendants herein. She is now without an ability to obtain employment as a teacher, and it is unlikely that she will be able to secure other employment in that field due to the public nature of these matters.

202. Plaintiff has now been forced to accept employment in an alternative field.

203. Furthermore, Plaintiff is now obligated to repay a plethora of student loan debt for an education that she can no longer utilize.

204.    The injuries and damages sustained by Plaintiff were caused solely by the torts of the Defendants, without any negligence on the part of Plaintiff.

205.    Due to the negligence, fraud, misconduct, violation of due process, violation of civil rights, and discrimination by the Defendants, Plaintiff has been significantly damaged. Plaintiff's reputation as a teacher has been irreparably and permanently damaged, the extent of which cannot be measured at this time. Her professional reputation has been substantially and publically compromised.

206.    In order to mask the Defendants' own inadequacies and to cover up the fact that the Defendants erroneously and falsely accused the Plaintiff of acts of a criminal nature, which never occurred, that they grossly overreacted due to the media coverage, Plaintiff learned on September 6, 2018, when she reviewed the Report for the first time, that the Defendants arbitrarily and capriciously found in the OSI Investigative Report  that the Plaintiff generally "acted with poor judgment in allegedly conducting a lesson that inadequately incorporated the New York City Department of Education social studies curriculum and guidance for the topic, and that the lesson significantly diverged from best-practices." In actuality, Plaintiff's lesson on the Middle Passage was in accordance with the New York State approved standards and perfectly aligned with the sample lesson in the Passport Guidebook which states that a teacher can adjust the lesson for the needs of their class.

207.    As a result of these arbitrary and capricious acts of the Defendants, Plaintiff was subjected to a further review to consider whether her services as a probationer would be discontinued and for "possible" termination of her employment. She was subsequently

terminated as a New York City Public School Teacher at The William W. Niles School - Middle School 118 on October 18, 2018.

208.    The Defendant Giulia Cox has repeatedly, arbitrarily and capriciously violated the rights of Plaintiff. Plaintiff made numerous requests to review and copy her teacher file; however, the Defendant Giulia Cox inexplicably refused to provide the Plaintiff with such an opportunity, in blatant violation of Article 21 A, of the Contract between the Board of Education of the City School District of the City of New York and the United Federation of Teachers. Accordingly, the Plaintiff filed a grievance with the UFT and the Step One was ignored by the Defendant Giulia Cox.

209.    As such, The UFT agreed that the grievance should go to the next level (Step 2 Grievance a/k/a a grievance at the Chancellor Level). A decision was subsequently made prior to leaving the hearing on November 13, 2018, wherein The Defendant, Giulia Cox stated, that she "can make arrangements to have the original files, and a full paper copy of the file, available for [Plaintiff's] review in the presence of a UFT Secretary at 1 Fordham Plaza." It was then that Chancellor Representative, Alan Lichtenstein confirmed that "You [Giulia Cox] agreed to have a complete copy of the file plus the original at 1 Fordham Plaza pending a request for a mutually convenient time." Mr. Lichtenstein then confirmed that the Plaintiff grievant will provide three dates and Giulia Cox will select one." The Plaintiff provided the dates as requested in an e-mail to Defendant, Giulia Cox on November 21, 2018, and did not receive a response. Instead, the Chancellor Representative, Alan Lichtenstein, wrote his decision in December, 2018; however, the decision that was written was not what had been agreed to at the prior grievance hearing. The decision instead stated that

87

Defendant, Giulia Cox would e-mail the Plaintiff's file to her [Plaintiff], which is also a clear violation of Article 21 A. This decision by Chancellor Representative, Alan Lichtenstein was signed-off and approved by Karen Solimando, an attorney at the NYCDOE and Director of the Office of Collective Bargaining and Labor Relations since 2015. As someone who is in a position of providing legal advice for the Chancellor and its agents and is responsible for ensuring NYCDOE staff know the rules and regulations and comply with them, Ms. Solimando knew or should have known that Chancellor Representative, Alan Lichtenstein's decision was a clear violation, further demonstrating the negligence and misconduct of the NYCDOE and its agents.

210.    Further, the Defendant Giulia Cox sent the e-mail with the Plaintiff's personnel file, which blatantly and egregiously violated the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and the Plaintiff's rights thereunder, by transmitting *via* e-mail and carbon copying other individuals in said e-mail, Plaintiff's medical records and other personal health information without the Plaintiff's consent.

211.    Based on the events leading up to and following Plaintiff's removal as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York, the Defendant Giulia Cox knew the accusation made against the Plaintiff.

