UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
PATRICIA CUMMINGS,

Plaintiff,

Docket No. 19-cv-07723 (CM)

-against-

THE CITY OF NEW YORK;
NEW YORK CITY DEPARTMENT OF EDUCATION;
GIULIA COX; COURTNEY WARE; BEN CHAPMAN;
NEW YORK DAILY NEWS; DR. ANDRE PERRY;
THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA;
LENARD LARRY McKELVEY a/k/a
CHARLAMAGNE THA GOD;
WWPR-FM (105.1 MHZ); iHEARTMEDIA;
CLEAR CHANNEL COMMUNICATIONS, INC.;
NEW YORK STATE SENATOR, KEVIN S. PARKER;
COALITION OF EDUCATIONAL JUSTICE;
ANGEL MARTINEZ2; NATASHA CAPERS;
PHILIP SCOTT; ADVISE MEDIA NETWORK
n/k/a AFRICAN DIASPORA NEWS CHANNEL, and
"JOHN DOE AND JANE DOE # 1-100" said names
being fictitious, it being the intent of Plaintiff to designate
any and all individuals, officers, members, agents, servants,
and/or employees of the aforementioned agencies owing a
duty of care to Plaintiff, individually and jointly and
severally,

Defendants.

------------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT, LENARD LARRY McKELVEY a/k/a CHARLAMAGNE *THA* GOD's
<u>MOTION TO DISMISS THE AMENDED VERIFIED COMPLAINT</u>**

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq.
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*
600 Old Country Road, Suite 530
Garden City, New York 11530
Phone: (516) 794-4700
Fax: (516) 794-2816
E-mail: Tom@TLiotti.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. *i*

PRELIMINARY STATEMENT .......................................................................................1

STATEMENT OF FACTS ..............................................................................................2

ARGUMENT ...................................................................................................................6

 POINT I ..........................................................................................................................6

    THE AMENDED COMPLAINT PROVIDES A SUFFICIENT BASIS
    FOR THIS COURT TO CONCLUDE THAT THE CHALLENGED
    STATEMENTS ARE ACTIONABLE AS A MATTER OF LAW ...................................6

        Characterization of Someone as a "Racist," "Bigoted," a "Cracker"
        or a "White Devil" is NOT Protected Opinion ..........................................................19

        The Nature of Term "Racist" Does Not Render it Protected Opinion .......................20

        Descriptions of the Plaintiff as a "Racist," "Bigoted," a "Cracker"
        or a "White Devil" are Actionable ...........................................................................20

        Speculation Over State of Mind is Not Applicable to These Proceedings .................21

        Charlamagne's Commentary is NOT Merely Emotionally Charged Rhetoric ...........22

        The Comments Complained of Are NOT Protected By the First Amendment ..........23

 POINT II ......................................................................................................................24

    A REASONABLE JURY COULD FIND THAT THE PLAINTIFF
    WAS PORTRAYED IN A "FALSE LIGHT" ..................................................................24

CONCLUSION.............................................................................................................27

# TABLE OF AUTHORITIES

## Cases

*Amadei v. Nielsen,*
     348 F. Supp.3d 145,155 (EDNY 2018)..............................................................................7,8

*Aronson v. Wiersma,*
     65 N.Y.2d 592, at 593-594, 483 N.E.2d 1138,
     493 N.Y.S.2d 1006, 1985 N.Y. LEXIS 15929, 12 Media L. Rep. 1150)..........................9, 11

*Armstrong v. Simon & Schuster,*
     85 N.Y.2d 373, at 380, 649 N.E.2d 825, 625 N.Y.S.2d 477, 1995 N.Y. LEXIS 699 ..............9

*Ashcroft v. Iqbal,*
     556 U.S. 662, 678(2009) .....................................................................................................8

*Bell Atl. Corp. v. Twombly,*
     550 U.S.544, at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929,
     2007 U.S .LEXIS 5901, 75 U.S .L.W. 4337, 2007-1 Trade Cas.
     (CCH) P75, 709, 68 Fed. R. Serv. 3d (Callaghan)
     661, 20 Fla. L. Weekly Fed. S 267, 41 Comm. Reg. (P & F) 567 ...........................................8

*Bellezza v. Holland,*
     No. 09-CV-8434 (RWS), 2011 U.S. Dist. LEXIS 76030,
     at *6 (S.D.N.Y. July 11, 2011). ............................................................................................7

*Bose Corp. v. Consumers Union,*
     466 US 485, 503-504 (1984) ...............................................................................................17

*Brian v Richardson,*
     87 NY2d 46, 51 [1995];............................................................................13, 22, 23, 24

*Buckley v. Littell,*
     539 F.2d 882, at 883, 1976 U.S. App. LEXIS 8226, 1 Media L. Rep. 1762).........................10

*Cantrell v. Forest City Publishing Co.,*
     419 U.S. 245, 248, 42 L. Ed. 2d 419, 95 S. Ct. 465 (1974)............................................25, 26

*Chau v. Lewis,*
     771 F.3d at 127 (2014) .......................................................................................................17

*Chaplinsky v. New Hampshire,*
     315 U.S. 568, 572 (1942). ..................................................................................................17

*Christopher v. American News Co.,*
     171 F.2d 275 (7th Cir. 1948) ..............................................................................................13

*Celle v. Filipino Reporter Enters.*,
    209 F.3d 163, 2000 U.S. App. LEXIS 6785 .........................................................................11

*Cohen v. Cowles Media Co.*,
    501 U.S. 663, 669-70, 115 L. Ed. 2d 586, 111 S. Ct. 2513 (1991) ......................................17

*Davis v. Boeheim*,
    24 NY3d 262, at 268, 269 [2014] ..............................................................................9, 12, 13

*Davis v. Ross*,
    754 F.2d 80, 1985 U.S. App. LEXIS 28944at 82 ...............................................................11

*Doe v. Doe*,
    No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017) .................................14

*Egiazaryan v. Zalmayev*,
    880 F Supp 2d 494, 503 [SD NY 2012] ...............................................................................12

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
    F Supp 3d, 2016 WL 3773394, [SD NY 2016] ...................................................................13

*Gertz v. Welch*,
    418 U.S. 313-45 (1974) ...............................................................................8, 10, 12, 26

*Greenbelt Pub. Assn. v. Bresler*,
    398 U.S. 6 (1970). ................................................................................................................18

*Golub v. Enquirer/Star Group*,
    89 N.Y.2d 1074, at 1076, 681 N.E.2d 1282,
    659 N.Y.S.2d 836, 1997 N.Y. LEXIS 761, 25 Media L. Rep. 1863 ........................................9

*Gross v. New York Times Co.*,
    82 NY2d 146 at 53-154 (1993) .............................................................................12, 13, 23

*Herbert v. Lando*,
    441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed. 2d 115, 1979 U.S. LEXIS 88,
    27 Fed. R. Serv. 2d (Callaghan) 1, 3 Fed. R. Evid. Serv. (Callaghan) 822,
    4 Media L. Rep. 2575 ...........................................................................................................21

*Howell v. New York Post*,
    81 N.Y.2d 115, 596 N.Y.S.2d 350, 354, 612 N.E.2d 699 (N.Y. 1993)...............................25

*Immuno AG. v. Moor-Jankowski*,
    77 N.Y.2d 235, 255, 566 N.Y.S.2d 906, 917, 567 N.E.2d 1270 (1991) .........................23, 24

*James v. Gannett Co.*,
    40 N.Y.2d 415, at 418, 353 N.E.2d 834,
    386 N.Y.S.2d 871, 1976 N.Y. LEXIS 2900 ...........................................................................9

