UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
PATRICIA CUMMINGS,

                                        Plaintiff,

                                                                Docket No. 19-cv-07723 (CM)

                        -against-

THE CITY OF NEW YORK;
NEW YORK CITY DEPARTMENT OF EDUCATION;
GIULIA COX; COURTNEY WARE; BEN CHAPMAN;
NEW YORK DAILY NEWS; DR. ANDRE PERRY;
THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA;
LENARD LARRY McKELVEY a/k/a
CHARLAMAGNE THA GOD;
WWPR-FM (105.1 MHZ); iHEARTMEDIA;
CLEAR CHANNEL COMMUNICATIONS, INC.;
NEW YORK STATE SENATOR, KEVIN S. PARKER;
COALITION OF EDUCATIONAL JUSTICE;
ANGEL MARTINEZ2; NATASHA CAPERS;
PHILIP SCOTT; ADVISE MEDIA NETWORK
n/k/a AFRICAN DIASPORA NEWS CHANNEL, and
"JOHN DOE AND JANE DOE # 1-100" said names
being fictitious, it being the intent of Plaintiff to designate
any and all individuals, officers, members, agents, servants,
and/or employees of the aforementioned agencies owing a
duty of care to Plaintiff, individually and jointly and
severally,

                                        Defendants.
------------------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' HECHINGER INSTITUTE ON EDUCATION AND THE MEDIA AND
DR. ANDRE PERRY'S MOTION TO DISMISS THE AMENDED COMPLAINT**

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq.
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*
600 Old Country Road, Suite 530
Garden City, New York 11530
Phone: (516) 794-4700
Fax: (516) 794-2816
E-mail: Tom@TLiotti.com

Plaintiff, Patricia Cummings, (hereinafter "Plaintiff" or "Ms. Cummings"), a private individual, respectfully submits this Memorandum of Law in Opposition to Defendants', Hechinger Institute on Education and the Media, an institute of Teachers College, Columbia University (the "Hechinger Institute"), and Dr. Andre Perry ("Dr. Perry," collectively, the "Hechinger Defendants") Motion to Dismiss the Plaintiff's Amended Verified Complaint pursuant to Federal Rule of Civil Procedure 12 (b)(6).

## PRELIMINARY STATEMENT

The Hechinger Defendants erroneously argue that the Amended Verified Complaint offers nothing to address the fatal flaws identified in the Court's Decision and Order (Docket. No. 94, Decision); however, Defendant's argument is misguided, as Plaintiff's Amended Verified Complaint has sufficiently established a claim for defamation, as Dr. Perry's statements fail to offer expressions of non-actionable opinion; they are blatantly false statements. It has been held in the courts that when readers understand a defamatory meaning, liability cannot be avoided simply because the publication is alleged to be cast in the form of an opinion, belief, insinuation or even question. Thus, Defendant Perry's statements are actionable as defamation, defamation *per se*, libel, libel *per se*, and false light.

The allegation contained within Plaintiffs' Amended Verified Complaint that Dr. Perry has engaged in "offensive racial slurs and hate speech against a Caucasian woman" is not wholly contrived. The Hechinger Defendants erroneously argue that they cannot be liable to the Plaintiff, as the references to Plaintiff were "explicitly and exclusively based on the reporting by the *New York Daily News*. This is a fallacy. Nonetheless, any claim that the *New York Daily News'* articles are <u>fair</u> and <u>true</u> reports of judicial proceedings, is <u>completely false</u>. There was <u>no</u> official proceeding taking place at the time it was reported that Plaintiff "*singled out black students and*

*made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*," as described and asserted as "fact." Plaintiff was later investigated for a completely different allegation, which was not even remoted close to what was reported.

Likewise, the Hechinger Defendants disingenuously claim that Dr. Perry did not offer any reporting on Plaintiff in particular, but **only made passing reference** to the "facts" as outlined in the New York *Daily News'* article. This is also <u>**false**</u>. It is also <u>**misleadingly**</u> asserts that Dr. Perry's column was not largely about Plaintiff. It is further disingenuously asserted that Dr. Perry "simply used the widely reported and discussed story to provide context for his larger academic discussion of addressing race in the classroom." How could the challenged column not have been largely about Plaintiff, when the widely reported and discussed story, (though false), <u>**was clearly all about Plaintiff**</u>. Further, it is clear that the Hechinger Defendants knew or should have known that the original reporting was not accurate. Plausibility was completely ignored, to wit: if Plaintiff had in fact walked on student's backs, would they not have sustained physical injuries? Would she not have been arrested or charged with child abuse? It should have been obvious that this allegation was preposterous; however this gross distortion helped Dr. Perry to substantiate his column. As a result, Plaintiff's claims must stand.

The Hechinger Defendants argue that Dr. Perry merely used the previous reporting about the Plaintiff in a "broader" academic column about addressing race in education. In this regard, the Hechinger Defendants argue that the intended audience would understand his column to be "his opinion and an academic rumination on race in the classroom." It is important to note that there were no substantiated, accurate facts reported. Moreover, the disingenuous attempt to characterize the reference to Plaintiff's actions as <u>opinion</u> by the Hechinger Defendants is derisory.

Defendant, Dr. Perry is self-described as a <u>thought-leader</u> in the field of education and a publisher of a weekly column on an academic blogging platform for the Hechinger Institute at Columbia University. Credible journalists must be able to distinguish between facts and opinions. A journalist needs to know how reliable statements are <u>before reporting them as facts</u>. <u>See</u>, Henshall, Peter and David Ingram, <u>The News Manual: A Professional Resource for Journalists and the Media</u> (1991). In order to formulate his purported "opinion," that Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*," Dr. Perry performed no independent investigation of the "facts" despite the fact that the reported account by Defendant, Dr. Perry differed dramatically from the actual allegation that was made by just **<u>one student and ultimately unsubstantiated by New York City Department of Education Office of Special Investigations (OSI)</u>**. What was erroneously the subject of his column amounted to child abuse and/or endangerment, yet there was no indication of a substantiated investigation by Dr. Perry before making the Plaintiff a subject of his column. He is a self-designated <u>thought-leader</u>; referencing recent events in the media, and it is further admitted that the Defendant Hechinger Report is a <u>news organization</u> focused on producing <u>in-depth journalism</u>. Thus, the Hechinger Defendants are held to a higher standard. Those events as reported by Defendant Dr. Perry in the Hechinger Report were **<u>not</u>** opinion. The subject article is not an "*opinion column about race and academia*;" the Amended Verified Complaint highlights the fact that the claims herein go beyond a classification of "racial slurs and hate speech." They furthered a false narrative against Plaintiff, which would be actionable. At the center of this case is the veracity of a contextual world of facts more broad than the allegedly defamatory statements. Nonetheless, Plaintiff has properly identified the statements as allegedly defamatory. Plaintiff alleges that the content of these statements contain

actionable falsehoods. Thus, Defendants' arguments fail and their motion should be denied in all respects.

## STATEMENT OF FACTS

The Hechinger Defendants included the Plaintiff in an article entitled, "*Teachers, how does it feel to be oppressors?"* (which was published a mere five (5) days after the Defendants *New York Daily News* published its first article on this matter; clearly, referring to the Plaintiff as an oppressor and attempting to hide behind what they purport herein, to be a "<u>suggestion</u>" that "*teachers use narratives written by slaves in order to teach about slavery from the perspectives of the slaves and properly educate their students on the horrors of slavery*."

Plaintiff was a probationary New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York. She seeks damages related *inter alia* to defamation, defamation *per se*, slander, slander *per se*, libel, libel *per se*, and false light against Defendants, Perry and the Hechinger Report, as well as the "*badge of infamy,*" with which she has forever been branded.

Plaintiff's claims arose as a result of what was fallaciously reported concerning an alleged complaint made by **one (1)** parent of **one (1)** student regarding a lesson taught by Plaintiff in her social studies class on the Middle Passage, wherein she subsequently and unwillingly became the subject of a scandalously false and defamatory front page pictorial and story in the *New York Daily News*, mendaciously accusing her of being a "*racist*" and "<u>making black students lie face down on the floor of her class</u>, and asking them: *'[H]ow does it feel to be a slave?*" Thereafter, this fabricated and erroneous set of purported "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world.

Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it was erroneously reported, among other things that she "*singled out black*

students and made them act like slaves;" she is falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" She has been publically shamed and falsely accused of "*child abuse*," labeled as a "*racist*," referred to as an "*oppressor*," by many, including politicians and activists, and specifically in various and extensive media outlets discussing this issue. She has received direct threats of violence and death causing her to fear for her life. Plaintiff was ultimately exonerated of the original erroneous allegations following an investigation by the New York City Department of Education's Office of Special Investigations, yet has nonetheless been terminated from her employment as New York City Public School Teacher at The William W. Niles School - Middle School 118.

