UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
PATRICIA CUMMINGS,

                          Plaintiff,

                                             Docket No. 19-cv-07723 (CM)

                  -against-

THE CITY OF NEW YORK;
NEW YORK CITY DEPARTMENT OF EDUCATION;
GIULIA COX; COURTNEY WARE; BEN CHAPMAN;
NEW YORK DAILY NEWS; DR. ANDRE PERRY;
THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA;
LENARD LARRY McKELVEY a/k/a
CHARLAMAGNE THA GOD;
WWPR-FM (105.1 MHZ); iHEARTMEDIA;
CLEAR CHANNEL COMMUNICATIONS, INC.;
NEW YORK STATE SENATOR, KEVIN S. PARKER;
COALITION OF EDUCATIONAL JUSTICE;
ANGEL MARTINEZ2; NATASHA CAPERS;
PHILIP SCOTT; ADVISE MEDIA NETWORK
n/k/a AFRICAN DIASPORA NEWS CHANNEL, and
"JOHN DOE AND JANE DOE # 1-100" said names
being fictitious, it being the intent of Plaintiff to designate
any and all individuals, officers, members, agents, servants,
and/or employees of the aforementioned agencies owing a
duty of care to Plaintiff, individually and jointly and
severally,

                          Defendants.
------------------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' NEW YORK DAILY NEWS (THE "DAILY NEWS"), AND BEN CHAPMAN ("DEFENDANT CHAPMAN") MOTION TO DISMISS THE AMENDED COMPLAINT

                          THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
                          By: Thomas F. Liotti, Esq.
                          Attorneys for the Plaintiff
                          *PATRICIA CUMMINGS*
                          600 Old Country Road, Suite 530
                          Garden City, New York 11530
                          Phone: (516) 794-4700
                          Fax: (516) 794-2816
                          E-mail: Tom@TLiotti.com

Plaintiff, Patricia Cummings, (hereinafter "Plaintiff" or "Ms. Cummings"), a private individual, respectfully submits this Memorandum of Law in Opposition to New York Daily News (the "Daily News"), and Ben Chapman ("Defendant Chapman") (together with the Daily News, the "Daily News Defendants") Motion to Dismiss the Plaintiff's Amended Verified Complaint pursuant to Federal Rule of Civil Procedure 12 (b)(6).

## PRELIMINARY STATEMENT

The Daily News Defendants disingenuously argue that Plaintiff's Amended Complaint is "laden with irrelevant new information," but in fact, their arguments are comprised of imprudent and factually incorrect statements. What the News Defendants have disingenuously described as a "misguided history lesson" was, in actuality, an example of a multi-sensory[1] teacher demonstrating "spatial recognition" to her students. This part of her lesson was described by Plaintiff as a "teachable moment," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes; it was not, in any way, a reenactment. The News Defendants falsely state that "multiple students in the classroom reported that she *physically pushed* the 'student volunteers' closer together, asking them "*how it felt*" to be a slave. This fabricated account is contradicted by the reported findings of the of the New York City Department of Education's Office of Special Investigations (also referred to as OSI); to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student' I never observed Ms. Cummings' knee make contact with 'Student A'*'"

---

[1] Multi-sensory teaching is a didactic system that seeks to develop awareness of self in time and space in order to raise cognition and understanding of the world as is experienced. It takes into account that different children learn in different ways; conveys information through things like touch and movement-called tactile and kinesthetic elements, as well as sight and hearing. See, White, Helen and Christina Evans, Learning to Listen to Learn: Using Multi-Sensory Teaching for Effective Listening (2005).

"'*Student J'* denied that Ms. Cummings made any physical contact with the students to make contact with them.*" <u>See</u>, Redacted Copy of Office of Special Investigations Investigative Report (OSI) dated July 24, 2018, included as News Defendants' Exhibit D. Moreover, "Students B, D, E, F, I, J and K" noted that the participating student volunteers did not appear to be in any distress. <u>See</u>, News Defendants' Exhibit D. Most remarkably, "Student J" admitted that "'*Student A '*[2] *was lying and was attempting to get Ms. Cummings fired or in trouble because 'Student A' did not like Ms. Cummings.*" <u>See</u>, News Defendants' Exhibit D, at page 5. Moreover, Plaintiff controverts this fallacious allegation in her rebuttal correspondence addressed to Community Superintendent Maribel Torres-Hulla dated October 5, 2018, annexed hereto as **Exhibit A** at page 8.

The News Defendants further disingenuously state that "[A] student and parent, upset by the Plaintiff's alleged actions, <u>immediately</u> filed complaints with the school's principal." In fact, "Student A" is alleged to have complained on or about January 11, 2018, and as noted in the OSI Report, "Student A's" mother is noted to have complained 6 days later (9 days after the lesson). Further, it is evident that a complaint was not immediately filed according to the OSI Report. <u>See</u>, Daily News Defendants' Exhibit D. Furthermore, Plaintiff was not removed for investigation by the New York City Department of Education's Office of Special Investigations until February 2, 2018; <u>the day after</u> their "exclusive," fallacious narrative was published online at 9:00 PM, and the Daily News exclusive front page story was published. A copy of the Plaintiff's Amended Verified Complaint dated May 15, 2019, annexed hereto as **Exhibit B**.

It is erroneously argued that "*the Daily News, in a series of articles* authored by Defendant Chapman, and others, <u>accurately</u> reported on the allegations as the situation developed." **This is**

---

[2] "Student A" was one of four students who voluntarily participated in the classroom demonstration for spatial recognition. It was erroneously alleged that Ms. Cummings pushed "Student A's" back with her knee and asked if it hurt or caused her discomfort.

2

**completely false**, as the original reports were grossly incorrect and completely distinct from the allegation that was actually being investigated by OSI. The original allegation involved a false report that the Plaintiff "pushed Student A's back with her knee and asked if it hurt." See O.S.I. Report at page 1; it was NEVER the complaint that she "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like,*" as falsely and repeatedly reported by the Daily News Defendants. See, Plaintiff's Exhibit B at pages 24-25. Notably, the Office of Special Investigations Investigative Report (OSI Report) dated July 24, 2018, indicates that "*[T]he written statements made by 'Students B, C, D, E, H, I, J, Q, R, S, T, U, and V' fail to corroborate that Ms. Cummings pressed her knee into 'Student A's' back or any students' back*." See, News Defendants' Exhibit D. "Therefore, the allegation that Ms. Cummings used corporal punishment against "Student A" by pushing her knee into her ["Student A's"] back during a classroom demonstration was never corroborated and is **unsubstantiated**." See, Daily News Defendants' Exhibit D. Parenthetically, the finding that Ms. Cummings acted with poor judgment in conducting a lesson that inadequately incorporated the New York City DOE social studies curriculum and guidance for this topic is a violation of her due process, as this is an improper finding, as it is not the function of the Office of Special Investigations to examine and evaluate teacher pedagogy (method or practice of teaching). It is well established, not only with the Department of Education's policies but with New York State Educational Law, that to evaluate a teacher's pedagogy, their lesson must be observed. No one determining this finding of "poor judgement" observed Plaintiff's lesson.

The News Defendants erroneously argue that the Plaintiff's claims against them fail for three (3) reasons; yet each of the reasons cited are without merit. The claim that the *Daily News* articles are fair and true reports of judicial proceedings, is completely false. There were NO

proceedings taking place at that time which alleged that the Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*," as was asserted and reported as "fact" by the News Defendants each and every time they reported on this matter. The Plaintiff was being investigated for a completely different allegation. Thus, New York Civil Rights Law § 74 affords no privilege to protect the Daily News Defendants from liability.

Likewise, the Daily News Defendants' claim that references to the Plaintiff's actions as "racist" in the *Daily News* articles are non-actionable opinions based on disclosed facts is <u>untrue</u>. There were no substantiated, accurate facts reported by the News Defendants. Moreover, the furtive attempt to characterize the reference to the Plaintiff's actions as <u>opinion</u> by the News Defendants is derisory. Credible journalists must be able to distinguish between facts and opinions. A journalist needs to know how reliable statements are <u>before reporting them as facts</u>. <u>See</u>, Henshall, Peter and David Ingram, <u>The News Manual: A Professional Resource for Journalists and the Media</u> (1991). In order to formulate his purported "opinion," that the Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*," Defendant, Ben Chapman trespassed onto school property and solicited information from minor students without any adult permission or consent. No other investigation of the "facts" occurred, as evidenced by the fact that the reported accounts by the News Defendants differed dramatically from <u>the actual allegation</u> that was made by just one student and <u>ultimately unsubstantiated by OSI</u>. What was being erroneously reported by the News Defendants amounted to child abuse and/or endangerment, yet there was no indication of a substantiated investigation by the Defendant, Ben Chapman. Furthermore, the Defendant, Ben Chapman is an award-winning reporter who at the time of this article's publication

4

covered education for the New York Daily News. A graduate of Columbia University's Graduate School of Journalism whose work has also been published in the Washington Post and the New York Times, the Defendant, Chapman has written more than 2,200 articles about New York City schools for the Daily News since joining the paper in 2009. He does not write an opinion column; he is regarded as an investigative reporter writing a factual column[3]. Therefore, the News Defendants cannot duplicitously cloak their otherwise actionable behavior as "opinion" while publically and repeatedly describing and referring to the Plaintiff as a "racist" while promoting a false fact pattern and expect to escape any liability.

The Daily News Defendants failed to exhibit any iota of journalistic integrity when they published false assertions of fact and entirely false articles about the Plaintiff. Notably, even when the Daily News Defendants obtained the conclusion page of the Office of Special Investigations Investigative Report on October 3, 2018 from our Law Office, (see, Daily News Defendant's Exhibit D), which confirmed that every item previously reported had been blatantly false, the News Defendants never issued a retraction or made any attempt to correct the record. In fact, they became more resolute in their determination to defame the Plaintiff. See, Plaintiff's Exhibit C, Ben Chapman and Stephen Rex Brown, Daily News, EXCLUSIVE: "City Fires Bronx 'Slave' Teacher," October 20, 2018, at page 25.

---

[3] It should be noted that it was reported recently that after more than eight (8) years covering the New York City schools for the New York Daily News, in June, 2019, (curiously, one month after the filing of the Verified Complaint in this action), Ben Chapman left his employment with the New York Daily News, and is now writing about crime for the Wall Street Journal. See, Russo, Alexander, Ben Chapman Reflects on Eight Years Covering NYC Schools, New York School Talk, July 10, 2019.

