UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
PATRICIA CUMMINGS,

                                Plaintiff,

                                                        Docket No. 19-cv-07723 (CM)

                 -against-

THE CITY OF NEW YORK;
NEW YORK CITY DEPARTMENT OF EDUCATION;
GIULIA COX; COURTNEY WARE; BEN CHAPMAN;
NEW YORK DAILY NEWS; DR. ANDRE PERRY;
THE HECHINGER REPORT a/k/a HECHINGER
INSTITUTE ON EDUCATION AND THE MEDIA;
LENARD LARRY McKELVEY a/k/a
CHARLAMAGNE THA GOD;
WWPR-FM (105.1 MHZ); iHEARTMEDIA;
CLEAR CHANNEL COMMUNICATIONS, INC.;
NEW YORK STATE SENATOR, KEVIN S. PARKER;
COALITION OF EDUCATIONAL JUSTICE;
ANGEL MARTINEZ2; NATASHA CAPERS;
PHILIP SCOTT; ADVISE MEDIA NETWORK
n/k/a AFRICAN DIASPORA NEWS CHANNEL, and
"JOHN DOE AND JANE DOE # 1-100" said names
being fictitious, it being the intent of Plaintiff to designate
any and all individuals, officers, members, agents, servants,
and/or employees of the aforementioned agencies owing a
duty of care to Plaintiff, individually and jointly and
severally,

                                Defendants.
------------------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DOE AND CITY OF NEW YORK DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

                       THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
                       By: Thomas F. Liotti, Esq.
                       Attorneys for the Plaintiff
                       *PATRICIA CUMMINGS*
                       600 Old Country Road, Suite 530
                       Garden City, New York 11530
                       Phone: (516) 794-4700
                       Fax: (516) 794-2816
                       E-mail: Tom@TLiotti.com

Plaintiff, Patricia Cummings, (hereinafter "Plaintiff" or "Ms. Cummings"), a private individual, respectfully submits this Memorandum of Law in Opposition to Defendants' City of New York, New York City Department of Education, Guilia Cox, and Courtney Ware (hereinafter "DOE and City Defendants" or "Defendants") Motion to Dismiss the Plaintiff's Amended Verified Complaint pursuant to Federal Rule of Civil Procedure 12 (b) (6).

## PRELIMINARY STATEMENT

Plaintiff was a dedicated, effective, and highly respected probationary New York City Public School Teacher employed by the Department of Education to teach at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York. She seeks damages related *inter alia* to the infliction of defamation and defamation *per se*, slander, slander *per se*, libel, libel *per se*, fraud/misconduct, negligence, denial of due process, violation of civil rights, discrimination, and intentional infliction of emotional distress, loss of reputation, loss of income, expenses upon her, the erroneous termination of her employment as a New York City school teacher, and the "*badge of infamy*" with which she has forever been branded.

Plaintiff's claims arose as a result of what was fallaciously reported concerning an alleged complaint made by **one (1)** parent as a result of a bloviated, if not fabricated depiction of a sequence of events made by **one (1)** student middle school student on or about January 11, 2018, regarding a lesson taught by the Plaintiff in her social studies class 408, on the Middle Passage, which took place on January 9, 2018, wherein she subsequently and unwillingly became the subject of an "exclusive" story first published on February 1. 2018 and what became a front page pictorial and story in the New York Daily News on February 2, 2018, falsely accusing her of being a "*racist*" and "making black students lie face down on the floor of her class," and asking them: *"[H]ow does it feel to be a slave?"* As a result of the City Defendants' actions, this fabricated and erroneous

1

set of purported "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world.

Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, which created a widespread scandal where it was erroneously reported, among other things that she "*singled out black students and made them act like slaves*;" she is falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" She has been publicly shamed and falsely accused of "*child abuse*," labeled as a "*racist*," referred to as an "*oppressor*," by many, including politicians and activists, and specifically in various and extensive media outlets discussing this issue. She has received direct threats of violence and death causing her to fear for her life. Plaintiff was ultimately exonerated of the original erroneous allegations following an investigation by the New York City Department of Education's Office of Special Investigations, yet has nonetheless been terminated from her employment as New York City Public School Teacher at The William W. Niles School - Middle School 118.

Neither the City Defendants nor the DOE Defendants have met this Circuit's standard on Rule 12 (b) (6) motions. "The Supreme Court in *Bell Atlantic Corp v. Twombly*, (550 US 544, 570, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) held that, in order to survive a motion to dismiss pursuant to Rule 12 (b) (6), a plaintiff need not provide detailed factual allegations, but the factual allegations asserted must be "enough to raise a right to relief above the speculative level…" <u>See</u>, *Koulkina v. City of New York*, 559 F. Supp. 2d 300 (S.D.N.Y. 2008). Accordingly, Defendants' motion to dismiss should be denied in all respects.

2

## STATEMENT OF FACTS

Plaintiff's lesson was, in actuality, an example of a multi-sensory[1] teacher demonstrating "spatial recognition" to her students. This part of her lesson was described by Plaintiff as a "teachable moment," meant for the students to perceive the closeness of the conditions being discussed for clarification purposes; it was not, in any way, a reenactment. A fabricated account alleged by Defendant Giulia Cox (*See* OSI Report page 1: "Origin of Complaint"), accused Ms. Cummings "pushed Student A's back with her knee and asked if it hurt" (*See* O.S.I. Report page 1), is contradicted by the reported findings of the of the New York City Department of Education's Office of Special Investigations (also referred to as OSI); to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student' I never observed Ms. Cummings' knee make contact with 'Student A'*'" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them.*" *See*, Redacted Copy of Office of Special Investigations Investigative Report (OSI) dated July 24, 2018, included as City Defendants' **Exhibit A**. Moreover, "Students B, D, E, F, I, J and K" noted that the participating student volunteers did not appear to be in any distress. *See*, City Defendants' Exhibit A. Most remarkably, "Student J" admitted that "'*Student A'*[2] *was lying and was attempting to get Ms. Cummings fired or in trouble because 'Student A' did not like*

---

[1] Multi-sensory teaching is a didactic system that seeks to develop awareness of self in time and space in order to raise cognition and understanding of the world as is experienced. It takes into account that different children learn in different ways; conveys information through things like touch and movement-called tactile and kinesthetic elements, as well as sight and hearing. *See*, White, Helen and Christina Evans, Learning to Listen to Learn: Using Multi-Sensory Teaching for Effective Listening (2005).

[2] "Student A" was one of four students who voluntarily participated in the classroom demonstration on the Middle Passage. It was erroneously alleged that Ms. Cummings pushed "Student A's" back with her knee and asked if it hurt or caused her discomfort.

*Ms. Cummings*." <u>See</u>, Defendants' Exhibit A, at page 5. Moreover, Plaintiff controverts this fallacious allegation in her rebuttal correspondence addressed to Community Superintendent Maribel Torres-Hulla dated October 5, 2018, annexed hereto as **Exhibit B** at page 8.

On January 9, 2018, she Plaintiff taught her 7th grade social studies Integrated Co-teaching (ICT) Class 408 a lesson on the Middle Passage. As part of the lesson, plaintiff employed best practices in differentiating her instruction, through the theory of multiple intelligences, by using a portion of a film which would be beneficial to all students. Plaintiff acknowledges that in her lesson she showed a *five (5) minute video clip* from the movie entitled *Freedom* to differentiate her lesson and increase student engagement and retention of the material which depicted the horrible conditions and atrocities Africans who were slaves were subjected to on the Middle Passage. Defendants disingenuously include in their papers descriptions of the entire movie as a "melodramatic religious drama," where the ship's captain "sees countless awful sights, from nearly naked people chained together in the tightest quarters to a woman being branded with a hot iron." (noting that it "[c]ontains violence and disturbing images"). It should be noted that nothing graphic was shown to the students. It is important to note that there is no policy within the DOE which states that that a teacher needs to seek approval to use material in their lesson to differentiate instruction. There is however, policy within the DOE which states that (1) an a teacher rated "Effective" by the DOE, like the Plaintiff had been, does not to need to have her lessons reviewed prior to executing them, and (2) teachers have the professional discretion in regards to a lesson plan's format, organization, and elements that are included. During the showing of the *five (5) minute video clip*, as some students were mocking the contents of said video clip, specifically the closeness of the conditions being discussed; as a result, a teachable moment arose, and the Plaintiff engaged four (4) student volunteers to sit very close together utilizing the educational methodology

4

of spatial recognition. Nonetheless, Plaintiff denies that any student laid on the floor at any time during the demonstration and denies making any physical contact with any student during the demonstration, which was no more than 20 seconds in length. Ralph Hudson[3], a teacher on his preparation period and in Plaintiff's classroom, observed the Plaintiff's lesson.

"Student A" is alleged to have complained on or about January 11, 2018, and as noted in the OSI Report, "Student A's" mother is noted to have complained 6 days later (9 days after the lesson). See, **Exhibit C** for an abridged and concise timeline of events. Further, it is evident that a complaint was not immediately filed according to the OSI Report. See, City Defendants' Exhibit A. Furthermore, Plaintiff was not removed for an investigation by the New York City Department of Education's Office of Special Investigations until February 2, 2018; the day after the Defendants Daily News and Ben Chapmans "exclusive" false and salacious story was first published and day the Defendant Daily News' "exclusive" front page story was published. Principal Cox did an independent investigation, and failed to adhere to Chancellor Regulation A-420 and breached Article 20 of the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT). A copy of the Plaintiff's Amended Verified Complaint dated May 27, 2020, annexed hereto as **Exhibit D**.

On or about January 16, 2018, Plaintiff received a hand-delivered correspondence by and from Defendant, Giulia Cox, Principal of The William W. Niles School - Middle School 118,

---

[3] It should be noted that Ralph Hudson is African-American and witnessed the Plaintiff's lesson. He acknowledged to the Plaintiff after the lesson that he was impressed with how she handled the situation and subject matter with such grace and dignity. It is important to note that he told investigators from the Department of Education's Office of Special Investigations (OSI) that he found the lesson to be "*appropriate* and was within the scope of *effectively educating students* about the harsh conditions endured by slaves during transport." (Emphasis added). He did not corroborate the events that the student alleged to have happened. Furthermore, he indicated that it was his belief that if the Plaintiff were African-American, the incident would have been a non-issue.

inexplicably informing her that she was the subject of a disciplinary meeting to take place on January 18, 2018. On or about January 18, 2018, Plaintiff met with Defendant, Giulia Cox and was shown the student's statements taken on January 11, 2018. Plaintiff requested that Defendant, Giulia Cox speak with Ralph Hudson regarding what he had observed in the classroom that day; however, Defendant, Giulia Cox inexplicably refused. It was at this time that Defendant, Giulia Cox began to create a false narrative regarding the events of January 9, 2018.