212.    Plaintiff was already asked about an alleged incident and had already been disciplined to which there was no investigation by OSI, because there was no corporal punishment, anything to arise to such an allegation, or any conclusion of poor judgement. Plaintiff should have never been initially removed from her position in class 408, and

subsequently reassigned to Queens South Reassignment Center, at 82-01 Rockaway Boulevard, Queens County, which is informally referred to as "teacher jail." The reassignment to "teacher jail" is a policy improperly utilized by the Defendants as a form of "punishment" for teachers, where the teacher's civil rights are continuously and repeatedly violated. Due to the regulations of the Defendants, Plaintiff and others likewise situated are deprived of their constitutional right to due process. Plaintiff and other teachers are subject to the unsubstantiated narrative as reported by the principals of their respective schools and referred to "teacher jail" reassignment at the whim of their superiors; this is exemplified by Defendant Cox putting Plaintiff back into reassignment on September 4, 2018. 42 U.S.C. §§ 1983 and 1988, provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party.

213.    Plaintiff was actually told by an African-American colleague, Anthony Worrell, that this was the result of *"having a white teacher, teach events of black history to black students."* It was further stated to her that *"only black teachers should be allowed to teach about events of black history to black students."* Ralph Hudson, another African-American colleague, and the witness to Plaintiff's lesson stated, *"A black teacher could have taught the very same lesson, and there would not have been a single complaint from any student's parent."* Statements such as these evidence the discrimination employed by the Defendants in the way that the Plaintiff was treated, as a Caucasian teacher, teaching in a school that has a significant minority population.

214.    Notably, on or about April 9, 2018, it was reported to the UFT that the OSI investigation was completed on April 2, 2018. However, the final report, curiously dated July 24, 2018, was not released and provided to the Plaintiff until September 6, 2018 [almost five (5) months] following when it was reported to have been completed and three (3) months after it is dated. The Plaintiff was advised that she should have been returned to Middle School 118 on April 23, 2018, but that never occurred, yet there was never any substantiation of the claims made against the Plaintiff.

215.    Further, the Defendants' only finding in the OSI Investigative Report is that the Plaintiff generally "acted with poor judgment in allegedly conducting a lesson that inadequately incorporated the New York City Department of Education social studies curriculum and guidance for the topic, and that the lesson significantly diverged from best-practices". This finding is outside the scope of OSI. OSI's function within the NYCDOE is to investigate allegations of corporal punishment and verbal abuse. Accordingly to Defendant NYCDOE's own policies, a teacher's pedagogy (lesson and practice/performance) can only be evaluated through observation by an administrator. No administrator observed Plaintiff's January 9, 2018 lesson.

216.    All Defendants each individually, by and through its agents, servants and employees, actual and ostensible, were negligent and departed from standards of good and accepted practice, of which they had a non-delegable duty to utilize reasonable care and judgment in the performance of their respective responsibilities and obligations with respect to the Plaintiff; such negligence was continuing and cumulative over the period of time referenced herein.

90

217.    Defendants' negligence and negligent acts, whether taken singularly or in combination, were a direct and proximate cause of Plaintiff's suffering, mental anguish, and loss of personal dignity, both in the past and continuing in the future.

218.    The Defendants, their agents, servants and/or employees were careless and negligent in departing from good and accepted practice in the investigation and monitoring of the unsubstantiated claims made against Plaintiff; in screening them before taking action against a teacher, for their credibility, veracity, and reliability; and for the removal of the Plaintiff, from her position as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York; among other things: in failing to possess the requisite learning, skill, knowledge and judgment ordinarily exercised in investigating and monitoring claims against faculty members; in permitting the media on school property and to question students; in failing to perform certain procedures, which the reasonably skillful and competent personnel would have so done under the circumstances; and in violating each and every rule, regulation, code statute or ordinance governing the exercise of reasonable care and due diligence concerning the management, and control of the aforementioned situation, including but not limited to, violating the New York City Chancellor Regulations and the contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT).

219.    The Plaintiff has suffered significant economic damages, actually and proximately caused by the departures and negligence of the Defendants herein. She is now

without employment as a teacher, and it is unlikely that she will be able to secure other employment as a teacher due to the public nature of these matters.

220.    The injuries and damages sustained by Plaintiff were caused solely by the torts of the Defendants, without any negligence on the part of any other person contributing thereto.

221.    Plaintiff sustained damages in excess of the jurisdictional limits of all lower courts, which might otherwise have jurisdiction.

### AS TO THE DEFENDANTS,
### THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF EDUCATION, GIULIA COX, AND COURTNEY WARE

### IV.    CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

222.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "221," above, with the same force and effect as though fully set forth herein.