*Lerman v. Flynt Distributing Co., Inc.*,
  745 F.2d 123 (2d Cir. 1984) at 136-137 ................................................................................21

*Letter Carriers v. Austin*,
  418 U.S. 264 (1974) .............................................................................................................18

*Levin v. McPhee*,
  119 F.3d 189, 196 (2d Cir. 1997)........................................................................................22

*Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ.*,
  397 F.3d 77, 94 (2d Cir. 2005)..............................................................................................6

*Liberman v. Gelstein*,
  80 NY2d 429, 435 (1992).....................................................................................................14

*Mann v. Abel*,
  10 NY3d 271 at 276 (2008) ..................................................................................................13

*Matthews v. Malkus*,
  377 F. Supp. 2d 350, 2005 U.S. Dist. LEXIS 14401 ...........................................................26

*Mencher v. Chelsey*,
  297NY 94, 100 [1947]............................................................................................................9

*Mr. Chow of New York v. Ste. Jour Azur S.A.,*
  759 F.2d 219, 224, (2d. Cir. 1985) U.S. App. LEXIS 30321,
  11 Media L. Rep. 1713 ..................................................................................................11, 17

*Ollman v. Evans*,
  750 F.2d 970 (1984),  ......................................................................................................18, 19

*Parks v. Steinbrenner*,
  131 AD2d 60, 62-63 [1st Dept. 1987] ..................................................................................13

*Palin v. N.Y. Times Co.*,
  933 F.3d 160, 2019 U.S. App. LEXIS 23439, 104 Fed. R. Serv. 3d (Callaghan) 723)  ...........7

*Patane v. Clark*,
  508F.3d 106, 112 (2d Cir. 2007)............................................................................................7

*Philadelphia Newspapers, Inc. v. Hepps*,
  475 U.S. 767, 54 U.S.L.W. 4373, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986) ........................27

*Penn Warranty Corp. v. DiGiovanni*,
  2005 NY Slip Op 25449 10 Misc3d 998 (2005)....................................................................14

*Qureshi v. St. Barnabas Hosp. Ctr.*,
  430 F.Supp.2d 279, 287 (SDNY 2006) ................................................................................12

*Restis v. Am. Coalition Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705, 2014 U.S. Dist. LEXIS 139402 ...........................................................11

*Rezzonico v. H & R Block, Inc.*,
    182 F.3d 144, 149 (2d Cir. 1999)...........................................................................................7

*Rinaldi v. Holt, Rinehart & Winston*,
    42 NYS2d 369, cert. denied 434 US 969 at p 381 ..............................................................17

*Scottish Air Inter. v. British Caledonian Group, PLC*,
    152 F.R.D. 18, 24-25 (S.D.N.Y. 1993) .................................................................................7

*Silsdorf v. Levine*,
    59 NY2d 8, 12 [1983], cert denied, 464 US 831 ...........................................................9, 13

*Silverman v. Daily News, LP*,
    129 AD3d 1054 (2nd Dept. 2015), .................................................................................14, 16

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124, 1127 (2d Cir. 1994).......................................................................................11

*Steinhilber v. Alphonse*,
    68 NY2d 283 at 289 (1986) ...........................................................................................12, 13

*Stevens v. Tillman*,
    855 F.2d 394, 403 (7th Cir. 1988) .................................................................................19, 20

*Whitney Info Network, Inc. v. Weiss*,
    2008 WL731024, (E.D.N.Y. March 18, 2008) ....................................................................10

*600 W. 15th St. Corp. v. VonGutfeld*,
    80 NY2d 130,139 (1992)......................................................................................................10

**Constitution**

First Amendment ....................................................................................................................1, 10

**Rules**

Federal Rule of Civil Procedure 12 (b)(6). .....................................................................1, 7, 8, 27

N.Y. Civ. Rights Law § 51 .........................................................................................................25

Restatement [Second] of Torts § 566 comment c. ......................................................................18

Restatement, Torts 2d, § 652E, Comment d, particularly p 399.................................................24

Restatement (2d) of Torts §652 E ..............................................................................................25

Restatement, Torts, § 867, Comment d ...........................................................................25

Restatement, Torts 2d, § 652E, Comment c ...................................................................25

Prosser, Torts [4th ed], p 813;.......................................................................................24

**Other Sources**

Law of the Case Doctrine .................................................................................................6

Wade, <u>Defamation and the Right of Privacy</u>,
15 Vand L Rev 1093, 1121......................................................................................24, 25

Plaintiff, Patricia Cummings, (hereinafter "Plaintiff" or "Ms. Cummings"), a private individual, respectfully submits this Memorandum of Law in Opposition to Defendant, Lenard Larry McKelvey a/k/a *Charlamagne tha God*'s, (hereinafter "Defendant" or "Defendant Charlamagne") Motion to Dismiss the Plaintiff's Amended Verified Complaint pursuant to Federal Rule of Civil Procedure 12 (b)(6).

## PRELIMINARY STATEMENT

The Defendant's application erroneously focuses his argument on this Court's Memorandum Decision and Order entered February 24, 2020 ("Decision"), wherein this Court dismissed Plaintiff's defamation claims against Defendant Charlamagne on the grounds that the statements challenged by Plaintiff, when considered in context, "could only be understood by listeners and readers as *impassioned criticism* of the conduct reported in media coverage, and as [his] *personal ruminations* concerning the educational impropriety and racial insensitivity of that conduct . . . [and] therefore do not give rise to a cause of action for defamation." (Docket. No. 94, Decision at 41.) Nonetheless, Defendant's argument is misguided, as the Plaintiff's Amended Verified Complaint has sufficiently established a claim for defamation, as Charlamagne's statements fail to offer expressions of opinion; moreover, they are blatantly false statements.

Contrary to Defendant's argument, Plaintiff's Amended Complaint is **not** the functional equivalent of a motion for reconsideration; it otherwise outlines the factual specificity necessary to make out claims of defamation, defamation *per se*, slander, slander *per se*, libel, libel *per se*, and false light against Defendant, Charlamagne. His statements are actionable primarily due to the fact that there are no First Amendment privileges to protect false statements. Further, Defendant Charlamagne used no language to presuppose Plaintiff's innocence, such as "accused" or "alleged." The statements made by Defendant Charlamagne about Plaintiff were personal in their

1

invective, designed to expose her to public contempt and ridicule and impugn Plaintiffs character and professional integrity. Moreover, he led his listeners to believe that the recitation of the facts presented were accurate. Thus, Defendant Charlemagne's statements are actionable. Defendant Charlemagne cannot cloak his actionable behavior as "opinion," while publicly stating that Plaintiff committed such acts, and utilizing a myriad of offensive racial slurs against a Caucasian woman, teaching in a minority community. It has been held in the Courts that when readers [or listeners] understand a defamatory meaning, liability cannot be avoided simply because the publication is alleged to be cast in the form of an opinion, belief, insinuation, or even question. Thus, Defendant's arguments fail and his motion should be denied in all respects.

## STATEMENT OF FACTS

Defendant, Lenard Larry McKelvey is an individual American radio presenter, television personality, and author; known professionally as *Charlamagne tha God*; co-host of the nationally syndicated radio show The Breakfast Club with DJ Envy and Angela Yee, broadcast on Power 105.1, an Urban contemporary radio station. Plaintiff has alleged that she was defamed by comments made by Defendant Charlamagne on a "Donkey of the Day" segment of his show, which aired on February 7, 2018. Defendant Charlamagne's radio show broadcasts a segment known as "Donkey of the Day," wherein he speaks out on racial inequality and call out a person or place that embodies foolery for the given moment. On this segment, Defendant makes blatantly false statements about Plaintiff's behavior and actions and publically refers to her as, among other things, a "*racist*," a "*bigot*" a "*cracke*r," "*white devil,*" and uses other racial and ethnic slurs." Defendant Charlamagne disingenuously argues that Plaintiff lacks the ability to impose any liability, as the personal viewpoints expressed by him concerning the performance of her classroom educational responsibilities (1) is speech involving an essential matter of public concern and (2) is extinguished by the First Amendment. This argument fails on all counts.