The Hechinger Defendants' arguments are comprised of offensive, imprudent and factually incorrect statements. What falsely, disparagingly, and libelously described Plaintiff as an oppressor, was, in actuality, an example of a multi-sensory teacher demonstrating "spatial recognition" to her students. Multi-sensory teaching is a didactic system that seeks to develop awareness of self in time and space in order to raise cognition and understanding of the world as is experienced. It takes into account that different children learn in different ways; conveys information through things like touch and movement-called tactile and kinesthetic elements, as well as sight and hearing. See, White, Helen and Christina Evans, Learning to Listen to Learn: Using Multi-Sensory Teaching for Effective Listening (2005).

This part of her lesson was described by Plaintiff as a "teachable moment," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes; it was not, in any way, a reenactment. Defendants' article described as "fact," a false scenario, wherein it was erroneously stated that Plaintiff had *singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*." This fabricated account is contradicted by the reported findings of the of the New York City Department of Education's Office of Special Investigations (OSI); wherein Plaintiff was

actually being investigated for a false allegation stating she "pushed Student A's back with her knee and asked if it hurt." See, Redacted Copy of Office of Special Investigations Investigative Report (OSI) dated July 24, 2018, at page 1 "Origin of Complaint") included herein as Plaintiff's **Exhibit A**, to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student' I never observed Ms. Cummings' knee make contact with 'Student A'*'" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them*." See, Plaintiff's Exhibit A. Moreover, "Students B, D, E, F, I, J and K" noted that the participating student volunteers did not appear to be in any distress. See, Plaintiff's Exhibit A. Most remarkably, "Student J" admitted that "'*Student A'[1] was lying and was attempting to get Ms. Cummings fired or in trouble because 'Student A' did not like Ms. Cummings.*" See, Plaintiff's Exhibit A, at page 5. Moreover, Plaintiff controverts this fallacious allegation in her rebuttal correspondence addressed to Community Superintendent Maribel Torres-Hulla dated October 5, 2018, annexed hereto as **Exhibit B** at page 8.

"Student A" is alleged to have complained on or about January 11, 2018, and as noted in the OSI Report, "Student A's" mother is noted to have complained 6 days later (9 days after the lesson). Further, it is evident that a complaint was not immediately filed according to the OSI Report. See, Plaintiff's Exhibit A. Furthermore, Plaintiff was not removed for investigation by the New York City Department of Education's Office of Special Investigations until February 2, 2018. Principal Cox did a school based investigation, but failed to adhere to Chancellor Regulation A-420 and breached Article 20 of the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT). A copy of the Plaintiff's Amended Verified Complaint dated May 27, 2020, annexed hereto as **Exhibit C**.

---

[1] "Student A" was one of four students who voluntarily participated in the classroom demonstration on the Middle Passage. It was erroneously alleged that Ms. Cummings pushed "Student A's" back with her knee and asked if it hurt or caused her discomfort.

The writing by the Hechinger Defendants asserted as fact, grossly false information, which was completely different from the allegation that was actually being investigated by OSI. The true and factual allegation involved a false report that the Plaintiff pushed her knee into the back of one student during her classroom lesson; it was NEVER the complaint that she "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like,*" as falsely and repeatedly reported. See, Plaintiff's Exhibit A at pages 24-25. Notably, the Office of Special Investigations Investigative Report (OSI Report) dated July 24, 2018, indicates that *"[T]he written statements made by 'Students B, C, D, E, H, I, J, Q, R, S, T, U, and V' fail to corroborate that Ms. Cummings pressed her knee into 'Student A's' back or any students' back.*" See, Plaintiff's Exhibit A. "Therefore, notably, the allegation that Ms. Cummings used corporal punishment against "Student A" by pushing her knee into her ["Student A's"] back during a classroom demonstration was never corroborated and is **unsubstantiated**." See, Plaintiff's Exhibit A. Nonetheless, the pertinent fact, with respect to these Defendants is that they described as "fact," a blatantly **false** scenario, wherein it was erroneously stated that Plaintiff had *singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" **THIS NEVER HAPPENED, NOR WAS THE PLAINTIFF EVER BEING INVESTIAGTED FOR THIS ACTON AND/OR BEHAVIOR.**

## ARGUMENT

## POINT I

### THE AMENDED COMPLAINT ADDRESSES THE INFIRMITIES IDENTIFIED IN THE DECISION AND ORDER

Defendants rely upon the argument that the Court previously decided that the Hechinger Defendants' statements do not give rise to a cause of action for defamation "as a matter of law." To survive a motion to dismiss under Fed. R. Civ. P. 12(b) (6), a complaint (or Amended Verified

7

Complaint, in this case), must plead enough facts to state a claim to relief that is plausible on its face. In reviewing the Amended Verified Complaint, the Court must accepts all well-pleaded allegations as true and draw all reasonable inferences in Plaintiff's favor. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. However, as in this case, where Plaintiff's Amended Verified Compliant has nudged her claims across the line from conceivable to plausible, her Amended Verified Complaint cannot be dismissed.

   "The purpose of a motion to dismiss for failure to state a claim under Rule 12(b) (6) is to test the legal sufficiency of a plaintiff's claim for relief." See, *Amadei v. Nielsen*, 348 F. Supp.3d 145,155 (EDNY 2018) (citing, *Patane v. Clark*, 508F.3d 106, 112 (2d Cir. 2007)). For a 12(b) (6) motion, the court must "construe the complaint liberally, excepting all factual allegations in the complaint as true, and drawing all reasonable inference is in the plaintiff's favor." See, *Palin v. N.Y. Times Co*., 933 F.3d 160, 2019 U.S. App. LEXIS 23439, 104 Fed. R. Serv. 3d (Callaghan) 723) (quotations and alteration omitted); see, also, *Amadei*, 348 F. Supp. 3d, supra, at 155("[W]hen reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept all true allegations of fact in the complaint and draw all reasonable inference is in favor of plaintiffs."). A complaint's "factual allegations must be enough to raise a right of relief to above the speculative level… On the assumption that all the allegations in the complaint are true (even if doubtful in fact") (quoting, *Bell Atl. Corp. v. Twombly*, 550 U.S.544, at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 2007 U.S .LEXIS 5901, 75 U.S .L.W. 4337, 2007-1 Trade Cas. (CCH) P75, 709, 68 Fed. R. Serv. 3d (Callaghan) 661, 20 Fla. L. Weekly Fed. S 267, 41 Comm. Reg. (P & F) 567. Once the facts are construed in the light most favorable to the plaintiff, on order to avoid dismissal, there must be sufficient facts that allege a plausible claim. See, *Ashcroft v. Iqbal*, 556 U.S. 662, 678(2009) ("to survive a motion to dismiss [pursuant to Rule 12 (b) (6)], a complaint must contain sufficient factual matter, excepted as true, to state a claim to relieve that is plausible on its face." (Quotations omitted)). Moreover, to survive a motion to dismiss, a plaintiff's

facts must give rise to a plausible narrative supporting his/her claim. See, *Twombly*, supra, 550 U.S. at 570 (Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relieve that is plausible on its face.") While this "plausibility standard is not akin to a 'probability requirement' at the pleading stage, the standard calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the claim." Id. (quoting, *Twombly*, supra, 550 U.S. at 556).

The law of defamation serves to protect an individual's right to one's reputation. See, *Gertz v. Welch*, 418 U.S. 313-45 (1974). It has long been recognized that "a person has a legal right to enjoy his reputation free from false or derogatory characterization by others." Id. Therefore, a statement that casts an individual unfavorably in society will constitute an infringement upon that person's reputational right and give rise to a cause of action for civil defamation, as it has done here. The legal question to be resolved by this Court is whether a reasonable basis exists for defamatory interpretation of the words and statements written by Defendant, Dr. Perry. If the words are "not reasonably susceptible of a defamatory meaning, they are not actionable, and cannot be made so by a strained and artificial construction." See, *Golub v. Enquirer/Star Group*, 89 N.Y.2d 1074, at 1076, 681 N.E.2d 1282, 659 N.Y.S.2d 836, 1997 N.Y. LEXIS 761, 25 Media L. Rep. 1863; *Aronson v. Wiersma*, 65 N.Y.2d 592, at 593-594, 483 N.E.2d 1138, 493 N.Y.S.2d 1006, 1985 N.Y. LEXIS 15929, 12 Media L. Rep. 1150). Thus, the Court must determine "whether the contested statements are reasonably susceptible of a defamatory connotation,….[and] [i]f, upon **any** reasonable view of the stated facts, plaintiff would be entitled to recovery for defamation, the complaint must be deemed to sufficiently state a cause of action." See, *David v. Boeheim*, 24 NY3d 262, 268 [2014] [citations omitted]; See, *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, at 380, 649 N.E.2d 825, 625 N.Y.S.2d 477, 1995 N.Y. LEXIS 699; *Silsdorf v. Levine*, 59 NY2d 8, 12 [1983], cert denied, 464 US 831; *Mencher v. Chelsey*, 297NY 94, 100 [1947]; [court may **not** determine sole meaning of words, only whether reasonable basis exists for defamatory interpretation]) (Emphasis added). It is then for a jury to determine

"whether that was the sense in which the words were likely to be understood by the ordinary and average reader." <u>See</u>, *James v. Gannett Co.*, 40 N.Y.2d 415, at 418, 353 N.E.2d 834, 386 N.Y.S.2d 871, 1976 N.Y. LEXIS 2900, <u>quoting</u>, *Mencher v. Chesley*, <u>supra</u>, 297 N.Y. 94, at 100, 75 N.E.2d 257, 1947 N.Y. LEXIS 904.