**The News Defendants' Statements Concerning Plaintiff's "Teachable Moment" on Slavery and the Department of Education's Subsequent Investigation Contain Numerous Errors**

In an attempt to diminish the Plaintiff's claims, the Daily News Defendants erroneously state that by showing the clip from the movie *Freedom*, the Plaintiff deviated from the class's preapproved curriculum and failed to seek permission. Nonetheless, the Plaintiff maintains that she did not deviate from the curriculum. See, Plaintiff's Exhibit A, at page 3-4. The Plaintiff was not looking to replicate the conditions on the boats along the Middle Passage; she sought to replicate the space, or lack thereof, as a demonstration of spatial recognition. Moreover, the Plaintiff did not specifically select black students as volunteers for the demonstration. It was acknowledged that she sought random volunteers from the class to participate in the demonstration; no student was forced to participate. Notably, the class was comprised entirely of minority students. Again, the claim that multiple students reported that Plaintiff used her feet or hands to push these students even closer together is false. As stated previously herein, "Student B" specifically denied that Ms. Cummings used her feet or her knees to push students closer together. The Daily News Defendants' fabricated account is clearly contradicted by the reported findings of the Office of Special Investigations; to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student I' never observed Ms. Cummings' knee make contact with Student 'A*;'" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them*." See, News Defendants' Exhibit D; see also, Plaintiff's Exhibit A at page 8.

The Daily News Defendants present an inaccurate account of the complaint filed with the principal, (Defendant Giulia Cox), by the student and her parent. Believing that these actions may constitute corporal punishment, for any of that account to be plausible, Principal Cox would have had to report the alleged incident after the "original" students' statements were taken by Defendant

and Assistant Principal Courtney Ware on January 11, 2018, prior to the Plaintiff's notice of a disciplinary meeting which she received on January 16,; she (Principal Cox) had not. The Plaintiff was NEVER removed to a different school; she was reassigned to an administration building as of February 2, 2018. The OSI report did NOT contain "various eyewitness accounts confirming that Plaintiff had placed her feet or knees on the students." See, News Defendant's Exhibit C; see also, Plaintiff's Exhibit A at page 8. The one student's complaint was not corroborated. While it was reported that the Department of Education "does not ever include or encourage reenactments of historical events where students take on roles of victimized people," no such policy is known to exist. See, Plaintiff's Exhibit A at pages 7-8. Nonsensically, OSI, in its report, referred the matter back to Principal Cox to "take appropriate disciplinary action." See, News Defendants' Exhibit D. Yet, the Plaintiff had already been disciplined by Principal Giulia Cox when she was removed from her classroom in January, 2018. Furthermore, the report recommended training, not termination; however, the events that followed made it very clear that there was no intention for the Plaintiff to return to the school and teach. Though she was assured that she would be returning following the requisite filing of the disciplinary letter, the school apparently created a false schedule for the Plaintiff in order to conceal their true and premeditated intention to terminate her from her position. If the scheduled given to Plaintiff, which was provided by Defendant Giulia Cox, was in fact her teaching schedule/assignment for the 2018-2019 school year, then Plaintiff would have been the Teacher of Record for those classes listed on her schedule/assignment and when she was inexplicably Reassigned for a second time on September 4, 2018, there would had to have been a substitute teacher covering her schedule/assignment up until and including the day of her termination, October 18, 2018; there was NEVER a substitute assigned to her schedule/assignment from September 4, 2018-October 18, 2018.

**The News Defendants' Statements Concerning Their Reporting of the Department of Education's Investigation Are Untrue**

The Daily News Defendants' statement that "in its first in a series of articles written by the Defendant, Ben Chapman and others, they reported on OSI's investigation of the Plaintiff's conduct" is FALSE. OSI did not get involved until the Department of Education learned on February 1, 2018 that the *Daily News* by Ben Chapman were publishing a story about the Plaintiff. There was not an investigation being conducted by OSI when the Defendant, Ben Chapman trespassed on onto school property seeking a salacious story. The Daily News Defendants attempt to disingenuously argue herein that "students and a staff member at the school accused Plaintiff of having her history students "*lie on the floor*" and then "*stepped on their backs to show them what slavery feels like.*" None of these accusations were verified by Defendants, Ben Chapman and *Daily News*. The article also erroneously quoted another student who discussed Plaintiff "*measuring the length and width to show how little space slaved had in the ship*;" yet, that never happened in Plaintiff's class 408. Curiously, the Daily News Defendants argue that the article included a quote from a Department of Education spokesperson, Tonya Holness stating, *"[W]hile the investigation has not been completed, these are deeply disturbing allegations, and the alleged behavior has no place in our schools or society.*" This comment obviously was related to the false allegations perpetuated by the Daily News Defendants, (that the Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*"), not the actual allegation that was ultimately unsubstantiated by OSI (*a false report that the Plaintiff "pushed Student A's back with her knee and asked if it hurt."* See O.S.I. Report page 1.

The Daily News Defendants attempt to justify their defamatory behavior as legitimate investigation coverage. In this motion, they only discuss a hand-picked selection of articles, while

8

clearly ignoring the other articles published between February and July, 2018, which affirmatively stated that Plaintiff "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*." The News Defendants admit publishing an article on July 9, 2018, entitled, "*Bronx educators accused of racism still under investigation, still on payroll*," which was blatantly <u>false</u>, as <u>the Plaintiff was never accused of racism</u>, she was accused of corporal punishment. <u>See</u>, Plaintiff's Exhibit B, at page 25; <u>see also</u>, News Defendants' Exhibit D. These facts make it clear that the Department of Education utilized the Daily News Defendants' unscrupulous actions to their advantage by posturing for $23 million dollars in funding ear-marked for cultural competency and anti-bias training, bolstered by numerous radical civil rights activists provoked by the News Defendants' false reporting.

The Daily News Defendants duplicitously and erroneously argue that the articles they published are privileged under Section 74 as "fair and accurate reports of official and judicial proceedings" and contain "opinion statements" <u>supported by facts</u> disclosed in the articles and admitted by Plaintiff. <u>This argument is without merit and must fail</u>. The Daily News Defendants cannot successfully demonstrate the truth of any of these asserts and further regurgitates the same nonsensical reasoning in arguing that the Amended Complaint contains only three new allegations, which, although not directly addressed by the Court's prior opinion, still wholly lack merit under the Court's reasoning and well-established law. Specifically:

(1)     That Plaintiff focuses on a sub-headline of a single print article that states that Plaintiff "walked" on students. But, just as the allegation that Plaintiff "stepped" on students was deemed to be privileged under Section 74, as a substantially accurate formulation of the allegations leading to the Department of Education ("DOE")'s investigation into Plaintiff, so too is this

statement. Further, this sub-headline must be read in context with the rest of the article, which accurately reports on the allegations leading to the investigation as well as the results of the investigation.

The statement that Plaintiff "walked" on students cannot be deemed to be privileged under Section 74, as it was **NOT** a substantially accurate formulation of the allegations leading to the DOE investigation of Plaintiff. It was entirely **FALSE**. Plaintiff was **NEVER** the subject of an investigation alleging that she "walked" on students. Further, there was no way that the article could accurately report on the allegations leading to the investigation, as there **NEVER** was any allegation being investigated that Plaintiff "*singled out black students and made them act like slaves*;" and told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*"

(2)     Plaintiff claims that it was defamatory to refer to her lesson as "insensitive." But like the statements referring to her lesson as "racist," calling the lesson insensitive is an opinion based on undisputed disclosed facts. It is therefore non-actionable.

The Daily News Defendants' claim that references to the Plaintiff's actions as "racist" in the *Daily News* articles are non-actionable opinions based on disclosed facts is <u>untrue</u>. There were no substantiated, accurate facts reported by the News Defendants. Moreover, the disingenuous attempt to characterize the reference to the Plaintiff's actions as <u>opinion</u> by the News Defendants is derisory. Credible journalists must be able to distinguish between facts and opinions.

(3)     Plaintiff alleges that various statements, including that she "shocked and traumatized" students and adults, that she was "removed from her post" after the lesson, and even that her lesson was "about slavery and the Triangle Trade," are defamatory. But each of the

10

statements that she references is substantially true based on her own admissions and DOE's investigative findings. Thus, they cannot form the basis of a defamation action.

Again, the Daily News Defendants have mischaracterized every single detail of this event in order to substantiate their own narrative. They published false assertions of "facts" that had not basis in reality. In short, the Daily News Defendants are unable to demonstrate that the Amended Verified Complaint fails to state a cognizable defamation cause of action against them.

### STATEMENT OF FACTS

The Plaintiff was a probationary New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York. She seeks damages related *inter alia* to defamation, defamation *per se*, slander, slander *per se*, libel, libel *per se*, and false light against the Daily News Defendants, and the "*badge of infamy,*" with which she has forever been branded. The Plaintiff's claim arose as a result of what was fallaciously reported concerning an alleged complaint made by **one (1)** parent of **one (1)** student regarding a lesson taught by the Plaintiff in her social studies class on the Middle Passage, wherein she subsequently and unwillingly became the subject of an "exclusive" story in and by the New York Daily News, falsely accusing her of being a "*racist*" and "making black students lie face down on the floor of her class, and asking them: *'[H]ow does it feel to be a slave?*" As a result of the News Defendants' actions, this fabricated and erroneous set of purported "facts" disseminated on February 1, 2018 at 9:00 PM, was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world.

The Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it was erroneously reported, among other things that she "*singled out black students and made them act like slaves;*" she is falsely reported to have told them to "*lie*

*on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" She has been publically shamed and falsely accused of "*child abuse*," labeled as a "*racist*," referred to as an "*oppressor*," by many, including politicians and activists, and specifically in various and extensive media outlets discussing this issue. She has received direct threats of violence and death causing her to fear for her life. The Plaintiff was ultimately exonerated of the actual erroneous allegation following an investigation by the New York City Department of Education's Office of Special Investigations, yet has nonetheless been terminated from her employment as New York City Public School Teacher at The William W. Niles School - Middle School 118.

## ARGUMENT

The Daily News Defendants rely upon the argument that the Court previously decided that the Defendants statements do not give rise to a cause of action for defamation "as a matter of law," yet while Courts are understandably reluctant to reopen a ruling once made, (see, *Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005), there is no preclusion for the Court to reconsider its prior opinion in light of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice. See, *Scottish Air Inter. v. British Caledonian Group, PLC*, 152 F.R.D. 18, 24-25 (S.D.N.Y. 1993) (citation omitted). There is no legally binding limitation on the court's authority to reconsider such matters. Thus, to survive a motion to dismiss under Fed. R. Civ. P. 12(b) (6), a complaint (or Amended Verified Complaint, in this case), must plead enough facts to state a claim to relief that is plausible on its face. In reviewing the Amended Verified Complaint, the Court must accepts all well-pleaded allegations as true and draw all reasonable inferences in Plaintiff's favor. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged. However, as in this case, where Plaintiff's Amended Verified Compliant has nudged her claims across the line from conceivable to plausible, her Amended Verified Complaint cannot be dismissed. Further, notably, a court in this Circuit has found that the law of the case doctrine did not control where an amended complaint, contained "more detailed claims" than the original complaint. See, *Bellezza v. Holland*, No. 09-CV-8434 (RWS), 2011 U.S. Dist. LEXIS 76030, (S.D.N.Y. July 11, 2011). The Daily News Defendants' arguments that the allegedly defamatory statements are either absolutely privileged under New York Civil Rights Law § 74, are pure statements of opinion, or are substantially true, are without merit. Accordingly, there is no basis to dismiss the Amended Verified Complaint.