Shortly thereafter, from January 23, 2018 to January 25, 2018, Plaintiff was only removed from teaching class 408; however, notably, she continued to teach the rest of her classes on her teaching schedule/assignment during this time. Following Plaintiff's return to class 408, on or about February 1, 2018, due to Defendants' negligence and/or lack of security, Plaintiff was accosted and confronted on school property by Defendant, Ben Chapman, a reporter with the New York Daily News, and as a result, Plaintiff became the subject of a false and scandalous "exclusive" story falsely accusing her of being a "racist" and *singling out black students and making them act like slaves*;" telling them to "*lie on the floor for a lesson on slavery and then stepping on their backs to show them what slavery felt like*", which was first published on February 1, 2018 at 9:00 PM online. Defendant herein, Ben Chapman, further wrote that the Plaintiff had "*shocked and traumatized children in her social studies classes*."

As a result of Defendants' negligence and/or willful failure to secure the campus, this fabricated and erroneous set of "facts" was picked up by the media worldwide and transmitted to various news outlets and appeared online and in media all over the world. Plaintiff has received direct threats of violence, sexual assault, and death causing her to fear for her life and safety. Not only did Defendant, Ben Chapman and Defendant, New York Daily News defame Plaintiff's character in their exclusive February 1, 2018 article, and subsequent articles thereafter including

their "exclusive" front page pictorial and story on February 2, 2018, but they also took her picture against her will on school property and published it on the cover page to entice the public to read the article as well as other pictures of Plaintiff in the article itself, which caused Plaintiff to suffer enormous and outrageous attacks. Due to the Defendants' negligence and/or lack of security, Defendant, Ben Chapman, and his photographer trespassed on school grounds speaking freely with minor students, without parental knowledge or consent and walked around the entire campus unattended. In homeroom on February 1, 2018, two of Plaintiff's students reported to her that on January 31, 2018, a "white man" had been walking around campus confronting students asking questions about her [Plaintiff]. Plaintiff immediately went to the main office after speaking to said two students, to inform Defendant, Giulia Cox. She learned that Defendant Cox was not in the building at the start of the school day, and saw the UFT Chapter Leader, (Ms. Murphy-Higgs) and informed her. Ms. Higgs in turn informed Defendant, Assistant Principal Courtney Ware, of the situation. Defendant, Courtney Ware confronted and questioned the students. She also spoke to School Safety Agent Rodriguez and stated to him how "she couldn't understand how he let this happen," and directed that "there better be more agents outside because this cannot happen again." Further, numerous students informed Plaintiff throughout the school day on February 1, 2018, that a "white man" with a notepad had asked if Plaintiff ever walked on their backs. This fabricated and erroneous set of "facts" would be what the public at large would believe had been perpetrated by Plaintiff. Other students agreed that they had also been confronted by a "white man" who was 'writing down what they [the students] were saying. During second period, two students in Plaintiff's class 408 confronted a third student and accused him of being a liar – screaming that he [the student] had lied to the "white man" yesterday when asked about the Plaintiff. After class,

those same two students confided in Plaintiff and stated that the third student (J.S.),[4] had erroneously told the reporter that she [Plaintiff] "*had us [the students] lie on our stomachs and walk on our backs*," and the student was described as laughing hysterically at what he had told the reporter. Those two students had tried to defend Plaintiff by saying it never happened and what (J.S.) had told the reporter was a lie. One of the two students even explained the lesson and what he learned while defending her. It is important to note that Student J.S. was not even in attendance the day the lesson was taught; a fact that would have easily been verifiable.

Following the Defendant Daily News' exclusive, Plaintiff was featured in several prominent newspapers and televised news programs, as well as on YouTube, where it is erroneously reported, among other things that she "*singled out black students and made them act like slaves*;" she is falsely reported to have told them to "*lie on the floor for a lesson on slavery and then stepped on their backs to show them what slavery felt like.*" She has been publicly and falsely accused of "child abuse," labeled as a "racist," referred to as an "oppressor," by many, including politicians and activists, and specifically by Defendant, Ben Chapman, a reporter from the New York Daily News and Defendant, Dr. Andre Perry in the Hechinger Report, a nonprofit, independent news organization focused on inequality and innovation in education. Plaintiff has been publicly referred to as, among other things, a "racist," a "bigot" a "cracker," and a "white devil," by New York City Power 105.1 radio personality and social media influencer, Defendant, Lenard Larry McKelvey, known professionally as "*Charlamagne tha God*;" and, among other things, as a "cave animal" and a "white supremacist" by Defendant, Philip Scott, a YouTube personality, host of TheAdviseShowTV channel, disingenuously proclaiming a commitment to

---

[4] The minor student's name has been replaced with in initials in order to protect his privacy. Plaintiff acknowledged that this student was angry with Plaintiff because he was not doing well in her class and wanted to get her [Plaintiff] fired.

reporting "truthful" and "accurate news," where he has over a million subscribers listening to his social and political commentary, and further by other members of the general public in various and extensive online media posts discussing this issue. Plaintiff has received direct threats of violence, sexual assault, and death causing her to fear for her life and safety. Notably, Defendant, Giulia Cox, Principal of The William W. Niles School - Middle School 118, adamantly refused to speak with Ralph Hudson, a teacher who was present in the classroom, underlinwitnessed Plaintiff's lesson, and later testified to the Office of Special Investigations (O.S.I.) that the lesson in question was "appropriate and in the scope of effectively educating students." See, Defendants' Exhibit A at pages 7 and 8.

On February 1, 2018, after being ambushed on school property at dismissal by the Defendant, Ben Chapman and his photographer, Plaintiff immediately went to see her immediate supervisor, the Assistant Principal, Leah Dyer and advised her [AP Dyer] that she [Plaintiff] had been ambushed on school grounds by Defendant, Ben Chapman. Assistant Principal, Leah Dyer consoled Plaintiff and advised her to fill out a DOE Online Occurrence Reporting System Report ("OORS Report") so as to document the incident. Assistant Principal, Leah Dyer then called the Main Office to speak with Defendant, Giulia Cox regarding the incident. After some time passed, Defendant, Giulia Cox came to Ms. Dyer's Office and stated she [Defendant, Giulia Cox] called the Chancellor Division that handles media issues and confirmed that the *Daily News* would indeed be running a story on Plaintiff. Defendant, Giulia Cox then suggested to Plaintiff that she should take the next day off. Plaintiff adamantly refused, as she had done nothing wrong. Later on February 1, 2018, at 6:02 pm, Plaintiff was advised via e-mail that the Division of Human Resources has reassigned her work location to 100 Gold Street; which has been notoriously referred to as "teacher jail." In an effort to be certain that Plaintiff would be advised of her abrupt

reassignment, Defendant, Giulia Cox left Plaintiff a voicemail message at 5:59 pm. Plaintiff was further advised that she was the subject of an investigation by the Office of Special Investigations (OSI). As a result, Plaintiff was prohibited from returning to the Department of Education Middle School 118 without prior written permission. Plaintiff was subsequently further reassigned to the Queens South Reassignment Center, at 82-01 Rockaway Boulevard, Queens County, a small, uncomfortable room with bars on the windows and 15+ teachers crammed together. On February 2, 2018, at 6:15 am, Defendant, Giulia Cox sent an e-mail to the entire school staff advising that the Superintendent has advised that the school should expect a large media presence at the school that morning. They were expected to be reporting on the "classroom incident" that occurred approximately two weeks ago. She [Defendant, Giulia Cox] further stated: "It is normal for Middle School children to be curious and excited about the presence of reporters, but the students are minors and should not be speaking with the media without parental permission." These statements by Defendant, Giulia Cox are curiously disingenuous, as Defendant, Ben Chapman and his photographer had been on school grounds speaking freely with minor students without parental knowledge or consent and walking around the entire campus unattended. As previously stated, two of Plaintiff's homeroom students, two students in her class 408 second period, and numerous students throughout the school day, reported to her that the previous day, January 31, 2018, that on January 31, 2018, a "white man" had been walking around campus confronting students asking questions about her [Plaintiff]. Moreover, the students told Plaintiff that the "white man" had asked if Plaintiff had ever walked on their backs and was writing things down in a notepad. On or about February 2, 2018, Defendant, Giulia Cox sent a letter to the parents expressing the school's concern over the reported accusation; informing them that it is being investigated; and reassuring the parents that she [Plaintiff] has "been assigned away from students." Moreover, Defendant, Giulia

Cox appeased the parents by advising them that "she was working with staff to review the Department's Non-Discrimination Policy to further diversity and sensitivity awareness in the workplace."

On or about March 9, 2018, Plaintiff received a 48-hour written notice from Defendant, DOE's confidential investigator, William Deininger, advising that OSI is conducting an investigation into an allegation of employee misconduct that had been filed against her. The meeting did not take place until March 15, 2018, (due to inclement weather). On or about March 19, 2018, Plaintiff received an e-mail from Defendant, DOE's confidential investigator, William Deininger advising that she would be returning to her teaching position at the William W. Niles School - Middle School 118, Community School District 10, located in Bronx County, New York. That never happened. Plaintiff was ultimately exonerated of the erroneous allegation of corporal punishment alleged by Defendant Giulia Cox following an investigation by the Office of Special Investigations. The OSI report was reduced to writing on July 24, 2018, (see, Defendant's Exhibit A), but Plaintiff was not notified that she had been cleared of the accusations until July 26, 2018, by her UFT District 10 Representative. She was advised by the UFT District 10 Representative that she would be returning to work and teaching at the William W. Niles School - Middle School 118 for the 2018-2019 school year. Defendant DOE curiously did not mail the letter stating she was able to return to her position as "TEACHER" to her mailing address, but instead mailed the letter to the William W. Niles School, Middle School 118.