223.    By virtue of all of the aforesaid, the Defendants' conduct was and is so atrocious and malicious that a reasonable person should know or would have known that its effect was such as to cause the Plaintiff extreme emotional distress.

225.    The effect of such negligent behavior toward the Plaintiff, inflicted through the Defendants' intentional and deliberate campaign of harassment, rose and continues to rise to a level that goes beyond all bounds of decency in a civilized society.

226.    As a result of the utterly vicious and incomprehensible nature of the actions taken against the Plaintiff by the Defendants, the Plaintiff has suffered and continues to suffer

such distress that the conduct and actions rose and continues to rise to a level such that no reasonable person could be expected to endure.

227.    The Plaintiff has sustained, among other things, severe mental distress, severe emotional and psychological distress, loss of sleep, anxiety, and has sustained damages of a permanent, lasting nature.

228.    Plaintiff has sustained damages in excess of the jurisdictional limits of all lower courts, which might otherwise have jurisdiction.

229.    The Defendants have proximately caused the Plaintiff to sustain very substantial damages to be determined at a jury trial of this matter.

**AS TO THE DEFENDANTS,
THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF EDUCATION, GIULIA
COX, AND COURTNEY WARE**

## V.    CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

230.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "229," above, with the same force and effect as though fully set forth herein.

231.    The aforementioned conduct of the Defendants is extreme, outrageous, and unwarranted and constitutes a deliberate and persistent campaign of harassment and intimidation resulting in an intentional infliction of emotional distress on the Plaintiff.

232.    The Defendants intentionally, willfully, and recklessly permitted a deliberate and persistent campaign to threaten, intimidate, harass, and demean the Plaintiff for the intentional purpose of attaining her/their own gains and causing the Plaintiff grief and distress.

93

233.   The Defendants have intentionally inflicted severe emotional distress upon the Plaintiff by a course of outrageous and horrifying conduct, which has caused her to suffer humiliation; embarrassment; the loss of business, friendships and associations; the loss of reputation; ridicule; depletion of financial resources, as well as other inchoate and unspecified damages, as yet to be fully determined.

234.   The Defendants have specifically and intentionally uttered, stated and published the foregoing knowing or having reason to know that such statements would cause the Plaintiff to be ridiculed, embarrassed, humiliated and emotionally hurt or distressed by the aforesaid comments.

235.   The Defendants have intentionally inflicted severe emotional distress upon Plaintiff by a course of outrageous and horrifying conduct, which has caused her to suffer humiliation; embarrassment; the loss of employment as a teacher, friendships and associations; the loss of reputation; ridicule; depletion of financial resources, as well as other inchoate and unspecified damages, as yet to be fully determined.

236.   The Defendants' intentional conduct as related to the Plaintiff in these and the aforementioned incidents in the allegations common to all causes of action, were such that they knew that severe emotional distress would be certain or substantially certain to result, and in fact, engaged in the acts purposefully and specifically with the intent to cause distress in an effort to achieve their own ulterior motives. Such conduct was so malicious that it rises to a level that goes beyond all bounds of decency in a civilized society.

237.    That as a result of the aforesaid intentional infliction of emotional distress, the Plaintiff has suffered and continues to suffer a level of distress that rises to a level such that no reasonable person could be expected to endure.

238.    Plaintiff sustained damages in excess of the jurisdictional limits of all lower courts, which might otherwise have jurisdiction.

239.    The Defendants have proximately caused Plaintiff to sustain very substantial damages to be determined at a jury trial of this matter.

## VI.  REQUEST FOR RELIEF

**WHEREFORE**, the Plaintiff, Patricia Cummings, respectfully requests the Court to enter Judgment against all defendants as follows:

A.  Judgment against the Defendants on all causes of action for compensatory damages and punitive damages, together with interest, costs and disbursements of this action, in an amount to be determined at a jury trial of this matter, no less than $1,000,000,000.00;

B.  All costs of this action be taxed to the Defendants;

C.  Prejudgment interest from May 17, 2019, until the date of Judgment is entered at the maximum rate allowed by law;

D.  Post-judgment interest at the rate of nine percent (9%) per annum until paid;

95

E. Such other and further relief the Court deems just and proper, including equitable

relief granted to Plaintiff.

Dated: Garden City, New York
May 27, 2020

Yours, etc.,

LAW OFFICES OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq. (TL4471)
Attorneys for Plaintiff
600 Old Country Road. Suite 530
Garden City, New York 11530
(516) 794-4700

96