2

Plaintiff was a probationary New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York. She seeks damages related *inter alia* to defamation, defamation *per se*, slander, slander *per se*, libel, libel *per se*, and false light against Defendant, Charlamagne, and the "*badge of infamy,*" with which she has forever been branded.

Plaintiff's claims arose as a result of what was fallaciously reported concerning an alleged complaint made by **one (1)** parent of **one (1)** student regarding a lesson taught by Plaintiff in her social studies class on the Middle Passage, wherein she subsequently and unwillingly became the subject of a front page pictorial and story in the New York Daily News, falsely accusing her of being a "*racist*" and "making black students lie face down on the floor of her class, and asking them: *'[H]ow does it feel to be a slave?*" Thereafter, this fabricated and erroneous set of purported "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world.

Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it was erroneously reported, among other things that she "*singled out black students and made them act like slaves;*" she is falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" She has been publically shamed and falsely accused of "*child abuse,*" labeled as a "*racist,*" referred to as an "*oppressor,*" by many, including politicians and activists, and specifically in various and extensive media outlets discussing this issue. She has received direct threats of violence and death causing her to fear for her life. Plaintiff was ultimately exonerated of the original erroneous allegations following an investigation by the New York City Department of Education's Office of Special Investigations, yet has nonetheless been terminated from her employment as New York City Public School Teacher at The William W. Niles School - Middle School 118.

Defendant Charlamagne's arguments are comprised of offensive, imprudent and factually incorrect statements. What was falsely, disparagingly, and slanderously described by the Defendant Charlamagne as a "*history lesson with extra mayonnaise on it*" (see, Transcript of the Donkey of the Day Broadcast Segment airing February 7, 2018, Defendant's Exhibit A, at page 5 and 6) was, in actuality, an example of a multi-sensory teacher demonstrating "spatial recognition" to her students. The reference to "*mayonnaise*" by Defendant is a racial slur word used to describe Caucasian individuals. Multi-sensory teaching is a didactic system that seeks to develop awareness of self in time and space in order to raise cognition and understanding of the world as is experienced. It takes into account that different children learn in different ways; conveys information through things like touch and movement-called tactile and kinesthetic elements, as well as sight and hearing. See, White, Helen and Christina Evans, Learning to Listen to Learn: Using Multi-Sensory Teaching for Effective Listening (2005).

This part of her lesson was described by Plaintiff as a "teachable moment," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes; it was not, in any way, a reenactment. Defendant Charlamagne was describing as "fact," a false scenario, wherein it was erroneously stated that Plaintiff had *singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*." This fabricated account is contradicted by the reported findings of the of the New York City Department of Education's Office of Special Investigations (also referred to as OSI); wherein Plaintiff was actually being investigated for an false accusation of "*using her feet or her knees to push the students closer together during a classroom demonstration*," which was ultimately unsubstantiated, to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student' I never observed Ms. Cummings' knee make contact with 'Student A'*"" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them*." See, Redacted Copy of Office of Special Investigations

4

Investigative Report (OSI) dated July 24, 2018, included Plaintiff's **Exhibit A**. Moreover, "Students B, D, E, F, I, J and K" noted that the participating student volunteers did not appear to be in any distress. See, Plaintiff's Exhibit A. Most remarkably, "Student J" admitted that "'*Student A'[1] was lying and was attempting to get Ms. Cummings fired or in trouble because 'Student A' did not like Ms. Cummings*." See, Plaintiff's Exhibit A, at page 5. Moreover, Plaintiff controverts this fallacious allegation in her rebuttal correspondence addressed to Community Superintendent Maribel Torres-Hulla dated October 5, 2018, annexed hereto as **Exhibit B** at page 8.

"Student A" is alleged to have complained on or about January 11, 2018, and as noted in the OSI Report, "Student A's" mother is noted to have complained 6 days later (9 days after the lesson). Further, it is evident that a complaint was not immediately filed according to the OSI Report. See, Plaintiff's Exhibit A. Furthermore, Plaintiff was not removed for investigation by the New York City Department of Education's Office of Special Investigations until February 2, 2018. Principal Cox did a school based investigation, but failed to adhere to Chancellor Regulation A-420 and breached Article 20 of the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT). A copy of the Plaintiff's Amended Verified Complaint dated May 27, 2020, annexed hereto as **Exhibit C**.

The segment broadcast by Defendant Charlamagne asserted as fact, grossly false information, which was completely different from the allegation that was actually being investigated by OSI. The original allegation involved a false report that the Plaintiff physically pushed student volunteers closer together, using her feet or her knees during a lesson demonstration; it was never the complaint that she "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like,*" as falsely and

---

[1] "Student A" was one of four students who voluntarily participated in the classroom demonstration on the Middle Passage. It was erroneously alleged that Ms. Cummings pushed "Student A's" back with her knee and asked if it hurt or caused her discomfort.

5

repeatedly reported. <u>See,</u> Plaintiff's Exhibit A at pages 24-25. Notably, the Office of Special Investigations Investigative Report (OSI Report) dated July 24, 2018, indicates that *"[T]he written statements made by 'Students B, C, D, E, H, I, J, Q, R, S, T, U, and V' fail to corroborate that Ms. Cummings pressed her knee into 'Student A's' back or any students' back*." <u>See,</u> Plaintiff's Exhibit A. "Therefore, notably, the allegation that Ms. Cummings used corporal punishment against "Student A" by pushing her knee into her ["Student A's"] back during a classroom demonstration was never corroborated and is **unsubstantiated**." <u>See,</u> Plaintiff's Exhibit A. Nonetheless, the pertinent fact, with respect to this Defendant is that he described as "fact," a blatantly **false** scenario, wherein it was erroneously stated that Plaintiff had *singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*." **THIS NEVER HAPPENED, NOR WAS THE PLAINTIFF EVER BEING INVESTIAGTED FOR THIS ACTON AND/OR BEHAVIOR.**

## ARGUMENT

## POINT I

**THE AMENDED COMPLAINT PROVIDES A SUFFICIENT BASIS FOR THIS COURT TO CONCLUDE THAT THE CHALLENGED STATEMENTS ARE ACTIONABLE AS A MATTER OF LAW**

Defendant relies upon the argument that the Court previously decided that Defendant Charlamagne's statements do not give rise to a cause of action for defamation "as a matter of law[.]" (Decision at 42); erroneously reasoning that the Court's prior conclusions on these issues are now the law of the case. While under the 'Law of the Case Doctrine,' Courts are understandably reluctant to reopen a ruling once made, (<u>see</u>, *Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005)), the law of the case is a discretionary doctrine, which does not preclude a court from reconsidering its prior opinion in light of an intervening change in controlling law, the availability of

new evidence, or the need to correct clear error or prevent manifest injustice. See, *Scottish Air Inter. v. British Caledonian Group, PLC*, 152 F.R.D. 18, 24-25 (S.D.N.Y. 1993) (citation omitted).