A key word in this case is "context," which is defined in Merriam Webster's dictionary as "*the part of a discourse that surround a word or passage and can throw light on its meeting.*" Simply put, it's the circumstances that form the background of an event, idea, or statement in such a way as to enable readers to understand the narrative, i.e. what is being told. The circumstances that formed the background in Defendants' narrative is the assertion of facts by the *New York Daily News* about and concerning Plaintiff in their "exclusive" story published on February 1, 2018. The article stated and asserts as fact that Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" An assertion of this magnitude, in the racially divided social climate we see today, it is no surprise that this was reported by Defendants. Nonetheless, the Hechinger Defendants' erroneous theory of liability is incorrect. By their own admission, counsel asserts in Defendants' Memorandum of Law, the Hechinger Defendants gave their audience the "factual" background, i.e. context, so as that his readers would be informed and knowledgeable. Therefore a "reasonable reader… could have concluded that [Defendants] were conveying facts about Plaintiff." <u>See</u>, *Whitney Info Network, Inc. v. Weiss*, 2008 WL731024, (E.D.N.Y. March 18, 2008). While Defendants would argue that an assertion that cannot be proved false cannot be held libelous, (<u>see</u>, *Gertz v. Robert Welch, Inc.*, <u>supra</u>, 418 US at 339–40, 94S. CT. 2997; *Buckley v. Littell*, 539 F.2d 882, at 883, 1976 U.S. App. LEXIS 8226, 1 Media L. Rep. 1762), Defendants' assertions (statements) characterizing the Plaintiff as an "oppressor" **<u>can</u>** be proven false.

Under both Federal and New York Constitutions, only statements that are demonstratively false are actionable, especially in regards to a matter of public concern. "Because falsity is a necessary

element in a defamation claim involving statements of public concern, it follows that only statements alleging fact can properly be the subject of a defamation action." <u>See</u>, *600 W. 15th St. Corp. v. VonGutfeld*, 80 NY2d 130,139 (1992). There is no First Amendment privilege; by making this statement, the Hechinger Defendants are stating **and asserting as a fact** that Plaintiff *laid students on the floor on their stomachs and stepped on their backs*, thus constituting a criminal act under New York State Penal Law. What Defendants wrote about **NEVER** happened, nor was she ever charged with any crime, which he could have easily been verified. Moreover it could easily be interpreted by a reasonable person with average intelligence that Defendants were, as stating facts about Plaintiff, a private person. Dr. Perry's statements were not only demonstratively false, making it actionable, it is also "reasonably susceptible of a defamatory meaning when it tends to expose a person" to those things, e.g., "hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community." <u>See</u>, *Restis v. Am. Coalition Against Nuclear Iran, Inc*., 53 F. Supp. 3d 705, 2014 U.S. Dist. LEXIS 139402 (quotations and alterations omitted).

In a defamation action, a plaintiff must identify "a plausible defamatory meaning of the challenged statement or publication. If the statement is susceptible of only one meaning, the court "must determine, as a matter of law, whether that one meaning is defamatory." <u>See</u>, *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 2000 U.S. App. LEXIS 6785, <u>quoting</u>, *Davis v. Ross*, 754 F.2d 80, 1985 U.S. App. LEXIS 28944at 82; <u>see also</u>, *Aronson*, <u>supra</u>, 483 N.E.2d at 1139. Plaintiff provided the meaning for the Court within the charts listed in the Amended Verified Complaint, and "[T]he inquiry into whether a statement should be viewed as one of fact or one of opinion must be made from the perspective of an ordinary reader of the statement." <u>See</u>, *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 224, (2d. Cir. 1985) U.S. App. LEXIS 30321, 11 Media L. Rep. 1713 [alteration added]. Curiously, in attempt to conceal his wrongdoing, Defendants do not address or negate use of the word "oppressor," but instead attempts to camouflage his libelous words as protected speech, even though such words, most certainly, do have specific meanings, and when in context of his reporting,

they are personal in their invective and designed to expose Plaintiff, a highly educated white teacher, teaching in a predominantly minority populated school, to public contempt and ridicule and impugn her character and professional integrity.

"Generally, it has been held that a dismissal of a claim will be upheld, only if it appears that the plaintiff can prove no set of facts upon which relief may be granted." See, *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir. 1994). Such is not the case herein. The Hechinger Defendants disingenuously argue that multiple statements alleged to be actionable in the Amended Verified Complaint are non-defamatory on their face. A statement is defamatory "if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of [her] in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." See, *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F.Supp.2d 279, 287 (SDNY 2006). Clearly, Plaintiff's has demonstrated the defamatory nature of Defendant's statements. He publically referred to her as an "oppressor." This characterization furthered the racist narrative and undoubtedly exposed the Plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of her in the minds of right-thinking persons, and to deprive her of her friendly intercourse in society. This is evident in the demonstrations of hate, ridicule, harassment, and threats of violence which followed. The Amended Verified Complaint alleges in detail precisely how Defendants directly defamed Plaintiff. Defendants have failed to offer any specific argument, instead they are simply assuming that this Court will accept at face value, their assertion that the defamatory slander was merely his opinion.

The privilege protecting the expression of an opinion is rooted in the preference that ideas be fully aired. See, *Davis v. Boeheim*, 24 NY3d 262 at 269 (2014), citing, *Steinhilber v. Alphonse*, 68 NY2d 283 at 289 (1986), and *Gertz v. Robert Welch, Inc.*, supra, 418 US 323, 339-340 (1974). Nonetheless, privileged statements of opinion are either accompanied by the **facts** on which they are based, or do not imply that they are based on undisclosed facts. See, *Gross v. New York Times Co.*, 82 NY2d 146 at 53-154 (1993). "When a statement of opinion implies that it is based on unstated facts

that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" See, *Egiazaryan v. Zalmayev*, 880 F Supp 2d 494, 503 [SD NY 2012], quoting, *Steinhilber*, supra, 68 NY2d at 289, "because a reasonable listener or reader would infer that 'the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]'" See, *Gross*, supra, 82 NY2d at 153-154, quoting, *Steinhilber*, 68 NY2d at 290, and "if the predicate facts are disclosed, but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity," the statement may be actionable as a "defamatory opinion" See, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, F Supp 3d , 2016 WL 3773394, [SD NY 2016], citing *Silsdorf v. Levine*, 59 NY2d 8, 15-16 [1983], cert denied 464 US 831; see also, *Parks v. Steinbrenner*, 131 AD2d 60, 62-63 [1st Dept. 1987]. Consequently, the Defendants' assertions of fact "produce a different effect on the reader than would a report containing the precise truth," thus making it actionable. See, *Karades v. Ackerley Grp., Inc.*, 423 F3d 119 (2d Cir. 2005) (citations omitted).

An asserted fact may be distinguished from a nonactionable opinion if the statement: (1) has a precise, readily understood meaning, that is (2) capable of being proven true or false, and (3) where the full context in which it is asserted or its broader social context and surrounding circumstances indicate to readers or listeners that it is likely fact, not opinion. See, *Davis*, supra, 24 NY3d at 271, citing, Mann v. Abel, 10 NY3d 271 at 276 (2008), and *Brian v Richardson*, 87 NY2d 46, 51 [1995]; *Gross*, supra, 82 NY2d at 153; *Steinhilber*, supra, 68 NY2d at 292. "Where readers/listeners would understand a defamatory meaning, liability cannot be avoided merely because the publication is alleged to be cast in the form of an opinion, belief, insinuation or even question. A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community." See, *Christopher v. American News Co.*, 171 F.2d 275 (7th Cir. 1948).

"[T]he following factors should be considered in distinguishing fact from opinion: (1) whether the language used has a precise meaning or whether it is indefinite or ambiguous, (2) whether the

13

statement is capable of objectively being true or false, and (3) the full context of the entire communication or the broader social context surrounding the communication. Moreover, the Court of Appeals makes a distinction between a statement of opinion that implies a factual basis that is not disclosed to the reader and an opinion that is accompanied by a recitation of facts on which it is based. The former is actionable, the latter is not." <u>See</u>, *Penn Warranty Corp. v. DiGiovanni*, 2005 NY Slip Op 25449 10 Misc3d 998 (2005). Defendant Charlamagne <u>never</u> used words such as "alleged" or "accused of" in his broadcast; he lead his listeners to believe the recitation of the facts presented to be accurate.