Moreover, Defendants, Daily News and Ben Chapman attempt to deceive the Court by stating in their Memorandum on Page 11, "particularly in light of the leeway of forwarded by the "substantially accurate "standard stating that plaintiff "walk "on students is no different than stating that she "put her knee, "pushed," or "pressed "into their backs with her hands or feet." Defendants further reference the teacher in the classroom Ralph Hudson; however, Ralph Hudson provided an affidavit stating "At no time did I observe any student in distress, nor student lay on the floor at any time. The Plaintiff never "kneed" any student, nor did she ever apply any pressure to any student using her knee." This statement by Ralph Hudson, the black teacher in Plaintiff's classroom that observed her lesson on January 9, 2018 is the exact opposite of what Defendants are trying to peddle as "substantially accurate." This is *prima facie* libel.

The Defendants attempt to further deceive the Court by stating that their first publication was on February 2, 2018, when in actuality, their first publication was online on February 1, 2018. The libelous damage was done when Defendants published the article online, and the Defendants

13

are attempting to rely on an event that occurred hours after the damage was already done, i.e. the print publication.  The fact that the Defendants are focusing on the "print article" instead of their online click-baiting article, is an admission that their online article is and was actionable.

**POINT I**

**PLAINTIFF'S AMENDED COMPLAINT DEMONSTRATES THAT THE ARTICLES ARE NOT PRIVILEGED UNDER NEW YORK CIVIL RIGHTS LAW SECTION 74**

Most respectfully, this Court incorrectly concluded that the Daily News Defendants' articles are privileged under New York Civil Rights Law § 74 ("Section 74") as being "substantially accurate." In this regard, the Daily News Defendants have erroneously argued that the claims based upon the *Daily News* Articles[4] are barred by New York Civil Rights Law § 74.

New York Civil Rights Law § 74 states:

> "A civil action cannot be maintained against any person, firm or corporation, for the publication of a <u>fair and true report of any judicial proceeding</u>, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.
>
> This section does **not** apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof." (Emphasis added).

In *Gillings v. New York Post*, 2018 NY Slip Op 07413 (App. Div. 2nd Dept. Nov. 7, 2018), the court affirmed the dismissal of a defamation action against the New York Post and Julia Marsh,

---

[4] Contrary to the News Defendants' footnote number 6, the Plaintiff is in possession of an audio recording of "All Things Considered" – radio show on WNYC with Jamie Floyd dated February 7, 2018. The recording is available on line for pubic on https://www.wnyc.org/story/use-empathy-when-teaching-history-slavery-nyc-city-schools-parent-activist-says/   Forty seconds into this audio, the voice of Daily News Reporter Ben Chapman is heard and identified.

on the basis of New York Civil Rights Law § 74; <u>however</u>, the Court summarized the law as follows:

> "This absolute privilege applies **only** where the publication is a comment on a judicial, legislative, or other official proceeding…and is **a fair and true' report of that proceeding**." <u>See</u>, *Saleh v. New York Post*, 78 AD3d 1149, 1151, <u>quoting</u>, *Holy Spirit Assn. for Unification of World Christianity v. New York Times Co.*, 49 NY2d 63, 67).

As to the threshold requirement that the publication purport to comment on a judicial, legislative, or other official proceeding, if the context in which the statements are made makes it impossible for the ordinary viewer, listener, or reader to determine whether the defendant was reporting on a judicial or other official proceeding, **the absolute privilege does not apply**. <u>See</u>, *Saleh v. New York Post*, 78 AD3d at 1151-1152; *Cholowsky v. Civiletti*, 69 AD3d at 114-115; *Wenz v. Becker*, 948 F Supp 319, 323 [SD NY].

It is fundamental to the common law of defamation that the falsity leads to liability. To the extent the reporting and publishing creates public suspicion that the person engaged in criminal activity, the suspicion is false when the person has committed no crime. Some cases have taken a very simplistic approach that reporting on a person that is under Investigation for criminal activity is true and non-actionable when the person was in fact being investigated. In *Hirschfeld v. Daily News*, L.P., 703 N.Y.S.2d 123 (App. Div. 2000), appeal denied, 713 N.Y.S.2d 463 (App. Div. 2000), a newspaper had published an article stating that "the Manhattan district attorney's office is investigating millionaire developer Abe Hirschfeld for allegedly plotting to kill a longtime business partner." (Id. At 124; Mark Kriegel, DA, probing Hirschfeld Allegedly Plotted to Kill Biz Partner, DAILY NEWS (N.Y.), Nov. 8, 1997, at 3) In a brief opinion, the New York Supreme Court's Appellate Division held that Hirschfeld's defamation action against the newspaper had been properly dismissed because "the central premise of the article was factually true": a grand

15

jury was receiving evidence "in connection with allegations that Abraham Hirschfeld may have been involved in a plot to kill [the business partner]." *Hirschfeld*, <u>supra</u>, 703 N.Y.S.2d at 124. Plaintiff, Patricia Cummings, highlights this case in her Opposition to emphasize the fact that the defamation action against the newspaper in that particular case was dismissed because of the semantics of the wording. For example, if there were two reports, one stating that "Macbeth murders Dunkin" and the other stating "Macbeth assassinates Dunkin," both reports have the same meaning and image in the minds of the readers. In the case at hand, the Defendants Daily News and Ben Chapman published assertions of fact that the Plaintiff was involved in a crime when no such no crime was committed.  A statement is deemed fair and true report if it is "substantially accurate'" that is "if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." <u>See</u>, *Karates v. Ackerley Grp. Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (Citations omitted) (emphasis added); <u>see also</u>, *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993) (noting that "only 'facts' are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action" (citation and quotation marks omitted)). What was "reported" and published would in fact have a different image in the minds of an average reader than what the Plaintiff was investigated for (notably only after the defendants reported and published their false assertions of facts).  "The language   used by any reporter or member of the media, when read by an average person with average intelligence, should not create a different image in their mind and different effect on the reader then if the reporter or member of the media reported the truth" <u>See</u>, *Procter and Gamble*, 974F. Supp. at 196. As stated in Plaintiff's Amended Complaint, "being falsely accused of allegedly putting a knee into a child's back versus it being reported and published by the Defendants that "she singled out black students and told them to lie on the floor for a lesson on

U.S. slavery—and then stepped on their backs to show them what slavery felt like" are two completely different scenarios that create two totally different images in one's mind. Those two scenarios— (1) putting a knee into a child's back and (2) telling black children to lie on their stomachs so that a white teacher can walk on them—are **NOT** one in the same.

First, the Daily News Defendants argue that privilege applies, because (1) publication is a comment on a judicial, legislative, or other official proceeding, and (2) the substance of the article be substantially accurate. Neither of these elements are true. The Daily News Defendants continued to falsely promote the Plaintiff as a "racist," never once retracting the **FALSE** account that she "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*." The substance of the articles were **NEVER** substantially accurate, and **NEVER** commented appropriately on any investigation of Plaintiff, as she was being investigated for allegations of corporal punishment **NOT** allegations of racism. There were no "minor inaccuracies" reported (see, *Posner v. NY Law Publ'g Co.*, 228 AD2d 318, 318 (1ˢᵗ Dept. 1996)); the Daily News Defendants' reports were completely wrong. It must be made clear that this is **NOT** a situation where the Daily News Defendants reported on a proceeding and the subject was found to be exonerated – this is a situation where what was being reported was **NOT** what was actually happening at all. An example of a cogent analogy would be a news entity reporting a proceeding, which states that the party is on trial for murder, when they are actually on trial for jay walking.

The Daily News Defendants argue that privilege applies, because the publication is a comment on a substantive the truth of that label. "*McCarthy's Red Scare*" witch hunt has manifested itself into twenty-first century American society, to which there is a finding of criminality or grievance, where none exists and irreparably damaging a person's reputation. Some

examples include, the Duke Lacrosse rape case (criminal charges built on a lie, because they fit a popular media narrative, and Rolling Stone magazine publishing an account of fraternity gang rape as the basis of a 'campus rape epidemic,'(later retracted), because it fit a popular media narrative. The issue of reputation as a federally protected interest, as an inalienable liberty, has come to the fore, especially with the current surge of public concern and unrest in regards race relation matters and the potential for immense and irrevocable harm to one's name and reputation. Furthermore, the Court has observed that liberty extends to "those privileges long recognized as common law as essential to the orderly pursuit of happiness by free men." <u>See</u>, *Meyer v. Nebraska*, 262 U.S. 390, at 399, 43 S. Ct. 625, 67 L. Ed. 1042, 1923 U.S. LEXIS 2655, 29 A.L.R. 1446. Just as the Court protected individuals during the era of McCarthy, so too should the Court when an individual is accused of criminally racist acts that are proven to be false. Any unjustified communication which tends to diminish an individual standing in his community constitutes an infringement of his property right in reputation." <u>See</u>, W. Prosser Law Torts, Law §114, at 739-744 (4th ed. 1971).

The Court held in *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995), <u>citing</u>, *Scheuer v. Rhodes,* 416 U.S. 232 at 236, 94 S. Ct. at 1686 (1974)), that "[I]f the published account, along with the rest of the article, <u>suggests more serious conduct than that actually suggested in the official proceeding, then the privilege does not attach, as a matter of law</u>." Such was the case in this instance, where the published account of the Plaintiff's alleged conduct was substantially more serious than suggested in the official proceedings that followed. The statements did not accurately portray the gist of what transpired in the subject proceedings. <u>See</u>, *Cholowsky*, <u>supra</u>.

The Daily News Defendants mistakenly rely upon the holding in *Cholowsky*, <u>supra</u>. Likening the facts of this matter to a mere "overstatement" of the truth. <u>See</u>, *Cholowsky*, <u>supra</u>, 69 A.D.3d at 113. In *Cholowsky*, <u>supra</u>, an article reporting on a federal investigation stated that

"evidence gathered by federal investigators established that [an accomplice of plaintiff's] was using the plaintiff's hauling permit to dump hazardous waste" in a landfill. Id. at 112 (internal quotation marks omitted). In reality, the findings by federal officials only indicated that the accomplice planned to dump hazardous waste, but had not actually done so. Id. at 113. The court found that, despite this "mistake," the statement was "substantially accurate" under Section 74, since the "'fair and true' standard has been held to apply to articles containing partial inaccuracies, even if misleading." See, Cholowsky, supra, 16 Misc. 3d 1138(A).The logic of Cholowsky, supra, does **not** apply equally here—the "gist" of the allegation made by Then Principal Giulia Cox( See OSI Report, at page 1), and reported to OSI is NOT what was reported.