On August 22, 2018, Plaintiff received an e-mail from Defendant, Giulia Cox, advising that she was released from reassignment in August, (which is factually wrong), and would be scheduled to be teaching at the William W. Niles School - Middle School 118 in September. Defendant, Giulia Cox stated that Plaintiff would be tentatively teaching 6th grade Social Studies

11

in Spectrum Academy; (the position that Mr. Cavallo vacated when he took an Open Market Transfer in June). This is extremely notable, as Plaintiff believes that was how Defendant Giulia Cox knew Plaintiff was going to be terminated, and she [Defendant Giulia Cox] would be able to justify her hiring someone with that schedule. It would be just an easy name switch on her part. However, the fact that Plaintiff had filled out a preference sheet complicated matters; therefore, Defendant, Giulia Cox had to create the fake schedule—one that looked as if she created a schedule for the Plaintiff and followed the contract between the DOE and United Federation of Teachers ("UFT") . [Plaintiff advises that as Middle School teacher you teach 25 classes per week; 21 out of the 25 classes on her 2018-2019 teaching schedule/assignment were the same exact classes (day, time, class period and classroom number) as Mr. Baker's, 2 were the same exact classes (day, time, class period and classroom number) as Mr. Thomas' and 2 were the same exact classes (day, time, class period and classroom number) as Ms. Gambordelli's]. Plaintiff was NEVER the teacher of record for the classes she was scheduled for, as Mr. Baker, Mr. Thomas, and Ms. Gambordelli are all General Education Teachers of Social Studies and they would NEVER be scheduled to teach the same exact class, at the exact same time, at the exact same location.  This evidences the fact that Plaintiff's firing was pre-meditated and that there was no due process in her termination. Defendant, Giulia Cox will likely argue that she had to restructure the building; however, to make her story plausible, if Plaintiff was the true and actual teacher of record for those classes listed on her teaching schedule/assignment, there would've had to have been a substitute teacher covering those classes Plaintiff was scheduled for during her second reassignment, from September 5th, (the first day students report) up until and including her termination on October 18, 2018. Moreover, Plaintiff is not licensed in NYS to teach 6th grade and would be violating NYS Education Law by accepting the assignment as Defendant, Giulia Cox stated Plaintiff would be tentatively teaching.

Nonetheless, Plaintiff advised Defendant, Giulia Cox that she would be returning to the school and provided her with a completed preference sheet[5] and filled out a circular assignment utilizing the hyperlink Defendant, Giulia Cox had provided. On August 29, 2018, Plaintiff contacted the Manager of Reassigned Staffing Team – Division of Human Resources, Colin Caldwell, because it was her [Plaintiff's] understanding that if she is still reassigned at the end of the (2017-2018) school year, she should report to the same reassignment location on the first day of school, unless she received a formal notice. Plaintiff had not received any official notice from the DOE authorizing her to return to the Middle School, and she was concerned about being falsely accused of insubordination. Nonetheless, she was advised by Mr. Caldwell that she should report to the William W. Niles School - Middle School 118 on September 4, 2018, the date all teachers in the NYC Department of Education return from summer break and return to their schools. On September 4, 2018, Plaintiff returned to the William W. Niles School - Middle School 118, and at 8:11 am Plaintiff was texted by Defendant, Cox's secretary Arlene Enriquez, summoning her to the Principal's office for a "meeting." At this meeting, following her receipt of her program schedule and 48-hour notice to review the OSI report, Plaintiff was instructed to report downstairs for the Welcome Back meeting. Plaintiff went downstairs and was warmly greeted by faculty and staff. As she was about to take her seat with her colleagues for the Welcome Back Meeting, in the inner courtyard of the building, Defendant, Cox's secretary Arlene Enriquez, came to her and told her that the Principal needed her to sign something. Plaintiff was abruptly and inexplicably presented with another notice to reassign her <u>again</u>, not as the subject of an investigation but

---

[5] The preference sheet was received by the Plaintiff in the August 22, 2018, e-mail, but it should have properly been provided to the Plaintiff in May in accordance with the UFT/DOE Contract for Classroom Teachers. <u>See</u>, Article 7B (1). Nothing in the collective Bargaining Agreement between the DOE & UFT indicates that a teacher who has been reassigned would not be afforded this right.

pending employee discipline. Plaintiff was shocked and devastated that they could do this to her, after the DOE had cleared her to come back. Plaintiff notified her UFT District representative and the Manager of Reassigned Staffing Team – Division of Human Resources, Colin Caldwell, who proceeded to advise her that her Principal had done this to her. He stated blatantly and with remorse, "*I'm sorry. Your Principal did this to you.*"

Plaintiff reluctantly signed the reassignment paper acknowledging she received it in accordance with the Contract between the UFT and DOE, in the presence of her UFT Chapter Leader (Lisa Baccari) and Arlene Enriquez, and clocked out of the building at 8:38 am; she [Plaintiff] had been there a mere one hour and thirty-eight minutes of arriving. Defendant, Giulia Cox further exacerbated Plaintiff's humiliation and embarrassment, by publicly notifying Plaintiff of her reassignment back to 100 Gold Street, in front of the entire faculty and staff and having Plaintiff escorted out of the building by NYPD School Safety agents. Plaintiff was subsequently and inexplicably placed back in the Queens South Reassignment Center, where she remained until she was terminated on October 18, 2018. Nonetheless, despite being exonerated of the erroneous allegations following an investigation by the Office of Special Investigations, Plaintiff was found in the report, to have exercised "poor judgment" and was terminated from her position as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10 on October 18, 2018.

In an attempt to diminish Plaintiff's claims, Defendants erroneously argue that by showing the clip from the movie *Freedom*, Plaintiff deviated from the class's preapproved curriculum and failed to seek permission. Nonetheless, Plaintiff maintains that she did not deviate from the curriculum. See, Plaintiff's Exhibit A, at page 3-4. Additionally, Plaintiff did not need to seek permission to differentiate her instruction, as DOE Policy dictates that "the elements that are to be

included [in a teacher's lesson] are appropriately left to the digression of the teacher". Moreover, Plaintiff was not looking to replicate the <u>conditions</u> on the boats along the Middle Passage; she sought to replicate the space, or lack thereof, as a demonstration of spatial recognition. By the same token, Plaintiff did <u>not</u> specifically select black students as volunteers for the demonstration. It was acknowledged that she sought random volunteers from the class to participate in the demonstration; no student was forced to participate. Notably, the class was comprised entirely of minority students. Again, the claim that multiple students reported that Plaintiff used her feet or hands to push these students even closer together is <u>false</u>. As stated previously herein, "Student B" specifically denied that Ms. Cummings used her feet or her knees to push students closer together. The fabricated account is clearly contradicted by the reported findings of the Office of Special Investigations; to wit: "'*Student B' denied that Ms. Cummings used her feet or her knees to push the students closer together during the demonstration*;" "'*Student I' never observed Ms. Cummings' knee make contact with Student 'A'*;'" "'*Student J' denied that Ms. Cummings made any physical contact with the students to make contact with them*." <u>See</u>, Defendants' Exhibit A; <u>see also</u>, Plaintiff's Exhibit A at page 8.

Defendants herein present an inaccurate account of the complaint filed with the principal, [Defendant Giulia Cox], by the student and her parent. Believing that these actions may constitute corporal punishment, for any of that account to be plausible, Defendant Giulia Cox would have had to report the alleged incident after the "original" students' statements were taken by Defendant Courtney Ware on January 11, 2018, prior to the Plaintiff's notice of a disciplinary meeting which she received on January 16, 2020 and prior to Plaintiff's initial meeting with her on January 18, 2018; she [Principal Cox] had not. This is evidenced by the fact Defendant Cox independently "disciplined the Plaintiff and only removed her from teaching class 408". Defendant, Cox left Ms.

Cummings to teach her other classes on her official school schedule.  This infers that there was no indication of corporal punishment, because had there actually been, (1) Plaintiff would have been removed from teaching all of her classes and (2) Plaintiff would have received correspondence indicating that she was the subject of an OSI investigation within 5 school days as outlined in the Department of Education's Chancellor Regulations. To make Defendant Cox's narrative plausible, Plaintiff would have received correspondence no later than January 25, 2018 indicating she was the subject of an OSI investigation <u>and</u> given an OSI Index Number; that did not occur. Additionally, Plaintiff was returned to teaching all of her classes after three days. This demonstrates that the discipline by Defendant Cox was done so to placate the parent of the student in class 408, and that Defendant Cox did not follow any of the NYC DOE Chancellor's Regulations, as detailed in the Amended Complaint. Thus, Defendant Cox conducted an independent investigation, which did <u>NOT</u> comply with the rules and regulations of the DOE. Therefore, Defendant Cox's independent/rogue investigation did <u>NOT</u> constitute any type of state investigation or "Official Proceeding" by the DOE. Plaintiff was <u>never</u> removed to a different school; she was reassigned to an administration building. The OSI report did <u>not</u> contain "various eyewitness accounts confirming that Plaintiff had placed her feet or knees on the students." <u>See</u>, Defendant's Exhibit A; <u>see also</u>, Plaintiff's Exhibit A at page 8. The <u>one</u> student's complaint was <u>not corroborated</u>. While it was reported that the Department of Education "does not ever include or encourage reenactments of historical events where students take on roles of victimized people," <u>no such policy is known to exist</u>. <u>See</u>, Plaintiff's Exhibit A at pages 7-8. Nonsensically, OSI, in its report, referred the matter back to Defendant, Principal Cox to "take appropriate disciplinary action." <u>See</u>, Defendants' Exhibit A. Yet, Plaintiff had already been disciplined by Defendant, Principal Giulia Cox, when she was removed from her classroom and from teaching class 408 in

16

January, 2018. Furthermore, the report recommended training, <u>not</u> termination; however, the events that followed made it very clear that there was no intention for Plaintiff to return to the school. Though she [Plaintiff] was assured that she would be returning following the requisite filing of the disciplinary letter, the school apparently created a false schedule for Ms. Cummings in order to conceal their true and premeditated intention to terminate her from her position. She was not terminated at the beginning of the 2018-2019 school year; she was actually terminated on October 18, 2018. Additionally, the finding that Plaintiff acted with "poor judgment" in conducting a lesson that inadequately incorporated the New York City DOE social studies curriculum and guidance for this topic is a violation of her due process, as this is an improper finding; it is not the function of the Office of Special Investigations to examine and evaluate teacher pedagogy (method or practice of teaching). The "poor judgement" conclusion is hearsay, violates their own rules and regulations, and its agency (OSI) does not evaluate pedagogy and in doing so, is in violation of NYS and DOE policy, thus further constituting fraud and misconduct, not only in the process of but the dissemination of their conclusion that Ms. Cummings acted with "poor judgment." The DOE then fraudulently acted to conceal the fact that they were going to terminate her employment upon the knowledge that the Plaintiff was going to return to her teaching position for the 2018-2019 school year, after the DOE cleared her of the corporal punishment charge in July 2018; thus the Defendants made it appear that they followed contractual rules and NYS regulation/law in regards to Plaintiff's termination, when in fact they did not. Defendants terminated Plaintiff's probationary employment on October 18, 2018. Defendants state that the termination was based upon the outcome of the investigation as well as her overall poor performance as an educator. However, the Ms. Cummings was rated as an "Effective" teacher by the DOE, in accordance with NYS Educational law and their own regulations.