"Law of the case directs a court's discretion, it does not limit the tribunal's power." See, *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999) ("The doctrine expresses, in shorthand fashion, a practice of courts generally not to reconsider that which has already been decided, but it does **not** purport to be a legally binding limitation on the court's authority to reconsider such matters."). Notably, a court in this Circuit has found that the law of the case doctrine did not control where an amended complaint, contained "more detailed claims" than the original complaint. See, *Bellezza v. Holland*, No. 09-CV-8434 (RWS), 2011 U.S. Dist. LEXIS 76030, at *6 (S.D.N.Y. July 11, 2011).

Thus, to survive a motion to dismiss under Fed. R. Civ. P. 12(b) (6), a complaint (or Amended Verified Complaint, in this case), must plead enough facts to state a claim to relief that is plausible on its face. In reviewing the Amended Verified Complaint, the Court must accepts all well-pleaded allegations as true and draw all reasonable inferences in Plaintiff's favor. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. However, as in this case, where Plaintiff's Amended Verified Compliant has nudged her claims across the line from conceivable to plausible, her Amended Verified Complaint cannot be dismissed.

"The purpose of a motion to dismiss for failure to state a claim under Rule 12(b) (6) is to test the legal sufficiency of a plaintiff's claim for relief." See, *Amadei v. Nielsen*, 348 F. Supp.3d 145,155 (EDNY 2018) (citing, *Patane v. Clark*, 508F.3d 106, 112 (2d Cir. 2007)). For a 12(b) (6) motion, the court must "construe the complaint liberally, excepting all factual allegations in the complaint as true, and drawing all reasonable inference is in the plaintiff's favor." See, *Palin v. N.Y. Times Co*., 933 F.3d 160, 2019 U.S. App. LEXIS 23439, 104 Fed. R. Serv. 3d (Callaghan) 723) (quotations and alteration omitted); see, also, *Amadei*, 348 F. Supp. 3d, supra, at 155("[W]hen reviewing a complaint on a motion

to dismiss for failure to state a claim, the court must accept all true allegations of fact in the complaint and draw all reasonable inference is in favor of plaintiffs."). A complaint's "factual allegations must be enough to raise a right of relief to above the speculative level… On the assumption that all the allegations in the complaint are true (even if doubtful in fact") (quoting, *Bell Atl. Corp. v. Twombly*, 550 U.S.544, at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 2007 U.S .LEXIS 5901, 75 U.S .L.W. 4337, 2007-1 Trade Cas. (CCH) P75, 709, 68 Fed. R. Serv. 3d (Callaghan) 661, 20 Fla. L. Weekly Fed. S 267, 41 Comm. Reg. (P & F) 567. Once the facts are construed in the light most favorable to the plaintiff, on order to avoid dismissal, there must be sufficient facts that allege a plausible claim. See, *Ashcroft v. Iqbal*, 556 U.S. 662, 678(2009) ("to survive a motion to dismiss [pursuant to Rule 12 (b) (6)], a complaint must contain sufficient factual matter, excepted as true, to state a claim to relieve that is plausible on its face." (Quotations omitted)). Moreover, to survive a motion to dismiss, a plaintiff's facts must give rise to a plausible narrative supporting his/her claim. See, *Twombly*, supra, 550 U.S. at 570 (Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relieve that is plausible on its face.") While this "plausibility standard is not akin to a 'probability requirement' at the pleading stage, the standard calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the claim." Id. (quoting, *Twombly*, supra, 550 U.S. at 556).

The law of defamation serves to protect an individual's right to one's reputation. See, *Gertz v. Welch*, 418 U.S. 313-45 (1974). It has long been recognized that "a person has a legal right to enjoy his reputation free from false or derogatory characterization by others." Id. Therefore, a statement that casts an individual unfavorably in society will constitute an infringement upon that person's reputational right and give rise to a cause of action for civil defamation, as it has done here. The legal question to be resolved by this Court is whether a reasonable basis exists for defamatory interpretation of the words and statements spoken by Defendant. If the words are "not reasonably susceptible of a defamatory meaning, they are not actionable, and cannot be made so by a strained and artificial

8

construction." <u>See</u>, *Golub v. Enquirer/Star Group*, 89 N.Y.2d 1074, at 1076, 681 N.E.2d 1282, 659

N.Y.S.2d 836, 1997 N.Y. LEXIS 761, 25 Media L. Rep. 1863; *Aronson v. Wiersma*, 65 N.Y.2d 592,

at 593-594, 483 N.E.2d 1138, 493 N.Y.S.2d 1006, 1985 N.Y. LEXIS 15929, 12 Media L. Rep. 1150).

Thus, the Court must determine "whether the contested statements are reasonably susceptible of a

defamatory connotation,….[and] [i]f, upon **any** reasonable view of the stated facts, plaintiff would be

entitled to recovery for defamation, the complaint must be deemed to sufficiently state a cause of

action." <u>See</u>, *David v. Boeheim*, 24 NY3d 262, 268 [2014] [citations omitted]; <u>See</u>, *Armstrong v. Simon

& Schuster*, 85 N.Y.2d 373, at 380, 649 N.E.2d 825, 625 N.Y.S.2d 477, 1995 N.Y. LEXIS 699; *Silsdorf

v. Levine*, 59 NY2d 8, 12 [1983], cert denied, 464 US 831; *Mencher v. Chelsey*, 297NY 94, 100 [1947];

[court may **not** determine sole meaning of words, only whether reasonable basis exists for defamatory

interpretation]) (Emphasis added). It is then for a jury to determine "whether that was the sense in

which the words were likely to be understood by the ordinary and average reader." <u>See</u>, *James v.

Gannett Co.*, 40 N.Y.2d 415, at 418, 353 N.E.2d 834, 386 N.Y.S.2d 871, 1976 N.Y. LEXIS 2900,

<u>quoting</u>, *Mencher v. Chesley*, <u>supr</u>a, 297 N.Y. 94, at 100, 75 N.E.2d 257, 1947 N.Y. LEXIS 904.

    A key word in this case is "context," which is defined in Merriam Webster's dictionary as "*the

part of a discourse that surround a word or passage and can throw light on its meeting.*" Simply put,

it's the circumstances that form the background of an event, idea, or statement in such a way as to

enable readers to understand the narrative, i.e. what is being told. The circumstances that formed the

background in Defendant's narrative is the assertion of facts by the New York Daily News about and

concerning Plaintiff in their "exclusive" story published on February 1, 2018. The article stated and

asserts as fact that Plaintiff "*singled out black students and made them act like slaves*;" told them to

"*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt

like.*" An assertion of this magnitude, in the racially divided social climate we see today, it is no surprise

that this was reported by Defendant. Nonetheless, Charlamagne's erroneous theory of liability is

incorrect. By his own omission, his counsel asserts in Defendant's Memorandum of Law, "[t]he factual

predicate for [his] commentary was contained in a CBS News broadcast that was expressly incorporated as part of the Donkey of the Day segment" (Defendant's Memorandum of Law at page 4). Thus, Defendant Charlemagne gave his audience the "factual" background, i.e. context, so as that his listeners would be informed and knowledgeable. Therefore a "reasonable listener... could have concluded that [Defendant] was conveying facts about Plaintiff." See, *Whitney Info Network, Inc. v. Weiss*, 2008 WL731024, (E.D.N.Y. March 18, 2008). While Defendant would argue that an assertion that cannot be proved false cannot be held libelous, (see, *Gertz v. Robert Welch, Inc.*, supra, 418 US at 339–40, 94S. CT. 2997; *Buckley v. Littell*, 539 F.2d 882, at 883, 1976 U.S. App. LEXIS 8226, 1 Media L. Rep. 1762), Defendant's assertions (statements) herein **can** be proven false.