It bears mentioning that Under New York law, some statements are considered defamation (slander) *per se* if they "(1) charge plaintiff with a serious crime; (2) tend to injure plaintiff in its business, trade or profession; (3) [communicate that] plaintiff has some loathsome disease; or (4) impute unchastity. <u>See</u>, *Doe v. Doe*, No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017) (a statement is *per se* defamatory when it tends to injure another in his or her trade, business, or profession) (<u>citing</u> *Liberman v. Gelstein*, 80 NY2d 429, 435 (1992)). Such statements are presumed to cause injury, so a separate showing of harm is not necessary. Here, the facts as presented by the Hechinger Defendants further the narrative of Plaintiff of having committed a serious crime; to wit: walking on the backs of students is akin to child abuse and endangerment and the false labeling of the Plaintiff as a racist who committed such an atrocity has irreparably injured the Plaintiff in her profession as a school teacher and otherwise. **Most notably, Plaintiff was <u>never</u> accused or investigated on an allegation of a racist act by the City Department of Education**. She was being investigated on an allegation of corporal punishment that did not involve any of the "facts" disseminated by the Defendants in their erroneously misleading article.

The hallmark of a defamation claim is reputational harm. Former United States Supreme Court Justice Potter Stewart wrote in *Rosenblatt v. Baer*, 383 U.S. 75 (1966), that the essence of a defamation claim is the right to protect one's good name. According to Justice Stewart, this tort "reflects no more

14

than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty." Id.

The Hechinger Defendants mistakenly rely upon *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), where the landscape of libel law dramatically changed involving a case where two paragraphs in an advertisement contained factual errors. For the first time, the Supreme Court ruled that "libel can claim no talismanic immunity from constitutional limitations," but must "be measured by standards that satisfy the First Amendment." The high court established a rule for defamation cases that dominates modern-day American libel law. The Court wrote:

> "The constitutional guarantees require, we think, a federal rule that prohibits a *public* official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (Emphasis added).

The Hechinger Defendants erroneously argue the existence of re-publisher's qualified privilege, since they reason that a company or concern which simply republishes a work is entitled to place its reliance upon the research of the original publisher, absent a showing that the re-publisher had, or should have had, substantial reasons to question the accuracy of the articles or the *bona fides* of the reporter, and no such showing was made. The difference between the "actual malice" standard utilized in cases involving public officials and the "gross irresponsibility" standard utilized in cases involving private plaintiffs is relevant only in determining the degree of fault that must be established in order to defeat the re-publisher's qualified privilege. The cases relied upon by the Defendant to support their argument are distinguishable from the facts of the matter herein. In *Duane Reade Inc. v. Local 338 Retail, Wholesale, Dept. Store Union, UFCW, AFL-CIO*, 6 Misc. 3d 790, 791 N.Y.S.2d 288, 2004 N.Y. Misc. LEXIS 2567, 2004 NY Slip Op 24504, 176 L.R.R.M. 2125, a plaintiff corporation sued defendants, a union and its officers (collectively union), for defamation. Defendants moved to dismiss the complaint. The corporation argued that the union was responsible for the statements made

on a website. The union's defamatory activities were related to a labor dispute. The corporation could **not** show that the allegedly defamatory statements were maliciously false. Moreover, the union was protected by the republication privilege as the non-opinion factual allegations were merely reprints from credible sources. Furthermore, **the statements were true, an absolute defense to defamation**. The union merely published what a newspaper reported and what a legislator said, while making it clear that the information was only a reprint. Id. This is not the case herein, where Plaintiff has demonstrated that the alleged defamatory statements were maliciously false, and the purportedly "factual" allegations were more than mere re-prints.

Likewise, *Lerman v. Chuckleberry Pub., Inc.*, 521 F. Supp. 228, 1981 U.S. Dist. LEXIS 14084, 32 Fed. R. Serv. 2d (Callaghan) 487, 7 Media L. Rep. 2282, is also distinguishable from the instant matter. In *Lerman*, supra, the plaintiff, a novelist, had been granted a preliminary injunction and partial summary judgment on her invasion of privacy claims against defendants, a publishing company and distributing company, under N.Y. Civ. Rights Law §§ 50 and 51 for publishing a picture of a nude woman that incorrectly identified the novelist. The novelist sought to amend her complaint and the publishing company and novelist each moved for summary judgment. The publication of the nude photo had also been republished along with the novelist's name subsequent to the granting of the preliminary injunction. The court denied the publishing company and the distribution company's motion for summary judgment on the novelist's right of publicity claims, and granted her summary judgment. The court found that the novelist had established her name was commercially valuable, and that she had used her name and likeness for her own self-exploitation. The third element that the publishing company had used the name for purposes of trade had previously been determined. The court denied the motion for summary judgment on the libel claim, finding that the novelist was not a public figure for the limited purpose of promoting, publicizing, and selling sex. It was a fact question as to whether the re-publication was permitted. Thus, the publishing company was not entitled to summary judgment.

Notably, as an individual, probationary middle school teacher, with no involvement in administration or policy, the Plaintiff is <u>not</u> a public official. Nonetheless, even if, assuming *arguendo*, the Plaintiff was considered a public official, she has no problem demonstrating that the blatantly false statement was made with actual malice - knowledge that it was false or with reckless disregard of whether it was false or not. Even after seeing the OSI conclusion, the Hechinger Defendants promoted the Plaintiff as a "racist" and an oppressor," never once retracting the false account that she "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*."

The Supreme Court clarified the limits of the "actual malice" standard and the difference between public and private figures in defamation cases in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 471 F.2d 801 (1974). The court had to determine what standard to apply for private persons and so-called limited purpose public figures. Then, the Court had to determine whether Gertz was a private person or some sort of public figure. The news-media defendant argued that the *Times v. Sullivan* standard should apply to any defamation plaintiff as long as the published statements related to a matter of public importance. The high court disagreed, finding a distinction between public figures and private persons. The Court noted two differences: (1) public officials and public figures have greater access to the media in order to counter defamatory statements; and (2) public officials and public figures, to a certain extent, seek out public acclaim and assume the risk of greater public scrutiny.

For these reasons, the *Gertz* Court set up a different standard for private persons:

> "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

This standard means that <u>a private person does not have to show that a defendant acted with actual malice in order to prevail in a defamation suit</u>. The private plaintiff usually must show simply that the defendant was negligent, or at fault. However, the Supreme Court also ruled that private

defamation plaintiffs could not recover punitive damages unless they showed evidence of actual malice.

A defamation plaintiff must usually establish the following elements to recover: (1) Identification: The plaintiff must show that the publication was "of and concerning" himself or herself; (2) Publication: The plaintiff must show that the defamatory statements were disseminated to a third party; (3) Defamatory meaning: The plaintiff must establish that the statements in question were defamatory. For example, the language must do more than simply annoy a person or hurt a person's feelings; (4) Falsity: The statements must be false; truth is a defense to a defamation claim. Generally, the plaintiff bears the burden of proof of establishing falsity; (5) Statements of fact: The statements in question must be objectively verifiable as <u>false</u> statements of fact. In other words, the statements must be provable as false; and (6) Damages: The false and defamatory statements must cause actual injury or special damages. Clearly, the Plaintiff has successfully demonstrated each of the elements. Further, in *Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999), the Court discussed the high burden of proof necessary on a motion to dismiss under Fed. R. Civ. P. 12 (b) (6) and held:

> "Any Rule 12 (b) (6) motion for a dismissal faces a difficult (though not insurmountable) hurdle. (citations and internal quotation marks omitted):  On a motion to dismiss under 12 (b)(6), the Court must accept as true the factual allegations in the complaint, and draw all favorable inferences in favor of the plaintiff.  The District Court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

It is well settled that courts in this Circuit follow the Supreme Court determination in *Conley v. Gibson*, 355 U.S. 41 (1957). In *Conley*, Court laid down the criteria to be applied when evaluating motions to dismiss prior to the defendants serving an answer and discovery being conducted. The Court held that a dismissal should only be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Id</u>.

The Court then referenced Fed. R. Civ. P. 8 (a) (2) to illustrate the liberal system of pleading in a Federal action and cited the oft advanced rule that the appropriate inquiry on a motion to dismiss is not whether the plaintiff will ultimately prevail on the merits, but whether the plaintiff is entitled to offer evidence in support of his claims at the time of trial. "A claimant need only give a statement that gives the defendant 'fair notice of what the…claim is and the grounds upon which it rests." See, *Conley,* 355 U.S. 41 (1957), supra. The issue at the motion to dismiss stage of an action is not whether a plaintiff will ultimately prevail on the merits, but whether or not the plaintiff is entitled to offer evidence to support the complaint. "Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." See, *Phelps v. Kapnolas*, 308 F.3d 180, 184-185 (2d Cir. 2002).