The false facts that were published by the Daily News Defendants were untrue and disparaged, libeled, and misrepresented Plaintiff. Plaintiff is not "dissecting and analyzing every article with a lexicographer's precision," (see, Holy Spirit Ass'n, supra, at 67), instead she is identifying the outrageous falsities that caused her, a private person, the loss of her career, and worldwide disdain.

Second, the Daily News Defendants argue that whether the underlying allegations are true or false, privilege applies when there is a **substantially accurate** description of the claims made. See, Mulder v. Donaldson, Lufkin & Jenrette, 161Misc.2d 698, 705 (Sup. NY Cty. 1994). There was no substantially accurate description of the claims made in this matter. The claims made were **completely inaccurate**. The Daily News Defendants reported and asserted as fact that the Plaintiff had "*singled out black students and made them act like slaves*;" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like*;" that is substantially different than her being investigated for an false accusation that she "pushed Student A's back with her knee and asked if it hurt". See O.S.I. Report page 1. The "substantially accurate"

argument is inapplicable in this instance, because the News Defendants' description of the events, reported as facts, is not even close to the reality. Thus, this specious argument must also fail.

Defendants are attempting to camouflage and shield their actionable defamatory actions behind the veil of the First Amendment.  The Defendants state in their Motion to Dismiss, "the 'substantially accurate' requirement of Section 74 provides defendants with great leniency in reporting. So long as the 'statements accurately portray[] the gist of what transpired in the subject proceedings,' they are privileged." (See, page 11 of Memorandum in Support Motion to Dismiss Amended Complaint) The Defendants reporting and publishing were NOT "substantially accurate" nor were they "the gist", and their attempt to conceal their tortious actions are evidently undeniable. The only accurate assertion was Plaintiff was teaching a lesson on slavery and the Middle Passage; was a white social studies teacher, notably NOT a "slave teacher" at Middle School 118 in the Bronx; the student body is 81% black and Hispanic 3% white;" Plaintiff "was assigned away from children later Thursday, after the Daily News contacted the city Education Department about her slavery lesson" (emphasis added); "she refused to discuss her lessons when a reporter approached her after school on Thursday. "Excuse me, I'm not talking to anyone, no,' she said when asked if she stepped on black student in her class". By Defendants including Plaintiff's statements of the actual truth—that she did NOT step on black children in her class— they assist in proving Plaintiff's argument that they did not consider what she stated to Defendant Ben Chapman  when she as ambushed on school property on Thursday February 1, 2018 at the school's dismissal time. Additionally, the Defendants should have realized that the information from their anonymous sources, such as the "unidentified staffer" could be problematic for them because they accused the Plaintiff of a crime; acted immorally; and acted with professional incompetence. The statements should have been considered "Red Flag" statements by the

Defendants, however they published their article less than seven hours after ambushing the Plaintiff instead of doing their due diligence.   If the Defendants Daily News and Ben Chapman did any due diligence, interviewed the teacher in the room that witnessed the lesson, they would have been able to report the truth and would have had a substantially accurate account. Additionally, under both Federal and New York Constitutions, only statements that are demonstrably false are actionable, especially in regards to a matter of public concern. "Because falsity is a necessary element in a defamation claim involving statements of public concern it follows that only statements alleging fact can properly be the subject of a defamation action." See, *600 W. 15th St. Corp. v. Vongutfeld*, 80 N.Y.2d 130, 139 (1992).

**NONE** of what was "reported" and published by the Defendants falls under the privilege they are now so desperately asserting. What was "reported" as assertions of fact by the Defendants and the actual allegation are totally different scenarios and create two totally different images in one's mind. Those two actions, as they are described, are not one in the same; thus making this assertion of fact false and substantially inaccurate. The Defendants assertions of fact produces a different effect on the Reader then would a report containing the precise truth, thus making it actionable and not protected. "A statement is deemed a fair and true report if it is "substantially accurate," that is "if, despite minor in accuracies, it does not produce a different effect on a reader then would a report containing the precise truth." See, *Karades v. Ackerley Grp. Inc.*, 423 F.3d107, 119 (2d Cir. 2005) (citations omitted) Moreover, the Defendants did **NOT** explicitly state that it was describing an official investigation or proceeding commenced against the Plaintiff. The subject of the February 1, 2018 Daily News article was the allegation – which again was a false assertions of fact—**NOT** a description of an investigation. There was no sourcing of any official documents. The only thing the Defendants are hanging their hat on in a desperate attempt to avoid

21

liability for their defamatory actions is their statement to the court that they were reporting on a proceeding. Therefore, in making this determination, "statements must… Be viewed in their context in order for the courts to determine whether a reasonable person would view them as expressing or implying any facts." See, *Immuno AG. v. J. Moor-Jankowski*, 567N.E.2d 1270, 1278, 1281 (N.Y. 1991) (emphasis omitted) (holding that a court must consider a statement's "tone and apparent purpose"). It is also in the context that a reader would be able to formulate the conclusion that the article was about the Plaintiff and the allegation, **NOT** an official investigation or proceeding. Additionally, in context—which is defined as "the part of a discourse that surrounds a word or passage and can throw light on its meaning" (Merriam-Webster's Dictionary)— the average reader with average intelligence would believe that the statements made by the defendants were a fact—when indeed they were **NOT** because it can be proven false, it never happened, and therefore not substantially accurate in the least—and about the allegation false assertions of fact reported, NOT an official proceeding. Therefore, the tortious actions of the Defendants are not privileged and are actionable. The article did **NOT** attribute to any official records in the article.

Moreover, "Critical to the determination is understanding the "temper of the times" and the "current of contemporary public opinion"" (quoting, Nolan) (*Mencher v. Chesley*, 297 NY at 100). The context of the February 1, 2018 article along with the Defendants' false assertions of fact and "The Facts, Truth, Accuracy and Legal Merits for Defamation" are outlined below:

| CONTEXT OF THE DAILY NEWS' February 1, 2018 PUBLISHED ARTICLE | | |
|---|---|---|
| Historical Context:<br><br>Provides time period and current event to inform the general mood of the era, setting the stage for the tone of the piece and creating an understanding of the society of the time. | Physical Context:<br><br>Indicator of a place/ physical environment that can inform how a storyline unfolds | Cultural Context:<br><br>Beliefs, religion, marriage, food and clothing are all elements of cultural context. |
| As any person, with a high school education would know, historically in this country whites have been indifferent to the plight of African Americans. Thus the epigenetics of African-Americans' experience has historically shaped how whites have been perceived as racist and insensitive. (As historically seen through the chattel slavery, the Era of Jim Crow from 1865- 1965, the "Great migration" and urbanization of African Americas from1915-1968, and from the institutionalization that has existed since the 1980s. This is taught within the NYS Social Studies curriculum to which all people who complete a high school education in the State of New York would have been exposed to this information.)<br><br>Thus this intergenerational trauma, stems from Post Traumatic Slave | As of the 2010 U.S. Census, NYC has a population of 8,175,133 people to which 32.1% identify their race as "white alone no Hispanic or Latino". Of NYC's population, 1,384,580 people reside in the Bronx, to which 9% of the population identifies their race as "white alone, no Hispanic or Latino", (2010 U.S. Census) which is the same identification as the Plaintiff. "<br><br>Population composition is strongly related to the social structure of a place." (Curtis, K.J., O'Connell, H.A. Historical Racial Contexts and Contemporary Spatial Differences in Racial Inequality. Spat Demogr. 5, 73–97 (2017). https://doi.org/10.1007/s 40980 -016-0020-x) | "Throughout the last four and a half centuries, racism and white supremacy have continually threatened the existence of African people before, during, and after enslavement. [This is taught within the NYS Social Studies curriculum to which all people who complete a high school education in the State of New York would have been exposed to this information] These threats have forced Africans to modify their beliefs, thoughts, and behavior in orderto survive on a planet wh ere theyare regarded as "Third World"peop le. Those who now claim that members of the "First World" are actually late comers to the human family." (pg. 179) "Serious scholars would not divorce the legacy of European enslavement and Colonialism from fully comprehending the present problems of racialized discrimination that is blighting, for example, urban Black communities across the Western world...Crucially, white supremacy…and its ramifications have left cultural and socioeconomic scars throughout the world where people of African descent reside (we could add other peoples of color…) Pg.181 |

23

| | | |
|---|---|---|
| Syndrome, a theory developed by Dr. Joy DeGruy, to which institutionalized racism and oppression have resulted in multigenerational adaptive behavior. (Legacy of Trauma: Context of the African American Existence, by Brandon Jones M.A.) | | (Taken from the Journal of Black Studies, Volume 33 No. 2, November 2002, pigs. 179-198 DOI 10.1177/002193402237224) |
| It is the result of decades of institutionalized racism that we as a nation see a surge in public action to combat these issues as evidenced by groups such as Black Lives Matter that was founded in 2013 and protests throughout the Nations when devastatingly, unlawful events towards African Americans occur. Therefore, whenever race is a factor to a story or current event it evokes a negative reaction towards Caucasians, especially when the media legitimizes over represented and idealized representations of white Americans while marginalizing and minimizing people of color. Moreover, due to the history of our nation in regards to race, people automatically assume that if something is potentially done in a negative was to a | Based on the U.S. Census information, the Plaintiff was the minority of the area in which she was teaching. | When racism is theorized through culture, it prevails in mainstream U.S. society. The idea that psyche and culture are inseparable is one that explains the "mind-in-context", which draws on the foundation that culture shapers the psyche in regards to racism in the world and emerging as people interact with others that have racialized experiences and racist habits of mind. ("Racism in the structure of Everyday Worlds: A Cultural-Psychological Perspective", published December 7, 2017, Https://journals.sagepub.com/doi/full/10.1177/0963721417724239) |

| | | |
|---|---|---|
| black person by a white person, it is because the white person is racist. This is evidenced by the growing societal protests we have seen across the country in reaction to race related issues. | | |