As a result, Ms. Cummings' reputation as a respected educator has been irrevocably damaged. Her professional career has been substantially compromised, and she has been unwillingly exposed to negative notoriety, which has publicly humiliated and embarrassed her and subjected her to threats of violence, assault, and death.

## ARGUMENT

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), District Courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. See, *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); see also, *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). In order to satisfy the pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. See, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) at 678 (citing, *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 2007 U.S. LEXIS 5901, 75 U.S.L.W. 4337, 2007-1 Trade Cas. (CCH) P75, 709, 68 Fed. R. Serv. 3d (Callaghan) 661, 20 Fla. L. Weekly Fed. S 267, 41 Comm. Reg. (P & F) 567.

## POINT I

## THE FAC VIOLATES THE COURT'S MAY 28th ORDER PERMITTING PLAINTIFF TO FIX A TYPO AND RE-FILE THE AMENDED COMPLAINT

Defendants erroneously argue that Plaintiff's Amended Complaint does not comply with the Court's May 26, 2020 Order. On February 24, 2020, this Court issued its Memorandum Decision and Order, dismissing Plaintiff's claim with leave to replead within 21 days. In accordance with the Court's Decision and Order, Plaintiff timely filed an Amended Verified Complaint (Document No. 95), on March 16, 2020 (the 21st day). Nonetheless, on March 17,

2020, the CM/ECF system issued a notification advising of a deficiency in Plaintiff's pleading, and further, that the Court's leave must be granted in order to re-file.

Nonetheless, on March 20, 2020, the majority of Plaintiff's counsel's office staff was furloughed as a result of Governor Andrew Cuomo Executive Order No. 202.8, and it was understood that all court filings were temporarily suspended.  It further understood that filing deadlines in this Court's civil cases had been administratively extended, and that Plaintiff would be precluded from seeking leave to refile Plaintiff's Amended Verified Complaint until such time as the suspension of Court filings were lifted. On May 15, 2020, blanket extension for filing papers in civil cases expired, and Plaintiff sought this Court's leave to refile the Plaintiff's Amended Verified Complaint. On May 26, 2020, the Court granted Plaintiff's request and instructed counsel to file it immediately. See, Docket No. 99. On May 28, 2020, Plaintiff filed its Amended Verified Complaint. See, Docket No. 100. Based on the foregoing, the Defendant argues that Plaintiff made numerous changes to paragraphs of the Amended Verified Complaint, for which it did not seek leave of the Court to do, and should therefore, be dismissed.

While Defendants have sought to capitalize on the fact that the Amended Verified Complaint filed on May 28, 2020, contained certain modifications, from the March 16, 2020 filing, the Court of Appeals has reminded us that there is a preference for determination on the merits, rather than dismissal on technicalities. See, *Valentin v. Commissioner of Social Servs.*, 2000 U.S. Dist. LEXIS 16948, 2000 WL 1727710, quoting, *Cody v. Mello*, 59 F.3d 13, 15 (2d Cir. 1995).

This Court has expressed on numerous occasions its preference that litigation disputes be resolved on the merits, not by default. See, e.g., *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993); *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983); *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981). We have recognized that "'dismissal is "a harsh remedy to be utilized only in

extreme situations.'" <u>See</u>, *Colon v. Mack*, 56 F.3d 5, 1995 U.S. App. LEXIS 13047, (2d Cir. 1995) (<u>quoting</u>, *Jackson v. City of New York*, 22 F.3d 71, 75 (2d Cir. 1994) (<u>quoting</u>, *Harding v. Federal Reserve Bank of New York*, 707 F.2d 46, 50 (2d Cir. 1983) (<u>quoting</u>, *Theilmann v. Rutland Hosp., Inc.*, 455 F.2d 853, 855 (2d Cir. 1972)). Moreover, even assuming there is any merit to the Defendants' argument, there has been no prejudice to them, as they were not foreclosed of any opportunity to file a response to Plaintiff's amended pleading. Accordingly, the Defendants' request for dismissal on this basis is without merit and should be denied.

**POINT II**

**PLAINTIFF'S CONSTITUTIONAL LAW CLAIMS ARE MERITORIOUS**

Plaintiff claims that the actions of Defendants violated her rights under the Fourteenth and Fifth Amendments to the Constitution. Despite its malleable characteristics, a fundamental requirement of due process is the opportunity to be heard, at a meaningful time and in a meaningful manner. <u>See</u>, *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); *Ahern v. Board of Education*, 456 F.2d 399, 403 (8th Cir.1972); *Cooley v. Board of Education*, 453 F.2d 282, 286-87 (8th Cir.1972). In the absence of a state tenure statute, a teacher may still attain *de facto* tenure rights if the customs or circumstances of employment demonstrate that a teacher has a "legitimate claim of entitlement for job tenure." The United States Supreme Court recognized this right in the case of *Perry v. Sindermann*, 408 U.S. 593 (1972), which also held that where a teacher has attained *de facto* tenure, the teacher is entitled to due process prior to dismissal by the School District.

**The Plaintiff Has Established the Deprivation of a Property Interest**

To have a property interest in a benefit an individual must show he is entitled to the benefit. <u>See</u>, *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972).

Since Plaintiff is non-tenured, her claim of a property interest created by the probationary teachers' statutes must be evaluated in light of *Board of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). The United States Supreme Court stated in *Roth*, supra that the requirements of procedural due process apply only to the interests encompassed by the Fourteenth Amendment's protection of liberty and property. See, *Roth*, supra at 556.

Further, the remedies recognized in *Brown v. State of New York*, 89 N.Y.2d 172 (N.Y. 1996) were the private interests that citizens harmed by constitutional violations have an avenue of redress and the public interest that future violations be deterred. Additionally, plaintiffs must establish grounds that entitled them to damages and in addition to proving their Constitutional rights have been violated. Notably, the money damages must be appropriate to ensure full realization of her asserted constitutional rights. Similar to case at hand, the Plaintiff has suffered a multitude of damages, including but not limited to, bearing a "*badge of infamy*" forever. The Plaintiff was also entitled to the proper procedures as afforded to her in the Collective Bargaining Agreement between the DOE and UFT. As stated in Article 1 of the Contract, "The Board recognizes the Union as the exclusive bargaining representative of all those assigned as teachers in the regular day school instructional program…"  The Plaintiff's position in the DOE was "Teacher" and she taught in the regular day school instructional program. Therefore, she was afforded the due process that was outlined in the contract for all teachers regardless if their status was probationary or tenured.

Although a probationary teacher is not afforded a 3020-A procedure, they are still afforded other procedures directed by the Department of Education's regulations. For example, Article 20 in the contract between the DOE and UFT states:

> "All existing determinations, authorizations, by-laws, regulations, rules, rulings, resolutions, certifications, orders, directives and other

> actions, made issued or entered into by the Board of Education
> governing or affecting salary and working conditions of the
> employees in the bargaining unit shall continue in force during the
> term of the Agreement, except in so far as change is commanded by
> law."

Therefore, all Chancellor Regulations and their procedures are contractual and as such the Plaintiff is afforded due process. As such, the New York City Chancellor Regulations and the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT), applied to Plaintiff's interest in her position regardless of permanency. Plaintiff was in contract with Defendants and they breached said contract. See, a copy of the Opinion and Award of the American Arbitration Association dated June 19, 2019 annexed hereto as Plaintiff's **Exhibit E** which further highlights the Defendants fraud/misconduct. Based on Defendants' actions and arguments regarding this point, it would seem that Defendants believe they are above the law and may partake in any procedure or lack thereof at their own whim regardless of such conduct constituting the violation of Plaintiff's rights. Given the comportment of Defendants, it is clear that they fired Plaintiff for the unlawful reason that she was a white teacher teaching African American students about slavery. Plaintiff's termination of her respective position as a reputable, Middle School teacher is in violation of Title VII of the Civil Rights Act.

**The Plaintiff Has Established a Deprivation of Liberty Interest**

The Due Process Clause protects an individual from a government employer who disseminates false and defamatory information about the individual in connection with his termination. See, *Goetz v. Windsor Cent. Sch. Dist.*, 698 F.2d 606, 610 (2d Cir.1983). While the liberty interest at stake is the employee's reputation, injury to one's reputation by itself is insufficient to invoke due process protections. See, *Paul v. Davis*, 424 U.S. 693, 701, 96 S. Ct. 1155, 47 L.Ed.2d 405 (1976); *Walentas v. Lipper*, 862 F.2d 414, 420 (2d Cir.1988). The employee's liberty interest is only implicated when the employer imposes such a **stigma** as to

22

restrict the employee's ability to obtain future employment, in which case due process requires the government to provide the employee a name-clearing hearing. See, *Baden v. Koch*, 799 F.2d 825, 830–31 (2d Cir.1986). This is commonly referred to as the "*stigma plus*" test. See, *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir.1994).

To satisfy the "*stigma-plus*" test, Plaintiff must prove (1) that she was defamed; (2) that the defamation took place in the course of her termination; and (3) and that stigma foreclosed her from any future employment. See, *Abramson v. Pataki*, 278 F.3d 93, 103 (2d Cir.2002); *O'Neill v. City of Auburn*, 23 F.3d 685, 691 (2d Cir.1994); *Baden v. Koch*, 799 F.2d 825 (2d Cir. 1986) at 830–31. After showing each of the three elements of the "*stigma-plus*" test, Plaintiff must also show that the District failed to provide her a hearing consistent with her due process rights. That is, she must show harm caused by denial of a hearing. See, *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). Defendants claim that Plaintiff has failed to establish a *stigma-plus* claim, which is an inaccurate statement. Public employees who are not afforded the due process of the law are deprived of liberty interests. The reason being because damaging information tarnishes their reputations which in turn, makes it that much more difficult to secure employment.