Under both Federal and New York Constitutions, only statements that are demonstratively false are actionable, especially in regards to a matter of public concern. "Because falsity is a necessary element in a defamation claim involving statements of public concern, it follows that only statements alleging fact can properly be the subject of a defamation action." See, *600 W. 15th St. Corp. v. VonGutfeld*, 80 NY2d 130,139 (1992). There is no First Amendment privilege; Defendant Charlemagne attempts now to disguise his defamation. Within his seven minute racial rant, he states, *"OK, she wanted kids to feel how it felt to be a slave? You gonna lay someone's child on their stomach, put your foot in their back and see how does it feels?* By making this statement, Defendant Charlemagne is stating **and asserting as a fact** that Plaintiff *laid students on the floor on their stomachs and stepped on their backs*, thus constituting a criminal act under New York State Penal Law. What Defendant reported never happened, nor was she ever charged with any crime, which he could have easily been verified. Moreover it could easily be interpreted as stating facts about Plaintiff, a private person, with reasonable intelligence. His statement is not only demonstratively false, making it actionable, it is also "reasonably susceptible of a defamatory meaning when it tends to expose a person" to those things, e.g., "hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in

the minds of a substantial number in the community." See, *Restis v. Am. Coalition Against Nuclear Iran, Inc*., 53 F. Supp. 3d 705, 2014 U.S. Dist. LEXIS 139402 (quotations and alterations omitted).

In a defamation action, in particular slander, a plaintiff must identify "a plausible defamatory meaning of the challenged statement or publication. If the statement is susceptible of only one meaning, the court "must determine, as a matter of law, whether that one meaning is defamatory." See, *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 2000 U.S. App. LEXIS 6785, quoting, *Davis v. Ross*, 754 F.2d 80, 1985 U.S. App. LEXIS 28944at 82; see also, *Aronson*, supra, 483 N.E.2d at 1139. Plaintiff provided the meaning for the Court within the charts listed in the Amended Verified Complaint, and "[T]he inquiry into whether a statement should be viewed as one of fact or one of opinion must be made from the perspective of an ordinary reader [listener] of the statement." See, *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 224, (2d. Cir. 1985) U.S. App. LEXIS 30321, 11 Media L. Rep. 1713 [alteration added]. Defendant, in an attempt to cloak his actionable defamatory behavior, states in his Memorandum of Law that Plaintiff's explanation merely "quibbles with the accuracy of immaterial statements," such as the use of words like "soul food" and "mayonnaise." Curiously, in attempt to conceal his wrongdoing, Defendant does not address or negate his use of the words "bigot", "cracker", or "white devil," but instead attempts to camouflage his slanderous words as protected speech, even though such words, most certainly, do have specific meanings, and when in context of his reporting, they are personal in their invective and designed to expose Plaintiff, a highly educated white teacher,  teaching in a predominantly minority populated school, to public contempt and ridicule and impugn her character and professional integrity.

"Generally, it has been held that a dismissal of a claim will be upheld, only if it appears that the plaintiff can prove no set of facts upon which relief may be granted." See, *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir. 1994). Such is not the case herein. Defendant Charlamagne disingenuously argues that multiple statements alleged to be actionable in the Amended Verified Complaint are non-defamatory on their face. A statement is defamatory "if it tends to expose the

11

plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of [him] in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." See, *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F.Supp.2d 279, 287 (SDNY 2006). Clearly, Plaintiff's has demonstrated the defamatory nature of Defendant's statements. He publically referred to her a "racist," a "bigot" a "cracker-ass cracker," and a "white devil." He further noted that [he] wanted to slap the fire" out of her, and "described her when making the potato salad, (see, Defendant's Exhibit 1, at page 8), as "being heavy-handed with the mayonnaise," questioning, "[w]hy is she in the kitchen on Soul Food Sundays." See, Defendant's Exhibit 1, at pages 8, 9, and 13. These statements undoubtedly exposed the Plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of her in the minds of right-thinking persons, and to deprive her of her friendly intercourse in society. This is evident in the online commentary following this broadcast and the demonstrations of hate, ridicule, harassment, and threats of violence which followed. Plaintiff's explanations provided in the Amended Verified Complaint do more than merely "quibble with the accuracy of immaterial statements." The Amended Verified Complaint alleges in detail precisely how Defendant directly defamed Plaintiff. Defendant has failed to offer any specific argument, instead he is simply assuming that this Court will accept at face value, his assertion that the defamatory slander was merely his opinion.

The privilege protecting the expression of an opinion is rooted in the preference that ideas be fully aired. See, *Davis v. Boeheim*, 24 NY3d 262 at 269 (2014), *citing, Steinhilber v. Alphonse*, 68 NY2d 283 at 289 (1986), and *Gertz v. Robert Welch, Inc.*, supra, 418 US 323, 339-340 (1974). Nonetheless, privileged statements of opinion are either accompanied by the **facts** on which they are based, or do not imply that they are based on undisclosed facts. See, *Gross v. New York Times Co.*, 82 NY2d 146 at 53-154 (1993). "When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" See, *Egiazaryan v. Zalmayev*, 880 F Supp 2d 494, 503 [SD NY 2012], quoting, *Steinhilber*, supra, 68 NY2d at 289,

"because a reasonable listener or reader would infer that 'the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]'" See, *Gross*, supra, 82 NY2d at 153-154, quoting, *Steinhilber*, 68 NY2d at 290, and "if the predicate facts are disclosed, but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity," the statement may be actionable as a "defamatory opinion" See, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, F Supp 3d , 2016 WL 3773394, [SD NY 2016], citing *Silsdorf v. Levine*, 59 NY2d 8, 15-16 [1983], cert denied 464 US 831; see also, *Parks v. Steinbrenner*, 131 AD2d 60, 62-63 [1st Dept. 1987].

An asserted fact may be distinguished from a nonactionable opinion if the statement: (1) has a precise, readily understood meaning, that is (2) capable of being proven true or false, and (3) where the full context in which it is asserted or its broader social context and surrounding circumstances indicate to readers or listeners that it is likely fact, not opinion. See, *Davis*, supra, 24 NY3d at 271, citing, *Mann v. Abel*, 10 NY3d 271 at 276 (2008), and *Brian v Richardson*, 87 NY2d 46, 51 [1995]; *Gross*, supra, 82 NY2d at 153; *Steinhilber*, supra, 68 NY2d at 292. "Where readers/listeners would understand a defamatory meaning, liability cannot be avoided merely because the publication is alleged to be cast in the form of an opinion, belief, insinuation or even question. A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community." See, *Christopher v. American News Co*., 171 F.2d 275 (7th Cir. 1948).

"[T]he following factors should be considered in distinguishing fact from opinion: (1) whether the language used has a precise meaning or whether it is indefinite or ambiguous, (2) whether the statement is capable of objectively being true or false, and (3) the full context of the entire communication or the broader social context surrounding the communication. Moreover, the Court of Appeals makes a distinction between a statement of opinion that implies a factual basis that is not disclosed to the reader and an opinion that is accompanied by a recitation of facts on which it is based.

13

The former is actionable, the latter is not." See, *Penn Warranty Corp. v. DiGiovanni*, 2005 NY Slip Op 25449 10 Misc3d 998 (2005). Defendant Charlamagne never used words such as "alleged" or "accused of" in his broadcast; he lead his listeners to believe the recitation of the facts presented to be accurate.