The test, as relied upon by this Circuit and the standard on a Rule 12 (b) (6) motion, is for the Court to merely determine the legal feasibility of the complaint and not to weigh the evidence which might ultimately be offered in support of the complaint. Moreover, it is well settled that on a motion to dismiss pursuant to Rule 12 (b) (6), the Court must accept all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. See, *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002). In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), the Supreme Court set forth:

> Given the federal rule of simplified standard for pleading, [a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations … Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56.

In the instant case, the Hechinger Defendants' motion to dismiss under Rule 12 (b) (6) is based upon the alleged lack of merit in the Plaintiff's case; however, that is not the test in this Circuit when determining the validity of a 12 (b)(6) motion. The Hechinger Defendants have not met this Circuit's test on motions of this type, and should; therefore, be denied in all respects.

Third, the Hechinger Defendants argue that if a reasonable observer would find that the statements **constitute reports of a proceeding**, then the Plaintiff would be barred from claims against them. We must remain mindful of the rule that the defamatory effect of the article is to be ascertained not from the viewpoint of a critic or language expert, but rather from that of a reader of reasonable intelligence who takes ordinary interest in the articles of a periodical, but does not commonly subject them to careful scrutiny and analysis. In applying New York law, words that are challenged as defamatory "must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader . . . ." See, *Aronson v. Wiersma*, 65 NY2d 592, (1985) at 594; see also, *Armstrong v. Simon & Schuster*, 85 NY2d 373 (1995) at 380; *James v. Gannett Co.*, 40 NY2d 415 (1976) at 419-420; *Ava v. NYP Holdings, Inc.*, 64 AD3d 407 (2009) at 413. All relevant factors may be considered in determining whether a word or statement is defamatory. See, *Farber v. Jefferys*, 33 Misc 3d 1218[A], 2011 NY Slip Op 51966, [Sup Ct, NY County 2011], affd 103 AD3d 514 [1st Dept. 2013], lv denied 21 NY3d 858, citing, *Steinhilber v. Alphonse*, 68 NY2d 283, 291-292 [1986], and courts have considerable discretion in deciding whether a statement is defamatory, guided only by "the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used . . . ." See, *Steinhilber*, supra, 68 NY2d at 291-292.

While notably, the New York Court of Appeals has repeatedly held that the New York Constitution provides greater protection than the United States Constitution and, accordingly that the inquiry under the two constitutional regimes is different, (see, *600 West 115th Street Corp. v. Von Gutfeld*, 80 N.Y.2d at 136 & 138, 589 N.Y.S.2d at 827 & 829, 603 N.E.2d at 932 & 934 (1992); *Immuno AG v. J. Moor-Jankowski*, 77 N.Y.2d at 248-49, 566 N.Y.S.2d at 913-14, 567 N.E.2d at 1277-78 (1991)), the thrust of the dispositive inquiry under both New York and Constitutional law is "whether a reasonable [reader] could have concluded that [the publications were] conveying facts about the plaintiff." See, *Gross v. New York Times Co.*, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817, 623 N.E.2d at 1167 (1993); *600 West 115th Street*, supra, at 829, 603 N.E.2d at 934 ("Under either Federal

or State law, the dispositive question is whether a reasonable listener….could have concluded that [defendant] was conveying facts about the plaintiff"). See, *Freeze Right Refrigeration & Air Conditioning Services, Inc. v. City of New York*, 101 AD2d 175, 182. Clearly a reasonable viewer in this instance would believe that the statements were conveying facts about the Plaintiff [this is evidenced by the vicious attacks and public outcry for social justice that followed], and would believe that the statements constituted reports of a proceeding, which they did not. There never was a reporting of any truth, to wit: there was **NEVER** any proceedings investigating the Plaintiff for "*singling out black students and making them act like slaves*;" or telling them to "*lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like*." THIS ERRONEOUS ACCUSATION WAS NEVER THE SUBJECT OF ANY INQUIRY BY THE DEPARTMENT OF EDUCATION OR OTHERWISE. It was entirely INACCURATE. It was completely ignored that Plaintiff was <u>never</u> accused or investigated of "racist acts" by OSI. She was investigated by the DOE for an allegation of corporal punishment, which was unsubstantiated. Defendants evidently preferred readers believe the false narrative of a "slavery controversy" that they themselves promoted.

**The Defendants DID NOT Fairly and Accurately Report on These Proceedings**

Plaintiff <u>does</u> allege that the articles present inaccurate summaries of the allegation against her. The Hechinger Defendants attempt to distract this Court with an analysis of truth or falsity of the underlying allegations; however, they concede that the ultimate question is whether the articles truly and fairly report the allegations, and it this case, they clearly did not. The glaring distinctions in the allegations are clear and disqualify this report from any protections.

It is important to also note that the student that was interviewed by the Defendant, Ben Chapman, and who allegedly reported that the Plaintiff "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" was **absent** on the day of the lesson in question and in no way could

have possibly witnessed the lesson. Absolutely no fact checking was done in disseminating these erroneous assertions of fact to the public.

As stated <u>supra</u>, the Hechinger Defendants argue that they merely re-published what had been previously published by the Defendant *New York Daily News* and Ben Chapman. As such, the Defendants improvidently reply upon *Karaduman v. Newsday*, (51 NY2d 531, 539 (1980), holding that the re-publication of statements is only actionable if the Defendant re-publisher acted in a "**grossly irresponsible**" manner in relation to the republication. <u>Id</u>. Defendants disingenuously argue that Plaintiff's complaint does not point to any fact known by Dr. Perry or Hechinger Report that would have caused them to doubt the accuracy of the story; however, they knew at the very least that *some allegation* remained under investigation with the New York City Department of Education. Plaintiff has sufficiently plead facts to plausibly demonstrate that the Hechinger Defendants knew or should have known that the *New York Daily News'* story was inaccurate.

Notably, "(a) wide variety of factors may enter into a determination of whether the **grossly irresponsible** standard has been met, such as whether sound journalistic practices were followed in preparing the defamatory article, whether normal procedures were followed, and whether an editor reviewed the copy, whether there was any reason to doubt the accuracy of the source relied upon <u>so as to produce a duty to make further inquiry to verify the information</u>, for example, by checking secondary sources, and whether the truth was easily accessible." <u>See</u>, *Hawks v. Record Printing and Pub. Co., Inc.*, 109 AD2d 972, 975) (citations omitted). The facts of this matter clearly demonstrate that the Hechinger Defendants had or should have had substantial reasons to question the accuracy of the articles or the *bona fides* of [the] reporter, and thus the Defendants acted in a grossly irresponsible manner. <u>See</u>, *Karaduman*, <u>supr</u>a and *Jewell v. NYP Holdings, Inc.*, 23 F. Supp.2d 348, 371 (SDNY 1998). There were substantial reasons to question the accuracy of the material. Accordingly, and "(s)ince a wide variety of factors enter into a determination of whether the grossly irresponsible standard has been met, the issue of Defendants' conduct in this case should be resolved by a jury." <u>See</u>,

*Brien v. Troy Pub. Co., Inc.*, 121 AD2d 794 (1986), at 795; *Morsette v. Final Call*, 278 AD2d 81 (2000), at 82. Thus, dismissal of the Plaintiff's complaint would be improper. Similarly, triable issues of fact exist as to the claimed substantial truthfulness of the article.

Plaintiff has plead and proven that the Hechinger Defendants' comments addressing the Plaintiff were made with "gross irresponsibility." The parties dispute whether the statements at issue are "arguably within the sphere of legitimate public concern," and thus whether the "gross irresponsibility" standard applies. However, the Court need not reach the issue because even if gross irresponsibility is the requisite level of fault, the Plaintiff satisfies that standard. The Amended Verified Complaint sufficiently alleges that the Hechinger Defendants "knowingly" and intentionally made false statements. On a motion to dismiss, the Court accepts this assertion as true, considering the additional facts pleaded by Plaintiff and the glaring fact that the accusation was not even plausible. See, *Pollnow v. Poughkeepsie Newspapers, Inc.*, 107 A.D.2d 10, 18, 486 N.Y.S.2d 11 (2d Dep't 1985) (plaintiff satisfied the "minimum requirements for stating a cause of action" by alleging that "defendant acted negligently, maliciously and with a reckless disregard for the truth"), aff'd, 67 N.Y.2d 778, 492 N.E.2d 125, 501 N.Y.S.2d 17 (1986).