| Statements/False Assertions of Fact made within the Daily News February 1, 2018 Article | The Facts, Truth, Accuracy and Legal Merits for Defamation |
|---|---|
| "Bronx teacher sparks outrage for using black students in cruel slavery lesson" | The title of the February 1, 2018 Daily News Article. "Using black students in cruel slavery lesson" implies that the "Bronx Teacher" tokenized (which is a form of racism) students in a classroom lesson, thus leading the public to believe that the teacher committed a racist act, thus constituting moral turpitude. |
| "Patricia Cummings shocked and traumatized children in her social studies classes when she singled out black students and told them to lie on the floor for a lesson on U.S. slavery — and then stepped on their backs to show them what slavery felt like" | The assertion of facts implies through the use of the words "singled out" that the Defendants knew the racial composite of the class. "A statement may still be actionable if it impl[ies] that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader." *Levin*, F.3d at 197. The court should rule that the statement is actionable not only because it is a false assertion of fact, but "because a reasonable listener or reader would infer that the speaker or writer knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed." *Gross*, N.Y.2d at 153. Moreover, Black students are not the minority of the class since the class is only made up of Black and Hispanic students; no white students were enrolled in Plaintiff's class.<br><br>As a result of the historical and cultural context, the average reader with average intelligence would believe that the assertions of facts are true. However, this assertion of fact can be proven false thereby making it substantially inaccurate. Add court case about average intelligence and accuracy |
| "Students said Cummings, who is white, pulled the insensitive stunt in multiple seventh-grade classes as | Just as New York Civil Rights Law §74 did not "protect Bloomberg against Friedman's claim as to the "repeatedly tried to extort" statement" (Hudson v. Goldman Sachs & Co., 283 A.D.2d 246 (1st Dep't 2001), it too should not protect the Defendants. "Section §74 protects the reporting of a defendant's publicly stated legal position only where the report is "a substantially accurate description of [defendant's] position in the lawsuit" (Hudson at 247). The |

| | |
|---|---|
| part of a unit on the infamous Middle Passage, in which Africans were kidnapped and brought to America as part of the slavetrade." | word "repeatedly" that was cited in Hudson is defined as "again and again". In the case at hand, Defendants used the words "multiple" which is defined as "consisting of or including of more than one" and the word "classes" which in itself indicates more than one because it is the plural of the word "class". As such the court should deem this unprotected speech. Moreover, this assertion of fact does not align with what was officially investigated beginning February 2, 2018, nor does it mirror the subject of conversation at the January 18, 2018 meeting with Defendant Giulia Cox. Thus the Court should not deem this protected speech. |
| Kids and adults in Cummings' school, where the student body is 81% black and Hispanic and just 3% white, were horrified by the offensive lessons they said occurred roughly two weeks ago. | Just as New York Civil Rights Law §74 did not "protect Bloomberg against Friedman's claim as to the "repeatedly tried to extort" statement" (Hudson v. Goldman Sachs & Co., 283 A.D.2d 246 (1st Dep't2001), it to o should not protect the Defendants. "Section §74 protects the reporting of a defendant's publicly stated legal position only where the report is "a substantially accurate description of [defendant's] position in the lawsuit" (Hudson at 247). Defendants used the words "kids", "adults", and "lessons" indicating that there was more from each category present at the time. However, this can be proven false. Only one child and their parent complained about one lesson. Moreover, Ralph Hudson, an African American teacher who witnessed the lesson, stated that it was appropriate. Quote Hudson's affidavit and cite the affidavit. Therefore, the statement is not only substantially inaccurate but can be proven false, and as such should not be protected by §74. Moreover, the article states "kids and adults in Cummings' school", NOT kids and adults in the classroom. This is a clear indication that whomever they spoke to did NOT witness the classroom lesson and as such is hearsay. It is apparent that the Defendants did not even bother to ask if these alleged "kids and adults" were in the Plaintiff's classroom during this alleged incident. If they actually had journalistic integrity and done so, they would not have had anything to report. |
| "It was a lesson  about slavery and the Triangle Trade," said one of Cummings' students, who asked to remain anonymous.<br><br>"She picked three of the black kids," the boy said, and instructed them to get on the floor in | This is one of the only statements within the article that has some sort of merit. The Defendants were correct in that the lesson was in fact about slavery and the Triangle Trade, as stated by one of Plaintiff's students, which the Defendants were so kind to notate as such in the article. HOWEVER, the student's comments were completely taken out of context. The Plaintiff asked for student volunteers. Moreover, in using empathy—an intra-personal realization of another's struggle that illuminates the potential consequences of one's own actions on the lives of others—within the teachable moment, Plaintiff asked the class "How do think it would feel to be a slave?"<br><br>Moreover, this is the first of only two times in the article that the Defendants acknowledge speaking to one of the Plaintiff's students from that particular class to which they saw the lesson firsthand. Nowhere else in the article does it state that the Defendants spoke with a student of the Plaintiff's particular |

| | |
|---|---|
| front of the class. "She said, 'You see how it was to be a slave?' She said, 'How does it feel?' " | class. Furthermore, the comments by the "unidentified staffer" are hearsay as well since Ralph Hudson was the Staffer/adult witness of Plaintiff's lesson. See, 50-H Hearing and Affidavit from Hudson and OSI Report of Hudson. |
| When a girl on the floor made an uncomfortable joke and said she felt fine, Cummings stepped on her back, the student said. | This NEVER happened. Again, the Defendants do not indicate they were speaking to students from Plaintiff's particular class. Moreover, this never having happened in Plaintiff's class is supported by the adult witness to the lesson Ralph Hudson as indicated not only in the DOE OSI Report, but also in his affidavit. |
| "She put her foot on her back and said 'How does it feel?'" the student said. 'See how it feels to be a slave?' | This NEVER happened. This can Not even be considered an overstatement. Again, the Defendants do not indicate they were speaking to a students from Plaintiff's class. Moreover this never having happened in Plaintiff's class is supported by the adult witness to the lesson Ralph Hudson as indicated not only in the DOE OSI Report, but also in his affidavit. Add more and quote from the affidavit |
| "Cummings' students said the lesson followed a showing of a video of slaves being beaten, tortured and thrown over the side of the ship." | This is the second and final time that the Defendants indicated that they spoke to students of the Plaintiff, and the statement is not entirely false.<br> Plaintiff did show a 5 minute clip of the movie *Freedom*. In fact, the video clip was used to differentiate the Plaintiff's lesson since it depicted the atrocities of the Middle Passage in a visual way and aligned with the NYCDOE's Sample Lesson's Scope and Sequence. A scope and sequence describes the ideas and concepts that will be covered within the curriculum. Plaintiff's five minute movie clip depicting the atrocities of the Middle Passage used to differentiate her lesson coincided with the documents of the Sample Lesson within the NYCDOE's Resource Guide.  Please note that teachers who have been rated "EFFECTIVE" by the Department of Education, as the Plaintiff has been, are not required to have their lessons viewed prior to teaching. Additionally, teachers have professional discretion in regards to lesson plans. As acknowledged by the NYCDOE, "A supervisor may suggest elements to include in a lesson, [but] lesson plans are by and for the use of the teacher. Their format and organization, including which elements are to be included, are appropriately left to the discretion of the teacher". (JOINT DOE/UFTLESSON PLAN LETTER, September 19, 2014) NYS Teaching Standards of 2011, "Element II.6: Teachers evaluate and utilize curricular materials and other appropriate resources to promotestudent success in meeting learning goals" so that teachers "organize physical space to reflect an awareness of learner needs and curricular goals, incorporate a  and understanding of technology in their lessons to enhance student learning, organize and |

27

| | |
|---|---|
| | effectively use time to achieve learning goals, **select and adapt curricular materials to align with state standards and meet diverse learning needs, and access appropriate resources to meet   specific learning differences or needs**." (Emphasis added) ( http://www.highered.nysed.gov/tcert/pdf/teachingstandards9122011.pdf) As eviden ced by Student D in the OSI report, "he explained that the video clip depicted slaves seated in close proximity to each other, in addition to the inhumane conditions and poortreatment". It is important to   note that the OSI Report was reduced to writing on July 24, 2018, over 5 months AFTER the official investigation began on February 2, 2018. |
| Cummings has worked in city schools since 2016 and is also a school cheerleading coach, according to her LinkedIn profile. | The Defendants still could not get information completely correct and use semantics. According to Plaintiff's LinkedIn profile, she had worked for NYC public schools beginning in 2006 as a school aid (while she continued her education to become a teacher). She left the NYCDOE as a school aid in February 2014 and returned as a teacher in 2016. |
| She refused to discuss her lessons when a reporter approached her after school Thursday.    ""Excuse me, I'm not talking to anyone, no," she said, when asked if she stepped on black students in her class. | First and foremost, the Defendants admit to approaching the Plaintiff about their lesson after school on Thursday, February 1, 2018. Students are dismissed no earlier that 2:20 p.m.. This is significantly important as this coincides and corroborates the chain of events as outlined in Plaintiff's Amended Verified Complaint.    The Defendants explicitly asked the Plaintiff if she stepped on black students in her class and the plaintiff replied, "NO".    Notably, this part of the article that is substantially accurate. By the Plaintiff answering the Defendants' question she refuted the false assertion that she "stepped on black students in her class". This is also refuted by Ralph Hudson in his signed affidavit. |
| However, the  $68,934-a-year teacher was reassigned away from children later Thursday, after the Daily News contacted the city Education | It is significant to note that the Defendants' own admission corroborates the timeline presented by Plaintiff in the Amended verified Complaint, to wit:   1. January 9, 2018–Plaintiff taught her lesson. 2. January 18, 2018–Defendant Courtney Ware took written student statements ("Original Statements") and in doing so violated the NYCDOE Chancellor Regulations  (Amended Complaint #59) One must infer that after the statements were taken, the statements would have been read by administration. Therefore the inference is that the statements taken on January 11, 2018 did not rise to any level to which OSI would be contacted, |

| | |
|---|---|
| Department about her slavery lesson.<br><br>[emphasis added] | thus there was no official investigation by the Department of Education or OSI. |

3. January 16, 2018 – Defendant Cox hand-delivered correspondence beckoning her [Plaintiff] to a meeting "inexplicably informing her [the Plaintiff] that she was the subject of a disciplinary meeting to take place on January 18, 2018. (Amended Complaint #58) This would infer that the statements had been read by administration. At this time OSI had not been contacted.

4. January 18, 2018 – Plaintiff met with Defendant Cox as instructed and at the meeting requested and pleaded with Defendant Cox to speak with the adult witness to the lesson, Ralph Hudson, to which "Defendant Cox inexplicably refused" (Amended Complaint #59) and stated "I don't have to".

5. After the January 18, 2018 meeting, Defendant Cox independently "disciplined the Plaintiff and only removed her from teaching class 408". Defendant Cox left Ms. Cummings to teach her other classes on her official school schedule.   This infers that there was no indication of corporal punishment, because had there actually been, (1) Plaintiff would have been removed from all of her classes and (2) Plaintiff would have received correspondence indicating that she was the subject of an OSI investigation within 5 school days as outlined in the Chancellor Regulations. To make Defendant Cox and Defendant NYCDOE and Defendant NYC story plausible, Plaintiff would have received correspondence no later than January 25, 2018 indicating she was the subject of an OSI investigation and given an OSI Index Number. That did not occur. Additionally, Plaintiff was returned to teaching all of her classes after three days. This demonstrates that the discipline by Defendant Cox was done so to placate the parent of the student in class 408. and Defendant Cox did not follow any of the NYCDOE Chancellor Regulations, as detailed in the Amended Complaint. Thus, Defendant Cox conducted an independent investigation, which did NOT comply with rules and regulations of the NYCDOE regulations. Therefore, Defendant Cox's independent/rogue investigation does NOT constitute any type of state investigation or "Official Proceeding" by the NYCDOE.