Defamation is established if the statements made were false and publicly stigmatized the Plaintiff. See, *Abramson*, supra, 278 F.3d at 101–02. "[S]tigmatizing allegations ... include charges going to professional competence when the charges are sufficiently serious." *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 632 (2d Cir.1996). Yet, "[a] statement that an employee poorly performed her duties or acted in an improper manner is insufficient to establish defamation." See, *LaForgia v. Davis*, No. 01 Civ. 7599, 2004 WL 2884524, (S.D.N.Y. Dec. 14, 2004) (quoting, *O'Neill*, supra, 23 F.3d at 692). A temporal link between the defamation and the

23

dismissal is necessary if the employee is to succeed upon a claim of liberty deprivation. See, *Martz v. Incorporated Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir.1994) (holding that in the absence of the necessary nexus between the defamation and the time of termination, defamatory statements in newspaper did not deprive attorney of liberty interest for due process purposes); *Gentile v. Wallen*, 562 F.2d 193, 198 (2d Cir.1977) (stating that alleged defamatory statements made after plaintiff had been terminated from employment as public school teacher amounted to "simple defamation" which does not trigger due process rights). In the present case, the temporal nexus between the defamation and the termination is present.

Similar to the case at hand, the alleged charges against the Plaintiff have placed a negative stigma on her reputation. In connection to the OSI investigation and report, the Defendants made false, stigmatizing statements about Ms. Cummings. The reason being because Defendants never updated nor corrected the record to reflect Plaintiff's full exoneration of the charges placed against her, nor did they correct the record to reflect that the stories being published regarding her and the investigation were actually false. As a result of their actions, Ms. Cummings' professional reputation has been irrevocably harmed and her relationships with other potential employers and organizations have been damaged. There is a presumption that the defendants failed to correct the record because they wanted the $23 million "*for anti-bias training of city educators after the Daily News exposed shocking instances of racism in public schools. In February, The News uncovered allegations of a white Bronx teacher who stepped on a black student during a lesson on slavery....*" "*The stories fueled demonstrations across the city from activists who had pushed for anti-bias training for months without response from the city. Now the 2019 city budget unveiled by Mayor de Blasio includes millions in funding for the training and a plan to offer anti-bias training to all city educators by 2021.*" See, Chapman, Ben, City to Spend $23M for Anti-Bias Training for

<u>Public School Educators</u>, New York Daily News, (online article), April 26, 2018; <u>see also</u>, Plaintiff's Exhibit B at page 25. Had the DOE publicly admitted that the Plaintiff was exonerated of the charges and that the stories published were inaccurate and heinously false, the extortion of these funds would have never occurred. Furthermore, it is important to note that when Richard Carranza took over as the DOE's Chancellor on April 1, 2018, there was an e-mail exchange from April 3 to April 23 between the assigned investigator, OSI Deputy Director, Christina Nowak, Sara Shumway, Director of Academic Policy, and Chris Sandor, Chief of Staff Curriculum, Instruction and Professional Learning. This e-mail exchange not only gave the City the justification it needed for said funding, it also violated Plaintiff's due process as an educator. <u>See</u>, Plaintiff's Exhibit A, at page 5.

Further, in *Sciolino v. Newport News,* US-2229 (4th Cir. Mar. 12, 2007), the court concluded that an employee sufficiently meets the second element when they allege that prospective employers are likely to see the stigmatizing allegations.

The Supreme Court has recognized that there is liberty interest under the Due Process Clause and a liberty deprivation based on reputation. Under that test, there must be an injury resulting from defamation as well as an alteration of legal status. The DOE is a public school district, hence Middle School 118 is a public school. Plaintiff had a state-created constitutionally protected interest in accessing the school building after she was cleared to return to her teaching position for September 2018. However, Defendant Cox abused the DOE's policy of reassignment, removed Ms. Cummings from the school building, and reassigned her out of the building. According to DOE policy and Article 21 of the contract between the DOE and UFT, the DOE may reassign employees who are <u>the subject of an investigation</u> dealing with potential misconduct. Ms. Cummings was cleared of any misconduct as stated in the OSI Report dated July 24, 2018.

25

According to the NYS Department of Labor misconduct is <u>NOT</u> poor judgement. "Misconduct may be found in cases of gross negligence, indifference, or a pattern of recurrent carelessness". (See pattern of Conduct, *infra*; see also *matter of Weinfeld,* 135 A.D.2d 880 (3rd Dep't 1987)("misconduct may be found where an employee is terminated for conduct which exceeds mere carelessness (*Matter of Sisco*, 63 A.D.2d 1094 (3d Dep't 1978) or for negligence which has persisted in spite of warnings (*Matter of Woods*, 52 A.D.2d 696 (3d Dep't 1976)"). "Circumstances which would not justify the imposition of a disqualification for misconduct, include: mere inefficiency, inadequate performance as a result of inability or incapacity, inadvertence or ordinary negligence in isolated instances, or good faith errors in judgement or discretion." (https://uiappeals.ny.gov/system/files/documents/2020/01/part-2-chapter-2.pdf) The Defendant is on the record for stating, by way of their spokesperson Doug Cohen in the New York Daily News' September 28, 2018 article "**White social studies teacher ousted over slavery lesson plans to sue over reverse racism",** that the Plaintiff was terminated "*based on an investigation of this unacceptable behavior and her performance as an educator".* This in no way constitutes misconduct. Second, Ms. Cummings had a constitutionally protected interest in her reputation and good name—a right <u>not</u> to be stigmatized by false statements.  The Defendants <u>NEVER</u> came out to correct the public record—that the Daily News' assertions of fact were <u>not</u> the allegation that were ever investigated. Additionally, Plaintiff shows a change in legal status if she "legally [cannot] do something that [she] could otherwise do." *Latif v. Holder,* 28 F. Supp.3d 1134, 1150 (D Or. 2014) quoting *Miller v. California*, 35 F.3d 1172, 1179 (9th Cir. 2004). Before the arbitrary and capricious termination of Ms. Cummings on October 18, 2018, she had the liberty to work in the field of Education and to be employed as a Secondary Social Studies Teacher, since that is where she has her licensure. However, after her termination, the Plaintiff could no longer find

employment in the job of her choosing, let alone education, and no other district would hire her. Plaintiff has actively attempted to mitigate her circumstances and seek employment in her respective field. Defendant acknowledges in its papers that Connetquot School District was going to hire the Plaintiff for a long-term assignment teaching position at the school until they undoubtedly learned of her wrongful termination and false accusations in the Daily News on Saturday, October 20, 2018. This is evidenced by the e-mail Ms. Cummings received from Connetquot School District at 9:00 am on Monday, October 22, 2018, stating that they would not be able to recommend her to the School Board. Ms. Cummings had to change careers since she was unable to find employment as a teacher. Therefore, Plaintiff has demonstrated a deprivation of her liberty, which is a change in her legal status. For this reason, Plaintiff has suffered a deprivation of her liberty. Therefore, Defendants' argument that Plaintiff lacked a property interest, and therefore was not entitled procedures in place to protect her liberty interest, in her teaching position because she was a "*probationary employee*" fails desperately.

With respect to Plaintiff's procedural due process claims, in *Segal v. City of New York*, 459 F.3d 207 (2d Cir. 2006), the Court held that "in the context of an at-will government employee, a reasonably prompt, post-termination name-clearing hearing satisfies constitutional due process, only as long as the procedures afforded at such a hearing are sufficient to protect the employee's reputational and professional interests. Plaintiff argues that even if an Article 78 proceeding was available to her, which she contends it was not, her reputational and professional interests had already been destroyed and not afforded any protection by the Defendants. Accordingly, the Court should not dismiss Plaintiff's claim that she was deprived of liberty interest without due process.

**Plaintiff's Equal Protection Claim is Meritorious**

The Equal Protection Clause of the Fourteenth Amendment applies to actions by public schools towards their employees. The Equal Protection Clause prohibits discrimination on the basis of national origin, race, color, gender, religion, age or disability. In addition to this Constitutional protection, teachers are protected against similar discrimination by the New York State Human Rights Law, New York City Human Rights Law (if you live in New York City), and Title VII of the Civil Rights Act of 1964. The Supreme Court has held that, when confronted with a Rule 12 (b) (6) motion to dismiss, courts must evaluate complaints of discrimination under the standard set forth in Fed.R.Civ.P. 8, which requires that pleadings present "a short and plain statement of the claim showing that the pleader is entitled to relief." See, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (holding that plaintiffs met Fed.R.Civ.P. 8(a)'s simplified notice pleading standard).

As Defendants have indicated, "The Equal Protection Clause prohibits, *inter alia,* purposeful employment discrimination on the basis of race." See, *Batista v. DeGennaro,* 13 Civ. 1099 (DAB), 2015 U.S. Dist. LEXIS 44022, (S.D.N.Y. Mar. 31, 2015). Defendants' further state Plaintiff's claim of discrimination by the Defendants, because she is Caucasian should be dismissed. Such a statement alone, bolsters the notion that because Plaintiff is Caucasian, her claim of discrimination on that basis should be dismissed, this statement alone is discriminatory. Section 1 of the Civil Rights Act of 1866 states:

> "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, **of every race and color**, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and

>Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

The fact that Defendant, Giulia Cox opted <u>not</u> to interview the other teacher, Ralph Hudson, who was in the room at the time of the Middle Passage lesson, who himself is African American, seems outrageously careless; Defendant Giulia Cox had a legal and supervisory obligation to speak with him, unless Defendant Giulia Cox knew that such an interview would exonerate Ms. Cummings. It should be noted that Defendant, Giulia Cox was under investigation herself and has been forced to resign and retire as principal since this action. There is enough reason to believe that her forced resignation is a result of *<u>her</u>* [Defendant, Giulia Cox] "poor judgment" and the DOE attempting to collude and conceal <u>ALL</u> of the DOE Defendants' improper execution of procedures against Plaintiff. Given that the Defendants make <u>**NO**</u> mention of their violations of the Plaintiffs' 5th and 14th Amendment rights, it should be acknowledged and ratified that they concede to violating her Constitutional rights. Additionally, Plaintiff's action against Defendants is not only for wrongful termination but a majority of the basis of her claim is due to her being discriminated against which resulted in her wrongful termination.