It bears mentioning that Under New York law, some statements are considered defamation (slander) *per se* if they "(1) charge plaintiff with a serious crime; (2) tend to injure plaintiff in its business, trade or profession; (3) [communicate that] plaintiff has some loathsome disease; or (4) impute unchastity. See, *Doe v. Doe*, No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017) (a statement is *per se* defamatory when it tends to injure another in his or her trade, business, or profession) (citing *Liberman v. Gelstein*, 80 NY2d 429, 435 (1992)). Such statements are presumed to cause injury, so a separate showing of harm is not necessary. Here, the facts as presented by Defendant Charlamagne accuse Plaintiff of having committed a serious crime; to wit: walking on the backs of students is akin to child abuse and endangerment and the false labeling of the Plaintiff as a racist who committed such an atrocity has irreparably injured the Plaintiff in her profession as a school teacher and otherwise. **Most notably, Plaintiff was never accused or investigated on an allegation of a racist act by the City Department of Education**. She was being investigated on allegations of corporal punishment that did not involve any of the facts presented by Defendant in his on-air tirade.

Contrary to the defendant in *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), Defendant Charlamagne disclosed erroneous facts. There were no allegations from parents, students, or staff that the Plaintiff ever "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Likewise, Plaintiff contests that she ever admitted "having misbehaving students sit in the front of the room to demonstrate the conditions on slave ships, or that a parent reported that she 'pushed her knee' into *students'* (plural) backs and asked if students (plural) felt pain." See, Plaintiff's Exhibit B at paragraph 53. How can Defendant argue that there was nothing in the statements, which disparage

14

the Plaintiff's professional skills or competence or attributes wrongdoing to her? The entirety of the transcript was a <u>criticism of her skills</u> and <u>competence</u> and falsely accused her of the equivalent of child abuse and/or child endangerment, to wit:

- ".....it's levels to this thing called stupid sometimes." Defendant's Exhibit 1, at page 3

- "But nope, that's not what Patricia Cummings did. See, Patricia Cummings decided to give these kids a lesson on slavery and she put extra mayonnaise on it. Oh that Hellman's is heavy on this one." Defendant's Exhibit 1, at pages 5 and 6.

- "I would love to know how many black and Spanish teachers this school has, because you can avoid problems like the one Patricia cause for herself, if you simply have us teaching us." Defendant's Exhibit 1, at page 6.

- "She picked three black kids to participate." Defendant's Exhibit 1, at page 7

- "Patricia Cummings, told several black children to lie on the floor during a lesson about the slave trade.... stepped on their back saying, '[S]ee how it feels to be a slave.'" Defendant's Exhibit 1, at pages 7 and 8.

- "Why is Patricia Cummings in the kitchen on Soul Food Sundays.....When it's time to make a nice quiche, call Patricia. You know good damn well when you let Patricia make the potato salad, she heavy-handed with the mayonnaise." Defendant's Exhibit 1, at page 8.

- ".....if you a white teacher teaching a majority black and Hispanic class, you should have to run those lesson plans by some type of diversity board at the school to make sure you talking the right language to the kids..." Defendant's Exhibit 1, at page 9.

- "You could have showed them the horror of slavery by simply letting them watch '12 Years a Slave....but no you would rather lay kids on their stomach and step on their backs, because truth be told, you wanted to break their spirits. You wanted to give them an inferiority complex.'" Defendant's Exhibit 1, at pages 9 and 10.

15

- "Why not give the kids some required reading about slavery and let them come to their own conclusions?....." Defendant's Exhibit 1, at pages 10 and 11.

- "It was all kind of lesson plans you could have gave these kids other than laying them on the floor on their stomachs, and stepping on their backs. Defendant's Exhibit 1, at page 12.

- "See, I refuse to believe that Patricia Cummings, a middle school teacher making over $68,000 a year, doesn't know any better and that she couldn't do any better." Defendant's Exhibit 1, at page 12.

- "I could have created a better lesson plan for these kids, and my lesson plan would have actually had some redeeming qualities to it.....There is no redeeming value in this lesson" Defendant's Exhibit 1, at pages 12 and 13.

- "....and now they have reassigned her away from children after the New York Daily News contacted the City Education Department about her slavery lesson." Defendant's Exhibit 1, at page 13.

A chart summarizing the *contextual* background of Defendant Charlamagne's public rant on Power 105.1 FM is annexed hereto as **Exhibit D**.

There is no question that these comments would be interpreted by the average [listener] as defamatory when predicated by the false "facts" recited by Defendant. They are not merely observations; in distinguishing *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), it is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable [listener] would have concluded that he or she was [hearing] opinions, not facts about Plaintiff. To describe these rants as merely setting forth pedagogical preferences and teaching protocols is entirely disingenuous; as is claiming that they are "merely offensive or unpleasant." They clearly do negatively reflect on Plaintiff's reputation as a school teacher and her ability to appropriately determine the way to present the curriculum to the students. Unquestionably, this speech attributes

odious and despicable characterizations to the Plaintiff. See, *Chau v. Lewis*, 771 F.3d at 127 (2014). There is no need to render any interpretation of the challenged comments. Thus, the statements describing Plaintiff's lesson are actionable.

"The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty - and thus a good unto itself - but also is essential to the common quest for truth and the vitality of society as a whole." See, *Bose Corp. v. Consumers Union*, 466 US 485, 503-504 (1984). Nevertheless, there are categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend because they "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." See, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

The counsel for Defendant, Charlamagne erroneously classifies this case as "free speech litigation;" (see, *Grygiel Memorandum of Law at page 2*), however, it is well established that the media "has no special privilege to invade the rights and liberties of others. See, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669-70, 115 L. Ed. 2d 586, 111 S. Ct. 2513 (1991) (quotations and citation omitted). Here, the challenged statements alleging "facts" about the incident were absolutely false. The allegations that were the subject of the OSI investigation were proven to be false and unsubstantiated, (see, Plaintiff's Exhibit A), and the factual narrative spoken about by Defendant Charlamagne in his "Donkey of the Day" segment was **never** true, nor was it ever the subject of any pending investigation. The challenged statements were clearly not opinion, entitling Defendant Charlamagne to Constitutional protection. Arguably, determining whether a given statement expresses fact or opinion may be challenging. Nonetheless, the question must be answered on the basis of what the average person hearing or reading the communication would take it to mean. See, *Rinaldi v. Holt, Rinehart & Winston*, supra, at p 381; *Mr. Chow of N. Y. v Ste. Jour Azur S.A.*, 759 F.2d 219, 227-228). There is no definitive test or set of criteria. See, *Mr. Chow of N. Y. v. Ste. Jour Azur S.A.*, supra, at pp 225-226. The essential

task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion. See, Restatement [Second] of Torts § 566 comment c. The court, in *Letter Carriers v. Austin*, (418 U.S. 264 (1974)), decided on the same day as provides some precedent. The Court considered both the context of the entire communication and the type of "intemperate, abusive, or insulting language." (Id., at p 283). In *Letter Carriers*, supra, it concluded that no reader of the newsletter would have understood the union "to be charging the appellees with committing the criminal offense of treason." Id., at pp 285, 286; see also, *Greenbelt Pub. Assn. v. Bresler*, 398 U.S. 6 (1970). The Courts have taken great pains to avoid any attempt to reduce the problem of distinguishing fact from opinion to a rigid set of criteria which can be universally applied. The infinite variety of meanings conveyed by words; depending on the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used, rules out a formulistic approach. A court must have the flexibility to consider the relevant factors and to accord each the degree of importance, which the specific circumstances warrant.

Nonetheless, Judge Starr's plurality opinion in *Ollman v. Evans*, 750 F.2d 970 (1984), sets out four factors which should generally be considered in differentiating between fact and opinion. The four factors are: (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might "signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." See also, *Ollman v. Evans*, 750 F.2d 970 (1984) at p 983.