Intentional lies not only satisfy, but surpass, the culpability of "gross irresponsibility," which signifies "something more than . . . negligence." See, *Mott v. Anheuser-Busch, Inc.*, 910 F. Supp. 868, 875 (N.D.N.Y. 1994), aff'd, 112 F.3d 504 (2d Cir. 1996); see also, *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) (regarding knowing falsities as a level of fault "[b]eyond gross irresponsibility"); *Lopez v. Univision Commc'ns, Inc.*, 45 F. Supp. 2d 348, 362 (S.D.N.Y. 1999) (observing that at least one court has equated gross irresponsibility with "gross negligence"). Accordingly, the Amended Verified Complaint sufficiently alleges that the Hechinger Defendants acted with the requisite level of fault and it cannot be dismissed on this basis.

23

**The Statements Describing the Plaintiff and Her Lesson are NOT Opinions**

The privilege protecting the expression of an opinion is rooted in the preference that ideas be fully aired. See, *Davis v. Boeheim*, 24 NY3d 262 at 269 (2014), citing, *Steinhilber v. Alphonse*, 68 NY2d 283 at 289 (1986), and *Gertz v. Robert Welch, Inc.*, supra, 418 US 323, 339-340 (1974). Nonetheless, privileged statements of opinion are either accompanied by the facts on which they are based, or do not imply that they are based on undisclosed facts. See, *Gross v. New York Times Co.*, 82 NY2d 146 at 53-154 (1993). "When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" See, *Egiazaryan v. Zalmayev*, 880 F Supp 2d 494, 503 [SD NY 2012], quoting, *Steinhilber*, supra, 68 NY2d at 289, "because a reasonable listener or reader would infer that 'the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]'" See, *Gross*, supra, 82 NY2d at 153-154, quoting, *Steinhilber*, 68 NY2d at 290, and "if the predicate facts are disclosed, but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity," the statement may be actionable as a "defamatory opinion" See, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, F Supp 3d , 2016 WL 3773394, [SD NY 2016], citing *Silsdorf v. Levine*, 59 NY2d 8, 15-16 [1983], cert denied 464 US 831; see also, *Parks v. Steinbrenner*, 131 AD2d 60, 62-63 [1st Dept. 1987].

An asserted fact may be distinguished from a nonactionable opinion if the statement: (1) has a precise, readily understood meaning, that is (2) capable of being proven true or false, and (3) where the full context in which it is asserted or its broader social context and surrounding circumstances indicate to readers or listeners that it is likely fact, not opinion. See, *Davis*, supra, 24 NY3d at 271, citing, Mann v. Abel, 10 NY3d 271 at 276 (2008), and *Brian v Richardson*, 87 NY2d 46, 51 [1995]; *Gross*, supra, 82 NY2d at 153; *Steinhilber*, supra, 68 NY2d at 292. "Where readers would understand a defamatory meaning, liability cannot be avoided merely because the publication is alleged to be cast

in the form of an opinion, belief, insinuation or even question. A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community." See, *Christopher v. American News Co*., 171 F.2d 275 (7th Cir. 1948).

"[T]he following factors should be considered in distinguishing fact from opinion: (1) whether the language used has a precise meaning or whether it is indefinite or ambiguous, (2) whether the statement is capable of objectively being true or false, and (3) the full context of the entire communication or the broader social context surrounding the communication. Moreover, the Court of Appeals makes a distinction between a statement of opinion that implies a factual basis that is not disclosed to the reader and an opinion that is accompanied by a recitation of facts on which it is based. The former is actionable, the latter is not." See, *Penn Warranty Corp. v. DiGiovanni*, 2005 NY Slip Op 25449 10 Misc3d 998 (2005). The Hechinger Defendants never used words such as "alleged" or "accused of" when reporting; they lead the readers to believe the recitation of the facts presented to be accurate.

It bears mentioning that Under New York law, some statements are considered defamation (libel) *per se* if they "(1) charge plaintiff with a serious crime; (2) tend to injure plaintiff in its business, trade or profession; (3) [communicate that] plaintiff has some loathsome disease; or (4) impute unchastity. See, *Doe v. Doe*, No. 16 Civ. 0332 (NSR), 2017 WL 3025885, (SDNY July 14, 2017) (a statement is *per se* defamatory when it tends to injure another in his or her trade, business, or profession) (citing *Liberman v. Gelstein*, 80 NY2d 429, 435 (1992)). Such statements are presumed to cause injury, so a separate showing of harm is not necessary. Here, the facts as presented by the Defendants accuse the Plaintiff of having committed a serious crime; walking on the backs of students is akin to child abuse and endangerment and the false labeling of the Plaintiff as a racist oppressor, who committed such an atrocity has irreparably injured the Plaintiff in her profession as a school teacher and otherwise. Plaintiff was never accused or investigated on an allegation of a racist act by the City Department of Education. She was investigated on an allegation of corporal punishment.

In this regard, any quotes from the OSI Report, which was finalized in July, 5 months after the Defendants published the article, have related to the corporal punishment allegation, **NOT** what had been mendaciously reported - that she "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" This is an indication that the Hechinger Defendants inappropriately grouped Plaintiff with other educators who had been accused of racist acts. Plaintiff was <u>never</u> accused or investigated on an allegation of a racist act by the City Department of Education. She was investigated on an allegation of corporal punishment. Moreover, it is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable reader would have concluded that he or she was reading opinions, not facts about Plaintiff. Thus, the statements describing Plaintiff's lesson as "racist" are actionable.

The challenged statements are to be read in the context of the publication as a whole. <u>See</u>, *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986). <u>See</u>, **Exhibit D**. A statement is defamatory "if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of [him] in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." <u>See</u>, *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F.Supp.2d 279, 287 (SDNY 2006). Clearly, Plaintiff's has demonstrated the defamatory nature of Defendant's statements. These statements undoubtedly exposed Plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of her in the minds of right-thinking persons, and to deprive her of her friendly intercourse in society. This is evident in the demonstrations of hate, ridicule, harassment, and threats of violence which followed.

Contrary to *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), Defendants disclosed erroneous facts. There were no allegations from parents, students, or staff that Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Likewise, Plaintiff

contests that she ever admitted "having misbehaving students sit in the front of the room to demonstrate the conditions on slave ships, or that a parent reported that she 'pushed her knee' into *students'* (plural) backs and asked if students (plural) felt pain." <u>See</u>, Plaintiff's Exhibit B at paragraph 53. How can the Defendant argue that there was <u>nothing</u> in the statements, which disparage the Plaintiff's professional skills or competence or attributes wrongdoing to her? The entirety of the column was a <u>criticism of her skills</u> and <u>competence</u> and falsely accused her of the equivalent of child abuse and/or child endangerment, to wit:

- "*A teacher [Patricia Cummings] in a majority-minority school in the Bronx, NY instructed three black children in her seventh grade class to lie on the floor during a lesson on slavery.*" <u>See</u>, Defendant's Exhibit A, at page 1.

- "*This was not the first time that Patricia Cummings, who is white, 'taught' this module on the Middle Passage…*" <u>See</u>, Defendant's Exhibit A, at page 1.

- "*Cummings' slavery lesson wasn't only cruel…*" <u>See</u>, Defendant's Exhibit A, at page 2.

- "*Many compliant students who sit quietly accepting demeaning lessons like the ones administered by Cummings…*" <u>See</u>, Defendant's Exhibit A, at page 2.

- "*There are white teachers like Cummings who have not reckoned with what it means to oppress….*" <u>See</u>, Defendant's Exhibit A, at page 3.

- "*Cummings has since been reassigned away from children. The New York City education department should throw her out of the district, with assistance from the union.*" <u>See</u>, Defendant's Exhibit A, at page 3.

- "*While most teachers probably won't see themselves in either Black or Cummings…*" <u>See</u>, Defendant's Exhibit A, at page 6.

They are not merely observations; it is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable reader would have concluded that

27

he or she was reading opinions, not facts about the Plaintiff. To describe these comments as merely setting forth pedagogical preferences and teaching protocols is entirely furtive and disingenuous; as is claiming that they are "merely offensive or unpleasant." They clearly negatively reflect on Plaintiff's reputation and professional integrity as a school teacher. Unquestionably, these statements attribute odiously loathsome and despicably offensive characterizations of and about Plaintiff. See, *Chau v. Lewis*, 771 F.3d at 127 (2014). There is no need to render any interpretation of the challenged comments.

Defendants' reliance on *Gertz*, (418 U.S. 323, 471 F.2d 801 (1974)), in this instance is misplaced. The challenged statements were clearly <u>not</u> opinion, entitling the Hechinger Defendants to Constitutional protection. While it is argued that expressions of opinion receive absolute constitutional protection under Gertz, determining whether a given statement expresses fact or opinion may be difficult. The question must be answered on the basis of <u>what the average person hearing or reading the communication would take it to mean</u>. See, *Rinaldi v. Holt, Rinehart & Winston*, <u>supra</u>, at p 381; *Mr. Chow of N. Y. v Ste. Jour Azur S.A.*, 759 F.2d 219, 227-228). There is no definitive test or set of criteria. See, *Mr. Chow of N. Y. v. Ste. Jour Azur S.A.*, <u>supra</u>, at pp 225-226. The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion. See, Restatement [Second] of Torts § 566 comment c.