6. February 1, 2018– Students reported to the Plaintiff and Ralph Hudson  that after school on Wednesday January 31, 2018, "a "white man" had been walking around on campus" and "questioning them about Plaintiff." (Amended Complaint #64) This infers that the parent or someone else who was motivated and had access to the details of the allegation—that the plaintiff put her knee into the student's back, made by the student and parent—called the Defendant Daily News because there was no official record of any investigation or documents to support any official investigation at the time of Defendant Ben Chapman came to the school to question minor students on January 31, 2018. A reporter doesn't just show up randomly at a school with questions that probe an alleged incident to which there was no official investigation.

7. February 1, 2018 "at approximately 2:40 pm, Plaintiff was ambushed on school property by Defendant Chapman. (Amended Complaint #72) "After being confronted on school property…the Plaintiff immediately went to see Assistant principal Dyer" who "called the Defendant, Giulia Cox, in her office to notify her of what just occurred. Defendant Cox came to A.P. Dyer's office and advised that she [Cox] called the Chancellor Division that handles media issues and confirmed that the Daily News would indeed be running a story on Plaintiff…" (Amended Complaint # 73)

8. Plaintiff was left a twenty-one (21) second voicemail by Defendant Giulia Cox from phone number 718-364-3752 on Thursday, February 1, 2018 at 5:59 p.m. to which she states: "Hi Ms. Cummings it's Ms. Cox at 118.uh, I am calling to ask you to check your email. Um, Central HR has reassigned you for tomorrow and the information is in your email. You can reach me on my cell phone 917-292-1352. Thanks. Bye bye." It is at this time that Plaintiff was reassigned thus constituting an official investigation to be started on February 2, 2018.

9. The Defendants, by their own admission, state in their February 1, 2018 article state that "the $68,934-a-year teacher [Plaintiff] was reassigned away from children later Thursday, **after** the Daily News contacted the city Education Department about her slavery lesson." (emphasis added)

Therefore, the overall context of the article by a reader with average intelligence is that the white social studies teacher teaching in the Bronx [Plaintiff] singled out black students, had them lie on the floor on their stomachs, and then walked on them during her classroom lesson. This is evidenced by the comments made by people Eight (8) months after their "exclusive" story was published first on February 1, 2018. Notably, show below are the comments under the Defendants online article dated October 19, 2018:







Third, the Daily News Defendants argue that if a reasonable observer would find that the statements **constitute reports of a proceeding**, then Plaintiff would be barred from claims against them. We must remain mindful of the rule that the defamatory effect of the article is to be ascertained not from the viewpoint of a critic or language expert, but rather from that of a reader of reasonable intelligence who takes ordinary interest in the articles of a periodical, but does not commonly subject them to careful scrutiny and analysis. In applying New York law, words that are challenged as defamatory "must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader . . . ." <u>See</u>, *Aronson v. Wiersma*, 65 NY2d 592, (1985) at 594; <u>see</u> <u>also</u>, *Armstrong v. Simon & Schuster*, 85 NY2d 373 (1995) at 380; *James v. Gannett Co.*, 40 NY2d 415 (1976) at 419-420; *Ava v. NYP Holdings, Inc.*, 64 AD3d 407 (2009) at 413. All relevant factors may be considered in determining whether a word or statement is defamatory. <u>See</u>, *Farber v. Jefferys*, 33 Misc. 3d 1218[A], 2011 NY Slip Op 51966, [Sup Ct, NY County 2011], affd 103 AD3d 514 [1st Dept. 2013], lv denied 21 NY3d 858, <u>citing</u>,

*Steinhilber v. Alphonse*, 68 NY2d 283, 291-292 [1986], and courts have considerable discretion in deciding whether a statement is defamatory, guided only by "the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used . . . ." <u>See</u>, *Steinhilber*, <u>supra</u>, 68 NY2d at 291-292.

While notably, the New York Court of Appeals has repeatedly held that the New York Constitution provides greater protection than the United States Constitution and, accordingly that the inquiry under the two constitutional regimes is different, (<u>see</u>, *600 West 115th Street Corp. v. Von Gutfeld*, 80 N.Y.2d at 136 & 138, 589 N.Y.S.2d at 827 & 829, 603 N.E.2d at 932 & 934 (1992); *Immuno AG v. J. Moor-Jankowski*, 77 N.Y.2d at 248-49, 566 N.Y.S.2d at 913-14, 567 N.E.2d at 1277-78 (1991)), the thrust of the dispositive inquiry under both New York and constitutional law is "whether a reasonable [reader] could have concluded that [the publications were] conveying facts about the plaintiff." <u>See</u>, *Gross v. New York Times Co.*, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817, 623 N.E.2d at 1167 (1993); *600 West 115th Street*, <u>supra</u>, at 829, 603 N.E.2d at 934 ("Under <u>either</u> Federal or State law, the dispositive question is whether a reasonable listener….could have concluded that [defendant] was conveying facts about the plaintiff"). Clearly a reasonable viewer in this instance would believe that the statements were conveying facts about Plaintiff [this is evidenced by the vicious attacks and public outcry for social justice that followed], and would believe that the statements constituted reports of a proceeding, which they did not.

**The Department of Education's Investigation and Plaintiff's Filings Are NOT Proceedings Covered Under Section 74**

Contrary to the Daily News Defendants' argument, neither the Department of Education's investigation into the Plaintiff, nor the Plaintiff's own Notice of Claim and Complaint can be considered "proceedings" for the purposes of Section 74, because there never was a reporting of any truth, to wit: there was **NEVER** any proceedings investigating the Plaintiff for "singling out

black students and making them act like slaves;" or telling them to "lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like." **THIS ERRONEOUS ACCUSATION WAS NEVER THE SUBJECT OF ANY INQUIRY BY THE DEPARTMENT OF EDUCATION OR OTHERWISE. It was entirely INACCURATE.** See, *Freeze Right Refrigeration & Air Conditioning Services, Inc. v. City of New York*, 101 AD2d 175, 182. Even Defendants' reporting related to Plaintiff's Notice of Claim and pleadings was inaccurate, as they continued to refer to her as a racist "slave teacher." See, Plaintiff's Exhibit B, at page 25. The News Defendant's disingenuous attempt to reconfigure the facts in order to hide behind Section 74 is transparent.

The Daily News Defendants disingenuously argue that each of the *Daily News* Articles report on OSI's investigation, include the allegations from parents and students that triggered the investigation, and then give as examples three (3) articles that do not support this position, yet ignore the numerous other articles, which also contain inaccurate and false information. See, Plaintiff's Exhibit B, at page 25. As to the February 2, 2018 article, the News Defendants ignore the false commentary that appeared on the front cover, under the Plaintiff's photograph, which clearly states: "*Made Black Students Lie Facedown on the Floor" and "Asked Them: 'See How It Feels to Be a Slave'*" See, Daily News Defendants' Exhibit A. This was not ever something being investigated by OSI. As to the July 9, 2018 article, the News Defendants ignore that the Plaintiff was never being accused or investigated of "racist acts." She was being investigated by the DOE for an allegation of corporal punishment. As to the August 11, 2018, article, the Daily News Defendants never bothered to correct the record and continued to have readers believe their initial false narrative of a "slavery controversy" that they themselves created. It remained consistent that the allegations they claimed were being investigated by OSI were not the allegations

which were actually associated with Plaintiff. Thus, the Daily News articles were **not** reports of official and judicial proceedings, and therefore, not within the contemplations of Section 74.

**The Daily *News* Defendants DID NOT Fairly and Accurately Report on These Proceedings**

Contrary to the Daily News Defendants' argument, the Plaintiff <u>does</u> allege that the articles present inaccurate summaries of the allegations against her. She does **not** concede that <u>at least</u> one parent complained that "Plaintiff instructed [the student] to get on the floor" and "put her knee into her back and pushed down;" <u>ONLY</u> one parent complained and the then Principal, Giulia Cox, alleged that the Plaintiff "pushed Student A's back with her knee and asked if it hurt" (See O.S.I. Report page 1), which was ultimately discredited by the OSI investigation. The Daily News Defendants attempt to distract this Court with an analysis of truth or falsity of the underlying allegations; however, they concede that the ultimate question is whether the articles truly and fairly report the allegations, and it this case, <u>they clearly did not</u>. Disingenuously arguing that the variations in the allegations were merely "*minor inaccuracies*" is laughable. The glaring distinctions in the allegations are clear and disqualify these reports from the protections of Section 74.

It is important to also note that the student that was interviewed by the Defendant, Ben Chapman, and who allegedly reported that the Plaintiff "*singled out black students and made them act like slaves;*" told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" was **absent** on the day of the lesson in question and could not have possibly witnessed the lesson. Absolutely no fact checking was done in presenting these erroneous facts to the public. Had there have been, they would have been able to interview ralph Hudson, the African-American teacher <u>who witnessed Plaintiff's lesson</u> and who has stated that her lesson was appropriate. <u>See</u> Ralph Hudson's Affidavit and OSI Report pgs. 7-8. Thus, the

Daily News Defendants' third argument must also fail. The Daily News Defendants cannot hide behind the protection otherwise afforded by New York Civil Rights Section 74.

Despite claims that this matter passes the "substantially accurate" standard. Here, the articles repeatedly fail to put the headline in context and fails to accurately report on OSI's investigation into Plaintiff. First, it notes that "several students and one staffer claimed that [Plaintiff] *singled out black students and told them to lie on the floor* for a lesson on U.S. slavery – and then stepped on their backs to show them what it felt like." None of this is true, nor is any of it what the Plaintiff was being accused of or the subject of an investigation. Here, contrary to the Defendants' argument, there was a failure to put the headline in context and accurately report on OSI's investigation. The article and headline, when read in conjunction, failed to accurately report on OSI's investigation, thus, the sub-headline, on its own, would be actionable. Based on the foregoing, the Daily News Defendants' articles are **not** privileged reports of official and judicial proceedings, the Amended Complaint cannot be dismissed on this basis.