**The Plaintiff has sufficiently Demonstrated a Private Right of Action**

Section 1983 is the mechanism for enforcing constitutional and statutory rights against state actors–i.e., the government. Section 1981, though conceivably able to be violated by the government, provides a remedy against private actors–individuals and businesses–for, among other things, discriminating against someone in contracts on the basis of race. This case stems from the overlap of the two statutes because Defendants are arguably state actors. Plaintiff has alleged that her former employer violated her rights under 42 U.S.C. § 1981. Before 1989, employees or

29

former employees could rely on Section 1981 to challenge various forms of employment discrimination. Then in 1989, the Supreme Court decided *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). The Court ruled that the phrase "make and enforce contracts" applied only to the formation of contracts and subsequent legal enforcement. Id. at 177-78. Section 1981 provides a broad right to employees. The Third Circuit explained in *McGovern v. City of Philadelphia*, 554 F.3d 114, 120-21 (3d Cir. 2009) that "[I]n sum, because Congress neither explicitly created a remedy against state actors under § 1981(c), or expressed its intent to overrule, and held that 'the express cause of action for damages by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in Section 1981." Id.

**The Plaintiff has established a *Monell* Claim**

Under *Monell v. Department of Social Serv.*, 436 U.S. 658 (1978), a municipal government can be held liable under Section 1983 if a plaintiff can demonstrate that a deprivation of a Federal right occurred as a result of a "policy" of the local government's legislative body or of those local officials whose acts may fairly be said to be those of the municipality. An employee must be acting pursuant to a municipal "policy." To establish a municipal "policy," a plaintiff must prove that the municipal action was (I) taken with the requisite degree of culpability and (ii) causally linked to the deprivation of a federal right. See, also, Amendment 14 of the United States Constitution. The actions and statements of these Defendants are indicative of a pattern of discrimination against Caucasian teachers.[6] Here, there are no checks and balances of the authority of the administrators in this regard; they are free to disregard proper protocol and ignore Plaintiff's basic rights, with no

---

[6] "Schools Chancellor Richard Carranza Accused of Demoting Admins Because They Were White"
https://nypost.com/2019/05/18/nyc-schools-chancellor-richard-carranza-has-madewhiteness-toxic-doe-insiders-claim/

accountability. Plaintiff's claims clearly identify a violation of her rights. The municipality cannot use this argument as both a "sword and shield" against Ms. Cummings.

Moreover, deliberate indifference has been clearly established by Plaintiff. There was an obvious and conscious choice to disregard the protocols and to manipulate and fabricate the information against Ms. Cummings. The pleadings demonstrate that Defendants were more than merely negligent in their actions and behavior; ignoring all proper protocols and submitting outdated and fabricated documents in an attempt to sustain a finding against Plaintiff. Thus, Plaintiff's claim has been sufficiently plead, and Defendants' argument must fail.

The equal protection clause of the New York State Constitution (Art I, § 11) does not require identity of treatment; the Legislature may classify persons for purposes of legislation without infringement of the equal protection guarantee and its discretion in this regard is broad and will not be disturbed if any state of facts can reasonably be conceived to sustain its classification or even if the classification be fairly debatable, provided only it shall not be palpably arbitrary. See, *Muessman v. Ward*, 95 Misc. 2d 478, 408 N.Y.S.2d 254, 1978 N.Y. Misc. LEXIS 2450 (N.Y. Sup. Ct. 1978). Plaintiff has sufficiently demonstrated the motivations of the Defendants' actions. As a result, Plaintiff's New York Constitutional claim should not be dismissed.

The Plaintiff was actually told by a colleague in the school that what occurred was the result of "*having a white teacher, teach events of black history to black students*." It was further stated to her that "*only black teachers should be allowed to teach about events of black history to black students*." "*A black teacher could have taught the very same lesson, and there would not have been a single complaint from any student's parent.*" Statements such as these, evidence the

reverse discrimination employed by the Defendants in the way that the Plaintiff was treated, as a Caucasian teacher, teaching in a school that has a significant minority population.

To reiterate, on January 11, 2018, the Plaintiff learned from various students in her class that with regard to concerning the Plaintiff's January 9, 2018 lesson, students' statements were being taken by Assistant Principal, Courtney Ware, collectively and in a classroom setting. This method for taking students' statements was a direct violation of the New York City Chancellor Regulations and the Contract existing between the New York City Department of Education (NYCDOE) and the United Federation of Teachers (UFT), such that, in accordance with New York City Chancellor Regulations, alleged victims and student/staff witnesses are to be interviewed separately and their written statements are to be obtained as quickly as possible, (see, Regulations of the Chancellor A-420 (VI)[B](1); the first set of statements were taken by the Assistant Principal, Courtney Ware, in a classroom setting. This is not the only instance of direct violation of the New York City Chancellor Regulations. There were other violations including, but not limited to the following:

☐   The accused employee must be provided with 48 hour written notice of the right to appear with union representation at an investigative interview to discuss the allegation of corporal punishment. See, Regulations of the Chancellor A-420 (VI)[B](2). The Plaintiff was given a letter directing a disciplinary meeting from the principal, of The William W. Niles School - Middle School 118, Giulia Cox, on January 16, 2018. No mention was made of any allegation of corporal punishment; no Chancellor Regulation was cited in the correspondence;

☐   Upon receipt of any complaint of corporal punishment, OSI will recommend whether the employee should be removed from his/her assignment pending completion of the investigation. See, Regulations of the Chancellor A-420 (V)[A]. According to the investigators, the principal, of The William W. Niles School - Middle School 118, Giulia Cox did **not** inform OSI until February 18, 2018, after the "disciplinary meeting;"

☐   When determining whether to remove the employee, the following should be considered: the severity of the alleged behavior; the prior record of the accused employee; the likely disciplinary action if the allegations are substantiated; the nature and frequency of the contact between the subject students; and any other relevant factors. See, Regulations of the Chancellor A-420 (V)[B]. Giulia Cox, Principal of The William W. Niles School - Middle School 118, only

removed the Plaintiff from teaching class 408, from January 23, 2018 to January 25, 2018, the Plaintiff nonetheless continued to teach her other classes at Middle School 118 during this time;

☐　　If an employee has been removed from his/her assignment pending the outcome of a corporal punishment investigation, the principal shall inform the employee, in writing, of the nature of the investigation, no later than five (5) school days from the date of his/her removal. See, Regulations of the Chancellor A-420 (V)[C]. The Plaintiff was never informed in writing of the nature of the investigation;

☐　　At the time of the meeting with the accused employee, the employee must be provided with an explanation of the allegation of corporal punishment and the opportunity to make a statement. See, Regulations of the Chancellor A-420 (VI)[B](4). There was no allegation of corporal punishment asserted at the January 18, 2018 meeting with Giulia Cox, Principal of The William W. Niles School - Middle School 118, nor was the Plaintiff told she would be removed from teaching class 408, until January 22, 2018;

☐　　If the accused employee requests an opportunity to review student witness statements, or adult witness statements that contain student-specific information, the employee must be provided with an opportunity to review and sign a privacy acknowledgment in the presence of union representation (where such representation is present) that he/she will not disclose the contents of the statements or retaliate against the author(s) of the statements. The UFT union representative also must also be provided the opportunity to review and sign the privacy acknowledgment. See, Regulations of the Chancellor A-420 (VI)[B](4)(a). The Plaintiff asked that the statements be redacted, because it had already been reported to her by other students that certain students, who were failing, were trying to get her fired;

☐　　The principal/designee must evaluate the evidence and credibility of all witnesses, including the alleged victim and the accused employee. See, Regulations of the Chancellor A-420 (VI)[B](4)(a). Instead, Giulia Cox, Principal of The William W. Niles School - Middle School 118, created her own narrative of the alleged incident and despite the Plaintiff' pleas, refused to speak with several witnesses, including Ralph Hudson, another teacher, who is African American, and was present in the classroom on his preparation period, and observed the Plaintiff's lesson on the day in question.

Plaintiff was presumed to be guilty without following the guidelines set forth within the Chancellor's Regulations for investigating allegations, which fall under Article 20 of the Contract between the DOE and UFT. This rush to judgment is a clear denial of due process and the equal protection of the laws. It is unfortunately, a classic example of "reverse racial discrimination" at its worst. Since February 1, 2018, Plaintiff has found herself having to publicly defend her reputation and integrity, as a direct result of the actions of Defendants, particularly the principal of The William W. Niles School - Middle School 118, Defendant, Giulia Cox, whose negligent

actions commenced a course of misconduct designed to conceal her failure and inability to adhere to the New York City Chancellor Regulations and the Contract existing between the DOE and UFT. The principal, Defendant Giulia Cox, recklessly disclosed false and unsubstantiated information to the OSI Investigators prior to and during the investigation and consciously and knowingly tampered with witnesses, to wit: in the disciplinary meeting on January 18, 2018, Ms. Cummings advised Defendant Giulia Cox that Ralph Hudson, another teacher, was present in the classroom on his preparation period and observed Plaintiff's lesson, yet Defendant Giulia Cox refused to speak with Mr. Hudson, flatly stating to Ms. Cummings, "*I don't have to*." Further, Defendant, Principal Giulia Cox told the OSI investigators that Plaintiff's lesson was taught on a different date than it actually was, so that it would corroborate her [Defendant, Giulia Cox] false narrative that Mr. Hudson was not in the room when the lesson was taught. These actions by the Defendant, Giulia Cox and the other City and DOE Defendants, directly resulted in an erroneous fallacious Daily News article, and numerous subsequent articles and reports thereafter, being written and subjecting Ms. Cummings to defamation by numerous individuals. As a result of Defendants' actions, Ms. Cummings has been erroneously and permanently labeled and identified as a "racist," constituting a "*badge of infamy*" with which she has been forever branded. Moreover, she has been publicly humiliated and subjected to public scrutiny, causing a degradation of her professional status and reputation, death threats, and numerous threats of physical harm.

In order to mask Defendants' own inadequacies and to cover up the fact that Defendants erroneously accused Plaintiff of an act, which never occurred, and that they grossly overreacted and exaggerated their diversity and sensitivity awareness in order to appease their constituents, Plaintiff learned (on September 6, 2018, when she reviewed the Report) that Defendants erroneously found in the OSI Investigative Report, that Plaintiff generally "acted with poor

judgment in allegedly conducting a lesson that inadequately incorporated the New York City Department of Education social studies curriculum and guidance for the topic, and that the lesson significantly diverged from best-practices." In actuality, Ms. Cummings' lesson on the Middle Passage was in accordance with the New York State approved standards. See, Plaintiff's Exhibit A, at page 3. It should be noted that "Student A's" parent (who made the initial complaint to the school), curiously refused to permit Student A to be interviewed during the course of the OSI Investigation, likely because they knew that the complaint contained fabricated accusations in the first instance. This is a form of blatant discrimination and racism condoned by these Defendants. Further, as a result of these erroneous acts committed by the Defendants, Plaintiff was subjected to a further review to consider whether her services as a probationer would be discontinued and for possible termination of her employment. She was subsequently terminated as a New York City Public School Teacher at The William W. Niles School - Middle School 118 on October 18, 2018.