Consideration of the circumstances and of the broader social context (i.e., the factual background leading to segment) confirms the conclusion that the broadcast would be taken literally by the ordinary person. An analysis of the statements made about Plaintiff in the light of the third and fourth *Ollman* factors (the full verbal context of the statement and its broader social context), compels the conclusion that the statement would **not** be taken as pure opinion. Further, to be sure, in another context, the statements made by Defendant will be viewed as a factual assertion, if considered under the first and second *Ollman* factors: whether the statements are sufficiently specific to convey "a precise core of meaning for which a consensus of understanding exists," (see, *Ollman v. Evans*, supra, at p 979), and whether it is "capable of being objectively characterized as true or false." See, *Ollman v. Evans*, supra, at p 979. Here, the inescapable conclusion from the verbal context of the entire message and all of the circumstances under which it was delivered is that the statement would be understood by the ordinary listener for what it is: a defamatory factual assertion, wherein Defendant Charlamagne was falsely asserting as "fact" that the Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Thus, there is no Constitutional protection afforded.

**Characterization of Someone as a "Racist," "Bigoted," a "Cracker" or a "White Devil" is NOT Protected Opinion**

Many courts in other jurisdictions that have faced the issue of defamation claims based on accusations of bigotry or racism have held the statements to be nonactionable statements of opinion. See, e.g., *Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) (holding that neither general statements charging a person with being racist, unfair, unjust, nor references to general discriminatory treatment, without more, constitute provably false assertions of fact); however, claiming that a person made a particular statement would be a factual assertion, and might well be libelous if false and defamatory (i.e., if the statement, if made, would reflect badly on the person). In this instance, there were not mere references to general discriminatory treatment. Thus, in this instance, there was a "factual" assertion

that that Plaintiff "singled out black students in her class and made them act like slaves;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" This false and defamatory statement reflected badly on Plaintiff and in conjunction with the implication of those accusations of bigotry and racism, would remove any purported protection and render those statements actionable.

**The Nature of Term "Racist" Does Not Render it Protected Opinion**

In *Stevens v. Tillman*, 855 F.2d 394, 402, the Court opines that "[I]n daily life 'racist' is hurled about so indiscriminately that it is no more than a verbal slap in the face; the target can slap back, (as Stevens did). It is not actionable <u>unless it implies the existence of undisclosed, defamatory facts</u>." Here, Plaintiff was not a public figure, who easily could "slap back" and the implication of the existence undisclosed defamatory facts was clear.

Defendant Charlamagne disingenuously argues that speech is not actionable so long as it is a protected opinion. Remarkably, the statements falsely permitted his listeners to believe that Plaintiff was being accused of "*singling out black students and making them act like slaves;*" telling them to "*lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like.*" It is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable listener would have concluded that he or she was hearing opinions, not facts about Plaintiff. Thus, the statements describing Plaintiff's lesson and the Plaintiff herself as "racist" are actionable.

**Descriptions of the Plaintiff as a "Racist," "Bigoted," a "Cracker" or a "White Devil" are Actionable**

Arguing that the descriptions of Plaintiff as a "racist," "bigot," "cracker," or a "white devil" cannot be proven false is misguided. In this instance, the very alleged incident that prompted these offensive descriptions was <u>false</u>. **It never happened**. The Plaintiff **<u>NEVER</u>** *singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped*

*on their backs to show them what slavery felt like*" nor was she ever the subject of an investigation concerning such an allegation Therefore, these descriptions of Plaintiff, in this regard, are similarly false. The cases cited by the Defendant Charlamagne are distinguishable from the instant matter; none of the cases demonstrate a scenario, where those terms were unequivocally proven to be related to a false event. Thus, again, in this instance, the assertion that that the Plaintiff "*singled out black students in her class and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*" was false and **NEVER** the subject of the OSI investigation, for which she was otherwise exonerated. <u>See</u>, Plaintiff's Exhibit B, thus Defendants' statements are actionable.

**Speculation Over State of Mind is Not Applicable to These Proceedings**

Defendant Charlamagne's argument that his statements relating to Plaintiff's demonstration, to wit: that she "*wanted to break their spirits*" and "*give them an inferiority complex*" are not mere subjective evaluations of intent and state of mind. With respect to these statements, it has been correctly noted the evidence produced by Plaintiff demonstrates that Defendant Charlamagne should have known the statements were false at the time of the broadcast. In other cases, proof of some kind of fault, negligence perhaps, is essential to recovery." <u>See</u>, *Herbert v. Lando*, 441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed. 2d 115, 1979 U.S. LEXIS 88, 27 Fed. R. Serv. 2d (Callaghan) 1, 3 Fed. R. Evid. Serv. (Callaghan) 822, 4 Media L. Rep. 2575. Citing *Herbert*, <u>supra</u>, the Second Circuit held in *Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123 (2d Cir. 1984) at 136-137, that "actual malice" as is implied in that expression, is a subjective test focused on Defendant's state of mind." At 140. The state of mind requisite for liability is <u>knowledge of actual or probable falsity</u>. <u>See</u>, *Herbert v. Lando*, <u>supra</u>, at 172. "If such proof results in liability for damages which in turn discourages the publication of erroneous information known to be false or probably false, this does not abridge either freedom of speech or of the press." <u>Id</u>. A knowledge of actual or probable falsity is clear, as the events attributed to Plaintiff were entirely improbable to wit, among other things: an adult walking on a child's back would have

21

produced obvious injury and Plaintiff would have been criminally charged with child abuse or child endangerment. Notably, none of things occurred.

**Charlamagne's Commentary is NOT Merely Emotionally Charged Rhetoric**

The key question here is whether, drawing all reasonable inferences in favor of Plaintiff, the comments of Defendant contain assertions of fact or opinion. The New York Court of Appeals distilled the following three factors which courts are instructed to consider in determining whether a statement is one of fact or opinion: (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] readers or listeners that what is being read or heard is likely to be opinion, not fact. See, *Brian v. Richardson*, 87 N.Y.2d 46, 660 N.E.2d 1126, 1129, 637 N.Y.S.2d 347 (N.Y. 1995) (internal quotation marks and citations omitted), cited in *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997). The third factor "lends both depth and difficulty to the analysis" and is critical to determining whether the alleged defamatory statements consist of "assertions of facts [or] nonactionable expressions of opinion." Id. It is important for a court to "consider the content of the communications as a whole, as well as its tone and apparent purpose." Id. At 1129-30 (citation omitted). "Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the Court should look to the over-all context in which the assertions were made and determine, on that basis, whether the reasonable reader would have believed that the challenged statements were conveying facts about the defamed Plaintiff." Id. At 1130 (internal quotation marks omitted). Beyond the "immediate context in which the disputed words appear," the New York Court of Appeals requires Courts "to take into consideration the larger context in which the statements were published, including the nature of the particular forum." Id.

The New York Court of Appeals, however, has expressed its belief that "an analysis that begins by looking at the content of the whole communication, its tone and apparent purpose better balances

the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions, and finds them <u>actionable unless couched in loose, figurative or hyperbolic language</u>." <u>See</u>, *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 255, 566 N.Y.S.2d 906, 917, 567 N.E.2d 1270 (1991) (citation omitted).

Defendant argues, as he did previously, that the comments are hyperbolic statements of opinion. Yet in this instance, the broadcast statements are clearly capable of being proven false—the comments, even if viewed in isolation, are <u>not</u> considered opinion. Notably, the purported "fractious debate" described by Defendant was actually based on a fact pattern that was entirely fabricated. Yet, when viewed within the larger context of the broadcast on which they were made, there can be no doubt that a reasonable listener would understand the comments to be factual. The average listener would <u>not</u> know that the comments were merely "emotionally charged rhetoric." <u>Id</u>. Of course the internet and social media makes it more likely that a greater number of people heard Defendant Charlamagne's statements, and thereby amplifying the impact they may have on a person.