While the Supreme Court in *Gertz*, <u>supra</u>, did not focus on the distinction between fact and opinion, the court, in *Letter Carriers v. Austin*, (418 U.S. 264 (1974)), decided on the same day as *Gertz*, <u>supra</u>, provides some precedent. The court considered both the context of the entire communication and the type of "intemperate, abusive, or insulting language." (<u>Id</u>., at p 283). In *Letter Carriers*, <u>supra</u>, it concluded that no reader of the newsletter would have understood the union "to be charging the appellees with committing the criminal offense of treason." <u>Id</u>., at pp 285, 286; <u>see also</u>,

*Greenbelt Pub. Assn. v. Bresler*, 398 U.S. 6 (1970). The Courts have taken great pains to avoid any attempt to reduce the problem of distinguishing fact from opinion to a rigid set of criteria which can be universally applied. The infinite variety of meanings conveyed by words; depending on the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used, rules out a formulistic approach. A court must have the flexibility to consider the relevant factors and to accord each the degree of importance which the specific circumstances warrant.

Nonetheless, Judge Starr's plurality opinion in *Ollman v. Evans*, 750 F.2d 970 (1984), sets out four factors which should generally be considered in differentiating between fact and opinion. The four factors are: (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might "signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." See, *Ollman v. Evans*, 750 F.2d 970 (1984) at p 983.

Consideration of the circumstances and of the broader social context (i.e., the factual background leading to segment) confirms the conclusion that the broadcast would be taken literally by the ordinary person. An analysis of the statements made about the Plaintiff in the light of the third and fourth *Ollman* factors (the full verbal context of the statement and its broader social context), compels the conclusion that the statement would not be taken as pure opinion. Further, to be sure, in another context, the statements made by the Defendant will be viewed as a factual assertion, if considered under the first and second *Ollman* factors: whether the statements are sufficiently specific to convey "a precise core of meaning for which a consensus of understanding exists," (see, *Ollman v. Evans*, supra, at p 979), and whether it is "capable of being objectively characterized as true or false." See,

29

*Ollman v. Evans*, <u>supra</u>, at p 979. Here, the inescapable conclusion from the verbal context of the entire message and all of the circumstances under which it was delivered is that the statement would be understood by the ordinary listener for what it is: a defamatory factual assertion, wherein the Hechinger Defendants were falsely asserting as "fact" that Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Thus, there is no protection can be afforded.

**Characterization of Someone as a "Racist" or an "Oppressor" is NOT Protected Opinion**

Many courts in other jurisdictions that have faced the issue of defamation claims based on accusations of bigotry or racism have held the statements to be nonactionable statements of opinion. <u>See</u>, <u>e.g.</u>, *Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) (holding that neither general statements charging a person with being racist, unfair, unjust, nor references to general discriminatory treatment, <u>without more</u>, constitute provably false assertions of fact); however, claiming that a person made a particular statement would be a factual assertion, and might well be libelous if false and defamatory (i.e., if the statement, if made, would reflect badly on the person). In this instance, there were not mere references to general discriminatory treatment. Thus, in this instance, there was a "factual" assertion that that Plaintiff "*singled out black students in her class and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" This false and defamatory statement reflected badly on Plaintiff and in conjunction with the implication of those accusations of bigotry and racism, would remove any purported protection and render those statements actionable.

**The Nature of Term "Racist" Does Not Render it Protected Opinion**

The Hechinger Defendants attempt to support their position on their prior motion, referenced herein by siting various cases where the term "racist" or the like was used; however, these are clearly distinguishable from this case, as it should be noted that some of these cases involved public figures. The Hechinger Defendants disingenuously argue that speech is not actionable so long as it is a

protected opinion. Remarkably, the statements falsely permitted Dr. Perry's readers to believe that Plaintiff was being accused of "*singling out black students and making them act like slaves*;" *telling them to "lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like*." Moreover, in distinguishing *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), it is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable listener would have concluded that he or she was hearing opinions, not facts about Plaintiff. Thus, the statements describing Plaintiff's lesson and the Plaintiff herself as "racist" are actionable.

**Descriptions of the Plaintiff as a "Racist" and "Oppressor" are Actionable**

The Hechinger Defendants disingenuously allege that such statements could not be understood as assertions of objective fact. Further, as the Defendants argue, in order to constitute actionable defamation, a challenged statement must be provably false. <u>See</u>, *Buckley v. Littell*, 539 F2d 882, 894 (2d Cir. 1976). Arguing that the descriptions of the Plaintiff as a "racist" and an "oppressor" cannot be proven false is misguided. In this instance, the very alleged incident that prompted these offensive descriptions was <u>false</u>. **It never happened**. The Plaintiff **<u>NEVER</u>** *singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*." Therefore, these descriptions of Plaintiff are similarly false. The cases cited by the Hechinger Defendants are distinguishable from the instant matter; none of the cases demonstrate a scenario, where those terms were unequivocally proven to be related to a false event. Thus, again, in this instance, the assertion that that the Plaintiff "*singled out black students in her class and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*" was false and not the subject of the OSI investigation, for which she was otherwise exonerated. <u>See</u>, Plaintiff's Exhibit A.

While Courts are understandably reluctant to reopen a ruling once made, (<u>see</u>, *Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005)), the Court's possess a discretionary

power, which does not preclude a court from reconsidering its prior opinion in light of the need to correct clear error or prevent manifest injustice. See, *Scottish Air Inter. v. British Caledonian Group, PLC*, 152 F.R.D. 18, 24-25 (S.D.N.Y. 1993) (citation omitted).

It is a practice of courts generally not to reconsider that which has already been decided, but there is **not** a legally binding limitation on the court's authority to reconsider such matters. Notably, a court in this Circuit has found that the law of the case doctrine did not control where an amended complaint, contained "more detailed claims" than the original complaint. See, *Bellezza v. Holland*, No. 09-CV-8434 (RWS), 2011 U.S. Dist. LEXIS 76030, at *6 (S.D.N.Y. July 11, 2011).

Based on the foregoing, Plaintiff has sufficiently demonstrated that the Amended Verified Complaint addressed the infirmities identified in the Court's prior Decision and Order, and there is a sufficient basis to deny the Hechinger Defendants' request to dismiss the Amended Verified Complaint.

## POINT II

### A REASONABLE JURY COULD FIND THAT THE PLAINTIFF WAS PORTRAYED IN A "FALSE LIGHT"

There has been serious concern that, by sidestepping the safeguards which restrain the reach of traditional public defamation litigation, a "false light" approach could compromise the Constitutional guarantee of Freedom of the Press. See, Prosser, Torts [4th ed], p 813; Restatement, Torts 2d, § 652E, Comment d, particularly p 399; Wade, Defamation and the Right of Privacy, 15 Vand L Rev 1093, 1121). Responsively, the Restatement, which in 1933 suggested that to impose liability under the false light rubric a publication need but be "offensive to persons of ordinary sensibilities" (see, Restatement, Torts, § 867, Comment d), by 1976 had raised the threshold to a "highly" offensive level (see, Restatement, Torts 2d, § 652E, Comment c). Even assuming, that such an action is not cognizable in this State, by all means, this case measures up to this kind of criterion.

While New York does not have a common law tort protecting privacy against publicity that unreasonably places a person in a "false light," (see, *Howell v. New York Post*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 354, 612 N.E.2d 699 (N.Y. 1993), New York Courts construe the language of N.Y. Civ. Rights Law § 51 broadly enough to encompass false light claims. Claims under N.Y. Civ. Rights Law § 51 based on a fictitious or falsified report, which would otherwise be privileged, are actionable, with proof of knowledge of falsity or reckless disregard of the truth. Where falsity is the gravamen of a §51 claim, U.S. Const. Amend. guarantees permit imposition of liability where actual malice is shown. In examining the false light tort, it is notable to consider section 652E of the Restatement (2d) of Torts that provides:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
>   (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
>   (a) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

Hence, if a false light claim under the Restatement rubric is recognized in New York, Plaintiff has more than stated a claim under it.

In *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 248, 42 L. Ed. 2d 419, 95 S. Ct. 465 (1974), the Court addressed a false light claim in which it was conceded that an offending newspaper article contained a number of false statements and inaccuracies. It stated that the subject article contained "'calculated falsehoods,' and the jury was plainly justified in finding that [a news reporter] had portrayed the Cantrells in a false light through **knowing or reckless untruth**." Id. at 253 (emphasis added). *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), raised without deciding, whether in subsequent cases an actual malice or a negligence standard should be applied in a false light action commenced by a private individual against a media defendant. As in

*Cantrell*, supra, the jury here found that the more stringent actual malice standard had been satisfied. As demonstrated herein, there is evidence on which a reasonable jury could find that the broadcast contained knowingly false and reckless statements, portraying the Plaintiff in a false light.