## POINT II

### STATEMENTS DESCRIBING PLAINTIFF'S LESSON AS "RACIST" AND "INSENSITIVE" ARE NOT OPINIONS AND ARE THEREFORE ACTIONABLE

The privilege protecting the expression of an opinion is rooted in the preference that ideas be fully aired. See, *Davis v. Boeheim*, 24 NY3d 262 at 269 (2014), citing, *Steinhilber v. Alphonse*, 68 NY2d 283 at 289 (1986), and *Gertz v. Robert Welch, Inc.*, supra, 418 US 323, 339-340 (1974). Nonetheless, privileged statements of opinion are either accompanied by the facts on which they are based, or do not imply that they are based on undisclosed facts. See, *Gross v. New York Times Co.*, 82 NY2d 146 at 53-154 (1993). "When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" See, *Egiazaryan v. Zalmayev*, 880 F Supp 2d 494, 503 [SD NY 2012], quoting, *Steinhilber*, supra, 68

36

NY2d at 289, "because a reasonable listener or reader would infer that 'the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]'" See, *Gross*, supra, 82 NY2d at 153-154, quoting, *Steinhilber*, 68 NY2d at 290, and "if the predicate facts are disclosed, but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity," the statement may be actionable as a "defamatory opinion" See, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, F Supp 3d , 2016 WL 3773394, [SD NY 2016], citing *Silsdorf v. Levine*, 59 NY2d 8, 15-16 [1983], cert denied 464 US 831; see also, *Parks v. Steinbrenner*, 131 AD2d 60, 62-63 [1st Dept. 1987].

An asserted fact may be distinguished from a nonactionable opinion if the statement: (1) has a precise, readily understood meaning, that is (2) capable of being proven true or false, and (3) where the full context in which it is asserted or its broader social context and surrounding circumstances indicate to readers or listeners that it is likely fact, not opinion. See, *Davis*, supra, 24 NY3d at 271, citing, *Mann v. Abel*, 10 NY3d 271 at 276 (2008), and *Brian v Richardson*, 87 NY2d 46, 51 [1995]; *Gross*, supra, 82 NY2d at 153; *Steinhilber*, supra, 68 NY2d at 292.

"Where readers would understand a defamatory meaning, liability cannot be avoided merely because the publication is alleged to be cast in the form of an opinion, belief, insinuation or even question. A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community." See, *Christopher v. American News Co*., 171 F.2d 275 (7th Cir. 1948).

"[T]he following factors should be considered in distinguishing fact from opinion: (1) whether the language used has a precise meaning or whether it is indefinite or ambiguous, (2) whether the statement is capable of objectively being true or false, and (3) the full context of the entire communication or the broader social context surrounding the communication. Moreover,

the Court of Appeals makes a distinction between a statement of opinion that implies a factual basis that is not disclosed to the reader and an opinion that is accompanied by a recitation of facts on which it is based. The former is actionable, the latter is not." <u>See</u>, *Penn Warranty Corp. v. DiGiovanni*, 2005 NY Slip Op 25449 10 Misc3d 998 (2005). The Daily News Defendants never used words such as "alleged" or "accused of" when reporting; they lead the readers to believe the recitation of the facts presented to be accurate.

It bears mentioning that Under New York law, some written statements are considered defamation (libel) *per se* if they "(1) charge plaintiff with a serious crime; (2) tend to injure plaintiff in its business, trade or profession; (3) [communicate that] plaintiff has some loathsome disease; or (4) impute unchastity. <u>See</u>, *Penn Warranty Corp. v. DiGiovanni*, <u>supra</u>, 2005 NY Slip Op 25449 10 Misc3d 998 (2005). Such statements are presumed to cause injury, so a separate showing of harm is not necessary. Here, the facts as presented by the Daily News Defendants accuse Plaintiff of having committed a serious crime; to wit: walking on the backs of students is akin to child abuse and endangerment and the false labeling of the Plaintiff as a racist who committed such an atrocity has irreparably injured the Plaintiff in her profession as a school teacher and otherwise.

The News Defendants assert <u>factually incorrect statements</u>, to wit:

- "For example, in the Daily News Defendants' February 1, 2018 article, the opening line states that "kids" and parents say this Bronx teacher needs a lesson – in racism." "Clearly this line expresses the opinion of Plaintiff's students and their parents, whose interview quotes are included in later articles."

None of the Plaintiff's students or their parents were ever quoted in any article. In this regard, any quotes from the OSI Report would have related to the corporal punishment allegation, **not** what had been falsely reported as an assertion of fact in the Daily News - that she "*singled out black*

*students and made them act like slaves;" told them to "lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*"

- "Similarly, in the Daily News Defendants' July 9, 2018 article, the Daily News Defendants note that the City Department of Education officials had not yet concluded investigations of 'educators accused of racist acts.'"

This is <u>not</u> an indication that the Plaintiff's accusers viewed her actions as racist; it is an indication that the News Defendants inappropriately grouped the Plaintiff with other educators who had been accused of racist acts. The Plaintiff was <u>never</u> accused or investigated on an allegation of a racist act by the City Department of Education. She was being investigated on an allegation of corporal punishment.

Contrary to *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), the Daily News Defendants disclosed erroneous assertions of facts. There were no allegations from parents, students, or staff that the Plaintiff "*singled out black students and made them act like slaves;" told them to "lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" Likewise, the Plaintiff contests that she ever admitted "having misbehaving students sit in the front of the room to demonstrate the conditions on slave ships, or that a parent reported that she 'pushed her knee' into *students'* (plural) backs and asked if students (plural) felt pain." <u>See</u>, Plaintiff's Exhibit B at paragraph 53.

The Daily News Defendants attempt to support their position by citing various cases where the term "racist" was used; however, these are clearly distinguishable from this case, as it should be noted that these cases involve slander, not libel, and some of them involved public figures, <u>and Plaintiff is a private figure</u>. For example, in *Stevens v. Tillman*, 855 F.2d 394, 402, the Court opines that "[I]n daily life 'racist' is hurled about so indiscriminately that it is no more than a verbal slap

in the face; the target can slap back (as Stevens did). It is not actionable <u>unless it implies the</u> <u>existence of undisclosed, defamatory facts</u>." Here, the Plaintiff was not a public figure, who could easily "slap back" and the implication of the existence undisclosed defamatory facts was clear.

The Daily News Defendants erroneously rely upon *Covino v. Hagemann*, 165 Misc. 2d 465, 627 N.Y.S.2d 894, 1995 N.Y. Misc. LEXIS 272, in support of its position that use of the words "*racism*," "*racist*," and "*racially prejudiced*" were no longer obviously and naturally harmful. And were now used for their impact, rather than as a means to convey a precise meaning, and that the use of such words was generally not actionable as defamation. However, should these words *imply the existence of undisclosed, defamatory facts*, they would be actionable as defamation. <u>Id</u>.

Nonetheless, in *Covino*, <u>supra</u>, the facts are distinguishable, to wit: an investigator sent a letter to the borough officer, eventually published in a newspaper that accused the borough officer of being racially insensitive in dealings with borough citizens. The borough officer alleged that the statements constituted slander and libel. There were no undisclosed, defamatory facts. Moreover, the predicate facts in the instant matter are false; and the statements are capable of being proven false. <u>Id</u>.

The Daily News Defendants duplicitously argue that a headline is not actionable so long as it is a "*fair index of the article with which it appears*." <u>See</u>, *Mondello v. Newsday, Inc.*, 6 AD3d 586, 587 (2d Dept. 2004). Remarkably, it was **not** a fair index of the articles with which it appears, as the articles falsely permitted its readers to believe that the Plaintiff was being accused of "*singling out black students and making them act like slaves;" telling them to "lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like*."

Moreover, in distinguishing *Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept. 2015), it is clear that the Court in this matter could <u>not</u> find that the context of the complained-of statements was such that a reasonable reader would have concluded that he or she was reading opinions, not facts about the Plaintiff. It is significantly imperative to note that there were no actual facts being reported about Plaintiff and lies disguised as facts and asserted as facts <u>cannot</u> be considered disclosed facts. Thus opinions based on these false facts cannot be protected." It is more than the Plaintiff merely denying ever having students lie face down on the classroom floor and denying making physical conduct with any students. **These events never occurred**. These "facts" alone are insufficient to support the Daily News Defendants' description of the lesson as "racist" and "insensitive." These statements were **not** mere "subjective characterizations" of Plaintiff's behavior; they were blatantly false. Thus, the statements describing the Plaintiff's lesson as "racist" are actionable.

## POINT III

### THE REMAINING STATEMENTS THAT PLAINTIFF COMPLAINS OF ARE <u>NOT</u> SUBSTANTIALLY TRUE

The Daily News Defendants disingenuously argue that this Court should dismiss Plaintiff's Amended Complaint, because she fails to adequately plead that any of the remaining complained-of statements, are materially false. In fact, Plaintiff has substantially demonstrated that all of the statements made by the Defendants are materially false. To this end, the Daily News Defendants wrongfully rely upon *Masson v. New Yorker Magazine*, 501 U.S. 496, 111 S. Ct. 2419, 115 L. Ed. 2d 447, 1991 U.S. LEXIS 3630, 59 U.S.L.W. 4726, 91 Cal. Daily Op. Service 4683, 91 Daily Journal DAR 7272, 18 Media L. Rep. 2241, wherein the petitioner, a <u>public figure</u>, claimed that he was defamed by respondent author who attributed statements to him that were untrue. Petitioner further claimed that respondent author knew these statements were untrue but used them in her

book anyway. Petitioner brought an action for libel in federal court against respondent author, respondent publisher, and respondent magazine, which had originally published the book in the form of a series of articles. The lower court held that because petitioner was a <u>public figure</u> he had to show malice on the part of respondents in order to avoid summary judgment, and that he had failed to do so, therefore, it dismissed petitioner's suit. On appeal, the court held that petitioner had satisfied the malice prong of the test for defamation of a public figure, or libel. In this instance, <u>Plaintiff is **not** a public figure, and a showing of malice is not required</u>.

Moreover, "substantial truth" is the standard by which New York law, and the law of most other jurisdictions, determines an allegedly defamatory statement to be true or false. <u>See</u>, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) ("The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. It overlooks minor inaccuracies and concentrates upon substantial truth." (citations omitted)); <u>see</u> <u>also</u>, *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 21 N.Y.S.3d 6, 12 (1st Dept. 2015). In *Franklin*, the Appellate Division explained that "[t]o satisfy the falsity element of a defamation claim, plaintiff must allege that the complained of statement is 'substantially false.'" <u>See</u>, *Franklin*, <u>supra</u>, 21 N.Y.S.3d at 12.

"[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." <u>Id</u>. (internal quotation marks and citations omitted) (<u>quoting</u>, *Biro v. Condé Nast*, 883 F. Supp. 2d 441, at 458, 2012 U.S. Dist. LEXIS 112466, 2012 WL 3234106.); <u>see</u> <u>also</u>, *Fleckenstein v. Friedman*, 266 N.Y. 19, 23, 193 N.E. 537 (1934). "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." <u>See</u>, Fleckenstein, 266 N.Y. at 23 (<u>quoting</u>, *Cafferty v. S. Tier*

*Pub. Co.*, 226 N.Y. 87, 93, 123 N.E. 76 (1919)). That is not the case here. When a court interprets a publication in an action for defamation, "[t]he entire publication, as well as the circumstances of its issuance, must be considered in terms of its effect upon the ordinary reader." See, *Silsdorf v. Levine*, 59 N.Y.2d 8, 13, 449 N.E.2d 716, 462 N.Y.S.2d 822 (1983); see also, *Aronson v. Wiersma*, 65 N.Y.2d 592, 594, 483 N.E.2d 1138, 493 N.Y.S.2d 1006 (1985); *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34, 987 N.Y.S.2d 37 (1st Dept. 2014).