Defendant Giulia Cox has repeatedly and egregiously violated the rights of Ms. Cummings. Notably, in or around September, 2018, Plaintiff made a request to view and copy her personnel file; however, Defendant Giulia Cox inexplicably refused to provide Plaintiff with such an opportunity, a blatant violation of Article 21 A, of the Contract between the Board of Education of the City School District of the City of New York and the United Federation of Teachers. Accordingly, Ms. Cummings filed a grievance with the UFT and the Step One was ignored by Defendant Giulia Cox. As such, the UFT agreed that the grievance should go to the next level (Step 2 Grievance a/k/a, a grievance at the Chancellor Level). A decision was subsequently made prior to leaving the hearing on November 13, 2018, wherein Defendant, Giulia Cox stated, that she "can make arrangements to have the original files, and a full paper copy of the file, available for [Plaintiff's] review in the presence of a UFT Secretary at 1 Fordham Plaza." It was then that

Chancellor Representative, Alan Lichtenstein confirmed that "*You [Giulia Cox] agreed to have a complete copy of the file plus the original at 1 Fordham Plaza pending a request for a mutually convenient time.*" Mr. Lichtenstein then confirmed that Plaintiff grievant will provide three dates and Defendant, Giulia Cox will select one." Plaintiff provided the dates as requested in an e-mail to Defendant, Giulia Cox on November 21, 2018, and received the following response: "+ *Alan L. for his input. Have a nice holiday, all!*" Instead, the Chancellor Representative, Alan Lichtenstein, wrote his decision in December, 2018; however, the decision that was written was <u>not</u> what had been agreed to at the prior grievance hearing. The decision instead stated that Defendant, Giulia Cox would e-mail Plaintiff her file, which is also a clear violation of Article 21 A. Furthermore, his decision was signed off on by Karen Solimando, Director of the Office of Collective Bargaining and Labor Relations for the New York City Department of Education. Further, Defendant Giulia Cox sent the e-mail with Plaintiff's personnel file, which blatantly and egregiously violated the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Plaintiff's rights thereunder, by transmitting via e-mail and carbon copying other individuals in said e-mail, Plaintiff's medical records and other personal health information without Plaintiff's consent. Moreover, New York City Department of Education, spokesman Doug Cohen stated on the record in the media, in particular to the Daily News on September 28, 2018, that "[*W]e've begun the process of firing Ms. Cummings based on an investigation of this unacceptable behavior and her performance as an educator.*" Curiously, the 30-day, possible termination notice provided to Plaintiff by District 10 Superintendent Maribel Torres-Hulla, dated September 17, 2018, stated that on October 18, 2018, Ms. Torres-Hulla would be *<u>reviewing and considering rendering whether the probationer services of the Plaintiff would continue</u>*. How could Mr. Cohen have already determined that the process to fire Plaintiff had begun on September 28, 2018, when

Superintendent Torres-Hulla had not yet completed her review and consideration? This demonstrates Defendant's clear violation of Plaintiff's due process and civil rights.

Based on the events leading up to and following Plaintiff's removal as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York, Defendants knew or should have known that the accusations made against Plaintiff were erroneous, and Plaintiff should have never been initially removed from her position in class 408, and subsequently reassigned to Queens South Reassignment Center, at 82-01 Rockaway Boulevard, Queens County, which is informally referred to as "teacher jail." The reassignment to "teacher jail" is a policy improperly utilized by Defendants as a form of "punishment" for teachers, where the teacher's civil rights are continuously and repeatedly violated. Due to the regulations of Defendants, Plaintiff and others likewise situated are deprived of their constitutional right to due process. Plaintiff and other teachers are subject to the unsubstantiated narrative as reported by the principals of their respective schools and referred to "teacher jail" reassignment at the whim of their superiors. 42 U.S.C. §§ 1983 and 1988, provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. Notably, on or about April 9, 2018, it was reported to the UFT that the OSI investigation was completed, and the report was finalized and sent to the Defendant, Department of Education on April 2, 2018. However, the final report, curiously dated July 24, 2018, was not released and provided to Ms. Cummings until September 6, 2018 [almost five (5) months] following when it was reported to have been completed and three (3) months after it is dated. Plaintiff was advised that she should have been returned to Middle School 118 on April 23, 2018, which never occurred, and there was never any

substantiation of the claims made against Ms. Cummings. Further, Defendants' only finding in the OSI Investigative Report is that Plaintiff generally "acted with poor judgment in allegedly conducting a lesson that inadequately incorporated the New York City Department of Education social studies curriculum and guidance for the topic, and that the lesson significantly diverged from best-practices"; this is not even a charge that would be investigated by OSI under any circumstances. Claims relating to pedagogy are handled internally through observations and assessments. This was Defendants' way of "substantiating something," because the investigation of Ms. Cummings was a public relations nightmare for Defendants and was considered a media case. Plaintiff was abruptly removed from her school without merit or cause, and compelled to report to an undesirable location under undesirable conditions without any rational or reasonable basis for her removal and reassignment. She is humiliated and embarrassed by the actions taken against her by Defendants in removing her from her position for the second time in September, 2018 without sufficient justification.

Defendants, their agents, servants and/or employees were careless and negligent in departing from good and accepted practice in the investigation and monitoring of the unsubstantiated claims made against Plaintiff, in screening them before taking action against a teacher, for their credibility, veracity, and reliability; and for the removal of Plaintiff from her position as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York; among other things: in failing to possess the requisite learning, skill, knowledge and judgment ordinarily exercised in investigating and monitoring claims against faculty members; in permitting the media on school property and to question students; in failing to perform certain procedures, which the reasonably skillful and competent personnel would have so done under the circumstances; and in violating

each and every rule, regulation, code statute or ordinance governing the exercise of reasonable care and due diligence concerning the management, and control of the aforementioned situation, including but not limited to, violating the New York City Chancellor Regulations and the contract existing between the New York City Department of Education and the United Federation of Teachers.

Due to the negligence of Defendants, Plaintiff has been significantly damaged. Ms. Cummings' reputation as a respected educator has been irreparably and permanently damaged, the extent of which cannot be measured at this time. Her professional career has been substantially compromised and she has been unwillingly exposed to negative notoriety, which has publicly humiliated and embarrassed her and subjected her to threats of violence, assault, and death.

**POINT III**

**PLAINTIFF'S STATE LAW CLAIMS ARE MERITORIOUS**

**The Plaintiff's Notice of Claim was Timely**

Defendants disingenuously assert that all of Plaintiff's state law claims asserted against the DOE Defendants and all of the tort claims asserted against the City Defendants that accrued before July 3, 2018, are barred. Defendants make no mention of what they have established as the purported claim date. Nonetheless, Plaintiff has complied with the requirements of New York General Municipal Law Section 50-I by serving notices of claim upon City and DOE Defendants within the time required by New York General Municipal Law Section 50-e. Further, at the request of The City of New York, the Plaintiff submitted to hearings pursuant to New York General Municipal Law Section 50-h involving the events as referred to hereinafter. No other hearings have been requested or conducted.

In any event, clearly it would be in the interest of justice to deny a dismissal of Plaintiff's action as to these Defendants. An interest of justice standard requires a careful judicial analysis of the factual setting of the case and a balancing of the competing interests presented by the parties. Factors that might be considered include whether Plaintiff has a meritorious cause of action, prejudice, if any, to Defendants, and the length of any delay. See, *Leader v. Marone, Ponzini & Spencer*, 97 N.Y.2d 95, 736 N.Y.S.2d 291, 761 N.E.2d 1018 (C.A. 2001) at p. 105-106. No one fact is determinative and the calculus of the court's decision is dependent on the competing interests of the litigants. Prior to 1976, many courts construed General Municipal Law § 50 (e) rigidly, thereby depriving claimants of the right to commence a tort action against public entities despite the merit of the claim and the severity of the claimant's injury. In 1976 a remedial amendment to General Municipal Law §50 (e) was proposed and adopted by the legislature. The official committee that proposed said amendment stated that "it is intended that older judicial decisions construing the provisions of General Municipal Law section 50 (e) rigidly and narrowly will be inapplicable as a result of these remedial amendments, which will enable the court to apply the provisions in a more flexible manner to do substantial justice." Significantly, in the published memorandum submitted in support of the said legislation, it was emphasized that:

> "These amendments introduce a degree of flexibility long needed in this area of law, without subverting the basic purposes of a notice of claim provisions. It is intended that these remedial amendments will overrule older decisional law which construed rigidly and narrowly the provisions related to late filing and will enable the court to construe these provisions liberally to do substantial justice." (1976 Legislative Annual; emphasis added.)