**The Comments Complained of Are NOT Protected By the First Amendment**

The comments complained of are <u>not</u> protected under the First Amendment or the New York State Constitution. They cannot be considered statements of "pure opinion" despite the fact that the media worldwide picked up on this false incident.

Under New York and federal law, expressions of "pure opinion," <u>as opposed to statements of fact</u>, are not actionable, receiving full Constitutional protection. <u>See</u>, *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152, 623 N.E.2d 1163, 603 N.Y.S.2d 813 (1993). Yet, at bottom, the inquiry is whether a reasonable listener is likely to have understood the statements as conveying provable facts about Plaintiff. <u>See</u>, *Gross*, <u>supra</u>, 82 N.Y.2d at 155; <u>see also</u>, *Brian v. Richardson*, 87 N.Y.2d 46, 51, 660 N.E.2d 1126, 637 N.Y.S.2d 347 (1995) (explaining that the factors to be considered in addressing this question are: (1) whether the specific language at issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either

23

the full context of the communication in which the statement appears or the broader social context and surrounding circumstances signals to listeners that what is being heard is likely to be opinion, not fact."

Having reviewed the statements in the overall context that they were made, (see, *Brian*, supra, 87 N.Y.2d at 51), it can be concluded that a reasonable listener would have believed that the statements were intended to convey objective facts. The terms used by the Defendant may be used in a way that has a precise meaning and that is capable of being proven true or false; (see, Id.), a reasonable listener would have perceived Defendant Charlamagne's statements, in the context that they were made - to convey that Plaintiff had actually committed racist acts. Further, his remarks, received extensive media coverage and commentary. It is within this surrounding circumstance that Defendant's statements must be examined and how a reasonable listener would have perceived them. Thus, for example, when Defendant Charlamagne described Plaintiff as a "racist" and a "bigot," a reasonable listener would have easily perceived that Defendant was expressing that Plaintiff was being described as having committed the actual acts stated. In short, when examined in the context in which they were made, it must be concluded that all of Defendant Charlamagne's statements would "reasonably appear to state or imply assertions of objective fact." See, *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 243, 567 N.E.2d 1270, 566 N.Y.S.2d 906 (1991).

Thus, for all the reasons set forth herein, Plaintiff's defamation and related claims are premised on statements that are NOT protected under the First Amendment and should NOT be dismissed.

**POINT II**

**A REASONABLE JURY COULD FIND THAT THE PLAINTIFF
WAS PORTRAYED IN A "FALSE LIGHT"**

There has been serious concern that, by sidestepping the safeguards which restrain the reach of traditional public defamation litigation, a "false light" approach could compromise the Constitutional guarantee of Freedom of the Press. See, Prosser, Torts [4th ed], p 813; Restatement, Torts 2d, § 652E, Comment d, particularly p 399; Wade, Defamation and the Right of Privacy, 15

Vand L Rev 1093, 1121). Responsively, the Restatement, which in 1933 suggested that to impose liability under the false light rubric a publication need but be "offensive to persons of ordinary sensibilities" (see, Restatement, Torts, § 867, Comment d), by 1976 had raised the threshold to a "highly" offensive level (see, Restatement, Torts 2d, § 652E, Comment c). Even assuming, that such an action is not cognizable in this State, by all means, this case measures up to this kind of criterion.

While New York does not have a common law tort protecting privacy against publicity that unreasonably places a person in a "false light," (see, *Howell v. New York Post*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 354, 612 N.E.2d 699 (N.Y. 1993), New York Courts construe the language of N.Y. Civ. Rights Law § 51 broadly enough to encompass false light claims. Claims under N.Y. Civ. Rights Law § 51 based on a fictitious or falsified report, which would otherwise be privileged, are actionable, with proof of knowledge of falsity or reckless disregard of the truth. Where falsity is the gravamen of a §51 claim, U.S. Const. Amend. guarantees permit imposition of liability where actual malice is shown. In examining the false light tort, it is notable to consider section 652E of the Restatement (2d) of Torts that provides:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (a) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

Hence, if a false light claim under the Restatement rubric is recognized in New York, Plaintiff has more than stated a claim under it.

In *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 248, 42 L. Ed. 2d 419, 95 S. Ct. 465 (1974), the Court addressed a false light claim in which it was conceded that an offending newspaper article contained a number of false statements and inaccuracies. It stated that the subject article

25

contained "'calculated falsehoods,' and the jury was plainly justified in finding that [a news reporter] had portrayed the Cantrells in a false light through **knowing or reckless untruth**." Id. at 253 (emphasis added). *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), raised without deciding, whether in subsequent cases an actual malice or a negligence standard should be applied in a false light action commenced by a private individual against a media defendant. As in *Cantrell*, supra, the jury here found that the more stringent actual malice standard had been satisfied. As demonstrated herein, there is evidence on which a reasonable jury could find that the broadcast contained knowingly false and reckless statements, portraying the Plaintiff in a false light.

Notably, the cases cited by Defendant in support of its argument are distinguishable from the instant matter. In *Matthews v. Malkus*, 377 F. Supp. 2d 350, 2005 U.S. Dist. LEXIS 14401, the plaintiff filed suit against defendants, a nurse and a medical center, claiming medical malpractice and/or professional negligence and/or professional recklessness; negligent misrepresentation; defamation/slander; false imprisonment; false light; invasion of privacy/trespass; violations to civil rights and to constitutional guarantees; and intentional and/or negligent infliction of emotional distress. Defendants moved for *summary judgment*. Plaintiff called the nurse, who was working at a crisis hotline, and said something about killing herself or wanting to die. The nurse believed plaintiff was expressing "suicidal ideations," so she phoned authorities in Florida (where plaintiff lived) to alert them to a potentially suicidal person. The local police in Florida arrived and took plaintiff to a hospital. There were no genuine issues of material fact, as all material facts were undisputed. The only dispute was whether the nurse did anything that subjected her or the medical center, her employer, to liability on any theory. The answer was no. All of the allegations in the complaint stemmed from the nurse's decision to call Florida authorities after plaintiff said something about wanting to die or kill herself. Unlike in this matter, nothing the nurse did in *Matthews*, supra, was wrongful, and plaintiff provided no evidence to support her conclusory allegations that the nurse acted negligently or improperly, that she made any false statements, that she invaded plaintiff's privacy or caused her to be falsely

26

imprisoned, that she did anything to violate her civil or constitutional rights, or that she intentionally or negligently caused her any emotional distress.

Regardless of the particular fault standard to be applied, it is clear that when publishing or broadcasting a newsworthy matter of public interest, a media defendant may be held liable for the tort of false light invasion of a person's privacy with proof of falsity and some level of fault. Cf. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 54 U.S.L.W. 4373, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986). Accordingly, Plaintiff's false light claim should be considered by this Court under these extreme circumstances.

## CONCLUSION

Based on the foregoing, it has been demonstrated that Defendant Charlamagne has failed to meet the standards in this Circuit that are necessary on a Motion to Dismiss under Rule 12 (b) (6). Accordingly, Defendant's Motion to Dismiss should be denied in all respects, and Plaintiff should have such other and further relief that this Court may deem just and proper.

Dated:  Garden City, New York
　　　 August 20, 2020

　　　　　　　　　　　　　　　THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
　　　　　　　　　　　　　　　By: Thomas F. Liotti, Esq. (TL 4471)
　　　　　　　　　　　　　　　Attorneys for the Plaintiff
　　　　　　　　　　　　　　　*PATRICIA CUMMINGS*

27