Regardless of the particular fault standard to be applied, it is clear that when publishing or broadcasting a newsworthy matter of public interest, a media defendant may be held liable for the tort of false light invasion of a person's privacy with proof of falsity and some level of fault. Cf. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 54 U.S.L.W. 4373, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986). Accordingly, Plaintiff's false light claim should be considered by this Court under these extreme circumstances.

## POINT III

**THE COURT DID NOT PROPERLY DIMISS THE PLAINTIFF'S NEGLIGENCE AND EMOTIONAL DISTRESS CLAIMS, HOWEVER THESE CLAIMS WERE NOT INCLUDED IN THE PLAINTIFF'S AMENDED VERIFIED COMPLAINT AGAINST THESE DEFENDANTS**

Plaintiff maintains that the Court did not properly dismiss Plaintiff's claims for negligence and emotional distress against the Hechinger Defendants; nonetheless, Plaintiff did not re-plead those causes of action in its Amended Verified Complaint. Despite this fact, the Hechinger Defendants cite to *Anyanwu v. Columbia Broadcasting Sys.*, 887 F. Supp. 690, 1995 U.S. Dist. LEXIS 8156, 24 Media L. Rep. 1021, wherein defendants journalists and broadcaster filed a motion to dismiss plaintiff businessperson's complaint sounding in defamation for failure to state a claim for which relief could be granted under Fed. R. Civ. P. 12(b) (6). The plaintiff businessperson contended that defendants journalists and broadcaster defamed him and others similarly situated when they reported **to the effect that all businesspeople of plaintiff's nationality were fraudulent and deceitful**. Holding that the complaint failed because it did not allege that the statements were "of and concerning" plaintiff or any individual in his class, the court granted the motion. The court held that in an action for defamation, plaintiff must advance colorable claims of having been identified and described by defamatory

34

comment. The court held that it must consider whether those who know the plaintiff, upon reading the statements, would know that he was the target of the allegedly libelous statement. The court also dismissed plaintiff's other tort claims that were based on the same speech, to prevent an end run around the stricter burden of proof of libel. This case is distinguishable from the facts herein.

**The Plaintiff's Claims for Negligence and Emotional Distress are NOT Duplicative**

With respect to the argument that a separate tort for infliction of emotional distress could not be sustained where the underlying conduct overlapped with other torts, it has been noted in certain dicta from the New York Court of Appeals that "questioning whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability." See, *Fischer* v. *Maloney*, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978). It has been concluded that, even if New York law does not permit entirely overlapping torts, the negligence and intentional infliction of emotional distress claims in this case contained elements that did not entirely overlap the claims of defamation. In particular it is noted that, if a jury believes that the Hechinger Defendants acted with reckless intent a jury could believe that there were additional elements of negligence and intentional infliction of emotional distress which do not necessarily inhere in a charge of defamation.

To falsely accuse the Plaintiff of "*singling out black students and making them act like slaves;*" telling them to "*lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like,*" without checking the facts and continuing to characterize her under that narrative, even after confronted with the falsity, subjecting her to public admonishment, ridicule, and harassment is extreme and outrageous. The Hechinger Defendants did not merely "publish articles about Plaintiff's conduct based on firsthand account of students, reports from the Department of Education, and Plaintiff's own judicial findings." They furthered a false narrative, purporting it to be undisputed fact.

The Defendant argues that it is nearly impossible in New York for a Plaintiff to state a viable claim for intentional infliction of emotional distress, predicating liability on the basis of extreme and outrageous conduct. Nonetheless, under New York law, the four elements required to state a claim for intentional infliction of emotional distress are: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress. See, *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). In this case the Plaintiff has established the elements necessary to sustain a claim of intentional infliction of emotional distress, specifically the outrageous conduct and the Defendant's intent to cause emotion distress. Outrageous conduct is defined to be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See, *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) [**33]  (quoting Restatement (Second) of Torts § 46, comment d (1979)); see also, *Piesco v. City of New York Dep't of Personnel*, 753 F. Supp. 468, 479 (S.D.N.Y. 1990), aff'd in part, rev'd in part and remanded on other grounds, 933 F.2d 1149 (2d Cir.), cert. denied, U.S., 112 S. Ct. 331 (1991).

Here, the actions of the Defendants in promoting a false account of facts and destroying the Plaintiff's reputation, and inciting others to believe that she would commit such a heinous act, which ultimately affected her reputation and employment, does constitute, as a matter of New York law, conduct which may be deemed outrageous or beyond the possible bounds decency. Accordingly, the Plaintiff has adequately alleged outrageous conduct necessary to sustain this claim.

**The Complaint Sufficiently States a Claim for Negligence, Negligent Infliction of Emotional Distress, and Intentional Infliction of Emotional Distress**

To establish a cause of action in negligence, a plaintiff must demonstrate the existence of a duty, a breach of that duty, causation, and damages. See, *Chylinski v. Wal-Mart Stores, Inc.*, 150 F.3d 214, 218 (2d Cir. 1998).  Based on what has been demonstrated in this matter, the Hechinger

Defendants' argument that "defamation claims (that involve matters of public concern) cannot be sustained upon a showing of negligence" must fail. The Plaintiff has more than established not only that the statements were false statements of fact, but that the Defendants acted in a "grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." <u>See</u>, *Chapadeau v. Utica Observer-Dispatch*, 38 NY2d 196, 199 (1975); <u>see</u> <u>also</u>, *Bloom v. Fox News of LA*, 528 F. Supp. 2d 69, (EDNY 2007).

Further, the Plaintiff alleges that Defendants inflicted emotional distress both intentionally and negligently. <u>See</u>, Plaintiff's Exhibit C. To state a claim for negligent infliction of emotional distress ("NIED") in New York, a plaintiff must allege: "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress." <u>See</u>, *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 297-98 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). Intentional infliction of emotional distress ("IIED") claims require a plaintiff to allege the same elements as an NIED claim together with the additional requirement that the defendant must have an "intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress." <u>See</u>, *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (citation and internal quotation marks omitted). The basis for Plaintiff's NIED claim is clear from the face of the Complaint. To the extent her NIED claim is based on the same conduct as her IIED claim, both claims can be sustained. <u>Id</u>.

The Fourth Department has held that a cause of action for negligent infliction of emotional distress must be "premised on conduct that unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for his or her physical safety." <u>See</u>, *Passucci v. Home Depot, Inc.*, 67 AD3d 1470, 1471 [4th Dept. 2009]. In this regard, the Plaintiff's complaint contains allegations that the Hechinger Defendants engaged in conduct that unreasonably endangered the Plaintiff's physical safety

37

or caused her to fear for her safety. <u>See</u>, Plaintiff's Exhibit C, at pages 15 and 45. Second, the Plaintiff has plead sufficient facts to allege that the Defendant intended to cause her severe emotional distress or such disregard which has the probability of causing severe emotional distress. The Defendant, Dr. Perry was selfishly pursuing his own interests in inciting his readers at the Plaintiff's expense without considering the plausibility of the statements being made or verifying the "facts."

To support an emotional distress claim, the alleged conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." <u>See</u>, *Conboy*, <u>supra</u>, 241 F.3d at 258 (citation and internal quotation marks omitted). Defendants failed to <u>ever</u> demonstrate that their articles were true, and it is a well-known fact that truth and only truth is an absolute defense in any defamation claim. Further, in *Deluca v. New York News*, 109 Misc. 2d 341 (1981), it is stated that journalists, have the right to be wrong, so long as they are not guilty of not checking their facts at all, making gross distortions of the record, or jumping to totally unwarranted conclusions. The Hechinger Defendants never interviewed or contacted any school officials, nor did they verify what Defendants Ben Chapman and the *New York Daily News* reported/published. Had they done this, they would have known the actual allegation made against the Plaintiff. Further, plausibility was completely ignored, to wit: if the Plaintiff had in fact walked on student's backs, would they not have sustained physical injuries? Would she not have been arrested or charged with child abuse? It should have been obvious that this allegation was preposterous; however this gross distortion helped them sell papers and assisted the Department of Education in securing the funding that it so desperately desired.

## CONCLUSION

Based on the foregoing, it has been demonstrated that the Hechinger Defendants have failed to meet the standards in this Circuit that are necessary on a Motion to Dismiss under Rule 12 (b) (6). Accordingly, Defendant's Motion to Dismiss should be denied in all respects, and Plaintiff should have such other and further relief that this Court may deem just and proper.

Dated: Garden City, New York
August 20, 2020

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq. (TL 4471)
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*

39