Here, the Daily News Defendants speciously argue that Plaintiff complains of various statements that—as a matter of law—are "substantially true," and therefore, claims arising from them should be dismissed. This argument is without merit, as the various statements complained of are not "substantially true" – in fact, they are blatantly false:

First, the Daily News Defendants argue that Plaintiff claims that it was false and defamatory to state that she "*shocked and traumatized children in her social studies class*" and that "*kids and adults . . . were horrified by the offensive lessons.*"

Contrary to the Daily News Defendants argument, the statement that Plaintiff "shocked and traumatized" children in her social studies classes, when she purportedly "*singles out black students and told them to lie on the floor for a lesson on U.S. slavery–and then stepped on their backs to show them what slavery felt like*" can be proven false. The statement asserting facts is "read as conveying a negative characterization of (plaintiff) without stating sufficient facts to provide the context for that characterization; under NY law, such a statement is actionable" See, *Friedman v. Bloomberg L.P.*, 884 F. 3d 83, 98 (2d Cir. 2017). "Nothing about the statement conveys hesitation or uncertainty. The statement does **NOT** contain any hyperbolic language suggesting opinion." See, *C.F.-Donofrio-Ferrezza v. Nicer*, 2000 WL 312477 at (S.D.N.Y. Sept 21, 2005). Using inflammatory words such as that is reckless and irresponsible. This is a "buzz

word" used to sell newspapers, because the Plaintiff was a "white" teacher teaching in a minority school and community. These reported and published statements and descriptions were false and based upon an erroneous set of egregious false statements asserted as "facts." Defendant Daily News' award-winning investigative reporter, Defendant Ben Chapman, failed to fully investigate and reasonably assess the veracity of the minor children and "unidentified staffer" before manufacturing the salacious story that was published by them.

Second, the Daily News Defendants argue that Plaintiff claims that it was false and defamatory to state that she "*pulled the insensitive stunt in multiple seventh-grade classes*" because she "asked for four (4) student volunteers to sit very close together for an exercise to exhibit spatial recognition in class 408, ONLY."

In support of its position, the Daily News Defendants erroneously rely upon *Cabello-Rondón v. Dow Jones & Co.*, 2017 U.S. Dist. LEXIS 131114, 45 Media L. Rep. 2746, 2017 WL 3531551, wherein Cabello, a public figure, alleges that Dow Jones published a defamatory article in the Wall Street Journal entitled "Venezuelan Officials Suspected of Turning Country into Global Cocaine Hub." The majority of Cabello's objections to the statements in the article pertain to statements describing him as "[t]he biggest target" or "a leading target" of U.S. investigations. The court found that Cabello has failed to adequately plead that those statements are materially false because he has not challenged the "gist or substance" of those statements—that he is, in fact, under investigation for his potential involvement in drug trafficking and money laundering activities. Cabello argues that he has adequately pled that the article's statements regarding his status as a target of the investigation are materially false. In this instance, Plaintiff has done more than perfunctorily state that a statement is false; Plaintiff has identified precisely *how* the Defendants' statements are false. See, *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 2017

U.S. App. LEXIS 13380, 45 Media L. Rep. 2093, 2017 WL 3137462. Unlike the plaintiff in *Cabello*, supra, Plaintiff herein has identified what portion of the headlines and subtitles she believes to be materially false: She was never accused of "*singling out black students and making them act like slaves;" telling them to "lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like*." As such, she has plausibly pled facts that give rise to the inference of a valid claim.

Third, the Daily News Defendants argue that Plaintiff claims that it was false and defamatory to state that Plaintiff's lesson "was about slavery and the Triangle Trade." Plaintiff maintains that the anonymous student interviewed was taken out of context. The Plaintiff taught about the Triangle Trade as part of the NYS curriculum she must teach as a seventh grade social studies teacher. She was adhering to the directives in teaching this topic.

Fourth, the Daily News Defendants argue that Plaintiff claims that Plaintiff claims that it was false and defamatory to state that she picked "three of the black kids" from the class to participate. The fact that there were no white students in her class to choose, permits the Daily News Defendants' phrasing to "mislead the public and place [her] in a false light." The statement implies that Defendants knew the racial make-up of Plaintiff's class. "A statement may still be actionable if it impl[ies] that the speaker's opinion was based on the speaker's knowledge of facts that are not disclosed to the reader." See, *Levin*, supra, 119 F.3d at 197. These statements may be actionable, "not because they convey 'false opinions' but rather a reasonable listener or reader would infer that the speaker or writer knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed." See, *Gross*, 82 N.Y.2d at 153.

There has been serious concern that, by sidestepping the safeguards which restrain the reach of traditional public defamation litigation, a "false light" approach could compromise the Constitutional guarantee of Freedom of the Press. See, Prosser, Torts [4th ed], p 813; Restatement, Torts 2d, § 652E, Comment d, particularly p 399; Wade, Defamation and the Right of Privacy, 15 Vand L Rev 1093, 1121). Responsively, the Restatement, which in 1933 suggested that to impose liability under the false light rubric a publication need but be "offensive to persons of ordinary sensibilities" (see, Restatement, Torts, § 867, Comment d), by 1976 had raised the threshold to a "highly" offensive level (see, Restatement, Torts 2d, § 652E, Comment c). Even assuming, that such an action is not cognizable in this State, by all means, this case measures up to this kind of criterion.

While New York does not have a common law tort protecting privacy against publicity that unreasonably places a person in a "false light," (see, *Howell v. New York Post*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 354, 612 N.E.2d 699 (N.Y. 1993), New York Courts construe the language of N.Y. Civ. Rights Law § 51 broadly enough to encompass false light claims. Claims under N.Y. Civ. Rights Law § 51 based on a fictitious or falsified report, which would otherwise be privileged, are actionable, with proof of knowledge of falsity or reckless disregard of the truth. Where falsity is the gravamen of a §51 claim, U.S. Const. Amend. guarantees permit imposition of liability where actual malice is shown. In examining the false light tort, it is notable to consider section 652E of the Restatement (2d) of Torts that provides:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

> (a) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

Hence, if a false light claim under the Restatement rubric is recognized in New York, Plaintiff has more than stated a claim under it.

In *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 248, 42 L. Ed. 2d 419, 95 S. Ct. 465 (1974), the Court addressed a false light claim in which it was conceded that an offending newspaper article contained a number of false statements and inaccuracies. It stated that the subject article contained "'calculated falsehoods,' and the jury was plainly justified in finding that [a news reporter] had portrayed the Cantrells in a false light through **knowing or reckless untruth**." Id. at 253 (emphasis added). *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), raised without deciding, whether in subsequent cases an actual malice or a negligence standard should be applied in a false light action commenced by a private individual against a media defendant. As in *Cantrell*, supra, the jury here found that the more stringent actual malice standard had been satisfied. As demonstrated herein, there is evidence on which a reasonable jury could find that the broadcast contained knowingly false and reckless statements, portraying the Plaintiff in a false light.

Notably, the cases cited by Defendant in support of its argument are distinguishable from the instant matter. In *Proskin v. Hearst Corp.*, 14 A.D.3d 782, 787 N.Y.S.2d 506, 2005 N.Y. App. Div. LEXIS 77, 33 Media L. Rep. 2439, the complaint was dismissed in defamation action arising out of newspaper article which stated that plaintiff attorney's political career fizzled after public revelations that he altered client's will, while plaintiff contended that article implied that he modified will illegally, surreptitiously or without authority from his client, innuendo or adverse inferences are not enough to establish that statement was false - as plaintiff undeniably modified

or changed his client's will, albeit with her permission and at her direction, statement was true; because statement was true, defendants established entitlement to absolute defense. There is more than just innuendo or adverse inferences here. Emphatically accusing Plaintiff of committing a racist act and stating that Plaintiff purposefully "selected picked three of the black kids, and instructed them to get on the floor in front of the class, saying, *'You see how it was to be a slave?' She said, 'How does it feel?'*'" Thus, the holding of *Proskin*, supra, is inapplicable here.

Regardless of the particular fault standard to be applied, it is clear that when publishing or broadcasting a newsworthy matter of public interest, a media defendant may be held liable for the tort of false light invasion of a person's privacy with proof of falsity and some level of fault. Cf. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 54 U.S.L.W. 4373, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986). Accordingly, Plaintiff's false light claim should be considered by this Court under these extreme circumstances.

Fifth, the Daily News Defendants argue that Plaintiff claims that it was false and defamatory to state that she was "removed from her post for a couple of days following the incident but then returned to class and was in school Thursday." This is blatantly false as well as misleading to the public. Plaintiff was in attendance at the William W. Niles School, Middle School 118 the entire start of 2018 until her removal/reassignment on February 2, 2018, the day after the Defendants' "exclusive" was published. Plaintiff was not removed for an investigation by the New York City Department of Education's Office of Special Investigations until February 2, 2018; the day the Daily News "exclusive" front page story was published.

Notably, the Plaintiff was never removed to a different school; she was reassigned to an administration building. The OSI report did not contain "various eyewitness accounts confirming that Plaintiff had placed her feet or knees on the students." See, Daily News Defendant's Exhibit

48

D; see also, Plaintiff's Exhibit A at page 8. The one student's complaint was not corroborated. Nonsensically, OSI, in its report, referred the matter back to Principal Cox to "take appropriate disciplinary action." See, News Defendants' Exhibit D. Yet, the Plaintiff had already been disciplined by Principal Giulia Cox when she was removed from teaching only class 408 in January, 2018; it is significant to note that Plaintiff continued to teach all of her other classes during that time. Furthermore, the report recommended training, not termination; however, the events that followed made it very clear that there was no intention for the Plaintiff to return to the school and teach. Though she was assured that she would be returning following the requisite filing of the disciplinary letter, the school apparently created a false schedule for the Plaintiff in order to conceal their true and premeditated intention to terminate her from her position. She was not terminated at the beginning of the 2018-2019 school year; she was actually terminated on October 18, 2018.

## CONCLUSION

Based on the foregoing, it has been demonstrated that the Daily News Defendants have failed to meet the standard in this Circuit that is necessary on a motion to dismiss under Rule 12 (b) (6). Accordingly, the Defendants' motion to dismiss should be denied in all respects and Plaintiff should have such other and further relief that this Court may deem just and proper.

Dated: Garden City, New York
      August 21, 2020

_____
THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq. (TL 4471)
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*

49