Subsequent to enactment of this remedial legislation, courts have (almost) uniformly recognized that the judiciary is now provided with a mandate to liberally construe its provisions; and that they now have been provided with sufficient discretion to afford greater flexibility in granting leave to serve a notice of claim after the ninety (90) day period has expired. See, e.g.,

*Heinman v. City of New York*, 85 AD2d 25, 28, 447 NYS2d 158 [1st Dept. 1982]; *Barnes v. County of Onondaga*, 103 AD2d 624, 627, 481 NYS2d 539, aff'd, 65 NY2d 664, 491 NYS2d 613 [1984]. The purpose behind the Notice of Claim requirement is ostensibly to allow the municipality to investigate the claim while the information is still available and before witnesses depart or conditions change. See, *Beary v. City of Rye*, 44 N.Y.2d 398, 406N.Y.S.2d 9 (1978). This section was designed to act as a shield and not as a sword to defeat rights of people having legitimate claims against a municipal body. See, *Gisondi v. Harrison*, 220 N.Y.S.2d 105, 1961 N.Y. Misc. LEXIS 3680 (N.Y. Sup. Ct. 1961), modified, 16 A.D.2d 929, 229 N.Y.S.2d 698, 1962 N.Y. App. Div. LEXIS 9364 (N.Y. App. Div. 2d Dep't 1962). A late notice of claim may be filed with leave of the Court, upon consideration of "whether the plaintiff has demonstrated a reasonable excuse for the delay, whether the entity to be served acquired actual knowledge of the essential facts within ninety (90) days, or within a reasonable time thereafter, and whether the delay would substantially prejudice the entity in maintaining its defense on the merits." See, *Biss v. City of New York*, (Sup.Ct. Queens County) NYLJ 1/2/97, page 30, cols. 1, 2, GML Section 50-e(5) Op. Cit.; *Sverdlin v. City of New York*, 229 A.D.2d 544, 645 N.Y.S.2d 843; *Calloway v. City of New York Hous. Auth.*, 219 A.D.2d 711, 631 N.Y.S.2d 752; and *O'Mara v. Town of Cortlandt*, 210 A.D.2d 337, 620 N.Y.S.2d 82. Here, even if, assuming *arguendo*, the Court were to consider the date of the suture removal on December 15, 2018, as the accrual date, only thirteen (13) days would have elapsed prior to the date the Notice of Claim was filed on March 28, 2017. It should be noted that Defendants in this case have failed to claim or suffer any prejudice. See, e.g., Matter of Morris, 88 A.D.2d 956, 451 N.Y.S.2d 448, aff'd 58 N.Y.2d 767, 459 N.Y.S.2d 38, 445 N.E.2d 214. In fact, Defendants had an opportunity to acquire knowledge of the essential facts of Plaintiff's claim within a reasonable time, and further by examining Plaintiff in a 50-h hearing on January 16, 2019.

Moreover, Defendants have essentially waived any argument regarding prejudice and untimeliness, by examining Plaintiff in a 50-h hearing.

Where a petitioner sued a school district for negligence, the trial court was found to have abused its discretion in denying his motion for leave to serve a late notice of claim because "it erred (1) in placing the burden solely on him to establish lack of substantial prejudice and by failing to consider whether his initial showing shifted the burden to the district; and (2) by relying on speculation and inference rather than record evidence to find that the district would by substantially prejudiced by the late notice. See, *Matter of Newcomb v. Middle Country Cent. Sch. Dist.*, 28 N.Y.3d 455, 68 N.E.3d 714, 45 N.Y.S.3d 895, 2016 N.Y. LEXIS 3854 (N.Y. 2016), reh'g denied, 29 N.Y.3d 963, 73 N.E.3d 853, 51 N.Y.S.3d 496, 2017 N.Y. LEXIS 811 (N.Y. 2017). The Courts have exercised flexibility and discretion when Defendants have had an opportunity to acquire knowledge of the essential facts of Plaintiffs' claim. See, *Lozada v. City of New York*, 189 A.D.2d 726, 592 N.Y.S.2d 742 (1st Dept.1993) (late filing allowed 8½ months after the 90 day limitations against the Housing Authority where a housing police officer had filed an accident report giving the authority notice of the accident); *Mestel v. Board of Education of the City of Yonkers*, 90 A.D.2d 809,455 N.Y.S.2d 667 (2d Dept. 1982) (late notice of claim was excused where employees of the City were at the scene and assisted the plaintiff at the time of the accident). Here, while it is argued by Defendants that Plaintiff's notice of claim is untimely, under the particular circumstances of this case, assuming *arguendo* that the notice of claim is determined to be untimely, the Court may exercise its discretion in granting the Plaintiff's motion for leave to serve a late notice of claim. See, *Matter of Roland v. Nassau County Dept. of Social Servs.*, 35 A.D.3d 477, 478, 828 N.Y.S.2d 94; *Matter of Belenky v. Nassau Community Coll.*, 4 A.D.3d 422, 771 N.Y.S.2d 379.

**Plaintiff's Tort Claims are Meritorious**

All of Plaintiff's tort claims are meritorious and should not be dismissed as she has sufficiently plead any plausible tort claims.

**Plaintiff's Fraud Claim is Meritorious and Should Not Be Dismissed**

Plaintiff has substantially demonstrated the elements of a fraud claim against the City and DOE Defendants. Plaintiff's Amended Verified Complaint details the false material representations that were perpetrated against Plaintiff to which she relied and ultimately sustained a pecuniary loss. See, Plaintiff's Exhibit B. Based on the events already stated herein, leading up to and following Plaintiff's removal as a New York City Public School Teacher at The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York, Defendants knew (or should have known) that the accusations made against Plaintiff were erroneous, and Plaintiff should have never been initially removed from her position in class 408, and subsequently reassigned. The principal, Defendant, Giulia Cox, recklessly disclosed false and unsubstantiated information to the OSI Investigators, prior to and during the investigation and tampered with witnesses. These fraudulent actions commenced a course of misconduct designed to conceal a failure and inability to adhere to the New York City Chancellor's Regulations and the Contract existing between the DOE and UFT, resulting in the Ms. Cummings' termination.

**Plaintiff's Claims for Negligence and Intentional Infliction of Emotional Distress are Meritorious**

Based on what has been demonstrated in this matter, the City and DOE Defendants' argument that "defamation claims (that involve matters of public concern) cannot be sustained upon a showing of negligence" must fail. Plaintiff has more than established not only that the statements were false statements of fact, but that the City and DOE Defendants acted in a "grossly irresponsible manner without due consideration for the standards of information gathering and

43

dissemination ordinarily followed by responsible parties." See, *Chapadeau v. Utica Observer-Dispatch*, 38 NY2d 196, 199 (1975); see also, *Bloom v. Fox News of LA*, 528 F. Supp. 2d 69, (EDNY 2007).

It is notable to mention that to date, the Department of Education has failed to release any of the supporting documentation of the OSI Report to Plaintiff despite the fact that she has repeatedly made requests through the Freedom of Information Act; it's been over 10 months since her initial request. A copy of the Plaintiff's chain of e-mail requests is annexed hereto as **Exhibit F**. This failure to act appropriately further violates Plaintiff's rights and demonstrates the Defendants' blatant disregard for rules and the law, further highlighting their misconduct. Additionally, the fact they have failed to release the requested documents to Plaintiff, can infer the contention that if the Defendants release said records, it will further substantiate what Ms. Cummings has been pleading.

The Defendants erroneously contend that Plaintiff cannot, as a matter of law, plead negligent infliction of emotional distress (NIED) or intentional infliction of emotional distress. In fact, the Amended Verified Complaint presents a cause of action only for intentional infliction of emotional distress. Initially, while claims of intentional infliction of emotional distress against government bodies have been shown to be barred as a matter of public policy (see, *Lauer v City of New York*, 240 AD2d 543, lv denied 91 NY2d 807; *Wheeler v. State of New York*, 104 AD2d 496, 498), in any event, the pleadings are otherwise sufficient. A cause of action for either intentional or negligent infliction of emotional distress must be supported by allegations of conduct by a defendant "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community'" See, *Murphy v. American Home Prods. Corp.*, 58 NY2d 293, 303, supra, [citation

omitted]; see also, *Howell v. New York Post Co.*, 81 NY2d 115, 121-122). The same standard is applied to both the intentional and negligence theories of emotional distress. See, *Young v. GSL Enters.*, 237 AD2d 119; *Naturman v. Crain Communications*, 216 AD2d 150. Such extreme and outrageous conduct has been plead and thus, the pleadings should survive dismissal. See, *Trachtman v. Empire Blue Cross & Blue Shield*, 251 AD2d 322). To the extent that the statements complained of are true, Plaintiff can claim sufficient distress; thus, dismissal is inappropriate in this case. Moreover, the extreme disparagement of Ms. Cummings' character in this case more than rises to that standard.

Moreover, Plaintiff has substantially pled that the DOE and City Defendants engaged in extreme and outrageous conduct and demonstrated a causal connection between their conduct and her injuries as well as her severe emotional distress. Plaintiff's claims are in substance, much more than a mere reiteration of Plaintiff's belief that she was unfairly terminated. Further, as to the arguments concerning a demonstration of the existence of a special duty, Plaintiff has sufficiently alleged a special relationship; she claims that Defendants were required to monitor, supervise and control, thereby creating a special relationship. A special relationship giving rise to a duty of care can be created in three ways: "(1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; and, (3) when the municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation." See, *Valdez v. City of New York*, 936 NYS2d at 592; *Pelaez v. Seide*, 778 NYS2d 111, 117 (2004). Plaintiff has adequately alleged facts sufficient to demonstrate that she had a special relationship with municipal Defendants, such that they owed her a special duty.

## POINT IV

## PLAINTIFF HAS PROPERLY PLEAD ALL CAUSES OF ACTION
## AGAINST THE DEPARTMENT OF EDUCATION

Defendant, Department of Education (DOE) is a department of the City of New York, and The William W. Niles School - Middle School 118, Community School District 10, in Bronx County, New York, where Plaintiff was employed, is operated by the DOE. Defendants argue that the DOE and the City of New York are separate legal entities, and Plaintiff was employed by the DOE, and not the City of New York, and thus, the claims asserted against the City of New York should be dismissed, as the City is not liable for the actions of the DOE or its employees. However, this is true only absent some action by the City itself. See, NY Ed Law § 2950-g(2); see also, *Williams v. City of New York*, 2014 US Dist. LEXIS 49837 (SDNY Mar. 26, 2014), aff'd, 602 Fed. Appx. 28 (2d Cir. 2015). In this regard, it bears mentioning that the Legislature amended the Education Law in 2002 to grant the Mayor greater control over public schools and limit the power of the DOE. See, L 2002, ch 91; he was appointed to operate New York City's public education system, a.k.a. the Department of Education. Unlike much of the rest of New York state, since 2002, the City's schools have not had elected school boards. They are instead consolidated under the auspices of the Mayor, who appoints the schools' Chancellor and sets policy through the Department of Education. Thus, there is arguably a sufficient nexus in this instance to connect the City and the DOE and its employees. Nonetheless, Plaintiff named and sufficiently plead all causes of action against the Department of Education, which is a Department of the City of New York.

## CONCLUSION

Based on the foregoing, it has been demonstrated that the DOE and City Defendants have failed to meet the standard in this Circuit that is necessary on a motion to dismiss under Rule 12

(b)(6). Accordingly, the Defendants' motion to dismiss should be denied in all respects and

Plaintiff should have such other and further relief that this Court may deem just and proper.

Dated:  Garden City, New York
        August 25, 2020

THE LAW OFFICE OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq. (TL 4471)
Attorneys for the Plaintiff
*PATRICIA CUMMINGS*